## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MASIH ALINEJAD; | |
| *Plaintiff*, | |
| v. | Civil Action No: 1:19-cv-03599-EGS |
| THE ISLAMIC REPUBLIC OF IRAN et al.; | |
| *Defendants*. | |

## PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

The Plaintiff, Masih Alinejad, moves this Court for entry of default judgment against Defendant Islamic Republic of Iran, find Iran liable for its torture and hostage taking against Plaintiff's brother Mr. Alireza Alinejad, and award compensatory damages and punitive damages in favor of Plaintiff.

Plaintiff, Ms. Masih Alinejad, a prominent Iranian American journalist, author, and political activist filed this action against Defendants the Islamic Republic of Iran under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA"), for severe personal injuries and other irreparable harm suffered as a result of Defendants' unlawful acts of terrorism, torture, hostage taking, kidnapping and other torts against; Plaintiff, Mr. Alireza Alinejad-Ghomi (Plaintiff's brother), and Ms. Zarrin Badpa, (Plaintiff's mother).

### I.     FACTUAL BACKGROUND

Plaintiff Masih Alinejad (A/K/A Masoumeh Alinejad-Qomi) is an American-Iranian writer and feminist activist who has achieved international acclaim as an outspoken critic of the Islamic Republic of Iran and the law requiring compulsory hijab for women. She is the sister of Mr. Alireza

Alinejad-Ghomi ("Mr. Alinejad"), who is currently a political prisoner of the Islamic Republic as a result of Ms. Alinejad's activism.[1] Because of her courageous opposition to the regime of the Islamic Republic and its leadership, she has been forced into exile and cut off from her family in Iran, while her loved ones have themselves been subjected to harassment, unlawful arrest, false imprisonment, torture and hostage taking as an attempt to silence her powerful voice.[2]

In 2008, Ms. Alinejad wrote a controversial article criticizing Iranian politician Mahmoud Ahmadinejad and his followers, which was regarded by the Iranian government as offensive towards the Iranian president and the people of Iran.[3] In the weeks surrounding the disputed 2009 Iranian presidential election, due to her journalistic pursuits and political activism, Ms. Alinejad was forced to flee from Iran out of fear for her life.[4] She came to the United States as a political asylee in July 2014, and became a naturalized U.S. citizen on October 17, 2019.[5]

Ms. Alinejad spent about five years after coming to the U.S. documenting human rights abuses by the Islamic Republic of Iran in the aftermath of Iran's rigged 2009 presidential elections. In 2010 Ms. Alinejad, along with a group of Iranian writers and intellectuals, established the "IranNeda" foundation as an outlet for protesting the Iranian government.[6] In 2014, Ms. Alinejad launched a campaign on the social media website Facebook with a page entitled "My Stealthy Freedom" or "Stealthy Freedoms of Iranian Women", which protests compulsory hijab by inviting Iranian women to post pictures of themselves without a hijab.[7] In Iran, women who appear in

---

[1] *See generally* Exhibit 1, Declaration of Masih Alinejad.
[2] *See id.*
[3] *See* Exhibit 10, Nahid Siamdoust, "'Jesus' vs. Ahmadinejad", TIME (May 7, 2008).
[4] *See* Exhibit 1, Declaration of Masih Alinejad ¶ 7.
[5] *Id.* ¶ 1.
[6] *See* Exhibit 11, *Masih Alinejad Profile*, STRIVING FOR HUMAN RIGHTS.
[7] *See* Exhibit 12, Julia Carpenter, "Iranian Women Shed Hijabs for 'Stealthy Freedom' Facebook Page", THE WASHINGTON POST (May 16, 2014); *see generally* Exhibit 13, "My Stealthy Freedom" group page, FACEBOOK.COM.

public without a hijab risk being arrested or attacked: "Under Islamic law in force in Iran since the 1979 revolution, women must wear loose clothing, known as hijab, that covers the head and neck and conceals their hair . . . [m]orality police with the power of arrest patrol public areas and decide if women are observing the law."[8] The campaign quickly attracted international attention and has garnered hundreds of thousands of followers on Facebook. Currently the campaign has more than 1 million followers.[9] In 2017, Ms. Alinejad expanded the campaign through a "White Wednesdays" initiative, which encourages women to post pictures and videos of themselves wearing white headscarves or pieces of white clothing as symbols of protest. This campaign is now the longest-running civil disobedience campaign for women's rights against the Islamic Republic of Iran.[10]

In February 2019, Ms. Alinejad was invited to meet with United States Secretary of State Mike Pompeo.[11] Mr. Pompeo thanked Ms. Alinejad for her bravery and continued dedication to her cause.[12] During their meeting, Ms. Alinejad spoke with Mr. Pompeo about her concerns related to the Islamic Republic of Iran and the human rights violations committed by the regime.[13] As a direct result of Ms. Alinejad's activism, in July of 2019, Iranian officials warned that anyone sending videos to Ms. Alinejad faced up to ten years in prison.[14] Musa Ghazanfarabadi, the head of Tehran's Revolutionary Court, declared Ms. Alinejad an enemy of the state and told Fars News

---

[8] Exhibit 14, "Iranians Protest Over Acid Attacks on Women, Apparently for Not Wearing Veils" ABC NEWS (Oct. 22, 2014).
[9] *See id.*
[10] *See id.*
[11] *See* Exhibit 15, "Secretary Pompeo's Meeting with Iranian Women's Rights Activist Masih Alinejad", *Press Statement*, U.S. DEP'T OF STATE (Feb. 4, 2019).
[12] *Id.*
[13] *Id.*
[14] Exhibit 16, Sonia Elks, "Iranian Women Defy Prison Threats by Sending Veil Photos: Activist", REUTERS (July 31, 2019).

(an Iranian News outlet) that those people found to be sharing protest videos with Ms. Alinejad could be imprisoned for up to a decade under Iranian laws relating to cooperating with an enemy of the state.[15]

During her extensive career, Ms. Alinejad has received numerous death threats from the Iranian government and its agents, and women involved in her hijab campaign have been harassed, detained, arrested and sentenced to lengthy jail sentences inside Iran:

> On 1 June 2019, Saba Kord Afshari was arrested in Tehran in relation to her participation in the White Wednesday campaign against compulsory veiling and due to a video of the protest that was posted on Ms. Alinejad's social media account. Upon arrest, Ms. Afshari was interrogated and then held in solitary confinement for 11 days. She was reportedly told that her father would be killed and her mother would be arrested and that all the private photographs on her telephone would be released if she did not make a confession. She was also reportedly forcibly disappeared for 12 days in July, when she was transferred to a location unknown to her and her family. In August 2019, Ms. Afshari was convicted of three national security-related and morality charges and sentenced to 24 years in prison. She will need to serve seven and a half years if the sentence is upheld on appeal, in line with article 134 of the Penal Code.[16]

In 2014, Iranian state television commentators falsely alleged that Ms. Alinejad was raped by three men in London as an attempt to smear her reputation and inspire fear in any other women who might follow in her example as an activist.[17]

---

[15] *Id.*

[16] Exhibit 17, U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, 2019 Custom Report Excerpts: Iran, HUMAN RIGHTS REPORTS, page 10.

[17] *See* Exhibit 18, Julia Carpenter, "Iranian journalist faces threats, false report of rape after viral Facebook success", THE WASHINGTON POST (June 7, 2014); Exhibit 19, Freda Kahen-Kashi, "Iranian Journalist Denounced as 'Whore' Amid Women's Rights Campaign", ABC NEWS (June 5, 2014) ("'Masih Alinejad is a whore, and not a heretic as some people claim her to be,' [Vahid] Yaminpour wrote on his Facebook page. 'We shouldn't elevate her to the level of a heretic. She's just trying to compensate her psychological (and probably financial) needs by recruiting young women and sharing her notoriety with younger women who are still not prostitutes.'")

