# EXHIBIT 17

**REPORT OVERVIEW**

★ ★ ★

# 2019 Country Reports on Human Rights Practices: Iran

**BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR**

 **DOWNLOAD** 🔴 **[651 KB]** / **TRANSLATIONS** / **Share** 🔗

In this section /

☰    Executive Summary

---

## Executive Summary



# IRAN 2019 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

The Islamic Republic of Iran is an authoritarian theocratic republic with a Shia Islamic political system based on *velayat-e faqih* (guardianship of the jurist).  Shia clergy, most notably the *rahbar* (supreme leader), and political leaders vetted by the clergy dominate key power structures.  The supreme leader is the head of state.  The members of the Assembly of Experts are nominally directly elected in popular elections.  The assembly selects and may dismiss the supreme leader.  The candidates for the Assembly of Experts, however, are vetted by the Guardian Council (see below) and are therefore selected indirectly by the supreme leader himself.  Ayatollah Ali Khamenei has held the position since 1989.  He has direct or indirect control over the legislative and executive branches of government through unelected councils under his authority.  The supreme leader holds constitutional authority over the judiciary, government-run media, and other key institutions.  While mechanisms for popular election exist for the president, who is head of government, and for the Islamic Consultative Assembly (parliament or *majles*), the unelected Guardian Council vets candidates, routinely disqualifying them based on political or other considerations, and controls the election process.  The supreme leader appoints half of the 12-member Guardian Council, while the head of the judiciary (who is appointed by the supreme leader) appoints the other half.  Parliamentary elections held in 2016 and presidential elections held in 2017 were not considered free and fair.

The supreme leader holds ultimate authority over all security agencies.  Several agencies share responsibility for law enforcement and maintaining order, including the Ministry of Intelligence and Security and law enforcement forces under the Interior Ministry, which report to the president, and the Islamic Revolutionary Guard Corps (IRGC), which reports directly to the supreme leader.  The Basij, a volunteer paramilitary group with local organizations across the country, sometimes acted as an auxiliary law enforcement unit subordinate to IRGC ground forces.  The IRGC and the national army, or "Artesh," provided external defense.  Civilian authorities maintained effective control over the security forces.

In response to widespread protests that began November 15 after a fuel price increase, the government blocked almost all international and local internet connections for most of a week, and security forces used lethal force to end the protests, killing approximately 1,500 persons and detaining 8,600, according to

international media reports.  There was no indication government entities were pursuing independent or impartial investigations into protester deaths.

Significant human rights issues included executions for crimes not meeting the international legal standard of "most serious crimes" and without fair trials of individuals, including juvenile offenders; numerous reports of unlawful or arbitrary killings, forced disappearance, and torture by government agents, as well as systematic use of arbitrary detention and imprisonment; harsh and life-threatening prison conditions; hundreds of political prisoners; unlawful interference with privacy; significant problems with independence of the judiciary, particularly the revolutionary courts; severe restrictions on free expression, the press, and the internet, including violence, threats of violence, and unjustified arrests and prosecutions against journalists, censorship, site blocking, and criminalization of libel; substantial interference with the rights of peaceful assembly and freedom of association, such as overly restrictive nongovernmental organization (NGO) laws; severe restrictions of religious freedom; restrictions on political participation through arbitrary candidate vetting; widespread corruption at all levels of government; unlawful recruitment of child soldiers by government actors to support the Assad regime in Syria; trafficking in persons; violence against ethnic minorities; harsh governmental restrictions on the rights of women and minorities; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons; criminalization of LGBTI status or conduct; and outlawing of independent trade unions.

Despite repeated calls from the international community, including the United Nations, the government effectively took no steps to investigate, prosecute, punish, or otherwise hold accountable officials who committed these abuses, many of which were perpetrated as a matter of government policy.  This included abuses and numerous suspicious deaths in custody from previous years.  Impunity remained pervasive throughout all levels of the government and security forces.

Government officials materially contributed to human rights abuses in Syria, through their military support for Syrian President Bashar Assad and Hizballah forces; in Iraq, through aid to pro-Iran militia groups; and in Yemen, through support for Houthi rebels, who targeted civilians and civilian infrastructure in Yemen and Saudi Arabia.

**Section 1. Respect for the Integrity of the Person, Including Freedom from:**

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

The government and its agents reportedly committed arbitrary or unlawful killings, most commonly by execution after arrest and trial without due process, or for crimes that did not meet the international threshold of "most serious crimes." Media and human rights groups also documented suspicious deaths while in custody or following beatings of protesters by security forces throughout the year.

On December 23, Reuters reported that the supreme leader ordered security forces to do "whatever it takes" to end several days of protests against a hike in fuel prices on November 15. Security forces killed approximately 1,500 persons across the country in response to the demonstrations, according to the Reuters report, which was sourced to four unidentified government officials. In a December 16 report, Amnesty International cited at least 304 persons killed by security forces in the demonstrations. Authorities reportedly used firearms, water cannons, tear gas, and snipers against the largely peaceful protesters. In one incident in the city of Mahshahr, IRGC forces reportedly shot and killed up to 100 protesters who had sought refuge in a marsh, after authorities violently dispersed the initial protest in an adjacent town, according to media and NGO reporting based on witness accounts. As of December 26, there was no indication that officials were conducting impartial investigations into those deaths or, more broadly, into law enforcement officials' use of excessive force to repress protests. Government officials asserted casualty figures in international media and NGO reports were "fake news."

In June, Amnesty International called on authorities to investigate the suspicious circumstances surrounding the death of Benyamin Alboghbiesh, a 28-year-old Ahwazi Arab held at a detention center in Ahvaz believed to be under the control of the IRGC. Authorities initially detained Alboghbiesh, along with his brother and mother, for several months beginning in March 2018, on unspecified national security accusations. All three individuals were rearrested on May 26, and the IRGC reportedly notified Alboghbiesh's family of his death on June 26. There was no information available on any investigation into the cause of Alboghbiesh's death.

As documented by international human rights observers, revolutionary courts continued to issue the vast majority of death sentences, and trials lacked due process. Legal representation was denied during the investigation phase, and in most cases, no evidence other than confessions, often reportedly extracted through

## IRAN                                                                     4

torture, was considered.  Judges may also impose the death penalty on appeal, which deterred appeals in criminal cases.  According to the NGO Human Rights Activists in Iran, the government does not disclose accurate numbers of those executed, and as many as 60 percent of executions are kept secret.  As of December 11, NGOs Iran Human Rights Documentation Center (IHRDC) and the Abdorrahman Boroumand Center reported there were more than 200 executions during the year, while the government officially announced only 62 executions in that time period.  The government often did not release further information, such as names of those executed, execution dates, or crimes for which they were executed.

The Islamic penal code allows for the execution of juvenile offenders starting at age nine for girls and age 13 for boys, the legal age of majority.  The government continued to execute individuals sentenced for crimes committed before the age of 18.  According to Amnesty International, authorities executed seven persons in 2018 who were children at the time of their alleged crimes.  In May, UN human rights experts expressed serious concerns for the up to 90 individuals on death row for alleged offenses committed when they were younger than age 18.

In May, according to widespread media and NGO reports, authorities in Adel Abad Prison in Shiraz secretly executed two 17-year-olds, Mehdi Sohrabifar and Amin Sedaghat.  According to the reports, authorities arrested the two boys in 2017 when they were 15 on various accusations, including alleged rape.  Reporting indicated a court convicted the two teens following a "grossly unfair" trial and that they were flogged before their execution.

According to human rights organizations and media reports, the government continued to carry out some executions by torture, including hanging by cranes.  Prisoners are lifted from the ground by their necks and die slowly by asphyxiation.  In addition, adultery remains punishable by death by stoning, although provincial authorities were reportedly ordered not to provide public information about stoning sentences since 2001, according to the NGO Justice for Iran.

Although the majority of executions during the year were reportedly for murder, the law also provides for the death penalty in cases of conviction for "attempts against the security of the state," "outrage against high-ranking officials," *moharebeh* (which has a variety of broad interpretations, including "waging war against God"), *fisad fil-arz* (corruption on earth, including apostasy or heresy), rape, adultery, recidivist alcohol use, consensual same-sex sexual conduct, and "insults against the memory of Imam Khomeini and against the supreme leader of the Islamic Republic."

Prosecutors frequently used "waging war against God" as a capital offense against political dissidents and journalists, accusing them of "struggling against the precepts of Islam" and against the state that upholds those precepts. Authorities expanded the scope of this charge to include "working to undermine the Islamic establishment" and "cooperating with foreign agents or entities."

The judiciary is required to review and validate death sentences.

On April 17, an appeals court ordered the release of spiritual leader and founder of the spiritual doctrine Interuniversalism and the Erfan-e Halgheh group Mohammad Ali Taheri, who had twice been sentenced to death. On April 24, Judiciary Spokesperson Gholam-Hossein Esmaili stated all outstanding sentences in Taheri's case had been rescinded but that he was "still under certain legal and social restrictions" in proportion to his alleged crimes. Taheri had been in prison--mostly in solitary confinement--since his arrest in 2011. He was sentenced to five years in 2011 for "insulting the sanctities," then sentenced to death in 2015 for "corruption on earth," and sentenced to death for a second time in 2017.

As of November the overall number of executions remained low in comparison with previous years, reportedly as a result of a 2017 amendment to the 1997 Law to Combat Drugs raising the threshold for the death penalty for drug-related offenses. Under the amended law, capital punishment applies to the possession, sale, or transport of more than approximately 110 pounds of natural drugs, such as opium, or approximately 4.4 to 6.6 pounds of manufactured narcotics, such as heroin or cocaine. According to the previous law, capital punishment applied to similar offenses involving slightly more than 11 pounds of natural drugs or two-thirds of a pound of manufactured drugs. Capital punishment, however, still applies to drug offenses involving smaller quantities of narcotics, if the crime is carried out using weapons, employing minors, or involving someone in a leadership role in a trafficking ring or someone who has previously been convicted of drug crimes and given a prison sentence of more than 15 years.

Terrorist groups also committed killings during the year. On February 13, according to international and state media reporting, a suicide bomber targeted a bus transporting IRGC personnel in Sistan va Baluchestan Province, near the border with Pakistan. The bombing killed at least 27 members of the IRGC and wounded 13 others. Jaish al-Adl, a Sunni Muslim militant group, claimed responsibility for the bombing.

## b. Disappearance

There were reports of politically motivated abductions during the year attributed to government officials.  Plainclothes officials seized journalists and activists without warning, and government officials refused to acknowledge custody or provide information on them.  In most cases the government made no efforts to prevent, investigate, or punish such acts.

In July, Amnesty International reported authorities were using incommunicado detention, as well as prolonged solitary confinement and threats against family members, to extract forced video "confessions" from women's rights defenders detained for campaigning against the country's mandatory hijab law.  Amnesty highlighted the case of Saba Kordafshari, whose fate and whereabouts the government concealed from her family for 12 days.  On August 27, a revolutionary court sentenced Kordafshari to 24 years in prison for protesting compulsory hijab.

In July, IranWire, a human rights reporting agency, reported on the case of Hamed Rezvani, a Bahai musician and teacher, who left his home in Isfahan in December 2018 and has not been heard from since.  Repeated requests by Rezvani's family members for information from police and local intelligence agents have not produced any information about his disappearance.  According to IranWire, Intelligence Ministry agents also raided Rezvani's home in 2016 under the pretext that Rezvani had spread "propaganda against the regime" through spreading the Bahai faith; he was beaten and detained for 21 days.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the constitution prohibits all forms of torture "for the purpose of extracting confession or acquiring information," use of physical and mental torture to coerce confessions remained prevalent, especially during pretrial detention.  There were credible reports that security forces and prison personnel tortured and abused detainees and prisoners throughout the year.

Impunity remained a problem within all security forces.  Human rights groups frequently accused regular and paramilitary security forces, such as the Basij, of committing numerous human rights abuses, including acts of violence against protesters and participants in public demonstrations.  According to Tehran Prosecutor General Abbas Jafari-Dolatabadi, the attorney general is responsible for investigating and punishing security force abuses, but the process was not

transparent, and there were few reports of government actions to discipline abusers.

Commonly reported methods of torture and abuse in prisons included threats of execution or rape, forced tests of virginity and "sodomy," sleep deprivation, electroshock, including the shocking of genitals, burnings, the use of pressure positions, and severe and repeated beatings.

Human rights organizations frequently cited some prison facilities, including Evin Prison in Tehran and Rajai Shahr Prison in Karaj, for their use of cruel and prolonged torture of political opponents, particularly Wards 209 and Two of Evin Prison, reportedly controlled by the IRGC.

Numerous human rights organizations, including the Center for Human Rights in Iran (CHRI), reported on allegations that in late 2018 Intelligence Ministry agents tortured Esmail Bakhshi, a labor activist and leading representative of Haft Tappeh Sugarcane Company workers in Khuzestan Province, and Sepideh Gholian, a journalist and human rights activist. Both Bakhshi and Gholian were forced to make confessions that the state-owned Islamic Republic of Iran Broadcasting (IRIB) broadcast. Authorities released both individuals in December 2018.

