# EXHIBIT 24

United Nations

A/HRC/43/61



# General Assembly

Distr.: General
28 January 2020

Original: English

**Human Rights Council**
**Forty-third session**
24 February–20 March 2020
Agenda item 4
**Human rights situations that require the Council's attention**

## Situation of human rights in the Islamic Republic of Iran

### Report of the Special Rapporteur on the situation of human rights in the Islamic Republic of Iran*

*Summary*

        The present report, submitted pursuant to General Assembly resolution 74/167, provides an overview of human rights concerns in the Islamic Republic of Iran, including the use of the death penalty, the execution of child offenders, the rights to freedom of opinion, expression, association and assembly, the human rights situation of women and girls, the human rights situation of minorities and the impact of sanctions. The report also provides an overview of the legal framework governing detention and an assessment of the human rights concerns arising from conditions in prisons and detention centres in the Islamic Republic of Iran in light of the country's human rights obligations under international law.

---

    *   Agreement was reached to publish the present report after the standard publication date owing to circumstances beyond the submitter's control.

GE.20-01246(E)



Please recycle 



# I.  Introduction

1.      The present report, submitted pursuant to General Assembly resolution 74/167, is divided into two parts. The first part describes pressing human rights concerns in the Islamic Republic of Iran. The second part examines human rights concerns related to conditions of detention in the country.

2.      In 2019, the Special Rapporteur on the situation of human rights in the Islamic Republic of Iran met with victims of alleged violations, their families, human rights defenders, lawyers and representatives of civil society organizations, including in the Netherlands and Austria (2–8 June 2019) and in the United States of America (4–8 November 2019). The Special Rapporteur travelled to New York to present his most recent report[1] to the General Assembly and, during that mission, met with representatives of Member States and civil society. In preparing the present report, he reviewed written submissions, government reports, legislation, media reports and reports of international human rights mechanisms. During his visit to Geneva in March 2019, he met with representatives of the Permanent Mission of the Islamic Republic of Iran to the United Nations and had a constructive meeting with a delegation of senior Iranian officials, including from the judiciary, in Geneva in early 2019. The Special Rapporteur thanks all interlocutors and officials for their cooperation and the information provided.

3.      The Special Rapporteur is shocked at the number of deaths, serious injuries and reports of ill-treatment of persons detained during the November 2019 protests. According to reports, detainees are being tortured or are suffering other forms of ill-treatment, sometimes to extract forced confessions. There are also reports of denials of medical treatment, including for injuries caused by the excessive use of force by the security forces, with some other detainees being held incommunicado or being subjected to enforced disappearance. He is concerned about reports that families of individuals killed by the security forces have been threatened not to speak out. He remains highly concerned about the continuing restrictions on freedom of expression. Although access to the Internet has been restored since it was shut down at the peak of the protests, the policy of intimidation and harassment of journalists and their families has continued. In its comments, the Government rejects these allegations and states that during the incidents law enforcement agencies displayed restraint while exercising their duty to maintain security.

4.      The Special Rapporteur remains concerned about the use of the death penalty in the Islamic Republic of Iran, including for child offenders. These concerns are compounded by the fact that he has consistently received reports indicating serious violations of fair trial standards, including through the use of forced confessions as the basis for convictions. He is disturbed by ongoing challenges faced by human rights defenders and others who have been arrested for their peaceful activities calling for the full realization of their rights. The continued efforts by the Government to stifle the rights to freedom of opinion, expression and association only serve to decrease security and stability in the Islamic Republic of Iran. The Special Rapporteur continues to receive reports of discrimination against minorities and women, and is concerned about the lack of legal protections for vulnerable groups, including children.

# II.  Overview of the situation of human rights in the Islamic Republic of Iran

## A.  November 2019 protests

5.      The situation of human rights in the Islamic Republic of Iran continues to be of grave concern, with continued economic hardship having a significant impact on economic

---

[1]   A/74/188.

and social rights. Efforts to exercise civil and political rights, including protests and social mobilization calling for an improvement in the economic situation in the country, have led to widespread protests. Between 15 and 21 November 2019, protests spread across 29 of the country's 31 provinces, with as many as 200,000 participants.[2] The protests began after the Government announced on 15 November that, effective immediately, the price of a litre of petrol would increase by 50 per cent and that each car would be entitled to a monthly ration of 60 litres, with additional purchases costing 200 per cent more.[3] The protests appeared to reflect widespread discontent with the economic situation, which has posed significant challenges for Iranians and which is the result of mismanagement and corruption as well as sanctions imposed by the United States.

6.      The authorities reacted strongly to the protests, warning that decisive action would be taken if the unrest continued, and reportedly deployed a heavy police presence in major cities to deter protesters.[4] The Special Rapporteur is alarmed at the reported deaths and injuries of protesters caused by the Iranian security forces. According to credible reports, at least 304 people, including 12 children, are confirmed to have died; unconfirmed reports indicate that the total number of deaths is over 400.[5] In the days following the demonstrations, footage and reports emerged of brutal tactics employed by the security forces, including the use of live ammunition against unarmed individuals.[6] A member of the Iranian parliament's Commission on National Security and Foreign Policy stated on 25 November that more than 7,000 people had been arrested during the protests.[7] Detainees have reportedly been held in overcrowded conditions, without access to lawyers and in some cases have been subjected to torture and ill-treatment and pressured into making forced confessions.[8] The Special Rapporteur is disturbed by reports that detainees are also being denied medical treatment, including for injuries caused by the excessive use of force by the security forces, and that some detainees are being held incommunicado or are being subjected to enforced disappearance. There are particular concerns that journalists and their families specifically have been threatened and arrested to prevent them from reporting on protests.[9] Journalists have been strictly ordered not to criticize the government response to the protests and the relatives of journalists working for Farsi-language news outlets based outside of the Islamic Republic of Iran are being put under pressure by the authorities, including by being summoned for interrogation in an attempt to intimidate and silence news reporting by their relatives.

7.      The Special Rapporteur is deeply concerned about the Government's excessive use of force during the protests in November 2019 in provinces with a majority population of ethnic minorities. According to reports, some of those provinces have the highest numbers of deaths, with 84 and 52 people being killed in Khuzestan and Kermanshah Provinces respectively. Dozens of activists from ethnic minorities, including Kurds and Azerbaijani-Turks, were reportedly summoned or arrested following the protests. The Special Rapporteur has also received reports that officials have increased arrests of Baha'is

---

[2]   www.reuters.com/article/us-iran-protests/iran-says-200000-took-to-streets-in-anti-government-protests-idUSKBN1Y11PE.

[3]   www.bbc.com/news/world-middle-east-50444429.

[4]   www.reuters.com/article/us-iran-gasoline-protests/irans-guards-warn-of-decisive-action-if-unrest-continues-idUSKBN1XS1BU; www.reuters.com/article/us-iran-gasoline-protests/more-than-100-protestors-killed-in-iran-during-unrest-amnesty-international-idUSKBN1XT0X7.

[5]   www.amnesty.org/en/latest/news/2019/12/iran-thousands-arbitrarily-detained-and-at-risk-of-torture-in-chilling-post-protest-crackdown/.

[6]   www.bbc.com/news/world-middle-east-50562584; www.hrw.org/news/2019/11/27/iran-deliberate-coverup-brutal-crackdown.

[7]   www.reuters.com/article/us-iran-protests/iran-says-200000-took-part-in-anti-government-demos-lawmaker-says-7000-held-idUSKBN1Y11PE.

[8]   www.iranhr.net/en/articles/4020.

[9]   https://iranhumanrights.org/2019/11/we-know-where-you-live-iran-goes-after-foreign-based-reporters/; https://iranhumanrights.org/2019/11/iranian-government-dictated-to-local-media-how-to-cover-protests-new-documents-reveal/.

following the protests and that 10 Baha'is were arrested in Baharestan on 29 and 30 November 2019.[10]

8.      Government officials, including the Supreme Leader, the President and the head of the judiciary, have all issued public statements denouncing the protests, attributing them to foreign meddling in the affairs of the Islamic Republic of Iran.[11] There has been a public admission by the Governor of Quds City that she herself ordered the security forces to shoot protesters who had entered the Governor's building. Iranian media sources have reported that protesters were violent and burned businesses and public buildings. In contrast, human rights organizations have reported that the protests were largely peaceful. Footage and reports have recorded unarmed protesters being shot by security forces as they were running away, as well as security forces aiming directly at protesters' heads and vital body organs.[12] The Special Rapporteur expresses grave concern about reports that lethal force was used against unarmed protesters. As set out in principle 9 of the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, the intentional lethal use of firearms is permitted only when strictly unavoidable in order to protect life. Moreover, everyone is allowed to participate in lawful and peaceful assemblies, in accordance with the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights. In its comments, the Government challenges the peaceful nature of the protests by claiming that a number of protesters were armed and by noting the destruction of public and private property. The Supreme Leader reportedly issued an order addressed to the Secretary of the Supreme National Security Council to promptly address the situation of detainees and provide the required assistance to the families of the deceased. In addition, the Government reports the creation of a committee, consisting of the Vice President for Legal Affairs, the Minister of the Interior and the Minister of Justice, to investigate the events and ensure compensation to all those affected by the violence and destruction.

