# EXHIBIT 27

# "Like the Dead in Their Coffins"
## Torture, Detention, and the Crushing of Dissent in Iran

I. Summary ....................................................................................................... 1

II. Recommendations ....................................................................................... 3
   To the Office of the Leader ......................................................................... 3
      On Unlawful Arrest and Detention ........................................................ 3
      On Torture and Ill-Treatment ............................................................... 3
      On Administration of Justice.................................................................. 4
   To the Guardian Council ............................................................................. 5
   To the European Union................................................................................ 5
   To the Special Rapporteur on Torture and Cruel and Inhuman Punishment.... 5

III. Background .............................................................................................. 5
   Methodology.............................................................................................. 7

VI. Arbitrary Arrest and Detention................................................................ 7

V. Detention Centers and Ill-Treatment ...................................................... 12
   Evin Prison ............................................................................................... 12
   Parallel Forces and Illegal Detention Centers ........................................... 13
      Prison 59 ............................................................................................ 17
      Edareh Amaken .................................................................................. 18
      "White Torture": The Use of Solitary Confinement............................ 19
      Interrogations .................................................................................... 26

VI. The Students ........................................................................................... 31

VII. Encounters with the Judiciary................................................................ 43
   Denial of right to counsel and right to prepare a defense .......................... 44
   Non-Public Trials....................................................................................... 45
   Denial of the Right to Appeal .................................................................... 46
   Testimonies............................................................................................... 46
      Massoud Behnoud .............................................................................. 46
      Mohsen M........................................................................................... 51
      Ebrahim Nabavi................................................................................... 53
      Ali K. .................................................................................................. 54
   Rewarding Injustice ................................................................................... 55

IIX. The Independent Press and the Prisoners .............................................. 56
   The Article 90 Commission ....................................................................... 60

IX. A Bleak Future ........................................................................................ 62

Acknowledgments......................................................................................... 65

# I. Summary

*If there had been no press, no investigations by the Parliament, no Article 90 Commission, I think that I would still be in prison or I would be dead.  They made sure that I was not forgotten…If I had spoken out and no one knew my name from the newspapers, I would be dead. I am sure of this.  Now, there are those students in prison, and no one knows their names, and they are rotting in a corner somewhere thinking that no one in the world knows where they are. And now, how will we know?[1] – Hossein T., a student activist and former prisoner.*

No one knows how many people are held in Iran's prisons and secret detention centers for the peaceful expression of their views.  Over the past four years, as the window of free expression has closed in Iran, abuse and torture of dissidents have increased in Evin Prison's solitary cells and secret detention centers.

In the years following the election of President Mohammad Khatami in 1997, on a platform of supporting rule of law and civil society, independent newspapers and journals flourished in Iran.  In 2000, a large class of more vocal and reform minded representatives entered a revitalized parliament, promising to introduce new laws that would challenge the status quo.  Intellectuals, journalists, and writers debated publicly some of the most critical issues facing Iranian society.  In response, the judiciary and the extra-legal security and intelligence agencies of the Iranian state have sought to destroy these voices.

Since then Iran's independent newspapers have been almost completely destroyed, the result of a campaign launched by the Office of the Leader and the judicial authority in April 2000 to silence growing dissent.[2]  Said Mortazavi, then the judge of Public Court Branch 1410, was the leading force behind the crackdown in its early years, directed mainly at newspapers and journals which had become critical voices for change.  He was subsequently appointed to the powerful position of Tehran Chief Prosecutor, a post he holds today.

This report demonstrates a nexus between the press closures that began in 2000, the systematic arrests of journalists, writers and intellectuals in the following years, and the

---

[1] Human Rights Watch telephone interview with Hossein T., location withheld, December 8, 2003.

[2] See Human Rights Watch, "Stifling Dissent," *A Human Rights Watch Report*, vol. 13, no. 4(E), May 2001.

treatment of political prisoners. With the newspapers closed, treatment of detainees worsened considerably in Evin prison and in detention centers operated clandestinely by the Islamic Revolutionary Guard Corps and the judiciary. Members of parliament and defense attorneys who have spoken out against the crackdown have themselves been summoned to court, and some jailed. Few platforms outside of the Internet remain available to expose the reality of conditions for Iran's political prisoners in detention centers. The closure of the newspapers has secured an environment of impunity for judges and security forces who routinely violate international human rights law and Iran's criminal and penal codes.

The Iranian authorities have managed, in the span of four years, to virtually silence the political opposition within the country through the systematic use of indefinite solitary confinement of political prisoners, physical torture of student activists, and denial of basic due process rights to all those detained for the expression of dissenting views. Paradoxically, criticism of government policies has increased over the past several years on the streets, in shopping lines, in taxis, within homes. But those engaged in criticism on the record — newspapers, websites, public statements of members of parliament, and legally organized protests—have been silenced.

The former political detainees interviewed for this report were denied the most basic aspects of due process, including rights of access to counsel, to be formally charged, to prepare a defense, and to have a public trial. Many were held in small basement solitary cells for weeks or months without any contact with other human beings except their interrogators. Some were denied medical care. Judges used confessions extracted through torture, ill-treatment, or the threat of continued isolation to hand down prison terms, fines, and lashings.

The Iranian judiciary is at the center of the human rights violations documented in this report. A small group of judges accountable only to the Leader has shut down public dissent. They have used various tools for repression: including plainclothes militia, various intelligence services, prisons and detention centers, and courtrooms.

This report documents treatment in detention in a number of facilities in Iran. Among these, Evin Prison is the most well-known and holds many political detainees. In addition, former prisoners interviewed for this report were held in several secret detention centers in and around Tehran. The entire number of secret detention centers in Iran is unknown, but this report documents conditions in Prison 59 and Towhid detention center. Finally, this report discusses an interrogation center, *Amaken*, the

location most recently used to threaten and terrify political activists, writers, and journalists.

The combination of torture and ill-treatment in detention, closing off of avenues for legal redress, and silencing public information about these abuses has created an increasingly hostile environment for human rights in Iran.  This report is structured to convey the experiences of former prisoners who spoke with Human Rights Watch.  As each means of monitoring and reporting is destroyed, the risk of torture and ill-treatment increases. By attacking a small percentage of those critical of the government, Iranian authorities have been able to silence a much larger body of journalists, activists, and students. Many of those who spoke out in years past now choose to remain quiet. The authorities have largely succeeded in their campaign to send a message to the broader public that the costs of voicing peaceful political criticism are unbearably high.

## II. Recommendations

### To the Office of the Leader [3]

### On Unlawful Arrest and Detention

- Release all individuals currently deprived of their liberty for peacefully exercising their rights to free expression, opinion, and association;

- Abolish the use of prolonged solitary confinement;

-  Ensure that all persons deprived of their liberty receive family visits, and inform families about the location and status of their family members in detention;

- Revoke the authority of the Ministry of Intelligence, the judicial authority, and the armed forces (including the Islamic Revolutionary Guard Corps) over any civilian prisons or detention centers.

### On Torture and Ill-Treatment

- Investigate promptly all complaints of  torture and ill-treatment;

---

[3] In this report, Ayatollah Ali Khamenei is referred to as the "Leader," which is a direct translation of his most common title in Farsi, "*Rahbar.*"  His position is also called *Vali-e Faqih*, which is "the Jurist Ruler," which is a reference to the theory of rule enshrined in Iran's Constitution, placing the most significant aspects of governance in the hands of one individual who is seen as the leader of the faithful on earth.

- Respond quickly to complaints of ill-treatment, and ensure that prisoners have access to medical care on a regular basis;

- Ensure that guards, interrogators and other detention facility officials who are responsible for the abuse of prisoners are subjected to disciplinary measures or criminal prosecution as appropriate;

- Ensure that all interrogators wear identifying badges with their names and identification numbers, and all individuals involved in interrogations should be seen by the prisoner.

## *On Administration of Justice*

- Ensure that all detainees are brought before a judge and informed of the charges against them within 24 hours of their detention, as required by Iran's constitution

- Ensure that all detainees have access to counsel and are able to meet with their attorneys in confidence;

- Ensure that all trials are conducted in public in accordance with article 14 of the ICCPR;

- Ensure that meetings with judges are held only in the presence of counsel;

- Order an independent investigation into the use of *Ansar-e Hizbollah* (partisans of the party of God) and *Basij* (militia) to arrest, search, harass, beat, and interrogate persons targeted for criticizing the government;

- Suspend judges who order the use of these forces for such purposes;

- Investigate and prosecute plainclothes agents and militia engaged in attacks against peaceful protesters and activists during November 2002 protests, June and July 2003 protests, and similar incidents;

- Follow up on the recommendations of the parliamentary Article 90 Commission: including investigation and prosecution of officials accused of violating the law.

- Reform the penal code so that vaguely-worded crimes such as "activities against national security," "public disturbance," and "cooperating with foreign entities" can no longer be used to punish persons for exercising their rights to free expression and association.

### *To the Guardian Council*

- Approve ratification of the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, which has already been passed twice by the Parliament.

### *To the European Union*

- Use further sessions of the EU-Iran Human Rights Dialogue to develop performance and time-based benchmarks with respect to ending practices documented in this report;

- Urge Iranian authorities to release those currently held in detention for the peaceful expression of their views;

- Urge Iranian authorities to follow up on the recommendations of the Working Group on Arbitrary Detention and the Special Rapporteur on Freedom of Opinion and Expression following their visits to Iran.

### *To the Special Rapporteur on Torture and Cruel and Inhuman Punishment*

- Request an urgent visit to Iran, noting that Iran issued a standing invitation to UN thematic mechanisms in 2002;

- Following up on the relevant findings of the Working Group on Arbitrary Detention as well as the Special Rapporteur on the Freedom of Opinion and Expression, monitor closely the systematic use of solitary confinement as a form of torture and cruel and inhuman punishment.

## III. Background

The space for free speech in Iran has narrowed considerably since April 2000. In that month, after the resounding reformist victory in parliamentary elections two months earlier, Leader Ayatollah Khamenei gave a speech in which he said that the reformist newspapers "have entered the country and set up a stronghold...and they are the stronghold and the platform of the enemy." This speech marked the beginning of a systematic campaign to silence critics within the country and to send the message that the window for free expression, briefly opened, would now be closed.

First, in 2000, came an unprecedented wave of newspaper closures by a branch of the Public Court that became devoted almost completely to hearing press-related cases. The authorities then arrested increasing numbers of journalists, writers, activists, editors, and publishers. By late 2000, many joked that in order to have a discussion with the great minds of Iran, one had to visit Tehran's notorious Evin Prison.

Iranian human rights advocates and dissidents are well aware of the risks that come with speaking out against government policies. Freedom of expression and opinion are violated on a systematic basis. Since the crackdown on the reformist press began in April 2000, the Iranian government has become increasingly efficient and successful at intimidating and ultimately silencing voices of those who wish to speak against it.

Today, the environment for expression and dissent is at its worst since President Khatami's election in May 1997. "Before there was fear of your newspaper being shut down or being called before the court," one writer said. "Today, it is fear of force. It is fear for your life. It is fear that you will be beaten such that you will never dare speak again."[4] The judiciary, using security forces and interrogators under their control, has become adept at creating an environment of fear where dissidents know that they may at any time be arrested, called before court, held in solitary confinement for unlimited durations without charge, and tortured. Former judge and now Chief Prosecutor Said Mortazavi and a handful of powerful judges have developed an increasingly brutal yet sophisticated machinery to crush criticism.

This report, covering the period from early 2000 to early 2004, links the repression of speech with increasingly coordinated efforts on the part of the government, and particularly the judiciary, to intimidate those who speak out, through abusive use of the courts, prolonged solitary confinement, and torture and ill-treatment in detention. Human Rights Watch spoke with former political prisoners, journalists, academics, Iranian human rights advocates working inside and outside Iran, and Iranian students. There is widespread agreement that the political environment has become increasingly abusive and defined by force.

Having closed virtually all of the reformist newspapers by early 2004, the authorities facilitated greater impunity for interrogators, judges, and plainclothes security agents to violate the law by attacking, detaining, and torturing those who speak out. Today, few avenues, formal or informal, exist for those who are wrongly imprisoned to tell their stories or to seek redress.

---

[4] Human Rights Watch interview with Iran expert  N.M., November 24, 2004.

## *Methodology*

Effective human rights monitoring of Iran is difficult and risky, particularly for Iranians who might seek to provide information. Many Iranians have been detained for their alleged contacts with international media or nongovernmental organizations. While the authorities have allowed several U.N. human rights mechanisms to visit the country, the capacity of these individuals to do any investigations on the ground has varied. In 2003, at least one prisoner was punished for speaking with the U.N. Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression.[5]

For this report Human Rights Watch interviewed former political detainees and prisoners who have left Iran since 2001, student activists who have fled the country, and the families of those deprived of their liberty. Interviews were conducted in Canada, the United States, Europe, and Turkey. Some individuals that we spoke with continue to live and work in Iran, and we have changed their names and identifying characteristics for their and their families' security.  Others, who have written and spoken out publicly since leaving Iran, asked that Human Rights Watch use their names.

Informal interviews and conversations were carried out over email with a number of individuals inside Iran, as well as foreign journalists who have reported on the country. There are significant security constraints to carrying out interviews on politically sensitive topics inside Iran. Many individuals who have been in prison do not feel safe using email, telephone, or post for any substantive communication.

## VI. Arbitrary Arrest and Detention

> *I came out of my apartment to go to work, and headed to my car. Suddenly, a group of plainclothes men with guns drove up. One of them had a walkie-talkie. They said, "If you work with us, we will help you. There is a report of drug use in your home." I said, "Do you have a search warrant?" They showed me a piece of paper. "Who sent this?" I asked. "The judge from the Revolutionary Court."…They searched my home for hours. I tell you, even if you had gone to your enemies' home, and you had carte blanche, you would not have done what they did to my home that day.  They*

---

[5] Student activist Ahmed Batebi, who was out of prison on medical leave, was kidnapped by plainclothes agents and eventually acknowledged to be at Evin prison after meeting with Ambeyi Ligabo, the UN Special Rapporteur on freedom of opinion and expression in November 2003.

*took all of my notes, my diaries, my family photographs, my personal videotapes, my speeches, everything. They told me that I had to go to the Intelligence office…When they took me to the office, they said, "Write down everything you have done." I would write something down, and they would tear it up. They would give me a new piece of paper and say, "Write down what you have done." I would write, and they would tear it up. This happened eleven times. Finally, they said, "You write what we tell you to write. You are very smart, you are very educated, and yet you have written the same thing eleven times even though we have torn it apart every time." I said, "Because it is the truth."*

*They blindfolded on me and said, "You are arrested." They took me to a car, told me to lie down in the back seat, and we drove around for 45 minutes. One of the men in the car said, "People this smart will pay a price." Finally, we stopped, we went down some steps, and I remember that I fell because of the blindfold. They kept telling me to keep my head down. "Head down, head down, head down." I sat in a room in the basement until the first interrogations began…[6]*

These were the first few hours of what would become months of detention, harassment, and intimidation for Moshen M., a young doctor and student activist who had been very vocal on his university campus. He had recently been elected to a high position in a campus student group and had given a speech on student activism and written several articles critical of government hardliners in reformist newspapers. He was targeted by the Ministry of Intelligence (*Vezarat-e Etelaat*) prior to its "clean-up" in 2001.[7]

Iran is a party to the International Covenant on Civil and Political Rights (ICCPR), which prohibits arbitrary arrests and detentions. An arrest or detention is arbitrary when not carried out in accordance with the law, or if the law is itself arbitrary or so broadly worded as to allow arrest and detention even for the peaceful exercise of basic rights

---

[6] Human Rights Watch telephone interview with Dr. Mohsen M., Ankara, Turkey, December 8, 2003.

[7] In late 1998 and early 1999, a number of Iran's most prominent writers, journalists, and secular intellectuals were brutally murdered in a series of killings that came to be known in Iran as the "Serial Murders" [*qatl-hayeh zanjiri*]. In a watershed response, the government announced in January 1999 that a group of "rogue elements" within the Ministry of Intelligence were operating a death squad that was responsible for the killings. President Khatami created a commission to investigate the 'serial murders,' and to charge all the Ministry of Intelligence staff involved. At least seventeen staff were terminated, including Said Emami, the man charged with masterminding the group and later said to have committed suicide in prison. See, for example, "Iran OKs New Intelligence Minister," Associated Press, February 24, 1999; Scott Peterson, "Iran's Arrests of Intelligence Officers May be Watershed," *Christian Science Monitor*, January 8, 1999. A new minister was appointed, and the agency was brought more directly under the control of the President's office. However, many dissidents told Human Rights Watch that many of the individuals who were removed from the Ministry moved to the intelligence services of the judicial authority and currently operate a parallel intelligence service targeting those who are politically active or vocal.

such as freedom of expression.[8]  In 2000 and 2001, many intellectuals, activists, and dissidents feared the Ministry of Intelligence, which was known for its links with plainclothes security agents ready to do the ministry's bidding: pick up dissidents, search homes, and imprison activists and intellectuals in illegal detention centers—without judicial orders or on the basis of vaguely worded prohibitions.

