II

117TH CONGRESS
1ST SESSION

# S. 3347

To identify and impose sanctions with respect to persons who are responsible
for or complicit in abuses toward dissidents on behalf of the Government
of Iran.

————————————

## IN THE SENATE OF THE UNITED STATES

DECEMBER 8, 2021

Mr. TOOMEY (for himself, Mr. CARDIN, and Ms. ROSEN) introduced the fol-
lowing bill; which was read twice and referred to the Committee on For-
eign Relations

————————————

# A BILL

To identify and impose sanctions with respect to persons
who are responsible for or complicit in abuses toward
dissidents on behalf of the Government of Iran.

1    *Be it enacted by the Senate and House of Representa-*
2 *tives of the United States of America in Congress assembled,*
3 **SECTION 1. SHORT TITLE.**
4    This Act may be cited as the ''Masih Alinejad Har-
5 assment and Unlawful Targeting Act of 2021'' or the
6 ''Masih Alinejad HUNT Act of 2021''.
7 **SEC. 2. FINDINGS.**
8    Congress finds that the Government of the Islamic
9 Republic of Iran surveils, harasses, terrorizes, tortures,

1 abducts, and murders individuals who peacefully defend
2 human rights and freedoms in Iran, and innocent entities
3 and individuals considered by the Government of Iran to
4 be enemies of that regime, including United States citizens
5 on United States soil, and takes foreign nationals hostage,
6 including in the following instances:

7    (1) In 2021, Iranian intelligence agents were
8    indicted for plotting to kidnap United States citizen,
9    women's rights activist, and journalist Masih
10   Alinejad, from her home in New York City, in retal-
11   iation for exercising her rights under the First
12   Amendment to the Constitution of the United
13   States. Iranian agents allegedly spent at least ap-
14   proximately half a million dollars to capture the out-
15   spoken critic of the authoritarianism of the Govern-
16   ment of Iran, and studied evacuating her by mili-
17   tary-style speedboats to Venezuela before rendition
18   to Iran.

19   (2) Prior to the New York kidnapping plot, Ms.
20   Alinejad's family in Iran was instructed by authori-
21   ties to lure Ms. Alinejad to Turkey. In an attempt
22   to intimidate her into silence, the Government of
23   Iran arrested 3 of Ms. Alinejad's family members in
24   2019, and sentenced her brother to 8 years in prison
25   for refusing to denounce her.

3

1      (3) According to Federal prosecutors, the same

2   Iranian intelligence network that allegedly plotted to

3   kidnap Ms. Alinejad is also targeting critics of the

4   Government of Iran who live in Canada, the United

5   Kingdom, and the United Arab Emirates.

6      (4) In 2021, an Iranian diplomat was convicted

7   in Belgium of attempting to carry out a 2018 bomb-

8   ing of a dissident rally in France.

9      (5) In 2021, a Danish high court found a Nor-

10   wegian citizen of Iranian descent guilty of illegal es-

11   pionage and complicity in a failed plot to kill an Ira-

12   nian Arab dissident figure in Denmark.

13      (6) In 2021, the British Broadcasting Corpora-

14   tion (BBC) appealed to the United Nations to pro-

15   tect BBC Persian employees in London who suffer

16   regular harassment and threats of kidnapping by

17   Iranian government agents.

18      (7) In 2021, 15 militants allegedly working on

19   behalf of the Government of Iran were arrested in

20   Ethiopia for plotting to attack citizens of Israel, the

21   United States, and the United Arab Emirates, ac-

22   cording to United States officials.

23      (8) In 2020, Iranian agents allegedly kidnapped

24   United States resident and Iranian-German jour-

25   nalist Jamshid Sharmahd, while he was traveling to

4

India through Dubai. Iranian authorities announced
they had seized Mr. Sharmahd in "a complex oper-
ation", and paraded him blindfolded on state tele-
vision. Mr. Sharmahd is arbitrarily detained in Iran,
allegedly facing the death penalty. In 2009, Mr.
Sharmahd was the target of an alleged Iran-directed
assassination plot in Glendora, California.

(9) In 2020, the Government of Turkey re-
leased counterterrorism files exposing how Iranian
authorities allegedly collaborated with drug gangs to
kidnap Habib Chabi, an Iranian-Swedish activist for
Iran's Arab minority. In 2020, the Government of
Iran allegedly lured Mr. Chabi to Istanbul through
a female agent posing as a potential lover. Mr.
Chabi was then allegedly kidnapped from Istanbul,
and smuggled into Iran where he faces execution,
following a sham trial.

