## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MASIH ALINEJAD;

    *Plaintiff,*

v.

THE ISLAMIC REPUBLIC OF IRAN et al.;

    *Defendants.*

Civil Action No: 1:19-cv-03599-GMH

### PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

Plaintiff respectfully requests that this Court enter default judgment against Defendant, the Islamic Republic of Iran. In support thereof, Plaintiff avers as follows:

### I.    FACTUAL BACKGROUND

#### A.  Introduction

Plaintiff Masih Alinejad filed this action against Defendants the Islamic Republic of Iran ("Iran"), the Supreme Leader of Iran Seyed Ali Hosseini Khamenei, the Judiciary of Iran, and the Islamic Revolutionary Guard Corps ("IRGC") under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. ("FSIA"), to recover for severe personal injuries and other irreparable harm suffered as a result of Defendants' hostage taking and torture of her brother, Mr. Alireza Alinejad. Plaintiff now proceeds in this action under 28 U.S.C. §1605A, which provides for a private cause of action against a state sponsor of terrorism, in this case Iran, against Defendant Iran alone.

#### B. Statement of Facts

Plaintiff Masih Alinejad (A/K/A Masoumeh Alinejad-Qomi) is an American-Iranian writer and feminist activist who has achieved international acclaim as an outspoken critic of the Islamic

1

Republic of Iran and the law requiring compulsory hijab for women. She is the sister of Mr. Alireza Alinejad-Ghomi ("Mr. Alinejad"), who is currently a political prisoner of the Islamic Republic as a result of Plaintiff's activism.[1] Because of her courageous opposition to the regime of the Islamic Republic and its leadership, she has been forced into exile and cut off from her family in Iran, while her loved ones have themselves been subjected to harassment, unlawful arrest, false imprisonment, torture and hostage taking as an attempt to silence her powerful voice.[2]

In 2008, Plaintiff wrote a controversial article criticizing Iranian politician Mahmoud Ahmadinejad and his followers, which was regarded by the Iranian government as offensive towards the Iranian president and the people of Iran.[3] In the weeks surrounding the disputed 2009 Iranian presidential election, due to her journalistic pursuits and political activism, Plaintiff was forced to flee from Iran out of fear for her life.[4] She came to the United States as a political asylee in July 2014, and became a naturalized U.S. citizen on October 17, 2019.[5]

Plaintiff spent five years after coming to the U.S. documenting human rights abuses by Iran in the aftermath of Iran's rigged 2009 presidential elections. In 2010 Plaintiff, along with a group of Iranian writers and intellectuals, established the "IranNeda" foundation as an outlet for protesting the Iranian government.[6] In 2014, Plaintiff launched a campaign on Facebook with a page entitled "My Stealthy Freedom" or "Stealthy Freedoms of Iranian Women", which protests compulsory hijab by inviting Iranian women to post pictures of themselves without a hijab.[7] In Iran, women who appear in public without a hijab risk being arrested or attacked: "Under Islamic law in force in Iran since the 1979 revolution, women must wear loose clothing, known as hijab,

---

[1] *See generally* Exhibit 1, Declaration of Masih Alinejad.
[2] *See id.*; *see generally* Exhibit 56, Expert Declaration of Ali Arab.
[3] *See* Exhibit 10, Nahid Siamdoust, "'Jesus' vs. Ahmadinejad", TIME (May 7, 2008).
[4] *See* Exhibit 1, Declaration of Masih Alinejad, ¶7.
[5] *Id.* ¶1.
[6] *See* Exhibit 11, *Masih Alinejad Profile*, STRIVING FOR HUMAN RIGHTS.
[7] *See* Exhibit 12, May 2014 Washington Post article; *see* Exhibit 13, "My Stealthy Freedom" Facebook page.

that covers the head and neck and conceals their hair . . . [m]orality police with the power of arrest patrol public areas and decide if women are observing the law."[8] The campaign quickly attracted international attention and has garnered over 1 million followers on social media. In 2017, Plaintiff expanded the campaign through a "White Wednesdays" initiative, which encourages women to post pictures and videos of themselves wearing white headscarves or pieces of white clothing as symbols of protest. This campaign is now the longest-running civil disobedience campaign for women's rights against the Islamic Republic.[9]

In February 2019, Plaintiff was invited to meet with U.S. Secretary of State Mike Pompeo, who thanked her for her bravery and continued dedication to her cause.[10] During their meeting, Plaintiff spoke with Secretary Pompeo about her concerns related to the Islamic Republic and the regime's human rights violations.[11] As a direct result of her activism, in July 2019 Iranian officials warned that anyone sharing protest videos with Plaintiff faced up to ten years in prison under Iranian laws relating to cooperating with an enemy of the state.[12]

During her extensive career, Plaintiff has received numerous death threats from the Iranian government and its agents, and women involved in her hijab campaign have been harassed, detained, arrested and sentenced to lengthy jail sentences inside Iran:

> "On 1 June 2019, Saba Kord Afshari was arrested in Tehran in relation to her participation in the White Wednesday campaign against compulsory veiling and due to a video of the protest that was posted on Ms. Alinejad's social media account. Upon arrest, Ms. Afshari was interrogated and then held in solitary confinement for 11 days. She was reportedly told that her father would be killed and her mother would be arrested and that all the private photographs on her telephone would be released if she did not make a confession. She was also reportedly forcibly disappeared for 12 days in July, when she was transferred to a location unknown to her and her family. In August 2019, Ms. Afshari was convicted of three national security-related and morality charges and sentenced to 24 years in prison.

---

[8] Exhibit 14, Oct. 2014 ABC News article.
[9] *See id.*
[10] *See* Exhibit 15, U.S. Dep't of State Feb. 2019 Press Statement.
[11] *Id.*
[12] Exhibit 16, July 2019 Reuters article.

She will need to serve seven and a half years if the sentence is upheld on appeal, in line with article 134 of the Penal Code."[13]

In 2014, Iranian state television commentators falsely alleged that Plaintiff was raped by three men in London as an attempt to smear her reputation and inspire fear in any other women who might follow in her example as an activist.[14]

Due to her continued activism against the Iranian government, Plaintiff has been unable to return to Iran or see her family for over ten years.[15] The government has continuously harassed and interrogated her family in an effort to intimidate and pressure her to halt her activism.[16] The Iranian government has pressured Plaintiff's entire family to cease all communications with her.[17] Her mother has been interrogated multiple times by Iranian agents, who held her overnight and warned her not to contact her daughter again; she felt she had no choice but to heed the warning.[18] Thus, since leaving Iran over ten years ago, Plaintiff has only been in contact with one family member on a regular basis: her brother, Mr. Alireza Alinejad.[19]

In 2019, when the Iranian government increased pressure on the Alinejad family, Mr. Alinejad courageously prepared a video of himself to be released in the event of his arrest, in which he encouraged his sister to continue her fight and said that their mother was considering making a statement of condemnation against Plaintiff under duress in order to protect the family and hopefully spare him from arrest after she herself had been interrogated several times.[20] Yet, he

---

[13] Exhibit 24, Jan. 2020 Special Rapporteur report, ¶36; *see also* Exhibit 17, U.S. Dep't of State 2019 Iran Human Rights Report, p. 10.

[14] *See* Exhibit 18, June 2014 Washington Post article; Exhibit 19, June 2014 ABC News article ("'Masih Alinejad is a whore, and not a heretic as some people claim her to be,' [Vahid] Yaminpour wrote on his Facebook page. 'We shouldn't elevate her to the level of a heretic. She's just trying to compensate her psychological (and probably financial) needs by recruiting young women and sharing her notoriety with younger women who are still not prostitutes.'"); Exhibit 35, FIDH report, p. 51.

[15] *See* Exhibit 1, Declaration of Masih Alinejad, ¶¶7-8, 45.

[16] *See generally*, Exhibit 1, Declaration of Masih Alinejad.

[17] *See id.*, at ¶¶14, 15.

[18] *Id.*, at ¶¶35–6; *see also* Exhibit 26, Sept. 2019 Amnesty International article.

[19] Exhibit 1, Declaration of Masih Alinejad, ¶¶8–9, 12-5.

[20] *See* Exhibit 20, Alireza Youtube Video Transcript (English).

stated that he had no fear of arrest and gave his sister permission to continue her advocacy if it should happen. Knowing the unbearable future ahead of him, he bravely encouraged Masih to continue to fight for human rights.[21]

On September 24, 2019, a group of agents from the IRGC's intelligence unit raided Mr. Alinejad's home in Tehran, Iran. Mr. Alinejad was arrested, blindfolded, and handcuffed by IRGC agents, and removed from his home in front of his family, including his two small children.[22] Mr. Alinejad was relentlessly interrogated while detained in solitary confinement in Ward 2A of Evin Prison, a notorious site of human rights abuses against prisoners, where he was detained until May 7, 2020, when he was removed to Evin Prison's political ward.[23]

Initially, Mr. Alinejad was held in incommunicado detention for days, was initially refused legal counsel, and for months was not allowed to communicate with his family.[24] When he was finally able to speak with family in Iran, the calls were fully monitored and limited.[25]

After months of solitary confinement and intense interrogations during which the authorities attempted to extract forced false confessions from him, Mr. Alinejad was finally tried in June 2020.[26] The judge in his case was Mohammad Moghiseh, known for hearing cases of political prisoners in which he has denied them due process, such as the opportunity to present a defense, insulted and cursed at them, and issued death sentences and long prison terms based on trumped-up charges. Having earned the nickname "The Hanging Judge", and having had an active role in the 1988 executions of political prisoners in Gohardasht Prison where he was both the judge

---

[21] *Id.*

[22] Exhibit 40, May 2020 Washington Post article; Exhibit 23, Amnesty International 2019 Annual Report on Iran, p. 4; Exhibit 26, Sept. 2019 Amnesty International article.

[23] *See* Exhibit 1, Declaration of Masih Alinejad, ¶20; Exhibit 60, Declaration Requested to Be Sealed, ¶¶5, 10; *see also* Exhibit 26, Sept. 2019 Amnesty International article; Exhibit 56, Expert Declaration of Ali Arab, pp. 22-8.

[24] *See* Exhibit 1, Declaration of Masih Alinejad, ¶¶22, 26; Exhibit 60, Declaration Requested to Be Sealed, ¶¶2, 5.

[25] *See* Exhibit 1, Declaration of Masih Alinejad, ¶26.

