# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MASIH ALINEJAD,<br><br>         *Plaintiff*,<br>  v.<br><br>THE ISLAMIC REPUBLIC OF IRAN ET AL.,<br><br>         *Defendants*. | Case Number:  1:19-cv-03599-GMH |

## DECLARATION OF MEHRANGIZ KAR

COMES NOW Mehrangiz Kar and states as follows:

1. I was born in Ahvaz, Iran and have been a naturalized citizen of the United States since June 22, 2006.

2. I am a human rights attorney and have dedicated my life to protecting and enhancing human rights, including women's rights in Iran. Before I left Iran, I was among a handful of attorneys promoting and defending human rights in Iran's revolutionary courts. I also have written many books and articles promoting human rights values in Iran.

3. As both a human rights attorney and a target of the Iranian regime's attacks on dissidents, I am well acquainted with Iran's practices of human rights abuses. The Islamic Republic routinely relies upon threats, harassment and intimidation to silence those who oppose the regime. Arbitrary detention and arrest are common practices, both against dissidents and their loved ones. The use of torture and coercion to force false confessions is widespread and well-documented by international organizations and governments.

4.      After the 1997 presidential election in Iran, I openly promoted women rights and published about the necessary reforms for Iranian society. The Iranian regime was not happy about my activities, and was looking for an excuse to arrest me. In April of 2000, along with sixteen other Iranian journalists, activists, and intellectuals I attended a conference held at the Heinrich Boll Institute in Berlin entitled "Iran after the Elections." There, I made remarks about the urgent need for constitutional reform in Iran. When I returned to Iran, I was arrested at the airport and taken to Evin Prison. The government levelled several charges against me, such as "acting against national security" and "spreading propaganda against the regime of the Islamic Republic." On January 13, 2001, I was sentenced to four years of imprisonment.

5.      After two months in prison, I was diagnosed with breast cancer. My cancer was used by international organizations and European countries to pressure Iran convivence Iranian authorities to allow me to get medical leave to travel to Netherland for medical treatment in the Netherlands. This attempt was successful and I left Iran to Netherland, with pending jail time and pending charges for different cases against me.

6.      My husband, Siamak Pourzand, was a journalist and film critic. In the 1960's, Siamak worked in the United States as a foreign correspondent for an Iranian publication. As part of his work, he had interviewed U.S. president Richard Nixon, as well as other American politicians and cultural figures, which created suspicion in the eyes of the new Iranian regime. For over ten years, he wrote articles for reformist newspapers and foreign-based Farsi language media outlets. As a result, he had created a reputation as an outspoken critic of the Islamic Republic's policy towards culture and the arts.

2

7. On November 24, 2001, Siamak was kidnapped by unknown individuals. On the same day he went to her sister to get his house keys, car keys, shoes, and medicine without giving reason. Then he disappeared for more than two weeks. After he went missing, security forces raided our apartment and seized my computer hard drive without a warrant. For at least two weeks after his disappearance, we had no news of Siamak. I was frightened for his safety. No government authorities assumed responsibilities for his arrest. I was going crazy. I did not know if he was alive or dead. My family and I began a campaign to inform the international human rights committee of Siamak's plight, which began right after his arrest and has continued well after his death.

8. Siamak faced a sham trial, where he was forced to confess to crimes he did not commit. Later, he was forced to participate in a televised forced confession. When I later saw footage of the taped confession, I could see the fear in Siamak's expressions and hear it in his voice. He was afraid that he would be tortured if he did not give the expected answers to the questions asked by his torturers. In that tape, I saw Siamak's haggard and gaunt face on the computer's monitor. I noticed he had probably lost 70 lbs. He looked awful in his jacket which was too large and was sagging on his now frail and meager body. Siamak appeared very angry.

9. The televised confessions were damaging to Siamak and the whole family. We were following the news of injustices Siamak was being subjected to from far away. Our lives were shattered and disarrayed even more after seeing the haggard visage and wounded dignity of Siamak. Based on his confessions, a new case was opened against me, creating another obstacle for my return to Iran.

3

10. My daughters and I were driven out of our land and lost our jobs and our mental health. Moreover, we have despaired at our inability to save our loved one from the hands of his criminal, mendacious captors. We knocked at every door fruitlessly to free Siamak from the claws of the security establishment, who deemed him a burnt asset and a cadaver which had served its purpose. They feared that Siamak would leave the country, and knowing him, to make waves and report what they had done to him during his captivity and reveal to and inform the world of what he had witnessed done to others.

11. Over the years, Siamak suffered terrible torture in detention, which culminated in severe health problems, threatening his life. Whenever we received such news, we were all collectively feeling Siamak's pain and torture. We, too, experienced the humiliation and field trial in a medieval court.

12. On April 29, 2011, we received the news that my husband, Siamak Pourzand, allegedly jumped out the window of the sixth floor apartment where he was under house arrest and passed away instantly. We were unable to properly observe mourning rituals in the absence of the body of our loved one. We could not take part in funeral and burial ceremonies and bid our loved one farewell according to our own cultural norms in our own homeland. In fact, we did not really mourn. We could not still believe that he is dead. Such fate nibbles away at the survivor's soul and spirit. The survivor cannot believe the death of the loved one and reaches a point of self-loathing and self-blame. The mourner disregards and forgets all the reasons that exist for the distance between him or her and the deceased and questions and blames oneself for not being on the side of the

4

loved one all the way to the burial. The survivor regrets that he or she has to beg others to bury the loved one as quickly as possible on his or her behalf.

13. Psychologically, the effects were far-ranging and quite damaging for me and my daughter. We both suffered from constant anxiety, worry, and fear over Siamak's condition while in prison. We worried about each other's safety and wellbeing. I suffered from constant anxiety and depression ever since Siamak was arrested. I suffered nightmares, which left no place for a peaceful sleep. I was gripped by paranoia, and my hysteric conduct at home was severely hurting my younger daughter Azadeh.

14. I was isolated in my grief. To whom I could talk of nine long, eventful years, of hope for a happy ending, of the spark of hope in my heart which would drive me to knock on any door so that once more, just one more time, somewhere on this planet, the four of us could sit together and drink tea, like old times in Tehran. This was the only hope I was nesting in my heart and it was what I had guaranteed my girls at times when they were overwhelmed with absence of their father.

15. I have known Masih Alinejad for since his arrival in the United States.

16. Masih has lived in exile in the United States since 2014, and most recently has suffered the imprisonment and sentencing of her beloved brother Alireza as an attempt to silence her voice. Having experienced the same abusive practices at the hands of the Islamic Republic, I know well the pain that she is undergoing. When the regime takes a loved one hostage, every day is filled with feelings of guilt for the harm being visited upon that person due to your actions, and fear for how every word or action you make could cause them further suffering. Iran's actions against Masih and Alireza are abhorrent and

violate the very principles of human rights. I commend their courage in standing by their principles while they suffer a type of pain and torture that no one should have to endure.

I declare and can competently testify under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of April, 2021.

M. KAR
Mehrangiz Kar