Due to her continued activism against the Iranian government, Ms. Alinejad has been unable to return to Iran or see her family for over ten years.[18] The government of Iran has continuously harassed and interrogated Ms. Alinejad's family as an effort to intimidate and put pressure on Ms. Alinejad to prevent her from continuing her activism.[19] The Iranian government has pressured Ms. Alinejad's entire family, specifically her parents, to cease all communications with Ms. Alinejad.[20] Her mother, Zarrin Badpa, has been interrogated multiple times by Iranian agents, and confided in a neighbor that she was held overnight by agents and warned not to contact her daughter again, and that she felt she had no choice but to heed the warning.[21] Thus, since leaving Iran ten years ago, Ms. Alinejad has only been in contact with one family member on a regular basis: her brother, Mr. Alireza Alinejad.[22]

In May of 2020, when Iranian government increased pressure on the Alinejad family, Mr. Alinejad courageously prepared a video of himself[23] to be released in the event of his arrest, in which he encouraged his sister to continue her fight and said that their mother was considering making a statement of condemnation against Ms. Alinejad under duress in order to protect the family and hopefully spare him from arrest after she herself had been interrogated several times. However, he stated that he had no fear of arrest, and gave his sister permission to speak out and continue her advocacy if it should happen. This brave man, knowing the unbearable future ahead of him, encouraged Masih to continue to fight for human rights.[24]

---

[18] *See* Exhibit 1, Declaration of Masih Alinejad.
[19] *See id.*
[20] *See id.* ¶ 15.
[21] *Id.* ¶¶ 35–36.
[22] *See id.* ¶¶ 8–9, 12.
[23] "Alireza Alinejad Encourages His Sister to Continue To Speak Out Against Unjust Iran Regime", uploaded May 3, 2020, available at https://www.youtube.com/watch?v=BWkNsqUcjKQ. *See* Exhibit 20 for English transcript.
[24] *Id.*

On September 24, 2019, a group of agents from the intelligence unit of the Islamic Revolutionary Guard Corps (IRGC) raided Mr. Alinejad's home in Tehran, Iran.[25] Mr. Alinejad was arrested, blindfolded and handcuffed by IRGC agents, and removed from his home in front of his family, including his two small children.[26] Mr. Alinejad was interrogated and kept in solitary confinement in Evin Prison, a notorious site of human rights abuses against prisoners.[27]

On July 15, 2020, Mr. Alinejad was sentenced to eight years in prison for acting against national security, insulting Iranian Supreme Leader Ayatollah Ali Khamenei, and engaging in anti-government propaganda on behalf of his sister.[28] During his arrest he was denied access to a lawyer, and for a long period of time was not allowed to communicate with his family.[29] When he was finally able to speak with family in Iran, the calls were fully monitored and limited.[30]

On February 13, 2021, his request for appeal was denied by the Iranian highest court of appeals. His attorney, Mr. Saeed Dehghan, has stated that Mr. Alinejad's case was rejected as quickly as the appeals for all other human rights cases and said, "It is very rare in a case that a brother is tried and convicted for the crime of having contact with his sister, or for her actions."[31]

As a result of Defendants' actions, Ms. Alinejad has suffered immense emotional trauma. For days after her brother's arrest, she had no information regarding his whereabouts or treatment,

---

[25] Exhibit 40, Roya Hakakian, "Opinion: He Chose Jail Over Disowning His Sister—and Set an Example for All His Countrymen", THE WASHINGTON POST (May 1, 2020).
[26] *Id.*
[27] *See* Exhibit 1, Declaration of Masih Alinejad ¶ 20; *see also* Exhibit 26, "Iran: Family of Women's Rights Activist Arrested in Despicable Attempt to Intimidate Her into Silence", AMNESTY INT'L (Sept. 25, 2019).
[28] *See* Exhibit 21, Alireza Alinejad Order.
[29] *See* Exhibit 1, Declaration of Masih Alinejad ¶¶ 22, 26.
[30] *See* Exhibit 1, Declaration of Masih Alinejad ¶ 26.
[31] Exhibit 22, "Prison for Iranian Woman Rights Activists Confirmed, Alinejad's Appeal Denied", IRAN INT'L, Feb. 13, 2021.

only to learn later that he was being held in section 2A of Evin Prison, which is notorious for its tough and inhumane interrogations.[32]

Alireza Alinejad has now been imprisoned for almost two years, and Ms. Alinejad suffers from anxiety regarding her brother's condition, guilt at the knowledge that his imprisonment and mistreatment is being done to hurt her, and constant fear for how her actions could have negative repercussions for him.[33] Dr. Ramin Ahmadi states that based upon the symptoms of depression, panic attacks, difficulty sleeping and concentrating and constant feelings of guilt and fear that he has observed in Ms. Alinejad in their personal acquaintance, she is likely experiencing post-traumatic stress disorder (PTSD).[34]

To this day, Ms. Alinejad receives constant threats against her life, and repeated public insults from both individuals and the Iranian government.[35]

On July 13, 2021, the U.S. government made public the indictments of several individuals acting on behalf of Iran's Ministry of Intelligence in a plot to kidnap Plaintiff from her home in New York and forcibly return her to Iran.[36] On multiple occasions, the conspirators arranged for invasive surveillance of Ms. Alinejad's home and neighborhood, including photos and videos taken of her family and associates, and installation of a live high-definition video feed of her

---

[32] *See* Exhibit 1, Declaration of Masih Alinejad ¶ 20; *see also* Exhibit 26, "Iran: Family of Women's Rights Activist Arrested in Despicable Attempt to Intimidate Her into Silence", AMNESTY INT'L (Sept. 25, 2019).

[33] *See id.*

[34] Exhibit 4, Declaration of Ramin Ahmadi ¶¶ 6–8.

[35] *See* Exhibit 1, Declaration of Masih Alinejad ¶ 34; Exhibit 39, Documentation of Twitter Threats.

[36] Exhibit 1, Declaration of Masih Alinejad ¶ 37; Exhibit 41, "Iranian Intelligence Officials Indicted on Kidnapping Conspiracy Charges" THE U.S. DEP'T OF JUSTICE (July 13, 2021), available at https://www.justice.gov/opa/pr/iranian-intelligence-officials-indicted-kidnapping-conspiracy-charges.

home.[37] The indictment further indicates that the conspirators researched methods of abducting and transporting Ms. Alinejad out of the United States to Iran, where U.S. Attorney Audrey Strauss notes "[Ms. Alinejad's] fate would have been uncertain at best."[38]

## II.    PERSONAL JURISDICTION OVER IRAN

Courts have personal jurisdiction over a foreign state when that state has been served in accordance with 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b); *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 196, 199 (D.C. Cir. 2005); *see also* Fed. R. Civ. P. 4(j)(1) (requiring that foreign states be served in accordance with 28 U.S.C. § 1608).

In this case, service of process on Iran was obtained pursuant to 28 U.S.C. § 1608(a)(4) by diplomatic note forwarded by the U.S. Department of State to the Foreign Interests Section of the Embassy of Switzerland. Specifically, the U.S. Department of State coordinated with the Swiss government to effect service of the suit papers on Defendant. Because the United States does not maintain diplomatic relations with the government of Iran, the Department of State is assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran in delivering these documents to the Iranian Ministry of Foreign Affairs. Delivery of the documents to the Iranian Ministry of Foreign Affairs was attempted under cover of diplomatic note No. 1192-IE on October 27, 2020. The Ministry of Foreign Affairs refused acceptance on the same day.[39] As a result of the above-described service of process, this Court has personal jurisdiction over Defendants. On January 13, 2021, the Clerk of Court entered a default against Defendant the Islamic Republic of Iran. (ECF. No. 15).

---

[37] *Id.*
[38] *Id.*
[39] *See* Exhibit 8, Swiss Embassy Certification of Service of Process on Defendants.

### III.    SUBJECT MATTER JURISDICTION UNDER 28 U.S.C. § 1605A

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., provides the exclusive basis for subject matter jurisdiction over all civil actions against foreign states. 28 U.S.C. §§ 1330, 1602-1611. Section 1604 of Title 28 provides that foreign states are "immune from the jurisdiction of the courts of the United States except as provided in section 1605-1607 of this chapter." The exception applicable to this case is found in 28 U.S.C. § 1605A(a)(1), which provides that foreign states are not immune from the jurisdiction of U.S. courts where a claimant seeks money damages for personal injury or death that was "caused by an act of torture [or] . . . hostage taking" and the injury or death is attributable to the foreign state's employees or agents or the foreign state's material support of such acts.