On January 4, Bakhshi posted a letter on Instagram stating he was severely beaten during his 25 days of detention following his arrest in November 2018. Bakhshi, referring to the Intelligence Ministry agents, said, "[T]hey tortured me and beat me with their fists and kicked me until I was going to die. They beat me so much I couldn't move in my cell for 72 hours… I turned into a washed-up rat. My hands are still trembling. I still get severe panic attacks." Gholian said she witnessed authorities severely beating Bakhshi at the time of his arrest when they were peacefully protesting unpaid wages for fellow Haft Tappeh workers. Despite demands for an investigation following Bakhshi's disclosure, no one has been held accountable. On January 20, Bakhshi and Gholian were rearrested. BBC Persian broadcast a video of Gholian recorded prior to her second arrest saying authorities beat her with a cable to force her to confess that she was "after overthrowing the government and hijacking the demands of the laborers in Iran." Authorities reportedly released Gholian and Bakhshi on unusually high bail amounts of nearly three billion rials (more than $70,000) on October 30. Authorities again arrested Gholian on November 17 for participating in the fuel price demonstrations (see section 1.a.) and released her on December 3 on bail of two billion rials ($47,000). According to a report by Haft Tappeh activists on the messaging app Telegram, an appellate court sentenced Bakhshi, Gholian, and five others to five years in prison

on December 14.  As of December 16, they had not been rearrested to serve these sentences.

NGOs reported that predominantly Shia prison guards tortured numerous Sunni Muslim prisoners at Ardabil Prison for their religious beliefs.  Guards also reportedly retaliated against prisoners for "security issues" that occurred elsewhere in the country.  According to reports, torture at Ardabil included severe beatings, being tied to flag poles for prolonged durations of time, and being forced to watch executions of fellow prisoners.

Authorities also allegedly maintained unofficial secret prisons and detention centers, outside the national prison system, where abuse reportedly occurred.

Judicially sanctioned corporal punishments continued.  These included flogging, blinding, stoning, and amputation, which the government defends as "punishment," not torture.  At least 148 crimes are punishable by flogging, while 20 can carry the penalty of amputation.

According to media and NGO reports, in October authorities in Mazandaran amputated the hand of a man imprisoned for theft.  According to a media report in May, 23 prisoners convicted of theft and held at the Greater Tehran Prison were awaiting hand amputation.  State media reported Attorney General Mohammad Jafar Montazeri stating he regretted that international pressure had caused an alleged drop in amputations in the country.

In August, Amnesty International reported that authorities flogged Kurdish singer and prisoner of conscience Peyman Mirzazadeh on July 28.  According to the report, officials flogged Mirzazadeh 100 times for a conviction of drinking alcohol, and "insulting Islamic sanctities."  The flogging, which Amnesty characterized as an "unspeakably cruel punishment," left Mirzazadeh in agonizing pain with a severely swollen back and legs.

In May, Tehran University student Parisa Rafiei alleged in an open letter that an interrogator sent her to a medical examiner's office for a "virginity test" after she was arrested for participating in street protests.  After Rafiei told officials she would file a complaint, they reportedly withdrew the demand.

Extrajudicial punishments by authorities involving degrading public humiliation of alleged offenders were also frequently reported throughout the year.  The government regularly forced alleged offenders to make videotaped confessions that

the government later televised.  On January 19, a state-run television channel aired a "documentary" about labor rights in the country that included filmed "confessions" of several prominent labor activists.  Two of the activists said the confessions were coerced.

## Prison and Detention Center Conditions

Prison conditions were harsh and life threatening due to food shortages, gross overcrowding, physical abuse, and inadequate sanitary conditions and medical care.  Prisoner hunger strikes in protest of their treatment were frequent.

Physical Conditions:  Overcrowding remained a problem in prisons with many prisoners forced to sleep on floors, in hallways, or in prison yards.  In a 2018 local media report, Asghar Jahangir, the country's chief prison warden, estimated the total number of prisoners at a quarter of a million, a threefold increase in 20 years.

There were reported deaths in custody and prisoner-on-prisoner violence, which authorities sometimes failed to control.  In June, CHRI reported that a prisoner killed prisoner of conscience Alireza Shir Mohammad Ali in a knife attack at the Greater Tehran Central Penitentiary.  Shir Mohammad Ali was serving an eight-year sentence based on content he posted on social media.  He had protested being kept in a ward with prisoners convicted of violent crimes; the law requires that prisoners be separated by the type and duration of their sentence (see below). Authorities prosecuted the prisoner accused of the killing, but there was no information whether any prison officials were held accountable.

According to IranWire and human rights NGOs, guards beat both political and nonpolitical prisoners during raids on wards, performed nude body searches in front of other prisoners, and threatened prisoners' families.  In some instances, according to the Human Rights Activists News Agency (HRANA), guards singled out political prisoners for harsher treatment.

Prison authorities often refused to provide medical treatment for pre-existing conditions, injuries that prisoners suffered at the hands of prison authorities, or illnesses due to the poor sanitary conditions in prison.  Human rights organizations reported that authorities used denial of medical care as a form of punishment for prisoners and as an intimidation tool against prisoners who filed complaints or challenged authorities.  On July 10, eight UN officials issued a statement expressing serious concern about a consistent pattern of the government denying medical treatment to detainees.  The statement cited the cases of human rights

defenders Arash Sadeghi and Narges Mohammadi, and dual nationals Ahmadreza Djalali, Kamran Ghaderi, and Nazanin Zaghari-Radcliffe.  The UN experts also cited unsafe and unsanitary detention conditions, including overcrowding, contaminated food and water, rodent and insect infestations, unhygienic facilities, and inadequate temperature controls.

Medical services for female prisoners were reported as grossly inadequate.

The human rights community and international media reported on frequent water shortages, insufficient food, intolerable heat, unsanitary living spaces, poor ventilation, infestations with cockroaches and mice, chronic overcrowding, and prisoners being forced to sleep on the floor with little bedding in prisons throughout the country.  Prisoner hunger strikes occurred frequently.

In August, CHRI reported 200 inmates at Gharchak Prison for Women wrote an open letter to the State Prisons Organization chief Heshmatollah Hayatolgheyb, complaining of overcrowding, unsafe drinking water and food, unsanitary living conditions, and denial of medical treatment at the prison.

There was no indication that authorities investigated the December 2018 death of political prisoner Vahid Sayyadi-Nasiri, who had been on hunger strike since October 2018 to protest conditions at Langroud Prison in Qom.

According to Amnesty International, at least 10 Gonabadi Sufi dervish women were unjustly detained in Shahr-e Rey Prison on national security-related charges since February 2018.  The women were routinely denied urgently needed medical care and kept in unsanitary, inhuman conditions.  CHRI and the UN special rapporteur (UNSR) on the situation of human rights in the Islamic Republic of Iran, Javaid Rehman, reported that one of the detained women, Elham Ahmadi, who is serving a two-year sentence, was reportedly sentenced to a further 148 lashes in January for speaking out about the denial of medical treatment.  In April a prisoner allegedly beat another of the detained women, Sima Entesari, after prison authorities reportedly promised the attacker a case review if she carried out the attack.  The two detained women were reportedly placed in the same ward as prisoners convinced of drug-related charges, theft, and social crimes in contravention of the prison's rules and regulations.

Authorities occasionally held pretrial detainees with convicted prisoners. According to a June report from IranWire, there was a noticeable increase over the past two years of the practice of holding political prisoners in wards with allegedly

violent and dangerous criminals, with the goal of "breaking" the political prisoners' wills.  Also, according to HRANA, juvenile detainees were held with adult prisoners in some prisons, including Saghez Central Prison in Kurdistan Province.  Male juvenile detainees were held in separate rehabilitation centers in most urban areas, but female juvenile detainees and male juvenile detainees in rural areas were held alongside adults in detention facilities, according to NGO reports.  Authorities held women separately from men.

In 2017 Mohammad Javad Fathi, a member of parliament's judicial committee, was quoted in the media saying that 2,300 children lived in prisons with their incarcerated mothers.  Fathi urged the Prisons Organization to provide transparent statistics on the number of imprisoned mothers.  IranWire reported multiple prisons across the country held older children who lived with their incarcerated mothers without access to medical care or educational and recreational facilities.

There were numerous reports of prisoner suicides throughout the year in response to prison conditions or mistreatment.  In October the local newspaper Qanun reported that a clergyman committed suicide in Evin Prison due to unspecified "hardships" faced by prisoners.

Administration:  According to reports from human rights NGOs, prison authorities regularly denied prisoners access to visitors, telephone, and other correspondence privileges.  Prisoners practicing a religion other than Shia Islam reported experiencing discrimination.

According to an October 24 report from CHRI, Evin Prison Director Gholamreza Ziaei appeared to target prisoners of conscience for denial of communication with family.

Authorities did not initiate credible investigations into allegations of inhuman conditions or suspicious deaths in custody.  There was no further investigation into the February 2018 death of Iranian-Canadian Kavous Seyed-Emami, an environmentalist, at Evin Prison.  Authorities labeled the death a suicide, but there was no independent investigation to verify the cause of death.  A lawyer representing the family told CHRI in April 2018 that a preliminary state medical examiner's report "showed evidence of an injection on his skin" as well as "bruises on different parts of the body."  Authorities placed a travel ban on Seyed-Emami's wife, Maryam Mombeini.

Prisoners were able to submit complaints to judicial authorities but often faced censorship or retribution in the form of slander, beatings, torture, and denial of medication or furlough requests.  Families of executed prisoners did not always receive notification of their scheduled executions, or if they did, it was often on very short notice.  Authorities frequently denied families the ability to perform funeral rites or an impartial autopsy.

Independent Monitoring:  The government did not permit independent monitoring of prison conditions.  Prisoners and their families often wrote letters to authorities and, in some cases, to UN bodies to highlight and protest their treatment.

For more information on treatment of political prisoners, see section 1.e., Political Prisoners and Detainees.

**d. Arbitrary Arrest or Detention**

Although the constitution prohibits arbitrary arrest and detention, the practices occurred frequently during the year.  President Rouhani's 2016 *Citizen's Rights Charter* enumerates various freedoms, including "security of their person, property, dignity, employment, legal and judicial process, social security, and the like."  The government did not implement these provisions.  Detainees may appeal their sentences in court but are not entitled to compensation for detention.

**Arrest Procedures and Treatment of Detainees**

The constitution and law require a warrant or subpoena for an arrest and state that arrested persons should be informed of the charges against them within 24 hours. Authorities, however, held some detainees, at times incommunicado, for prolonged periods without charge or trial and frequently denied them contact with family or timely access to legal representation.

The law obligates the government to provide indigent defendants with attorneys for certain types of crimes.  The courts set prohibitively high bail, even for lesser crimes, and in many cases, courts did not set bail.  Authorities often compelled detainees and their families to submit property deeds to post bail, effectively silencing them due to fear of losing their families' property.

The government continued to use house arrest without due process to restrict movement and communication.  At year's end former presidential candidates Mehdi Karroubi and Mir Hossein Mousavi, as well as Mousavi's wife Zahra

Rahnavard, remained under house arrest imposed in 2011 without formal charges. Security forces continued to restrict their access to visitors and information. Concerns persisted over Karroubi's deteriorating health, reportedly exacerbated by his treatment by authorities.

Arbitrary Arrest:  Authorities commonly used arbitrary arrests to impede alleged antiregime activities.  Plainclothes officers arrived unannounced at homes or offices; arrested persons; conducted raids; and confiscated private documents, passports, computers, electronic media, and other personal items without warrants or assurances of due process.

Individuals often remained in detention facilities for long periods without charges or trials, and authorities sometimes prevented them from informing others of their whereabouts for several days.  Authorities often denied detainees' access to legal counsel during this period.

International media and human rights organizations documented an increase in detentions of dual nationals--individuals who are citizens of both Iran and another country--for arbitrary and prolonged detention on politically motivated charges.

A July, 7 UNSR report estimated there were at least 30 cases of dual and foreign nationals who authorities had arrested arbitrarily and subjected to mistreatment, denial of appropriate medical treatment, or both.  Several detainees were American citizens, including Xiyue Wang, arbitrarily arrested in 2016 and released December 7 after more than three years in prison.  A doctoral student at Princeton University, Wang had been conducting research for his dissertation on the history of the Qajar dynasty.  In 2017 a revolutionary court sentenced him to 10 years in prison on charges of "cooperating with an enemy state."  Revolutionary court judge Abolqasem Salavati presided over the case.  In August 2018 the UN Working Group on Arbitrary Detention stated Wang's detention was arbitrary and "motivated by the fact that he is a United States citizen."

Additional cases of arbitrarily detained dual and foreign nationals continued.  In January an appeals court ruled against Siamak Namazi, who challenged a 10-year prison sentence for "espionage" following a lower court trial with numerous procedural irregularities, according to international media and NGO reports. Authorities initially detained Namazi in 2015, and he remained in prison at year's end.

The UNSR concluded the government subjected dual and foreign nationals to "sham trials which have failed to meet basic fair trial standards and convicted them of offenses on the basis of fabricated evidence or, in some cases, no evidence at all, and has attempted to use them as diplomatic leverage." Dual nationals, like other citizens, faced a variety of due process violations, including lack of prompt access to a lawyer of their choosing and brief trials during which they were not allowed to defend themselves.