9.      The Supreme National Security Council voted on 16 November 2019 to restrict Internet access, resulting in connectivity rates in the country dropping to 5 per cent of their usual levels.[13] The Security Emergency Centre of the Ministry of the Interior reportedly stated that it would legally pursue social media users who shared footage of the protests online, and accused some of spreading lies and recycling footage from previous incidents to undermine public confidence and disrupt national security.[14] In some cities, Internet connectivity was reportedly restored by 19 November, but full connectivity was not restored countrywide until 5 December.

## B.    Impact of sanctions

10.     The Islamic Republic of Iran has continued to struggle economically since the reimposition of sanctions by the United States in November 2018.[15] In addition, foreign companies and banks are exercising increased caution out of concern for reputational risk and other repercussions, which have had a serious impact on Iranian banks, businesses and the economy as a whole. This in turn has had a significant negative impact on the human rights of Iranians, especially in relation to the rights to food and health.

---

[10]   www.en-hrana.org/tag/bahai-arrests-iran.

[11]   www.reuters.com/article/us-iran-gasoline-protests-minister/hundreds-of-banks-and-government-sites-burned-in-iran-unrest-interior-minister-idUSKBN1Y10GY; https://fr.reuters.com/article/media News/idUKL5N27X0LP.

[12]   www.amnesty.org/en/latest/news/2019/11/iran-world-must-strongly-condemn-use-of-lethal-force-against-protesters-as-death-toll-rises-to-143/; www.amnesty.org/en/latest/news/2019/11/iran-more-than-100-protesters-believed-to-be-killed-as-top-officials-give-green-light-to-crush-protests/; www.bbc.com/news/world-middle-east-50562584.

[13]   www.france24.com/en/20191117-internet-restricted-in-protest-hit-iran-report; https://netblocks.org/reports/internet-disrupted-in-iran-amid-fuel-protests-in-multiple-cities-pA25L18b.

[14]   www.bbc.com/news/world-middle-east-50444429.

[15]   https://home.treasury.gov/news/press-releases/sm541.

11.     On 3 October 2018, the International Court of Justice issued an order for provisional measures in proceedings instituted by the Islamic Republic of Iran against the United States invoking alleged violations of the Treaty of Amity, Economic Relations and Consular Rights concluded in 1955 by the two States, which also contains rules on freedom of trade and commerce. [16] The Government noted that the Court had concluded that assurances regarding humanitarian exemptions did not fully address the humanitarian and safety concerns raised, maintaining the risk of "irreparable prejudice" on health and life, in particular with regard to medicines, medical devices, foodstuffs and agricultural commodities.[17] Proceedings in the case were ongoing as at November 2019.[18]

12.     The Special Rapporteur continues to be concerned about the impact of sanctions and banking restrictions on the humanitarian operations of the United Nations and other organizations. He notes the statement by the Norwegian Refugee Council that "sanctions have a crippling effect on refugees, the poorest and on the humanitarian work we do for the most vulnerable". [19] He notes the difficulty many humanitarian organizations face in obtaining the cash and supplies needed to conduct their work, resulting from challenges associated with payments to foreign companies, including for humanitarian transactions that should be exempt from the sanctions. The Government indicates that, following the floods of 16 March 2019, a number of humanitarian organizations faced serious difficulties in providing aid to the affected populations due to the sanctions imposed on financial transactions. Due diligence requirements, limited access to non-sanctioned banking services and shortages of foreign currency appear to have had a negative effect on much-needed humanitarian assistance.[20]

## 1.     Right to food

13.     An increase of 63.5 per cent in food prices compared to the same time in 2018 has contributed to a rise in the overall inflation rate, with the International Monetary Fund estimating the 2019 inflation rate at 35.7 per cent (consumer price index).[21] The loss in agricultural production resulting from the 2019 floods has contributed to the documented food-price inflation. According to the Statistical Centre of Iran, in October 2019 the price of red meat and poultry increased by 82.2 per cent, that of vegetables by 74.2 per cent, that of fruit and nuts by 67 per cent and that of cheese, milk and eggs by 45.8 per cent.[22] These increases have likely had significant negative repercussions on lower-income groups, which in many cases are already marginalized communities such as ethnic and religious minorities.

## 2.     Right to health

14.     The Special Rapporteur remains concerned about the impact of sanctions and banking restrictions on the right to health, particularly on the production, availability and distribution of medicines, pharmaceutical equipment and supplies. [23] He notes that a documented significant rise in the price of medicines[24] and the depletion of available stocks, combined with the risk of corruption[25] and smuggling, all create obstacles to health

---

[16]   https://www.icj-cij.org/files/case-related/175/175-20181003-ORD-01-00-EN.pdf.

[17]   Ibid.

[18]   www.icj-cij.org/files/case-related/164/164-20190213-JUD-01-00-EN.pdf.

[19]   www.nrc.no/news/2019/august2/aid-work-in-iran-at-risk-due-to-u.s.-sanctions/;
www.nrc.no/opinions-all/in-trump-iran-showdown-afghan-refugees-are-neglected-but-devastating-
collateral-damage/.

[20]   www.bourseandbazaar.com/news-1/2019/10/29/us-sanctions-threaten-iranians-right-to-health-hrw.

[21]   www.imf.org/en/Countries/IRN; https://djavadsalehi.com/2019/09/23/good-news-for-iran-from-the-
inflation-front/#more-4674.

[22]   www.amar.org.ir/Portals/0/News/1398/shg9807.pdf.

[23]   www.isna.ir/news/98050703466/; https://edition.cnn.com/2019/02/22/middleast/iran-medical-
shortages-intl/index.html; www.nytimes.com/2018/11/11/world/middleeast/iran-sanctions.html.

[24]   https://financialtribune.com/articles/economy-business-and-markets/93564/impact-of-us-sanctions-
on-irans-healthcare-sector; www.irna.ir/news/83236255/.

[25]   www.al-monitor.com/pulse/originals/2019/01/iran-us-sanctions-rentierism-pharmaceutical-sector-
medicine.html.

A/HRC/43/61

care. As hospitals are reportedly experiencing shortages of medicines, medical equipment[26] and consumer goods,[27] the most vulnerable patients, especially those with serious diseases such as cancer, haemophilia, thalassaemia, multiple sclerosis and epilepsy, are at greater risk.[28] In its comments, the Government states that, in November 2019, the Head of the Epidermolysis Bullosa Association announced that 15 children had lost their lives due to lack of medication and equipment.