Since 2000 the use of plainclothes security agents to attack critics of the government has taken on a more formal character. They are increasingly armed, violent, and use sophisticated communication and transportation equipment.  Very few of the individuals interviewed have reported encounters with the regular Iranian police or Law Enforcement Forces [LEF].  We asked one writer if the uniformed police had worked with or attempted to stop the plainclothes agents who had attacked a group of students and others who had gathered to hear him speak, "The police?" he replied, "The police are afraid of these groups."[9]

These state sponsored groups have been implicated in the crimes of assault, theft, illegal seizure, and illegal detention.  The cumulative effect of their activities is to foster an environment where people are afraid to speak out, to write critically, and to engage in political activism.  Dr. M.'s experience is typical of those who were arrested or picked up in 2000, when the Ministry of Intelligence was firmly under the control of conservatives.

Farhad T.'s unlawful arrest in September 2000 followed a similar pattern:

> Plainclothes men put me in a car, and they kept telling me to put my head down, to put my head between my legs.  They put a blindfold over my eyes, and we started to drive around a lot. We drove around for at least an hour.  Finally, we went down a set of stairs into a room, and I could hear someone approach me wearing boots.  They told me, "You have had a relationship with a martyr's wife, that is why we have arrested you."[10]

---

[8] International Covenant on Civil and Political Rights (ICCPR), G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force Mar. 23, 1976.  Iran ratified the ICCPR in June 1975.  Article 9(1) states: "Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law.

[9] Human Rights Watch interview with Siamak S. (not his real name), December 20, 2003.

[10] Human Rights Watch interview with Farhad T. (not his real name), London, December 21, 2003.

Farhad T. had been very active in developing youth support for President Khatami's initiatives, had recently given a speech in early 2000 where he challenged Expediency Council Chairman (and former president) Hashemi Rafsanjani on government policies. This was his first of several encounters with plainclothes officers. He was never charged with any crime.

Those who spoke out were typically picked up by plainclothes agents. Several established writers and intellectuals said that upon hearing that they were to be detained, decided to report to the courtroom themselves. This did not prevent them from being subjected to similar treatment. Massoud Behnoud, a highly respected journalist and writer, heard from a newspaper reporter on August 8, 2000 that his arrest would be announced in the dailies the following day:

> I went to [then-judge Said] Mortazavi's court myself, because I did not want them to come and get me. They took me to the basement of Branch 1410 and there was a man there who took my bag. They put me in a car and didn't tell me where we were going. It became obvious that we were going to my house…[T]hey brought a locksmith and opened the door to my home and began searching. Whatever they were looking for, they didn't find it, because I could tell that they were frustrated. They kept calling Mortazavi on their mobile phones, telling him they didn't have anything yet. They went through … my personal files, my notes, my CD collection, my home videos, collections of my speeches and writings. [11]

Behnoud was then driven to his second home, where the men carried out another five hours of aggressive searching through his private belongings. Despite Behnoud's repeated requests, the men never displayed a search warrant:

> At this point, it was probably about 11 o'clock at night, and they kept calling Mortazavi on their mobiles and checking in with him. They started shoveling my garden, and I again asked them what they were looking for. They started going through my wife's private belongings. In my home, there were spare jugs of potable water that we kept in case the water was cut off. They started to pack up the jugs of water, and I didn't

---

[11] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

understand what they were doing. They took out a sheet of paper, and began to create a false inventory: "white powder," "illegal liquids."[12]

One group [of agents] stayed at my home, and at about 2 a.m. that night, we drove up to the gates of Evin.  At the gates, they turned to me and said, "We have a message for you from Judge Mortazavi:  if you cooperate with the interrogators, we will not enter all these things that we have collected in your home as evidence."[13]

With this, Behnoud, like many other political prisoners before him, and many more who would come after him over the next three years, entered Tehran's notorious Evin prison.

None of the journalists arrested and detained during the first wave of the crackdown in 2000-2001 were promptly charged with a crime.  Iran's constitution requires that the authorities submit provisional charges to the competent judicial authorities within 24 hours.[14]  As described above, detainees were held, often incommunicado and in solitary confinement, for long periods without being charged, in violation of the constitution and Iran's obligations under international human rights law.[15]  Several former prisoners told Human Rights Watch that all of "Mortazavi's prisoners" were cut off from communications for several long stretches beginning in late 2001. While in prison in early 2000 and 2001, a group of 'Mortazavi's Prisoners' provided secret interviews over prison telephones, passed letters to the press and international organizations through their families, and were able to pass messages to their families about the condition of other political prisoners or about their most recent encounters with their judges.[16]

---

[12] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

[13] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

[14] Article 32 of the Iranian Constitution states: No one may be arrested except by the order and in accordance with the procedure laid down by law.  In case of arrest, charges with the reasons for accusation must, without delay, be communicated and explained to the accused in writing, and a provisional dossier must be forwarded to the competent judicial authorities within a maximum of twenty-four hours so that the preliminaries to the trial can be completed as swiftly as possible.  The violation of this article will be liable to punishment in accordance with the law.

[15] See ICCPR, article 9 ("anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arrest and shall be promptly informed of any charges against him").

[16] Examples include the number of critical letters and interviews by journalist and writer Akbar Ganji, the letter passed to the international press from Ahmed Batebi, and others.  Prison letters from Nasser Zarafshan, Akbar Ganji, and Ahmed Batebi are on file with Human Rights Watch.

These testimonies, which document the invasion of privacy, threats of false prosecutions, and intimidation of writers and journalists critical of the government are typical of the experiences of the other individuals that spoke with Human Rights Watch.

## V. Detention Centers and Ill-Treatment

This section describes the treatment of political detainees in Tehran's Evin Prison as well as illegal detention centers staffed by various intelligence and security agencies.  It describes that aspect of detention that most traumatized political detainees with whom we spoke: total solitary confinement for indefinite periods of time.  This section also documents the connection between plainclothes security forces and illegal detention centers.

Under international human rights law, Iran is obligated to ensure that all persons deprived of their liberty are treated with humanity and respect. [17] Moreover, no one may be subjected to cruel, inhuman or degrading treatment or punishment.[18]

### *Evin Prison*

Evin Prison, located in the hills of northern Tehran, was built in 1971.[19] It grew to international prominence when, during the late period of Mohammad Reza Shah Pahlavi's rule, thousands of political prisoners were held in horrifying conditions, tortured, executed there under the control of the shah's secret police, SAVAK.[20] After the 1979 revolution, the new government rounded up those associated with the monarchy and detained them in the facility, and in the years that followed those who had supported the revolution but were later seen as a threat to the new Islamic Republic were taken to Evin. Perhaps the darkest period in Evin's history came in the late summer of 1988 when untold thousands of political prisoners were executed after cursory trials.[21]

---

[17] ICCPR, art. 10.

[18] ICCPR, art. 7.

[19] Ervand Abrahimian, *Tortured Confessions: Prisons and Public Recantations in Modern Iran,* (Berkeley: University of California Press, 1999)*,* p. 105.

[20] Prison memoirs have become an increasingly popular genre in Iran, and are a rich source of information for the changing (and constant) aspects of life behind bars in Evin.  For the treatment of political prisoners before the revolution, see Abrahimian, *Tortured Confessions*.

[21] See Amnesty International, "Mass Executions of Political Prisoners," *Newsletter,* February 1989*;* Amnesty International, "Iran: Over 900 Executions Announced in Five Months," 19 June 1989 (Noting that "the organization now has over 1,700…names but it remains impossible to estimate accurately the number of

The compound, in an eerily beautiful location for a prison, has grown over the years to several buildings.  While formally under the control of the National Prisons Office, in the last several years different wards of the prison have  effectively been handed over to the judicial authority, the Iranian Revolutionary Guards Corps, and the Ministry of Intelligence and Security.[22]

While Evin is not the only prison in Tehran, almost all of the individuals whom we spoke with spent some part of their detention there. Many persons detained there in these first years of the crackdown interpreted the new interrogation methods introduced in late 2000 and 2001 as a reminder that Evin was a place to be feared.  The authorities seemed to understand that in early 2000 many intellectuals who went in and out of Evin shared the impression of one prisoner: "We were all in there together, and it was like a university."[23]

Political detainees in Evin report different experiences in prison than those charged with common crimes: interacting with different authorities, and being pulled out for interrogations much more frequently. The authorities use threats of torture, threats of indefinite imprisonment and torture of family members, deception and humiliation, multiple daily interrogations lasting up to five or six hours, denial of medical care, and denial of family visits.

### Parallel Forces and Illegal Detention Centers

> *You need to understand that Prison 59 is not just a place, it is a concept.  One begins to think that there are underground prisons everywhere. And even for those of us who are free, we feel constantly as though we are walking on the screams of our colleagues.*[24]

Iranians use the term "*nahad-eh movazi*" literally "parallel institutions" to refer to the various extralegal agents of state coercion that have grown in formality, organization,

---

political executions which did in fact take place in the latter half of 1988…it has gathered reports of their massive number and arbitrary nature from a wide variety of sources.");  Ervand Abrahimian, *Tortured Confessions,*  p. 209.

[22] In Farsi, the Ministry is called *Vezarat-e Etelaat va Amniat-e Keshvar*. In press accounts, it is sometimes referred to as the Ministry of Intelligence or the Ministry of Information.

[23] Human Rights Watch interview with former prisoner, London, December 2003.

[24] Human Rights Watch Interview with former prisoner, London, December 11, 2003.

and capacity.  Iranian newspapers regularly use the term "parallel institutions" and "plainclothes ones" to refer to the networks of *Basiji* [militia], *Ansar-e Hizbollah* [partisans of the party of God], various intelligence services outside of the Ministry of Intelligence, and the secret prisons and interrogation centers at their disposal.

The number of illegal detention centers not under the direct control of the National Prisons Office is unknown.  They are not officially registered as prisons, do not record the names of their prisoners, and information about their budgets, administration, and management is not known even by relevant government authorities.  There are reportedly many in and around Tehran, and they appear to be growing in number.

In early 2001, members of parliament learned that underground prisons were being used to hold many political detainees. Several members, led by MP Ali Akbar Musavi-Khoini, demanded to see these prisons for themselves.  The ensuing debates about the secret prisons led to some light being shed on their existence, and there was a moment of hope in which it appeared that some of the prisons would be shut down.  It did not last. While there were some reports that illegal prisons were closed, specifically Towhid Prison, several former prisoners reported that they witnessed construction of other buildings while they were in custody. While it has not been possible to confirm this information, it appears that the authorities responded to the increased domestic and international attention on the secret prisons by transferring the monitoring, intimidation, and detention of political targets to alternate agencies.

For Iranians, the secret detention centers are inextricably linked with plainclothes security agents.  These forces have attacked reformist newspaper, violently lashed out against students and other protesters in the streets of major cities, and interrogated political prisoners in custody.  We spoke with one newspaper editor, a member of the first parliament after the revolution, who was attacked by these agents after he gave a speech with another MP.[25] More recently in 2004, they have "kidnapped" student leaders, verbally threatened human rights activist and Nobel Peace Prize winner Shirin Ebadi, and physically attacked a crowd in Hamedan gathered to hear a speech by a prominent student leader and a reformist politician.[26]

---

[25] "MP Warns 'Pressure Groups' are Active Again," *Aftab-e Yazd* (Tehran).

[26] "Rejected Majlis Candidates Attacked by Hezbollah, One Taken to Hospital," Islamic Republic News Agency (IRNA), January 22, 2004 (translated by BBC Monitoring Middle East, original text conferred by Human Rights Watch):

> An IRNA correspondent reports from the hall that about 200  Hezbollah members entered the hall and began heckling speakers, Sa'id Razavi-Faqih and Shahmoradi, by chanting the slogans "the blood in our veins will be submitted as a gift to our Leader" and "death to hypocrites." The hecklers than started banging their feet on the floor and rushed forward and demolished the speakers platform.

These militia groups have in recent years become more sophisticated, improving their organization, visibility, level of resources, planning, and coordination.  Human Rights Watch spoke with several reporters who had observed that during the protests of June and July 2003, plainclothes militia groups had set up checkpoints around the Tehran University in order to keep people from joining the protesters that had already gathered.[27]  In addition, several witnesses to these protests noted that plainclothes agents were communicating on walkie-talkies with one another.

In the period covered in this report - April 2000 to February 2004- plainclothes agents wrecked the offices of reformist newspapers, attacked preeminent intellectuals during public lectures,[28] kidnapped student leaders[29], beat protesters with batons, broken bottles, and wooden clubs during peaceful political gatherings,[30] and delivered many individuals to detention centers and prisons. As these forces have grown, it has become more difficult to determine which arm of the government they are connected. For example, while the *Basiji* and *Ansar-eh Hizbollah* groups are well known quasi-official groups, it appears that the judiciary is also using plainclothes agents to silence those who criticize the government.

Some officials have openly threatened political activists with reprisals from pro-hardliner vigilantes.  The commander of the Basij forces at Amir Kabir University was quoted as saying, "From now on, we will confront them in a different manner; we will put those who disagree with our opinion or do something illegal back in their place.  These

---

[27] Human Rights Watch interview with international expert on Iranian current affairs, November 18, 2003.

[28] See Human Rights Watch, World Report 2000, Iran, "Two leading reformist thinkers, Abdol Karim Soroush and Mohsen Kadivar, were prevented by *hizbollahis* armed with clubs and knives from attending a student convention  in the town at which they were due to give speeches."

[29] Kasra Naji, "Facing External Pressure, Iranian Hardliners Crack Down," CNN Online, July 29, 2003, http://www.cnn.com/2003/WORLD/meast/07/29/otsc.naji/ (retrieved October 30, 2003).

[30] See, for example, BBC News, "Militia Attack Tehran Protesters," June 14, 2003 ("Security forces and hardline supporters of Iran's conservative leadership have clashed with large crowds in the capital Tehran who were protesting against clerical rule.  Tear gas, clubs, and iron bars were used to disperse the protesters.  Hardline vigilantes were also seen pulling people from cars and beating them.").  On June 10, 2002, Two leading reformists, newspaper editor Latif Safari and MP Hossein Loqmanian were also attacked while giving a speech at a mosque in Kermanshah, discussing the frustrations and successes of reform efforts.   Hundreds of plainclothes agents raided the mosque, attacking audience members and chanting threatening slogans.  The local governor general noted that "despite all actions, we saw the official statement by an illegal, law-breaking, freedom-killing, and anti-religious group of the Ansar-e Hezbollah." MP Loqmanian said, "When a deputy of the Majlis criticizes any official of the judiciary in the slightest, he is sent to prison. But members of these pressure groups assault the citizens in public thoroughfares and even enter the people's houses by force. Nevertheless they get away with it without the slightest response by the judiciary." See "MP Warns 'Pressure Groups' are Active Again," *Aftab-e Yazd* (Tehran), June 12, 2002 (translated by BBC Monitoring Middle East); *Mardom Salari* (Tehran), June 23, 2002 (translated by BBC Monitoring Middle East).

confrontations might be physical, and from now on, we will not recognize these matters as our responsibility."[31]There is a great deal of evidence to suggest that these agents act with full state authority: there are many reports of Ansar-e Hizbollah men with arms.[32] People saw checkpoints manned solely by plainclothes men with guns during the protests of June and July 2003.[33]

Perhaps the clearest link between the parallel forces and the government is seen in the secret detention centers. Every former prisoner interviewed by Human Rights Watch had spent some portion of his detention in an illegal prison, and all suffered similar mistreatment. More than anything else, every prisoner emphasized that his treatment in the illegal detention centers was far worse than in any section of Evin Prison. Transport of prisoners to these detention centers began with being told to put their heads down or being forcibly pushed down in the back of a car with a blindfold on, followed by at least forty-five minutes of circling around Tehran in order to confuse the prisoners' directional bearings.  Family members recalled that this is the point at which they lost contact with the prisoner, hearing nothing more until or unless they had been moved to a formal prison.[34]  Every prisoner told Human Rights Watch that they had been kept in absolute solitary confinement in the illegal detention centers, Prison 59 and Prison 66, allowed to visit the bathroom and pray three times a day while blindfolded, and faced the harshest interrogations of his imprisonment. All said that the staff they were allowed to see did not wear uniforms, and were members of the *lebas shakhsi-ha,* or "the plainclothes ones."

---

[31] "Commander of Basij," Amir Kabir University News (AKU News), November 12, 2003.

[32] Civilians are not permitted to carry arms in Iran.

33 Human Rights Watch interview with an expert on Iranian current affairs, November 23, 2003.  The Special Rapporteur on the right to freedom of opinion and expression recently confirmed this characterization, noting  in his report that:

> The Special Rapporteur was informed that, during both the 1999 and the 2003 events, students demonstrating peacefully were reportedly attacked by members of the Basij (a paramilitary group under the authority of the Revolutionary Guards, which is represented in each
>
> university through a Students Basij Organization) and of the Ansar Hezbollah (a group dependent on the authority of the Office of the Leader) and many were arrested.