(10) In 2020, a United States-Iranian citizen
and an Iranian resident of California pleaded guilty
to charges of acting as illegal agents of the Govern-
ment of Iran by surveilling Jewish student facilities,
including the Hillel Center and Rohr Chabad Center
at the University of Chicago, in addition to
surveilling and collecting identifying information

5

1    about United States citizens and nationals who are
2    critical of the Iranian regime.

3       (11) In 2019, 2 Iranian intelligence officers at
4    the Iranian consulate in Turkey allegedly orches-
5    trated the assassination of Iranian dissident jour-
6    nalist Masoud Molavi Vardanjani, who was shot
7    while walking with a friend in Istanbul. Unbe-
8    knownst to Mr. Molavi, his ''friend'' was in fact an
9    undercover Iranian agent and the leader of the kill-
10   ing squad, according to a Turkish police report.

11      (12) In 2019, around 1,500 people were alleg-
12   edly killed amid a less than 2 week crackdown by se-
13   curity forces on anti-government protests across
14   Iran, including at least an alleged 23 children and
15   400 women.

16      (13) In 2019, Iranian operatives allegedly lured
17   Paris-based Iranian journalist Ruhollah Zam to
18   Iraq, where he was abducted, and hanged in Iran for
19   sedition.

20      (14) In 2019, a Kurdistan regional court con-
21   victed an Iranian female for trying to lure Voice of
22   America reporter Ali Javanmardi to a hotel room in
23   Irbil, as part of a foiled Iranian intelligence plot to
24   kidnap and extradite Mr. Javanmardi, a critic of the
25   Government of Iran.

6

1        (15) In 2019, Federal Bureau of Investigation
2    agents visited the rural Connecticut home of Iran-
3    born United States author and poet Roya Hakakian
4    to warn her that she was the target of an assassina-
5    tion plot orchestrated by the Government of Iran.

6        (16) In 2019, the Government of Denmark ac-
7    cused the Government of Iran of directing the assas-
8    sination of Iranian Arab activist Ahmad Mola Nissi,
9    in The Hague, and the assassination of another op-
10   position figure, Reza Kolahi Samadi, who was mur-
11   dered near Amsterdam in 2015.

12       (17) In 2018, German security forces searched
13   for 10 alleged spies who were working for Iran's al-
14   Quds Force to collect information on targets related
15   to the local Jewish community, including kinder-
16   gartens.

17       (18) In 2017, Germany convicted a Pakistani
18   man for working as an Iranian agent to spy on tar-
19   gets including a former German lawmaker and a
20   French-Israeli economics professor.

21       (19) In 2012, an Iranian American pleaded
22   guilty to conspiring with members of the Iranian
23   military to bomb a popular Washington, DC, res-
24   taurant with the aim of assassinating the ambas-
25   sador of Saudi Arabia to the United States.

7

1    (20) In 1996, agents of the Government of Iran

2    allegedly assassinated 5 Iranian dissident exiles

3    across Turkey, Pakistan, and Baghdad, over a 5-

4    month period that year.

5    (21) In 1992, the Foreign and Commonwealth

6    Office of the United Kingdom expelled 2 Iranians

7    employed at the Iranian Embassy in London and a

8    third Iranian on a student visa amid allegations they

9    were plotting to kill Indian-born British American

10   novelist Salman Rushdie, pursuant to the fatwa

11   issued by then supreme leader of Iran, Ayatollah

12   Ruhollah Khomeini.

13   (22) In 1992, 4 Iranian Kurdish dissidents

14   were assassinated at a restaurant in Berlin, Ger-

15   many, allegedly by Iranian agents.

16   (23) In 1992, singer, actor, poet, and gay Ira-

17   nian dissident Fereydoun Farrokhzad was found

18   dead with multiple stab wounds in his apartment in

19   Germany. His death is allegedly the work of Iran-

20   directed agents.

21   (24) In 1980, Ali Akbar Tabatabaei, a leading

22   critic of Iran and then president of the Iran Free-

23   dom Foundation, was murdered in front of his Be-

24   thesda, Maryland, home by an assassin disguised as

25   a postal courier. The Federal Bureau of Investiga-

8

1  tion had identified the "mailman" as Dawud
2  Salahuddin, born David Theodore Belfield. Mr.
3  Salahuddin was working as a security guard at an
4  Iranian interest office in Washington, DC, when he
5  claims he accepted the assignment and payment of
6  $5,000 from the Government of Iran to kill Mr.
7  Tabatabaei.