[26] Exhibit 60, Declaration Requested to Be Sealed, ¶12.

and warden, the European Union sanctioned him as a human rights violator in 2011, followed by the U.S. Department of the Treasury in 2019.[27] In Mr. Alinejad's trial, Judge Moghiseh refused his attorney the opportunity to defend him and harshly rejected his attorney's objections.[28]

Mr. Alinejad was sentenced on July 11, 2020, to eight years in prison for "insulting the supreme leader", "propaganda against the Islamic Republic of Iran", and "association and collusion to commit crimes against internal and external security".[29] An appeals court upheld this sentence on October 18, 2020.[30] On February 13, 2021, his request for appeal was denied by Iran's highest appeals court. His attorney, Saeid Dehghan, stated that Mr. Alinejad's case was rejected as quickly as the appeals for all other human rights cases and said, "It is very rare in a case that a brother is tried and convicted for the crime of having contact with his sister, or for her actions."[31]

As a result of Defendant's actions, Plaintiff has suffered immense emotional trauma. For days after her brother's arrest, she had no information regarding his whereabouts or treatment, only to learn later that he was being held in section 2A of Evin Prison, which is notorious for its tough and inhumane interrogations.[32]

During her brother's detention, on July 13, 2021, the U.S. government made public the indictments of several individuals acting on behalf of Iran's Ministry of Intelligence in a plot to kidnap Plaintiff from her home in New York and forcibly return her to Iran. On multiple occasions, the conspirators arranged for invasive surveillance of her home and neighborhood, including photos and videos taken of her family and associates, and installation of a live high-definition

---

[27] Exhibit 57, United for Iran, Judge Mohammad Moghiseh; and Exhibit 58 UANI, Mohammad Moghiseh; *see also* U.S. Dep't of the Treasury, Iran-related Designations (December 19, 2019), https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20191219.
[28] Exhibit 60, Declaration Requested to Be Sealed, ¶12.
[29] *See* Exhibit 21, Alireza Alinejad Order.
[30] Exhibit 60, Declaration Requested to Be Sealed, ¶13.
[31] Exhibit 22, Feb. 2021 Iran Int'l article.
[32] *See* Exhibit 1, Declaration of Masih Alinejad, ¶20; *see also* Exhibit 26, Sept. 2019 Amnesty International article.

video feed of her home. The indictment further indicates that the conspirators researched methods of abducting and transporting Plaintiff out of the United States to Iran, where U.S. Attorney Audrey Strauss notes "[Plaintiff's] fate would have been uncertain at best."[33]

Soon after this failed attempt to kidnap Plaintiff, Mr. Alinejad was granted temporary, conditional leave on August 3, 2021, on the condition that he has no contact with Plaintiff.[34] During her brother's detention and ill-treatment, Plaintiff suffered from anxiety regarding her brother's condition, guilt at the knowledge that his circumstances were designed to hurt her, and constant fear for how her actions could have negative repercussions for him.[35] This suffering persists today as she remains unable to communicate with her brother and he could be returned to prison at any time.[36] Dr. Ramin Ahmadi states that based upon the symptoms of depression, panic attacks, difficulty sleeping and concentrating and constant feelings of guilt and fear that he has personally observed in Plaintiff, she is likely experiencing post-traumatic stress disorder.[37]

To this day, Plaintiff receives constant threats against her life, and repeated public insults from both individuals and the Iranian government.[38]

### C. Parties

#### 1. <u>Plaintiff Masih Alinejad</u>

Plaintiff Masih Alinejad was born in northern Iran, where she grew up as the youngest of five children, including her brother Mr. Alireza Alinejad. She is a journalist, documentarian, TV presenter, author, and women's rights activist who has been targeted by the Islamic Republic for her activism. She was granted political asylum and has been a permanent resident of the U.S. since

---

[33] Exhibit 1, Declaration of Masih Alinejad, ¶37; Exhibit 41, 2021 U.S. Dep't of Justice Press Release.

[34] Exhibit 1, Declaration of Masih Alinejad, ¶¶26, 44; Exhibit 60, Declaration Requested to Be Sealed, ¶16.

[35] Exhibit 1, Declaration of Masih Alinejad, ¶37; Exhibit 41, 2021 U.S. Dep't of Justice Press Release; *see also* Exhibit 56, Expert Declaration of Ali Arab, p. 31.

[36] Exhibit 1, Declaration of Masih Alinejad, ¶44.

[37] Exhibit 4, Declaration of Ramin Ahmadi, ¶¶6–8.

[38] *See* Exhibit 1, Declaration of Masih Alinejad, ¶¶34, 45; Exhibit 39, Documentation of Twitter Threats.

July 24, 2014.[39] She became a naturalized U.S. citizen on October 17, 2019,[40] just three weeks after Mr. Alinejad was imprisoned on September 24, 2019.

### 2. **Defendant the Islamic Republic of Iran and its Instrumentalities**

Defendant the Islamic Republic of Iran is a foreign state, currently designated by the U.S. Department of State as a state sponsor of terrorism. Iran is a theocratic republic with an elected head of government and a head of state, the Supreme Leader, appointed for life by a council of theologians. The Supreme Leader controls all three branches of government, major policies, and the military. Ayatollah Ali Husseini Khamenei has been the Supreme Leader since 1989.

The Islamic Revolutionary Guard Corps ("IRGC") is a military organization under the control of the Supreme Leader, established in 1979 in the wake of the Islamic Revolution to act as the country's "ideological custodian".[41] It is one of the most powerful and oppressive factions of the Iranian government, with an army, navy, air force, intelligence service, and foreign operations. The Judiciary branch of the Iranian government detains, prosecutes, interrogates, and tortures domestic targets by order of the IRGC's security apparatus.

The U.S. Department of the Treasury has designated the IRGC as a sponsor of terrorism and human rights violations.[42] The IRGC's domestic intelligence apparatus and Iran's Judiciary branch, which are instrumentalities of the Iranian government as defined under 28 U.S.C. § 1605A, are responsible for the hostage taking and torture of Mr. Alinejad. All such acts of hostage taking and torture were conducted by an agent of the Islamic Republic of Iran.

---

[39] Exhibit 1, Declaration of Masih Alinejad, ¶1.
[40] Exhibit 6, Masih Alinejad Certificate of Naturalization.
[41] CFR.org Editors, *Iran's Revolutionary Guards*, COUNCIL ON FOREIGN RELATIONS (May 6, 2019), https://www.cfr.org/backgrounder/irans-revolutionary-guards.
[42] U.S. State Dept., "Executive Order 13224", https://www.state.gov/executive-order-13224; and U.S. Treasury Dept., Press Release, "Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority" (2017), https://home.treasury.gov/news/press-releases/sm0177.

## II.      PERSONAL JURISDICTION OVER IRAN

Courts of the United States have personal jurisdiction over a foreign state when that state has been served in accordance with 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b); *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 196, 199 (D.C. Cir. 2005); *see also* Fed. R. Civ. P. 4(j)(1) (requiring that foreign states be served in accordance with 28 U.S.C. § 1608).

In this case, service of process on Iran was obtained pursuant to 28 U.S.C. § 1608(a)(4) by diplomatic note forwarded by the U.S. Department of State to the Foreign Interests Section of the Embassy of Switzerland. The U.S. does not maintain diplomatic relations with the government of Iran and is assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran in delivering these documents to the Iranian Ministry of Foreign Affairs. Delivery of the documents was attempted under cover of diplomatic note No. 1192-IE on October 27, 2020. The Ministry of Foreign Affairs refused acceptance on the same day.[43] As a result of the above-described service of process, this Court has personal jurisdiction over Defendant. On January 13, 2021, the Clerk of Court entered a default against Defendant the Islamic Republic of Iran. (ECF. No. 15).

## III.     SUBJECT MATTER JURISDICTION UNDER 28 U.S.C. § 1605A

The FSIA, 28 U.S.C. § 1602 *et seq.*, provides the exclusive basis for subject matter jurisdiction over all civil actions against foreign states. 28 U.S.C. §§ 1330, 1602-1611. Section 1604 of Title 28 provides that foreign states are "immune from the jurisdiction of the courts of the United States except as provided in section 1605-1607 of this chapter." The exception applicable to this case is found in §1605A(a)(1), which provides that foreign states are not immune from U.S. jurisdiction where a claimant seeks money damages for personal injury or death "caused by an act

---

[43] *See* Exhibit 8, Swiss Embassy Certification of Service of Process on Defendants.

of torture [] [or] hostage taking" and the injury or death is attributable to the foreign state's employees or agents or the foreign state's material support of such acts.

In addition, federal courts shall hear a claim under 28 U.S.C. § 1605A if the following three subject matter jurisdictional criteria are met:

    i.    The foreign state was designated as a state sponsor of terrorism at the time the act occurred and remains so designated when a claim is filed. 28 U.S.C. § 1605A(a)(2)(A)(i)(I).;

    ii.    The claimant or victim was, at the time of the foreign state's act, a national of the United States. 28 U.S.C. § 1605A(a)(2)(A)(ii)(I) and (III).; and

    iii.    In cases in which the act occurred in the foreign state, the claimant has "afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration."  28 U.S.C. 1605A(a)(2)(A)(iii).

Each of these jurisdictional prerequisites has been met in this case.

## A.  Evidence of Hostage Taking and Torture

Plaintiff was injured by Iran's hostage taking and torture of her brother, Mr. Alireza Alinejad, as defined under 28 U.S.C. § 1605A(a)(1). Agents of the Iranian government were the direct cause of injuries to Mr. Alinejad and Plaintiff.

### 1. Evidentiary Standard

To prove Defendant's acts of hostage taking and torture pursuant to 28 U.S.C. § 1605A(a)(1), the statute requires that a claimant "establish his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Owens v. Republic of Sudan*, 864 F.3d 751, 784-85 (D.C. Cir. 2017) (describing claimants' burden as a "rather modest burden of production to establish the court's jurisdiction"). In meeting this standard, plaintiffs are not limited to evidence that would be admissible at trial. In *Owens*, this Court stated:

"The district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism. For example we have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial . . . Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge, only where the court relies upon evidence that

is clearly inadmissible and essential to the outcome has it abused its discretion." *Owens,* supra, at 785-86.

The Court is also obligated to adjust evidentiary requirements to the particular circumstances of each case. In *Kim*, the Court described the reasoning behind the loosened evidentiary standard under the FSIA's terrorism exception: "[…] Congress aimed to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim v. Dem. People's R. of Korea*, 774 F.3d 1044, 1048 (D.C. Cir 2014); *Owens,* supra, at 787-88 (requiring firsthand evidence under the FSIA would "'effectively immunize' the regime from responsibility for its crimes"). For this reason, courts have loosened the evidentiary standard for FSIA cases where firsthand accounts may be difficult or impossible to obtain, as "[e]yewitnesses in a state that sponsors terrorism are similarly difficult to locate and may be unwilling to testify for fear of retaliation," and "[t]he sovereigns themselves often fail to appear and to participate in discovery." *Owens*, supra, at 787, quoted in *Warmbier v. Dem. People's R. of Korea*, 356 F.Supp 3d 30, 43 (D.D.C. 2017).

Accordingly, "[w]ith a dearth of firsthand evidence, reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Owens*, supra, at 787; *see also Kim*, supra, at 1049 ("[W]here a plaintiff has produced compelling, admissible evidence that the regime abducted the victim and that it routinely tortures and kills the people it abducts, the courts can assume that the defendant probably tortured and killed the victim."). Further, "[i]n these circumstances, requiring that the [plaintiff] prove exactly what happened to the [victim] and when would defeat the Act's very purpose" of "punish[ing] foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Kim*, supra, at 1048. In this sense, this case before the Court is similar to the *Warmbier* case as it involves abduction and attempted forced confessions by a regime notorious

for torture and resistance to outside inquiry. Thus, the evidentiary standard described in *Warmbier*, *Kim* and *Owen*s applies, and Plaintiff satisfies it. Testimonial accounts and other available evidence corroborate Iran's harsh treatment of Mr. Alinejad and its impact.[44] Government and NGO reports and an expert report of Professor Ali Arab document Iran's acts against him as typical against political dissidents, which this Circuit has also found.[45] *Hekmati v. Islamic R. of Iran*, 278 F. Supp. 3d 149 (D.C. Cir. 2017); *Estate of Bayani v. Islamic R. of Iran*, 530 F. Supp. 2d 40 (D.D.C. 2007); and *Azadeh v. Islamic R. of Iran*, Civil Action No. 1:16-cv-1467 (D.D.C. 2018).