Federal courts shall hear a claim under 28 U.S.C. § 1605A if the following three subject matter jurisdictional criteria are met:

- The foreign state was designated as a state sponsor of terrorism at the time the act occurred and remains so designated when a claim is filed. 28 U.S.C. § 1605A(a)(2)(A)(i)(I)

- The claimant or the victim was, at the time of the foreign state's act, a national of the United States, or an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment.     28 U.S.C. § 1605A(a)(2)(A)(ii)(I) and (III).

- In cases in which the act occurred in the foreign state, the claimant has "afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration." 28 U.S.C. § 1605A(a)(2)(A)(iii).

Each of these jurisdictional prerequisites has been met in this case, and this Court has jurisdiction over this matter.

### A.  Evidence of Hostage Taking and Torture Under the FSIA

Plaintiff's brother Mr. Alireza Alinejad is a prisoner of the Islamic Republic of Iran, and has been subject to hostage taking and torture by Iran since 2019.

#### 1.  Evidentiary Standard

Section 1605(A)(a)(1) requires proof of hostage taking or torture. Any discussion of the available evidence of Iran's responsibility for hostage taking and torture in this case should begin with the applicable evidentiary standards. The statute requires that a claimant "establish his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Owens v. Republic of Sudan*, 864 F.3d 751, 784-85 (D.C. Cir. 2017) (describing claimants' burden as a "rather modest burden of production to establish the court's jurisdiction"). In meeting this standard, plaintiffs are not limited to evidence that would be admissible at trial. In *Owens*, this Court stated:

> The district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism. For example we have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial . . . Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge, only where the court relies upon evidence that is clearly inadmissible and essential to the outcome has it abused its discretion.

The trial court is also obligated to adjust evidentiary requirements to the particular circumstances of the case. In *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir 2014), the court described the reasoning behind the loosening of evidentiary standards in cases involving state sponsors of terrorism:

> With these provisions, Congress aimed to prevent state sponsors of terrorism— entities particularly unlikely to submit to this country's laws—from escaping liability for their sins.

> Here, North Korea seeks to do exactly that. The regime made Reverend Kim unavailable to testify on his own behalf, refused to appear in court and subject itself to discovery, and is known to intimidate defectors and potential witnesses . . .
>
> In these circumstances requiring the Kims to prove exactly what happened to the Reverend and when would defeat the Acts very purpose: to give American citizens an important economic and financial weapon . . . to compensate the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future [citation omitted] . . .
>
> Fortunately for the Kims and for Congress's objective the Supreme Court has "recognize[d] very realistically that courts have the authority – indeed we think the obligation – to 'adjust [evidentiary requirements] to . . . differing situations. [citation omitted]

*See also Owens v. Republic of Sudan* at 787-88 (requiring first-hand evidence under FSIA would "effectively immunize the regime from responsibility for its crimes").

### 2. Hostage Taking Under the FSIA

Mr. Alinejad's arrest and sentencing were done for the clear purpose of punishing Plaintiff and anyone who publicly supports her, as will be discussed further below. Under the standard established by the FSIA, Iran is therefore liable for its ongoing acts of hostage taking against Mr. Alinejad as he remains a prisoner of the Iranian government as a political tool to be used against Plaintiff.

#### i. <u>Legal Standard</u>

Pursuant to 28 U.S.C. § 1605(A)(a)(1), hostage taking constitutes a basis for jurisdiction under the FSIA, for which the definition is taken from Article 1 of the International Convention Against the Taking of Hostages:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the

offence of taking of hostages ("hostage-taking") within the meaning of this Convention.[40]

*See also Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 420 (D.C. Cir. 2006); *see also Wyatt v. Syrian Arab Republic*, 362 F. Supp. 2d 103, 112 (D.D.C. 2005). Hostage taking thus has two elements: the abduction or detention, and the purpose of accomplishing "the sort of third-party compulsion described in the [C]onvention." *Simpson* at 359 (quoting *Price*, 294 F.3d at 94).

### ii.   Mr. Alireza Alinejad is a Victim of Hostage Taking

Mr. Alinejad was arrested by agents of the government of Iran on September 24, 2019.[41] Mr. Alinejad's arrest was done with the clear intent of pressuring Plaintiff to stop her efforts as an activist and halt her criticism of the Iranian government. In addition to Mr. Alinejad, other relatives of Plaintiff have also been detained and interrogated, and have clearly indicated that the questioning and treatment they were subjected to related to Ms. Alinejad and her activism. Agents of the Iranian government have gone to Ms. Alinejad's family home and pressured their mother Ms. Zarrin Badpa to publicly disown her daughter on national television on multiple occasions, including shortly after her son's arrest when she was interrogated for hours about her conversations with her daughter, eventually being warned not to contact Ms. Alinejad again.[42]  Since then, the only contact they have had was a brief phone call Ms. Alinejad received from her mother in early 2021 warning her not to travel abroad before disconnecting the call.[43]

---

[40] International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 1316 U.N.T.S. 205.

[41] Exhibit 26, "Iran: Family of Women's Rights Activist Arrested in Despicable Attempt to Intimidate Her into Silence", AMNESTY INT'L (Sept. 25, 2019).

[42] Exhibit 1, Declaration of Masih Alinejad ¶ 36.

[43] Exhibit 1, Declaration of Masih Alinejad ¶ 37.

Additionally, Ms. Alinejad's sister Ms. Mina Alinejad publicly denounced her on National Iranian Television in 2018, which Plaintiff Ms. Alinejad reasonably believes to have been a coerced statement.[44] On the same day that Mr. Alinejad was arrested, two siblings of Ms. Alinejad's former husband were also arrested.[45] Mr. Hadi Lotfi was released after one day of detention, but Ms. Leila Lotfi was detained in jail for more than two weeks.[46] Mr. Hadi Lotfi has stated that during his detention he was interrogated by IRGC agents about Ms. Alinejad's activities and told that future contact with her would be considered a criminal offense.[47]

Mr. Alinejad was sentenced on July 15, 2020 to eight years in prison for acting against national security, insulting Iranian Supreme Leader Ayatollah Ali Khamenei, and engaging in anti-government propaganda. The court order for his sentencing specifically references his affiliation with Masih:

> "Alireza Alinejad is recognized as the liaison and the main arm of the leader of the opposition to the system, Masih Alinejad . . . investigations show that he was in charge of directing, guiding, and persuading Masih Alinejad in organizing anti-cultural actions and security activities, and he has been instrumental in regard to the qualitative and quantitative measures and effectiveness of Masih's anti-cultural and subversive actions aiming at improving the level of feedback and effectiveness of measures in the field of publishing criminal content."[48]

During the same proceedings, Ms. Leila Lotfi and her father, Mr. Hormoz Lotfi, were also sentenced for their affiliation with Ms. Alinejad.[49] Even before Mr. Alinejad's formal arrest, international organizations have acknowledged that Iran's use of threats and harassment against

---

[44] *See* Exhibit 1, Declaration of Masih Alinejad ¶ 14; Exhibit 3, Declaration of Roya Hakakian ¶ 4.
[45] Exhibit 26, "Iran: Family of Women's Rights Activist Arrested in Despicable Attempt to Intimidate Her into Silence", AMNESTY INT'L (Sept. 25, 2019).
[46] *Id.*
[47] *Id.*
[48] Exhibit 21, Alireza Alinejad Order.
[49] *Id.*

the families of activists like Ms. Alinejad, combined with interrogation and eventual arrest, constitute acts of hostage taking.[50]

Based upon both the explicit grounds for Mr. Alinejad's sentencing as well as the implicit intent to put pressure on Ms. Alinejad demonstrated by the interrogation and arrest of her family members, it is clear that Iran has targeted Plaintiff via acts of hostage taking. In particular, Mr. Alireza Alinejad's arrest, sentencing, and ongoing imprisonment are intended by Iran to compel Plaintiff to abstain from speaking out against the Iranian government, and as such, his ongoing imprisonment meets the standard of hostage taking under the FSIA.