According to Human Rights Watch (HRW), since January 2018, the IRGC's intelligence organization arbitrarily arrested at least 50 environmental activists. These included the January-February 2018 arrests of a group affiliated with the Persian Wildlife Heritage Foundation, which had been tracking the critically endangered Asiatic cheetah. The conservationists had reportedly set up camera traps to assist with tracking the animals. The IRGC claimed the detainees were gathering intelligence on missile sites. In October prosecutors dropped the charge of "corruption on Earth," which carries the death penalty, against four of the conservationists. On November 20, the Tehran Revolutionary Court sentenced six of them--Houman Jokar, Sepideh Kashani, Niloufar Bayani, Amirhossein Khaleghi, Taher Ghadirian, and Morad Tahbaz--to between six and 10 years in prison on charges of collaborating with an "enemy state"; two other defendants, Sam Rajabi and Abdolreza Kouhpayeh, were awaiting sentencing as of December 10. According to HRW, the judge handed down the sentences in secret, without the presence of defense lawyers, and ignored the defendants' claims of abuse in detention.

Pretrial Detention:  Pretrial detention was often arbitrarily lengthy, particularly in cases involving alleged violations of "national security" law. Authorities sometimes held persons incommunicado for lengthy periods before permitting them to contact family members. Instances of unjust and arbitrary pretrial detention were commonplace and well documented throughout the year involving numerous prisoners of conscience. According to HRW, a judge may prolong detention at his discretion, and pretrial detentions often lasted for months. Often authorities held pretrial detainees in custody with the general prison population.

## e. Denial of Fair Public Trial

The constitution provides that the judiciary be "an independent power" that is "free from every kind of unhealthy relation and connection." The court system was subjected to political influence, and judges were appointed "in accordance with religious criteria."

The supreme leader appoints the head of the judiciary.  The head of the judiciary, members of the Supreme Court, and the prosecutor general were clerics. International observers continued to criticize the lack of independence of the country's judicial system and judges and maintained that trials disregarded international standards of fairness.

**Trial Procedures**

According to the constitution and law, a defendant has the right to a fair trial, to be presumed innocent until convicted, to have access to a lawyer of his or her choice, and to appeal convictions in most cases that involve major penalties.  These rights were not upheld.

Panels of judges adjudicate trials in civil and criminal courts.  Human rights activists reported trials in which authorities appeared to have determined the verdicts in advance, and defendants did not have the opportunity to confront their accusers or meet with lawyers.  For journalists and defendants charged with crimes against national security, the law restricts the choice of attorneys to a government-approved list.

When postrevolutionary statutes do not address a situation, the government advised judges to give precedence to their knowledge and interpretation of sharia (Islamic law).  Under this method judges may find a person guilty based on their own "divine knowledge."

The constitution does not provide for the establishment or the mandate of the revolutionary courts.  The courts were created pursuant to the former supreme leader Ayatollah Khomeini's edict immediately following the 1979 revolution, with a sharia judge appointed as the head of the courts.  They were intended as a temporary emergency measure to try high-level officials of the deposed monarchy and purge threats to the regime.  The courts, however, became institutionalized and continue to operate in parallel to the criminal justice system.  Human rights groups and international observers often identified the revolutionary courts, which are generally responsible for hearing the cases of political prisoners, as routinely employing grossly unfair trials without due process, handing down predetermined verdicts, and rubberstamping executions for political purposes.  These unfair practices reportedly occur during all stages of criminal proceedings in revolutionary courts, including the initial prosecution and pretrial investigation, first instance trial, and review by higher courts.

The IRGC and Intelligence Ministry reportedly determine many aspects of revolutionary court cases.  Most of the important political cases are referred to a small number of branches of the revolutionary courts, whose judges often have negligent legal training and are not independent.

During the year human rights groups and international media noted the absence of procedural safeguards in criminal trials, and courts admitted as evidence confessions made under duress or torture.  UNSR Javaid Rehman expressed concerns about allegations of confessions extracted by torture and a lack of due process or a fair trial.  According to Iran Human Rights, on August 4, authorities at Dezful Prison executed two Arab men after a court found them guilty of "waging war against God;" Amnesty International reported the men were tortured to gain confessions.

The Special Clerical Court is headed by a Shia Islamic legal scholar, overseen by the supreme leader, and charged with investigating alleged offenses committed by clerics and issuing rulings based on an independent interpretation of Islamic legal sources.  As with the revolutionary courts, the constitution does not provide for the Special Clerical Court, which operates outside the judiciary's purview.  Clerical courts were used to prosecute Shia clerics who expressed controversial ideas and participated in activities outside the sphere of religion, such as journalism or reformist political activities.

In January cleric Seyed Hasan Aghamiri posted on Instagram that the Special Clerical Court had sentenced him to two years in prison and permanent defrocking for social media posts critical of the clerical establishment.  He said authorities subsequently reduced the sentence to a suspended five-year sentence.

**Political Prisoners and Detainees**

Official statistics regarding the number of citizens imprisoned for their political beliefs were not available.  According to United for Iran, as of December 12, there were an estimated 610 prisoners of conscience held in the country, including those jailed for their religious beliefs.

The government often charged political dissidents with vague crimes, such as "antirevolutionary behavior," "corruption on earth," "siding with global arrogance," "waging war against God," and "crimes against Islam."  Prosecutors imposed strict penalties on government critics for minor violations.

The political crimes law defines a political crime as an insult against the government, as well as "the publication of lies." Political crimes are those acts "committed with the intent of reforming the domestic or foreign policies of Iran," while those with the intent to damage "the foundations of the regime" are considered national security crimes. The court and the Public Prosecutor's Office retain responsibility for determining the nature of the crime.

The political crimes law grants the accused certain rights during arrest and imprisonment. Political criminals should be held in detention facilities separate from ordinary criminals. Political criminals should also be exempt from wearing prison uniforms, not subject to rules governing repeat offenses, not subject to extradition, and exempt from solitary confinement unless judicial officials deem it necessary. Political criminals also have the right to see and correspond with immediate family regularly and to access books, newspapers, radio, and television.

Many of the law's provisions have not been implemented, and the government continued to arrest and charge students, journalists, lawyers, political activists, women's activists, artists, and members of religious minorities with "national security" crimes that do not fall under the political crimes law. Political prisoners were also at greater risk of torture and abuse in detention. They were often mixed with the general prison population, and former prisoners reported that authorities often threatened political prisoners with transfer to criminal wards, where attacks were more likely. Human rights activists and international media reported cases of political prisoners confined with accused and convicted violent criminals, and with criminals carrying contagious diseases such as HIV or hepatitis (see section 1.c., Physical Conditions). The government often placed political prisoners in prisons far from their families, denied them correspondence rights, and held them in solitary confinement for long periods.

The government reportedly held some detainees in prison for years on unfounded charges of sympathizing with real or alleged terrorist groups.

The government issued travel bans on some former political prisoners, barred them from working in their occupations for years after incarceration, and imposed internal exile on some. During the year authorities occasionally gave political prisoners suspended sentences and released them on bail with the understanding that renewed political activity would result in their return to prison. The government did not permit international humanitarian organizations or UN representatives access to political prisoners.

Prison authorities reportedly denied human rights defender and journalist Narges Mohammadi phone contact with her family, as well as appropriate medical treatment related to a major operation she underwent in May. Security forces arrested Mohammadi in 2016, and a revolutionary court sentenced her to 16 years in prison for "propaganda against the state," "assembly and collusion against national security," and establishing the illegal Step by Step to Stop the Death Penalty organization, allegedly harming national security.

Lawyers who defended political prisoners were often arrested, detained, and subjected to excessive sentences and punishments for engaging in regular professional activities. The government continued to imprison lawyers and others affiliated with the Defenders of Human Rights Center advocacy group. In 2018 the government arrested at least eight human rights attorneys in what the United Nations characterized as "increasing levels of intimidation, arrest and detention for providing legal counsel to dissenting voices."

In January imprisoned human rights attorney Mohammad Najafi was sentenced to an additional two years in prison, bringing his total sentence to 19 years for "national security-related" charges.

On March 11, a revolutionary court sentenced human rights attorney Nasrin Sotoudeh to a cumulative 38 years in prison and 148 lashes for providing legal defense services to women charged with crimes for not wearing hijab. Sotoudeh was previously arrested in 2010 and pardoned in 2013.

On July 30, a revolutionary court upheld a 30-year prison sentence--plus 111 lashes--against Amir Salar Davoudi, a lawyer and civil rights activist.

International human rights organizations reported the arrest of several other human rights lawyers during the year because of their work. In January security agents arrested Farhad Mohammadi, a Kurdish human rights lawyer, and Masoud Shamsnejad, a lawyer and professor.

**Politically Motivated Reprisal Against Individuals Located Outside the Country**

There were credible reports that the government attempted to misuse international law enforcement tools for politically motivated purposes as reprisals against specific individuals located outside the country.

In March the government filed an INTERPOL Red Notice on Bahareh Zare Bahari, an Iranian national who had resided for several years in the Philippines, claiming she faced charges of "assault and battery" in Iran for alleged threats she made against other Iranian nationals in the Philippines. Media and NGOs noted that Bahari had publicly expressed opposition to the Iranian government, and displayed a poster of a government opponent during an international beauty pageant in which she participated. Authorities detained Bahari at the airport in Manila in October when she returned to the country after an international trip. On November 8, Philippine authorities granted Bahari refugee status in the country.

**Civil Judicial Procedures and Remedies**

Citizens had limited ability to sue the government and were not able to bring lawsuits through the courts against the government for civil or human rights violations.

**Property Restitution**

The constitution allows the government to confiscate property acquired illicitly or in a manner not in conformity with Islamic law. The government appeared to target ethnic and religious minorities in invoking this provision.

**f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence**

The constitution states that "reputation, life, property, [and] dwelling[s]" are protected from trespass, except as "provided by law." The government routinely infringed on this right. Security forces monitored the social activities of citizens, entered homes, offices, and places of worship, monitored telephone conversations and internet communications, and opened mail without court authorization. The government also repeatedly detained the family members of activists as a form of intimidation and reprisal.

A semiofficial news agency in Iran reported December 24 that authorities arrested approximately 10 family members of Pouya Bakhtiari, a protester reportedly killed by security forces in the city of Karaj during the November fuel price-hike demonstrations. The detained persons reportedly included Bakhtiari's 11-year-old nephew and two of his elderly grandparents. According to other family members,

security forces detained these individuals to prevent them from holding a traditional memorial service for Bakhtiari 40 days after his death.

According to international human rights organizations, the Ministry of Intelligence arrested and intimidated BBC employees' family members, including elderly family members, based in Iran.  The government also froze and seized assets of family members, demoted relatives employed by state-affiliated organizations, and confiscated passports.  The government also compelled family members of journalists from other media outlets abroad to defame their relatives on state television.

In January a revolutionary court sentenced Nasrin Sotoudeh's husband, Reza Khandan, to six years in prison for "conspiring against national security" and "propaganda against the system" related to publicly expressing his support for his detained wife, according to his lawyer.  Khandan filed an appeal, and as of November, authorities had not detained him to serve the sentence.  In September, Amnesty International reported that authorities arrested three family members of women's rights activist and founder of anticompulsory hijab movement Masih Alinejad--her brother, Alireza Alinejad, and siblings of her former husband, Hadi and Leila Lotfi.  NGOs expressed concern they were potentially being held in solitary confinement.  Authorities reportedly released Hadi Lotfi after interrogation.

## g. Abuses in Internal Conflicts

Syria:  The government directly supported the Assad regime in Syria, primarily through the IRGC, and recruited Iraqi, Afghan, and Pakistani Shia fighters, which contributed to prolonging the civil war and the deaths of thousands of Syrian civilians during the year.  According to HRW, the IRGC since 2013 allegedly recruited thousands of undocumented Afghans living in Iran to fight in Syria, threatening forced deportation in some cases.  The Syrian Network for Human Rights attributed 89 percent of civilian deaths in Syria since the beginning of the conflict to government forces and Iranian-sponsored militias.  Hackers linked to Iran continued cyberattacks against Syrian opposition groups in an effort to disrupt reporting on human rights violations.

Child Soldiers:  In a 2017 report, HRW asserted that the IRGC had recruited Afghan children as young as age 14 to serve in the Fatemiyoun Brigade, reportedly an Iranian-supported Afghan group fighting alongside government forces in Syria, and noted that at least 14 Afghan children had been killed fighting in the Syrian

conflict.  In an August 2018 interview by IranWire, a Fatemiyoun Brigade commander confirmed Afghan minors as young as 15 served in his unit.

Iraq:  The Iranian government directly supported certain pro-Iran militias, including terrorist organization Kata'ib Hizballah, which reportedly was complicit in summary executions and other human rights abuses of civilians in Iraq.