15.    While a majority of medications are produced domestically, the Islamic Republic of Iran relies on the import of raw materials for their production, and a lack of stable imports has seriously hindered domestic production.[29] By June 2019, imports of medical supplies had fallen by 60 per cent compared to September 2018.[30] The Minister of Health has expressed concern that importers and manufacturers may be compelled to purchase alternative or lower-quality products, which could pose health risks for patients.[31]

## C.   Death penalty

16.    The Special Rapporteur notes ongoing serious concerns regarding the use of the death penalty in the Islamic Republic of Iran. According to information received, as many as 217 executions were carried out between 1 January and 31 October 2019. At least 25 executions were carried out pursuant to convictions for drug-related offences,[32] confirming the significant decrease in executions for drug-related offences since the 2017 amendment of the drug trafficking law. However, the Special Rapporteur is concerned that the overall rate of executions in 2019 appears to be higher than in 2018, with roughly 20 more executions reported at the time of writing compared to 2018. The actual number of executions may be higher, as many are not announced by the authorities. As few as 68 executions were announced by the Iranian authorities of those documented and verified by civil society between 1 January and 31 October 2019.[33]

17.    At least 12 of the executions reported in the first 10 months of 2019 were carried out in public.[34] The Human Rights Committee has opined that public executions are contrary to the provisions of the International Covenant on Civil and Political Rights.[35] The Committee has also noted that failure to respect article 7 would inevitably render the execution arbitrary in nature and thus also in violation of article 6.[36]

18.    The death penalty continues to be applied for a wide range of offences, in contravention of article 6 of the International Covenant on Civil and Political Rights, which notes that States parties that have not yet abolished the death penalty should only impose it for the most serious crimes. According to the consistent interpretation of the Human Rights Committee, the most serious crimes are those that involve intentional killing.[37] The Islamic Penal Code does not limit the application of the death penalty to such cases. The death penalty may be applied for example in some cases of adultery, for certain cases of consensual same-sex intercourse between men or for offences that are not well-defined, such as *efsad-e fel-arz* ("spreading corruption on earth"). In June 2019, when asked about

---

[26]  www.ilna.ir/fa/tiny/news-663910.
[27]  www.ilna.ir/fa/tiny/news-673055.
[28]  https://foreignpolicy.com/2019/08/14/u-s-sanctions-are-killing-cancer-patients-in-iran/.
[29]  https://ifpnews.com/iran-producing-97-of-medicines-it-needs-domestically;
      https://foreignpolicy.com/2019/08/14/u-s-sanctions-are-killing-cancer-patients-in-iran/;
      www.tehrantimes.com/news/439394/IRCS-Sanctions-hindering-pharma-raw-materials-import.
[30]  www.bbc.com/news/world-middle-east-49051782.
[31]  http://behdasht.gov.ir/?siteid=1&pageid=1508&newsview=195932;
      www.hrw.org/report/2019/10/29/maximum-pressure/us-economic-sanctions-harm-iranians-right-
      health.
[32]  Ibid.
[33]  Ibid.
[34]  Ibid.
[35]  Human Rights Committee, general comment No. 36 (2018) on the right to life, para. 40.
[36]  Ibid.
[37]  Ibid., paras. 5 and 35.

the imposition of the death penalty in cases of same-sex intercourse between men, the Iranian Minister of Foreign Affairs said that the law was reflective of moral principles held by society.[38]

**Execution of child offenders**

19.     Between 1 January and 31 October 2019, there were two confirmed executions of minors. On 25 April 2019, two 17-year-old boys were executed for the alleged crimes of rape and robbery. One of the boys reportedly had an intellectual disability. The Government consistently asserts that children under 18 years of age are not subject to execution. While these cases contradict that assertion, what this policy means in practice is that child offenders are often kept on death row until they reach the age of 18 and may then face execution.[39] The International Covenant on Civil and Political Rights and the Convention on the Rights of the Child, to both of which the Islamic Republic of Iran is a party, strictly prohibit the imposition of the death penalty for crimes committed by an individual under the age of 18 years.

20.     Furthermore, the Special Rapporteur echoes the concerns raised in the report of the Secretary-General about this practice, noting that the lack of information regarding the timing of executions imposes continuous anticipation of imminent death upon their families, resulting in mental distress, including for the child.[40] The Special Rapporteur has received unconfirmed reports of at least three additional individuals who were executed in 2019 for crimes allegedly committed while they were under the age of 18 years.

21.     The Special Rapporteur continues to monitor the situation of child offenders on death row, and has received information that there are at present at least 100 individuals who have been sentenced to death for crimes committed when they were under 18 years of age. The Islamic Penal Code retains the death penalty for girls aged 9 lunar years and older, and for boys aged 15 lunar years and older. The death penalty may be applied in cases where the child is convicted of *qisas* ("retribution in kind") or *hudud* crimes, such as adultery. Such a young age of criminal responsibility resulting in the execution of child offenders is in complete contravention of international law, with special procedures mandate holders and the United Nations High Commissioner for Human Rights stating unequivocally that this practice is absolutely prohibited.[41] The Government indicates that a new working group has been created under the umbrella of the executive committee for the protection of children and juveniles to intervene during court trials and to persuade the relatives of murder victims to accept financial compensation instead of retribution (*qisas*).

22.     Other elements of the Islamic Penal Code reflect recognition of the special status of children and highlight the inconsistency of the continued application of the death penalty for child offenders.[42] For example, the age of responsibility for less serious *ta'zir* crimes is 18 years. In such cases, the judge has discretion as to the sentence that should be imposed, and convicted children are sentenced to correctional measures.[43] In accordance with the 2017 amendments to the Islamic Penal Code regarding drug trafficking, the use of children under 18 years of age in drug trafficking is a serious offence, which demonstrates recognition of the vulnerable status of children.[44]

23.     The Special Rapporteur reiterates the recommendations he has already made in his report to the Human Rights Council at its fortieth session in relation to the execution of child offenders, specifically the call to revise legislation to increase the age of maturity to 18 years and for a moratorium on the death penalty for those aged under 18 years at the time of the alleged crime.[45]

---

[38] www.dw.com/en/iran-defends-execution-of-gay-people/a-49144899.
[39] A/HRC/40/67, para. 56.
[40] A/HRC/40/24, para. 7.
[41] www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=24550&LangID=E.
[42] A/HRC/40/67, paras. 43–49.
[43] Ibid., para. 46.
[44] www.iranrights.org/library/document/3262.
[45] A/HRC/40/67, paras. 72–76.

### D.    Rights to liberty and a fair trial

24.    Compounding concerns regarding the use of the death penalty and the high execution rate are continued reports of lack of due process and non-adherence to fair trial standards. The Special Rapporteur has received reports of violations, including lack of access to a lawyer of the accused's choice and to information regarding charges and evidence, arrest without warrant and the use of forced confessions extracted by torture and ill-treatment as evidence. Reportedly due to concerns about the judiciary's capacity to hold the scheduled number of in-person appeals, an amendment was proposed in May 2019 to leave the decision of whether to hold an in-person appeal to the discretion of the appeals court. Pursuant to a request from the head of the judiciary, the Supreme Leader agreed to this change in practice before its passage in parliament, raising concerns that the appeal process within the criminal justice system had been circumvented.[46]

25.    The case of Aras Amiri, an Iranian citizen convicted in May 2019 on national security-related charges, is of particular concern in this regard. Ms. Amiri appears to have been arrested for her work promoting Iranian culture with the British Council. She appealed her conviction in June 2019;[47] in August 2019, her family was informed that her appeal had been rejected shortly before it was announced on Iranian State television. Ms. Amiri has been sentenced to 10 years' imprisonment and is being held in Evin Prison.[48]

26.    The use of arbitrary detention remains a constant concern. The Special Rapporteur echoes the concerns expressed by the Working Group on Arbitrary Detention in an October 2019 opinion, in which the Working Group highlighted that the systemic problem of arbitrary detention in the country amounted to a serious violation of international law.[49]

### 1.    Dual and foreign nationals

27.    The Special Rapporteur remains seriously concerned about the situation of dual and foreign nationals in detention in the Islamic Republic of Iran, including Ahmadreza Djalali, Kamran Ghaderi, Robert Levinson, Siamak Namazi and Nazanin Zaghari-Ratcliffe. A number of new cases have been reported in 2019, including the cases of an Australian national,[50] a French national and an Iranian-French national.[51] He welcomes the news that two Australian nationals arrested in July 2019 were released in October 2019.

28.    The Special Rapporteur also notes the release of United States citizen Xiyue Wang on 7 December 2019. However, the issue of prisoner exchanges, which is what happened in this case and has been raised by the Iranian Minister of Foreign Affairs as an option for the release of dual and foreign nationals, raises concerns about the veracity of the Government's allegations against the individuals detained. He also notes the November 2019 release on bail of Kameel Ahmady, a dual Iranian-British national who was arrested in the Islamic Republic of Iran in August 2019 and whose case is reportedly at the stage of preliminary investigation. He is also concerned about the arrest and detention of Massud Mossaheb, an Austrian-Iranian dual national who has been detained since January 2019 and who, according to the Government, has been charged with "corruption on earth through acting against national security" and "illegally acquiring US$ 429,000", and whose case is currently under investigation.

---

[46] https://snn.ir/003Gkr.

[47] www.britishcouncil.org/contact/press/iran-statement-chief-executive-british-council-sir-ciaran-devane; www.iranhumanrights.org/2019/07/jailed-british-council-employee-says-she-rejected-explicit-invitation-to-spy-for-iran/.