*Report Submitted by the Special Rapporteur on the right of freedom of opinion and expression, Ambeyi Ligabo,* E/CN.4/2004/62/Add.2, January 12, 2004.

[34] This was also the case with the religious nationalist alliance prisoners, many of whom were detained in Prison 59.  The wife of one of the most prominent detainees states, "Eshkevari had phone privileges at Tehran's Evin Prison.. Suddenly, he told her that he was to be moved to Prison 59, a facility apparently run by Iran's Revolutionary Guards.  She has not heard from him since." Cameron Barr, "In Iran, Repression Hits Home," *Christian Science Monitor*, June 20, 2001.

*Prison 59*

Some forty members of the *Melli-Mazhabi*, (religious-nationalist alliance) a loosely affiliated group of writers, journalists, and political activists, were arrested in March 2001 and sentenced to prison. Many were held in one of the more notorious illegal prisons, Prison 59, also referred to as *Eshraat-abad*.[35]  Human Rights Watch spoke with several writers, journalists, and student activists who had been taken to Prison 59.  It appears that those prisoners who do not confess after being subjected to solitary confinement in Evin are taken to Prison 59 in order to cut them off from information and break them psychologically.[36] Several prisoners, returned to Evin after spending some time in Prison 59, were threatened with being sent back there if they did not cooperate.

Prison 59 is controlled by the Iranian Revolutionary Guards Corps and is located in the IRGC compound in Vali-e-Asr, Tehran. The prison itself appears to be run by the Intelligence Services of the Revolutionary Guard (*Hefazat-e Etelaat-e Sepah Pasdaran*).  It is composed of a series of solitary cells and interrogation rooms, and two larger holding areas equipped with video cameras.  Prisoners are provided with a rug, a towel, and a bowl upon entering, along with unmarked pajamas.  Each was told, "Here, there is absolute silence." They were told that before their cell door opened, they should don a blindfold until the guard allowed them to exit. They have no contact with their families, their attorneys, or any other prisoners. They do not have access to medical care while in Prison 59, and many reported falling ill due to severe temperatures.

Despite some reports that Prison 59 had been closed, Human Rights Watch interviewed individuals who had been held there as recently as July 2003.  They reported that in the sudden intake of thousands of prisoners during the June and July protests many were taken to Prison 59's holding areas in large groups.[37] One of these detainees was able to see much of Prison 59 without a blindfold and told Human Rights Watch, "I cannot imagine spending one night in those solitary cells without losing my mind."[38]

---

[35] See Barr, "In Iran, Repression Hits Home," *Christian Science Monitor*; See also "Centralization of Penal System to Resolve Shortcomings," RFE/RL, November 2002.

[36]  One journalist notes that as letters smuggled out of prison and prisoners' accounts of detention became too embarrassing for the authorities, many were moved to Prison 59.  "The most prominent of the political prisoners… were transferred to Prison 59, a notorious jail run by the Revolutionary Guards in Tehran's Eshrat Abad [sic] garrison, where nothing gets in or out.  Afshari, on state television, and Sahabi, in the form of a letter, have since made 'confessions' from Prison 59."  Guy Dinmore, "Words of hope in 'Hotel," *Financial Times,* August 25, 2001.

[37] Human Rights Watch interview with Ali K., New York, September 29, 2003.

[38] Human Rights Watch interview with Ali K., New York, September 29, 2003.

*Edareh Amaken*

More recently, politically active individuals are summoned to report to a detention center controlled by *Edareh Amaken Umumi* [Department of Public Places] for the day, and then released. *Amaken*, a division of the Law Enforcement Forces tasked with monitoring "morality crimes" such as physical contact between men and women and playing music, apparently provides facilities for the parallel intelligence services to carry out interrogations at its offices in Tehran.[39] Its building has a series of basement cells that have been used for political interrogations and in order to intimidate activists and writers.

The *Amaken* interrogations have become well known among Iran's students and the journalistic community, and they seem to be intended to spread uncertainty and fear among students and others.  Individuals often return home from a day of interrogations without being taken into long-term detention.  Some are asked to provide written confessions, others are threatened and told that they will be arrested in the future if they do not cooperate, or if they do not cease to engage in political activity.  Others are told that cases are being created against them. Individuals are reportedly taken to an office where they are interrogated about a particular article, website, or international telephone call, suggesting that the intelligence agents are developing a file against them.  Individuals are often spoken to harshly, threatened with imprisonment, and then let go.[40] One individual told Human Rights Watch said, "It is not worth it anymore, they can summon you whenever they like."[41]

Parallel security forces such as the Ansar-e Hizbollah and Basij shadow intelligence services such as Hefazat-e Etelaat-e Sepah of the IRGC and Hefazat-e Etelaat-e Ghovey-e Ghazai-e of the judicial authority, and the secret detention centers they control, are sanctioned by forces within the government. The illegal prisons, which are outside the oversight of the National Prisons Office, allow political prisoners to be abused, intimidated, and tortured with impunity.  The government has failed in its obligation to protect citizens from ill-treatment of this sort, to close down the illegal detention and interrogation centers, and bring the individuals responsible for these acts to justice.

---

[39] "Iran Report," Radio Free Europe, October 28, 2002.

[40] One journalist who had been interrogated there stated that "the men who interrogated him were not in uniforms and had nothing to do with the security forces. [He said]They insulted him and also asked him about Siamak Purzand [sic], a journalist who was jailed in January.  [He] also was questions about his interviews with foreign radio stations." Radio Free Europe, "Iran Report," February 18, 2002.

[41] Human Rights Watch telephone interview with former student journalist, Toronto, Canada, November 28, 2003.

### *"White Torture": The Use of Solitary Confinement*

In Iran, intellectuals, writers, activists and detainees themselves use the term "white torture" [42] to refer to the use of incommunicado solitary confinement (*enferadi*).  The conditions of solitary confinement used against political prisoners are designed to break the resolve of detainees such that they capitulate and agree to be videotaped, sign confessions, and give information regarding their political affiliations and associates. Prisoners are held in solitary cell blocks, many in secret detention centers, often underground, with twenty-four-hour artificial light. They are denied communication with other prisoners and access to attorneys, family members, and medical health professionals.

Under international law, prolonged solitary confinement may rise to the level of torture. The individuals who were interviewed by Human Rights Watch emphasized that their time in absolute solitary was far worse than any physical or verbal abuse they experienced.  They spoke of fear of losing their minds, of worrying that another day without any human contact would break their will.

Former prisoners emphasized that the increasing use of solitary confinement against those who criticize the government sends a message to others who might consider engaging in political expression: it is not worth it.  As many who have been detained have said, "I went in as one person and came out another person."[43] Their experiences in solitary have had a reverberating impact on the student and activist communities. By targeting the leadership of the student activist community and the most influential writers and newspaper editors, the government was able to chill expression among the larger public.

One writer described the effects of solitary confinement in Evin's Section 240:

> Since I left Evin, I have not been able to sleep without sleeping pills. It is terrible. The loneliness never leaves you, long after you are "free." Every door that is closed on you, it affects you.  This is why we call it "white torture." They get what they want without having to hit you. They know enough about you to control the information that you get:

---

[42] The origin of this term is unclear. Some use it because many of the solitary cells in Iran are freshly painted white so that the prisoners cannot leave messages for one another or write on the walls. Others believe the term refers to a technique that is as effective as physical torture but leaves no physical evidence.

[43] Dan De Luce, "Kidnapped, Jailed, Beaten," *The Observer*, April 4, 2004.

they can make you believe that the president has resigned, that they have your wife, that someone you trust has told them lies about you. You begin to break. And once you break, they have control.  And then you begin to confess.[44]

The Basic Principles for the Treatment of Prisoners state: "efforts addressed to the abolition of solitary confinement as a punishment, or to the restriction of its use, should be undertaken and encouraged."[45]  The U.N. Working Group on Arbitrary Detention noted in its recent report on Iran that:

> [F]or the first time since its establishment, [the Working Group] has been confronted with a strategy of widespread use of solitary confinement for its own sake and not for traditional disciplinary purposes, as the Group noted during its truncated visit to sector 209 of Evin prison.  This is not a matter of a few punishment cells, as exist in all prisons, but what is a "prison within a prison" fitted out for the systematic, large-scale abuse of solitary confinement, frequently for very long periods.
>
> It appears to be an established fact that the use of this kind of detention has allowed the extraction of "confessions" followed by "public repentance" (on television); besides their degrading nature, such statements are manifestly inadmissible as evidence.[46]

The Working Group further stated, "such absolute solitary confinement, when it is of a long duration, can be likened to inhuman treatment within the meaning of the Convention Against Torture."[47]

---

[44] Human Rights Watch telephone interview with Ebrahim Nabavi, January 8, 2004.

[45] U.N. Basic Principles for the Treatment of Prisoners, G.A. res. 45/111, annex, 45 U.N. GAOR Supp. (No. 49A) at 200, U.N. Doc. A/45/49 (1990), principle 7.

[46] Report of the U.N. Working Group on Arbitrary Detention, *Visit to the Islamic Republic of Iran*, E/CN.4/2004/3/Add.2, para 55, p. 15. This prohibition is also enshrined in Iranian law. Article 38 of the Constitution states: "All forms of torture for the purpose of extracting confession or acquiring information are forbidden.  Compulsion of individuals to testify, confess, or take an oath is not permissible; and any testimony, confession, or oath obtained under duress is devoid of value and credence.  Violation of this article is liable to punishment in accordance with the law.

[47] Report of the Working Group on Arbitrary Detention, E/CN.4/2004/3/Add.2, para 55, p. 16.

The U.N. Commission on Human Rights in an April 2003 resolution noted that "prolonged incommunicado detention may facilitate the perpetration of torture and can itself constitute a form of cruel, inhuman or degrading treatment or even torture."[48]  In interpreting Article 7 of the ICCPR on torture and other mistreatment, the U.N. Human Rights Committee stated that "prolonged solitary confinement of the detained or imprisoned person may amount to acts prohibited by article 7."[49]

The harm inflicted by solitary confinement is exacerbated by other aspects of the detention.  Cell conditions are especially poor: underground cells and cells filled with artificial light 24-hours a day appear designed to inflict maximum physical and psychological discomfort.   Incommunicado detention deprives detainees of access to family and counsel, allowing sole contact with interrogators and guards. This is psychologically damaging.  Furthermore, incommunicado confinement is considered the single highest risk factor for torture because of the absence of external monitoring of the interrogation process.[50]

The European Commission on Human Rights has stated that, "complete sensory isolation coupled with total social isolation, can destroy the personality and constitutes a form of treatment which cannot be justified by the requirements of security or any other reason."[51]

Different and sometimes competing branches of the Iranian government control the various blocks of solitary cells in Evin Prison. Individuals we spoke with reported being held in Section 209 and Section 240, and several reported that solitary cells were being built in Section 325. These sections are named after the internal phone code of the block: "209" is the internal Evin telephone number for this section of the prison.

It appears that Section 209 is under the control of the Ministry of Intelligence. Section 240 is under the control of the intelligence services of the judicial authority (*Hefazat-eh*

---

[48] U.N. Commission on Human Rights resolution 2003/32, *Torture and other cruel, inhuman or degrading treatment or punishment,* April 23, 2003, E/CN.4/2003/L.11/Add.4, para. 14.

[49] U.N. Human Rights Committee, General Comment 20, Article 7, Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.1 at 30 (1994), para. 6.  Article 7 of the ICCPR states: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."

[50] See Camille Giffard, *The Torture Reporting Handbook* (Human Rights Centre, Univ. of Essex 2000), p. 17.

[51] European Commission on Human Rights, *Kröcher and Möller v. Switzerland*, Application No. 8463/78 (1983); See also Nigel Rodley, *The Treatment of Prisoners Under International Law* (New York: Oxford University Press, 1999), pp. 294-297 (citing the view of the European Committee for the Prevention of Torture that 'solitary confinement can, in certain circumstances, amount to inhuman and degrading treatment.')

*Etelaat-eh Ghovey-eh Ghazai-e*), and it appears that Section 325 is under the control of the Intelligence Services of the Iranian Revolutionary Guards Corps (*Hefazat-eh Etelaat-eh Sepah Pasdaran*).[52]  Some believe that Section 209, while nominally under the control of the Ministry of Intelligence, is also under the control of the *Sepah* agents.  Human Rights Watch has not been able to confirm the fluctuations of power within the prison and the actual identities of those who control the solitary cells, due to the fact that prisoners are routinely blindfolded when moving within these structures. Former prisoners describe differences in conditions and treatment in different sections, as well as solely political and opinion-focused interrogations.  Rather than the differences, though, it is the similarities in the experiences of those who have been held in solitary confinement that is striking.

Section 209, the most notorious holding area for political prisoners in Iran, has been in use since before the 1979 revolution.[53]  Human Rights Watch interviewed one individual who had been in 209 in the 1980s who explained, "When they were building 240 and 325, they learned from their experiences in 209. In the newer cells, there is absolutely no way to communicate between cells, no way to hear sound."[54]  In February 2003, when the Working Group on Arbitrary Detention went to the prison accompanied by officials from the office of President Khatami and with official permission to see the prison and speak with prisoners, they were brusquely escorted out of Section 209, with no explanation. Their government guides did not protest: it appears that regular officials, including guards and police officers, have little or no authority in the halls of solitary cells.

Some prisoners were held in general wards before being taken to the solitary sections of Evin. Others were picked up by plainclothes men and taken directly to the solitary sections.  In Section 209, prisoners were walked down stairs into a basement, where there were at least four halls, approximately twelve cells per hall, and a separate row of solitary cells for female prisoners.  The cells measured about one meter by two meters, with a ceiling height of about four meters.  A light at the top of the cell (most prisoners estimated about 40 watts), is on twenty-four hours a day.  The cells in Section 209 have a toilet and a sink inside the cell.  The floor is made of what most prisoners described as chalk.  Prisoners are generally given a blanket, a pair of slippers, and a disposable cup.

[52] There has also been reference to the Judicial Organization of the Armed Forces, which is linked to the Intelligence Services. Meant to solely have jurisdiction over on military justice issues, this office seems to also be involved in interrogation and detention of political prisoners.

[53] Prison memoirs from the late 1980s also make frequent reference to the solitary cells of Section 209.  See, for example, Monireh Baradaran, *Erwachen aus dem Alptraum* (Zurich: Unionsverlag 1998); Nasser Mohajer, *Ketab-e Zendan* (Berkeley: Noghteh Books, 2001).

[54] Human Rights Watch interview with Iranian prisons expert, A.M., Paris, December 17, 2003.

The walls of the cell are all white.  Some prisoners were granted twenty minutes per twenty-four hour period in a caged outdoor area, but others never saw the open air except on their way to and from court.

The prisoners, many of them held without charge or on charges that changed once they get to court, were not told why they had been taken to solitary confinement, how long they could expect to be there, or whether there was any way for them to attempt to secure their release or return to the general ward of the prison. In their interrogations, their freedom or their return to public wards was conditioned on signing a confession or videotaping a recantation or confession.

Many prisoners were denied access to medical care while they were in Sections 209 and 240. Only one of the prisoners we spoke with had a family visit while he was in solitary confinement, and his wife left traumatized because of the severe weight loss her husband had experienced and his obviously altered demeanor.[55]

One writer described the impact of solitary imprisonment:

> In the first few hours, it is very hard. You have never been this close to walls in your life. You don't want to sit, because it is chalk, and you are not used to sitting on chalk. You stand.  You pace. You start to get dizzy. After you get dizzy, you lean on a wall. After three or four hours, your legs get tired, and you sit. And then you scream and no one hears you.

> And you feel like they are holding you, like they are physically holding on to you.  Your hair and nails grow faster. A lot of prisoners say that solitary is like being like "the dead in their coffins" because we had heard that the dead's nails grow in their coffins.  Even if they had given me something to read, they had taken my glasses. Even if I had had my glasses, there wasn't enough light.

> There is no sound.  Once in a while, you would hear the call to prayer…After three days, it becomes so, so difficult. Different people break at different times.  We used to talk about when people would "break" [*horidan*].  Some people broke after a few days, some could last

---

[55] Human Rights Watch interview with wife of political prisoner, London, December 2003.

much, much longer.  It is absolute silence [*sukuteh motlaq*].  After three days, I just wanted any words. Even if it was swearing, even if it was a harsh interrogation.[56]

He would not have to wait long.  Interrogations of political prisoners took on an increasingly ideological and substantive angle: probing, insulting, and manipulating the prisoners' writings, speeches, and views for hours.  Hours of interrogation at a time, while blindfolded, by alternating interrogators, were much more crushing when the prisoners were held in solitary.  The prisoner was cut off from information, from family and political events, leaving total control in the hands of guards, interrogators, and judges.