8  (25) Other exiled Iranian dissidents alleged to
9  have been victims of the Government of Iran's mur-
10  derous extraterritorial campaign include Shahriar
11  Shafiq, Shapour Bakhtiar, and Gholam Ali Oveissi.

12  (26) Iranian Americans face an ongoing cam-
13  paign of intimidation both in the virtual and phys-
14  ical world by agents and affiliates of the Government
15  of Iran, which aims to stifle freedom of expression
16  and eliminate the threat Iranian authorities believe
17  democracy, justice, and gender equality pose to their
18  rule.

19  **SEC. 3. DEFINITIONS.**

20  In this Act:

21  (1) ADMISSION; ADMITTED; ALIEN.—The terms
22  "admission", "admitted", and "alien" have the
23  meanings given those terms in section 101 of the
24  Immigration and Nationality Act (8 U.S.C. 1101).

9

1     (2) APPROPRIATE CONGRESSIONAL COMMIT-
2 TEES.—The term "appropriate congressional com-
3 mittees" means—

4     (A) the Committee on Banking, Housing,
5     and Urban Affairs and the Committee on For-
6     eign Relations of the Senate; and

7     (B) the Committee on Financial Services
8     and the Committee on Foreign Affairs of the
9     House of Representatives.

10     (3) CORRESPONDENT ACCOUNT; PAYABLE-
11 THROUGH ACCOUNT.—The terms "correspondent ac-
12 count" and "payable-through account" have the
13 meanings given those terms in section 5318A of title
14 31, United States Code.

15     (4) FOREIGN FINANCIAL INSTITUTION.—The
16 term "foreign financial institution" has the meaning
17 of that term as determined by the Secretary of the
18 Treasury pursuant to section 104(i) of the Com-
19 prehensive Iran Sanctions, Accountability, and Di-
20 vestment Act of 2010 (22 U.S.C. 8513(i)).

21     (5) FOREIGN PERSON.—The term "foreign per-
22 son" means any individual or entity that is not a
23 United States person.

24     (6) UNITED STATES PERSON.—The term
25 "United States person" means—

10

(A) a United States citizen or an alien law-
fully admitted for permanent residence to the
United States; or

(B) an entity organized under the laws of
the United States or any jurisdiction within the
United States, including a foreign branch of
such an entity.

**SEC. 4. REPORT AND IMPOSITION OF SANCTIONS WITH RE-
SPECT TO PERSONS WHO ARE RESPONSIBLE
FOR OR COMPLICIT IN ABUSES TOWARD DIS-
SIDENTS ON BEHALF OF THE GOVERNMENT
OF IRAN.**

(a) REPORT REQUIRED.—

(1) IN GENERAL.—Not later than 45 days after
the date of the enactment of this Act, the Secretary
of State, in consultation with the Secretary of the
Treasury, the Director of National Intelligence, and
the Attorney General, shall submit to the appro-
priate congressional committees a report that—

(A) includes a detailed description and as-
sessment of—

(i) the state of human rights and the
rule of law inside Iran, including the rights
and well-being of women, religious and eth-

11

1     nic minorities, and the LGBTQ community

2     in Iran;

3       (ii) actions taken by the Government

4     of Iran during the year preceding submis-

5     sion of the report to target and silence dis-

6     sidents both inside and outside of Iran who

7     advocate for human rights inside Iran;

8       (iii) the methods used by the Govern-

9     ment of Iran to target and silence dis-

10     sidents both inside and outside of Iran;

11     and

12       (iv) the means through which the

13     Government of Iran finances efforts to tar-

14     get and silence dissidents both inside and

15     outside of Iran;

16     (B) identifies foreign persons working as

17     part of the Government of Iran or acting on be-

18     half of that Government (including members of

19     paramilitary organizations such as Ansar-e-

20     Hezbollah and Basij-e Mostaz'afin), that the

21     Secretary of State determines, based on credible

22     evidence, are knowingly responsible for,

23     complicit in or involved in ordering, conspiring,

24     planning or implementing the surveillance, har-

25     assment, kidnapping, illegal extradition, impris-

12

onment, torture, killing, or assassination of citizens of Iran (including citizens of Iran of dual nationality) or citizens of the United States inside or outside Iran who seek—

(i) to expose illegal or corrupt activity carried out by officials of the Government of Iran;

(ii) to obtain, exercise, defend, or promote internationally recognized human rights and freedoms, such as the freedoms of religion, expression, association, and assembly, and the rights to a fair trial and democratic elections, in Iran; or

(iii) to obtain, exercise, defend, or promote the rights and well-being of women, religious and ethnic minorities, and the LGBTQ community in Iran; and

(C) includes, for each foreign person identified subparagraph (B), a clear explanation for why the foreign person was so identified.