## 2.   Hostage Taking under the FSIA

### i. <u>Legal Standard</u>

The FSIA derives its definition of hostage taking from the International Convention Against the Taking of Hostages, *see* 28 U.S.C. § 1605(A)(a)(1)-(2), which defines hostage taking as "seiz[ing] or detain[ing] and threaten[ing] to kill, injure, or to continue to detain another person… in order to compel a third party… to do or abstain from doing any act as an explicit or implicit condition for the release of a hostage."[46] Hostage taking thus has two elements: (1) the seizure or detention, and (2) the purpose of achieving "the sort of third-party compulsion described in the [C]onvention." *Simpson v. Libya*, 326 F.3d 230, 235, 359 (D.C. Cir. 2003) (quoting *Price v. Libya*, 294 F.3d 82, 94 (D.C. Cir. 2002)).

### ii. <u>Legal Interpretation of Elements of Hostage Taking</u>

The first element of hostage taking is satisfied as Defendant seized and detained Mr. Alireza Alinejad on September 24, 2019.[47] While initially held in incommunicado detention,[48] it

---

[44] Exhibits 1-5; Exhibit 26; Exhibit 33; and *see generally* Exhibit 60, Declaration Requested to Be Sealed.

[45] Exhibit 56, Expert Declaration of Professor Ali Arab; *See generally*, Exhibit 42, 2021 U.N. Special Rapporteur Report on Human Rights in Iran.

[46] International Convention against the taking of hostages art. 1, Dec. 17, 1979, 1316 U.N.T.S. 205.

[47] Exhibit 40, May 2020 Washington Post article; Exhibit 23, Amnesty International 2019 Annual Report on Iran, p. 4; Exhibit 26, Sept. 2019 Amnesty International article.

[48] Exhibit 1, Declaration of Masih Alinejad, ¶19; Exhibit 26, Sept. 2019 Amnesty Int'l article.

was eventually discovered that Mr. Alinejad was detained in solitary confinement in IRGC-controlled Ward 2A of Evin Prison for the first 225 days of his imprisonment. On May 7, 2020, he was transferred to the political ward of Evin Prison, where he remained until he was granted temporary and conditional leave from prison on August 3, 2021. Mr. Alinejad's release was conditioned on him having no contact with his sister, Plaintiff, and they have not spoken since.[49]

Defendant's actions also satisfy the second element of hostage taking. Prior caselaw under the FSIA affirms that there must be a "quid pro quo" arrangement whereby the hostage would have been released "upon performance or non-performance of any action by that third party." *Price*, supra, at 94. To satisfy the purpose element, "[t]he plaintiff must 'point to [a] nexus between what happened to [the hostages] in [the foreign state] and any concrete concession that [the foreign state] *may* have hoped to extract from the outside world." *Simpson v. Libya,* 470 F.3d 356, 360 (D.C. Cir. 2006) ["*Simpson II*"]. However, the hostage-taker need not communicate their purpose to the outside world. *Id*. Here, the purpose element is satisfied by how the Iranian authorities continued to detain Mr. Alinejad in Iran to compel Plaintiff to cease her activism efforts and her criticism of the Iranian government.

Human rights organizations have documented Iran's systematic practice of detaining political prisoners to silence opposition voices and apply psychological pressure on victims and their supporters no matter how far away.[50] In *Kar* and *Zand*, this Court found "Iran detained Siamak [Pourzand] to pressure [his wife Mehrangiz] Kar to stop publicly criticizing the Iranian regime." *Kar v. Islamic R. of Iran*, Civil Act. No. 19-2070 (JDB), 2022 U.S. Dist. LEXIS 178125, pp. 16-7 (D.D.C. 2022). Ms. Kar was detained in Iran in response to her criticism of the Islamic

---

[49] Exhibit 1, Declaration of Masih Alinejad, ¶¶26, 44; Exhibit 60, Declaration Requested to Be Sealed, ¶¶5-6, 10, 16.
[50] Exhibit 35, FIDH report, pp. 12-3, 27-40, 48-52; *see generally* Exhibit 56, Expert Declaration of Ali Arab; *see also* Exhibit 28, Oct. 2016 Reporters Without Borders article ("What the Iranian government is doing with journalists' families who remain in Iran is tantamount to taking the families of European and US citizens hostage.").

regime on charges of acting against national security and disseminating propaganda against the regime. Mr. Pourzand was initially detained after she was released from prison on medical leave. He "reportedly called Ms. Kar and the family in the United States on several occasions and begged them to stop their continued advocacy and press efforts on his behalf." *Id*. This Court found sufficient evidence "to conclude that there was a 'nexus' between both periods of Siamak's detention and Iran's attempts to compel Kar" based on expert statements such as that "plaintiffs' claim that [Siamak] was detained in an effort by government officials to undermine and coerce his wife is consistent with other instances of blackmail against family members of political dissidents in the Islamic Republic". *Id.*, citing *Price*, supra, at 94.

Here, there is similarly a nexus between Mr. Alinejad's detention and Iran's attempts to compel Plaintiff to halt her advocacy as an implicit condition for his release. Mr. Alinejad predicted his arrest in a courageous September 2019 video message to his sister, Plaintiff, to be released in the event of his arrest, as Defendant increased their pressure on the Alinejad family,[51] "calling us non-stop" and coming to their family home to persuade them to make public statements against Plaintiff and disown her on national television through threats and bribery.[52] In the video, he informed Plaintiff that their mother was considering succumbing to this pressure by making a statement for the "sake of the family" and to hopefully spare him from arrest after she had been interrogated by the authorities several times. Mr. Alinejad bravely assured Plaintiff that he had "no fear of being arrested" or "imprisoned" and encouraged her to continue her activism.[53]

---

[51] This pressure did not begin in 2019, but has developed for years prior. For instance, in 2018, Plaintiff's sister, Ms. Mina Alinejad, publicly denounced Plaintiff on Iranian state television, which Plaintiff reasonably believes was a coerced statement, *see* Exhibit 1, Declaration of Masih Alinejad, ¶14; Exhibit 3, Declaration of Roya Hakakian, ¶4.
[52] *See* Exhibit 1, Declaration of Masih Alinejad, ¶14; Exhibit 3, Declaration of Roya Hakakian, ¶4; *see also* Exhibit 56, Expert Declaration of Ali Arab, pp. 30-1.
[53] Exhibit 20, Alireza Youtube Video Transcript (English).

He was indeed detained just days later, and on the same day as two siblings of Plaintiff's former husband, Mr. Hadi Lotfi and Ms. Leila Lotfi, who were released after one day and two weeks of detention, respectively. Mr. Lotfi confirmed that during his detention IRGC agents interrogated him about Plaintiff's activities and threatened that any future contact with her would be considered a criminal offense.[54]

The facts of his detention, charges, and sentencing further indicate their purpose was related to Plaintiff. In June 2020, approximately ten months after his arrest, Mr. Alinejad was finally informed of the charges against him,[55] found guilty of them, and in July 2020 sentenced to eight years in prison for, insulting the Supreme Leader, propaganda against the Islamic Republic of Iran; and association and collusion to commit crimes against internal and external security.[56] The sentencing order, in which the court also sentenced Ms. Lotfi for her affiliation with Plaintiff, specifically and explicitly linked his detention and sentencing to Plaintiff's activism.

> "Alireza Alinejad is recognized as the liaison and the main arm of the leader of the opposition to the system, Masih Alinejad . . . investigations show that he was in charge of directing, guiding, and persuading Masih Alinejad in organizing anti-cultural actions and security activities, and he has been instrumental in regard to the qualitative and quantitative measures and effectiveness of Masih's anti-cultural and subversive actions aiming at improving the level of feedback and effectiveness of measures in the field of publishing criminal content."[57]

Further, both while detained and upon his eventual release, the Iranian authorities threatened both him and his and Plaintiff's mother against contacting Plaintiff.[58] Shortly after his arrest, their mother was interrogated for hours about her conversations with Plaintiff. Since these

---

[54] Exhibit 26, Sept. 2019 Amnesty International article.

[55] Exhibit 26, Sept. 2019 Amnesty International article. ("The authorities have refused to disclose the whereabout of Alireza Alinejad [...] and the reason for [his] arrest[]. Amnesty International believes that they may be at risk of torture and other ill-treatment.").

[56] Exhibit 21, Alireza Alinejad Order.

[57] Exhibit 21, Alireza Alinejad Order.

[58] Exhibit 1, Declaration of Masih Alinejad, ¶¶26, 36-7, 44; *see also* Exhibit 26, Sept. 2019 Amnesty International article; Exhibit 60, Declaration Requested to Be Sealed, ¶16.

interrogations, the only contact Plaintiff has had with her mother was a brief phone call in early 2021 during which her mother warned her to not travel abroad before disconnecting the call.[59]

Mr. Alinejad's arrest, conviction, sentencing, and ongoing imprisonment were intended by Defendant to compel Plaintiff to abstain from speaking out against the Islamic regime. Mr. Alinejad was only conditionally released in August 2021 after increased international attention on his case and pressure mounted. In July 2021 the U.S. government publicly revealed a plot by Iran's Ministry of Intelligence to kidnap Plaintiff from her home in New York.[60] This failed attempt to kidnap her, Plaintiff's continued activism during her brother's detention, and mounting international pressure forced Defendant to recognize that they could not halt Plaintiff's activism work through the detention and ill-treatment of her brother, and that she would not stop her work in exchange for his release. As a result, Mr. Alinejad was released in August 2021, on the condition that he does not contact his sister.[61] This conduct is consistent with Defendant's systematic practice of hostage taking against dissidents and political prisoners.[62]

The explicit grounds of Mr. Alinejad's sentencing, the authorities' explicit threats warning him to not communicate with Plaintiff, the authorities' implicit intent to put pressure on Plaintiff to cease her anti-regime activism in exchange for her brother's release, and her brother's conditional release upon Defendant's failure to compel Plaintiff to halt her activities demonstrate that Defendant has targeted Plaintiff through the hostage taking of her brother.

### 3. Torture Under the FSIA

Defendant tortured Mr. Alinejad from September 24, 2019 until August 3, 2021.

### i. Legal Standard

---

[59] Exhibit 1, Declaration of Masih Alinejad, ¶37.
[60] Exhibit 41, 2021 U.S. Dep't of Justice Press Release; Exhibit 38, Aug. 2020 Washington Post article.
[61] Exhibit 1, Declaration of Masih Alinejad, ¶¶26, 44; Exhibit 60, Declaration Requested to Be Sealed, ¶¶16-7.
[62] Exhibit 56, Expert Declaration of Ali Arab, pp. 17-20, 31-2.

The FSIA imports the definition of torture found in the Torture Victim Protection Act ("TVPA"). 28 U.S.C. § 1605A(h)(7). Under the TVPA, that definition states in pertinent part:

> (1)    the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; . . .  28 U.S.C. § 1350.

Caselaw under the FSIA has recognized acts with both physical and psychological effects as torture. *See e.g., Frost v. Islamic R. of Iran*, 383 F. Supp. 3d 33, 94-5 (D.D.C. 2019) ("[P]sychological torture — involving electrocution and mock executions that put the victims in constant fear of imminent death — was intended to "break" the individuals and elicit statements contrary to their most fundamental beliefs."); *Azadeh*, supra, at 11-2 (finding Iran tortured plaintiff by confining her in a small cell with poor light and toilet facilities, denying her medical care, and interrogating and threatening her); *Moradi v. Islamic R. of Iran*, 77 F. Supp. 3d 57, 67-68 (D.D.C. 2015) (finding mental torture based on threats to kill if prisoner refused to confess); *Daliberti v. Iraq*, 146 F. Supp. 2d 19, 25 (D.D.C. 2001) (finding torture based on prisoners being held at gunpoint, threatened with physical injury for failing to confess, and held with no bed, window, light, electricity, water, toilet or sanitary facilities).