### 3. Torture Under the FSIA

As noted above, pursuant to the FSIA, Iran may be held liable for the torture of Mr. Alinejad. Based upon the limited information available to Plaintiff regarding her brother's condition and the wealth of information regarding Iran's longstanding pattern of torture and abuse against political prisoners, Plaintiff asserts that Iran should be held responsible for her brother's ongoing pain and suffering as a victim of political hostage taking, reaching the standard of torture under the FSIA.

### i. Legal Standard

The FSIA adopts the definition of torture found in the TVPA, which itself has been established as the international standard under the U.N. Convention Against Torture:

> **(b) Torture.**—For the purposes of this Act—
> **(1)** the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such

---

[50] Exhibit 28, "Exiled Journalists Threatened, Pressured and Defamed from inside Iran" REPORTERS WITHOUT BORDERS (Oct. 3, 2013 – Updated on Jan. 20, 2016) ("What the Iranian government is doing with journalists' families who remain in Iran is tantamount to taking the families of European and US citizens hostage.")

purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

**(2)** mental pain or suffering refers to prolonged mental harm caused by or resulting from—

**(A)** the intentional infliction or threatened infliction of severe physical pain or suffering;

**(B)** the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

**(C)** the threat of imminent death; or

**(D)** the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Case law under the FSIA has recognized acts qualifying as torture in both physical and psychological contexts. *See, e.g., Frost v. Islamic Republic of Iran*, No. 17-cv-603 (TJK), 2019 U.S. Dist. LEXIS 179750, at \*94-95 (D.D.C. Aug. 26, 2019)("[P]sychological torture — involving electrocution and mock executions that put the victims in constant fear of imminent death — was intended to "break" the individuals and elicit statements contrary to their most fundamental beliefs. In this case, therefore, it is appropriate to consider other situations where victims were held in captivity for a period of time and subjected to similar physical and psychological torture when evaluating the appropriate amount of a pain and suffering award."); *Azadeh v. Islamic Republic of Iran*, No. 16-1467, 2018 U.S. Dist. LEXIS 150597 at \*11-12 (D.D.C. 2018) (finding Iranian actors tortured plaintiff at Evin Prison by confining her in a small cell with poor light and toilet facilities, denying her medical care, and endlessly interrogating and threatening her each day); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 67-68 (D.D.C. 2015) (finding of mental torture based on threats to kill if prisoner refused to confess); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 25 (D.D.C. 2001) (finding of torture based on prisoners being held at gunpoint, threatened with

physical injury for failing to confess, and incarcerated in a room with no bed, window, light, electricity, water, toilet or adequate access to sanitary facilities).

### ii.  Mr. Alireza Alinejad is a Victim of Torture

The nature and purpose of Iran's treatment of Mr. Alinejad satisfies the standard for torture under the FSIA. Two months before Mr. Alinejad's arrest, Amnesty International documented the use of incommunicado detention, prolonged solitary confinement, and threats against family members as tactics being applied by Iranian authorities to force "confessions" from activists detained for participating in Masih Alinejad's campaign against compulsory hijab.[51] In this report, Amnesty International specifically identified the interrogation of Ms. Alinejad's mother, Zarrin Badpa as an example of these abuses.[52] Since the writing of that report, the authorities have made good on their threats to arrest activists' family members through the wrongful imprisonment of Ms. Alinejad's brother Alireza. A subsequent press release by Amnesty International following Mr. Alinejad's arrest indicated that he would be likely to suffer torture during his imprisonment: "The authorities have refused to disclose the whereabouts of Alireza Alinejad and Leila Lotfi and the reason for their arrests. Amnesty International believes that they may be at risk of torture and other ill-treatment."[53]

Mr. Alinejad is in the custody of the Iranian government and has been held since his arrest on September 24, 2019, now for almost two years. He was denied the right to choose his own legal representation, and instead was required to choose counsel from a list of pre-approved

---

[51] Exhibit 25, "Iran: Cruel campaign to extract propaganda 'confessions' from protesters against compulsory veiling", AMNESTY INT'L (July 15, 2019).

[52] *Id.*

[53] Exhibit 26, "Iran: Family of Women's Rights Activist Arrested in Despicable Attempt to Intimidate Her into Silence", AMNESTY INT'L (Sept. 25, 2019).

representatives chosen by the Judiciary of Iran.[54] He has been permitted only supervised phone calls with family, though he is forbidden from contacting Plaintiff.[55] During his imprisonment, Mr. Alinejad has been repeatedly interrogated about his relationship with his sister[56] and it has been reported that he has suffered medical neglect such as refusal to treat an ear infection developed in prison.[57]

International organizations and bodies such as Amnesty International and the United Nations have reported that Iran regularly tortures its political prisoners: "Torture and other ill-treatment, including prolonged solitary confinement, remained widespread and systematic, especially during interrogations . . . Prisoners of conscience were deliberately denied adequate medical care, often as punishment . . . The Islamic Penal Code continued to provide for corporal judicial punishment amounting to torture, including flogging, blinding and amputation."[58] The 2020 Report of the United Nations' Special Rapporteur on the situation of human rights in Iran has documented Iran's practice of torturing its political prisoners and identified Mr. Alinejad as an individual at risk, though official details about his condition have not been made available by Iran: "Reports have also been presented to the Special Rapporteur confirming the use of torture and cruel, inhuman or degrading treatment or punishment to extract confessions . . . The Special Rapporteur is particularly concerned about reports received of increasing pressure on families of

---

[54] *See* Exhibit 1, Declaration of Masih Alinejad ¶ 22.
[55] *Id.* ¶ 26.
[56] *Id.* ¶ 22.
[57] *Id.* ¶ 25.
[58] Exhibit 23, *Annual Report on Iran*, AMNESTY INT'L (2019).

human rights defenders. The arrest of one family member of prominent women's rights defender

Masih Alinejad is emblematic of this trend."[59]

The State Department's 2018 report on Iran further describes the practices of torture

regularly carried out by the Iranian government against political prisoners:

> Credible reports indicate the Iranian regime regularly uses torture and other cruel, inhumane or degrading forms of punishment, particularly in Iran's notorious Evin Prison, which hosts many of Iran's political prisoners. This includes allegations of amputations, blinding, and flogging. The Iranian government also uses *physical and mental torture* to coerce confessions. Political prisoners are routinely denied access to medical care or family visitation. In May 2018, the U.S. Treasury designated Evin Prison for its serious human rights abuses. Despite Iran's denial of torture in its detention facilities, there is little transparency or accountability even to Iran's elected officials. In January 2018, the prison granted limited visitation access to about ten parliamentarians following weeks of parliamentary inquiries and national media coverage.

> Reflecting the dire circumstances of prisoners of conscience in Iran today, several suspicious "suicides" occurred in Iranian prisons in 2018, including the death in custody of environmental activist Kavous Seyed Emami. To date, no transparent or credible investigations have occurred, nor has any Iranian official been held accountable for these deaths. The regime frequently claims custodial deaths were the result of drug addictions, although the individuals in question often do not have a history of drug use.[60] (emphasis added)

Ward Two of Evin Prison, where Mr. Alinejad has been held, has been internationally

recognized as a particular site of human rights abuses against political prisoners.[61] The use of

solitary confinement as a form of torture intended to break the spirit of prisoners and coerce

---

[59] Exhibit 24, Javaid Rehman (Special Rapporteur on the situation of human rights in the Islamic Republic of Iran), *Situation of human rights in the Islamic Republic of Iran*, at 10–13, U.N. Doc. A/HRC/43/61 (Jan. 28, 2020).

[60] Exhibit 31, Iran Action Group, "Outlaw Regime: A Chronicle of Iran's Destructive Activities", U.S. Department of State, 37–38 (2018).