In October and November, there were reports that Iran-backed militia groups operating in Iraq shot and killed protesters and engaged in abductions and targeted killings of civil society activists, journalists, and human rights defenders.  On October 17, Reuters reported that Kata'ib Hizballah member Abu Zainab al-Lami directed sniper shootings of peaceful Iraqi demonstrators.

Yemen:  Since 2015 the Iranian government has provided hundreds of millions of dollars in support to the Houthi rebels in Yemen and proliferated weapons that exacerbated and prolonged the conflict.  On November 25, a vessel off the coast of Yemen was interdicted carrying a significant cache of sophisticated weapons and missile parts apparently of Iranian origin.  Houthi rebels used Iranian funding and weapons to launch attacks against civilians and civilian infrastructure both within Yemen and in Saudi Arabia.

According to a Bahai International Community report in April 2018, Iranian authorities directed authorities in Houthi-controlled areas of Yemen to harass and detain Bahais because of their religious affiliation.  On October 10, a judge in Yemen reportedly urged authorities to deport Bahais, ban their entry to the country, and seize the assets of the Bahai National Assembly.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Expression, Including for the Press**

The constitution provides for freedom of expression, including for the press, except when words are deemed "detrimental to the fundamental principles of Islam or the rights of the public."  According to the law, "anyone who engages in any type of propaganda against the Islamic Republic of Iran or in support of opposition groups and associations shall be sentenced to three months to one year of imprisonment."

The Charter on Citizens' Rights acknowledges the right of every citizen to freedom of speech and expression.  The charter grants citizens the right to seek, receive,

publish, and communicate views and information, using any means of communication; however, it has not been implemented.

The law provides for prosecution of persons accused of instigating crimes against the state or national security or "insulting" Islam.  The government severely restricted freedom of speech and of the press and used the law to intimidate or prosecute persons who directly criticized the government or raised human rights problems, as well as to bring ordinary citizens into compliance with the government's moral code.

Freedom of Expression:  Authorities did not permit individuals to criticize publicly the country's system of government, supreme leader, or official religion.  Security forces and the judiciary punished those who violated these restrictions, as well as those who publicly criticized the president, cabinet, and parliament.  A July UN report noted "increasing restrictions" on freedom of expression.

The government monitored meetings, movements, and communications of its citizens and often charged persons with crimes against national security and for insulting the regime, citing as evidence letters, emails, and other public and private communications.  Authorities threatened arrest or punishment for the expression of ideas or images they viewed as violations of the legal moral code.

In June and August, two dozen civil society activists circulated two separate letters calling on the supreme leader to step down and begin a process to develop a new constitution.  Authorities arrested nearly all of the signatories to these letters and charged them with "propaganda against the state" and "collusion against national security."  Their trials continued before a revolutionary court.

Press and Media, Including Online Media:  The government's Press Supervisory Board issues press licenses, which it sometimes revoked in response to articles critical of the government or the regime, or it did not renew them for individuals facing criminal charges or incarcerated for political reasons.  During the year the government banned, blocked, closed, or censored publications deemed critical of officials.

The Ministry of Culture and Islamic Guidance (*Ershad*) severely limited and controlled foreign media organizations' ability to work in the country.  The ministry required foreign correspondents to provide detailed travel plans and topics of proposed stories before granting visas, limiting their ability to travel within the country, and forced them to work with a local "minder."  According to the

*Washington Post*, the ministry temporarily stopped issuing permits to any foreign correspondents during the summer.

Under the constitution private broadcasting is illegal. The government maintained a monopoly over all television and radio broadcasting facilities through IRIB, a government agency. Radio and television programming, the principal source of news for many citizens, particularly in rural areas with limited internet access, reflected the government's political and socioreligious ideology. The government jammed satellite broadcasts as signals entered the country, a continuous practice since at least 2003. Satellite dishes remained illegal but ubiquitous. Those who distributed, used, or repaired satellite dishes faced fines up to 90 million rials (approximately $2,100). Police, using warrants provided by the judiciary, conducted periodic campaigns to confiscate privately owned satellite dishes throughout the country.

Under the constitution the supreme leader appoints the head of the Audiovisual Policy Agency, a council composed of representatives of the president, judiciary, and parliament. The Ministry of Culture reviews all potential publications, including foreign printed materials, prior to their domestic release and may deem books unpublishable, remove text, or require word substitutions for terms deemed inappropriate.

Independent print media companies existed, but the government severely limited their operations.

In June, Judge Mohammad Moghiseh, presiding over Tehran's Revolutionary Court Branch 28, sentenced Masoud Kazemi, editor in chief of the monthly political magazine *Sedaye Parsi*, to four and one-half years in prison followed by a two-year ban from working as a journalist for national security charges of spreading misinformation and insulting the supreme leader. In November 2018 authorities arrested Kazemi for reporting on corruption in the Ministry of Industry.

Violence and Harassment: The government and its agents harassed, detained, abused, and prosecuted publishers, editors, and journalists, including those involved in internet-based media, for their reporting. The government also harassed many journalists' families.

According to information provided by Journalism is not a Crime, an organization devoted to documenting freedom of the press in the country, at least 38 journalists or citizen-journalists were imprisoned as of December.

Authorities banned national and international media outlets from covering demonstrations throughout the year in an attempt to censor coverage of the protests and to intimidate citizens from disseminating information about them.  On May 4, authorities arrested Marzieh Amiri, a journalist for *Shargh*, a leading reformist newspaper, at a protest outside the parliament building in Tehran.  In reaction to Amiri's arrest, member of parliament Mohammad-Ali Pourmokhtar reportedly said to state media, "[J]ournalists don't have the right to report on anything they want. They are the problem."  Pourmokhtar noted there was nothing wrong with Amiri's arrest since she had been exposing important information to enemy states.  Amiri posted bail of one billion rials ($23,000) and was released from Evin Prison in late October.

In July, Amnesty International called for the release of three reporters for *Gam* (Step), a Telegram app news channel covering labor issues.  According to Amnesty International's report and other reporting from human rights organizations, authorities arrested Amirhossein Mohammadifard, *Gam*'s editor in chief; his wife Sanaz Allahyari, a reporter; and Amir Amirgholi, a *Gam* staff reporter, in January. The journalists reportedly faced national security charges connected to their reporting on workers' rights protests in Khuzestan Province.  Authorities released the journalists on bail in late October.

Censorship or Content Restrictions:  The law forbids government censorship but also prohibits dissemination of information the government considers "damaging." During the year the government censored publications that criticized official actions or contradicted official views or versions of events.  "Damaging" information included discussions of women's rights, the situation of minorities, criticism of government corruption, and references to mistreatment of detainees.

In July the *Huffington Post* reported that the government had set conditions for the BBC not to share reporting materials it gathered inside the country with BBC Persian, its Persian language channel.  According to the report, the agreement was made in exchange for the government to allow a BBC correspondent into the country.

Officials routinely intimidated journalists into practicing self-censorship.  Public officials often filed criminal complaints against newspapers, and the Press Supervisory Board, which regulates media content and publication, referred such complaints to the Press Court for further action, including possible closure, suspension, and fines.  The Islamic Republic News Agency determined the main

topics and types of news to be covered and distributed topics required for reporting directly to various media outlets, according to the IHRDC.

Libel/Slander Laws:  The government commonly used libel laws or cited national security to suppress criticism.  According to the law, if any publication contains personal insults, libel, false statements, or criticism, the insulted individual has the right to respond in the publication within one month.  By law "insult" or "libel" against the government, government representatives, or foreign officials while they are in the country, as well as "the publication of lies" with the intent to alter, but not overthrow, the government are considered political crimes and subject to certain trial and detention procedures (see section 1.e.).  The government applied the law throughout the year, often citing statements made in various media outlets or on internet platforms that criticized the government, in the arrest, prosecution, and sentencing of individuals for crimes against national security.

National Security:  Authorities routinely cited laws on protecting national security to arrest or punish critics of the government or to deter criticism of government policies or officials.  In January authorities charged three members of the Iran Writer's Association with national-security-related crimes, reportedly for publishing information opposing censorship of art and literature, according to CHRI.

**Internet Freedom**

The government restricted and disrupted access to the internet, including fully blocking access for almost one week during nationwide protests in November. There were reports the government again slowed internet access on December 25, which media and NGO reports noted would correspond to approximately 40 days after the protests began, when the government may be concerned that families of those killed would organize new protests surrounding memorial ceremonies for the victims.  Authorities also monitored private online communications and censored online content.  Individuals and groups practiced self-censorship online.

The Ministries of Culture and of Information and Communications Technology are the main regulatory bodies for content and internet systems.  The Supreme Leader's Office also includes the Supreme Council of Cyberspace, charged with regulating content and systems.  The government collected personally identifiable information in connection with citizens' peaceful expression of political, religious, or ideological opinion or beliefs.

The government continued to implement the National Information Network (NIN, also known as SHOMA).  As described by Freedom House, SHOMA enabled the government to reduce foreign internet connection speeds during politically sensitive periods, disconnect the network from global internet content, and disrupt circumvention tools.  According to widespread media and NGO reports, the government shut down nearly all internet access in the country for five days following the outbreak of protests over fuel price increases on November 15.  The BBC noted that authorities controlled the country's two internet connections to the outside world, the state telecommunications firm and the Institute for Physics and Mathematics.  Oracle's internet-monitoring service called it "the largest internet shutdown ever observed in Iran."  Access to mobile networks in parts of the country remained heavily restricted for several weeks after the demonstrations began to diminish.

NGOs reported the government filtered content on the internet throughout the year to ban access to particular sites and to filter traffic based on its content.  The law makes it illegal to distribute circumvention tools and virtual private networks, and Minister of Information and Communications Technology Jahromi was quoted in the press stating that using circumvention tools is illegal.

The Ministry of Culture and Islamic Guidance must approve all internet service providers.  The government also requires all owners of websites and blogs in the country to register with the agencies that compose the Commission to Determine the Instances of Criminal Content (also referred to as the Committee in Charge of Determining Unauthorized Websites or Committee in Charge of Determining Offensive Content), the governmental organization that determines censoring criteria.  These agencies include the Ministry of Culture and Islamic Guidance, Ministry of Information and Communications Technology, the Intelligence Ministry, and the Tehran Public Prosecutor's Office.

Ministry of Information and Communications Technology regulations prohibit households and cybercafes from having high-speed internet access.

Authorities continued to block online messaging tools, such as Facebook, YouTube, and Twitter, although the government operated Twitter accounts under the names of Supreme Leader Khamenei, President Rouhani, Foreign Minister Zarif, and other government-associated officials and entities, including after shutting down most of the country's internet access during the November demonstrations.

Government organizations, including the Basij Cyber Council, the Cyber Police, and the Cyber Army, which observers presumed to be controlled by the IRGC, monitored, identified, and countered alleged cyberthreats to national security. These organizations especially targeted citizens' activities on officially banned social networking websites such as Telegram, Facebook, Twitter, YouTube, and Flickr, and they reportedly harassed persons who criticized the government or raised sensitive social problems.

The popular messaging app Telegram remained blocked during the year, although it continued to be accessed using circumvention tools.

Bloggers, social media users, and online journalists continued to be arrested.  In April authorities warned citizens they could be prosecuted for posting pictures of major flooding in the country's southwest under the charge of "disturbing public opinion."  On October 5, authorities reportedly arrested Instagram user Sahar Tabar for "blasphemy" and "encouraging youths to corruption" for posts on her account depicting results of her numerous plastic surgeries.  Several weeks later, she appeared to express regret for her actions in a state television broadcast that observers described as a "forced confession."  CHRI reported in August that authorities detained at least 14 Instagram "celebrities" in the previous three months and ordered them to stop their online activities.

**Academic Freedom and Cultural Events**

The government significantly restricted academic freedom and the independence of higher education institutions.  Authorities systematically targeted university campuses to suppress social and political activism by banning independent student organizations, imprisoning student activists, removing faculty, preventing students from enrolling or continuing their education because of their political or religious affiliation or activism, and restricting social sciences and humanities curricula.

In April, according to a CHRI report, the Supreme Cultural Revolution Council's Committee for the Islamization of Universities passed an amendment to the country's academic disciplinary regulations, according to which university students could be punished for engaging in online activities deemed as "unethical."  Jamasb Nozari, director of the state-run Academic Affairs Organization, stated in an interview with Iranian Students News Agency (ISNA), "Publishing unethical photos or committing immoral acts in cyberspace and on information-sharing networks will result in disciplinary action against students."

Authorities barred Bahai students from higher education and harassed those who studied through the unrecognized online university of the Bahai Institute for Higher Education.  According to a HRANA report in September, authorities denied university admission to at least 22 Bahai students solely based on their religious affiliation despite they passed the national admissions test (see the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/).

The government maintained control over cinema, music, theater, and art exhibits and censored those productions deemed to transgress Islamic values.  The government censored or banned films deemed to promote secularism, non-Islamic ideas about women's rights, unethical behavior, drug abuse, violence, or alcoholism.

According to the IHRDC, the nine-member film review council of the Ministry of Culture and Islamic Guidance, consisting of clerics, former directors, former parliamentarians, and academics, must approve the content of every film before production and again before screening.  Films may be barred arbitrarily from screening even if all the appropriate permits were received in advance.