[48] https://iranhumanrights.org/2019/08/british-council-employees-10-year-prison-sentence-upheld-without-a-hearing/.

[49] A/HRC/WGAD/2019/51, para. 80.

[50] www.theguardian.com/australia-news/2019/sep/14/kylie-moore-gilbert-named-as-australian-british-academic-jailed-in-iran-since-2018.

[51] www.diplomatie.gouv.fr/en/country-files/iran/news/article/iran-situation-of-roland-marchal-q-a-from-the-press-briefing-16-oct-19; www.reuters.com/article/us-mideast-iran-france/france-demands-iran-release-two-of-its-citizens-held-since-june-idUSKBN1WU2XZ.

## 2. Environmentalists

29.     The Special Rapporteur is alarmed at the sentencing of eight environmentalists who were arrested in January and February 2018 to lengthy prison terms, specifically to between 4 and 10 years' imprisonment, after being convicted of "collaborating with the United States enemy state".[52] According to the Government, while Morad Tahbaz and Niloufar Bayani were acquitted of the charge of "gaining illegitimate income", they were still requested to return that income, in the respective amounts of US$ 600,000 and US$ 356,000. It is reported, however, that one of the environmentalists, who was a former consultant for the United Nations Environment Programme,[53] has been ordered to pay the Government the amount earned while in that position.[54]

30.     The verdict came after an announcement in September 2019 that the most serious charge levied against four of the eight – "corruption on earth", which carries the death penalty – had been dropped[55] and converted to "collaboration with enemy state". According to information received, after more than a year of inactivity, the hearings in all cases resumed in October and were concluded on 22 October 2019. During their detention, the environmentalists have had limited access to their lawyers and have been required to choose lawyers from a list pre-approved by the judiciary. The detainees' and their lawyers' ability to intervene during the hearings or to review the indictments or other documents has also been limited. The Special Rapporteur reiterates the concerns expressed by the Secretary-General about the conditions of detention, including reports of ill-treatment, efforts to extract forced confessions and denial of access to medical care, particularly in the case of Morad Tahbaz, who faced serious health complications.[56] The Government rejects all allegations on the detention conditions and lack of access to medical care, stating that Mr. Tahbaz has been provided medical treatment 15 times in specialized medical centres outside the prison.

31.     The Special Rapporteur is alarmed that such charges have been brought against individuals engaged in environmental work that is beneficial both to the Islamic Republic of Iran and to the international community, and calls upon the Government to ensure that the rights of individuals conducting peaceful and essential scientific work are respected and protected.

## 3. Human rights defenders and lawyers

32.     The Special Rapporteur continues to be concerned about the arrest and detention of human rights defenders and lawyers for their peaceful work. In 2019, human rights lawyers such as Nasrin Sotoudeh and Amirsalar Davoudi were convicted and sentenced to lengthy prison terms.[57] The Special Rapporteur calls upon the Government to ensure that those seeking to uphold the rights of others are not arbitrarily detained and prosecuted for their peaceful work.

33.     The critical condition of human rights defender Arash Sadeghi, who has been diagnosed with a rare form of bone cancer and been repeatedly denied needed medical care, is particularly alarming.[58] Mr. Sadeghi was sentenced to 15 years' imprisonment in August 2015 on national security-related and other charges connected to his work as a human rights defender, which included social media posts and communications with journalists and

---

[52] www.hrw.org/news/2019/11/22/iran-environmentalists-sentenced; https://iranhumanrights.org/2019/11/six-conservationists-sentenced-to-long-prison-terms-in-iran-environmentalist/.

[53] www.unenvironment.org/news-and-stories/statement/un-environment-programme-statement-sentencing-environmentalists-iran.

[54] https://iranhumanrights.org/2019/11/six-conservationists-sentenced-to-long-prison-terms-in-iran-environmentalist/.

[55] https://plus.irna.ir/news/83515698; https://en.radiofarda.com/a/iran-drops-death-row-charge-for-environmentalists/30214608.html.

[56] A/74/273, para. 15.

[57] A/74/188, paras. 15–16.

[58] https://iranhumanrights.org/2019/10/civil-rights-activist-arash-sadeghi-repeatedly-denied-medical-treatment-for-paralyzed-arm/. See also para. 67 below.

human rights defenders outside the Islamic Republic of Iran.[59] The Government has indicated that Mr. Sadeghi's prison sentence was reduced to seven and a half years and that he has been regularly offered medical care for his cancer, including in out-of-prison specialized medical centres, but has provided no information on his infection. In 2018, the Working Group on Arbitrary Detention found Mr. Sadeghi's detention to be arbitrary.[60]

34.     The Special Rapporteur is particularly concerned about reports received of increasing pressure on families of human rights defenders. The arrest of one family member of prominent women's rights defender Masih Alinejad is emblematic of this trend.[61] According to information received, in recent months families of human rights defenders, lawyers and activists have been facing more blatant harassment and pressure from the authorities, even arrest. Such treatment appears to be connected to their relatives' work on human rights.

## E.   Situation of women and girls

### 1.   Protesters opposed to compulsory veiling

35.     The Special Rapporteur remains alarmed at the ongoing repression of women human rights defenders who object to compulsory veiling, and condemns the recent sentencing of three women human rights defenders: Yasaman Aryani, Monireh Arabshahi and Mojgan Keshavarz. The women were arrested in April 2019 for their participation in a protest against compulsory veiling laws on 8 March 2019, International Women's Day.[62] In August 2019, Ms. Keshavarz was sentenced to 23 years and 6 months' imprisonment while Ms. Aryani and Ms. Arabshahi were each sentenced to 16 years' imprisonment.[63] If the sentences are upheld on appeal, they will serve the highest sentence of 10 years, which includes the days of detention already served, in line with article 134 of the Penal Code.

36.     On 1 June 2019, Saba Kord Afshari was arrested in Tehran in relation to her participation in the White Wednesday campaign against compulsory veiling and due to a video of the protest that was posted on Ms. Alinejad's social media account.[64] Upon arrest, Ms. Afshari was interrogated and then held in solitary confinement for 11 days. She was reportedly told that her father would be killed and her mother would be arrested and that all the private photographs on her telephone would be released if she did not make a confession. She was also reportedly forcibly disappeared for 12 days in July, when she was transferred to a location unknown to her and her family.[65] In August 2019, Ms. Afshari was convicted of three national security-related and morality charges and sentenced to 24 years in prison. She will need to serve seven and a half years if the sentence is upheld on appeal, in line with article 134 of the Penal Code.[66]

37.     The treatment of women human rights defenders, and of all individuals seeking to support the human rights of women, many of whom have faced harassment, arrest and detention, is of grave concern. The Special Rapporteur calls upon the Government to take all measures necessary to ensure the protection of women human rights defenders.

---

[59]  www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=24813&LangID=E.

[60]  A/HRC/WGAD/2018/19.

[61]  www.amnesty.org/en/latest/news/2019/09/iran-family-of-womens-rights-activist-arrested-in-despicable-attempt-to-intimidate-her-into-silence/.

[62]  A/74/273, para. 37.

[63]  www.amnesty.org/en/documents/mde13/0856/2019/en/.

[64]  www.fidh.org/en/issues/human-rights-defenders/iran-sentencing-of-mses-saba-kord-afshari-yassman-aryani-monireh.

[65]  www.amnesty.org/en/latest/news/2019/07/iran-cruel-campaign-to-extract-propaganda-confessions-from-protesters-against-compulsory-veiling/.

[66]  www.fidh.org/en/issues/human-rights-defenders/iran-sentencing-of-mses-saba-kord-afshari-yassman-aryani-monireh.

### 2.   Discriminatory policies

38.     A prohibition on Iranian women attending sporting events in the Islamic Republic of Iran, while not written into law, has effectively been enforced since 1981. A few exceptions to this policy have occurred in recent years,[67] most recently in October 2019, when more than 3,000 women were allowed to attend a football match.