Former detainees told Human Rights Watch that this power over the prisoners' reality, when combined with psychological and physical torture, denial of medical care, and threats to the prisoners' family, left them with very little will to withstand coercive interrogations. They become increasingly willing to sign retractions of their views, confessions of wrongdoing, or even to participate in videotaped confessions.  Many told Human Rights Watch that the interrogations increased in intensity in solitary confinement.

Former prisoners told Human Rights Watch that as their time in solitary confinement increased, they began to suffer more physical and psychological symptoms as a result of the isolation, lack of fresh air and lack of movement. Most did not complain about lack of food, although many said that they lost significant amounts of weight due to their loss of appetite after a short time in solitary.  More than anything else, the prisoners said, it was the absolute silence that broke their spirits and threatened their mental well-being. They had no reading material, no writing implements, were told to remain quiet at all times, and only had contact with interrogators or guards passing through food.

Prisoners who had spent time in Evin's different solitary blocks reported that Section 209 had slightly better conditions than Section 240, which is believed to be under the control of the intelligence services of the judicial authority.  Of the prisoners who had been in both, all reported that in section 240 the silence was more complete and the interactions with guards and interrogators were much more abusive. In Section 209, each cell block door has a small window at the top that, while filthy, allowed the prisoner some connection to the outside world.  The cells of Section 240, in the basement of a building on Evin's grounds, have a small hole at the top of the door that is closed from

---

[56] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

the outside, allowing guards to look in on the prisoner but not allowing the prisoner to look out. These prisoners noted that they could not hear anything but the sound of their own voices when they were in 240, and that this was the most terrifying aspect of their time there.

One journalist who spent twelve days in Section 209 of Evin in 1998 was never charged with a crime nor taken to a court hearing. He was again arrested in August 2000. This time he was taken to Section 240. There, he said, "They were much harsher, more aggressive, and more insulting." "I'll be honest," he told Human Rights Watch:

> I was scared this time. In my interrogation, I said, "Ok, what do you want?" The interrogator said, "The behavior you have engaged in has been against the Leader. Tell us who you have spoken with on your trips abroad." There were three interrogators in the room. They were verbally very aggressive. For twenty days, I was not allowed outside, I had no phone privileges, nothing to read. They told me that they wanted me to go to court and confess that I had made a mistake.[57]

Another prisoner noted that "everyone has a different breaking point in solitary, but everyone will eventually break. They know this." He said his own breaking point came on the thirtieth day in solitary confinement:

> I suddenly started to react to the lack of air. I would put my head at the window at the bottom of the door and try to get oxygen.[58] I couldn't sleep. I would talk to myself, but I couldn't be too loud. I sensed that my condition was worsening. I fell down, hit my head on the door, and fell unconscious.[59]

The word most commonly used by prisoners to characterize the solitary cells was "coffin." Most said that even after only a few days in the windowless, airless, soundless cells, they began to break down. [60]

---

[57] Human Rights Watch telephone interview, Ebrahim Nabavi, Belgium, January 8, 2004.

[58] The solitary cells in Section 209 have small openings at the bottom of the door .

[59] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

[60] The tall cells of Section 209 do have small windows at the top of the cell, but prisoners said that little light passes through the window and they were unable to see the outside.

The authorities in control of the solitary blocks needed the political prisoners to remain in a condition that allows interrogations to continue.  They were aware that mental and physical deterioration occurred more quickly in solitary.  One prisoner remembered that a friend, after three days in Section 209, began screaming, pounding his fists on the door. He recalled that the guards opened the door to the man's cell for a few hours to allow him to regain his composure.[61]

Several prisoners recalled being given a blank sheet of paper and being told to write "everything that they had done."  Because they were accused of nothing other than expressing their political views, it was difficult for them to know what it was that they were to confess. Prisoners would write down as many recent aspects of their lives as they could recall, only to have the sheets of paper ripped apart and told to "write down the truth."

Massoud Behnoud recalled what several others also told Human Rights Watch, that if they were able to get away from their solitary cells even for a few hours, returning was even more difficult then when they had initially begun their time there:

> After all this time, there were no words, no books, no toothpaste.  I would mark the days on the wall.  On the fifteenth day, they threw my clothes into my cell and said, "put on your clothes." I remember that my belt wouldn't hold up my pants.  My coat did not fit.  I thought, "they are going to set me free, and now, as a bonus I look fit too.  I had to fold down my pants like an old man who has just returned from the pilgrimage…I thought, as I put my clothes on, that I had handled solitary confinement in a gentlemanly manner.  They drove me out and they said, "you have a visit." I saw sky. I saw trees.  I told the sky that I appreciated it now. Evin, it was a beautiful place. But then, I realized with a chill, that when they said "visit," it meant I had to go back into that hole.[62]

### Interrogations

Interrogations carried out while detainees are held in abusive detention conditions raise the risk of forced confessions, torture and threats of torture, and use of other coercive techniques.  The interrogations carried out in Evin prison as well as unauthorized

---

[61] Human Rights Watch interview, Paris, December 17, 2003.

[62] Human Rights Watch interview with Massoud Behnoud, December 20, 2003.

detention centers demonstrate the very political nature of the crackdown: those targeted were detained because they acted as the main platforms for the reformist and student movements.  Testimony regarding the interrogations of political detainees demonstrated not only that these interrogations violated international standards,[63] but also that the crackdown was led by those in the government who saw the reformist journalists and students as a class to be intimidated, silenced, and ultimately to be made into examples. The interrogations also provided the authorities with an opportunity to learn more about the dissidents, and to use any information they were able to obtain to expedite their crackdown. Interrogations served as the principle means to fabricate criminal files and charges, coerce confessions, and make threats against prisoners' family, colleagues, or political associates.

Human Rights Watch interviews suggest a pattern in the interrogation of political prisoners after 2000: moving from a focus on the personal life of the detainee to their political views and opinions.  Some were held without ever being charged with a crime, or ever going to trial. Others were held in extended pre-trial detention in solitary confinement. Those who were charged were usually accused of opinion or belief related crimes such as "insulting the Leader." The interrogations often began with repeated questioning regarding unrelated matters.  As one writer recalled, "They started out by asking me all kinds of bizarre questions that had nothing to do with my work: 'Why did you separate from your first wife?' 'Why do you drink?' About my relations with women."[64] It was only later that they turned to his beliefs and political views. These early interrogations could go on for hours, carried out by rank-and-file interrogators who used insulting language and threatened physical torture if they did not "cooperate."   Another prisoner recalled:

> They had held me without telling me why I was there for twenty-four hours.  In my first interrogation, they kept asking me why I had had a relationship with a martyr's wife.  I kept telling them that I had no idea what they were talking about. It was as though they didn't hear me: they would just keep asking the same question over and over and over again.

---

[63] In addition to prohibitions on torture and ill-treatment in detention, international standards also forbid officials from "take[ing] undue advantage of the situation of a detained or imprisoned person for the purpose of compelling him to confess, to incriminate himself otherwise or to testify against any other person."  See United Nations Body of Principles for the Protection of All Persons under Any Form of Detention of Imprisonment, G.A. res. 43/173, annex, 43 U.N. GAOR Supp. (No. 49) at 298, U.N. Doc. A/43/49 (1988).

[64] Human Rights Watch telephone interview  with Ebrahim Nabavi, January 8, 2004.

> The interrogator said, "Don't say 'didn't,' 'wouldn't,' just sign this
> document, and we will let you go."[65]

Prisoners reported feeling frustrated by the ridiculousness of these early interrogations, as well as the humiliation and embarrassment of being insulted about the conduct of their private lives.  One prisoner reported once saying to his interrogator, "At least ask me a few questions that have something to do with why I am here."[66]  During almost every interrogation, prisoners reported having a sheet of paper (usually on judicial authority letterhead) placed in front of them, where they were asked to "confess what they had done wrong."

After the initial rounds of softening-up interrogations focusing on moral or sexual "crimes," detainees were questioned by more "intellectual" interrogators who focused on their writings and political beliefs.  Interrogators often used threats against prisoners' families or the promise of release in order to obtain confessions or disavowal of their stated political opinions on video camera. One writer's interrogation took on an Orwellian tone:

> The interrogations started again. They would take me into the same
> room, but there were new interrogators who had clearly looked at
> everything [I had published].  As interrogations became more
> sophisticated, they focused more on my politics.  Every few days, they
> would ask about my meetings with specific people, such as Dr. Soroush
> and Dr. Yazdi.[67]  It was the month of Ramadan, I remember, so there
> was no food at all during the day. It was becoming harder to bear.  One
> day when we were going into interrogation, they told me to put on my
> normal clothes.  A new man came into my interrogation room and he
> said, "we want to make a film." I said, "Oh, like Kianuri's confession."[68]
> I could tell that Mortazavi and several others were behind the door. I
> couldn't see him, but I could hear his voice, and his Yazdi accent. [69]  He
> would pass notes to the man who was interrogating me.

---

[65] Human Rights Watch interview with Farhad T., London, December 21, 2003.  *Shaheed*, or martyr, is the term generally used in Iran to refer to those who were killed during the Iran-Iraq war.

[66] Human Rights Watch telephone interview with Ebrahim Nabavi, January 8, 2004.

[67] Intellectuals well known for questioning concepts central to the *Vilayat-e Faqih*, or absolute rule of the Jurist.

[68] The broadcasted confessions of Nuraldin Kianuri, one of the foremost figures in the Iranian Tudeh Party, are well-known among the Iranian public. See Abrahimian, *Tortured Confessions*, pp. 179-187.

[69] Mr. Mortazavi is originally from the Yazd region of Iran, and blindfolded prisoners said they recognized him from his regional accented Farsi.

One would say, "Come on, let him go today." The other would say, "Let's wait and hear what he says, that is why I am here." Another would say, "We really should let him go, his family is very worried about him." Then they started asking questions in front of the camera.

Before they began recording, the interrogator said: "Say the reformist papers are controlled by the west and other powers."

I said: "I am just a writer."…

Him: "Mr. S [a fellow reformist writer] has told us what you did. So, say what we tell you on the video."

Me: "I refuse."

Him: "We have a tape of you saying that you got involved in [pro-reformist] newspapers through secrets and secret payments."

Me: "This is not true."

Him: "We have the video."

Me: "Show me."

Him: "That would take months. We want to let you go. If you want to be free, just do what we say on the tape. Don't you respect the law?"

Me: "Yes."

Him: "They law says you have to respect Mr. Khamenei. And Mr. Khamenei said in a speech that these newspapers [reformist papers] are the platform of the enemy. Don't you agree?"[70]

Many prisoners reported that they had been asked about their relationships with other reformist intellectuals or writers. They did not have access to news from outside. At most they had access to the state controlled *Kayhan* or the anti-reform *Jomhuri-ye Eslami*. Interrogators told prisoners that "[President] Khatami had left the country" or that "the reformists had given up." Massoud Behnoud recalled the authorities telling him that "Khamenei has ordered Khatami to leave the country."[71] Almost all the interrogators suggested that they were acting at the behest of the Leader. Another newspaper editor recalled:

---

[70] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

[71] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

> They told me to write a letter to the Leader asking for pardon, telling him that I had made a mistake.  I refused to write such a letter, because this would suggest that I thought that their actions or their laws were legitimate, or that I thought there was anything to pardon me for. I had done nothing wrong and therefore, there was nothing to seek pardon for.
>
> They wanted me to make a videotape saying that I had been wrong, that the newspapers had been wrong.[72]

For many, the interrogations focusing on their political beliefs and on their affiliations with other intellectuals and writers were the most difficult.  They felt as though they were being asked to disavow beliefs that they held and articulated legitimately. The intensity of the interrogations and the lack of any coherent judicial process or hope for redress led most eventually to admit that they had done something wrong.  In addition to threatening their families, or threatening to extend their stay in prison indefinitely, the authorities also reportedly detained people who had been taken "hostage" [*gerogan*] for their outspoken relatives.[73]   In 2001, prisoners in Evin believed that Khalil Rostamkhani, a well known writer and translator had been taken in so that he would force his wife, another reformist writer, to return to Iran and deliver herself to authorities. Many were unwilling to pay this price and, as their time in prison continued, began to lose hope that resistance would do anything but lengthen the duration of their suffering.

For student activists, particularly those who were taken in after few reformist papers remained and when leading intellectuals had either been silenced or run out of the country, the interrogations focused on obtaining information about dissidents' remaining outlet for information: external media and NGOs. One, who had been picked up during the raids on July 8, 2003,[74] recalled five-hour long interrogation sessions, blindfolded, that relentlessly focused on a particular set of questions:

---

[72] Human Rights Watch interview with Siamak S., London, December 9, 2003.

[73] There have been other reports of family members' of prisoners being taken as hostages in order to obtain custody of their relatives, or family members being taken into custody when they are seen as being overly vocal. This seems to have been the case in the reported arrest of Firuzeh Saber, sister of imprisoned journalist Hoda Saber. See, "Political prisoners relatives protest," IRNA, July 26, 2001.

[74] The Persian date marking the anniversary of the 1999 Tehran University protests, which many see as the beginning date of the modern resistance to some aspects of the Iranian political system.  This date has seen increasing tension on the streets of Tehran and other cities since that year, when at least one student was killed at the hands of plainclothes forces.

> Whether we had had contact with Radio Farda.[75] Whether we had been
> in touch with the satellite stations in Los Angeles, whether we had
> contacts in the West that we were giving information to, whether we had
> an internet connection at home, whether we were shah-lovers.[76]

Another student activist was asked similar questions about his connections to the
outside world, and especially whether he was providing information to anyone outside
the country:

> Every day, three times a day, they would take me to the interrogation
> room.  Often, because I had a blindfold on, I would fall. I would be told
> to sit on a chair, look forward, and be smart.  They would say, 'Who are
> you talking to? Who are you working with? Why did you insult Mr.
> Khamenei? It seemed like they would pick a question that they liked,
> and they would ask it over and over and over again.  Every time, I would
> give the same answer, and every time, they would ask the same question
> again. They would hit me hard on the side of the head and say, 'Not like
> that.'

> They would say, the people you are talking to in America are telling on
> you…it is much better if you tell us the truth. You have given many
> interviews to foreign radio stations.[77]

## VI. The Students

*They have made the students more afraid, but they have also made us more bold.*
*They see that students who have confessed or recanted are interviewed on television,*
*and it is obvious to us that they are trying to send a message directly into the*
*universities.  We have seen so much pain that we are not scared anymore.  After they*
*beat you enough times, your skin becomes thick. The difference between us and the*
*older generation of political prisoners (who were also active during the revolution) is*

---

[75] Radio Farda is a branch of Voice of America targeted specifically at Iranian young people. It has an increasing listenership within the country, and is a popular source of information for many.

[76] Human Rights Watch interview with A.K., New York City, September 29, 2003.

[77] Human Rights Watch telephone interview with Dr. Mohsen M., Ankara, Turkey,  December 8, 2003.

*that they are at the end of their rope. We are just at the beginning of ours. We can tolerate much more pain.[78]*

The current pressure for democratic reform in Iran changed dramatically after the student protests at Tehran University in 1999, protests that marked the beginning of the contemporary student movement. The protests began over the closure of the well known newspaper *Salam*. Black-clad thugs attacked the students, beating many and killing at least one student.  President Khatami called for an investigation and trial of those responsible, but no convictions were ever returned. Every year on the anniversary of the 1999 event, students have gathered at Tehran University and other major campuses throughout the country. The date has been a flashpoint for violence and tension, and as recently as July 2003 the authorities have tried to keep large crowds from gathering at the university campus in Tehran.

Almost every individual we spoke with said that it was important to draw a distinction between the treatment of "insiders" [*khodi*] and "outsiders" [*gheire khodi*].  "Insiders" are those who have had some role within the Islamic Republic, but have adopted more critical views, arguing reform of the legal system, transparency of governmental decision-making, and greater power for the elected branches of government.  Generally, they do not call for wholesale reexamination of the Islamic Republic's political foundations. "Outsiders" are those who have not been politically involved in the Islamic Republic, either because of their youth or because they have eschewed any affiliation with the government.  Some "outsiders" have argued that democratic progress can only come through fundamental transformations in the system.

The "student movement" is a disparate group, without a coherent leadership or organizational structure.  Some argue for reform within the current structure of the government, and others say that more drastic steps must be taken to create a democratic system.  There have been several splits within student political groups, and fissures are likely to continue. The largest known student group, *Daftar-e Tahkim-e Vahdat* (the Office for the Consolidation of Unity)*,* is the central office of various university-based *anjoman-e islami* [Islamic Societies].[79] Other groups of students affiliate themselves with particular intellectual leaders.

Student activists and journalists for university media have been treated by the judicial and penal system as "outsiders." Unlike the generation of well known writers or

---

[78] Human Rights Watch telephone interview with Hossein T., location withheld, 8 December 2003.