(2) UPDATES OF REPORT.—The report required by paragraph (1) shall be updated, and the updated version submitted to the appropriate congressional committees, during the 10-year period following the date of the enactment of this Act—

13

1           (A) not less frequently than annually; and

2           (B) with respect to matters relating to the

3 identification of foreign persons under para-

4 graph (1)(B), on an ongoing basis as new infor-

5 mation becomes available.

6     (3) FORM OF REPORT.—

7           (A) IN GENERAL.—Each report required

8 by paragraph (1) and each update required by

9 paragraph (2) shall be submitted in unclassified

10 form but may include a classified annex.

11           (B) PUBLIC AVAILABILITY.—The Secretary

12 of State shall post the unclassified portion of

13 each report required by paragraph (1) and each

14 update required by paragraph (2) on a publicly

15 available internet website of the Department of

16 State.

17   (b) IMPOSITION OF SANCTIONS.—In the case of a for-

18 eign person identified under paragraph (1)(B) of sub-

19 section (a) in the most recent report or update submitted

20 under that subsection, the President shall—

21     (1) if the foreign person meets the criteria for

22 the imposition of sanctions under subsection (a) of

23 section 1263 of the Global Magnitsky Human Rights

24 Accountability Act (subtitle F of title XII of Public

14

1 Law 114–328; 22 U.S.C. 2656 note), impose sanc-
2 tions under subsection (b) of that section; and

3 (2) if the foreign person does not meet such cri-
4 teria, impose the sanctions described in subsection
5 (c).

6 (c) SANCTIONS DESCRIBED.—The sanctions to be
7 imposed under this subsection with respect to a foreign
8 person are the following:

9 (1) BLOCKING OF PROPERTY.—The President
10 shall exercise all powers granted to the President by
11 the International Emergency Economic Powers Act
12 (50 U.S.C. 1701 et seq.) to the extent necessary to
13 block and prohibit all transactions in all property
14 and interests in property of the person if such prop-
15 erty and interests in property are in the United
16 States, come within the United States, or are or
17 come within the possession or control of a United
18 States person.

19 (2) INELIGIBILITY FOR VISAS, ADMISSION, OR
20 PAROLE.—

21 (A) IN GENERAL.—

22 (i) VISAS, ADMISSION, OR PAROLE.—
23 An alien described in subsection (a)(1)(B)
24 is—

15

1          (I) inadmissible to the United
2     States;
3          (II) ineligible to receive a visa or
4     other documentation to enter the
5     United States; and
6          (III) otherwise ineligible to be
7     admitted or paroled into the United
8     States or to receive any other benefit
9     under the Immigration and Nation-
10    ality Act (8 U.S.C. 1101 et seq.).
11    (ii) CURRENT VISAS REVOKED.—
12         (I) IN GENERAL.—The visa or
13    other entry documentation of an alien
14    described in subsection (a)(1)(B) shall
15    be revoked, regardless of when such
16    visa or other entry documentation is
17    or was issued.
18         (II) IMMEDIATE EFFECT.—A rev-
19    ocation under subclause (I) shall—
20              (aa) take effect immediately;
21         and
22              (bb) automatically cancel
23         any other valid visa or entry doc-
24         umentation that is in the alien's
25         possession.

16

1    (d) TERMINATION OF SANCTIONS.—The President
2 may terminate the application of sanctions under this sec-
3 tion with respect to a person if the President determines
4 and reports to the appropriate congressional committees,
5 not later than 15 days before the termination of the sanc-
6 tions that—

7        (1) credible information exists that the person
8     did not engage in the activity for which sanctions
9     were imposed;

10       (2) the person has been prosecuted appro-
11    priately for the activity for which sanctions were im-
12    posed; or

13       (3) the person has—

14           (A) credibly demonstrated a significant
15        change in behavior;

16           (B) has paid an appropriate consequence
17        for the activity for which sanctions were im-
18        posed; and

19           (C) has credibly committed to not engage
20        in an activity described in subsection (a) in the
21        future.