In a 2020 report, the U.N. Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment ("Special Rapporteur") noted that their mandate "has long recognized 'psychological' or 'mental' torture as an analytical concept distinct from physical torture" and that the Committee against Torture rejects the approach that psychological torture is "torture light" or that "in order to constitute torture, mental pain or suffering must be caused by

the threat or infliction of physical pain or suffering, threats of imminent death, or profound mental disruption." Rather, the Special Rapporteur offers the following definition:

> "[P]sychological torture" should be interpreted to include all methods, techniques and circumstances which intend or are designed to purposefully inflict severe mental pain or suffering without using the conduit or effect of severe physical pain or suffering. […] "[P]hysical torture" should be interpreted to include all methods, techniques and environments which intend or are designed to purposefully inflict severe physical pain or suffering, regardless of the parallel infliction of mental pain or suffering."[63]

Iran's frequent use of psychological torture against political prisoners has been heavily documented by the United Nations,[64] the American Bar Association,[65] and international NGOs such as Freedom from Torture,[66] Human Rights Watch,[67] and Amnesty International.[68] Furthermore, methods of psychological torture can often overlap with forms of physical torture:

> "A distinctive feature of torture in Iran is the level of psychological torture . . . While we distinguish between physical, sexual and psychological/ environmental torture, it is important to note that these labels are, to an extent, artificial. This is because forms of physical torture often have a strong psychological component, for example sexual assault, while psychological or environmental torture may have physical components."[69]

The Special Rapporteur identified the following classifications of psychological torture:

- Security (inducing fear, phobia and anxiety);
- Self-determination (domination and subjugation);
- Dignity and identity (humiliation, breach of privacy and sexual integrity);
- Environmental orientation (sensory manipulation);
- Social and emotional rapport (isolation, exclusion, betrayal);
- Communal trust (institutional arbitrariness and persecution);

---

[63] Exhibit 43, 2020 Report of the U.N. Special Rapporteur, ¶19.

[64] *See generally Id.*

[65] *See* Exhibit 44, American Bar Association report, pp. 766–67 ("In fact, all sources […] reported 'that ill-treatment and torture, both physical and psychological, continued to be common in Iranian prisons' [...] Former prisoners have complained of incommunicado or solitary confinement, not…to punish misdemeanors related to the prison regime, but as part of a method of obtaining confessions or information. According to witnesses with personal experience, the morale and mental health of the prisoners suffer on account of this treatment.").

[66] *See generally* Exhibit 45, Freedom from Torture report.

[67] *See generally* Exhibit 27, Human Rights Watch report.

[68] Exhibit 33, 2020 A.I. report, p. 47; Exhibit 46, 1987 A.I. report, p. 18 ("Torture in the Islamic Republic of Iran remains of major concern to Amnesty International […] [which] has received hundreds of reports of torture and ill-treatment in Iranian prisons and detention centres in recent years. The detailed nature of these reports, their number and their consistency have forced Amnesty [] to conclude that torture, both physical and psychological, has been commonly inflicted, and at certain periods in certain prisons and detention centres has been a routine practice.").

[69] Exhibit 45, Freedom from Torture report, pp. 9, 37.

- Torturous environments (accumulation of stressors).[70]

### ii. Legal Interpretation of Elements of Torture

#### a. Mr. Alinejad was in Defendant's custody and control

Custody or physical control refers to acts of arrest and detention in prisons or comparable facilities, but also extends to the deprivation of liberty or coercion by "serious and immediate threats." The Special Rapporteur defines the standard under the Convention against Torture as facts giving rise to the de facto "powerlessness" of the torture victim.[71]

The Special Rapporteur asserts that "powerlessness" is a prerequisite of torture and refers to when a victim is "'at least under the factual power or control of the person inflicting the pain or suffering', and where the perpetrator uses this unequal and powerful situation to achieve a certain effect, such as the extraction of information, intimidation, or punishment". The Special Rapporteur notes that "powerlessness" can arise through physical or non-physical custody.[72]

"Powerlessness" can result when a victim is under "direct physical [control] of the perpetrator and has lost the capacity to resist or escape the infliction of pain or suffering".[73] This can occur through deprivation of liberty, such as arrest, detention, and institutionalization. In the absence of physical custody, "powerlessness" can also result from the "complete subjugation of the victim irrespective of physical distance".[74] This can take various forms, including victims' deprivation of legal capacity, "when one's exercise of decision-making […] is taken away", serious and immediate threats or coercive control, and "state-sponsored persecution depriving victims of any possibility to effectively resis[t] or escap[e] their abuse".[75]

---

[70] Exhibit 43, 2020 Report of the U.N. Special Rapporteur, ¶¶85-6.
[71] *Id*., at ¶¶30, 39-40.
[72] *Id*., at ¶39; Exhibit 47, 2010 Special Rapporteur Report, ¶60; Exhibit 48, 2008 U.N.S.G. Note, ¶50.
[73] Exhibit 49, 2017 U.N.S.G. Note, ¶31.
[74] *Id*., at ¶51.
[75] *Id*., at ¶40; Exhibit 48, 2008 U.N.S.G. Note, ¶50; Exhibit 50, 2019 U.N.S.G. Note, ¶¶32-4.

While prior FSIA caselaw does not provide a definition of custody or physical control, it has indicated that a plaintiff must demonstrate at minimum a restriction on movement. For example, in *Valore*, this Court found that defendants did not engage in torture in carrying out a terrorist bombing because they never had custody or physical control over the victims. *Valore v. Islamic R. of Iran*, 700 F. Supp. 2d 52, 74 (D.D.C. 2010). In *Radmanesh*, the plaintiff alleged he was tortured by Iran while barred from leaving Iran. This Court found that the defendant did not torture the plaintiff because there was no evidence that he was in Iran's custody or under their physical control; plaintiff was able to attend school and move freely within Iran. *Radmanesh v. Islamic R. of Iran*, Case No. 17-cv-1708, p. 12 (GMH) (D.D.C. 2019).

Unlike Mr. Radmanesh, Iran's control and physical custody of Mr. Alinejad meets the Special Rapporteur's definition and the FSIA's minimum standard of "powerlessness". He was arrested on September 24, 2019, and detained in Evin Prison until August 3, 2021. During this time, he was deprived of numerous liberties, including through initially being held in incommunicado detention,[76] the denial of the right to representation and then the right to choose his own legal representation,[77] always being supervised when calling family members, the inability to contact Plaintiff, [78] repeated and intense interrogations about his relationship with Plaintiff,[79] and the denial of medical treatment for illnesses and a severe ear infection developed in prison.[80] During this time in Evin Prison, he was in the exclusive custody and physical control of Iran.[81]

## b. Defendant inflicted severe pain and suffering on Mr. Alinejad

---

[76] Exhibit 1, Declaration of Masih Alinejad, ¶19; Exhibit 26, Sept. 2019 Amnesty International article.

[77] *See* Exhibit 1, Declaration of Masih Alinejad, ¶22; Exhibit 60, Declaration Requested to Be Sealed, ¶2.

[78] Exhibit 1, Declaration of Masih Alinejad, ¶26; Exhibit 60, Declaration Requested to Be Sealed, ¶5.

[79] Exhibit 1, Declaration of Masih Alinejad, ¶22; Exhibit 60, Declaration Requested to Be Sealed, ¶5-9.

[80] Exhibit 1, Declaration of Masih Alinejad, ¶25; Exhibit 60, Declaration Requested to Be Sealed, ¶8.

[81] This Court found in *Kar v. Islamic R. of Iran*, Civil Act. No. 19-2070 (JDB), 2022 U.S. Dt. LEXIS 178125, pp. 18 (D.D.C. 2022) that the direct victim of hostage taking and torture was "under Iran's control both when Iran held him in various detention facilities and while he was detained on home confinement as his freedom was severely limited."

Under the FSIA, an act amounts to torture only if it causes severe pain and suffering. In *Price v. Socialist People's Libyan Arab Jamarihiriya*, the D.C. Circuit analyzed the drafting history of the TVPA, which showed that the term "torture" must be used only for acts of a certain gravity, "usually reserved for extreme, deliberate, and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." *See Price*, supra, at 92-3.

Severity of pain and suffering under the FSIA has been assessed as a matter of degree: "[T]he more intense, lasting, or heinous the agony, the more likely it is to be torture." *Id.*, at 93. Mr. Alinejad's severe pain and suffering by Iran lasted throughout his detention. His severe physical pain and suffering resulted from the denial of medical care for illnesses acquired in detention, such as a severe ear infection. His around-the-clock interrogations were never paused to tend to his illnesses, and he was never provided adequate specialist care. When he was eventually allowed to access the medical clinic in Evin Prison, he was only entitled to delayed and limited treatment. These repeated denials of adequate medical care resulted in the serious deterioration of his health.[82] This Court has recognized such denials of medical care for injuries and illnesses caused by Iran as torture. *See Azadeh*, supra, at 11-12; *Hekmati*, supra, at 150-54; *Kilburn v. Islamic R. of Iran*, 699 F. Supp. 2d 136, 152 (D.D.C. 2010); *Sutherland v. Islamic R. of Iran,* 151 F. Supp. 2d 27, 34-38, 45 (D.D.C. 2001); *Anderson v. Islamic R. Iran*, 90 F. Supp. 2d 107, 109-111, 113 (D.D.C. 2000) (finding unsanitary conditions in confinement by Iran constituted torture). As former Amnesty International researcher Drewery Dyke wrote in reference to Iran, "Unfair justice systems […] purposefully wear [prisoners] down, and by delaying and denying

---

[82] *See* Exhibit 1, Declaration of Masih Alinejad, ¶25; Exhibit 60, Declaration Requested to Be Sealed, ¶8.

medical care, they hasten their death."[83] According to Amnesty International, Iran's purposeful withholding of medical care for prisoners constitutes torture.[84]

During his detention, Mr. Alinejad also endured severe mental pain and suffering. In addition to relentless interrogations, primarily about his relationship with his sister,[85] prison guards and interrogators constantly threatened that if he would not cooperate with them against his sister, either by making false confessions or assisting in a renewed effort to kidnap his sister, then they would (1) torture his parents and other family members, (2) convict him with crimes against Islam that carry the death penalty, (3) force his wife to divorce him and use abusive and harsh tactics against his toddler, and (4) publish false and shameful information against his character.[86]

In Evin Prison, Mr. Alinejad was also held in prolonged solitary confinement, in excess of 15 consecutive days, which under international law amounts to torture and is always prohibited.[87] Evin Prison is internationally recognized as a site of human rights abuses, including prolonged solitary confinement: "Human rights organizations frequently cited some prison facilities, including Evin Prison in Tehran […] for their use of cruel and prolonged torture of political opponents, […] reportedly controlled by the [IRGC]."[88] The use of solitary confinement as torture intended to break the spirit of prisoners and coerce confessions has been widely reported by Iranian political prisoners and international human rights organizations:

> "In Iran, intellectuals, writers, activists and detainees themselves use the term "white torture" to refer to the use of incommunicado solitary confinement […] designed to break the resolve of detainees such that they capitulate and agree to be videotaped, sign confessions, and give information regarding their political affiliations and associates. Prisoners are held in solitary cell blocks, many in secret detention centers, often

---

[83] *See* Exhibit 51, 2011 Amnesty International article.