[61] *See, e.g.,* Exhibit 17, U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, 2019 *Custom Report Excerpts: Iran*, HUMAN RIGHTS REPORTS at 7 ("Human rights organizations frequently cited some prison facilities, including Evin Prison in Tehran . . . for their use of cruel and prolonged torture of political opponents, particularly Wards 209 and Two of Evin Prison, reportedly controlled by the Islamic Revolutionary Guards Corps (IRGC).")

confessions and scripted public statements has been widely reported by Iranian political prisoners

and international human rights organizations:

> In Iran, intellectuals, writers, activists and detainees themselves use the term "white torture" to refer to the use of incommunicado solitary confinement *(enferadi)*. The conditions of solitary confinement used against political prisoners are designed to break the resolve of detainees such that they capitulate and agree to be videotaped, sign confessions, and give information regarding their political affiliations and associates. Prisoners are held in solitary cell blocks, many in secret detention centers, often underground, with twenty-four-hour artificial light. They are denied communication with other prisoners and access to attorneys, family members, and medical health professionals.
>
> Under international law, prolonged solitary confinement may rise to the level of torture. The individuals who were interviewed by Human Rights Watch emphasized that their time in absolute solitary was far worse than any physical or verbal abuse they experienced. They spoke of fear of losing their minds, of worrying that another day without any human contact would break their will.
>
> Former prisoners emphasized that the increasing use of solitary confinement against those who criticize the government sends a message to others who might consider engaging in political expression: it is not worth it.[62]

The U.N. Working Group on Arbitrary Detention has noted in its reporting on Iran that "such

absolute solitary confinement, when it is of a long duration, can be likened to inhuman treatment

within the meaning of the Convention Against Torture."[63]

Iran's ongoing treatment of Mr. Alinejad is a form of extreme cruelty designed to inflict

great suffering on both Mr. Alinejad and Plaintiff, with the intention of pressuring Ms. Alinejad to

stop her criticism of the Iranian government. Mr. Alinejad has been and is still being subjected to

severe mental pain and suffering, in addition to likely physical torture, while in the custody and

control of the Iranian government, for the dual purposes of punishing him and obtaining a

confession for his involvement in Ms. Alinejad's activism, and of intimidating and coercing Ms.

---

[62] Exhibit 27, *"Like the Dead in Their Coffins": Torture, Detention, and the Crushing of Dissent in Iran*, HUMAN RIGHTS WATCH VOL. 16 NO. 2(E), p. 19, June 2004.
[63] *Id.* at 20.

Alinejad into ceasing her work. These facts sufficiently establish Iran's use of torture on Mr. Alinejad to meet the standards of section 1605A(a)(1).

**B.  Other Prerequisites for Subject Matter Jurisdiction**

The other requirements for this Court's subject matter jurisdiction under 28 U.S.C. § 1605A are fully satisfied in this action.

### 1.  Iran is a State Sponsor of Terrorism (28 U.S.C. § 1605A(a)(2)(A)(i)(I))

Iran was formally declared a "state sponsor of terrorism" on January 19, 1984, by Secretary of State George Schultz, in accordance with section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App 2405(j). S*ee* 49 Fed. Reg. 2836-02 ("I hereby determine that Iran is a country which has repeatedly provided support for acts of international terrorism."); 22 U.S.C. §2656f(a) ("The Secretary of State shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate, by April 30 of each year, a full and complete report" (the "Country Reports on Terrorism") as to the terrorism-related activities of foreign countries). Iran has been continuously listed by the United States Department of State as a state sponsor of terrorism since 1984.[64]

### 2.  Plaintiff is a National of the United States (28 U.S.C. § 1605A(a)(2)(A)(ii)(I)

Plaintiff was granted status as a political asylee and has been a permanent resident of the United States since July 24, 2014.[65] Plaintiff became a naturalized U.S. citizen on October 17, 2019,[66] and was subsequently a U.S. national at the time of her brother's sentencing in July 2020. Mr. Alinejad has been imprisoned since his arrest on September 24, 2019.

---

[64] *See* Exhibit 29, U.S. Department of State, *State Sponsors of Terrorism*; *see also* Exhibit 30, U.S. Department of State, *2019 Country Reports on Terrorism*.
[65] Exhibit 1, Declaration of Masih Alinejad ¶ 1.
[66] Exhibit 6, Masih Alinejad Certificate of Naturalization.

### 3. Plaintiff Afforded Iran an Opportunity to Arbitrate (28 U.S.C. § 1605A(a)(2)(A)(iii))

Plaintiff offered Defendants a reasonable opportunity to arbitrate the claims in this action. The offer to arbitrate required by the statute "need not precede the filing of the complaint." *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir. 2003) (holding that an offer to arbitrate made after the filing of the complaint was a reasonable offer).

On September 25, 2020, counsel for Plaintiff sent an Offer to Arbitrate via certified mail to Iran's ambassador to the United Nations and to the Interests Section of the Islamic Republic of Iran in Washington, DC. The Offer to Arbitrate stated:

> Pursuant to 28 U.S.C. § 1605A(a)(2)(iii), Plaintiff offers to submit the claims in this action to arbitration in accordance with accepted international rules of arbitration. Defendants may accept this offer to arbitrate within fifty (50) days of receipt of this offer by:
>
> 1. Notifying the undersigned counsel, in writing, of Defendants' acceptance; or
>
> 2. Filing a written acceptance with the Clerk of this Court.
>
> Defendants' failure to comply with the acceptance procedures set forth above shall constitute a rejection by the Islamic Republic of Iran of a reasonable opportunity to arbitrate these claims.[67]

These arbitration offers fully satisfy the offer to arbitrate requirement under the FSIA. *See Asemani v. Islamic Republic of Iran*, 266 F. Supp. 2d 24 (D.D.C. 2003) (finding that service of an offer to arbitrate on the Iranian interest section at the Pakistani embassy in Washington, D.C. is sufficient).

---

[67] *See* Exhibit 9, Plaintiff's Offer to Arbitrate and Electronic U.S.P.S. Certified Mail Return Receipt.

### 4.  Timeliness of Plaintiff's Suit (28 U.S.C. § 1605A(b))

Any argument as to the timeliness of a plaintiff's claims under the FSIA should be raised by the defendants rather than by the Court. *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 330-331 (D.D.C. 2014) ("the statute of limitations is not a requirement for exercise of subject matter jurisdiction"). Because Defendants are in default, the Court need not consider the timeliness of Plaintiff's arguments as a jurisdictional burden to be met by Plaintiff.

However, Ms. Alinejad's claims are nonetheless clearly timely. Plaintiff has been living in exile in the United States since July 24, 2014, and Defendants arrested her brother Alireza Alinejad on September 24, 2019 as a means of pressuring Ms. Alinejad to stop her activism.[68] He was sentenced to eight years in prison on July 15, 2020.[69] Mr. Alinejad's detention is ongoing, and Ms. Alinejad continues to receive threats and pressure from Defendants related to her work: "Today is my brother's birthday in prison. The Islamic Republic took my innocent brother hostage and has sentenced him to 8 years of prison to silence this voice. Meanwhile, regime lobbies abroad have been harassing, bullying, and libeling me on a continuous basis to silence me."[70] Section 1605A(b) of the FSIA indicates that actions should be brought within ten years from the date on which the cause of action arose. Mr. Alinejad's arrest falls within this window of time, and the abuses constituting the causes of action for this case are ongoing today. As a result, Plaintiff's action is timely within the framework of the terrorism exception of the FSIA.

---

[68] *See* Exhibit 32, "Amnesty International Accuses Iran of 'Blatant' Intimidation of Activist with Arrests", RADIO FREE EUROPE (Sept. 26, 2019) ("These arrests are a blatant attempt by the Iranian authorities to punish Masih Alinejad for her peaceful work defending women's rights").
[69] *See* Exhibit 33, "Brother of Anti-Hijab Activist Sentenced to Eight Years in Iran", RADIO FARDA (July 16, 2020).
[70] Exhibit 34, @AlinejadMasih, TWITTER (Feb. 13, 2021 at 1:12 PM), https://twitter.com/AlinejadMasih/status/1360653013707333634.

IV. **LIABILITY AND SCOPE OF DAMAGES**

The FSIA specifically authorizes a private right of action against a foreign state that is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i) and provides that the foreign state shall be liable to a United States national or the legal representative of such person for personal injury or death caused by the foreign state's torture or hostage taking. 28 U.S.C. § 1605A(c). This subsection extends liability to the foreign state if the torture or hostage taking is committed by an official, employee or agent of the foreign state: "In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents." The statute allows the recovery of money damages for a variety of claims, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C § 1605A(c).