In July, CHRI reported that a court sentenced filmmaker Mohammad Rasoulof to one year in prison for the content of his films.  According to Rasoulof, the accusations made against him in court focused on films he made examining the government's persecution of members of the Bahai faith.  Since 2017 authorities have banned Rasoulof from leaving the country and making films.  Similarly, film director Jafar Panahi has been barred from traveling since 2010, when he was charged with generating "propaganda against the Islamic Republic."

Officials continued to discourage teaching music in schools.  Authorities considered heavy metal and foreign music religiously offensive, and police continued to repress underground concerts and arrest musicians and music distributors.  The Ministry of Culture must officially approve song lyrics, music, and album covers as complying with the country's moral values, although many underground musicians released albums without seeking such permission.

In July a revolutionary court sentenced in absentia Nikan Khosravi and Arash Ilkhani of the metal band Confess to more than 14 years in prison and 74 lashes for "insulting the sanctity of Islam," among other charges.

**b. Freedoms of Peaceful Assembly and Association**

The government severely restricted freedoms of peaceful assembly and association.

**Freedom of Peaceful Assembly**

The constitution permits assemblies and marches of unarmed persons, "provided they do not violate the principles of Islam." To prevent activities it considered antiregime, the government restricted this right and closely monitored gatherings such as public entertainment and lectures, student and women's meetings and protests, meetings and worship services of minority religious groups, labor protests, online gatherings and networking, funeral processions, and Friday prayer gatherings.

According to activists, the government arbitrarily applied rules governing permits to assemble, as proregime groups rarely experienced difficulty, while groups viewed as critical of the regime experienced harassment regardless of whether authorities issued a permit.

Protests against government corruption and economic mismanagement continued throughout the year, as did labor-sector protests. Protests against the country's compulsory hijab laws also increased.

On May 13, Basij militia and progovernment plainclothes vigilante groups forcibly dispersed a student demonstration at the University of Tehran, in which hundreds of students peacefully protested the country's mandatory hijab laws. Videos showed clerics, vigilante groups, and Basij members chanting Islamic slogans, calling for the students to respect the law or leave the university. The vigilante groups later reportedly physically attacked the students after they had retreated to the university auditorium.

On November 14, the government announced a fuel subsidy cut that substantially increased the cost of gasoline. The cut sparked days of protests in nearly three-quarters of the country's provinces and increasingly included broader expressions of frustration regarding the country's leadership, according to media and NGO reports. Security forces responded with lethal force, killing approximately 1,500 protesters, according to international media reports (see section 1.a.). Authorities also arrested 8,600 demonstrators. Government officials described the protesters as "rioters" and did not indicate any intent to investigate protester deaths, calling the casualty figures "disinformation."

There were no government investigations into the killings of at least 20 demonstrators during protests in 2017-18, nor were there any government investigations into the forcible dispersal of February 2018 protests by the Gonabadi Sufi dervish community, during which security forces killed numerous dervishes. Between March 9 and 12, an appeals court upheld convictions of 23 dervishes arrested at the 2018 demonstrations and confirmed sentences ranging from six to 26 years in prison, lashings, social media bans, and travel bans.  Dozens of members of the Gonabadi Sufi community remained imprisoned at year's end.

**Freedom of Association**

The constitution provides for the establishment of political parties, professional and political associations, and Islamic and recognized religious minority organizations, as long as such groups do not violate the principles of freedom, sovereignty, national unity, or Islamic criteria, or question Islam as the basis of the country's system of government.  The government limited the freedom of association through threats, intimidation, the imposition of arbitrary requirements on organizations, and the arrests of group leaders and members (see section 7). The government continued to broaden arbitrarily the areas of civil society work it deemed unacceptable, to include conservation and environmental efforts (see section 1.d.).

**c. Freedom of Religion**

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

**d. Freedom of Movement**

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights, with some exceptions, particularly concerning migrants and women.  The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) with regard to refugees from Afghanistan and Iraq.

In-country Movement:  Judicial sentences sometimes included internal exile after release from prison, which prevented individuals from traveling to certain provinces.  Women often required the supervision of a male guardian or chaperone to travel and faced official and societal harassment for traveling alone.

<u>Foreign Travel</u>:  The government required exit permits for foreign travel for all citizens.  Citizens who were educated at government expense or received scholarships had either to repay the scholarship or receive a temporary permit to exit the country.  The government restricted the foreign travel of some religious leaders, members of religious minorities, and scientists in sensitive fields.

Numerous journalists, academics, opposition politicians, human and women's rights activists, and artists remained subject to foreign travel bans and had their passports confiscated during the year.  Married women were not allowed to travel outside the country without prior permission from their husbands.

## e. Internally Displaced Persons

Not applicable.

## f. Protection of Refugees

According to UNHCR, the government granted registration to 951,142 Afghans under a system known as *Amayesh*, through which authorities provide refugees with cards identifying them as de facto refugees.  The cards enable refugees to access basic services and facilitate the issuance of work permits.  The most recent Amayesh XIV renewal exercise started on May 28.  In addition to registered refugees, the government hosted some 450,000 Afghans who hold Afghan passports and Iranian visas and an estimated 1.5 to 2.0 million undocumented Afghans.  The country also hosted 28,268 Iraqi refugees.

<u>Abuse of Migrants, Refugees, and Stateless Persons</u>:  HRW and other groups reported the government continued its mistreatment of many Afghans, including physical abuse by security forces, deportations, forced recruitment to fight in Syria, detention in unsanitary and inhuman conditions, forced payment for transportation to and accommodation in deportation camps, forced labor, forced separation from families, restricted movement within the country, and restricted access to education or jobs.

<u>Refoulement</u>:  According to activist groups and NGOs, authorities routinely arrested Afghans without Amayesh cards and sometimes threatened them with deportation.  According to the International Organization for Migration, from the beginning of the year to August, more than 219,254 undocumented Afghans

returned to Afghanistan, with many claiming they were pressured to leave.  More than 273,089 were deported there throughout the year.

Access to Asylum:  The law provides for the granting of asylum or refugee status to qualified applicants.  While the government reportedly has a system for providing protection to refugees, UNHCR did not have information regarding how the country made asylum determinations.  According to HRW, the government continued to block many Afghans from registering to obtain refugee status.

Afghans not registered under the Amayesh system who had migrated during past decades of conflict in their home country continued to be denied access to an asylum system or access to register with the United Nations as refugees.  NGOs reported many of these displaced asylum seekers believed they were pressured to leave the country but could not return to Afghanistan because of the security situation in their home provinces.

Freedom of Movement:  Refugees faced certain restrictions on in-country movement and faced restrictions from entering certain provinces, according to UNHCR.  They can apply for laissez-passer documents allowing them to move between those provinces where Afghans were allowed to go.

Employment:  Only refugees with government-issued work permits were able to work.  NGO sources reported Amayesh cards were difficult to renew and were often prohibitively expensive for refugees to maintain, due to steep annual renewal fees.

Access to Basic Services:  Amayesh cardholders had access to education and health care, including vaccinations, prenatal care, maternal and child health, and family planning from the Ministry of Health.  All registered refugees can enroll in a basic health insurance package similar to the package afforded to citizens, which covered hospitalization and paraclinical services (medicine, doctor's visits, radiology, etc.).  During the year UNHCR covered the insurance premium for 92,000 of the most vulnerable refugees, including refugees who suffer from special diseases and their families.  The remaining refugee population can enroll in health insurance by paying the premium themselves during four enrollment windows throughout the year.

The government claimed to grant Afghan children access to schools.  More than 480,000 Afghan children were enrolled in primary and secondary schools, in addition to 103,000 undocumented Afghan children.  According to media

reporting, however, Afghans continued to have difficulty gaining access to education.

Most provinces' residency limitations on refugees effectively denied them access to public services, such as public housing, in the restricted areas of those provinces.

## g. Stateless Persons

There were no accurate numbers on how many stateless persons resided in the country.  Stateless persons included those without birth documents or refugee identification cards.  They were subjected to inconsistent government policies and relied on charities, principally domestic, to obtain medical care and schooling. Authorities prohibited stateless persons from receiving formal government support or travel documents.

In October the Guardian Council approved an amendment to the civil code granting Iranian citizenship to the children of Iranian women married to foreign men.  Previously, female citizens were not able to transmit citizenship to their children or to noncitizen spouses, and their dependents could not apply for citizenship until they lived in Iran for at least 18 years.  The children and spouses of Iranian men were granted citizenship automatically.  Under the new law, women must still apply for nationality for their children, and children who turn 18 can apply for nationality themselves.  Human rights activists noted concern that the amended law requires the Intelligence Ministry and the Intelligence Organization of the IRGC to certify that no "security problem" exists before approving citizenship for these specific applications, and this vaguely defined security provision could be used arbitrarily to disqualify applicants if they or their parents are seen as critical of the government.  According to media reports, between 400,000 and one million persons lacked Iranian nationality despite having an Iranian citizen mother, due to prior limitations on citizenship transmission (see section 6, Children).

## Section 3. Freedom to Participate in the Political Process

The constitution provides citizens the ability to choose the president, as well as members of the Assembly of Experts and parliament, provided all have been vetted and approved by the Guardian Council.  Elections are based on universal suffrage. Candidate vetting conducted by unelected bodies, however, abridged this right in all instances.  Reported government constraints on freedom of expression and the

media; peaceful assembly; association; and the ability freely to seek, receive, and impart information and campaign also limited citizens' right to choose freely their representatives in elections.

The Assembly of Experts, which is composed of 86 popularly elected clerics who serve eight-year terms, elects the supreme leader, who acts as the de facto head of state and may be removed only by a vote of the assembly.  The Guardian Council vets and qualifies candidates for all Assembly of Experts, presidential, and parliamentary elections based on criteria that include candidates' allegiance to the state and adherence to Shia Islam.  The council consists of six clerics appointed by the supreme leader and six jurists nominated by the head of the judiciary (who is appointed by the supreme leader) and approved by parliament.

The supreme leader exerted significant influence over the activities of elected officials.  For example, on November 17, according to press reports, the supreme leader's office sent a letter to parliament urging members of parliament to end debate on fuel rationing and pricing, which spurred major countrywide protests two days earlier.

**Elections and Political Participation**

Recent Elections:  Presidential and local council elections were held in 2017.  The country's electoral system continued to fall short of international standards for free and fair elections primarily because of the Guardian Council's controlling role in the political process, including determining which individuals could run for office and, in certain instances, arbitrarily removing winning candidates.

In 2017 the Guardian Council approved six Shia male candidates for president from a total candidate pool of 1,636 individuals.  Voters re-elected Hassan Rouhani as president.

Candidates for local elections were vetted by monitoring boards established by parliament, resulting in the disqualification of a number of applicants.  Observers asserted that reformist candidates such as Abdollah Momeni, Ali Tajernia, and Nasrin Vaziri, previously imprisoned for peacefully protesting the 2009 election, were not allowed to run due to their political views.

Political Parties and Political Participation:  The constitution provides for the formation of political parties, but the Interior Ministry granted licenses only to parties deemed to adhere to the "governance of the jurist" system of government

embodied in the constitution.  Registered political organizations that adhered to the system generally operated without restriction, but most were small, focused around an individual, and without nationwide membership.  Members of political parties and persons with any political affiliation that the regime deemed unacceptable faced harassment and sometimes violence and imprisonment.  The government maintained bans on several opposition organizations and political parties.  Security officials continued to harass, intimidate, and arrest members of the political opposition and some reformists (see section 1.e.).

Participation of Women and Minorities:  Women faced significant legal, religious, and cultural barriers to political participation.  According to the Guardian Council's interpretation, the constitution bars women, as well as persons of foreign origin, from serving as supreme leader or president, as members of the Assembly of Experts, the Guardian Council, or the Expediency Council, and as certain types of judges.

The Guardian Council disqualified all 137 women who registered as candidates for the 2017 presidential election.  Almost 18,000 female candidates, or 6.3 percent of all candidates, were permitted to run for positions in the 2017 local elections.

All cabinet-level ministers were men.  A limited number of women held senior government positions, including that of vice president for legal affairs and vice president for women and family affairs.  According to the World Bank, women make up 6 percent of members of parliament.

Practitioners of a religion other than Shia Islam are barred from serving as supreme leader or president, as well as from being a member in the Assembly of Experts, Guardian Council, or Expediency Council.  The law reserves five seats in parliament for members of recognized minority religious groups, although minorities may also be elected to nonreserved seats.  The five reserved seats were filled by one Zoroastrian, one Jew, and three Christians.  There were no non-Muslims in the cabinet or on the Supreme Court.

In 2018 the Expediency Council, the country's highest arbiter of disputes between state branches, amended the Law on the Formation, Duties, and Election of National Islamic Councils to affirm the right of constitutionally recognized religious minorities to run in local elections.

## Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for official corruption, but the government implemented the law arbitrarily, sometimes pursuing apparently legitimate corruption cases against officials, while at other times, bringing politically motivated charges against regime critics or political opponents. Officials continued to engage in corrupt practices with impunity. Many expected bribes for providing routine services or received bonuses outside their regular work, and individuals routinely bribed officials to obtain permits for otherwise illegal construction.