39.     Although the match was touted as representing the end of the unofficial ban, the number of tickets available to women was restricted by the authorities [68] and the Government gave no indication of having changed its policy. The Vice President for Women and Family Affairs has reportedly said that there is no obstacle to women entering stadiums and that there is hope for progress in lifting the ban.[69] At the same time, the Prosecutor-General and high-level religious figures[70] have reportedly indicated that they do not support lifting the ban. Other high-level religious figures have similarly noted that the ban should remain in place. Practical concerns also exist, such as the lack of women's restrooms in all stadiums other than Azadi Stadium, with the national football federation reportedly rejecting their installation in other stadiums.[71]

40.     Women have frequently sought to challenge the restriction on their ability to enter stadiums through peaceful demonstrations or by entering disguised as men, and many have been arrested and detained. In a recent tragic incident, Sahar Khodayari, who had been arrested for dressing as a man in order to attend a football match, died in August 2019 from self-immolation when she learned she could be sentenced to prison for her actions.[72] In March 2018, as many as 35 women were reportedly arrested for seeking to attend a match[73] and in August 2019 at least four women were arrested and held for several days after attempting to enter a stadium dressed as men.[74]

## F.   Situation of minorities

41.     The Special Rapporteur is deeply concerned about a bill adopted by the Committee for Judicial and Legal Affairs of parliament in July 2019 on "misguided sects".[75] The bill criminalizes membership in groups that the Government considers to be "misguided". According to a member of the Committee, the bill was proposed because of concerns about sects that have no jurisprudential or religious status but attribute their belief to Islam and about the cults that have emerged recently. Members of non-recognized religious minorities have expressed concern that passage of the bill would make it a criminal offence to follow certain religions and could be used to increase discrimination against them.

---

[67]   www.iranhumanrights.org/2018/10/iranian-women-attend-mens-soccer-game-standing-firm-against-state-ban-and-hardline-threats/; www.iranhumanrights.org/2018/06/iran-spain-match-aftermath-will-irans-ban-on-women-in-sports-stadiums-finally-be-lifted/; www.iranhumanrights.org/2017/06/some-female-sports-fans-allowed-to-watch-mens-volleyball-match-in-tehran-but-ban-persists/; www.al-monitor.com/pulse/fa/originals/2017/07/iranian-women-get-to-watch-volleyball.html.

[68]   www.amnesty.org/en/latest/news/2019/10/iran-limited-allocation-of-football-tickets-for-women-a-cynical-publicity-stunt/; https://iranhumanrights.org/2019/10/women-football-fans-decry-restrictions-why-didnt-they-let-us-all-in/.

[69]   https://iranhumanrights.org/2019/08/iran-releases-detained-stadium-ban-protesters-as-hardliners-cheer-on-discriminatory-policy/; https://piroozinews.com/%D9%85%D8%B9%D8%A7%D9%88%D9%86-%D8%B1%D8%A6%DB%8C%D8%B3-%D8%AC%D9%85%D9%87%D9%88%D8%B1%DB8C-%D9%85%D8%A7%D9%86%D8%B9%DB%8C-%D8%AF%D8%B1-%D9%88%D8%B1%D9%88%D8%AF-%D8%B2%D9%86%D8%A7%D9%86-%D8%A8%D9%87/.

[70]   www.isna.ir/news/98051507626/.

[71]   www.hrw.org/news/2019/10/04/iran-stadium-seating-cap-endangers-women.

[72]   www.hrw.org/news/2019/09/09/woman-banned-stadiums-iran-attempts-suicide.

[73]   www.bbc.com/news/world-middle-east-43243414.

[74]   https://iranhumanrights.org/2019/08/iran-releases-detained-stadium-ban-protesters-as-hardliners-cheer-on-discriminatory-policy/.

[75]   https://rc.majlis.ir/fa/news/show/1206670.

42.     The Special Rapporteur has continued to receive reports of the arrest, detention and sentencing of members of the Baha'i faith. Baha'is have faced a range of charges, including "collusion and assembly against national security" and "formation and management of an illegal Baha'i group with intent to disturb national security". In October 2019, three Baha'is were sentenced to between 5 and 10 years' imprisonment. In September 2019, the appeal court upheld the five years' imprisonment sentence of another Baha'i individual, while two other Baha'is each received six-year prison sentences in a separate case.

43.     The Special Rapporteur is concerned about the continuing use of excessive force against and extrajudicial killings of Kulbarans and Sokhtbaran border couriers. According to reports, an 18-year-old Sokhtbar was killed in September 2019 after the security forces shot his car, which carried fuel. Similarly worrying reports were received about Kulbarans being killed by security forces' gunfire, including two Kulbars on 23 November 2019 in West Azerbaijan Province and one Kulbar on 2 December 2019 in Kurdistan Province. Due to the high rate of unemployment in the Provinces of Sistan and Baluchistan and Kurdistan, courier work remains one of the few ways for the population to acquire income. In its comments, the Government has said that it tries to address the issue by setting up border markets and free zones, such as in Baneh region.

44.     The Special Rapporteur continues to receive worrying reports of violations of the economic, social and cultural rights of minorities. For example, the Kurdish, Ahwazi Arab and Azerbaijani-Turk communities are concerned about the limited access they have to education in their mother tongues. Moreover, he is concerned about the arbitrary detention of Kurdish language teacher Zahra Mohammadi since 23 May 2019. While reports indicate that her arrest was linked to her teaching of the Kurdish language, the Government has accused Ms. Mohammadi of cooperating with illegal opposition parties. The Special Rapporteur also remains highly concerned about the denials of the right to education for religious minorities, with continuing reports of Baha'i students being rejected from entering university despite passing the required examinations.

# III.    Conditions of detention

45.     The Islamic Republic of Iran is a party to the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights, the Convention on the Rights of the Child and the Convention on the Rights of Persons with Disabilities. These treaties, combined with a range of other texts, have established a framework aimed at safeguarding the rights of imprisoned and detained persons. The General Assembly has, for example, adopted the United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules),[76] the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment,[77] the Basic Principles for the Treatment of Prisoners[78] and the United Nations Rules for the Treatment of Women Prisoners and Non-custodial Measures for Women Offenders (the Bangkok Rules).[79]

## A.    Violations of civil and political rights

### 1.    Denial of access to a lawyer

46.     Upon arrest and during the pretrial investigation stages, it is vital that a person subjected to interrogation has access to a lawyer of his or her own choosing.[80] Members of

---

[76]   Resolution 70/175, annex.
[77]   Resolution 43/173, annex.
[78]   Resolution 45/111, annex.
[79]   Resolution 65/229, annex.
[80]   See the International Covenant on Civil and Political Rights, art. 14 (3) (b) and (d); Human Rights Committee, general comment No. 32 (20017) on the right to equality before courts and tribunals and to a fair trial, paras. 32, 34, 37 and 38; and the United Nations Principles and Guidelines on Access to Legal Aid in Criminal Justice Systems (General Assembly resolution 67/187, annex).

ethnic and linguistic minorities have reported that they are not allowed to be assisted by lawyers or translators who speak their language, which makes them more susceptible to being pressured into signing forced confessions. Child offenders are particularly vulnerable and, as such, all the more susceptible to intimidation and pressure to make a confession.[81]

47.    Under article 190 of the Iranian Code of Criminal Procedure, the right of accused persons to a lawyer at the stage of preliminary investigation is guaranteed. That right is tempered, however, by article 48, according to which individuals accused of offences against national security, of crimes punishable by death, life imprisonment or amputation, or of political or press crimes can only choose to be represented, during the investigation stage, by lawyers on a list approved by the head of the judiciary. The Special Rapporteur remains concerned not only that article 48 undermines the independence of the legal profession, but also that it is a serious impediment to due process and the right to a fair trial.[82] A proposed amendment to article 48 aims to delay access to any legal representation for 20 days for detainees facing charges related to national security offences, terrorism or financial corruption,[83] which would further restrict access to legal counsel during the pretrial stages, especially since the initial period of 20 days could be extended.[84]

## 2.    Use of torture to extract confessions

48.    Reports have also been presented to the Special Rapporteur confirming the use of torture and cruel, inhuman or degrading treatment or punishment to extract confessions during the investigative stages. According to the provisions of the Islamic Penal Code, confessions extracted through torture or duress are prohibited and inadmissible as evidence.[85] On the other hand, while the law prohibiting the use of forced confessions as evidence is prima facie commendable, other legal provisions appear to encourage law enforcement agencies and the judiciary to obtain and rely on confessions, including confessions extracted through torture or under duress. According to article 171 of the Islamic Penal Code, if an accused person confesses to the commission of an offence, his or her confession shall be admissible and there is no need for further evidence. Furthermore, according to article 360 of the Code of Criminal Procedure, if the accused explicitly confesses to the commission of a crime in such manner as to remove all doubt and uncertainty in respect of the confession, the court shall pronounce its judgment by virtue of the confession. The Special Rapporteur is concerned that the combined effect of the aforementioned provisions of the Islamic Penal Code and the Code of Criminal Procedure has led to a strong institutional expectation of extracting confessions and reliance on confessions as the basis of convictions, resulting in serious breaches of criminal justice and the rights of the accused. The Special Rapporteur has been informed that judges are frequently not satisfied with the evidence presented, preferring instead to have confessions from the accused, and that in a majority of cases confessions are the primary or only piece of evidence presented against the accused.