[79] For more information on the group, see www.tahkim.com.

journalists, the students cannot rely on their reputations or their connections with officials or their families for protection.   The students cannot rely on their status in society or their age, or their respect from some branches of the government to shield them from the worst treatment used to silence critics. In the cases that Human Rights Watch documented, student activists were physically tortured more often than their "insider" counterparts.[80]

Those formerly imprisoned students who spoke with Human Rights Watch had a markedly more abusive experience from other interviewees in their encounters with interrogators and guards. The sequence of their arrest and detention was often similar: arrested without charge; held incommunicado for long periods; held in solitary confinement in Evin or in illegal detention centers before finally being released. However, they were treated more brutally, and were often subjected to physical torture in order to obtain confessions or videotaped retractions.

Students were typically picked up by plainclothes men, taken to an illegal detention center where they were beaten, interrogated, and threatened for several days or weeks, and then released. There are often no prison records and no court documents, but the impact on the individuals and on the larger community of students was quick and far-reaching.  Former student detainee Farhad T. told Human Rights Watch that he was picked up several times and detained for short durations, only to be let go until his next involvement in political activities.

He remembered one incident in late summer of 2000, when he was walking into the gates of Azad University in Tehran and was picked up by a group of plainclothes men:

---

[80] For example, the numbers provided by the judicial authority state that at least 4,000 individuals were arrested during the June and July protests of 2003, and while the government acknowledged release of some of these individuals, it is impossible to document the exact number of detainees, how many were released, or how many were affiliated with student political groups. International press journalists who were in Tehran documented plainclothes militia roving the streets on motorcycles, beating protesters with clubs and bats, and violently attacking groups of peaceful protesters. In August 2003, confessions of several students were televised, retracting their affiliation with political activity, and begging forgiveness for their wrongdoing. Several students, after being freed, stated that their confessions had been the result of 'coercion.' Leader Ayatollah Khamenei threatened the students with a reaction they remembered well, stating that "If the Iranian nation decides to deal with the rioters, it will do so in the way it dealt with it … in 1999." See "Iran's Khamenei Rips Pro-Reform Protests," AP, June 12, 2003. Later, he freed a number of students, acknowledging that those "who had disassociated themselves from the trouble-makers and declared their loyalty to the Islamic Republic's regime should benefit from Islamic clemency."  "Iran's supreme Leader orders 'clemency' for arrested students," AFP, August 5, 2003.  See also "Gozaresh-e Na-arami hayeh se-shanbeh shab-e Tehran," [the report of the disturbances of Tuesday night in Tehran] *Yas-e Nau* (Tehran), June 12, 2003; and "*Lebas Shakhsi-ha ba motor seeklet dar Tehran,"* [the Plainclothes ones with motorcycles in Tehran] *Rooydad Online*, June 30, 2003.

They slammed my head down in the car, a white Peykan [a type of car], and we drove for one and a half hours around Tehran. I couldn't see out, but they just kept driving around the city so I would lose my bearings.  At the noon call to prayer, I was somewhere, in a basement I think, and the sound of the call to prayer was so loud I think that it was in or near a mosque.

My hands were bound behind me in a chair. I had a blindfold on, and they were both hitting me and kicking me.  I couldn't tell where the hits were coming from, so I had no defense, no warning.  They were telling me that I hadn't listened to their warnings.

For three days, I had bloody urine. I was yelling from pain, and I could tell that there was at least one other person in the same place, I could hear him.  They would swear at me during the interrogations, I could tell that they had to be IRGC, their demeanor and their movements seemed like soldiers.

There was three hours of beating and yelling a day, and then I would go back to the solitary cell.  I was there for six days, and on the last night, they dropped me off at about 11 at night.[81]

Several months later, in August 2000, he was a speaker at the annual meeting of Daftar-e Tahkim-e Vahdat in Khorramabad, when the meeting was raided by plainclothes men.[82]

They took many of us into a large room, blindfolded, and they put us in chairs with our hands tied behind our backs. About half an hour later, I could hear people being beaten near me, but I couldn't tell where it was coming from. The acoustics of the room made it sound like six or more.

They were insulting people as they hit them, calling them "anti-Islamic" [*zeddeh Islam*] and "criminal" [*jenayat kar*].  The sound kept getting closer, and I got myself ready to be beaten. He hit me three times, and I started to talk back at him. Thirty minutes later, they were still hitting people.

---

[81] Human Rights Watch interview with Farhad T., London, Dec. 21, 2003.

[82]  See "Iran Report," RFE/RL News, September 11, 2000.

They took everyone to take fingerprints, and told us to sign a form saying "I won't be active against security," "I support the Leader," "In the event that I am arrested, I will not protest whatever decision is made by the court." I told them that I didn't want to sign, and the man who was there said, "Shut up or I will tell them to hit you again."[83]

Mohsen M., another student activist and a representative of Daftar-e Tahkim-e Vahdat from the Medical School the University of Hamedan, was repeatedly taken into detention by plainclothes officers from the Ministry of Intelligence.  In September 2000, he was taken into a solitary cell in an illegal detention center.  His treatment there suggests that the tactics of the authorities were similar in cities other than Tehran.   He described the solitary cell as measuring 1.5 by 2 meters, with a four meter high ceiling, and a light at the top of the ceiling that was on twenty-four hours a day.  He was interrogated three times a day, at irregular times of day and night.

He was beaten especially severely when he refused to sign a blanket confession. He remarked on the humiliation he experienced at the hands of his captors:[84]

You have to understand that I have never been hit before. No one has ever spoken with me in such a way as they did, and I was not equipped. More than anything else, I was not prepared to deal with being insulted in that manner, in the way that they would interact with me.

They used their boots to kick me, and I could tell that they were using boots because sometimes I could hear the interrogator changing his

---

[83] Human Rights Watch interview with Farhad T., London, Dec 21 2003.

[84]   A letter from Evin prison by student protester Ahmed Batebi in prison refers to similar treatment:

The soldiers bound my hands and secured them to plumbing pipes. They beat my head and abdominal area with soldiers' shoes. They insisted I sign a confession of the accusations made against me. Next, they threw me onto the floor, stood on my neck and cut off not only all my hair, but also parts of my scalp causing it to bleed.

They beat me so severely with their heavy shoes that I lost consciousness. When I regained consciousness, they started their actions again.  They gave me some A4 paper and ordered me to write and sign a "confession" of their accusations. Upon my protesting, they took me to another room, blindfolded me and secured my bound hands to the window bars.  Once again they insisted that I "confess." When I again protested, they beat me with a car-jacking cable. Under extreme duress, I was forced to write what they wanted. At that time, they tore up the A4 paper and said that I had to write the same thing on official paper with logo. But they never brought this paper.

Text of Ahmed Batebi's letter from prison, March 23, 2000, on file with Human Rights Watch.

shoes, and I could tell that he was putting heavier shoes on, because his walk would sound different after he had changed his shoes.

Sometimes, they would smash their boots down on the roof of my foot, and when I would hear the change of the shoes, I would prepare myself, I would steel myself, because this act causes a kind of pain that you feel all the way into your bones.[85]

Mohsen's medical records confirmed injuries sustained as a result of beatings.[86]  He told Human Rights Watch that in every interrogation there would be a piece of paper on the table. At times he was told that there was a video camera in the room as well:

When they wanted you to write, they wouldn't take the blindfold completely off, only to the point that you could see the paper and pen.  I remember them tearing up the paper so many times.  They would tear it up and say, "See, you don't cooperate."

Many times, if there were two interrogators, one would be nice while the other would be very insulting and use harsh language that I do not want to repeat.  During one of my interrogations, one of them said, "I am trying to help you, you are a doctor working for your country, I know that you want to cooperate." He would say this, and the other one would hit me on the side of the head. The nicer one would plead with the other one: "Come on, I know the doctor will cooperate." The nicer one would push the confession paper over to me and say, "Come on, just write it and it will be over, just write it." [87]

Throughout his twenty-five days in solitary confinement, without any visits from family or counsel, Mohsen M. continued to resist confession.  He maintained the exact same story: that he had done nothing to violate the law, that he was involved with a recognized student group, and that he would not confess to any crimes.  "One day," he told Human Rights Watch:

---

[85] Human Rights Watch telephone interview with Mohsen M., Ankara, Turkey,  December 8, 2003.

[86] On file with Human Rights Watch.

[87] Human Rights Watch telephone interview with Mohsen M., Ankara, 8 December, 2003.

> They said in interrogation, "You have to sign this paper." They had
> written something in what looked very much like my handwriting which
> said, "I have made a mistake. I have insulted the Leader. I am very sorry.
> I will read from *Ayeh Tobeh* [the verse on penitence from the Qur'an]."  I
> said, "This makes no sense. I don't even know what that verse is.  I will
> not sign."

When physical torture did not produce the desired confession, the authorities turned to
psychological abuse:

> One of the guards who brought me food, who I had a much better
> relationship with because I had once given him some medical advice,
> came by my cell and told me that he had some bad news.  He told me
> that they had called my parents and told them that I was in detention
> and that I would have a trial and that they needed to bring bail money.
> He said that my parents were rushing to get to me, and that they had
> had a terrible car accident. He told me that my father was dead, and that
> my mother was in very serious condition.

> I was going crazy.  I cannot tell you what it was like for me those days
> after they told me this.  I felt like I had lost my mind with grief. In my
> next interrogation, the interrogator said, "If you had not done this, your
> father would not have died.  This is justice for what you did."

Dr. M. never found justice.  He did not realize that the guards had been lying to him
about his parents' death until he saw them in court. After a judgment sentencing him to
fifty lashes (later carried out) and a large fine, he was released and later gave several
international radio interviews criticizing his treatment at the hands of Iranian authorities.
Days later he was again abducted by plainclothes men and savagely beaten.[88]  An
experienced mountain climber, Mohsen M. then fled to the mountains around Tehran
for several weeks before escaping the country.

Some former prisoners told Human Rights Watch that brutal treatment by government
agents sometimes took place in the presence of high-level judges.  The claims are similar
to those made by other outspoken individuals who are critical of the government.

---

[88] Photographs of Dr. Mohsen M.'s injuries are on file with Human Rights Watch.

Ahmed Batebi, a university student who first came to international attention when he was pictured on the cover of the *Economist* magazine holding the bloodied shirt of a beaten student, was first sentenced to death for his involvement in the 1999 Tehran University protests. This sentence was later reduced to fifteen years imprisonment.  For many, he has become the living symbol of the student movement, and also of the torture and ill-treatment that so many have endured at the hands of the government. Batebi managed to smuggle out of prison a letter describing the conditions of the early part of his detention in 2000, which was then posted on many Persian language websites.  His letter states:

> They made me exit cell number 417 of TOHID blindfolded.  Half an hour later my judgment started at Branch 6 of Revolutionary Court. I had not been told where we were going. I had assumed the interrogation and investigation processes would be continuing.

> I, therefore, was astonished when they removed my blindfold. In fact, I did not understand what was happening until the moment I was brought to the room to be accused.   I had a fever, severe diarrhea and had lost consciousness due to all the pressures and sleep deprivation and, thus, I could not control my stability. I was unable to focus on what was happening, and these factors rendered me unable to defend myself.[89]

Human Rights Watch confirmed with other prisoners who were imprisoned at the same time that Batebi's letter was sent from inside Evin Prison.  Further, former prisoners who were in Evin with Batebi in 2001 and 2002 confirmed that his mental stability has degraded considerably, and that his physical condition (poor hearing, diminished eyesight, missing teeth) confirms his claims.  A journalist who recently met with Batebi confirms these accounts:

> The tough days in prison have shattered him. At the cafe, he pulled out of his pocket a fistful of medicine that he says he needs to calm his jittery nerves… He has lost teeth and has hearing problems and bad vision because of the beatings of his face.

> He has bad lungs, for which he blames his cell's location in the basement next to the main sewage pipe. Most prisoners are sick because

---

[89] Text of Ahmed Batebi's letter from prison, March 23, 2000, on file with Human Rights Watch.

of lack of air and the harsh smell of the chemicals used to kill the smell, he said. One of his cellmates, Akbar Mohammadi, had lung surgery.[90]

Hossein T., a student protester, experienced similar mistreatment. He was kidnapped and severely beaten by members of Ansar-e Hizbollah and later released, only to be arrested on May 23, 2000, and taken to Evin prison. He was taken to Section 209 of the prison, and kept there in solitary confinement.  His interrogations match the treatment of other detainees in Section 209: several hours long, constant demands for confession, and threats of continued detention or threats of physical abuse if a confession is refused. In his case, these threats were carried out.

> In one of my interrogations, Alizadeh [then a judge] came into the room, and he said, "Take off your blindfold."  There were three men in the room, and Alizadeh started to yell at me.  He said, "Tell the truth." I said, "I have told the truth."  One of the men hit me on the side of the head.  Alizadeh said, "I can order for you to be executed right now. You say what I say. You tell the truth we tell you. We will blacken your future otherwise."

> After that, every night, they would beat me while they interrogated me. Mostly kicking, and hitting on the side of the head, which the students don't consider to be torture because it is so common.

> Twice they took me to the courtyard in Evin, where the executions are carried out. [91]  They tied my feet.  They took off my blindfold.  One man was saying: "Tell me why you lied. Tell me what you did." They hung me from my feet, and they put a bag over my head.  For what I think was thirty minutes, they were kicking me and hitting me.  They hit my chin, and the skin broke. Blood began to fill the bag that was tied over my head.  Blood began to drip on the floor, and this is when they stopped.

---

[90] Nazila Fathi, "After 2 Visits to the Hangman, More Horror for Iran Dissident" *New York Times,* December 14, 2003.

[91] This is same place where Batebi alleges that he was taken twice, noose tied around his neck, and told that he would be executed.

They were putting anesthetic on my chin, and I asked for medication. They put me back in my cell.

The second time they took me in there, they hung me from my hands. They used a baton to beat my torso. They broke my hand, and I fell unconscious. When I regained consciousness, they said, "If you say you lied, we will stop." I could not speak. It is not because I am brave that I did not confess, it is because I couldn't talk.[92]

He was later taken to Towhid prison, an illegal detention center that is now believed to have been closed following pressure from members of parliament. There the interrogations and the attempts to force him to confess and retract his public statements continued:

Interrogations would normally last four to five hours. The interrogator would talk, kick, hit, and yell. If there was more than one interrogator, they would often take on different roles. One of them would say, "He is a good boy, let me talk to him, we will be able to work something out." And the other would say, "No, he doesn't want to tell the truth, he is a liar." The interrogations would begin late at night, and go into the early morning.

They would ask one question over and over again. The same question, again and again. I would say, "I know what the truth is." And then I would tell my story again. Always the same story, but never what they wanted to hear. Sometimes, they would ask me to write my side of the story. I would write it down, and then they would tear it up and tell me to write it again.

There, they would also sometimes use cables against the bottom of my feet. They treated us like animals there. There was no contact with other human beings.[93]

He remarked on the difficulty that faces many who attempt to document the crackdown by the "parallel institutions" on the students:

---

[92] Human Rights Watch telephone interview with Hossein T., location withheld, December 8, 2003.
[93] Human Rights Watch telephone interview with Hossein T., location withheld, 8 December, 2003.

> How can you prove that you were in the hands of the judiciary's intelligence services? How can you prove that you were in the hands of the IRGC?  You have no documentation. They can deny the entire thing, and the only thing you can say is that your life was taken away from you.[94]

Hossein T. fled the country in the summer of 2003.

On July 9, 2003, the anniversary of the 1999 University of Tehran protests, there were reports of plainclothes men staffing checkpoints near the university, as well as mass arrests of those near the Tehran University campus. One person arrested then spoke with Human Rights Watch.  His experiences confirm that the treatment of students continues to be harsher than that of other higher profile detainees.

After being picked up by plainclothes men, Ali K. was taken to a police detention center [*kalantari*], with at least fifty people who had been picked up that day:

> Plainclothes men were taking people into interrogation rooms, and you could hear banging against the wall, people being beaten.  It was very clear for those of us outside what was going on inside. They separated a group us that they thought were political.

> We were put in a bus, and we were told to put our heads between our knees and not to look up.  We went to Eshrataabad [secret Prison 59].[95] They were openly beating people there, beating them on the bottoms of their feet with cables.

---

[94] Human Rights Watch telephone interview with Hossein T., location withheld, 8 December, 2003.

[95] Several blocks or special sections of solitary cells (Prison 59, several blocks of Evin, and other secret detention centers in Tehran) were refashioned as holding cells for large groups of detainees during the June and July 2003 protests. According to numbers provided by the judicial authority, at least 4,000 individuals were arrested during the protests.  Due to the incredibly high numbers detained at one time, A. and other detainees viewed Prison 59 and other interrogation centers without blindfolds and were held in large groups.  In addition, Evin prison created an internal prosecution system, with prosecutors housed within the prison complex to deal with the large caseload of detainees.  These offices are reportedly now closed. See "Ten more detained Iranian students to be freed," Reuters, August 11, 2003; Ali Akbar Dareini, "Iranian Student Protests Spark Clashes," AP, June 11, 2003.