17

SEC. 5. REPORT AND IMPOSITION OF SANCTIONS WITH RE-
          SPECT TO FOREIGN FINANCIAL INSTITU-
          TIONS CONDUCTING SIGNIFICANT TRANS-
          ACTIONS WITH PERSONS RESPONSIBLE FOR
          OR COMPLICIT IN ABUSES TOWARD DIS-
          SIDENTS ON BEHALF OF THE GOVERNMENT
          OF IRAN.

(a) REPORT REQUIRED.—

    (1) IN GENERAL.—Not earlier than 30 days
and not later than 60 days after the Secretary of
State submits to the appropriate congressional com-
mittees a report required by section 4(a), the Sec-
retary of the Treasury, in consultation with the Sec-
retary of State, shall submit to the appropriate con-
gressional committees a report that identifies any
foreign financial institution that knowingly conducts
a significant transaction with a foreign person iden-
tified in the report submitted under section 4(a).

    (2) FORM OF REPORT.—

        (A) IN GENERAL.—Each report required
    by paragraph (1) shall be submitted in unclassi-
    fied form but may include a classified annex.

        (B) PUBLIC AVAILABILITY.—The Secretary
    of the Treasury shall post the unclassified por-
    tion of each report required by paragraph (1)

18

1          on a publicly available internet website of the
2          Department of the Treasury.

3      (b) IMPOSITION OF SANCTIONS.—The Secretary of
4  the Treasury may prohibit the opening, or prohibit or im-
5  pose strict conditions on the maintaining, in the United
6  States of a correspondent account or a payable-through
7  account by a foreign financial institution identified under
8  subsection (a)(1).

**9  SEC. 6. EXCEPTIONS; WAIVERS; IMPLEMENTATION.**

10     (a) EXCEPTIONS.—

11          (1) EXCEPTION FOR INTELLIGENCE, LAW EN-
12     FORCEMENT, AND NATIONAL SECURITY ACTIVI-
13     TIES.—Sanctions under sections 4 and 5 shall not
14     apply to any authorized intelligence, law enforce-
15     ment, or national security activities of the United
16     States.

17          (2) EXCEPTION TO COMPLY WITH UNITED NA-
18     TIONS HEADQUARTERS AGREEMENT.—Sanctions
19     under section 4(c)(2) shall not apply with respect to
20     the admission of an alien to the United States if the
21     admission of the alien is necessary to permit the
22     United States to comply with the Agreement regard-
23     ing the Headquarters of the United Nations, signed
24     at Lake Success June 26, 1947, and entered into
25     force November 21, 1947, between the United Na-

19

1    tions and the United States, the Convention on Con-
2    sular Relations, done at Vienna April 24, 1963, and
3    entered into force March 19, 1967, or other applica-
4    ble international obligations.

5    (b) NATIONAL SECURITY WAIVER.—The President
6    may waive the application of sanctions under section 4
7    with respect to a person if the President—

8        (1) determines that the waiver is in the national
9        security interests of the United States; and

10        (2) submits to the appropriate congressional
11        committees a report on the waiver and the reasons
12        for the waiver.

13    (c) IMPLEMENTATION; PENALTIES.—

14        (1) IMPLEMENTATION.—The President may ex-
15        ercise all authorities provided to the President under
16        sections 203 and 205 of the International Emer-
17        gency Economic Powers Act (50 U.S.C. 1702 and
18        1704) to carry out this Act.

19        (2) PENALTIES.—A person that violates, at-
20        tempts to violate, conspires to violate, or causes a
21        violation of section 4(b)(1) or 5(b) or any regulation,
22        license, or order issued to carry out either such sec-
23        tion shall be subject to the penalties set forth in sub-
24        sections (b) and (c) of section 206 of the Inter-
25        national Emergency Economic Powers Act (50

20

1  U.S.C. 1705) to the same extent as a person that

2  commits an unlawful act described in subsection (a)

3  of that section.

4 **SEC. 7. EXCEPTION RELATING TO IMPORTATION OF**

5    **GOODS.**

6  (a) IN GENERAL.—Notwithstanding any other provi-

7 sion of this Act, the authorities and requirements to im-

8 pose sanctions under this Act shall not include the author-

9 ity or a requirement to impose sanctions on the importa-

10 tion of goods.

11  (b) GOOD DEFINED.—In this section, the term

12 "good" means any article, natural or manmade substance,

13 material, supply or manufactured product, including in-

14 spection and test equipment, and excluding technical data.

○