[84] *See* Exhibit 52, 2016 Amnesty International report, pp. 6, 23-4.

[85] *See* Exhibit 1, Declaration of Masih Alinejad, ¶22.

[86] Exhibit 60, Declaration Requested to Be Sealed, ¶7.

[87] Exhibit 53, 2003 U.N. Working Group on Arbitrary Detention report, ¶55 (citing Exhibit 27, Human Rights Watch Report, p. 20); *see also* Rules 43-4 https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf.

[88] Exhibit 17, 2019 U.S. Dep't of State Custom Report Excerpts: Iran, p. 7.

underground, with twenty-four-hour artificial light. They are denied communication with other prisoners and access to attorneys, family members, and medical health professionals. […] Former prisoners emphasized that the increasing use of solitary confinement against those who criticize the government sends a message to others who might consider engaging in political expression: it is not worth it."[89]

Former detainees in Evin Prison have shared that "their time in absolute solitary was far worse than any physical or verbal abuse they experienced. They spoke of fear of losing their minds and worrying that another day without any human contact would break their will." [90]

Mr. Alinejad was held in solitary confinement for the first 225 days of his imprisonment in Ward 2A of Evin Prison. He was held in a small and dirty cell, barely longer than his height, with only a blanket and toilet inside. The only window in the cell was on the cell door, and he was deprived of open-air time, always held in either his cell or an interrogation room.[91] His mental suffering included depression,[92] and was exacerbated by constant threats of his own execution and threats against his loved ones' well-being,[93] which the Special Rapporteur has determined constitutes its own form of psychological torture.[94]

### c. Defendant intentionally inflicted severe pain and suffering on Mr. Alinejad to punish him for his suspected acts, intimidate him and other dissidents, and extract confessions.

The definition of torture under the TVPA, adopted by the FSIA, requires that the perpetrator intentionally inflicts severe pain and suffering for:

"such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has

---

[89] Exhibit 27, Human Rights Watch Report, p. 19; *see also*, Exhibit 56, Expert Declaration of Ali Arab, pp. 13, 23-6.
[90] *Id.*
[91] Exhibit 60, Declaration Requested to Be Sealed, ¶¶6, 10.
[92] Exhibit 1, Declaration of Masih Alinejad, ¶24.
[93] Exhibit 60, Declaration Requested to Be Sealed, ¶7.
[94] Exhibit 43, 2020 Report of the U.N. Special Rapporteur, ¶47 ("Perhaps the most rudimentary method of psychological torture is the deliberate and purposeful infliction of fear. […] In practice, fear can be induced through a virtually limitless variety of techniques; some of the most common include the following: […] Withholding or misrepresenting information about the fate of the victims or their loved ones, mock executions, witnessing the real or purported killing or torture of others".).

committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind".[95]

To satisfy this requirement, "suffering alone is insufficient"; instead, "the defendant must have targeted the victim". *Kim,* supra, at 1050; quoted in *Radmanesh*, supra, at 17.

Defendant intentionally inflicted severe pain and suffering on Mr. Alinejad to (1) punish him for his suspected acts; (2) intimidate and deter him and other dissidents, including Plaintiff, from challenging the regime; and (3) extract confessions from him. Many of the authorities' acts against him were intentionally inflicted to achieve multiple of these ends simultaneously.

The initial circumstances of Mr. Alinejad's imprisonment indicate that his torture was intended to punish him for his relationship with Plaintiff. As discussed above, just days after recording a video in which he anticipated Iran's retaliation against him for his sister's activism, he was detained on the same day as the siblings of Plaintiff's former husband, one of whom confirmed he was interrogated about Plaintiff's activities and threatened that any future contact with her would be considered a criminal offense.[96]

Defendant's intention to punish Mr. Alinejad was made even clearer throughout his detention. During interrogations, the Iranian authorities threatened him against contacting Plaintiff.[97] Further, his June through July 2020 indictment, trial, conviction, and eight-year sentence for insulting the Supreme Leader, propaganda against the Islamic Republic of Iran, and association and collusion to commit crimes against internal and external security,[98] which included acts of prolonged solitary confinement, intense interrogations, and denials of medical treatment, were explicitly linked by the court to Plaintiff's activism:

---

[95] *See* Torture Victim Protection Act of 1991, 28 U.S.C. § 1350(3)(b)(1) (1991).
[96] Exhibit 26, Sept. 2019 Amnesty International article.
[97] Exhibit 1, Declaration of Masih Alinejad, ¶¶26, 36-7; Exhibit 60, Declaration Requested to Be Sealed, ¶9.
[98] Exhibit 21, Alireza Alinejad Order; Exhibit 26, Sept. 2019 Amnesty International article ("The authorities have refused to disclose the whereabout of Alireza Alinejad […] and the reason for [his] arrest[]. Amnesty International believes that they may be at risk of torture and other ill-treatment.").

"Alireza Alinejad is recognized as the liaison and the main arm of the leader of the opposition to the system, Masih Alinejad . . . investigations show that he was in charge of directing, guiding, and persuading Masih Alinejad in organizing anti-cultural actions and security activities, and he has been instrumental in regard to the qualitative and quantitative measures and effectiveness of Masih's anti-cultural and subversive actions aiming at improving the level of feedback and effectiveness of measures in the field of publishing criminal content."[99]

Throughout his detention, Iran's ruthless acts against Mr. Alinejad were also intended to extract confessions from him. During his 225 days in prolonged solitary confinement, he was subjected to relentless interrogations during which the authorities pressured him to speak out against Plaintiff and confess to false crimes that would falsely implicate her and pressure her into silence. His interrogators specifically tried to: (1) obtain from Mr. Alinejad on-the-record forced confessions against his sister, admitting that she is working as a CIA agent with a wide network in Iran working against the government; (2) obtain from Mr. Alinejad a forced confession that he betrayed the country by revealing to his sister their plan to lure her to Turkey for them to kidnap her; and (3) force Mr. Alinejad to compensate for his alleged betrayal of the Islamic Republic by cooperating with them in either a renewed attempt to arrest his sister or a new program for the IRGC's benefit. His failure to comply is what led to his eventual charges, conviction, and sentencing approximately ten months after his arrest, indicating that their ongoing abuses against him were intended to push him to the point of confessing.[100] *See e.g. Azadeh*, supra, at 11-2.

These acts, and the above-described mistreatment causing Mr. Alinejad severe pain and suffering, were also carried out to intimidate, discredit, and deter him and other dissidents from calling for reform in Iran, including Plaintiff. By holding Mr. Alinejad, who Defendant knew to be beloved by Plaintiff, in incommunicado detention, refusing to disclose his whereabouts and reason for arrest, detaining him in prolonged solitary confinement, attempting to force him to

---

[99] Exhibit 21, Alireza Alinejad Order.
[100] Exhibit 60, Declaration Requested to Be Sealed, ¶9-12.

confess to false crimes, threatening him and Plaintiff's other family members, and denying him necessary medical treatment,[101] Defendant intentionally aimed to intimidate Plaintiff into silence, discredit her activism, and deter her from continuing her activism out of fear for Defendant's continued retaliation against her brother.

These facts of Defendant's relentless and intentional infliction of severe pain and suffering on Mr. Alinejad — with the purpose of punishing, intimidating, and forcing confession from him and other dissidents, including Plaintiff — sufficiently establish Iran's torture of him.

### iii. **As Defendant has not appeared to answer for their conduct, the Court may infer that Mr. Alinejad was tortured from the "compelling, admissible evidence" that the Islamic Republic of Iran routinely tortures its prisoners.**

This Circuit has held that when hostage-takers have not answered for their conduct, the Court may infer the hostage was tortured from "compelling, admissible evidence" that the regime at issue routinely tortures its prisoners due to the unavailability of direct evidence. *See Kim*, supra, at 1048; *Owens*, supra, at 787–89. Human rights organizations have documented Iran's torture of its prisoners. In 2019, Amnesty International found that "[t]orture and other ill-treatment, including prolonged solitary confinement, remained widespread and systematic, especially during interrogations […] Prisoners of conscience were deliberately denied adequate medical care, often as punishment […] The Islamic Penal Code continued to provide for corporal judicial punishment amounting to torture, including flogging, blinding and amputation."[102]

---

[101] Exhibit 1, Declaration of Masih Alinejad, ¶19; Exhibit 26, Sept. 2019 Amnesty Int'l article; Exhibit 60, Declaration Requested to Be Sealed, ¶8.
[102] *See* Exhibit 23, Amnesty International 2019 Annual Report on Iran; *see also* Exhibit 56, Expert Declaration of Ali Arab, pp. 22-5.

Further, the U.S. has confirmed Iran's systematic abuses against its prisoners.[103] In a 2019 report, the U.S. State Department described "significant human rights issues" in Iran including "systematic use of arbitrary detention and imprisonment; harsh and life-threatening prison conditions; hundreds of political prisoners"; and "torture by government agents". They elaborated on credible reports of torture, describing how "security forces and prison personnel tortured and abused detainees and prisoners throughout the year". They mentioned Evin Prison as an IRGC-controlled facility employing "cruel and prolonged torture of political opponents".[104]

This practice has proven to be systematic and unrelenting in Iran. In a 2020 report, during Mr. Alinejad's detention, the U.N. Special Rapporteur on the situation of human rights in Iran documented Iran's practice of torturing political prisoners and identified Mr. Alinejad as an individual at risk.[105] One of many examples is that of Mr. Siamak Pourzand who, as discussed above, this Court found Iran detained to pressure his wife, an outspoken activist against the Islamic regime, to stop publicly criticizing the regime. *Kar*, supra, at 16-7.  This Court found in *Kar* and *Zand* that it "'can assume that [Iran] probably tortured' Siamak on the basis of compelling admissible evidence that Iran routinely tortures the people it abducts", *Id.*, at 20, quoting *Kim*, supra, at 1049, and that the plaintiffs submitted sufficient evidence to support this.

Mr. Alinejad's imprisonment arose under similar circumstances to Mr. Pourzand's. Both men were public about their anti-regime stances in their own rights, targeted for their stances and the stances of their loved ones, imprisoned, and subjected to denials of due process, horrific living conditions, and the constant threat of additional charges and execution to achieve multiple ends,

---

[103] Exhibit 35, FIDH report, pp. 12-3, 27-40, 48-52; *See generally*, Exhibit 26, Sept. 2019 Amnesty International article; Exhibit 55, U.S. Dep't of State Diplomacy in Action 2004 Report; Exhibit 17; Exhibit 54, Amnesty International 2020-2021 Iran Human Rights Report.
[104] Exhibit 31, U.S. Dep't of State 2018 Iran Action Group report; Exhibit 17, pp. 2, 6-8 (finding credible reports of Iran's regular use of torture in Evin Prison which hosts many of Iran's political prisoners, including amputations, blinding, flogging, denial of medical care and visitation, and mental and physical torture to coerce confessions).
[105] Exhibit 24, Jan. 2020 Special Rapporteur report, p. 10–13.

including silencing their loved ones. Further, both Mr. Pourzand and Mr. Alinejad were and are unable to freely share the full extent of their torture, although for different reasons. While Mr. Pourzand had a questionable death in home confinement, Mr. Alinejad is on temporary leave from detention on the condition that he does not contact his sister, and he may be returned to prison at any time even if he does not contact her.[106]

Given the length of Mr. Alinejad's detention as a political opponent of the Iranian regime, it is likely that he was tortured in detention due to Iran's systematic practices alone, even without the substantial indirect evidence presented throughout this motion.