Plaintiff seeks recovery for emotional distress suffered by Plaintiff as a result of her brother Mr. Alinejad's torture and hostage taking. Plaintiff also seeks punitive damages. The emotional harm suffered by Ms. Alinejad is described in the attached declarations: Exhibit 1 (Masih Alinejad); Exhibit 2 (Kambiz Foroohar); Exhibit 3 (Roya Hakakian); Exhibit 4 (Ramin Ahmadi); Exhibit 5 (Mehrangiz Kar).

A. **Liability for Solatium and Intentional Infliction of Emotional Distress**

Both solatium damages and punitive damages are specifically provided for in the FSIA statute. Solatium claims and IIED claims in the context of intentional homicide have typically been held to be "indistinguishable" under the FSIA. *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135, note 11 (D.D.C. 2001)("In an intentional homicide case such as this, however, solatium appears in any event to be indistinguishable from the intentional infliction of emotional distress.")

However, Ms. Alinejad's grounds for solatium and IIED claims diverge from the standard plaintiff's under the FSIA terrorism exception. Ms. Alinejad claims solatium and IIED damages as a close family member of an individual subjected to Defendants' acts of assault and battery, wrongful imprisonment, torture, and hostage taking against her brother Mr. Alinejad, but also claims damages on the grounds of intentional infliction of emotional distress as she herself is the political figure who Defendants seek to pressure and compel by means of the harassment and hostage taking of her family members.

### 1. Plaintiff is Entitled to Solatium and IIED Damages as an Immediate Family Member of Mr. Alireza Alinejad

Solatium damages have been described as compensation "for mental anguish, bereavement and grief that those with a close personal relationship" to a decedent or person held and tortured; these damages are also appropriate to compensate those closely-related persons for "the harm caused by the loss of decedents' society and comfort." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d at 72. This Court has established that in hostage cases, the FSIA allows recovery for immediate relatives—defined to include siblings—on the grounds of intentional infliction of emotional distress wherein the "plaintiff need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family." *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 (D.D.C. 2001) ("This Court defines one's immediate family as his spouse, parents, siblings, and children. This definition is consistent with the traditional understanding of one's immediate family.")

Ms. Alinejad and her brother Alireza are particularly close: "I was born in a tiny village in northern Iran to a poor farming family. My brother Alireza and I were the two youngest of five children in the family and we developed close bond. My brother, 18 months older than me, not only acted as a big brother teaching me little things like riding a bicycle but also introduced me to

great works of literature and politics. He was my guardian angel."[71] According to Ms. Alinejad and her friends, Alireza has been a source of great emotional support to his sister throughout her time in the public eye as an activist and dissident, and has reassured her throughout the threats she has received and the likely coerced denunciations of other relatives: "Amid all the threats she was receiving and all the ties she had lost to her most loved ones, Alireza alone could be her lifeline."[72]

Alireza has refused to denounce his sister. As a result, he has been the victim of harassment, wrongful imprisonment, torture, and hostage taking by the Iranian government as they seek to pressure Ms. Alinejad into discontinuing her public activism by harm and threat of harm towards her loved ones. Because of his arrest and ongoing mistreatment, Ms. Alinejad suffers from severe emotional trauma and fear for her brother. She struggles with depression and anxiety, and exhibits symptoms aligned with PTSD such as difficulty concentrating and sleeping and lack of appetite.[73]

The torment Ms. Alinejad experiences at her brother's arrest and mistreatment is heartbreaking. Her husband watched as she lost more than ten percent of her body weight and developed violent nightmares.[74] Her feelings of guilt prevent her from enjoying experiences that she knows her brother cannot share, such as going out to restaurants with family.[75] She describes her brother's absence as "a big hole in my life" and writes, "If the aim of the Islamic Republic was to hurt me deeply, let me confess that they have succeeded. I have lost my bearings."[76] In having

---

[71] Exhibit 1, Declaration of Masih Alinejad ¶ 3; *see also* Exhibit 7, Photo of Masih Alinejad and her brother Alireza on a rice farm in the village of Ghomikola, Iran in 2007.
[72] Exhibit 3, Declaration of Roya Hakakian ¶ 6; *see generally* Exhibit 1, Declaration of Masih Alinejad.
[73] *See* Exhibit 1, Declaration of Masih Alinejad ¶¶ 19–20, 27, 29–32; *see generally* Exhibit 2, Declaration of Kambiz Foroohar; Exhibit 4, Declaration of Dr. Ramin Ahmadi; Exhibit 3, Declaration of Roya Hakakian; Exhibit 5, Declaration of Mehrangiz Kar.
[74] Exhibit 2, Declaration of Kambiz Foroohar ¶ 12.
[75] *Id.* ¶ 14.
[76] Exhibit 1, Declaration of Masih Alinejad ¶ 27.

her brother torn away so unjustly, she not only suffers from knowledge of his likely torture and abuse but also is deprived of her connection to her family and home in Iran:

> "I miss talking with Alireza in our Mazni dialect and exchanging stories.  In the center of my garden in Brooklyn, I have planted a cherry blossom tree and named it after Alireza. When I feel sad and depressed, which is quite often these days, I go outside and talk to the tree as if it was Alireza. It's a one-way conversation but at least I get to pretend that I'm talking with my brother. I've planted a cherry tree for my mother and a peach tree for my father. These are all to remind me of my birthplace."[77]

Ms. Alinejad makes video recordings of herself every day that she dreams of one day being able to share with him, in which she talks to her brother about her life and how much she misses him.[78] As an internationally recognized figure for women standing against oppression, she feels the need to put on a brave face in her public life, but her loved ones have seen the terrible burden these experiences have placed on her:

> "While she still carries on, those like me who intimately know her can see how the experience has taken a toll on her, though she rarely speaks of it. Her sleep is disturbed when she visits with us. She goes to bed long after everyone else, and is awake before everyone else. She eats less, and works more. She works more dedicatedly than ever, but I've no doubt that it is the work that keeps her from thinking about all that she has lost, and all that she yearns for. A single one of these losses could cripple anyone. But all of them combined carry a sort of lethality that only a cruel system aiming to annihilate another could exercise."[79]

Other Iranian dissidents such as Mehrangiz Kar have suffered similar anguish, and can attest to both the unimaginable emotional impact of Defendants' actions and the scope of abuses that Iranian political prisoners may be subjected to. Ms. Kar is a world-renowned human rights lawyer and advocate for women's rights.[80] Both she and her husband, Siamak Pourzand, were imprisoned for speaking out against the regime. In November of 2001, Mr. Pourzand was arrested and

---

[77] *Id.*
[78] *Id.* ¶ 31.
[79] Exhibit 3, Declaration of Roya Hakakian ¶ 8.
[80] *See* Exhibit 5, Declaration of Mehrangiz Kar ¶ 2.

subjected to a sham trial and forced confession to crimes he did not commit.[81] During his years in prison he suffered psychological and physical torture, leading to severe, life-threatening health problems.[82] As a result of her husband's wrongful imprisonment and torture, Ms. Kar suffered from severe anxiety and depression, nightmares, and paranoia just as Ms. Alinejad is currently experiencing.[83] She writes:

> "Having experienced the same abusive practices at the hands of the Islamic Republic, I know well the pain that she is undergoing. When the regime takes a loved one hostage, every day is filled with feelings of guilt for the harm being visited upon that person due to your actions, and fear for how every word or action you make could cause them further suffering."[84]

### 2. Plaintiff is Entitled to IIED Damages as the Political Target of the Hostage Taking of Mr. Alireza Alinejad

This Court has recognized grounds for family members' IIED claims in hostage taking cases:

> The Court finds that, when an organization takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostage's immediate family. Further, the Court finds that an organization taking someone hostage implicitly believes that such emotional distress is substantially certain to result. These conclusions are based on the logical inference that a hostage without loved ones--that is, a hostage without those who will be emotionally distressed by his absence--is of no value at all to a hostage-taker. For without loved ones, there is nobody to pay for the hostage's release. And even if the hostage's country (rather than his family) pays for his release, a hostage's loved ones play a vital role in agitating for governmental action. Governments rarely remain complacent when such complacency could be actively exposed by a hostage's family. *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 50 (D.D.C. 2001).