Endowed religious charitable foundations, or bonyads, accounted for one-quarter to one-third of the country's economy, according to some experts. Government insiders, including members of the military and clergy, ran these tax-exempt organizations, which are defined under law as charities. Members of the political opposition and international corruption watchdog organizations frequently accused bonyads of corruption. Bonyads received benefits from the government, but no government agency is required to approve their budgets publicly.

Numerous companies and subsidiaries affiliated with the IRGC engaged in trade and business activities, sometimes illicitly, including in the telecommunications, mining, and construction sectors. Other IRGC entities reportedly engaged in smuggling pharmaceutical products, narcotics, and raw materials. The domestic and international press reported that individuals with strong government connections had access to foreign currency at preferential exchange rates, allowing them to exploit a gap between the country's black market and official exchange rates.

Corruption: The judiciary continued an anticorruption campaign that observers viewed as motivated by several factors, including political infighting and replacing lost revenue due to economic challenges. The supreme leader approved a request from the head of the judiciary in 2018 to set up special revolutionary courts to try individuals for economic crimes, seeking maximum sentences for those who "disrupted and corrupted" the economy. He was quoted saying that punishments for those accused of economic corruption, including government officials and those from the military, should be carried out swiftly. Amnesty International criticized the courts' lack of fair trial and due process guarantees.

In October a court reduced a seven-year prison sentence handed down in May to Hossein Fereydoun, the brother of President Rouhani, to five years. The exact nature of the charges was unclear, but he was convicted of receiving bribes. Some

observers asserted the case was motivated by retribution sought by hardline political and judicial figures.

In November, Radio Farda reported that as a part of the judiciary's drive against corruption, a number of employees of the State Deeds and Properties Organization were arrested on charge including "taking huge bribes, forgery, and cooperation with profiteers to appropriate public and private property."  These arrests came in tandem with the arrest of the Rudehen City Council chairman, Manouchehr Hemmat Najafi, on charges of embezzlement and bribery, and of 25 other individuals in connection to a case of unlicensed construction projects.  As of December 9, details of the number of arrested employees and their positions have not been disclosed.

Financial Disclosure:  Regulations require government officials, including cabinet ministers and members of the Guardian Council, Expediency Council, and Assembly of Experts, to submit annual financial statements to the government inspectorate.  Little information was available on whether the government effectively implemented the law, whether officials obeyed the law, or whether financial statements were publicly accessible.

## Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Abuses of Human Rights

The government restricted the operations of and did not cooperate with local or international human rights NGOs investigating alleged violations of human rights.  The government restricted the work of domestic activists and often responded to their inquiries and reports with harassment, arrests, online hacking, and monitoring of individual activists and organization workplaces.

By law NGOs must register with the Ministry of Interior and apply for permission to receive foreign grants.  Independent human rights groups and other NGOs faced harassment because of their activism, as well as the threat of closure by government officials, following prolonged and often arbitrary delays in obtaining official registration.

During the year the government prevented some human rights defenders, civil society activists, journalists, and scholars from traveling abroad.  Human rights activists reported intimidating telephone calls, threats of blackmail, online hacking attempts, and property damage from unidentified law enforcement and government officials.  The government summoned activists repeatedly for questioning and

confiscated personal belongings such as mobile phones, laptops, and passports. Government officials sometimes harassed and arrested family members of human rights activists. Courts routinely suspended sentences of convicted human rights activists, leaving open the option for authorities to arrest or imprison individuals arbitrarily at any time on the previous charges.

In his July report, UNSR Rehman expressed concern about the arrest, arbitrary detention, and sentencing of human rights defenders, journalists, and lawyers. He noted acts of intimidation and reprisals in detention, including torture and mistreatment, as well as reports of reprisals against human rights defenders and journalists for engaging the UNSR and cooperating with other UN mechanisms.

According to NGO sources, including HRW and Amnesty International, the government's rights record and its level of cooperation with international rights institutions remained poor. The government continued to deny requests from international human rights NGOs to establish offices in or to conduct regular investigative visits to the country. The most recent visit of an international human rights NGO was by Amnesty International in 2004 as part of the EU's human rights dialogue with the country.

The United Nations or Other International Bodies:  During the year the government continued to deny repeated requests by the UNSR on the situation of human rights in Iran to visit the country.

On November 15, for the seventh consecutive year, the UN General Assembly adopted a resolution expressing serious concern about the country's continuing human rights violations. The resolution repeated its call for the country to cooperate with UN special mechanisms, citing the government's failure to approve any request from a UN thematic special procedures mandate holder to visit the country in more than a decade. It drew attention to the government's continued failure to allow the UNSR into the country to investigate human rights abuses despite repeated requests. The most recent visit by a UN human rights agency to the country was in 2005.

Government Human Rights Bodies:  The High Council for Human Rights, headed by Mohammad Javad Larijani, is part of the judicial branch of the government and lacks independence. The council continued to defend the imprisonment of high-profile human rights defenders and political opposition leaders, despite domestic and international pressure. Larijani continued to call for an end to the position of

the UNSR.  There was no information available on whether the council challenged any laws or court rulings during the year.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

### Women

Rape and Domestic Violence:  Rape is illegal and subject to strict penalties, including death, but it remained a problem.  The law considers sex within marriage consensual by definition and, therefore, does not address spousal rape, including in cases of forced marriage.  Most rape victims likely did not report the crime because they feared official retaliation or punishment for having been raped, including charges of indecency, immoral behavior, or adultery, the last of which carries the death penalty.  Rape victims also feared societal reprisal or ostracism.

For a conviction of rape, the law requires four Muslim men or a combination of three men and two women or two men and four women, to have witnessed a rape.  A woman or man found making a false accusation of rape is subject to 80 lashes.  In January, IranWire reported the suspicious death of Zahra Navidpour, a woman who had accused Salman Khodadadi, chairman of the parliament's Social Affairs Committee and a former IRGC commander, of raping her.  On January 6, Navidpour was found dead at her home; after her body was rushed to the hospital, the medical examiner provided no reason for the woman's death, leading to speculation that she had either committed suicide or been killed.  Navidpour died while Khodadadi was on trial for having an illegitimate affair; the court sentenced him to two years' exile, a two-year ban on serving in public office, and 99 lashes; however, the Supreme Court dismissed the lower court's verdict.

In May local and international media reported that Mohammad Ali Najafi, a former vice president and mayor of Tehran, had confessed to shooting to death one of his two wives.  Najafi resigned as mayor of Tehran in 2018 after he was criticized for attending a dance performance by young girls.  He was sentenced to death for the murder, but his wife's family reportedly waived the death penalty, as allowed by law.  He also received a two-year jail sentence for possessing an illegal firearm.

The law does not prohibit domestic violence.  Authorities considered abuse in the family a private matter and seldom discussed it publicly.  In July, according to a HRANA report, the head of the medical examiner's officer of Tehran Province announced that more than 16,420 cases of domestic violence had been reported to the office, a rise from 2018.

Female Genital Mutilation/Cutting (FGM/C):  The law criminalizes FGM/C and states, "the cutting or removing of the two sides of female genitalia leads to diyeh (financial penalty or blood money) equal to half the full amount of diyeh for the woman's life."

Little current data was available on the practice inside the country, although older data and media reports suggested it was most prevalent in Hormozgan, Kurdistan, Kermanshah, and West Azerbaijan Provinces.

Other Harmful Traditional Practices:  There were no official reports of killings motivated by "honor" or other harmful traditional practices during the year, although human rights activists reported that such killings continued to occur, particularly among rural and tribal populations.

The law reduces punitive measures for fathers and other family members who are convicted of murder or physically harming children in domestic violence or "honor killings."  If a man is found guilty of murdering his daughter, the punishment is between three and 10 years in prison rather than the normal death sentence or payment of diyeh for homicide cases.

On October 23, the Guardian Council reportedly approved a bill increasing sentences for perpetrators of "acid attacks," in which the perpetrators throw acid generally on women victims for perceived violations of social norms that discriminate against women.

Sexual Harassment:  The law addresses sexual harassment in the context of physical contact between men and women and prohibits physical contact between unrelated men and women.  There was no reliable data on the extent of sexual harassment, but women and human rights observers reported that sexual harassment was the norm in many workplaces.  There were no known government efforts to address this problem.

Coercion in Population Control:  There were no reports of coerced abortion or involuntary sterilization.

Discrimination:  The constitution provides for equal protection for women under the law in conformity with its interpretation of Islam.  The government did not enforce the law, and provisions in the law, particularly sections dealing with family and property law, discriminate against women.  Judicial harassment, intimidation,

detention, and smear campaigns significantly challenged the ability of civil society organizations to fight for and protect women's rights.

In October the Guardian Council approved an amendment to the country's civil code that allows Iranian women married to foreign men to transmit citizenship to their children (see section 2.f.).  Ahmad Meidari, the deputy of the Ministry of Social Welfare, was reported estimating in January that 49,000 children would benefit if the legislation were enacted.  The government does not recognize marriages between Muslim women and non-Muslim men, irrespective of their citizenship.  The law states that a virgin woman or girl wishing to wed needs the consent of her father or grandfather or the court's permission.

The law permits a man to have as many as four wives and an unlimited number of *sigheh* (temporary wives), based on a Shia custom under which couples may enter into a limited-time civil and religious contract, which outlines the union's conditions.

A woman has the right to divorce if her husband signs a contract granting that right; cannot provide for his family; has violated the terms of their marriage contract; or is a drug addict, insane, or impotent.  A husband is not required to cite a reason for divorcing his wife.  The law recognizes a divorced woman's right to part of shared property and to alimony.  These laws were not always enforced.

The government actively suppressed efforts to build awareness among women of their rights regarding marriage and divorce.  According to a CHRI report, in September 2018 the IRGC Intelligence Organization arrested Hoda Amid, a human rights attorney, and Najmeh Vahedi, a sociologist and women's rights activist, three days before they were supposed to host a workshop about the country's marriage laws, which they had organized with a legal permit.  One of the purposes of the workshop was to teach women how to expand their rights with legally binding prenuptial contracts.

The law provides divorced women preference in custody for children up to age seven, but fathers maintain legal guardianship rights over the child and must agree on many legal aspects of the child's life (such as issuing travel documents, enrolling in school, or filing a police report).  After the child reaches the age of seven, the father is granted custody unless he is proven unfit to care for the child.

Women sometimes received disproportionate punishment for crimes such as adultery, including death sentences.  Islamic law retains provisions that equate a

woman's testimony in a court of law to one-half that of a man's and value a woman's life as one-half that of a man's.  According to the law, the diyeh paid in the death of a woman is one-half the amount paid in the death of a man, with the exception of car accident insurance payments.  According to a CHRI report, in July the government declared equality between men and women in the payment of blood money.  Per the Supreme Court ruling, the amount paid for the intentional or unintentional physical harm to a woman will still be one-half the blood money as that paid for a man, but the remaining difference will now be paid from a publicly funded trust.

Women have access to primary and advanced education.  Quotas and other restrictions nonetheless limited women's admissions to certain fields and degree programs.

The Statistical Center of Iran reported during the year that the jobless rate among women ages 15 to 19 was 35 percent.  All women's participation in the job market remained as low as 16 percent.  Women reportedly earned 41 percent less than men for the same work.  Unemployment among women in the country was twice as high as it was among men.

Women continued to face discrimination in home and property ownership, as well as access to financing.  In cases of inheritance, male heirs receive twice the inheritance of their female counterparts.  The government enforced gender segregation in many public spaces.  Women must ride in a reserved section on public buses and enter some public buildings, universities, and airports through separate entrances.

The law provides that a woman who appears in public without appropriate attire, such as a cloth scarf veil (*hijab*) over the head and a long jacket (*manteau*), or a large full-length cloth covering (*chador*), may be sentenced to flogging and fined.  Absent a clear legal definition of "appropriate attire" or of the related punishment, women (and men) were subjected to the opinions of various disciplinary and security force members, police, and judges.

In May, CHRI reported that authorities arrested 30 individuals, including both men and women, who were practicing yoga inside a home in the city of Gorgan.  The individuals were accused of wearing "inappropriate clothing" and engaging in "indecent activities."  Several individuals reported such arrests were not uncommon but that public officials rarely acknowledged them.

Protests, beating, and arrests continued as security forces cracked down on peaceful nationwide protests against dress restrictions. CHRI reported that since 2018 at least 44 women had been arrested for peacefully protesting the mandatory dress code. According to media reports in June, the government introduced 2,000 new morality police units to manage what officials called "increasing defiance" of the compulsory hijab law.

In April security forces arrested Yasaman Aryani, her mother Monireh Arabshahi, and Mojgan Keshavarz after they posted a video for International Women's Day. In the video the women are seen walking without headscarves through a Tehran metro train, handing flowers to female passengers.

Numerous news outlets reported that in August a revolutionary court sentenced Arabshahi, Aryani, and Keshavarz to 16, 16, and 23 years in prison, respectively, for "spreading propaganda against the system" and "inciting corruption and prostitution."