## 3.    Medical treatment as conditional upon confession

49.    The Special Rapporteur heard evidence that security and intelligence officials, including from the Ministry of Intelligence and the Islamic Revolutionary Guard Corps, have in many cases prevented access to medical care for detainees and prisoners, or made medical attention or transfers to hospital conditional upon confession.[86] The cases of Nazanin Zaghari-Ratcliffe,[87] Ahmadreza Djalali[88] and former detainee Homa Hoodfar[89] are

---

[81]  A/HRC/40/67, para. 55.
[82]  A/HRC/34/65, para. 45.
[83]  www.amnesty.org/en/documents/mde13/0379/2019/en/.
[84]  A/74/273, para. 12.
[85]  Islamic Penal Code, arts. 168–169.
[86]  www.amnesty.org/en/documents/mde13/4196/2016/en/.
[87]  www.theguardian.com/news/2019/jul/17/nazanin-zaghari-ratcliffes-husband-fears-she-will-be-forced-to-confess.
[88]  www.amnesty.org/download/Documents/MDE1303592019ENGLISH.pdf.

emblematic of denials or delays in providing medical attention associated with attempts to extract confessions or inflict punishment. Attempts to obtain a confession as a condition for medical treatment violates the provisions of the Constitution of the Islamic Republic of Iran,[90] the Nelson Mandela Rules and the absolute prohibition of torture and other cruel, inhuman or degrading treatment or punishment in international law. The Government rejects the allegations and states that all three individuals have or had access to medical care, as guaranteed by articles 102 and 103 of the Executive Regulations of the Iranian Organization of State Prisons (Prison Regulations).[91]

50.    The Special Rapporteur has received disturbing information that several prisoners have been denied medical treatment for injuries sustained during interrogations conducted by intelligence or security officers. Reports have been received of torture, including beating, kicking, punching, slapping and suspension by the arms and legs. One former detainee of the Zahedan intelligence detention centre informed the Special Rapporteur that he had been tortured by the Islamic Revolutionary Guard Corps and showed him a "medical bed" where prisoners were tied, tortured and subjected to a mock execution by hanging.

### 4.    Broadcast of forced confessions

51.    The Special Rapporteur is concerned about the practice of publicizing forced confessions. The Iranian authorities have a track record of broadcasting forced confessions and statements of repentance by political prisoners on State-run television channels and other media outlets. The confessions shown on State-funded media outlets are often made under torture or cruel, inhuman or degrading treatment or under duress. Televised confessions violate the provisions of article 7 of the International Covenant on Civil and Political Rights, to which the Islamic Republic of Iran is a party, and provisions from which no derogations or reservations are permissible. This practice also violates article 9 and the fair trial provisions set out in article 14 of the Covenant, as well as articles 37, 38 and 39 of the Constitution of the Islamic Republic of Iran and article 91 of the Code of Criminal Procedure.

52.    The violations of the aforementioned provisions are particularly distressing in cases where detainees are charged with offences carrying serious punishments, including the death penalty. Ahmadreza Djalali, a Swedish-Iranian academic, had his confession to spying on the Islamic Republic of Iran broadcast on State television in December 2017, five days after the Supreme Court had upheld his death sentence through a hastily convened and secret process during which no submissions from the defence had been allowed.[92] It is reported Mr. Djalali recorded the confession under duress, after his interrogators had said that he would be released from solitary confinement only if he recorded the confession. In other instances, televised confessions are used to deprive detained persons of their due process rights; without access to legal advice, individuals in such cases make self-incriminating statements publicly, thereby pronouncing their "guilt" in the absence of a trial.

53.    In 2019, the women detained for participating in the White Wednesday campaign and appearing online without headscarves were tortured and ill-treated in an attempt to get them to confess their "guilt" and renounce the campaign in videos to be broadcast on State

---

[89]  www.amnestyusa.org/press-releases/amnesty-international-welcomes-release-of-dr-homa-hoodfar-from-prison-in-iran/.

[90]  Constitution of the Islamic Republic of Iran, art. 39.

[91]  http://prisons.ir/%D9%82%D9%88%D8%A7%D9%86%DB%8C%D9%86-%D9%88-%D8%A2%DB%8C%DB%8C%D9%86-%D9%86%D8%A7%D9%85%D9%87-%D9%87%D8%A7/%D8%A2%DB%8C%DB%8C%D9%86-%D9%86%D8%A7%D9%85%D9%87-%D8%B3%D8%A7%D8%B2%D9%85%D8%A7%D9%86-%D8%B2%D9%86%D8%AF%D8%A7%D9%86-%D9%87%D8%A7.

[92]  www.bbc.co.uk/news/world-middle-east-42387308 and www.amnesty.org/en/latest/news/2017/12/iran-upholding-academics-death-sentence-in-secret-shows-utter-contempt-for-right-to-life/.

television.[93] In October 2019, Iranian television aired a statement by Ruhollah Zam, producer of the anti-government AmadNews Telegram channel, expressing his "regret" over trusting the Governments of France and other countries.[94] It has been reported that Mr. Zam was persuaded, under false pretences, to go to Iraq from France, where he had refugee status. In Iraq, he was captured and returned to the Islamic Republic of Iran by the Islamic Revolutionary Guard Corps.[95] A parliamentary bill introduced in September 2019 aiming to end the broadcasting of confessions on State-funded media prior to trial has been stalled.[96] The bill focuses on confessions by prisoners accused of political and security-related crimes and aims to introduce a ban on broadcasting confessions from detainees with prison sentences of between six months and three years, and an additional ban on State employment of between one and five years for those involved in recording and broadcasting such confessions.[97]

### 5. Solitary confinement

54.     Depending on its aims, length and conditions, solitary confinement may amount to torture or other cruel, inhuman or degrading treatment or punishment.[98] The Nelson Mandela Rules provide detailed guidelines on solitary confinement, which is defined as the confinement of prisoners for 22 hours or more a day without meaningful human contact, and prolonged solitary confinement, which is understood to be solitary confinement for a period in excess of 15 consecutive days (rule 44). According to the Nelson Mandela Rules, solitary confinement should be used only in exceptional cases as a last resort, for as short a time as possible and subject to independent review, and only pursuant to authorization by a competent authority; moreover, solitary confinement should be prohibited in the case of prisoners with mental or physical disabilities when their conditions would be exacerbated by such confinement (rule 45). The prohibition on the use of solitary confinement involving women and children referred to in other United Nations standards on criminal justice and crime prevention need to be applied.[99] In its comments, the Government indicates that solitary confinement is used only in rare instances during the judicial investigation, as well as a punitive measure in places of detention for a maximum of 20 days, which may therefore constitute prolonged solitary confinement according to the Nelson Mandela Rules. The Government also noted that this punitive measure is mostly used in national security cases and that prisoners are entitled to all their rights.

55.     The Human Rights Committee has noted that the prolonged solitary confinement of the detained or imprisoned person may amount to acts prohibited by article 7 of the Covenant.[100] According to the Basic Principles for the Treatment of Prisoners, efforts addressed to the abolition of solitary confinement as a punishment, or to the restriction of its use, should be undertaken and encouraged (principle 7). The Special Rapporteur remains concerned about reports of torture and cruel, inhuman or degrading treatment of detainees conducted during solitary confinement, which is a violation of international human rights law.[101]

56.     One former detainee and student activist who spent four months in solitary confinement at Evin Prison reported that she had been held in a windowless cell measuring 2m by 3m. She reported that artificial lighting was turned on 24 hours a day and that she

---

[93]   www.amnesty.org/en/latest/news/2019/07/iran-cruel-campaign-to-extract-propaganda-confessions-from-protesters-against-compulsory-veiling/.

[94]   www.ft.com/content/a9247a7c-f0b4-11e9-ad1e-4367d8281195.

[95]   Ibid. and www.reuters.com/article/us-iran-opposition-arrest/iran-says-it-captures-exiled-journalist-who-supported-2018-unrest-idUSKBN1WT1JT.