> I was there for three days, with six interrogations.  They took pictures
> and videotape of me, where they told me to say in the camera that I had
> been charged with the crime of *eghteshash* [public disturbance], as well as
> being a threat to national security.[96]

Some of his interrogations were carried out while he was blindfolded, and he was asked
to tell his story over and over again. As with other detainees, he recalled telling the same
story to his interrogators day after day, only to be told to "tell the truth."

> I always thought that if someone did something like that to me, if
> someone spoke to me in that way, I would be brave. But, as I found
> out… after you have seen them beat people around you, you actually
> turn out to be not brave at all. You tell them what they want to hear.[97]

He was later taken to another illegal detention center, *Edareh Amaken* in Tehran.  There,
he recalls a double interrogation, in which he was interrogated in the same cell as
another man, "Habib," who was being beaten:

> He was in his early 20s. They told him to take off his shoes and his
> socks, and they beat him with cables on the bottom of his feet while
> they asked him and me questions.  He could not walk afterward, his feet
> were completely torn apart.  He said, "I will tell you whatever you want,
> I will confess to whatever you want."  He was crying, and he had open
> wounds on his feet.

> I am ashamed to say it, but I remember one day wishing that my parents
> were dead. Because then, maybe, I would have been more brave. I
> would not have worried about what they were thinking, and maybe I
> would have stood up to them more.[98]

> After paying a heavy fine for the crime of "endangering national
> security," Ali's case was closed.[99]

---

[96] Human Rights Watch interview with Ali K., New York, September 29, 2003.

[97] Human Rights Watch interview with Ali K., New York, September 29, 2003.

[98] Human Rights Watch interview with Ali K., New York, January 21, 2004.

[99] The judgment in his case is on file with Human Rights Watch.

## VII. Encounters with the Judiciary

*"When politics comes into the door of the courthouse, justice goes out the window."-*
*Statement attributed to Ayatollah Ruhollah Khomeini*

*I don't have any need for the law. I am the law.- Tehran Public Prosecutor Said*
*Mortazavi during a session with a political prisoner's family.* [100]

Iran's judiciary is at the core of the systematic crackdown on those who express views critical of the government. A handful of judges appointed by and accountable to the Leader define and enforce the law.  The judicial system in practice violates basic due process rights at every level. These include the rights to be promptly charged with a criminal offense;[101] have access to legal counsel; have adequate time and facilities for preparation of a defense; to be tried before a competent, independent and impartial court in a public hearing; to be able to examine the evidence and produce evidence on one's behalf; and, to have a conviction reviewed by a higher court.[102]  The violations are flagrant and systematic, and they undermine any capacity to seek remedy or justice.[103]

The cases of individuals detained for their political opinions are in the hands of judges who serve as prosecutor, investigator, and final decision maker. Many former political prisoners told Human Rights Watch that during their time in Evin Prison, guards, prison officials, and other prisoners referred to them as "Mortazavi's prisoners."  As one told Human Rights Watch, "No matter where you were, if you were political, you were under the direct control of Mortazavi."[104]

---

[100] "*Man be qanun kari nadaram. Man qanun hastam.*" Human Rights Watch interview  with family of former political prisoner who attended his trial before Judge Mortazavi, December 13, 2003.

[101] The U.N. Human Rights Committee also states that "Pre-trial detention should be an exception and as short as possible." Human Rights Committee, General Comment 8, Article 9, Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI\GEN\1\Rev.1 at 8 (1994).

[102] See ICCPR, articles 9 & 14.

[103] The final report of the U.N. Special Representative of the Commission on Human Rights to Iran, bears quoting:

> It seems very clear to the Special Representative that the principle obstacle to reform, to the introduction and nourishment of a culture of human rights, is the judiciary, its patrons and its supporters.  By any estimate, this is a very small group in a country of 65 million people.  It is a group that bears heavy responsibility for the ongoing violations of human rights in Iran.

 Maurice Danby Copithorne, *Report on the Situation of Human Rights in the Islamic Republic of Iran*, E/CN.4/2002/42, p. 5, para. 9.

[104]  Human Rights Watch interview with former political prisoner, Paris, December 2003.

Few individuals bear more responsibility for turning the judiciary into a tool of the ongoing political crackdown than Said Mortazavi. Mortazavi first served as a judge in Tehran's public court branch 1410, where he handled a number of key cases related to press freedom. Authorities reportedly began funneling sensitive cases to his court, secure in the knowledge that they would end in a conviction, regardless of the quality of the evidence against the accused. According to several sources interviewed by human rights watch, Mortazavi would openly confer by phone with government officials while on the bench over how to handle individual cases.

In 2003, Mortazavi was promoted to the powerful position of public prosecutor for Tehran, which meant that he was in charge of prosecuting virtually all of the cases of prominent journalists, political activists, and student protestors. Reportedly assigned to the prosecutor's office as a reward for his reliable tenure as a judge, Mortazavi has been personally involved in a number of coercive interrogations, threats against individual arrestees, and has even allegedly given the order for individual arrestees to be physically abused.

But the flaws of the Iranian judicial system extend well beyond Mortazavi himself. Responsibility for the systematic violations of due process extended to the highest levels of the judiciary. Judges in political cases often "visit" the accused in interrogation rooms and secret detention centers.  Many prisoners told Human Rights Watch they had seen Judge Alizadeh and Judge Mortazavi in Evin Prison's Section 209, confirming the absence of any separation between interrogator, prosecutor, and judge. For prisoners held for peaceful dissent, there was no space within the legal system to seek remedy for the treatment in detention.

### *Denial of right to counsel and right to prepare a defense*

Those held for expressing their political views were regularly denied the right to counsel. Many are told that any decision to retain counsel will reflect unfavorably on their cases. For those who did obtain counsel, many were never allowed to meet privately with their attorneys, and their attorneys were not given access to their files. During the early stages of the crackdown, several well-known attorneys who acted as defense counsel in cases relating to journalists or editors were arrested and detained themselves.  Many attorneys are now afraid to take on the cases of those held for political reasons.[105]

---

[105] The case of Nasser Zarafshan is illustrative. Zarafshan, a prominent attorney for many imprisoned journalists and writers, was also involved in the case of the "Serial Murders." He was arrested in late 2000, and held in Evin until his sentencing in March 2002 after a closed trial to three years in prison for "weapons and alcohol possession" and two years for "disseminating secret information." See FIDH, "Iran," Annual Report 2002.  He

In this environment, even for those who do obtain counsel, lawyers are rarely able to defend their clients effectively or to investigate the charges against them.  Defense lawyers could not carry out the most basic tasks required to act on their client's behalf. Attorneys brave enough to take freedom of expression related cases are constantly at risk of being arrested and detained, often on the charge of "disseminating lies."[106]  Those political detainees who did have lawyers did not have markedly different experiences than those who did not.

### Non-Public Trials

All trials in Iran are required to be public.[107]  Political and press-related cases must have a jury as well as a panel of judges.[108] Most of the cases investigated by Human Rights Watch involved informal sessions in chambers between judge and prisoner in which the judge urged the prisoner to "cooperate" or "confess." The prisoners were often brought into a courtroom in which they were faced with judge and complainant. (In all press-related cases covered in this report, the complainant was a government official or a member of the militia.)  These "trials" not only violate basic due process rights but also raised the risk of the use of coerced confessions in closed sessions. [109]

The Iranian judiciary's shunning of open trials stems from a desire to avoid giving arrestees a chance to air their grievances publicly.  At his open trial in late 2000, journalist Akbar Ganji aggressively challenged the basis for his detention and denounced

---

was tried by the Judicial Organization of the Armed Forces, which does not have jurisdiction over civilians, but seems to be increasingly involved in targeting political prisoners in cooperation with other security agencies. See Human Rights Watch, "Iran: Attempt to Silence Lawyer in Assassinations Case," March 22, 2002.

[106] Special Rapporteur Ligabo notes, "often, the legal provision used to prosecute lawyers is the 'dissemination of falsehoods.' Report Submitted by the Special Rapporteur on the right to freedom of opinion and expression, E/CN.4/2004/62/Add.2, para. 63.  The reason that this charge is easily used against lawyers is that they often record information, testimony, or expert opinion in documentary form (paper, notes, video or audio tapes, etc.) providing the means through which information could ostensibly be "disseminated."

[107] Article 165 of the Constitution of Iran states: "Trials are to be held openly and members of the public may attend without any restriction; unless the court determines that an open trial would be detrimental to public morality or discipline, or if in case of private disputes, both the parties request not to hold open hearing."

[108] Article 168 of the Constitution of Iran states: "Political and press offenses will be tried openly and in the presence of a jury, in courts of justice.  The manner of the selection of the jury, its powers, and the definition of political offences, will be determined by law in accordance with the Islamic criteria."

[109] One recent news report on a decision in the case of Emaddedin Baqi, a journalist imprisoned several times for his writing, typifies state-controlled press coverage of press-related cases: "Judge Babaei has stressed in the court ruling, a copy of which was faxed to IRNA, that Baqi had been found guilty of propagating against the Islamic establishment and working to the benefit of the opposition groups after the court considered a report by the Information Ministry, Baqi's lectures, notes and interviews, as well as his confessions. " IRNA, December 5, 2003.

his treatment in detention in the presence of international media.[110] According to former detainees, Iranian judges have since feared that if they comply with the law and hold public trials, they will create forums for defendants to speak out; if they are closed, they will invite criticism from the international community. There has been an attempt to demonstrate that trials are not secret, while warning defendants that if they do not cooperate, they will spend more time behind bars.  Several former prisoners said that their judges told them before their trial that if they were to speak out as Ganji did, their trial would immediately be converted to a closed session, and they would spend a longer time in solitary confinement.

Judges who hear cases where defendants have been abducted by plainclothes agents and kept incommunicado in illegal detention centers reinforce the perception among prisoners that these "parallel institutions" are supported by the government. The judiciary, is not merely ignoring violations of the law being committed in order to deliver those who criticize the government to the courtroom, it is directly sanctioning these violations.

### Denial of the Right to Appeal

Under Iranian law, those convicted of a crime have the right to appeal to a higher court within ten days of notice of their conviction. In practice, however, many political prisoners never have the chance to appeal their convictions. They are told that if they appeal, they will be sent back to prison or additional charges will be brought against them.  The politicization of the judiciary in Iran has led to a systematic denial of the last remaining mechanism for accountability for those imprisoned for their political expression or opinions.

### Testimonies

### Massoud Behnoud

Massoud Behnoud recalls being taken into a family visit on the twenty-eighth day of his imprisonment, to find a man he did not know seated next to his wife. His conversation with the man took a somewhat comic turn:

> The guard told me, this man Hosseinabadi is your lawyer.  The guard said to "my lawyer": "You have no right to talk about the case."

---

[110] "Iranian reformist trials to reopen," BBC, November 29, 2000 (Noting that at his first trial, "Akbar Ganji stormed into court, loudly claiming he had been beaten in jail").

> Hosseinabadi said, "But I don't have anything else to discuss with him."
> The guard said, "Judge Mortazavi said you are not to discuss the case."
> My lawyer said, "Well, then, I shall leave."[111]

He was never able to meet privately with his lawyer again. He recalls being told by Judge Mortazavi that "if he [the lawyer] is not here it is better." On the several occasions that Behnoud did see his attorney, he asked if the latter had been able to view his file. The only time that Behnoud had seen the file of charges against him was when he had been taken into Judge Mortazavi's court, approximately one week into his detention, to be informed of the charges against him.

> When I went to the court, Mortazavi said, "There are sixty-two charges against you, from the *Basij* and the Ansar-e Hizbollah. They had taken a number of my articles and highlighted them and put them in a notebook. They had written in the margins…I never heard about charges relating to those sixty-two initial complaints, or that file, again.

> After four months in prison, I went to court and I could tell that things were different. The man who had brought me to the courtroom left as soon as he had dropped me off. Mortazavi told me to come into the other room to see [Judge] Alizadeh. They took me to the basement of the building, and put me in a Nissan Patrol [a type of sport utility vehicle]. They put a blindfold on me, there was a handcuff attached to the seat that they put one of my hands into. They pushed my head down. I didn't see them, I didn't recognize any of their voices. For about one and a half hours, we just circled the city. They took me somewhere, they told me that the stairs went down, they sat me in a chair and disappeared.[112]

At this point, as Behnoud later learned, he had arrived at Prison 59. On his eighth day of detention there, in ill health, and having been denied even the most basic medical care for his condition, he was taken to see Mortazavi:

> Mortazavi told me, "I want to send you back to your friends in Ward 325 [journalists and editors being held at Evin who were not in solitary

---

[111] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

[112] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

were in Ward 325].  By now, I was in the fifth month of my detention, and I was beginning to realize that nothing that he said was true.[113]

Behnoud was eventually taken back to Ward 325.[114]  In his next interrogation, he was informed that it was time to write down his legal defense.  He repeatedly said that he was not a legal expert, and that he wished to consult his attorney.  He was told this was not an option.  He and other political prisoners also asked for their indictment papers, and were refused.[115] Behnoud was not informed of the charges that would be brought against him at his trial.  He raised this in his next session with Judge Mortazavi.

> Mortazavi said, "Write your defense, then I have to read it. If you do not write it, you will stay in."  In the interrogation room, they would put a piece of paper before me and tell me to write my defense.  I would write, and they would tear it up and tell me that it is not right, that I needed to write it again.  Another day in chambers, Mortazavi said, "You are not cooperating.  I want to free you, but you are not cooperating. Just say the right words, say the right things, and I will be able to free you."[116]

He was informed one day in mid-December, 2000 that it was time for his trial, and taken into Judge Mortazavi's chambers:

> Mortazavi said, "You have been good. Help us. Just help me to set you free." There were a lot of journalists at my trial, including many internationals. He was very very worried about how public the trial was becoming, and he was worried about me acting out like Ganji.  The courtroom became very crowded.  He took me into his office: myself, Mortazavi, my lawyer, and Tashakkori [the representative of the Public

---

[113] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

[114] By early 2001, there were reports in the press and among former prisoners that Block 325 had been cleared out, and that many ordinary-law prisoners had been removed. At one point, several of the most well-known reformist journalists and editors were held there at the same time. It was thought that the space had been cleared out in order to house the many political prisoners who would be entering Evin that year. More recent reports suggest that much of Block 325 is being converted to solitary cells. See Editorial, "The number of political figures that are summoned by the court or imprisoned is increasing," *Payam-eh Emrooz* (Tehran), March 16, 2001,  http://www.payvand.com/news/01/mar/1084.html, (retrieved February 2, 2004).

[115] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

[116] It would later become clear to many who had been in this early wave of prisoners that the written defenses could be easily used as confessions: to be paraded publicly as an example of the retraction of the author's political views after having had the opportunity to reflect in prison. Several texts written by Ebrahim Nabavi in prison were published in the state-run press as examples of confessions.

Prosecutor at the time].  Tashakkori said, "This will be a formal trial. And it will be *in camera* [closed to the public]."  They had told me that if I accepted a non-public trial, they would set me free. He told me, "If the trial is about an `indecent' issue, then the court can decide to make it non-public."

My lawyer said, "You can't do this." I had no idea what the judge was talking about.  At this point, Mortazavi took out a picture of my wife wearing a bathing suit that they had taken from my home. He said, "Say you took it or we will arrest her.  Do you want that?" Tashakkori said, "There is a part of the law which is related to the distribution of pornographic film." He then read the law.  And my lawyer and I said, "What does this have to do with anything?"  He said, "So, when you had the film for this picture, who did you give it to?"  He kept saying, "If you are quiet in court, we won't sign the indictment for this crime."[117]

At Behnoud's public trial, Prosecutor Tashakkori read the letter of indictment, which included charges of possession of heroin, possession of materials for the distribution and use of heroin, and importing illegal narcotics.[118]  Behnoud had never heard of these allegations.  The trial had no jury, as required by law. Tashakkori warned Behnoud's lawyer: "If you complain that there was no jury, which you can, then go ahead, but your client will be in jail for at least another three months."[119] Behnoud's sentence, nineteen months, was announced a week later and he was freed on 30 million tomans bail.[120] When Behnoud was called upon to defend himself, he said:

The representative of the public prosecutor reads a few articles and then he sticks some opium in them and then reads some speeches and adds heroin to them.  Then he reads a report written by me and wraps it around alcoholic drinks.  You know very well that I am on trial only for my writings here.[121]

---

[117] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

[118] The charges also included:  causing commotion in people's minds, dissemination of lies, cooperation with foreign radios, crossing the red lines.  Editorial, "I am tried for my writings," *Doran-eh Emrooz* (Tehran), December 15, 2000, http://www.payvand.com/news/00/dec/1075.html (retrieved February 2, 2004).

[119] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

[120] This is an enormously high bail amount, almost U.S. $35,000.

[121] Editorial, "I am tried for my writings," *Doran-eh Emrooz* (Tehran), December 15, 2000, http://www.payvand.com/news/00/dec/1075.html  (retrieved February 2, 2004).