### B. Other Prerequisites for Subject Matter Jurisdiction

The other requirements for this Court's subject matter jurisdiction under 28 U.S.C. § 1605A are fully satisfied in this action.

#### 1. Iran is a State Sponsor of Terrorism

Iran was formally declared a state sponsor of terrorism on January 19, 1984, in accordance with section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App 2405(j). S*ee* 49 Fed. Reg. 2836-02; 22 U.S.C. §2656f(a). Iran has maintained this designation since 1984.[107]

#### 2. Plaintiff is a National of the United States

Plaintiff was granted status as a political asylee and has been a permanent resident of the U.S. since July 24, 2014.[108] She became a naturalized U.S. citizen on October 17, 2019,[109] just three weeks after Mr. Alinejad was arrested on September 24, 2019. Thus, plaintiff was a U.S. national for the majority of Mr. Alinejad's hostage taking and torture by Defendant.

#### 3. Plaintiff Afforded Iran an Opportunity to Arbitrate

---

[106] Exhibit 1, Declaration of Masih Alinejad, ¶¶26, 45; Exhibit 60, Declaration Requested to Be Sealed, ¶16.
[107] *See* Exhibit 29, U.S. Department of State, *State Sponsors of Terrorism*; *see also* Exhibit 30, U.S. Department of State, *2019 Country Reports on Terrorism*.
[108] Exhibit 1, Declaration of Masih Alinejad, ¶1.
[109] Exhibit 6, Masih Alinejad Certificate of Naturalization.

Plaintiff offered Defendant a reasonable opportunity to arbitrate the claims in this action. The offer to arbitrate required by the statute "need not precede the filing of the complaint." *See Simpson*, supra, at 233 (holding that an offer to arbitrate made after the filing of the complaint was a reasonable offer).

On September 25, 2020, Plaintiff's counsel sent an Offer to Arbitrate via certified mail to Iran's U.N. ambassador and to the Interests Section of the Islamic Republic of Iran in Washington, DC.[110] This Offer fully satisfies the FSIA's offer to arbitrate requirement. *See Asemani v. Islamic R. of Iran*, 266 F. Supp. 2d 24 (D.D.C. 2003) (finding that service of an offer to arbitrate on the Iranian interest section at the Pakistani embassy in Washington, D.C. is sufficient).

## IV. LIABILITY AND SCOPE OF DAMAGES

The FSIA authorizes a private right of action against a state sponsor of terrorism and provides that the foreign state shall be liable to a United States national or their legal representative for personal injury or death caused by the foreign state's torture or hostage taking, even if committed by an official, employee or agent of the foreign state. The statute allows the recovery of money damages for a variety of claims, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. §1605A(a)(2)(A)(i) and (c).

Plaintiff brings claims to recover for solatium and punitive damages. Factors to be considered in determining appropriate awards include the cause of action, claimants' individual circumstances, and the history of awards in this circuit for similarly situated claimants. *See Kim v. Dem. R. of Korea*, 87 F. Supp. 3d 286, 290-91 (D.C. Cir. 2015) ["*Kim II*"].

### A.  Liability for Solatium Damages

#### 1. <u>Legal Standard</u>

---

[110] *See* Exhibit 9, Plaintiff's Offer to Arbitrate and Electronic U.S.P.S. Certified Mail Return Receipt.

Under the FSIA, claims for solatium damages "are functionally identical to claims for intentional infliction of emotional distress." *Spencer v. Islamic R. of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014). They provide compensation "for mental anguish, bereavement and grief that those with a close personal relationship" to a decedent or person held hostage and tortured endured. They are also appropriate to compensate those closely-related persons for "harm caused by the loss of the decedent's society and comfort." *Moradi*, supra, at 72, quoting *Oveissi v. Islamic R. of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011).

In awarding solatium damages, "[c]ourts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages". *Kim II*, supra, at 290; *see also Anderson*, supra, at 114 (awarding solatium damages to the family of a victim who was tortured and held for 6.5 years); *Cicippio v. Islamic R. of Iran*, 18 F. Supp. 2d 62, 70 (D.D.C. 1998) (awarding solatium damages to the wife of a torture victim held for 44 months). Plaintiff meets all of the statutory requirements for such compensation. Furthermore, for claimants like Plaintiff, related to a physically and psychologically injured victim, courts typically adhere to the following remedial scale: "$4 million, $2.5 million, $1.5 million, and $1.25 million to spouses, parents, children and siblings, respectively." *Davis v. Islamic R. of Iran*, 882 F. Supp. 2d 7, 12, 14 (D.D.C. 2012) (quoting *Oveissi*, supra, at 26).

This scale does not provide maximum caps, but instead provides guidance to promote uniformity and fairness for similarly-situated plaintiffs. Indeed, recognizing that "[e]ach victim's suffering is unique," and that "comparing the severity of the mental anguish endured by one victim to another is undoubtedly an inexact science," *Brewer v. Islamic R. of Iran*, 664 F. Supp. 2d 43, 57 (D.D.C. 2009), courts have deviated from these baseline numbers where circumstances dictate. *See Warmbier*, supra at 42. Specifically, courts have enhanced awards for loss of solatium in (1)

"aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering, such as cases involving torture or kidnapping of a spouse," *Greenbaum v. Islamic R. of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006); (2) where the "evidence establish[es] an especially close relationship," *Spencer*, supra, at 28, when compared to "the normal interactions to be expected given the familial relationship," *Oveissi*, supra, at 26-27; (3) in the presence of "medical proof of severe pain, grief or suffering on behalf of the claimant," *Roth v. Islamic R. of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C. 2015); or (4) where the "circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, supra at 26-7.

Mr. Alinejad was Defendant's prisoner for nearly two years. After his arrest in September 2019, his family, including Plaintiff, had no knowledge of his whereabouts for days and no communication with him for months.[111] Plaintiff is entitled to a non-economic damages award from Defendant for their hostage taking and torture of Mr. Alinejad, as she lived in daily fear of the extent of their mistreatment of her brother for almost two years.[112] She was deprived of his love and company and stuck with the knowledge of his torture and constant risk of unlawful execution. Even now, since his August 2021 conditional release, she remains deprived of her brother's love and company and is stuck with the constant fear of his potential return to detention. Her resulting pain and suffering requires compensation.

### 2. Quantum of Solatium Damages for Plaintiff

Plaintiff grew up in a tiny village in northern Iran as the youngest of five siblings, with Mr. Alinejad just 18 months older than her. As the two youngest, they have always been particularly

---

[111] Exhibit 1, Declaration of Masih Alinejad, ¶¶19-20, 26; Exhibit 60, Declaration Requested to Be Sealed, ¶5.
[112] Exhibit 1, Declaration of Masih Alinejad, ¶¶19-20, 27-30.

close: "My brother […] not only acted as a big brother teaching me little things like riding a bicycle but also introduced me to great works of literature and politics. He was my guardian angel."[113]

Plaintiff has continued to rely on her brother throughout her life as a source of great emotional support while she has been in the public eye as an activist and dissident: "Amid all the threats she was receiving and all the ties she had lost to her most loved ones, Alireza alone could be her lifeline."[114] He has gone lengths to protect her, including by refusing to denounce her before, during, and after his detention, all while knowing it would result in his initial and ongoing harassment, wrongful imprisonment, hostage taking, and torture by the Iranian government.

As a result of Defendant's treatment of her brother, Plaintiff suffers severe emotional trauma and fear. This manifests through anxiety, depression, and symptoms of post-traumatic stress disorder, including difficulty concentrating, difficultly sleeping, and a lack of appetite.[115]

As an internationally recognized figure for women standing against oppression, Plaintiff feels the need to put on a brave face in her public life. However, her loved ones have seen the terrible burden these experiences have placed on her. For instance, her husband watched as she lost more than ten percent of her body weight and endured violent nightmares.[116] Friend and fellow Iranian journalist and dissident Roya Hakakian describes:

> "While she still carries on, those like me who intimately know her can see how the experience has taken a toll on her, though she rarely speaks of it. Her sleep is disturbed when she visits with us. She goes to bed long after everyone else, and is awake before everyone else. She eats less, and works more. She works more dedicatedly than ever, but I've no doubt that it is the work that keeps her from thinking about all that she has lost, and all that she yearns for. A single one of these losses could cripple anyone. But all of them combined carry a sort of lethality that only a cruel system aiming to annihilate another could exercise."[117]

---

[113] Exhibit 1, Declaration of Masih Alinejad, ¶3; *see also* Exhibit 7, Photo of Masih and Alireza Alinejad.

[114] Exhibit 3, Declaration of Roya Hakakian, ¶6; *see generally* Exhibit 1, Declaration of Masih Alinejad.

[115] *See* Exhibit 1, Declaration of Masih Alinejad, ¶¶19–20, 27, 29–32; *see generally* Exhibit 2, Declaration of Kambiz Foroohar; Exhibit 4, Declaration of Ramin Ahmadi, ¶¶ 6–8; Exhibit 3, Declaration of Roya Hakakian; Exhibit 5, Declaration of Mehrangiz Kar.

[116] Exhibit 2, Declaration of Kambiz Foroohar, ¶12.

[117] Exhibit 3, Declaration of Roya Hakakian, ¶8.

Plaintiff's feelings of guilt for her brother's ill-treatment prevent her from enjoying experiences that she knows her brother cannot share.[118] She describes her brother's absence as a "big hole in [her] life" and writes, "[i]f the aim of the Islamic Republic was to hurt me deeply, let me confess that they have succeeded. I have lost my bearings."[119]

In having her brother torn away so unjustly, she has not only suffered from the knowledge of his ill-treatment but has also been deprived of her connection to her family and home in Iran:

> "I miss talking with Alireza in our Mazni dialect and exchanging stories.  In the center of my garden in Brooklyn, I have planted a cherry blossom tree and named it after Alireza. When I feel sad and depressed, which is quite often these days, I go outside and talk to the tree as if it was Alireza. It's a one-way conversation but at least I get to pretend that I'm talking with my brother. I've planted a cherry tree for my mother and a peach tree for my father. These are all to remind me of my birthplace."[120]

To cope with these losses, Plaintiff records daily videos of herself that she hopes to be able to share with her brother one day, in which she talks to him about her life and how much she misses him.[121]

Other dissidents, such as Plaintiff's friend Mehrangiz Kar whose husband Siamak Pourzand was found by this Court to have been held hostage and tortured by Iran, have suffered similar anguish and can attest to the unimaginable impact of Defendant's actions. Ms. Kar writes:

> "Having experienced the same abusive practices at the hands of the Islamic Republic, I know well the pain that she is undergoing. When the regime takes a loved one hostage, every day is filled with feelings of guilt for the harm being visited upon that person due to your actions, and fear for how every word or action you make could cause them further suffering."[122]

This Circuit has presumed "that those in direct lineal relationships with victims of terror suffer compensable mental anguish . . ." *Kim II,* supra at 290. While Plaintiff is entitled to the baseline award of $1.25 million as the sibling of an injured victim, the circumstances of this case

---

[118] *Id.* ¶14.
[119] Exhibit 1, Declaration of Masih Alinejad, ¶27.
[120] *Id.*
[121] *Id.*, at ¶31.
[122] Exhibit 5, Declaration of Mehrangiz Kar, ¶16.

dictate an upward deviation from the baseline award recommended in *Davis* and *Heiser* like those of similarly-situated plaintiffs. Plaintiff is not only "especially close" with Mr. Alinejad, as he was the only relative of hers in Iran who dared to remain in close communication with her and keep her updated on the well-being of her other relatives after she fled to the U.S in exile and as he did not succumb to Defendant's overwhelming pressure to denounce her,[123] but Iran's direct targeting of her "appreciably worsen[s]" her pain and suffering that go beyond the typical circumstances upon siblings in such cases involving hostage taking and torture.