However, in this case, Ms. Alinejad is not merely a close family member of Mr. Alireza Alinejad. The third party who Iran seeks to influence and control through Mr. Alinejad's hostage taking is

---

[81] *Id.* ¶ 8.
[82] *Id.* ¶ 11.
[83] *See id.* ¶ 13.
[84] Exhibit 5, Declaration of Mehrangiz Kar ¶ 16.

Plaintiff herself. Her emotional distress is not merely implicit based on her relationship with Mr.
Alinejad, but is the specific goal of Defendants and the direct purpose for his being taken hostage.
Ms. Alinejad is an outspoken critic of the government of Iran and has received international
recognition and acclaim. She has been a permanent resident of the United States since 2014, and
a naturalized U.S. citizen since 2019.[85]  As such, she is outside of the jurisdiction of the Iranian
government and cannot be imprisoned as a dissenter unless she is kidnapped or voluntarily returns
to Iran. However, it is a frequent practice of the Iranian government to use other methods of
pressure to silence dissenters who reside outside of the country, including the seizure of assets and
the detention of family members:

> In other words, the propaganda programmes, especially the use of footage of forced
> confessions or that of individuals being arrested, seem to have been used as a means
> of punishment. In fact, not only parts of these programmes are made using torture,
> but they are also used as means of torture themselves . . . footage of US-based
> women's rights activist Masih Alinejad's family denouncing her on national TV
> was aimed at inflicting psychological pain on Alinejad herself . . . by broadcasting
> these programmes, especially in the case of dual nationals, the Islamic Republic
> creates pressure on their families and compatriots to push their own governments
> to comply with the Islamic Republic's demands.[86]

Mr. Alireza Alinejad is not himself a political actor; his arrest and subsequent mistreatment at the
hands of Defendants were done with the obvious intent of pressuring Ms. Alinejad to cease her
criticism of Iran and her feminist activism.

In addition to the acts of torture and hostage taking committed against Mr. Alinejad,
Plaintiff has also been the direct recipient of death threats and public slander:

> About two weeks ago, I received a gruesome death threat from Hamid Reza
> Ahmadabadi, one of the more prominent figures of the Basij—Iran's much-dreaded
> paramilitary arm. In his message, he said I'd be butchered because I had been
> insulting the sanctity of Iran's revolutionary and Islamic values. He warned that

---

[85] *See* Exhibit 6, Masih Alinejad Certificate of Naturalization.
[86] Exhibit 35, FIDH/Justice for Iran, *Orwellian State: Islamic Republic of Iran's State Media as
a Weapon of Mass Suppression*, No. 749a (June 2020) at 51–52.

one of his agents in the United States would cut out my tongue and slash my breasts before killing me. I was to be "slaughtered" in the same manner that former opposition leaders had been murdered abroad in the 1990s.[87]

Ms. Alinejad's home address has been made public on the Internet, and she receives hundreds of threats of death, kidnapping and torture.[88] She has even had to further distance herself from her family in a desperate attempt to keep them safe: "Whenever there is a political development, the level of threats increases many folds. For the past nine months, I've received special protection from local police and the federal agencies and at times have stayed at a safe house. Because of the death threats against me, I took the precaution of sending away my two stepchildren for a few months."[89] Members of the Iranian parliament have called for drastic action to be taken against Ms. Alinejad and her family; essentially calling for their murder, according to her husband.[90] They also fear the possibility of an acid attack, a horrific method of silencing female activists which has seen increased use in Iran in recent years.[91]

Iran's practice of assassination and execution of dissidents is horrifyingly evident. In October 2019, the Islamic Revolutionary Guard Corps ("IRGC") kidnapped dissident and journalist Ruhollah Zam while he was traveling to Iraq and forcibly returned him to Iran.[92] In July 2020, Mr. Zam was sentenced to death on the charge of "spreading corruption on earth" and on December 12, 2020 it was announced by Iranian state media that he had been executed by

---

[87] Exhibit 36, Masih Alinejad, "Iran's Basij promised to butcher me for fighting compulsory hijab", THE WASHINGTON POST (March 28, 2018).
[88] Exhibit 1, Declaration of Masih Alinejad ¶ 34.
[89] *Id.*
[90] Exhibit 2, Declaration of Kambiz Foroohar ¶ 16.
[91] *Id.*; *see also* Exhibit 14, "Iranians Protest Over Acid Attacks on Women, Apparently for Not Wearing Veils" ABC NEWS (Oct. 22, 2014).
[92] *See* Exhibit 37, "Iran: UN experts condemn execution of Ruhollah Zam", OHCHR (Dec. 14, 2020).

hanging.[93] Following Mr. Zam's sentencing, Ms. Alinejad was targeted by official newspapers of the Iranian National Television saying "Masih be ready! You're the next to be kidnapped" and political cartoons warning that she was next on the regime's list.[94] On July 13, 2021, the U.S. government revealed the indictment of four Iranian nationals who were conspiring to forcibly abduct Ms. Alinejad and return her to Iran, and who had been actively surveilling her, her family and friends, and spying on her residence for months after unsuccessfully attempting to convince her family to lure her to a third country to more easily kidnap her.[95]

Defendants' actions have been deliberately calculated to cause emotional distress to Ms. Alinejad with the goal of punishing her for her activism and pressuring her to stop for fear of her own safety and her family's. As such, Ms. Alinejad is entitled to damages for IIED as a political target, in addition to her claim for solatium and pain and suffering damages as Mr. Alinejad's sister. The trauma of her brother's mistreatment is compounded by the knowledge that his imprisonment is directly related to her own actions, leading to feelings of extreme guilt and anxiety that her current actions could have further negative consequences for her brother:

> "I think about my every action and statement and whether it would hurt Alireza. After Quds Force commander Qassem Soleimani was killed in a drone strike, I was petrified that as retaliation my brother could be executed. Or when I launched a campaign for the Islamic Republic to be banned from international sports competition, I received threats that Alireza would receive additional punishment. Since Alireza's arrest, I have had trouble sleeping and have to take medication to fall asleep. Even then, my sleep is full of nightmares of Alireza being tortured and hanged in the main square in Tehran, or that I am in Iran trying to rescue him but

---

[93] *Id.*

[94] Exhibit 39, Documentation of Twitter Threats: @AlinejadMasih, TWITTER (Aug. 3, 2020 at 10:13 AM) https://twitter.com/AlinejadMasih/status/1290291711692795905; *see* Exhibit 38, Masih Alinejad, "Iranian Officials Have Declared They Want to Kidnap Me. It's Happened to Others Before." THE WASHINGTON POST (Aug. 10, 2020).

[95] Exhibit 1, Declaration of Masih Alinejad ¶ 37; Exhibit 41, "Iranian Intelligence Officials Indicted on Kidnapping Conspiracy Charges" THE U.S. DEP'T OF JUSTICE (July 13, 2021), available at https://www.justice.gov/opa/pr/iranian-intelligence-officials-indicted-kidnapping-conspiracy-charges.

no one can hear my screams. In some nightmares, Alireza's two children, Baran (12) and Rayan (3), have become destitute."[96]

### 3. Quantum of Solatium and IIED Damages

In deciding an appropriate damages award in FSIA claims, courts have regularly considered damages claims in similar cases and then adjusted those claims to fit the particular circumstances of the case before them. *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 85 (D.D.C. 2017)("These numbers serve only as a baseline from which the Court may deviate in order to compensate for specific circumstances.") As discussed above, Ms. Alinejad has suffered severe emotional anguish due to Iran's mistreatment of her brother Mr. Alireza Alinejad, which continues today as he remains in captivity. It is inarguable that as a sibling of Defendants' victim, Ms. Alinejad is entitled to recovery of damages. However, such damages should not be limited to the range of ordinary damages awards to siblings, due to the unique circumstances of this case. Prior FSIA cases before this Court have established that the scope of damages awarded to siblings are calculated based on the facts surrounding the parties and events, and greater awards may be made based upon the closeness of the relationship and the specific facts of the case:

> "Courts have found several factors significant when considering whether to award a higher sum: (1) whether family members had an "extraordinarily close relationship" to the victim, *see Jenco*, 154 F. Supp. 2d at 38 (noting upward deviation may be proper when victim "fulfil[s] the role of father for his brothers"); (2) whether the family member's emotional trauma was particularly severe, see *Oveissi*, 768 F. Supp. 2d 16, 29 (D.D.C. 2011) (awarding 50% upward deviation from *Heiser* framework to grandson of victim whose trauma affected his development at a young age because his family was forced to go into hiding); *Valore*, 700 F. Supp. 2d at 86; and (3) whether the circumstances of the attack made the suffering particularly agonizing for the family." *Abedini v. Gov't of the Islamic Republic of Iran*, 422 F. Supp. 3d 118, 140 (D.D.C. 2019).