In May, CHRI reported that authorities had released Vida Movahedi eight months after she was arrested for peacefully protesting the hijab law. Movahedi was initially arrested in October 2018 after she stood on a utility box on Revolution Street in Tehran, removed her headscarf, and waved it on a stick in defiance.

On June 22, according to a video posted to Instagram by activist Masih Alinejad, plainclothes police violently dragged a 15-year-old girl into a police car for not obeying a directive to put on a hijab. Tehran police confirmed the arrest two days later, stating that the girl and four of her friends "insulted the agents" after refusing to respect "public moral and civil codes."

According to international media reports, in June security guards attacked women trying to enter a stadium in Tehran to watch a men's soccer match between Iran and Syria. In September, Sahar Khodayari, known as "Blue Girl," died from severe burns caused by self-immolation after police arrested and later released her from Qarchak Prison on bail on charges of "improperly wearing hijab" and defying the country's ban on female spectators from viewing soccer and other sports in public stadiums. Following Khodayari's suicide and under pressure from the world soccer governing body (FIFA), the government permitted approximately 3,500 women to attend the October 10 World Cup qualifier match between Iran and Cambodia at Azadi Stadium, which has an estimated capacity of 78,000. Amnesty International labelled the government's last-minute permission a "cynical publicity stunt" to "whitewash their image" following the death of Khodayari.

As noted by the former UNSR and other organizations, female athletes have been traditionally barred from participating in international tournaments, either by the country's sport agencies or by their husbands.  There were, however, cases throughout the year of female athletes being permitted to travel internationally to compete.

**Children**

Birth Registration:  Prior to October only a child's father could convey citizenship, regardless of the child's country of birth or mother's citizenship.  Legislation passed and approved in October provides Iranian mothers the right to apply for citizenship for children born to fathers with foreign citizenship (see section 2.f. and section 6, Women).  The new law also includes a stipulation of obtaining a security clearance from the security agencies prior to receiving approval.  Birth within the country's borders does not confer citizenship, except when a child is born to unknown parents.  The law requires that all births be registered within 15 days.

Education:  Although primary schooling until age 11 is free and compulsory for all, media and other sources reported lower enrollment in rural areas, especially for girls.

Children without state-issued identification cards are denied the right to education.  In her March 2018 report, former UNSR Jahangir noted that in Sistan va Baluchestan Province, the Cabinet of Ministers requested the Ministry of Education to issue a special card for children without birth certificates so they could attend school.  As a result, more than 20,000 children who had received such cards registered for school, and 19,000 were allowed to attend.  In his February report, current UNSR Rehman expressed concern over access to education for minority children, including references to high primary school dropout rates for ethnic minority girls living in border provinces.

Child Abuse:  There was little information available on how the government dealt with child abuse.  The law states, "Any form of abuse of children and juveniles that causes physical, psychological, or moral harm and threatens their physical or mental health is prohibited," and such crimes carry a maximum sentence of three months in confinement or a fine of 10 million rials ($230).

Early and Forced Marriage:  The legal minimum age of marriage for girls is 13, but girls as young as nine years old may be married with permission from a court and

their fathers.  In 2018 UNICEF reported that 17 percent of girls in the country were married before reaching age 18 and that approximately 40,000 were married before 15.  In March 2018 former UNSR Jahangir stated this number was likely higher, as thousands of underage marriages were not reported.  The issue became a subject of national debate in February when a charity group reported on the case of "Raha," an 11-year-old girl who was reportedly raped by a nearly 50-year-old man she was forced to marry.  Authorities reportedly arrested the man on February 11 and nullified the marriage.

*Sexual Exploitation of Children*:  The legal age requirements for consensual sex are the same as those for marriage, as sex outside of marriage is illegal.  There are no specific laws regarding child sexual exploitation, with such crimes either falling under the category of child abuse or sexual crimes of adultery.  The law does not directly address sexual molestation nor provide a punishment for it.

According to CHRI, the legal ambiguity between child abuse and sexual molestation could lead to child sexual molestation cases being prosecuted under adultery law.  While no separate provision exists for the rape of a child, the crime of rape, regardless of the victim's age, is potentially punishable by death.

*Displaced Children*:  There were reports of thousands of Afghan refugee children in the country, many of whom were born in Iran but could not obtain identity documents.  These children were often unable to attend schools or access basic government services and were vulnerable to labor exploitation and trafficking.

UNHCR stated school enrollment among refugees was generally higher outside the 20 settlements, where more resources were available and where 97 percent of the refugees reside.

International Child Abductions:  The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.  See the Department of State's Annual Report on International Parental Child Abduction at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

## Anti-Semitism

The law recognizes Jews as a religious minority and provides for their representation in parliament.  According to the Tehran Jewish Committee, the population includes approximately 9,000 Jews.  Members of the Iranian Jewish

community are reportedly subject to government restrictions and discrimination.
Government officials continued to question the history of the Holocaust, and anti-
Semitism remained a pervasive problem.  In May, President Rouhani implied
Jewish control over various Western interests, saying that speeches by foreign
officials criticizing Iran were "written by Zionists word for word."  Cartoons in
state-run media outlets repeatedly depicted foreign officials as puppets of Jewish
control.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

**Persons with Disabilities**

In 2018 parliament adopted the Law for the Protection of the Rights of Persons
with Disabilities.  According to HRW, the law increases pensions and extends
insurance coverage to disability-related health-care services, but it does not
explicitly prohibit discrimination.  No information was available regarding
authorities' effectiveness in enforcing the law.  The law prohibits those with visual,
hearing, or speech disabilities from running for seats in parliament.  While the law
provides for government-funded vocational education for persons with disabilities,
domestic news reports noted vocational centers were located only in urban areas
and unable to meet the needs of the entire population.

In October, HRW and CHRI reported persons with disabilities remained cut off
from society, a major obstacle being a mandatory government medical test that can
exclude children from the public school system.  They continued to face stigma
and discrimination from government social workers, health-care workers, and
others.  Many persons with disabilities remained unable to participate in society on
an equal basis.  The law provides for public accessibility to government-funded
buildings, and new structures appeared to comply with these standards.  There
were efforts to increase access for persons with disabilities to historical sites.
Government buildings that predated existing accessibility standards remained
largely inaccessible, and general building accessibility, including access to toilets,
for persons with disabilities remained a problem.  Persons with disabilities had
limited access to informational, educational, and community activities.  CHRI
reported in 2018 that refugees with disabilities, particularly children, were often
excluded or denied the ability to obtain the limited state services provided by the
government.

## National/Racial/Ethnic Minorities

The constitution grants equal rights to all ethnic minorities, allowing minority languages to be used in the media.  The law grants the right of citizens to learn, use, and teach their own languages and dialects.  In practice minorities did not enjoy equal rights, and the government consistently barred use of their languages in school as the language of instruction.

The government disproportionately targeted minority groups, including Kurds, Ahwazis, Azeris, and Baluchis, for arbitrary arrest, prolonged detention, disappearances, and physical abuse.  These ethnic minority groups reported political and socioeconomic discrimination, particularly in their access to economic aid, business licenses, university admissions, job opportunities, permission to publish books, and housing and land rights.

Another widespread complaint among ethnic minority groups, particularly among Ahwazis, Azeris and Lors, was that the government diverted and mismanaged natural resources, primarily water, often for the benefit of IRGC-affiliated contractors.  According to reports from international media and human rights groups, these practices devastated the local environment on which farmers and others depended for their livelihoods and well-being, resulting in forced migration and further marginalization of these communities.

The law, which requires religious screening and allegiance to the concept of "governance by the jurist," not found in Sunni Islam, impaired the ability of Sunni Muslims (many of whom are also Baluch, Ahwazi, or Kurdish) to integrate into civic life and to work in certain fields.

Human rights organizations observed that the government's application of the death penalty disproportionately affected ethnic minorities.  Authorities reportedly subjected members of minority ethnicities and religious groups in pretrial detention repeatedly to more severe physical punishment, including torture, than other prisoners, regardless of the type of crime of which they were accused.

The estimated eight million ethnic Kurds in the country frequently campaigned for greater regional autonomy.  The government continued to use the law to arrest and prosecute Kurds for exercising their rights to freedom of expression and association.  The government reportedly banned Kurdish-language newspapers,

journals, and books and punished publishers, journalists, and writers for opposing and criticizing government policies.

Authorities suppressed legitimate activities of Kurdish NGOs by denying them registration permits or bringing security charges against persons working with such organizations.  Authorities did not prohibit the use of the Kurdish language in general but did not offer education in Kurdish in public schools.  UNSR Rehman stated in his July report concern regarding the reported persecution of Kurdish language teachers, including Zara Mohammadi, arrested and detained by authorities on May 23 for giving private Kurdish lessons without a permit in Sanandaj.

According to the same UN report, in the first six months of the year, 115 Kurdish citizens were arrested for charges related to membership in Kurdish political parties and 84 for participating in civic activities such as organizing Nowruz celebrations or managing networks on social media.  International human rights observers, including the IHRDC, stated that the country's estimated two million Ahwazi Arabs, representing 110 tribes, faced continued oppression and discrimination.  Ahwazi rights activists reported the government continued to confiscate Ahwazi property to use for government development projects, refusing to recognize the paper deeds from the prerevolutionary era.

According to UNSR Rehman's July report, his office received information that the IRGC was involved in redirecting floodwater in the spring towards local farms to preserve oil reserves and equipment in Khuzestan Province.  In April media and NGOs reported that police arrested social media users and Arab flood relief volunteers and charged them with "broadcasting distracting news and flood rumors."  They remained detained in Khuzestan.

Ahwazi human rights groups reported the government rounded up hundreds of Ahwazis following the September 2018 attack on a military parade in Ahwaz (estimates reported in November 2018 ranged from 600 to more than 800 arrests), while the state-run Tasnim news agency reported the arrest of 22 persons in connection with the attack (see section 1.a.).  Ahwazi human rights groups also reported instances of torture of detainees in the Intelligence Ministry detention center in Ahwaz.

Ethnic Azeris, who number more than 18 million, or approximately 23-25 percent of the population, were more integrated into government and society than other ethnic minority groups and included the supreme leader.  Azeris reported the

government discriminated against them by harassing Azeri activists or organizers and changing Azeri geographic names.

UNSR Rehman stated in his July report that there were 82 Azeris arbitrarily detained on national security-related charges with sentences of up to six years. This figure includes activists and supporters of the soccer club Tiraxtur who were arrested and detained on May 2 for leading pro-Azeri chants at a soccer match at Sehend Stadium in Tabriz.

According to reports, the government tried to prevent thousands of mostly Azeri speaking activists from meeting every year at Babak Fortress to celebrate peacefully the birthday of a historic figure, Babak Khorramdin.  The annual gathering has general overtones of Azeri nationalism.  Amnesty and HRANA reported that Azeri law student and activist Ebrahim Nouri was arrested on 30 occasions, including at Babak Fortress, and accused of promoting propaganda against the government and "separatism in Azerbaijan."

Local and international human rights groups alleged discrimination during the year against the Baluchi ethnic minority, estimated at between 1.5 and two million persons.  Areas with large Baluchi populations were severely underdeveloped and had limited access to education, employment, health care, and housing; Baluchi activists reported that more than 70 percent of the population lived below the poverty line.

According to activist reports, the law limited Sunni Baluchis' employment opportunities and political participation.  Activists reported that throughout the year, the government sent hundreds of Shia missionaries to areas with large Sunni Baluch populations to try to convert the local population.  According to Baluchi rights activists, Baluchi journalists and human rights activists faced arbitrary arrest, physical abuse, and unfair trials.

**Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity**

The law criminalizes consensual same-sex sexual activity, which is punishable by death, flogging, or a lesser punishment.  The law does not distinguish between consensual and nonconsensual same-sex intercourse, and NGOs reported this lack of clarity led to both the victim and the perpetrator being held criminally liable under the law in cases of assault.  The law does not prohibit discrimination based on sexual orientation and gender identity.  According to international and domestic

media reports, there was at least one case during the year in which an alleged criminal was executed for sodomy-related charges.  While few details were available for specific cases, LGBTI activists expressed concern that the government executed LGBTI individuals under the pretext of more severe, and possibly specious, criminal charges such as rape.  In June the foreign minister appeared to defend executions of LGBTI persons for their status or conduct.  After being asked by a journalist in Germany why the country executes "homosexuals," the foreign minister stated, "Our society has moral principles.  And we live according to these principles.  These are moral principles concerning the behavior of people in general.  And that means that the law is respected and the law is obeyed."

Security forces harassed, arrested, and detained individuals they suspected of being LGBTI.  In some cases security forces raided houses and monitored internet sites for information on LGBTI persons.  Those accused of "sodomy" often faced summary trials, and evidentiary standards were not always met.  The Iranian LGBTI activist group 6Rang noted that individuals arrested under such conditions were traditionally subjected to forced anal or sodomy examinations--which the United Nations and World Health Organization stated can constitute torture--and other degrading treatment and sexual insults.  Punishment for same-sex sexual activity between men was more severe than between women.

The government censored all materials related to LGBTI status or conduct.  Authorities particularly blocked websites or content within sites that discussed LGBTI issues, including the censorship of Wikipedia pages defining LGBTI and other related topics.  There were active, unregistered LGBTI NGOs and activists in the country, a number of whom were arrested or charged for LGBTI-related activities during the year.