[96]   https://iranhumanrights.org/2019/11/no-action-yet-in-parliament-on-bill-to-ban-broadcast-of-confessions-during-investigations/.

[97]   https://twitter.com/mah_sadeghi/status/1178262783030435840.

[98]   The Nelson Mandela Rules, rules 43–45.

[99]   See the United Nations Rules for the Protection of Juveniles Deprived of their Liberty, para. 67, and the Bangkok Rules, rule 22.

[100]  General comment No. 20 (1992) on the prohibition of torture, or other cruel, inhuman or degrading treatment or punishment, para. 6.

[101]  A/66/268, paras. 76 and 87–88.

was allowed to go to the bathroom only twice in any 24-hour period. She would have to press a button when she needed to use the bathroom and someone would come to take her, but sometimes that person would come two or three hours after she had pressed the button. As a result, she tended not to drink. This had an impact on her kidneys and digestive system that has lasted even after her release from prison. In fact, she has never recovered, despite being treated.

57.     Another former detainee who was an activist for lesbian, gay, bisexual and transgender rights and for gender equality and who had spent 19 days in solitary confinement in ward 209 at Evin Prison informed the Special Rapporteur that she was kept in a cell measuring 2m by 3m and could not talk to her family or the outside world for the first 15 days of her detention. She was not allowed to have any books. In the bathroom, only hot water was available, and in her cell the lights were on 24 hours a day. She developed an anxiety disorder that caused panic attacks, as a result of which she was taken to the prison clinic, where she was given medication. Another person who was in solitary confinement in ward 209 reports having been kept in such confinement for 83 days. For three weeks he had access only to the bathroom. He could ring a bell to ask for assistance and, when taken to the bathroom, he was blindfolded. During that period, he could not receive visits. His parents came every week but were sent back every time. Another detainee who was held in solitary confinement in Zahedan Prison was not allowed to talk to his family for 30 days.

### 6.     Visits, monitoring of communications and denial of furlough

58.     Another violation of the Prison Regulations of the Islamic Republic of Iran and international law is the arbitrary manner in which authorizations for visits and telephone communications with families are denied or delayed. For example, the prison authorities often deny detained women the possibility of meeting with their children as a means of punishment. The Special Rapporteur has been informed that the authorities in Evin Prison have introduced new restrictions on family visitations since the appointment of the new head of the prison. Previously, children were allowed to visit their mothers on Wednesdays but now they can only do so on Sundays, which is the only day when all family members can visit detainees. The visits take place in a large communal hall, without any separation between families for privacy.

59.     The Special Rapporteur has received reports of prison guards monitoring conversations by telephone from behind a glass. Article 221 of the Prison Regulations exempts furlough for those convicted of acting against national security. Given that a majority of political prisoners are convicted of alleged national security offences, they are denied furlough.

## B.     General conditions in prisons and detention centres

### 1.     Overcrowding and hygiene

60.     The Special Rapporteur has consistently received information of overcrowding in Iranian prisons. According to the director of judicial affairs in the State Prisons Organization, Hossein Pourmand, the prison population is 189,500, which is 27.7 per cent higher than its official capacity. These figures were published after 61,000 prisoners were freed in a general pardon on the occasion of the fortieth anniversary of the Islamic Revolution in February 2019 and prior to the most recent wave of arrests resulting from the November 2019 protests.[102] The United Nations High Commissioner for Human Rights has made reference to the established position of international and regional human rights mechanisms according to which overcrowding leads to situations in which detainees are required to live for long periods in deplorable conditions, unsuitable for human dignity and existence and can breach the absolute prohibition of torture.[103] Overcrowding is a source of infections and ill-health and has also been linked to the spread of infectious and

---

[102] www.mashreghnews.ir/news/955211/.
[103] A/HRC/36/28, para. 31.

communicable diseases, including tuberculosis,[104] HIV and hepatitis C.[105] A former prisoner in Evin Prison from the Gonabadi dervish community informed the Special Rapporteur that he had come across a prison hall with a capacity for 150 people holding over 400 prisoners.

61.     The Special Rapporteur remains concerned about the lack of hygiene, which leads to illness and skin conditions. Female prisoners have complained of the absence of feminine hygiene products, significantly affecting their personal hygiene. A former prisoner at the Greater Tehran Central Penitentiary described the prison conditions as "shocking", adding that the clothes and shoes of inmates were taken away by the prison authorities and that the only detainees who were clothed were those whose family members brought them clothes. According to another former prisoner, the cells were infected with lice, bugs and cockroaches and there was only a two-hour window for 400 people to take a shower. During his two years at Greater Tehran Central Penitentiary, only one hygiene kit was distributed to the inmates. Yet another former detainee at Evin Prison complained that he was not allowed to change his prison clothes for three months; he could have washed his clothes but had no detergent to do so. A former political prisoner at Zahedan Prison informed the Special Rapporteur that each prisoner was provided with one toothbrush but was forced to buy everything else, including soap. He informed the Special Rapporteur that there were only 12 beds and therefore most inmates had to sleep on the floor. As there were only 10 toilets for 200 people, there were always queues. Those who had money from relatives could buy additional hygiene items and food.

### 2.     Food and water

62.     During his interviews with political prisoners, the Special Rapporteur heard serious concerns as regards the quality and quantity of food provided to those prisoners. Specifically, the political prisoners in Qarchak Prison complained to the Special Rapporteur of the poor quality and inadequate portions of food provided. The Special Rapporteur was informed that in Qarchak Prison prisoners were forced to buy and eat cans of raw tuna and that the quality of the water was so poor that prison inmates developed stomach ulcers. Food was excessively expensive, which discriminated against poorer prisoners. Similar complaints about the poor quality and insufficient quantity of food have been received from other places of detention. A former male prisoner in Evin Prison informed the Special Rapporteur that during his 11 days of detention not once was he provided with meat, fruit, vegetables or milk. He informed the Special Rapporteur that, in order to have an appropriate level of nutrition, prisoners were forced to buy their own food, which was sold at a much higher price than in the markets outside the prison. The provision of food of such poor quality and in inadequate quantities, forcing prisoners to buy food, is a violation of the Nelson Mandela Rules and articles 93 and 95 of the Prison Regulations. According to the Nelson Mandela Rules, all prisoners should be provided by the administration at the usual hours with food of nutritional value adequate for health and strength, of wholesome quality and well prepared and served (rule 22 (1)). Moreover, drinking water should be available to every prisoner whenever he or she needs it (rule 22 (2)).

### 3.     Denial of access to medical care

63.     As a party to the International Covenant on Economic, Social and Cultural Rights, the Islamic Republic of Iran is legally obliged to respect, protect and fulfil the right of everyone to the enjoyment of the highest attainable standard of physical and mental health (art. 12), including those who are imprisoned or detained.[106] As set out in the Nelson Mandela Rules, prisoners' health care is a State responsibility and prisoners should enjoy the same standards of health care that are available in the community, and should have access to necessary health-care services free of charge without discrimination on the grounds of their legal status (rule 24 (1)). Furthermore, all prisons should ensure prompt access to medical attention in urgent cases; prisoners who require specialized treatment or

---

[104]  A/HRC/23/41/Add.1, para. 43.
[105]  A/65/255, para. 29.
[106]  Committee on Economic, Social and Cultural Rights, general comment No. 14 (2000) on the right to the highest attainable standard of health, para. 34.

surgery should be transferred to specialized institutions or to civil hospitals and, where a prison service has its own hospital facilities, they should be adequately staffed and equipped to provide prisoners referred to them with appropriate treatment and care (rule 27 (1)). Prisoners who require specialist treatment must be transferred to specialized institutions or outside hospitals when such treatment is unavailable in prison. In line with the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment (principle 24) and the Nelson Mandela Rules (rule 24 (1)), health care provided to individuals in custody must be free of charge. The failure to provide adequate health care to prisoners may violate the absolute prohibition of torture and other cruel, inhuman or degrading treatment or punishment, including under article 7 of the International Covenant on Civil and Political Rights.

64.     The Prison Regulations provide a comprehensive framework for the provision of health care to prisoners and, if fully complied with, would largely be in compliance with international standards regarding prison conditions. In practice however, there are consistent, significant breaches of these Regulations.