Behnoud and his lawyer had decided that they would appeal the decision, as the verdict suggested that he would have to serve an additional fourteen months in prison.  Judge Mortazavi had more advice for him regarding his appeal:

> He told me, "Don't ask for an appeal.  If you don't then I can cut one-fourth from your sentence. The appeals court is in my hands, don't do it."  I filed for an appeal anyways but Mortazavi would not send it up to the appeals court.

Behnoud found out about the next development in his case the way many of those targeted by the judiciary are informed: from the state-controlled media. Without ever having been informed that his case had been passed to the appeals court, he found out from media coverage that the appeals court had confirmed the nineteen month sentence. Behnoud received a midnight call from Judge Mortazavi on his mobile phone:

> He said, "I told you not to do that."  I went to go see him to find out what the next step would be, and he said, "I have put the decision in a drawer for now.  Why are you rushing to find out more about it? If you don't write anymore, I won't send this to the Office for the Enforcement of Judgments."

Behnoud did not remain silent for long. A month later, he published an article in the now-banned newspaper, *Bonyad*.  Judge Mortazavi called the editor of the newspaper and told him, "If you don't stop publishing his work, we will get him and we will close you down. Agha [a reference to Leader Khamenei] doesn't like him to write."

Behnoud was abroad for a speaking engagement when an arrest warrant authorizing his detention at the airport was announced. He did not return to Iran.  He told Human Rights Watch:

> They got what they wanted. It was difficult for them to keep me in jail: there were always people asking about my case, asking about my condition.  Now, I am out of the country.  I announced in my final court hearing that I would stop writing, which is what they really wanted.[122]

---

[122] Human Rights Watch interview with Massoud Behnoud, London, December 20, 2003.

*Mohsen M.*

Dr. Mohsen M., the student leader from Hamedan Medical School, was never formally charged with a crime during the year he was in and out of illegal detention centers from August 2000 to August 2001.[123]  On September 2, 2000, he was called to appear before Branch Four of the Revolutionary Court in Hamedan.  Throughout the year, whenever he had been taken to the Revolutionary Court and questioned by the judge, he had asked for a lawyer and had been repeatedly told that he could not have one, despite his right to an attorney under Iranian law. [124]  Prior to his September hearing before the Revolutionary Court, he consulted a lawyer as well as a prominent reformist member of parliament.  The lawyer told him that he could only represent him if the judge allowed it. The judge said that it was up to the Ministry of Intelligence.  Mohsen M. was not certain which of his meetings in the judges' offices were considered trials and which were not:

> My next trial was not public. The people in the room were a Ministry of Intelligence official, the judge, and myself. The judge said, "We will tell you what you did, and what your sentence is." My sentence was five years imprisonment *taziri*,[125] fifty lashes, and 500 *tomans* fine.[126]  I said that I wanted to appeal, and the judge told me that I had ten days to file my appeal.  I told the judge that I needed a lawyer in order to be able to understand how to file an appeal. He said, "You will not have a lawyer."[127]

His appeal was never passed to the higher court. M. was interviewed in the international media after receiving his sentence, and he believes that due to the pressure brought by heightened attention on his case, the five year sentence was suspended and the flogging converted to a fine in addition to the initial fine. [128]  When he continued to pursue the

---

[123] On several separate occasions after being released, he was picked up by plainclothes men, taken to the local Ministry of Intelligence office, beaten, interrogated, and later dropped off.

[124] He recalled one exchange with the judge:

> "It is much better for you if you just tell us the truth. We know that you are talking to people in America." I said: "The students want their rights as provided in the Constitution. The real one. Not the one that is framed on the wall but no one follows anymore. Why don't you take me to public court, why don't you put me on trial?"

Human Rights Watch telephone interview with Dr. Mohsen M., Ankara, Turkey, December 8, 2003.

[125] *Tazir* is an Islamic legal term generally meaning discretionary punishment. In this context, it refers to a suspended sentence that could be activated at the discretion of the judge.

[126] The judgment in Dr. Mohsen M.'s case is on file with Human Rights Watch.

[127] Human Rights Watch telephone interview  with Dr. Mohsen M., Ankara, Turkey December 8, 2003.

[128] The punishment of flogging, generally carried out with a leather whip, is common in Iran for 'morality crimes' as well as some other crimes, has been criticized by various international bodies. In the capacity that it is used in Iran, especially as punishment for 'morality crimes' and against political prisoners, it falls within the definition

appeal, arguing that he should not have any crimes on his record, the authorities did not react well:

> They told me, "You will have your [50] lashings now." I asked for a minute to prepare myself, and they refused.  They said that my crime was insulting the Leader.  They took off my coat, stood me up against a wall, and whipped me until I was purple. After the lashings, I was taken to the emergency room. When I put my coat on, I tell you, I do not know how I walked out.  As I left, the man said, "You are a counter-revolutionary, and you will pay for everything."[129]

Mohsen M. went to see a local cleric and judge to ask for advice and to request that the judge intervene on his behalf.

> I told him that as a gift for my graduation from medical school, I had received fifty lashes.  He asked me if I had been a member of the student group in school, and I said, "Yes, Khomeini said that all students should be a part of the *anjoman-e islami*."  He said I should no longer be involved in the student groups, he said that the martyrs[130] had shed blood for our system, and that I should not insult them by engaging in political activities. I told him: "Then, the martyrs are angry in heaven. They are angry that you crush us, beat us, destroy us in their names. They were young people too, they were students too."[131]

Mohsen M. fled Iran, but says, "Even today, I am ready to go to court and be charged with whatever crime it is that they say I have committed. I only ask two things: that I have a lawyer; and that my trial be public."[132]

---

of torture under international law. The Human Rights Committee notes in its General Comment to Article 7 of the ICCPR, "The prohibition in article 7 relates not only to acts that cause physical pain but also to acts that cause mental suffering to the victim.  In the Committee's view, moreover, the prohibition must extend to corporal punishment., including excessive chastisement ordered as punishment for a crime or as an educative or disciplinary measure." Human Rights Committee, General Comment 20, Article 7 (1992), HRI\GEN\1\Rev.1 at 30 (1994), para. 5.

[129] Human Rights Watch telephone interview  with Dr. Mohsen M., Ankara, Turkey December 8, 2003.

[130] "Martyrs" generally refers to those who died in combat during the 1980-1988 Iran-Iraq war. Many of those who were killed were young men.

[131] Human Rights Watch telephone interview  with Dr. Mohsen M., Ankara, Turkey, December 8, 2003.

[132] Human Rights Watch telephone interview  with Dr. Mohsen M., Ankara, Turkey, December 8, 2003.

## Ebrahim Nabavi

Satirist and writer Ebrahim Nabavi was first taken to prison in 1998 for twenty-nine days. At that time, he was not charged with a crime nor taken to court. His next arrest came in August 2000.[133]

> Judge Mortazavi called me and said, "I need to talk to you." I went to see him, and he said, "Here are all the charges against you." I saw that there were no plaintiffs listed. The charges included "insulting the Leader." There were over fifty charges listed, and I was called to go to the Revolutionary Court, Branch One.
>
> There it was just a police officer acting as the complainant, myself, the judge, and his secretary. At this point, the entire dossier was handed over to Branch 1410 of the Public Court under Judge Mortazavi.[134]

After his arrest, Nabavi was held in solitary confinement in Sections 240 and 209 of Evin Prison for over three months, and interrogated and held for three days in Prison 59. He recalls being placed before a videocamera and told to what to say about how his views had changed while in prison. Both Judge Ahmadi and Judge Mortazavi came to Section 209 of Evin during his interrogations.[135] Many journalists and intellectuals recall Nabavi's only public court hearing as a sign of what solitary confinement could do to their ranks: he seemed to confess to all charges.[136] His statements in court on November 15, 2000, testify both to the effectiveness of prolonged solitary confinement in silencing critics, and to Nabavi's skill as a satirist:

> I accept the accusation of distribution of lies, but I am ashamed to feel that my pen has ever reproached anybody. I have written my writings while perfect sanity and self-will and all of them have been written under specific conditions and in specific places. Naturally, as I consider my power of reasoning much higher than that of the editors and the directors that I had, fortunately I have not listened to them and have not been influenced by them.

---

[133] "Hamshahri Journalist Ahmad Zeidabadi detained" Islamic Republic News Agency, August 7, 2000; Committee to Protect Journalists, Iran Country Report, 2000, http://www.cpj.org/attacks00/mideast00/Iran.html (retrieved February 6, 2004).

[134] Human Rights Watch telephone interview with Ebrahim Nabavi, January 8, 2004.

[135] Human Rights Watch telephone interview with Ebrahim Nabavi, January 8, 2004.

[136] See Committee to Protect Journalists, "Iran Country Report," 2000, which notes, "In a surprising development, Nabavi apologized for his published work during a court session in mid-November."

> Regarding the accusation of "distribution of lies," I confess that this has been my mistake and I don't have anything to say in this respect. Distributing lies, and at the same time defending oneself, this is evidence of "shamelessness."[137]

Then-head Judge Tashakorri read out the list of crimes, and Judge Mortazavi presided over the trial. Nabavi recalls that as he confessed to 'wrongdoing,' those who knew him in the audience laughed out loud.  Nabavi was told at the end of his trial that his eight month sentence would not include much of the time he had already served. Because a portion of his sentence remained, he could be rearrested and jailed at any time. He recalled Judge Mortazavi telling him, "Don't write anymore, and you won't come back to jail."[138] Before leaving Evin, he was also warned not to tell his story: "They said ISNA [Iranian Student News Agency], IRNA [Islamic republic News Agency], and BBC [British Broadcasting Corporation] will be in touch with you.  Be careful what you say."[139]

Nabavi cannot return to Iran.  He continues to write about Iranian issues and publishes his work on his website.[140]

## Ali K.

Ali K.,[141] a student detained on the July 9, 2003 anniversary of the 1999 student protests, was repeatedly called to meet with the prosecutor and judge in Evin.  He was informed that the charges against him included "activities against national security" and "public disturbance."  He recalls that those individuals who had been picked up with him in the summer of 2003 were often confused about their legal status:

> Many people would be called in to go before the judge three or four times a week. They would always come away thinking different things: sometimes they would be told that they were about to be released if they cooperated, and other times they would be told that they would be in jail

---

[137] "Don't Take My Assertions Seriously," *Heyat-e Nau* (Tehran), November 16, 2000. Translated by Roya Monajem for Payvand.com, http://www.payvand.com/news/00/nov/1071.html (retrieved October 17, 2003).

[138] Human Rights Watch telephone interview  with Ebrahim Nabavi, January 8, 2004.

[139] Human Rights Watch telephone interview  with Ebrahim Nabavi, January 8, 2004.

[140] See www.nabavionline.com

[141] Not his real name.

for a very very long time.  This is part of what made it so difficult. You had no idea what was going on, and there was no one to explain it.[142]

He remembers meeting with the prosecutor in his case while he was in prison:

> He was the most terrifying man I have ever met. He would ask me the same questions over and over, and when I was in his office I saw that there were cases after cases piled upon his desk.  When he told me that I would be there for a very long time, I thought they were probably right because there were so many cases on his desk.  At one point, he said to me, "You have been accused of a serious crime, now it is your responsibility to prove that it is not true."[143]

He believes that he was eventually released because he comes from a relatively wealthy family, and his father was able to pay a bail of five million toman.[144]   He was brought to trial in late 2003, where he was convicted of "activities against national security," with a suspended sentence.  He does not plan to engage in political activism again.[145]

### *Rewarding Injustice*

Those judges named in this section, including representatives of the public prosecutor, were promoted during the period covered in this report.  Said Mortazavi is now the Tehran Chief Prosecutor. Abbasali Alizadeh is now the head of the Tehran judiciary, and Ali-Asghar Tashakkori is the deputy head of the justice department. As of this writing, no judge is known to have been independently investigated or disciplined for violations of Iranian law relating to the rights of the accused, freedom from ill-treatment, and freedom from torture.[146]

---

[142] Human Rights Watch interview  with Ali K., September 29, 2003, New York City.

[143] Human Rights Watch interview  with Ali K., September 29, 2003, New York City.

[144] Approximately U.S. $60,000.

[145] Human Rights Watch interview with Ali K., January 21, 2004, New York City.

[146]  In his 2001 report, the then Special Representative on Iran recommended that "Judge Mortazavi be immediately suspended from the bench, pending a decision on his case by the Disciplinary Court for Judges." Copithorne, *Report on the Situation of Human Rights in the Islamic Republic of Iran*, p. 11, para 40. See also, FIDH, "Assessment of the EU/Iran Human Rights Dialogue," November 2003,  p. 7.

## IIX. The Independent Press and the Prisoners

> *The newspapers wrote about my complaint to the Article 90 Commission.  About two days after the newspapers ran the story of my complaint to the Article 90 Commission, several plainclothes men came and put me in a car right in front of my house. They took me out on the road towards Karaj and they beat me up badly. When they drove me back to Tehran, they dropped me off in front of the Parliament building, and said, "There you go.   If you want to go and complain to the Majles [Article 90] Commission, there it is."* [147]

As the government campaign to silence critics escalated, it became more difficult for those imprisoned to seek redress or any means of defense.  Formal mechanisms, such as appeals to higher courts, were usually unavailable to political prisoners. Informal avenues for publicizing information and advocacy in the form of the reformist press and the Parliament's Article 90 Commission have been shut down or are now muted.

In retrospect, it is possible to appreciate better the important protective role played by the independent press.  Many newspapers, including *Tous, Bahar, Bayan, Payam-e Emrooz, Salam, Sobh-e-Emrooz, Neshat, Asr-e Azadegan, Aban, Iran-e Farda, Goonagoon,* and *Mosharekat* tackled the most difficult and sensitive political and theoretical issues in Iran.[148]  Full page articles were devoted to debates on issues of Islamic law, governance, democratic change, women's rights, natural rights and human rights, popular participation in state affairs, Western and Eastern philosophy, and world affairs.

Aside from creating intellectual space for discussion of various topics, the press also kept a close watch on domestic political developments and engaged in regular coverage of the treatment of political prisoners. Journalists with the reformist newspapers attended press conferences and meetings with government officials, peppering even the most highly-placed officials with questions about their previous statements or recent decisions.  They reported on meetings of parliamentary committees and initiatives introduced by parliament and repeatedly squashed by the Council of Guardians[149] or the Leader. The newspapers published debates, often in the form of letters to the editorial boards of the newspapers, between judges and activist lawyers.  The journalists attended court

---

[147] Human Rights Watch telephone interview  with Hossein T. (not his real name), location withheld, December 8, 2003.

[148] *Tous, Spring, Speech, Message of Today, Hello, Today's Morning, Joy, Age of the Free, Aban, Iran of Tomorrow, Happenings,* and *Participation,* respectively.  All have since been closed down.

[149] The Council of Guardians is a twelve person government-appointed body of Islamic jurists and clerics, which has the power to veto parliamentary laws.

sessions, demanded access to prisoners and to trials and hearings, questioned judges, and followed up on the cases of imprisoned writers, journalists, and editors.

During the early period of the crackdown, in 2000 and 2001, those who were arrested, imprisoned, and denied basic due process rights knew that their cases were being covered by the independent media.  Former prisoners told Human Rights Watch that the persistence of the reformist press was critical in their release and in providing information to their families regarding their condition.  Prisoners and families of prisoners were able to use the press, and the threat of increased press attention on a particular case, in order to obtain medical care for prisoners, secure family visits, exert pressure for public trials, and demand that individuals be released on the dates that they had been scheduled for release. They were able to create an environment that made it politically costly for the government to treat prisoners abusively or torture them.  Letters were spirited out to the press and quickly published, images of prisoners at trial were described repeatedly, and family members reported after visiting with their imprisoned family member.  As the wife of one prominent editor imprisoned in April 2000 told Human Rights Watch:

> We went to the parliament when we knew that the heads of the judiciary would be visiting, and we told the press that we were going.  We went and stood outside their offices and we waited. And when the head of the judiciary came out, we began to ask questions: Where were our husbands? When would they have trials? Why were they still being held without having done anything wrong? Because they saw that the journalists were there, they were scared, and they promised us a meeting right away.

> We would always tell the journalists from the reformist newspapers as soon as we would hear about a trial date, or as soon as we were going to go anywhere, because we knew that they would write about it, and we knew that they would follow up on the cases.[150]

She and other wives and family members of political prisoners were able to organize the Society of Family Members of Political Prisoners. They called journalists to alert them of any upcoming developments in their cases (for example, bringing large groups of people to the gates of Evin Prison when a prisoner was set to be released) or to report that they had not visited nor received telephone calls from their family members in several weeks,

---

[150] Human Rights Watch interview with family of former political prisoner, location withheld, December 11, 2003.

or to point out that the trials of their family members had been held behind closed doors.  In an informal way, they were able to protect the basic rights of family members by using the constant glare of the independent press.