In *Anderson*, the child of Iran's victim was awarded $6.7 million for her suffering during her father's detention over 6.5 years. *Anderson*, supra, at 114. In *Panahi*, the minor children of a victim who was tortured for over three years each received an award of $5 million. *Panahi v. Islamic R. of Iran,* Civil Action No. 19-0006 (ABJ) (D.D.C. 2020). In *Levinson*, the children of a victim tortured for 13 years received an enhancement award of $5 million each. *Levinson et al. v. Islamic R. of Iran*, Civil Action No. 17-511 (TJK) (D.D.C. 2020). Here, Plaintiff is not only the sister of a hostage and torture victim, spending nearly two years in extreme anguish not knowing whether he was being tortured or awaiting execution, but she herself is the political figure who Defendant has sought to compel by means of the harassment, hostage taking, and torture of her family members. Her severe pain and suffering is not merely implicit of her relationship with her brother, but is the direct purpose of Defendant's actions against her brother. As an outspoken political figure and U.S. citizen in exile in the U.S., outside of Iran's jurisdiction, she cannot be imprisoned as a dissenter unless she is kidnapped or voluntarily returns to Iran. Her severe pain and suffering due to Defendant's ill-treatment of her brother has been exacerbated by their direct targeting of her through public slander, publicizing her home address, Iranian parliament members

---

[123] *See* Exhibit 1, Declaration of Masih Alinejad, ¶¶8–9.

calling for her murder,[124] and actual attempts to kidnap and murder her,[125] with increasing death threats against her[126] that have forced her and her husband to live out of safehouses.[127] These direct threats have forced her to further distance herself from her family in a painful and desperate attempt to keep them safe.[128] This distressing reality has made her and her loved ones fearful of different forms of attacks, including kidnappings, executions, and acid attacks, which is a method of silencing female activists that has increased in Iran in recent years.[129]

Thus, Plaintiff should be granted a greater solatium damages award, with an enhancement of $5 million in addition to the $1.25 million baseline award. Plaintiff is also entitled to prejudgment interest. "Whether to award prejudgment interest 'is a question that rests within this Court's discretion, subject to equitable considerations.'" *Oveissi v. Islamic R. of Iran*, 879 F. Supp. 2d 44, 58 (D.D.C. 2012) ["*Oveissi II*"], quoted by *Kar*, supra, at 44. "This Court and several others in this District have previously awarded prejudgment interest on similarly situated plaintiffs' awards, including pain and suffering and solatium." *Id*. This Court held in *Ewan*, "'[a] solatium award is [] best viewed as fixed at the time of the loss', and plaintiffs are entitled to the full amount of their award as if they received it at the time of the injury. […] Failure to do so would also allow the Iranian defendants 'to profit from the use of the money" in the time between plaintiffs' injuries and the damages award. *Ewan v. Islamic R. of Iran*, 466 F. Supp. 3d 236 (D.D.C. 2020), cited by *id*., at 45. The appropriate rate of interest is the prime rate. *Oldham v. Korean Air Lines,* 127 F.3d 43, 54 (D.C. Cir. 1997). Using their loss of solatium amount and the prime rate of 6.25% for 2022,

---

[124] Exhibit 2, Declaration of Kambiz Foroohar, ¶16; and Exhibit 38, Aug. 2020 Washington Post article.
[125] Exhibit 1, Declaration of Masih Alinejad, ¶34, 37; Exhibit 41, 2021 U.S. Dep't of Justice Press Release; and Exhibit 59, NYT article.
[126] Exhibit 36, Masih Alinejad, "Iran's Basij promised to butcher me for fighting compulsory hijab", THE WASHINGTON POST (March 28, 2018); *see also* Exhibit 39, Documentation of Twitter Threats.
[127] Exhibit 1, Declaration of Masih Alinejad, ¶42.
[128] *Id.*, at ¶34.
[129] Exhibit 14, Oct. 2014 ABC News article.

this calculation is simple mathematics. Prejudgment interest for the $6.5 million loss of solatium amounts to $406,250, for a total solatium damages award of $6,906,250 for Plaintiff.[130]

## B. Liability for Economic Damages

Under the FSIA, economic damages may be awarded for personal injury or death caused by a foreign state or its officials, employees or agents acting in an official capacity. 28 U.S.C. § 1605A(c)(4).  Plaintiff reserves the right to raise claims for economic damages based on the circumstances that may arise prior to the resolution of this suit.

## C. Liability for Punitive Damages

### 1. Legal Standard

The FSIA also provides for punitive damages, which are intended to "punish and deter the actions for which they are awarded." *Oveissi II*, supra, at 55-6; *see also Kim,* supra, at 290-91 ("Punitive damages are not meant to compensate the victim, but [are] instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future.") While courts have routinely awarded punitive damages in FSIA cases, they have used different methods in determining an appropriate amount. *See e.g., Warmbier*, supra, at 59-60; *Braun v. Islamic R. of Iran*, 228 F. Supp. 3d 64, 86-7 (D.D.C. 2017). To determine an appropriate method and amount, the Court must consider: "(1) the character of the defendant's act (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause (3) the need for deterrence, and (4) the wealth of the defendants." *Id*. In this case, each of these factors weighs in favor of a substantial punitive damages award.[131]

### 2. Quantum of Punitive Damages

---

[130] J.P. Morgan Chase, Historical Prime Rate (www.jpmorganchase.com/about/our-business/historical-prime-rate).
[131] *Bodoff v. Islamic R. of Iran*, 907 F. Supp. 2d 93, 106 (D.D.C. 2012) ("foreign sovereigns cannot use the constitutional constraints of the Fifth Amendment due process clause to shield themselves from large punitive damages awards.").

First, the character of Defendant's actions in this case is abhorrent and has been characterized by this Court as "the height of barbarism," *Sutherland*, supra, at 52, and "the quintessential embodiment of outrageousness," *Jenco v. Islamic R. of Iran*, 154 F. Supp. 2d 27, 38 (D.D.C. 2001). Actions characterized by such systematic "barbarism" must be punished.

Second, the nature and extent of harm Defendant caused Plaintiff is severe, prolonged, and immeasurable. For the entirety of Mr. Alinejad's hostage taking and torture, Plaintiff suffered severe trauma, which she will continue to live with for the rest of her life.[132]

Third, there is an urgent and ongoing need to deter Defendant's behavior, which is part of a long pattern of arbitrary conduct that violates international law. As the U.S. government's and human rights organizations' reports demonstrate, Iran's behavior will continue unless it is punished and deterred. Indeed, Iran continues to systematically crackdown on critics' freedoms with hostage takings, torture, extrajudicial killings, and a lack of due process during trials. One common example during the same time as Mr. Alinejad's detention is that of dissident and journalist Ruhollah Zam. In October 2019, the IRGC kidnapped Mr. Zam while he was traveling to Iraq and forcibly returned him to Iran.[133] In July 2020, Mr. Zam was sentenced to death on the charge of "spreading corruption on earth" and on December 12, 2020, Iranian state media announced that he had been executed by hanging.[134] Following Mr. Zam's sentencing, Plaintiff was targeted by state newspapers saying, "Masih be ready! You're the next to be kidnapped" and political cartoons warning that she was next on the regime's list.[135] On July 13, 2021, the U.S. government revealed the indictment of four Iranian nationals who were conspiring to forcibly abduct Plaintiff and return her to Iran, and who had been actively surveilling her, her family and

---

[132] *See generally*, Exhibits 1-5.
[133] *See* Exhibit 37, OHCHR Report.
[134] *Id.*
[135] Exhibit 39, Documentation of Twitter Threats; *see* Exhibit 38, Aug. 2020 Washington Post article.

friends, and spying on her residence for months after unsuccessfully attempting to convince her family to lure her to a third country to more easily kidnap her.[136] She was targeted again in July 2022 when a man was found with a loaded AK-47 assault rifle outside her New York home.[137]

Mr. Alinejad is one of many political prisoners arbitrarily and unlawfully arrested, detained, held hostage, and tortured by Iran to quell dissent. Typical in these cases is the lack of due process. In Mr. Alinejad's case, his Judge was Mohammad Moghiseh, known for hearing cases of political prisoners in which he has denied them due process, such as the opportunity to present a defense, insulted and cursed at them, and issued death sentences and long prison terms based on trumped-up charges. Having earned the nickname "The Hanging Judge", and having had an active role in the 1988 executions of political prisoners in Gohardasht Prison, where he was both the judge and warden, the European Union sanctioned him as a human rights violator in 2011, followed by the U.S. Department of the Treasury in 2019.[138] "There would be nothing newsworthy about yet another unwarranted arrest in Iran, except that this one involves an unusual story of familial love, with a brother making a profound sacrifice for the sake of his sister."[139] Iran should be punished for this behavior and deterred from repeating it.

Last, Iran is a vast nation with substantial resources and spends enormous amounts of its wealth, estimated between $300 million and $1 billion, on terrorism-related activities. *Oveissi II*, *supra*, at 56 (awarding $300 million after taking judicial notice that Iran then provided between $300 and $500 million in material support for terrorism).[140] Only a substantial punitive damages award has the capability of punishing and deterring Defendant's behavior.

---

[136] Exhibit 1, Declaration of Masih Alinejad, ¶¶13, 15, 37; Exhibit 41, 2021 U.S. Dep't of Justice Press Release.
[137] Exhibit 59, NYT article.
[138] Exhibit 57, United for Iran, Judge Mohammad Moghiseh; and Exhibit 58 UANI, Mohammad Moghiseh; *see also* U.S. Dep't of the Treasury, Iran-related Designations (December 19, 2019), https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20191219.
[139] Exhibit 40, May 2020 Washington Post article.
[140] *See also* Exhibit 30, U.S. Department of State 2019 Country Reports on Terrorism, pp. 198-99.

While each of these factors weighs in favor of a substantial punitive damages award, this Court has used three main approaches to determine the exact amount of punitive damages to be awarded, while considering these four factors. *See Warmbier*, supra, at 59-60 (discussing each approach), cited in *Levinson*, supra, at 3-6. The first approach is primarily used in cases of "exceptionally deadly attacks", in which the court multiplies the foreign state-defendant's annual expenditures on terrorism by a factor between three and five. *Id*. This approach should not be applied here because, although the hostage taking and torture of Mr. Alinejad was outrageous, it was not "exceptionally deadly" when compared to other cases to which this approach has been applied (*e.g.* a bombing that killed hundreds of people, *see Murphy v. Islamic R. of Iran*, 740 F. Supp. 2d 51, 55 (D.D.C. 2010), and *Davis*, supra, at 17; and in other instances of severe conduct carried out by terrorist organizations, *see e.g. Anderson*, supra, at 114.).

The second approach awards punitive damages in an amount equal to the total compensatory damages. *See e.g. Moradi*, supra, at 73; *Onsongo v. R. of Sudan*, 60 F.Supp.3d 144, 152–53, 2014 WL 3702875, at *6; *Opati v. R. of Sudan,* No. 12–1224, 60 F.Supp.3d 68, 80–82, 2014 WL 3687125, at *8–9 (D.D.C. 2014); and *Hekmati*, supra, at 167. This approach also should not be applied here. As explained below, the requested compensatory damages award of $6.5 million would not deter Defendant from committing the same acts in the future.