In this case, Plaintiff is entitled to solatium and IIED damages in excess of the range typically provided to siblings under the FSIA. Ms. Alinejad and her brother are close in a way that

---

[96] Exhibit 1, Declaration of Masih Alinejad ¶¶ 29–30.

exceeds that of other members of their family; he is the sole relative in Iran who dared to remain in regular, close communication and keep her up to date on the well-being of other relatives after she fled to the U.S. in exile, and has refused to denounce her even after other relatives were forced to give in to overwhelming pressure by the Iranian government to do so.[97] Additionally, Ms. Alinejad's own conduct is the basis for Mr. Alinejad's hostage taking and torture. Defendants seek to silence Ms. Alinejad, and to compel her brother to publicly renounce her and her activism. It is impossible to fully describe the profound anguish and trauma that such circumstances have caused and continue to cause Ms. Alinejad. Defendants' purpose for targeting Mr. Alinejad is to inflict such emotional pain and fear upon Plaintiff that she gives up her life's work as an activist, and to force Mr. Alinejad to publicly denounce his sister in a way that would dissuade any others from following her example.

This conduct goes beyond the typical circumstances of intentional infliction of emotional distress upon siblings in hostage taking cases where the victim is being punished for his own actions, or held as a political prisoner to place pressure on a foreign government. Defendants want Ms. Alinejad personally, specifically, to suffer and live each day in fear due to their treatment of her brother. As a result of Defendants' actions, Ms. Alinejad has suffered loss of solatium where her closest family member has been taken hostage and sentenced to eight years in prison for his support of her, and also experiences ongoing pain and suffering as a result of his torture and hostage taking with the knowledge that forsaking her political ideals could potentially spare him this fate.

Though Ms. Alinejad is already entitled to damages as a sibling of a victim of hostage taking, in this case because Mr. Alireza Alinejad is serving as a political proxy for Plaintiff who is

---

[97] *See* Exhibit 1, Declaration of Masih Alinejad ¶¶ 8–9.

the true target of Iran's actions, Plaintiff should be assigned a greater damages award comparable to that of a direct victim rather than a relative. In the recent case of *Rezaian v. The Islamic Republic of Iran*, 422 F. Supp. 3d 164, 180 (D.D.C. 2019), journalist Jason Rezaian requested non-economic damages for the period of his hostage taking by Iran to be calculated at $10,000 per day of detention. In addition to non-economic damages for the duration of his imprisonment, this Court granted Mr. Rezaian $10,000,000 USD as a lump sum in non-economic damages for post-imprisonment pain and suffering. Mr. Alireza Alinejad has served approximately a year of his eight-year sentence, which is expected to continue until July 15, 2028, a total of 2,922 days. As a result, Plaintiff asks that this Court award non-economic damages in the amount of $10,000 per day of his sentence totaling $29,220,000, with an additional $10,000,000 USD for the pain and suffering Plaintiff and her brother will continue to experience after he is hopefully released at the end of his sentence, for an overall non-economic damages award of $39,220,000 USD.

### B. Liability for Economic Damages

Under the FSIA, economic damages may be awarded for personal injury or death caused by a foreign state or its officials, employees or agents acting in an official capacity. 28 U.S.C. § 1605A(c)(4). Plaintiff reserves the right to raise claims for economic damages based on the circumstances that may arise prior to the resolution of this suit.

### C. Liability for Punitive Damages

The FSIA statute also provides for punitive damages. 28 U.S.C. § 1605A(c). Punitive damages under the FSIA are intended to "punish and deter the actions for which they are awarded." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55-56 (D.D.C. 2012); *see also Kim v. Democratic Republic of Korea, supra,* at 290-91 ("Punitive damages are not meant to compensate

the victim, but [are] instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future.")

Dissidents who manage to leave Iran and seek asylum in the United States are still not truly free, as Ms. Alinejad's case demonstrates. As long as they have loved ones in Iran, they must live in daily fear for those friends and family members, knowing that they could be subjected to torture, hostage taking, and even death solely because of their relationship. Through its threats against Ms. Alinejad and the unlawful arrest, hostage taking and torture of her family, Iran has behaved in an outrageous and vile manner. Iran should be punished for that behavior and deterred from repeating it.

### 1. Quantum of Punitive Damages

While Courts have routinely awarded punitive damages in FSIA cases, they have used different methodologies in determining an appropriate amount. *See, e.g., Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 65–70 (D.D.C. 2018) and *Braun* at 86–87. In determining both an appropriate methodology and the amount of a punitive damages award, the court is required to consider certain factors. These are "(1) the character of the defendant's act (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause (3) the need for deterrence, and (4) the wealth of the defendants." *Warmbier* at 59. In this case, each of these factors weighs in favor of a substantial punitive damages award.[98]

Because of her activism, Ms. Alinejad has been forced to flee her home country and live in exile in the United States, while her family members who remain in Iran have lived under constant threat of arrest, torture, and even death due to their connection to her. Mr. Alinejad has

---

[98] In FSIA cases, "foreign sovereigns cannot use the constitutional constraints of the Fifth Amendment due process clause to shield themselves from large punitive damages awards." *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 106 (D.D.C. 2012).

been imprisoned for almost two years so far and is sentenced to another approximately seven years of imprisonment on sham grounds, simply because of his relation to Plaintiff. Ms. Alinejad is not alone in suffering the kinds of threats and emotional pressure used against dissidents, and Mr. Alinejad is one of many political prisoners arbitrarily and illegally arrested, detained, and tortured to quell dissent: "There would be nothing newsworthy about yet another unwarranted arrest in Iran, except that this one involves an unusual story of familial love, with a brother making a profound sacrifice for the sake of his sister."[99] It is imperative that Iran's behavior be deterred. It is part of a long pattern of human rights violations defying international and civilized norms, and international bodies have long called on Iran to cease these practices without success. Iran is a vast nation with substantial resources. Only a substantial punitive damages award has any chance of deterring its behavior.

In a recent case similarly based upon torture and hostage taking, the court chose to award punitive damages of $150,000,000 each to the mother, father and estate of the victim, Otto Warmbier, for a total punitive damages award of $450,000,000. *Warmbier* at 68–70. The court in *Warmbier* chose that amount because the acts committed by North Korea were "awful and worthy of the gravest condemnation" and because "North Korea is heavily aware of the political environment in the United States, including judgments issued by United States courts." The same can be said of Iran's actions in this case, and Iran's specific, public targeting of Plaintiff through her family due to her political activism would therefore support a punitive damages award of $150,000,000 USD.

---

[99] Exhibit 40, Roya Hakakian, "Opinion: He Chose Jail Over Disowning His Sister—and Set an Example for All His Countrymen", THE WASHINGTON POST (May 1, 2020).

## V.    CONCLUSION

Plaintiff respectfully requests that this Court enter a default final judgment in her favor and against Defendants. This Court has personal jurisdiction over Defendants, as well as subject matter jurisdiction over the claims in this action. Defendants, despite being provided notice and an opportunity to be heard, have declined to defend this action. The Defendants' silence says volumes about their culpability.

Plaintiff's damages are compelling and significant. The facts before the Court demonstrate that Plaintiff is fully entitled to the recovery of sizeable monetary damages for Defendants' outrageous behavior.

Accordingly, Plaintiff requests that this Court award the following monetary damages:

1.    Compensatory Damages:  $39,220,000 USD

2.    Punitive Damages:      $150,000,000 USD

3.    Total Damages:  $189,220,000 USD

Respectfully submitted,

Ali Herischi, Esq.
MD0024
Herischi & Associates LLC
7201 Wisconsin Ave. Ste. 440
Bethesda, MD 20814
ali.herischi@ibhlaw.com
Tel.: 301.363.4540
Fax: 301.363.4538

*Counsel for Plaintiff*