On December 13, Radio Farda reported that Rezvaneh Mohammadi, a gender-equality activist, was sentenced to five years in prison by Branch 28 of the revolutionary court in Tehran, presided over by Judge Mohammad Moghiseh, under the charge of "collusion against national security by seeking to normalize homosexual relations."  NGOs noted this was the first time an activist had faced such an accusation in the country.  According to CHRI, authorities arrested Mohammadi in September 2018 and held her in solitary confinement for several weeks at Evin Prison, where they pressured her, including with threats of rape, to confess to receiving money to overthrow the government.  Hate-crime laws or other criminal justice mechanisms do not exist to aid in the prosecution of bias-motivated crimes.

The law requires all male citizens older than age 18 to serve in the military but exempts gay men and transgender women, who are classified as having mental disorders.  New military identity cards listed the subsection of the law dictating the exemption.  According to the NGO 6Rang, this practice identified gay or transgender individuals and put them at risk of physical abuse and discrimination.

NGOs reported authorities pressured LGBTI persons to undergo gender reassignment surgery.  According to a July report by the NGO 6Rang, the number of private and semigovernmental psychological and psychiatric clinics allegedly engaging in "corrective treatment" or reparative therapies of LGBTI persons continued to grow.  The NGO 6Rang reported the increased use at such clinics of electric shock therapy to the hands and genitals of LGBTI persons, prescription of psychoactive medication, hypnosis, and coercive masturbation to pictures of the opposite sex.  According to the NGO 6Rang, one such institution is called The Anonymous Sex Addicts Association of Iran, with branches in 18 provinces.

## HIV and AIDS Social Stigma

Despite government programs to treat and provide financial and other assistance to persons with HIV/AIDS, international news sources and organizations reported that individuals known to be infected with HIV/AIDS faced widespread societal discrimination.  Individuals with HIV/AIDS, for example, continued to be denied employment as teachers.

## Section 7. Worker Rights

### a. Freedom of Association and the Right to Collective Bargaining

The constitution provides for freedom of association, but neither the constitution nor law specifies trade union rights.  The law states that workers may establish an Islamic labor council or a guild at any workplace, but the rights and responsibilities of these organizations fell significantly short of international standards for trade unions.  In workplaces where workers established an Islamic labor council, authorities did not permit any other form of worker representation.  The law requires prior authorization for organizing and concluding collective agreements.  Strikes are prohibited in all sectors, although private-sector workers may conduct "peaceful" campaigns within the workplace.  The law does not apply to establishments with fewer than 10 employees.

Authorities did not respect freedom of association and the right to collective bargaining, and the government did not effectively enforce applicable laws. The government severely restricted freedom of association and interfered in worker attempts to organize. Labor activism is considered to be a national security offense, with severe punishments up to and including the death penalty. The law does not prohibit antiunion discrimination and does not require reinstatement of workers fired for union activity.

Antiunion discrimination occurred, and the government harassed trade union leaders, labor rights activists, and journalists during a crackdown on widespread protests. Independent trade unionists were subject to arbitrary arrests, tortured, and subjected to harsh sentences.

According to media and NGO reporting, on May 1, International Labor Day, police violently attacked and arrested at least 35 activists who had gathered for peaceful demonstrations demanding workers' rights, organized by 20 independent labor organizations, in front of parliament. The government barred teachers from commemorating International Labor Day and Teachers' Day. Several prominent teachers and union activists remained in prison or awaited new sentences, including Mahmoud Beheshti Langroudi (see below).

The Interior Ministry; the Ministry of Cooperatives, Labor, and Social Welfare; and the Islamic Information Organization determined labor councils' constitutions, operational rules, and election procedures. Administrative and judicial procedures were lengthy. The Workers' House remained the only officially authorized national labor organization, and its leadership oversaw, granted permits to, and coordinated activities with Islamic labor councils in industrial, agricultural, and service organizations with more than 35 employees.

According to CHRI, the labor councils, which consisted of representatives of workers and a representative of management, were essentially management-run unions that undermined workers' efforts to maintain independent unions. The councils, nevertheless, sometimes could block layoffs and dismissals. There was no representative workers' organization for noncitizen workers.

According to international media reports, security forces continued to respond to workers' attempts to organize or conduct strikes with arbitrary arrests and violence. As economic conditions deteriorated, strikes and worker protests were numerous and widespread across the country throughout the year, often prompting a heavy police response. Security forces routinely monitored major worksites.

According to CHRI, workers were routinely fired and risked arrest for striking, and labor leaders were charged with national security crimes for trying to organize workers.

According to a CHRI report, in August 2018 security forces violently suppressed protests at the Haft Tappeh sugarcane company in the southeast.  Haft Tappeh, the country's largest sugar production plant, had been the site of continuing protests against unpaid wages and benefits for more than two years.  According to CHRI, at least five workers were detained and charged with national security crimes but later released on bail following negotiations between labor representatives and judicial officials.  In May the protests resurfaced in response to the announcement of a joint indictment issued against five journalists and two labor rights activists.  Sepideh Gholian, Amir Hossein Mohammadifard, Sanaz Allahyari, Ali Amirgholi, Asal Mohammadi, Esmail Bakhski, and Ali Nejati were charged with "assembly and collusion against national security," "forming groups with the intention to disturb national security," and "contacts with antistate organizations."

According to NGO and media reports, as in previous years, a number of trade unionists were imprisoned or remained unjustly detained for their peaceful activism.  Mehdi Farahi Shandiz, a member of the Committee to Pursue the Establishment of Labor Unions in Iran, continued serving a three-year sentence, having been convicted of "insulting the supreme leader" and "disrupting public order."  There were reports that Shandiz was beaten and tortured in Karaj Prison and kept for prolonged periods in solitary confinement.

The government continued to arrest and harass teachers' rights activists from the Teachers Association of Iran and related unions.  In March media outlets reported continued nationwide teacher strikes demanding better pay, rights to an official union, and the release of teachers' rights activists who were jailed during protests in 2018.  That same month Hashem Khastar, a teachers' rights activist from Mashhad, was allegedly abducted by unknown individuals, resurfaced shackled to a bed at a psychiatric hospital, was released, and taken into custody.

According to a CHRI report, Mahmoud Beheshti-Langroudi, the former spokesman for the Iranian Teachers' Trade Association (ITTA) jailed since 2017, continued a 14-year combined sentence for charges associated with his peaceful defense of labor rights.  CHRI reported in July that Beheshti-Langroudi commenced another hunger strike protesting his unjust sentence, the judiciary's refusal to review his case, and the mistreatment of political prisoners.  Esmail Abdi, a mathematics teacher and former secretary general of ITTA, continued a

six-year prison sentence for labor rights activism.  He was arrested in 2015 and convicted in 2016 for "propaganda against the state" and "collusion against national security."  CHRI reported in April 2018 that Abdi had written a letter from Evin Prison criticizing the judiciary's "arbitrary and illegal rulings" and "widespread violations of the rights of teachers and workers in Iran."  He decried the "criminalization of trade unions" and demanded a public trial that he had thus far been denied.

According to reports from international media and human rights organizations, truck drivers launched nationwide strikes over low and unpaid wages and stipends throughout the year.  HRANA reported that the government arrested at least 261 drivers in 19 provinces following a round of protests in the fall of 2018.  The drivers were threatened with heavy sentences, and Attorney General Mohammad Jaafar Montazeri issued a public statement suggesting that those who initiated the protest should be subject to the death penalty.  In October 2018 the International Transport Workers' Federation expressed concern over the government's harsh crackdown on labor action by truckers across the country, including the threat of the death penalty against organizers.

**b. Prohibition of Forced or Compulsory Labor**

The law prohibits all forms of forced or compulsory labor, but the government did not effectively enforce the law and made no significant effort to address forced labor during the year.  Penalties were not sufficient to deter violations.  Conditions indicative of forced labor sometimes occurred in the construction, domestic labor, and agricultural sectors, primarily among adult Afghan men and boys younger than age 18.  Family members and others forced children to work.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

**c. Prohibition of Child Labor and Minimum Age for Employment**

The law does not prohibit the worst forms of child labor.  The law prohibits employment of children younger than age 15 and places restrictions on employment of children younger than 18, such as prohibiting hard labor or night work.  The law does not apply to domestic labor and permits children to work in agriculture and some small businesses from the age of 12.  The government did not adequately monitor or enforce laws pertaining to child labor, and child labor

remained a serious problem.  Penalties for violations were not sufficient to deter violations.

The United Nations in 2016 cited a 2003 law that exempts workshops with fewer than 10 employees from labor regulations as increasing the risks of economic exploitation of children.  The UN report also noted serious concerns with the large number of children employed under hazardous conditions, such as in garbage collection, brick kilns, and industrial workshops, without protective clothing and for very low pay.

There were reportedly significant numbers of children, especially of Afghan descent, who worked as street vendors in major urban areas.  According to official estimates, there were 60,000 homeless children, although many children's rights organizations estimated up to 200,000 homeless children.  The Committee on the Rights of the Child reported that street children in particular were subjected to various forms of economic exploitation, including sexual abuse and exploitation by the public and police officers.  Child labor also was used in the production of carpets and bricks.  Children worked as beggars, and there were reports criminals forced some children into begging rings.  According to ISNA, Reza Ghadimi, the managing director of the Tehran Social Services Organization, said in 2018 that, according to a survey of 400 child laborers, 90 percent were "molested."

Also, see the Department of Labor's *List of Goods Produced by Child Labor or Forced Labor* at https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods.

## d. Discrimination with Respect to Employment and Occupation

The constitution bars discrimination based on race, gender, disability, language, and social status "in conformity with Islamic criteria," but the government did not effectively enforce these prohibitions.  According to the constitution, "everyone has the right to choose any occupation he wishes, if it is not contrary to Islam and the public interests and does not infringe on the rights of others."

Despite this constitutional provision, the government made systematic efforts to limit women's access to the workplace, and their participation in the job market remained as low as 16 percent.  Women reportedly earned 41 percent less than men for the same work.  Unemployment among women in the country was twice as high as it was among men.  Hiring practices often discriminated against women, and the Ministry of Cooperatives, Labor, and Social Welfare guidelines stated that

men should be given preferential hiring status.  An Interior Ministry directive requires all officials to hire only secretaries of their own gender.  Women remained banned from working in coffee houses and from performing music alongside men, with very limited exceptions made for traditional music.  Women in many fields were restricted from working after 9 p.m.

Kurds, Ahwazis, Azeris, and Baluchis reported political and socioeconomic discrimination with regard to their access to economic aid, business licenses, and job opportunities.

CHRI reported that, according to the director of the State Welfare Organization, 60 percent of persons with disabilities remained unemployed.

**e. Acceptable Conditions of Work**

In 2018 the Supreme Labor Council, the government body charged with proposing labor regulations, agreed to raise the minimum monthly wage by 19.8 percent. There were reported complaints that the minimum wage increase was too low in light of the plunging value of the Iranian rial against the U.S. dollar, which is used to price day-to-day goods.  The minimum wage is commonly below the poverty line in rural areas.

The law establishes a maximum six-day, 44-hour workweek with a weekly rest day, at least 12 days of paid annual leave, and several paid public holidays.  Any hours worked above that total entitles a worker to overtime.  The law mandates a payment above the hourly wage to employees for any accrued overtime and provides that overtime work is not compulsory.  The law does not cover workers in workplaces with fewer than 10 workers, nor does it apply to noncitizens.

Employers sometimes subjected migrant workers, most often Afghans, to abusive working conditions, including below-minimum-wage salaries, nonpayment of wages, compulsory overtime, and summary deportation without access to food, water, or sanitation facilities during the deportation process.  The government did not effectively enforce the laws related to wages and hours, and occupational safety and health.  Penalties were not sufficient to deter violations.

According to media reports, many workers continued to be employed on temporary contracts, under which they lacked protections available to full-time, noncontract workers, and could be dismissed at will.  Large numbers of workers employed in small workplaces or in the informal economy similarly lacked basic protections.

Low wages, nonpayment of wages, and lack of job security due to contracting practices continued to contribute to strikes and protests, which occurred throughout the year.

According to local and international media reports, thousands of teachers, truckers, and workers from a wide variety of sectors held largescale, countrywide rallies and protests demanding wage increases and payment of back wages throughout the year.  During the year authorities increased pressure against these protesters through intimidation, wrongful arrests, and arbitrary charges.

Little information was available regarding labor inspection and related law enforcement.  While the law provides for occupational health and safety standards, the government sometimes did not enforce these standards in either the formal or informal sectors.  Workers reportedly lacked the power to remove themselves from situations that endangered their health or safety without jeopardizing their employment.

Labor organizations alleged that hazardous work environments resulted in the deaths of thousands of workers annually.  In 2018 the state-run Iran Labor News Agency quoted the head of the Construction Workers Association as estimating there were 1,200 deaths and 1,500 spinal cord injuries annually among construction workers, while local media routinely reported on workers' deaths from explosions, gas poisoning, electrocution, or similar accidents.