65.     Iranian prisons can provide only basic medical facilities. Therefore, prisoners with serious medical conditions either need to be seen by a specialist physician within the prison or to be transferred to outside hospitals. The Special Rapporteur was informed that prison infirmaries have poor, outdated and insufficient stocks of medicine and the relevant prison staff are usually untrained or are unhelpful to prisoners, particularly political prisoners. Specialist physicians visit prisons irregularly, which results in many prisoners waiting for considerable periods for examinations, even when their condition is serious and requires urgent attention. The Special Rapporteur was informed by several prisoners that specialist physicians were under time pressure. He also received reports of failures to see seriously ill patients, inordinate delays and of trivializing or dismissive attitudes towards prisoners' health conditions. On occasions, specialists have reportedly refused to order diagnostic tests or provide essential medication and instead prescribed ordinary tranquillizers.

66.     The Special Rapporteur received alarming reports that detainees with previous and known medical conditions are not provided with any medical attention. While it is acknowledged that prisoners with serious medical conditions need to be transferred to hospitals outside of the prison where they are detained, such transfers must be approved by the prison clinic and then by the head of the prison and the associate prosecutor of the prison.[107] It has been reported that sometimes prison officials inform the prisoners that the prosecuting authorities or intelligence officials have refused medical leave or hospitalization, in contravention of international human rights norms. There have also been reports of medication provided by the family being withheld from the prisoner as a form of punishment. The Special Rapporteur has also received disturbing information regarding the failure of the prison authorities to provide prisoners with regular check-ups.

67.     Contrary to the Prison Regulations, the Special Rapporteur has received disturbing evidence of prisoners in hospital or undergoing medical care being forced to interrupt their treatment and return to prison against medical advice. An emblematic case is the continuous denial by the authorities of Raja'i Shahr Prison of medical treatment to Mr. Sadeghi, who did not receive a medical examination until May 2018 despite having complained of severe pain to his elbow and shoulder for 18 months.[108] Even after his examinations, he reportedly only discovered that he had a tumour after briefly being allowed to look at his medical file. Mr. Sadeghi was allowed surgery for cancer in September 2018 but the prison authorities reportedly delayed the operation despite medical specialists finding that he needed an operation urgently. Furthermore, the prison authorities returned him to prison three days after surgery against medical advice that he remain in hospital for 25 days to assess the need for further treatment. The prison authorities reportedly blocked a follow-up examination with his specialist on 22 September 2018, resulting in Mr. Sadeghi only seeing a general practitioner. He was diagnosed with a

---

[107]  Ibid., art. 103.
[108]  www.amnesty.org/en/documents/mde13/8687/2018/en/; www.ohchr.org/en/NewsEvents/Pages/ DisplayNews.aspx?NewsID=24813&LangID=E.

serious infection that could have been avoided had he remained hospitalized. He has reportedly been denied appropriate treatment repeatedly since, both for his cancer and for the infection, and his arm is now discoloured and immobile. There is also evidence of unnecessary use of force, such as the use of handcuffs and leg shackles, on political prisoners while they are receiving medical treatment in hospital. The Nelson Mandela Rules, in particular rules 47 and 48, prohibit the use of chains, irons or other instruments of restraint that are inherently degrading or painful.

# IV.   Conclusions and recommendations

## A.   Human rights situation

68.    **The Special Rapporteur recommends that the Government, the judiciary and the parliament:**

(a)    **Undertake prompt, independent and impartial investigations into all acts of violence that have taken place in the context of the November 2019 protests, including deaths of protesters and reported deaths in custody, and into reports of ill-treatment, and to hold those responsible accountable;**

(b)    **Ensure that all those arrested, including those arrested during the November 2019 protests, for the peaceful exercise of their rights to freedom of opinion, expression, assembly and association are released, and ensure also that the detaining authorities promptly report the whereabouts and situation of detainees to their families;**

(c)    **Take all measures necessary to mitigate the effects of economic sanctions, meet the obligations of the Islamic Republic of Iran under the International Covenant on Economic, Social and Cultural Rights, including on the protection of vulnerable groups, and establish transparent financial mechanisms to ensure that trade in medicines and other essential humanitarian items continues;**

(d)    **Pending its abolishment, remove the death penalty as punishment for all offences other than the most serious crimes, which involve intentional killing, and ensure that all individuals sentenced to death for offences other than intentional killing have their sentences commuted;**

(e)    **Ensure that prisoners and detainees are protected from all forms of torture and ill-treatment and that confessions obtained through torture or ill-treatment are never admitted as evidence against the accused;**

(f)    **Amend the Islamic Penal Code and the Code of Criminal Procedure to ensure that confessions alone are not sufficient for establishing guilt;**

(g)    **Ensure that all persons accused of any crime have access to a lawyer of their choosing during all stages of the judicial process, including during the initial investigation and interrogation stage, and are provided with legal aid as needed;**

(h)    **Protect the rights of all persons belonging to religious and ethnic minorities, address all forms of discrimination against them and release all those imprisoned for having exercised their right to freedom of religion or belief;**

(i)    **Ensure that lethal force is used only when strictly unavoidable to protect life, in accordance with principle 9 of the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, and that everyone is allowed to participate in lawful and peaceful assemblies, in accordance with article 21 of the International Covenant on Civil and Political Rights;**

(j)    **Ensure that human rights defenders, including women human rights defenders, lawyers and journalists, are not threatened with or subjected to intimidation, harassment, arbitrary arrest, deprivation of liberty or other arbitrary sanction, and release all those detained in connection with their work;**

(k)     **End the policy of prohibiting or severely limiting women's attendance at public sporting events, and bring both laws and policies protecting women's rights into compliance with international standards;**

(l)     **Immediately release all dual and foreign nationals arbitrarily detained.**

69.     **The Special Rapporteur recommends that sanctions-imposing countries take all measures necessary to ensure that sanctions do not undermine human rights, including by ensuring that humanitarian and procedural safeguards and exemptions are in place to prevent their harmful impact on the enjoyment of human rights.**

## B.     Conditions of detention

70.     **The Special Rapporteur recommends that the Government, the judiciary and the parliament, as appropriate:**

(a)     **Ensure that medical care is urgently provided to those individuals in detention who need it, in light of the imminent threat to life or serious deterioration of their health, and that all individuals in custody receive adequate, prompt and regular health care, including specialist care as needed, on the basis of their informed consent;**

(b)     **Ensure that all detained individuals receive adequate health care, without discrimination on grounds of political or legal situation, ethnicity, religion, political opinion, gender, sexual orientation or other status;**

(c)     **Ensure that all prisoners requiring specialist or any other treatment not available within prison are transferred free of cost to specialized institutions or outside hospitals to receive such treatment and that they remain in those institutions or hospitals for as long as the treatment is deemed necessary by specialist doctors;**

(d)     **End the unlawful practice of requiring prisoners to pay for medical treatment, which violates both international and Iranian law;**

(e)     **Ensure that medical decisions that relate to ongoing care and observation of the prisoners outside prison and the necessity of their release on medical grounds are only taken by the relevant, responsible health-care professionals;**

(f)     **Adopt regulations restricting the use of restraints in accordance with international laws and standards, including by ensuring that restraints are never used in a degrading, humiliating or painful manner or as a form of punishment and that they are used only when strictly necessary;**

(g)     **Ensure that medical care for detainees is never made conditional upon their making confessions and that officials who deny medical care to prisoners and detainees or who withhold medication as a form of coercion, as punishment or to elicit confessions are punished;**

(h)     **Pass the parliamentary bill introduced in September 2019 aimed at ending the recording and broadcasting of confessions on State-funded media prior to trial and ensure punishments for those involved in recording and broadcasting such confessions;**

(i)     **Pending its abolishment, ensure that solitary confinement is used only in exceptional cases, as a last resort and for as short a time as possible, following authorization by a competent authority and subject to independent review;**

(j)     **Make substantial investments in all prisons to reduce overcrowding, provide adequate sleeping facilities to prisoners and ensure that the essential personal hygiene of prisoners is maintained;**

(k)     **Ensure that prisoners are provided with food of appropriate nutritional value, quantity and quality and that drinking water is made readily available to all prisoners;**

(l)     **Ensure furlough and family visitation rights to all prisoners;**

(m)    Respect and fulfil the duty to conduct prompt, independent, impartial and effective investigations into all reports of torture or other ill-treatment, and hold perpetrators accountable;

(n)    Ensure that deaths in custody and allegations of violations of due process and of ill-treatment are promptly, independently, impartially and effectively investigated by an independent competent authority with a view to holding perpetrators accountable and in compliance with the right to a fair trial.

_____