Former political prisoners from that period interviewed by Human Rights Watch recalled that while they were in prison they felt as though they knew there were people fighting for their freedom outside, they knew that they would not be forgotten.  They recalled days that they were moved out of solitary confinement, or when they were allowed time to walk out of doors for twenty minutes.  Once they were released, they realized that these critical openings had occurred when their families and the reformist papers had continued to pressure the authorities on their cases.  One former prisoner told Human Rights Watch:

> When they got me, they weren't as aggressive because there were still many newspapers, the parliament was very active on our behalf, and the people felt very comfortable actively supporting us.  Later, they started going after confessions, they started going after things they could use publicly. Those who are in now are in a different world. We were so much more fortunate.[151]

Reformist papers and journalists also publicized and support the work of parliamentarians who pursued the cases of political prisoners.  They provided information about the investigations of the Article 90 Commission,  printed their findings and conclusions, and demanded responses from judges and other government officials.

Seen in this light, it is clear that the government shut down the reformist press in part to secure greater impunity for judges, interrogators, and plainclothes agents.  Under the guidance of the Office of the Leader, the Iranian authorities closed off the only voices for advocacy and defense of the rights of those who had been imprisoned.  As newspaper after newspaper was shut down under Judge Mortazavi's orders, and as more journalists and editors were imprisoned or threatened with imprisonment, fewer and fewer prisoners' cases were monitored or publicized.  By mid-2001, when at least fifty papers had been closed, the judges could be less concerned that their courtroom would be filled with inquisitive journalists. They could be assured that the critical statements of parliamentary commissions would not reach such a large audience as before.  They knew

---

[151] Human Rights Watch interview with Siamak S., London, December 21, 2003.

that the prisoners would be less confident, less sure that there was someone following their case outside prison walls.  As Ebrahim Nabavi told Human Rights Watch:

> The judges and the hardliners were afraid of the newspapers back then, they were afraid of what they would say.  It was such an important way to lessen the pressure on us. It is much, much worse now for those who are in prison.[152]

As of this writing, only one major reformist newspaper remains in print, *Sharq*.[153] Internet news sites, most of them run from outside of Iran, are now a vital source of information for most Iranians with access to the internet, and their reporting on the status of political prisoners often trickles into the print newspapers.  For those who remain in prison for speaking out, there are far fewer chances for information about their cases to reach the public.  As of this writing, those still in prison include: Abbas Abdi, Nasser Zarafshan, Ahmed Batebi, Taqi Rahmani, Hoda Saber, Ali Rahmani, Manoucher Mohammadi, Akbar Mohammadi, Hashem Aghajari, Reza Alijani, Akbar Ganji, Hassan Youssefi-Eshkevari, Iraj Jamshidi, Siamak Pourzand, Abbas Deldar, and Mehrdad Lohrasbi.  There are also fewer journalists today who dare challenge authorities to provide greater information, to make available written information on the cases of the imprisoned, or to monitor the cases of political prisoners as they move through the judicial system.  There are oblique references to torture or ill-treatment in order to obtain confessions, such as in the cases of several students from the June 2003 protests who provided televised apologies or recantations.  After they were pardoned by the

---

[152] Human Rights Watch telephone interview  with Ebrahim Nabavi, Belgium, January 8, 2004.

[153] Until the February 2004 parliamentary elections, two major papers remained open, *Sharq* as well as *Yas-e Nau*.  In the past year, both have been harassed, temporarily closed, and threatened with closure. *Yas-e Nau* placed itself in the line of fire in the fall of 2003. Human Rights Watch received information that the night before the paper published the full text of the Article 90 Commission's report on the death of photo-journalist Zahra Kazemi, the editor of the daily received a telephone call from Chief Prosecutor Mortazavi warning him not to publish the report.  Because the paper had already gone to press for the next day, *Yas-e Nau* was the only print newspaper to run the entire report.  In the events leading up to the Seventh Majles elections in February 2004, Mortazavi again threatened the remaining independent newsmedia to be cautious of what they wrote. When, on February 17, disqualified Members of Parliament wrote and distributed a public letter to the Leader, directly criticizing him for his role in allowing the disqualifications to go forward and for "trampling human rights in the name of Islam," *Yas-e Nau* and *Sharq* were the only domestic newspapers to publish excerpts of the unprecedented letter.  On February 18, Chief Prosecutor Mortazavi ordered both papers to close, and security forces working with the judiciary went to the offices of both buildings to ensure that the editions printing parts of the letter were not distributed.  On the eve of the parliamentary elections, the closures marked the silencing of the few remaining critical voices in Iran. *Sharq* was allowed to reopen two weeks later, but *Yas-e Nau* remains closed.  Mohsen Asgari and Gareth Smyth, "Tehran Muzzles Reformist Media Ahead of Election," *Financial Times,* February 20, 2004; Nazila Fathi, "In Iran, an Election or a Boycott?," *New York Times*, February 22, 2004; Human Rights Watch, "Reformist Newspapers Muzzled Before Election," February 19, 2004. http://hrw.org/english/docs/2004/02/19/iran7571.htm, (retrieved, February 23, 2004).

Leader, there was some discussion of what kinds of pressure they had experienced prior to their videotaped accounts.

Such examples today are few and far between. Many prisoners whose names are not publicly known or who are held in solitary confinement in detention centers are not only denied the formal means of redress guaranteed under law, but also are denied the significant benefits of the informal advocacy and monitoring role played by the independent press several years ago.[154]

### The Article 90 Commission

The Article 90 Commission is a parliamentary body mandated by the Constitution. Article 90 reads:

> Whoever has a complaint concerning the work of the Assembly or the executive power or the judicial power can forward his complaint in writing to the Assembly. The Assembly must investigate his complaint and give a satisfactory reply. In cases where the complaint relates to the executive or the judiciary, the Assembly must demand proper investigation in the matter and an adequate explanation from them, and announce the results within a reasonable time. In cases where the subject of the complaint is of the public interest, the reply must be made public.

At the height of press openness,[155] the parliament's Article 90 Commission began to exert real pressure on hardliner judges and other authorities. The commission, mandated under Article 90 of the Constitution to investigate and report on complaints by individuals against the three branches of government, has no real enforcement power. Still, when the press and parliament members pushed more vigorously for the rights of imprisoned journalists and activists, the commission served as the only means of official redress for many prisoners. They saw the commission, and particularly its public reporting mechanism, as a way to bring attention to their cases.

---

[154] For example, it is not known how many members of the Religious/Nationalist Alliance remain in prison, or the names, legal status, and location of many student protesters and activists. Some individuals who spoke with Human Rights Watch stated that there are still student activists from the 1999 Tehran University protests in detention, as well as those still in detention from November 2002 protests.

[155] The opening up of the press after President Khatami's election was not a result of legal changes. Press freedoms and increased public space for criticism and lively debate were tolerated by the government, where before they would have been immediately repressed. However, no lasting legal reforms or protections were put in place for, the authorities were subsequently able to dismantle these 'freedoms' with ease.

In 2000 and 2001, the Article 90 commission was able to bring pressure on the judiciary regarding the arrests of journalists and students, treatment of political prisoners, and state accountability for violence against student protesters.[156] One of the most recent reports of the commission highlights the degree to which the environment in Iran has changed for the worse. The report on the death in detention of Iranian-Canadian photojournalist Zahra Kazemi presents a scathing indictment of the judiciary, and specifically the role of Chief Prosecutor Said Mortazavi in covering up the cause of Kazemi's death. The report notes:

> Mr. Mortazavi has accused the commission of not knowing the law,[157] and he wouldn't accuse the commission of not knowing the law if he had studied the law. To shed light upon this point... this is the law. This commission can, in order to obtain sufficient information, request the presence of the three branches, all the ministries...and institutions who in any way are related to the branches of government aforementioned. The commission can invite them or write to them directly. The ones contacted are obliged to respond. In case of violation, and proof of the crime of not responding to the commission, a competent court has the responsibility of looking into the matter expediently and if they prove the crime, has to issue the punishment as described [in the law]. With this explanation, Mr. Mortazavi's statement as the Public Prosecutor is surprising.[158]

---

[156] In April 2001 the Article 90 Commission stated that it would launch a probe into the judiciary, primarily in order to investigate the "startling numbers of reformist writers and journalists who were in prison." "Justice official retracts himself," IRNA, April 11, 2001, http://www.payvand.com/news/01/apr/1037.html (retrieved February 2, 2004). The article quotes Judge Alizadeh as saying to a member of parliament involved in the investigation:

> Mr. Ansari, why are you making such a fuss over several journalists who have been legally detained," he said. "Why do you raise questions about legal proceedings for the sake of a bunch of so-called reformers and newspapers?

In early 2001, MPs on the Article 90 Commission urged Head of the judiciary Ayatollah Hashemi Shahroudi to release students arrested during the 1999 Tehran University Protests. MP Mohammad Dadfar stated: "In the dormitory case only students were punished and jailed but nobody from the Law Enforcement Forces (LEF) or the other camp was punished and the court dealing with the plainclothesmen's case has not yet begun its hearings." The term "the other camp" is a reference to plainclothes agents of *Ansar-e Hizbollah* and *Basij* forces. "MPs Will Urge Shahroudi to release students in dorm incident case," IRNA, January 27, 2001.

[157] Mortazavi wrote an angry response to the Commission's request for information and documents, noting that the "Article 90 Commission has no right to interfere in judicial matters," "The Text of The Answers of the Public Prosecutor of Tehran to The Report of the Article 90 Commission" ISNA, November 3, 2003, http://www.isna.ir/news/NewsPring.asp?id=305026 (retrieved 4, 2003). Translated by Human Rights Watch.

[158] Article 90 Commission Report on the killing of Zahra Kazemi, file 4952, read on the floor of the Majles on October 28, 2003. Translated by Human Rights Watch.

Rather than responding to the serious concerns raised by the Commission's report, the judiciary instead forced journalists to ignore the report. Only one print newspaper in Tehran ran the full report.  Human Rights Watch received information that others were warned not to run the story if they wanted to remain open.  Many Internet sites printed the report, but within Iran access to these was limited.

Some of the most vocal MPs who repeatedly sought out information about the condition of political prisoners or who have openly criticized the judiciary's targeting of journalists and activists have been subject to similar treatment.  Plainclothes agents attacked them attacked during public appearances.  One person who spoke with Human Rights Watch stated that:

> The Article 90 Commission is important, and they fulfilled a very necessary function. But now, what can they do?  Not only do they not have any enforcement power, but they are always getting arrested.[159]

# IX. A Bleak Future

The climate of fear created by the abuses documented in this report has affected many Iranians. Several students told Human Rights Watch that while they supported the views of the student activists, they were afraid to go out into the streets or attend public speeches. "Before, you might be afraid that they would take you to jail for the day," one said, "Now, you are afraid that they will beat you and cut you."[160]

Today, little hope remains for domestic organs to push for change in the judiciary's behavior.  The costs for speaking out against human rights violations by the judiciary and by the parallel forces have increased considerably over the past three years.  As Ambeyi Ligabo, U.N. Special Rapporteur on the promotion and protection of the right of freedom of opinion and expression observed in a report on his recent trip to Iran, repression of speech created a "climate of fear."

> The Special Rapporteur would go even further, underlining that the climate of fear induced by the systematic repression of people expressing critical views against the authorized political and religious

---

[159] Human Rights Watch telephone interview with Siamak S., December 11, 2003.

[160] Human Rights Watch interview with former student, October 13, 2003.

> doctrine and the functioning of institutions, coupled with the severity
> and disproportion of the sentences imposed, leads to self censorship on
> the part of many journalists, intellectuals, politicians, students and the
> population at large, thus in effect impeding freedom of expression. [161]

In the aftermath of the February 20, 2004 parliamentary elections, it seems that this climate of fear will only increase.  One popular disqualified MP, who was the first to resign from the Sixth Majles, recently said, "The Judicial mechanisms, which are under the direct control of the hardliners, and all the hardliners who are involved in a plan to limit the political space, and this new political space will render the country in a worse condition than before.  Compared with the past, we must expect a much worse condition."[162]  On the eve of the elections, one of two remaining reformist newspapers was permanently shut down, the other closed for two weeks; numerous individuals were threatened by the courts, several public lectures were physically attacked by plainclothes security forces, and a number of Internet news sites were filtered from users inside Iran.[163]  While it remains unclear precisely what impact the handover of the Majles to conservatives will have, events since the elections suggest that developments will be very detrimental to the rights of political prisoners.

On March 18, 2004, the spokesperson for the judiciary announced the end of activities of the presidential committee on the condition of political prisoners, despite objections from reformist members of the committee.  The spokesperson, in response to a question regarding three religious/nationalist alliance journalists who have been in detention without charge for months, suggested that their families had been overly vocal in pleading their cases with the media.[164]  The next day, a reformist minister – also a

---

[161] *Report Submitted by the Special Rapporteur on the right of freedom of opinion and expression, Ambeyi Ligabo*, E/CN.4/2004/62/Add.2, January 12, 2004.

[162] "Fatemeh Haqiqatjou: We Must Expect Much Worse Conditions," Peyke Iran Online, March 25, 2004, Citing Deutchewelle Persian Service, http://peykeiran.com (retrieved March 29, 2004).

[163] On January 21, 2004, a group of plainclothes *Ansar-eh Hizbollah* men attacked a peaceful gathering of speakers. Among the speakers were Said Rajavi-Faqih, a leading member of the Office of Fostering Unity [*Daftar-e Tahkim-e Vahdat*] and several others who were encouraging people to vote in the February 20 Parliamentary elections. There was also an attack against a leading reformist member of parliament on December 5, 2003, when MP Mohsen Mirdamadi attended a public meeting  of the Islamic Iran Participation Front in the city of Yazd, and was attacked by plainclothes agents.  A number of police officers were also injured in this attack. A local Yazd Province official noted; "How can we expect the rule of law to be respected anywhere in this country, when the chairman of the Majles' National Security and Foreign Policy Committee is assaulted by a factious group after being officially invited to deliver a speech?"  "Governor-General Expresses Regret Over MP's Attack," Iranian Students News Agency (ISNA) (Tehran), December 6, 2003.

[164] "The end of activities of the Presidential Committee for Following Up on the Condition of the Political Prisoners," *Sharq* (Tehran), March 18, 2004.  The judiciary's spokesman also noted, regarding the recent closure of the newspapers, "The judiciary did not see the closures of these papers as a politically advantageous act, and this act has no benefit or fruits for the judiciary, which means that if political exigency was a motivating

member of the committee - noted that the committee had not issued, and indeed lacked the jurisdiction to issue comment on the legal status of the journalists.[165]

On March 7, 2004, a disqualified parliamentarian who has spent much of his tenure investigating secret prisons, decrying the abuse of political prisoners, and demanding government accountability for their detention, read these words on the floor of the parliament while being shouted down by hardliner politicians:

> Today, we witness a parliamentary coup that employs disqualification and intimidation in the election of the 7th Islamic Majles as tools against the movement by Iranian people who desire change.  The coup we witness is designed to transform the Majles into an institution with hand-picked deputies who vote according to orders.  The coup is designed to transform the Majles into an institution from which letters of protest are no longer written, from which the voice of those wishing to uncover the truth will no longer rise, and whose Article 90 Commission will no longer investigate the complaints of the oppressed. It will, instead, become an institution whose reports on the murder of dissidents, on the attack by military forces on the campuses of Tehran, Tabriz, or Taraasht, and on the harassment of and solitary confinement of journalists, prisoners, and political activists, namely students and those involved in the student movement, will no longer bother the rulers.  In this transformed Majles, no longer will members speak of the loneliness of prison and solitary confinement for innocents like Saber, Alijani, Rahmani, Ganji, Zarafshan, Aghajari, Eshkevari, Abdi, Batebi, or others.[166]

---

factor, some aspect of the activities would not have happened, and now that those activities have happened, it shows that the work of the judiciary is not political." (Translated by Human Rights Watch).

[165] "Minister Says Investigation into Case of Political Prisoners has not ended," ISNA, March 19, 2004.

[166] "Speech of MP A. Akbar Mousavi Khoeini," (in Farsi), Islamic Republic of Iran Broadcasting (Tehran), March 7, 2004.

## Acknowledgments

This report was researched and written by a consultant to Human Rights Watch's Middle East and North Africa Division.  Joe Stork, Washington director of the Middle East and North Africa division, provided editorial review.  The Report was also reviewed by James Ross, senior legal advisor for Human Rights Watch, and Widney Brown, deputy program director.  Leila Hull, associate with the Middle East and North Africa division, prepared the report for publication.  Production assistance was provided by Andrea Holly, manager of outreach and publications, Fitzroy Hepkins, mail manager, Veronica Matushaj, photo editor, and Jagdish Parikh, online communication content coordinator.

Human Rights Watch would like to thank the many individuals in and outside Iran who contributed invaluably to this report, especially those detained and tortured by the Iranian government who shared their stories with us.  Unfortunately, current conditions in Iran do not permit us to thank those to whom we spoke by name.

This report would not have been possible without the assistance of Karim Lahidji and Raza Moini, who bear no responsibility for its contents.  Human Rights Watch is also deeply grateful to the Newman's Own Foundation for supporting our work on Iran.