The third approach simply awards $150,000,000 per affected family. In some cases, this Court has also applied a modified version of this approach by awarding $150,000,000 per plaintiff. *See Warmbier*, supra, at 60; and *Levinson*, supra, at 3-6. Here, the third approach and its modified version would result in the same award amount, as there is a single plaintiff.

The third approach, largely employed in cases of hostage taking and torture, would be most appropriate here to calculate the punitive damages award due to the similarities between this case

and the cases in which this Court has previously applied it, including *Rezaian* and *Kim*.[141] In *Rezaian* and *Kim*, the plaintiffs demonstrated that there were exacerbating factors that warranted a greater punitive damages award than that equivalent to the compensatory damages award granted, which ranged from $1,562,500 to $15,440,000. *Rezaian v. Islamic R. of Iran*, 422 F. Supp. 3d 164, 181, 184 (D.D.C. 2019). *Kim*, supra, at 290. In *Rezaian*, plaintiffs demonstrated that Iran held Jason Rezaian hostage to increase its bargaining leverage in ongoing negotiations with the U.S. *Rezaian*, supra, at 183-84. In *Kim*, plaintiffs demonstrated that North Korea's "abduction, and presumed torture and killing" caused "irreparable emotional and psychological harm" to plaintiffs. *Kim*, supra, at 288, 291. This Court found that these critical factors require a greater need for deterrence and therefore a greater sum of punitive damages than the amount of compensatory damages granted, leading them to award $150,000,000 per family in *Rezaian* and per plaintiff in *Kim*. *Rezaian*, supra, at 184; *Kim*, supra, at 291. Similarly here, Defendant's hostage taking and torture of Mr. Alinejad was politically-motivated upon arbitrarily and wrongfully accusing him of collaborating with his sister "against national security" with the U.S., and caused Plaintiff irreparable emotional and psychological harm. Therefore, a punitive damages award of $150 million for Plaintiff would be appropriate.

### D.  Plaintiff is entitled to damages for injuries suffered before becoming a U.S. citizen.

The Court may grant damages to Plaintiff for injuries she suffered before becoming a U.S. national for two reasons. First, the language of the FSIA does not place a temporal limitation on the recoverable damages period. Second, the continuous tort doctrine entitles Plaintiff to damages

---

[141] *See also Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48 (D.D.C. 2011); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008); *Weinstein v. The Islamic Republic of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002).

for the entire period during which she suffered injuries from Defendant's continuous hostage taking and torture of Mr. Alinejad.

1. **Language of the FSIA**

The FSIA's terrorism exception, 28 U.S.C. § 1605A, references a claimant's nationality in two subsections relevant here: (1) subsection 1605A(a)(2)(A)(ii)(I) concerning the court's subject matter jurisdiction to hear a claim under this section, and (2) subsection 1605A(c)(1) concerning the private right of action requirements.

The former subsection states that the court shall hear a claim under this section if, in relevant part, the claimant or victim was a U.S. national at the time the relevant act occurred. 28 U.S.C. § 1605A(a)(2)(A)(ii)(I). This requirement must be met for the court to hear a plaintiff's claim. The latter subsection discusses a nationality requirement in the context of damages:

> "A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—
> (1) a national of the United States". 28 U.S.C. § 1605A(c)(1).

Here, the statute does not place any explicit or implicit limitation on the period for the calculation of damages. Instead, it places a temporal limitation only on the requirement regarding the court's ability to hear a plaintiff's claim; once the court finds that a claim may be heard by satisfying all of the elements under § 1605A, then there is a private cause of action for a U.S. national plaintiff to bring an action and recover damages for the enumerated acts. This allows for a scenario in which the Court finds Plaintiff has standing pursuant to § 1605A(c) to bring an action against Defendant for acts of hostage taking and torture that occurred while she was a U.S. national and does not limit the recoverable damages to the statutory period in which Plaintiff had standing. Thus, Plaintiff may recover damages for the continuous acts of hostage taking and torture, which began prior to her becoming a U.S. national and continued after, even though she was not a U.S.

national when the acts initiated. The Court should hold Defendant liable to Plaintiff for the totality of the harm she endured due to Defendant's continuous acts. Neither the black letter law of § 1605A nor precedential case law suggests or demands otherwise.

Defendant held hostage and tortured Mr. Alinejad from September 24, 2019, until August 3, 2021. During this time, just a few weeks after her brother's arrest, Plaintiff became a U.S. national on October 17, 2019.[142] This date represents when Plaintiff first had standing to file suit under the FSIA, not a delineation for which fraction of suffering she is entitled to receive damages.

### 2. Continuing Tort Doctrine

Claims under the FSIA §1605A(c) are governed by tort law. One tort principle instructive here is the "continuing tort" doctrine. The doctrine states that "[w]here a continuing tort causes a single, indivisible injury, the cause of action accrues at, and limitations begin to run from, the time when the nature and extent of the damage are ascertainable, which may be at the inception of the tort or not until the last date of the tortious conduct." 54 C.J.S. Limitation of Actions § 204 (2005). Under D.C. law, this Court has found that the doctrine requires a plaintiff to allege:

> "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act within the limitation period." *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 729 (D.C.C. 2008) (quoting *Beard v. Edmondson Gallagher*, 790 A.2d 541, 547-48 (D.C. 2002)).

The spirit of this doctrine is to ensure that where a continuing tort has a cumulative effect, "such that the injury might not have come about but for the entire course of conduct [...] then all damages caused by the tortious conduct are recoverable even though some of the conduct occurred outside the limitations period." *Beard*, supra, at 548. While the statute of limitations is not at issue here, the principle of indivisible pain and suffering from continuous torts entitles Plaintiff to all

---

[142] Exhibit 6, Masih Alinejad Certificate of Naturalization.

damages for her pain and suffering caused by Defendant's tortious acts against Mr. Alinejad, including that prior to becoming a U.S. national.

In *National Telephone v. Exxon.,* this Court heard the 1998 case involving a telephone company and gasoline distributor with adjacent properties. The former alleged that the latter was liable for gasoline contamination that migrated from the distributor's underground storage tanks and onto the telephone company's property, damaging its resale value. The telephone company reported these leaks first in 1990, and again beginning in 1995. *National Tel. Coop. Ass'n v. Exxon Corp.*, 38 F. Supp 2d 1, 1-4 (1998). In response to the gasoline distributor's claim that the complaint was time-barred due to a statute of limitations of five years, this Court applied the above definition of the continuous tort doctrine, finding in favor of the telephone company. This Court found that a continuous tort was present and the complaint was timely because: (1) the gasoline leaks were continuous and repetitive; (2) damage to resale value flowed from the act as a whole rather than from each individual leak; and (3) at least one injurious act, or leak, occurred within the limitation period. Therefore, the telephone company was able to recover for the entire course of conduct, including the leaks that occurred prior to the limitation period. *Id.*, at 7-11.

Many courts have since applied this principle, finding that prescriptive periods such as statutes of limitations do not define the period for which damages can be recovered. *See Lehman v. Lucom,* 727 F.3d 1326 (11th Cir. 2013); *Rockwell Int'l Corp v. Wilhite*, 143 S.W.3d 604 (Ky.App. 2003); *Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645 (1995). Courts have routinely applied this doctrine to findings of torture and intentional infliction of emotional distress in various contexts, including cases concerning denying prisoners medical care. *See e.g., Hernandez v. Arpaio*, 2018 U.S. Dist. LEXIS 229759 (D. Ariz. 2018)*; Lucero-Nelson v. Wash. Metro. Area Transit Auth.*, 1 F. Supp. 2d 1 (D.D.C. 1998); *Von Dardel v. U.S.S.R.*, 623 F. Supp. 246, 246-50 (D.D.C. 1985); *Page v. U.S.,* 729 F.2d 818, 821 (D.C.C. 1984).

Here, Defendant's acts against Mr. Alinejad also constitute continuous torts, satisfying this Court's three-pronged test. First, Defendant's wrongful acts were continuous and repetitious, as Mr. Alinejad was unceasingly held hostage and tortured by Defendant. Second, damages flow from Defendant's act as a whole rather than from each individual act. While Iran's numerous acts against him between September 2019 and August 2021 constitute discrete acts of hostage taking and torture, it is highly likely that Mr. Alinejad's lasting suffering, and the serious deterioration of his health, was not the result of a discrete act but of continuing violations with a cumulative and compounded effect resulting from the entire course of torture against him. Further, Plaintiff's resulting suffering has cumulatively and permanently injured Plaintiff. Third, at least one injurious act occurred while Plaintiff was a U.S. national. Mr. Alinejad was held hostage and tortured by Iran from September 2019 until August 2021, during which time Plaintiff became a U.S. national on October 17, 2019. After October 17, 2019, he remained a hostage and was tortured on numerous occasions, for example through intense and prolonged interrogations through December 2019 during which Iran attempted to force him to confess to false crimes,[143] *see e.g. Azadeh*, supra, at 11-2, prolonged solitary confinement through May 2020,[144] persistent denials of his urgent medical care,[145] and persistent threats of execution and harm to his family,[146] all of which constitute psychological torture pursuant to experts such as the Special Rapporteur,[147] Amnesty International,[148] and Professor Ali Arab.[149]

Given the continuous, related nature of the acts of hostage taking and torture against Mr. Alinejad, resulting in the serious deterioration of his health, "all damages caused by the tortious

---

[143] Exhibit 60, Declaration Requested to Be Sealed, ¶¶5-6, 9-10.

[144] Exhibit 60, Declaration Requested to Be Sealed, ¶¶5, 10.

[145] Exhibit 1, Declaration of Masih Alinejad, ¶25; Exhibit 60, Declaration Requested to Be Sealed, ¶8.

[146] Exhibit 60, Declaration Requested to Be Sealed, ¶7.

[147] Exhibit 43, ¶¶85-6.

[148] Exhibit 46, p. 18.

[149] *See generally*, Exhibit 56, Declaration of Professor of Ali Arab.

conduct are recoverable even though some of the conduct occurred outside the limitations period," or the period in which Plaintiff was a U.S. national. *Beard*, supra, at 548.

## V.  CONCLUSION

Plaintiff respectfully requests that this Court enter a default final judgment in her favor and against Defendant. This Court has personal jurisdiction over Defendant and subject matter jurisdiction over the claims in this action. Despite being provided notice and an opportunity to be heard, Defendant has declined to defend this action, which says volumes about their culpability.

Mr. Alinejad was held hostage and tortured for nearly two years, and even on conditional release is forbidden from contacting his sister, depriving Plaintiff of the comfort and love of her brother and the ability to ever return to Iran. Plaintiff's damages are compelling and significant. The facts before the Court demonstrate that Plaintiff is fully entitled to recover sizeable monetary damages for Defendant's outrageous behavior.

Accordingly, Plaintiff requests that this Court award the following monetary damages:

1. Compensatory Damages:  $6,906,250 USD
2. Punitive Damages:      $150,000,000 USD
3. Total Damages:  $156,906,250 USD

Respectfully submitted,

Ali Herischi, Esq.
MD0024
Herischi & Associates LLC
7201 Wisconsin Ave. Ste. 440
Bethesda, MD 20814
ali.herischi@ibhlaw.com
Tel.: 301.363.4540
*Counsel for Plaintiff*