# EXHIBIT 35



# ORWELLIAN STATE:

# ISLAMIC REPUBLIC OF IRAN'S STATE MEDIA AS A WEAPON OF MASS SUPPRESSION

fidh



June 2020 / N° 749a

Cover photo:  © Shabnam Miri

# Table of Contents

**Acronyms** ................................................................................................................... **4**

**Executive Summary** ....................................................................................................... **5**

**1. Introduction** ............................................................................................................. **7**
    1.1 Historical background.............................................................................................7
    1.2 Methodology...........................................................................................................9
    1.3 Key concepts..........................................................................................................10
        1.3.1 Forced confession ........................................................................................10
        1.3.2 Defamation ....................................................................................................12
        1.3.3 Propaganda....................................................................................................13

**2. Iran's state media as a weapon of mass suppression** ................................................. **14**
    2.1 Victims...................................................................................................................17
        2.1.1 Activists and journalists .................................................................................17
        2.1.2 Minorities.......................................................................................................18
        2.1.3 Dual nationals or Iranians residing in foreign countries ...............................18
        2.1.4 Professional experts, academics & businessmen ..........................................19
    2.2 Perpetrators...........................................................................................................19
        2.2.1 IRIB organisation ...........................................................................................19
        2.2.2 Press TV.........................................................................................................21
        2.2.3 Ofogh TV........................................................................................................22
        2.2.4 Mardom Khabar Internet TV ..........................................................................23

**3. Weaponisation of media: Types of content** ................................................................. **24**
    3.1 Stolen private data ................................................................................................24
    3.2 Forced and/or false confessions ............................................................................27
        3.2.1 Scripted interviews ........................................................................................37
    3.3 Defamation ...........................................................................................................40

**4. Broadcasting: Tactics, patterns, & conceptual context** ............................................... **48**

**5. Goals & impacts** ........................................................................................................ **49**
    5.1 Demoralising civil society ......................................................................................49
    5.2 Spinning the discourse...........................................................................................49
    5.3 Justification for suppressive measures....................................................................50
    5.4 Evidential basis for conviction ...............................................................................51
    5.5 Emotional pressure ...............................................................................................51

**6. Forced confessions as human rights violations: A legal analysis** ................................. **53**
    6.1 Right to a fair trial .................................................................................................53
    6.2 Freedom from torture, inhuman or degrading treatment ..........................................53
    6.3 Right to privacy .....................................................................................................54

**7. Recommendations** ..................................................................................................... **55**

**Annexes** ...................................................................................................................... **57**

# Acronyms

**BBG** – Broadcasting Board of Governors

**CIA** – Central Intelligence Agency

**EctHR** – European Court of Human Rights

**EU** – European Union

**FIDH** – International Federation for Human Rights

**ICC** – International Criminal Court

**ICCPR** – International Covenant on Civil and Political Rights

**ICTY** – International Criminal Tribunal for the former Yugoslavia

**IRGC** – Islamic Revolutionary Guard Corps

**IRIB** – Islamic Republic of Iran Broadcasting

**JFI** – Justice for Iran

**MOI** – Ministry of Intelligence

**SCOCR** – Supreme Council of the Cultural Revolution

# Executive summary

The use of forced confessions, show trials, and defamatory programmes has been going on for 40 years since the very establishment of the Islamic Republic of Iran. The number of such programmes broadcast by the Islamic Republic of Iran Broadcasting (IRIB), which holds a monopoly over TV and radio since 1979, is on the rise. IRIB has broadcast hundreds of programmes containing forced confessions and defamatory contents, rendering it the most far-reaching tool for suppressing individuals and civil society inside and outside Iran.

This report uses an analysis of 151 IRIB programmes broadcast over the past decade, sourced from three databases, containing the confessions of 355 individuals and defamatory content against 505 individuals. According to the testimonies of the victims interviewed by Justice for Iran (JFI) and other testimonies and evidence examined for this report, the material for producing these programmes is typically obtained through coercion (including the use of physical and mental torture, inhuman or degrading treatment or punishment), theft, and misrepresentation of private data.

The interviews and the evidence clearly indicate certain patterns in the methods of torture, and inhuman or degrading treatment, which reveal that these forms of ill-treatment are common and systematic procedures in obtaining forced confessions in Iran. These methods vary from physical torture – such as flogging, *strappado* or hanging by the hands, and electrocution – to psychological torture – such as long-term solitary confinement, mock executions, rape threats, and deliberate exposure of prisoners to poor prison condition – to tempting and deceiving the detainee in order to extract confessions on camera.

The analysis of victims' testimonies also illustrated that the whole process of recording the confession is scripted and staged from start to end. The similarities between victims' accounts of the confessions being scripted and staged, the appearance of the detainee, the content of the confessions, and the false confessions which are knowingly imposed on the detainee, all indicate a systematic pattern of behaviour.

The televised propaganda programmes pursue multiple goals, including: creating a chilling effect on civil society; silencing opposition voices and spinning the public discourse; justifying the suppression of dissidents and activists; creating an evidential basis for criminalisation; meting out psychological torture; and promoting official narratives domestically and internationally. The interviews also indicate that the defamatory nature of these programmes has such a suppressive impact on the victims that its damaging effect supersedes the impacts of the severe physical ill-treatment and impedes the healing process.

The impact of these programmes is not limited to the victims. It also affects the victims' families and their reputation. Many of the victims described these programmes as a means of mental and psychological torture with long-lasting impacts. They asserted that the impact of these programmes on their family life and their reputation cannot be easily undone and that many of the audiences who have no access to independent sources of information believe the defamatory accusations made in these programmes. The majority of the interviewees mentioned the illegal use of their private data as the most damaging and traumatising part of their experience.

Despite several scandals[1] that revealed the falsehood of such programmes and the illegal methods used for producing them, the absence of both political will and a credible criminal justice system to hold personnel of intelligence agencies and IRIB staff to account for obtaining, producing and broadcasting forced confessions and defamatory programmes has allowed this state policy to continue. The widespread impunity of state agents has not only permitted this rise in broadcasting

---

1. See Chapters 3.2 and 3.2.1.

forced confessions and defamatory programmes and associated crimes, but it has also further eroded the rule of law in Iran.

Based on the testimonies and evidence, the report concludes that IRIB has long lost its function as a media organisation and has become a means of mass suppression, which, in collaboration with the Ministry of Intelligence (MOI) and the Islamic Revolutionary Guard Corps (IRGC), is actively involved in systematic violations of the most fundamental rights, including: the right to freedom from torture, inhuman or degrading treatment; the right to liberty and security; the right to a fair trial; the right to private and family life; and the right to freedom of opinion and expression.

# 1. Introduction

In theory, the media's main responsibilities are informing the general public, holding authorities to account, and promoting an informed public debate.[2] However, as this report reviews in detail, the duties of the Islamic Republic of Iran's media apparatus are quite the opposite. Instead, the media is tasked with keeping citizens in the dark, covering up the authorities' wrongdoings, disrupting ideas and debates considered undesirable to the state, and suppressing any voices that might challenge the state's socio-political, cultural, and religious narratives.

The Islamic Republic's media apparatus has a tentacular reach into the everyday lives of Iranians through the activities of various actors in multiple fields of broadcast and digital media, press, art and cultural industries. The Islamic Republic of Iran Broadcasting (IRIB), which falls directly under the control of the Supreme Leader of the Islamic Republic, works closely with the intelligence, security and paramilitary organisations of the Islamic Republic. As Iran's main media organ, IRIB is the most far-reaching and effective tool for producing and broadcasting programmes aimed at suppressing alternative voices inside and outside Iran. The special position of IRIB provided by the Constitution [see below, Chapter 3.2.1] not only guarantees its monopoly over all types of radio and TV broadcasting, but also characterises this organisation as the state's official representative in mass media.

Although the emergence of satellite TV channels and digital media over the past decades have significantly shrunk IRIB's audience, IRIB continues to be the main source of information and entertainment for the majority of Iranian citizens, making it an ideal tool to disseminate state propaganda and indoctrinate the population. According to a survey conducted by the state-controlled Statistical Centre of Iran in 2017, 91% of Iranians above the age of 15 watch IRIB programmes for an average of four hours per day.[3] While this number might be overestimated in order to exaggerate the popularity of IRIB, it is a fact that IRIB's monopoly over broadcast media, combined with heavy internet censorship and vast terrestrial satellite signal jamming, leaves Iranians with few choices for receiving independently-produced information and entertainment.

For these reasons, this report is focused only on the programmes disseminated by TV broadcast monopolised by IRIB. While IRIB is at the centre of all types of propaganda campaigns, this report focuses on the campaigns against Iranian citizens, dual nationals and foreigners through broadcasting forced confessions and defamatory programmes, using illegally-obtained and misrepresented private data.

## 1.1 Historical background

The history of using televised programmes as means of suppression of dissent can be traced back to the very beginning of the establishment of the Islamic Republic. The structure and form of these programmes have remained consistent ever since. They usually contain forced confessions, show trials, and an accompanying narrative that demonises the targets and portrays them as ideologically and morally corrupt or misled.

One of the earliest examples of such programmes were the show trials of the 21 members of the Union of Iranian Communists (Sarbedaran) in 1983.[4] All of the defendants, but for one, were

---

2. The Ethical Journalism report, Untold Stories, 2015, p. 69,
   https://ethicaljournalismnetwork.org/wp-content/uploads/2016/08/untold-stories-full.pdf

3. Iran Statistics Centre, Behavioural Culture of Iranian Families in 2017, https://www.amar.org.ir/Portals/0/News/1397/na-maye%20farhange.pdf

4. Sarbedaran was a Marxist-Leninist-Maoist organisation formed in 1976. The group started an insurrection in 1981, which was cracked down on by the Islamic Republic and eventually dismantled in 1982.

sentenced to death and publicly executed immediately after the trial.[5] The programme started with military and paramilitary officials claiming that Sarbedaran were a group of terrorists targeting innocent civilians in Amol, a city in Northern Iran. It then covered the story of those who claimed to be eyewitnesses. The main purpose of this part of the programme was to prove popular support for the Islamic Republic's military operation against Sarbedaran in Amol. In one instance, a member of the IRGC told the story of a pregnant woman who carried heavy sandbags to help build trenches for the IRGC.

The second part of the programme covered the trials, a typical example of a dramatic and staged spectacle. The trial portion opened with a chorus singing an elegy for the 'martyrs of Islam in Amol' in the middle of the court room, in the presence of the defendants and judges. The courtroom was covered with large banners with slogans condemning the Sarbedaran or praising the 'martyrs of Amol'. The audience was a group of carefully selected individuals presented as the families of the alleged victims, who had a very active role in supporting the prosecutor and disrupted any challenging statement on the part of defendants by shouting loud slogans and trying to silence the defendants.

The trial officially began with speeches by two individuals, both wearing khaki military uniforms, who were introduced as 'victims of Sarbedaran's atrocity.' In their testimonies, they accused Sarbedaran of torturing their victims, and each testimony was followed by the audience's shouting of supportive slogans. The trial then continued with the defendants' testimonies, which were not simply admissions of guilt, but vocal denouncements of their ideology as morally corrupt and essentially criminal.[6] The first defendant who spoke in court emphasised that their actions were even more criminal and inhuman than what had been mentioned by the prosecutor. None of the defendants were accompanied by legal counsel throughout the trial.

Another early instance of televised propaganda programme was a programme aired in January 1980 about the Forgan Group, an Iranian Shia militant group with an anti-clerical Islamist ideology, which had been accused of a series of assassinations of high-ranking state officials. These programmes followed a similar pattern, which started with a narrative that introduced the victims of the Forgan Group, including their families.[7] The remaining parts of the programmes focused on trials, the questioning of Forgan's members by alleged victims' families, and the group members' confessions, admissions of guilt, and denouncements of their ideology and organisation.

By the early 1980s, the use of suppressive propaganda in televised programmes had already become such a routine procedure that even Mehdi Bazargan, the first Prime Minister of the Islamic Republic, referred to it in his last parliamentary speech in 1983:

> *"In two days, the first round of Islamic Consultative Assembly, of which I am a member and, thus, entitled to parliamentary immunity, will be over. From the day after, I will be as well liable to prosecution, arrest and punishment. Therefore, I announce that if, in the coming days, you saw that I was arrested and it was announced, with propaganda and making [a] lot of noises, that I will be on TV to explain and clarify certain issues, and if you saw me saying things contrary to what I say now and in the past, and repeating things like a parrot, beware! That person is not Mehdi Bazargan."[8]*

The structure of these propaganda programmes has remained the same over the past four decades. In recent times, it was used for the programmes about Zanyar and Loqman Moradi, who were arrested in August 2009 and were taken to meet the Friday Prayer Imam for the city of

---

5. For more details on the Sarbedaran trials see: Shadi Sadr, The Grey Colour of Truth, Radion Zamaneh, available at: https://www.radiozamaneh.com/265223.

6. See footage from the Sarbedaran trial at: https://www.youtube.com/watch?v=bUGDPTOUbJ0 .

7. See IRIB coverage of the Forgan Group trial at: https://www.youtube.com/watch?v=4OXs0InnwwU.

8. Bazargan, Mehdi, speech in parliament, Jomhoori Eslami Newspaper, 30 April 1983.

Mariwan, in October 2010, to confess that they assassinated his son, after being tortured for days.[9] This programme was carefully staged to be broadcast by *Press TV*, the 24-hour English language channel of IRIB.

Propaganda programmes, especially in the form of televised forced confessions or show trials, have been consistently used by the Islamic Republic as an effective tool either to justify the waves of suppression of human rights, or to create a chilling effect and stifle political and civil society, thus suppressing their voices through indirect methods of propaganda. The show trials of former officials of the Islamic Republic, for example, not only help the state justify the political purge of rivals within the Islamic Republic's power structure, but also strengthen the image of a revolutionary state under constant threats of infiltration and in a righteous war against corruption.[10]

On the other hand, the forced confessions of those outside the Islamic Republic's power circle, from dissidents - such as communists, intellectuals, and activists - to other victims, such as dual nationals, help the government establish its own narrative about these groups, using their own words against them. But in both cases, the main goals are to characterize the ideas that these individuals embrace as morally corrupt and essentially criminal and to complete the cycle of physical crackdown with propaganda through mass media.

While over the past four decades these propaganda programmes have evolved in terms of techniques, sophistication, and the range of topics and victims, they all share one commonality - the replacement of the victims' voices with that of the state. Whenever the victim speaks, if they are allowed to speak, it is only the state's voice and narrative that can be heard. In other words, in all these propaganda programmes, from the early 1980s to the present, the state either speaks on behalf of the victim or forces them to speak on their own behalf in favour of the state's narrative.

## 1.2 Methodology

Researching and reporting on human rights violations in Iran is challenging due to the absence of government transparency and a lack of access to official archives. This is amplified by the lack of access to victims of human rights violations inside Iran, due to the use of various repressive measures by the Islamic Republic to silence their voices and to stop evidence of human rights violations from reaching the outside world.

JFI conducted research by analysing a wide range of televised programmes, reviewing numerous cases, judicial documents, and victims' testimonies. This report analysed the state's media apparatus, with a focus on IRIB as the largest player, and the three key tactics of using forced confessions, using illegally obtained private data, and broadcasting defamatory propaganda. This report investigated the tools used for producing these programmes, the goals and purposes behind broadcasting them, the scale of utilisation of such tactics, and samples of these programmes. It also provided detailed information on the victims and perpetrators.

JFI conducted 13 in-depth interviews with victims, which were used as the primary material for understanding the process of producing and broadcasting these types of content. The interviewees included a diverse range of individuals, from women's rights activists, lawyers, and journalists, to human rights and political activists, and families of dual nationals and political prisoners. In-depth interviews with the victims of defamatory programmes were also used to illustrate the impact of these programmes on the lives of victims and their families, as well as on their safety and security. All of the victims interviewed for this report are based outside Iran, with the exception of Loghman and

---

9. During a meeting on March 12, 2012, Ahmed Shaheed, UN Special Rapporteur for Human Rights in Iran, said: "Zanyar and Loghman Moradi [...] were detained for the first nine months of their detention without charges. [...] [They] were later compelled to confess to allegations of murder[ing the son of the Friday Prayer Imam] after being severely beaten and threatened with rape. [...] [N]o evidence or witnesses were brought against these men, and that they did not have reasonable access to their legal counsel. Both men were sentenced to public hanging."

10. From the early show trials of Sadegh Ghotbzadeh, former head of IRIB, and Mehdi Hashemi, former senior IRGC official, to the more recent trials of Karbaschi, former mayor of Tehran, and the senior reformist figures in 2009, the waves of televised show trials have consistently coincided with political purges inside the power structure of the Islamic Republic.

Zanyar Moradi, who were on death row in Iran at the time of their interviews, which were conducted through a smuggled mobile phone from inside the prison. Loghman and Zanyar were eventually executed in 2018. The interviews focused on detailing the systemic patterns of methods used to extract forced confessions and steal private data. They also sought to document the impact of defamatory programmes or broadcast of the forced confessions on the victims and their families.

This report also analysed more than 150 televised propaganda programmes broadcast by IRIB channels between 2009 and 2019 (programmes broadcast prior to 2009 are generally not available). These programmes were sourced using three databases.[11] These programmes included the forced confessions of about 300 individuals, as well as footage of 500 individuals who were accused, discredited, and defamed without being awarded neither the right to reply nor access to any effective remedial mechanism.

## 1.3 Key concepts

The following section provides definitions of the three key concepts covered in this report: forced confession, defamation, and propaganda within the context of state-controlled media as a means of suppression.

### 1.3.1 Forced confession

For the purpose of this report, forced confession is defined as any type of written or oral confession obtained through the use of physical or mental coercion, including physical or mental torture, exposing the prisoner to inhuman or degrading conditions, it constitutes, including: deprivation of medical care; threats; intimidation; deception; and any other types of coercion. In this sense, prisoners may agree to a certain statement or even make a false statement in order to stop their suffering or to prevent more severe types of suffering.

The key element in determining the forced confession is consent, not the content of their confessions, which can be false or true. While in all cases of forced confessions the perpetrators claim that the confessions were made voluntarily, it is crucial to emphasise the impossibility of giving "genuine consent under duress or coercive environment." The European Court of Human Rights (ECtHR), for example, defines the term consent as something that "must be given voluntarily, as a result of the person's free will, assessed in the context of the surrounding circumstances."[12]

The most important element missing in the coercive environment of Iran's interrogation rooms is the element of free will. The element of consent, in a case of forced confession, is not dissimilar to the element of "genuine consent" used by the International Criminal Court (ICC) for the crime of sexual violence under Article 7 (1)(g):

> "The perpetrator caused one or more persons to engage in one or more acts of a sexual nature by force, or by threat of force or coercion, such as that caused by fear of violence, duress, detention, psychological oppression or abuse of power, against such person or persons or another person, or by taking advantage of a coercive environment or such person's or persons' incapacity to give genuine consent."[13]

The matter of "taking advantage of a coercive environment or person's incapacity to give genuine consent" is similar to the case of obtaining forced confessions. This concept was further clarified by the International Criminal Tribunal for the former Yugoslavia (ICTY) Trial Chamber in their judgement in the Kunarac case:

---

11. The three databases are: 1) Telewebion video-sharing website which exclusively archives IRIB programmes. 2) Aparat video-sharing website which is the largest Iranian video-sharing platform. 3) Press TV archive, specifically Iran Today programme's archive.

12. M.C. v Bulgaria, application 39272/98, judgment of 4 December 2003, European Court of Human Rights, paragraph 163.

13. See: The Criminal Elements, International Criminal Court, 2011, p 9, available at:
   https://www.icc-cpi.int/nr/rdonlyres/336923d8-a6ad-40ec-ad7b-45bf9de73d56/0/elementsofcrimeseng.pdf

*"[T]he absence of genuine and freely given consent or voluntary participation may be evidenced by the presence of various factors specified in other jurisdictions, such as force, threat of force, or taking advantage of a person who is unable to resist. A clear demonstration that such factors negate the victim's ability to give free and genuine agreement is found in those jurisdictions [...] consent is explicitly defined not to exist where facts such as use of force, the unconsciousness or inability to resist of the victim, or misrepresentation by the perpetrator."*[14]

According to both Iranian law and international treaties that the Islamic Republic of Iran has ratified, a forced confession is not admissible evidence in judicial proceedings and considered illegal and a violation of human rights. Article 38 of the Iranian Constitution expressly prohibits the use of any coercive method to obtain a confession:

*"Torture, of any kind, in order to obtain confession or information is forbidden. It is not permissible to force someone to testify, confess, or swear an oath. Such a testimony, confession, or oath is worthless."*

Moreover, Articles 7 and 14 of the International Covenant on Civil and Political Rights (ICCPR), to which the Islamic Republic of Iran is a state party, prohibit the use of torture and forced confession. Article 14(3) establishes the minimum guarantees for defendants against whom criminal charges have been brought. Among them is the right "not to be compelled to testify against himself or to confess guilt."

The concept of a forced confession is similar to that of a false confession where detainees are forced to confess to a crime they did not commit. Studies have identified the following factors as essential causes of false confessions:[15]

- Real or perceived intimidation of the suspect by interrogators;
- Use of force, torture, or duress by interrogators during the interrogation, or perceived threat of force;
- Compromised reasoning ability of the suspect, due to exhaustion, stress, hunger, substance use, and in some cases, mental limitations or limited education;
- Devious interrogation techniques, such as untrue statements about the presence of incriminating evidence; and
- The suspect's fear that his or her failure to confess will yield a harsher punishment.

While forced confessions are often obtained and used by criminals and terrorist organisations, there are only four countries in the world whose governments have systematically broadcast videos of such confessions: Iran, China,[16] North Korea, and Vietnam.[17]

Although forced confessions are mostly obtained to be used as incriminating evidence, there are many other purposes for extracting them, especially from political prisoners. Such purposes include:

- Breaking prisoners' resolve, forcing them into submission, and presenting it as a symbolic defeat of the ideas of opposition and resistance;
- Humiliating prisoners through broadcasting confessions of unimaginable crimes and thereby demonstrating the state's power in forcing any individual into any level of submission. Sending such a message to society will cause a chilling effect;
- Using prisoners' confessions to incriminate other individuals or to accuse foreign governments of intervention or hostility against the Islamic Republic of Iran;

---

14. Prosecutor v Kunarac, Kovac and Vukovic IT-96-23-T & IT-98-30/1-T (22 February 2001), paras 457-458

15. Innocence Project, False Confessions & Recording Of Custodial Interrogations, available at: https://www.innocenceproject.org/false-confessions-recording-interrogations/

16. Safeguard, Scripted and staged: Behind the scenes of China's forced TV confessions, https://apo.org.au/node/141086.

17. Human Rights Watch, Vietnam: US Citizen in Televised 'Confession', July 2018, https://www.hrw.org/news/2018/07/18/vietnam-us-citizen-televised-confession.

- Using prisoners' confessions to defame or discredit a dissenting discourse, organisation, individual, or idea;

- Using prisoners' confessions as evidence to provide backing to an official narrative; and
- Using prisoners' confessions as a divisive tool to create social conflicts and weaken opposition and resistance organisations, instil fear in the audience, and demonstrate the futility of resistance against state power.

### 1.3.2 Defamation

Defamation occurs when words or matters containing an untrue imputation against the reputation of individuals, companies or firms are published to a third party, which serve to undermine their reputation in the eyes of members of society, generally by exposing the victim to hatred, contempt or ridicule.[18]

Defamation stands at the heart of the negative campaigns conducted by the state propaganda apparatus and is the main tool used to silence and marginalised undesirable ideas and activists. In many cases, the ultimate goal in obtaining a forced confession is to use it as evidence in a defamatory programme. The use of smear campaigns and defamatory programmes are considered by totalitarian regimes as the most effective tool to censor and silence the voices of its dissidents, by controlling the audience's response and the context within which a statement is made.[19] By launching smear campaigns and publishing defamatory content, the state deafens the audience to what the dissidents have to say and immunises the audience to the impacts of dissenting ideas.

Smear campaigns are not only used to reduce the impact of dissenting speech, but also to make the dissidents a target of violent attacks by fanatics and extremists.[20]  Smear campaigns and defamation are also used as the contextual basis that precedes judicial harassment or as a tool to justify previous judicial harassment. During the 2009 protests over disputed election results in Iran, the state-owned newspaper *Kayhan* was actively involved in a smear campaign against protesters, politicians, and activists, publishing regular articles accusing the protesters and activists of being funded and directed by foreign intelligence services. According to many detainees, these articles were then used by their interrogators as the main evidence against them. On 14 June 2009, *Kayhan* published an article entitled, 'Spider Net Preparing for Suicidal Attack,' which claimed that reformists had created a war room for chaos and sabotage operations. Hours after the article was published, security forces arrested dozens of reformist politicians, journalists, and campaign managers.[21]

In another instance, after the arrest and subsequent suspicious death in custody of academic and environmental activist Kavous Seyed Emami in Tehran's Evin prison, IRIB broadcast a programme

---

18. Ben Evans, A Brief Guide to the Tort of Defamation, July 2014, available at: https://www.blakemorgan.co.uk/a-brief-guide-to-the-tort-of-defamation/.

19. For an example of the use of smear campaign in totalitarian regimes see:
Rafael Rojas et al, Aim, Fire! Character Assassination in Cuba, 2012 (Miami, Eriginal Books), p. 12.

20. One close example of such an effect in the non-Iranian context is the case of Slavko Curuvija, who was shot dead in April 1999 in Belgrade, a few days after the pro-government Politika Ekspres accused him of welcoming the NATO bombardment. By relying on the audiences' nationalist, racial, ethnic, or religious sensitivities, the smear campaign can easily direct hatred and retaliatory attacks towards the state's adversaries. See:  Index on Censorship, Doing their masters' bidding: Media smear campaigns in central and eastern Europe, 21 December 2018, https://www.indexoncensorship.org/2018/12/doing-their-masters-bidding-media-smear-campaigns-in-central-and-eastern-europe/.  Another such example is the smear campaigns launched against the Venezuelan Observatory of Social Conflict (OVCS) and its director Marco Antonio Ponce. On 25 January 2019, as the most recent wave of social protests in Venezuela were ongoing, the government's online portal Misión Verdad published the article 'First Policy of the "Parallel Government": Building an Apartheid in Venezuela'. The article included an image of digital media outlet Vivoplay's interview with Marco Antonio Ponce, in which he spoke about the protests that took place between 21 and 22 January, which were strongly repressed by government forces. The article makes accusations against opposition parties and portrays the protests as destabilizing incidents financed by NGOs. It suggests that NGOs are "promoting and seeking to extend the logic of hatred and confrontation to the popular sectors of Caracas" and includes a hyperlink to OVCS's Twitter account. Ever since, Ponce has been the victim of several attacks, harassment, and intimidation. For more detail on Ponce Case, see Frontline Defenders, Marco Antonio Ponce – Target of Ongoing Smear Campaign and Incitement to Violence, https://www.frontlinedefenders.org/en/case/marco-antonio-ponce-target-ongoing-smear-campaign-and-incitement-violence.

21. Centre for Human Rights in Iran, Men of Violence: Post-Election Executors and Promoters of Violence, https://persian.iranhumanrights.org/1389/03/men_of_violence_fa/#sec17

titled 'Restricted Area', in which Emami was accused of being a Central Intelligence Agency (CIA) agent in charge of spying in IRGC facilities under the cover of environmental research. The programme also claimed that Emami had committed suicide in order to prevent the intelligence agents from extracting important information from him.[22]

### 1.3.3 Propaganda

For the purposes of this report, propaganda is defined as communication aimed at the institutionalisation of a certain narrative or discourse and the prevention or marginalisation of critical or alternative narratives and discourses. In this sense, propaganda mainly includes, but is not limited to, a set of mass-communicative practices. It also includes activities necessary for establishing, reinforcing, and amplifying a narrative and excluding alternative narratives from the public discourse through all types of overt and covert suppression methods.

As such, propaganda serves its function in both 'positive' and negative campaigns. While the main objective of 'positive' campaigns is to establish and strengthen an official narrative, the goal of negative campaigns is to deter, discredit, silence, and suppress the alternative or dissenting narratives. A propaganda organ is tasked with controlling public opinion and public debates in accordance with the official agenda through the production, establishment, and promotion of a set of negative and 'positive' values in a society.

---

22. See the full movie at: https://bit.ly/2F5liq9

# 2. Iran's state media as a weapon of mass suppression

The essential role of media in preserving democracy, either as a watchdog that provides information or as a representative forum for the views of the citizens is simply undeniable.[23] However, media, especially in authoritarian states, can gain a different function. It can turn into an instrument to undermine all the principles that it was originally conceived to protect. In other words, the means of mass communication becomes a weapon of mass suppression.

> "*The information age is actually a media age. We have war by media; censorship by media; demonology by media; retribution by media; diversion by media - a surreal assembly line of obedient clichés and false assumptions.*"[24] — John Pilger

Under the control of undemocratic states, media is stripped of its bilateral communicative nature and is turned into a unilateral communicator and an amplifier of state propaganda. Under the control of authoritarian states, media goes even further to become a means of silencing, shaming, demonising, vilifying, intimidating, punishing, and even torturing the detainees. In this sense, the media becomes indispensable to police, intelligence, and military arms of the state. This is characteristic of IRIB, the state-owned, monopolised, gargantuan media arm of the Islamic Republic of Iran.

Within the so-called revolutionary discourse of the Islamic Republic, the concept of war is of utmost importance. Since the very inception of the Islamic Republic, the state has viewed itself at perpetual ideological, military, and propaganda war with its real and perceived enemies.

The 1983 General Policies and Principles Governing IRIB Programmes Act (IRIB Programmes Act) expressly emphasises this view:

> "*The Islamic Revolution of Iran emerged as a critical event in the sequential course of divine revolts and uprisings throughout history, a revolution still in progress which represents the **battle** between truth and falsehood. Today, the world is overshadowed by imperialist regimes which, in their efforts to expand their demonic dominance, bring other nations under cultural, intellectual, and economic subjugation. Having access to innovative propaganda techniques, they are working to discredit genuine values, and alienate man from his true spiritual nature.*"[25]

While characterising the Islamic Revolution as an ongoing battle and determining and demonising its enemies, the IRIB Programmes Act then tasks IRIB with 'fighting' against any alternative narratives. Article 27 of the Act states IRIB's aim: "Seeking to replace both Western and Eastern value systems with an Islamic one and fighting off the remnants and consequences of the corrupt culture developed by the former tyrannical regime." Such a view, legitimises an endless state of emergency in which the ends justify the means and paves the way for weaponising every element of social life, including the role of the media.

On 4 October 2018, in a speech to the members of the Basij, a paramilitary organisation, on 4 October 2018, the Supreme Leader of the Islamic Republic, Ali Khamenei, compared the media to chemical weapons:

> "*Media is important, and in the hand of the enemy, it will become dangerous. Media is similar to chemical weapons in military war [...]*"[26]

---

23. Lisa Müller, The Impact of the Mass Media on the Quality of Democracy, 10 December 2014, https://blogs.lse.ac.uk/euro-crisispress/2014/12/10/the-impact-of-the-mass-media-on-the-quality-of-democracy-within-a-state-remains-a-much-over-looked-area-of-study/ .

24. Belfast Telegraph, War by Media and the Triumph of Propaganda, 6 December 2014, https://www.belfasttelegraph.co.uk/opinion/columnists/john-pilger-war-by-media-and-the-triumph-of-propaganda-30803378.html

25. See Annex 1.

26. See the full text of the speech at: http://farsi.khamenei.ir/speech-content?id=40645.

Media as a weapon of suppression attempts to destroy non-conforming perceptions and shame, punish or torment any behaviour that challenges the official narrative established through propaganda.

IRIB operates as a media hub that links a vast network of security, intelligence, military and judicial organisations. IRIB is not simply a media organisation and by no means an independent one, but rather an organ of state suppression that uses the tools of mass communication.

The wording of the IRIB Programmes Act sheds light on this peculiar characteristic of the organisation, that is, to establish the state's narrative as the only narrative that has the right to exist. It expressly assigns IRIB with "Identifying and disclosing the consequences of depraved values to be replaced with "authentic Islamic values." Article 55 of the IRIB Programmes Act mandates IRIB to "expose activities, conspiracies, and tactics adopted by anti-revolutionary groups and enemies' fifth columns, making people aware of the nature of their ideas and actions." The range of the groups and individuals targeted and tagged as anti-revolutionary indicates that IRIB acts as a gatekeeper for any narrative, idea, or discourse. Such a responsibility has led IRIB to broadcast hundreds of defamatory programmes against Iranian and foreign citizens, which include forced confession obtained under torture or duress.

While IRIB functions as a means of suppression along with other security and intelligence organisations of the Islamic Republic, it also actively attempts to justify and legitimise the state's suppressive actions by persuading the public, especially at the international level, that those actions are reasonable and proportionate. This part of IRIB's agenda is closely related to the concepts of "soft power" and "soft war."

The term "soft power" was coined by Thomas Nye in the early 1990s as "the ability to get what you want by attracting and persuading others to adopt your goals," [27] and has since been widely used by policy makers at both domestic and international levels.[28] However, it was only after the globally televised protests over the disputed 2009 election in Iran that the terms "soft war" and "soft power"[29] emerged in the speeches of the Islamic Republic's Supreme Leader and was quickly adopted by high-ranking officials.[30]

In a 2009 speech to members of the Basij, Supreme Leader Ali Khamenei defined "soft war" as "a war fought through cultural means and influence, through lies, and through slandering. The soft war is fought through the communication facilities which were not available ten, fifteen, or thirty years ago. The soft war means creating doubts in the hearts and minds of the people."[31]

This is precisely the type of war waged by IRIB under a wider agenda of 'Cultural Engineering' planned by the Supreme Council of the Cultural Revolution (SCOCR)[32] and under the direct supervision of Ali Khamenei. In the Islamic Republic's Cultural Engineering Map, published by SCOCR in 2012, "the improvement of soft power and effective engagement in soft war" is

27. Nye, Joseph. Bound to Lead: The Changing Nature of American Power (London: Basic Books, 1990)

28. The term was introduced into the Iranian political terminology by a 2004 book published by the Tehran International Studies and Research Institute (TISRI). Established in 2000, TISRI is the first non-governmental think tank on foreign relations and strategic studies, and national security in Iran. Its official website describes its goals as helping the Islamic Republic in establishing a national security strategy, influencing the Islamic Republic's foreign relations, cooperation with international organisation, and conducting research on topics that maintains the interests of the Islamic Republic. See: http://tisri.org/?page=about

29. Ziaei Parvar, Hamid, Soft War (2): Media War, Tehran International Studies & Research Institute (TISRI), September 2004, available at: http://www.iranreview.org/content/Documents/Soft_War_2_Media_War.htm.

30. New York Times, Iran Expanding Effort to Stifle the Opposition, 23 November 2009, https://www.nytimes.com/2009/11/24/world/middleeast/24iran.html?ref=world.

31. See full text of the speech at: http://english.khamenei.ir/news/1211/Leader-s-Address-to-Members-of-Basij.

32. The Supreme Council of the Cultural Revolution (SCOCR) is a conservative-dominated body based in Tehran, set up at the time of Ayatollah Khomeini. Its decisions can only be overruled by Iran's Supreme Leader. Majority of SCOCR members are also appointed by the Supreme Leader. The main responsibility of SCOCR is to ensure that the education system of Iran remains 100% Islamic and excludes any outside ideology or cultural influence. SCOCR is responsible for the mass expulsion of Iranian academics during the 1980s and 1990s.

mentioned among the 13 major cultural goals of the Islamic Republic.[33] The map expressly identifies the following segments as its main targets:[34]

1. Citizens of the Islamic Republic
2. The state's institutions and organisations
3. Farsi-speaking communities
4. The Islamic world
5. Regional countries with strong common cultural, historical, and political ties
6. Countries with close political, cultural, and economic ties to the Islamic Republic
7. Governments and groups that plan organised economic, cultural, and political activities directing the Islamic Republic's interests
8. Regional and international organisations
9. The international community

The suppressive apparatus of the Islamic Republic consists of a complex and diverse set of media, military, intelligence, judicial, cultural, political, and religious organisations. It is worth noting that although this report touches upon some intelligence and military organs of this apparatus, such as the Ministry of Intelligence (MOI) and the Intelligence Organisation of the IRGC, its focus is on the main player of its media arm, the IRIB.

In recent years and even more so since the 2009 protests, the Islamic Republic has invested heavily into developing its media empire[35] and has launched a global "soft war" against both its critics abroad and foreign states. With the emergence of digital media and social networks, especially since the 2009 presidential election, Iranian dissidents and activists have found new media platforms to circumvent the censoring media monopoly and reach out to a larger audience, in order to express their ideas and raise awareness of socio-political issues. The popularity of digital media has resulted in an exodus of a large portion of IRIB's audience, who is capable of using the internet. They now have a new source of information to rely on, connecting them to alternative ideas, both domestically and internationally.

Such a shift for this audience, from centralised state-owned media to decentralised, diverse, and independent media, has forced IRIB to expand its territory to the digital media realm. By using phony news websites with stories taken from other sources that support state-sponsored agendas, and fake social media accounts using stolen photos and made-up names to catfish unsuspecting victims,[36] the Islamic Republic has persistently targeted audiences with propaganda. The Islamic Republic's authorities have formed a web of promotion across Facebook, Twitter, YouTube, Google+, Reddit, Telegram, and other social media platforms,[37] accompanied by an army of fake users and bots who are tasked with down-voting or reporting dissenting content or trolling dissidents. They pose as British or US citizens to fuel[38] divisive conflicts during election periods.[39]

With the international focus on Iran as a result of the nuclear crisis, and with a large number of Iranian dissidents having been forced to leave Iran and now actively campaigning against the Islamic Republic aboard, the state media apparatus senses the urgency of targeting its critiques globally in order to reduce their impact, especially on global public opinion.

---

33. See the full text of "The Map of Cultural Engineering" at https://sccr.ir/UserFiles/entesharat/مهندسی%20فرهنگی_opt.pdf.

34. Fair Observer, Iran's Quest for a New Islamic Civilization, 3 May 2017, https://www.fairobserver.com/region/middle_east_north_africa/iran-islamic-civilization-middle-east-politics-culture-news-63411/.

35. Guardian, Iran's State TV Tries 'Soft power' to Win Hearts and Minds, 22 November 2013, https://www.theguardian.com/world/2013/nov/22/iran-state-tv-versus.

36. Wired, What We Now Know About Iran's Global Propaganda Campaign, 24 August 2018, https://www.wired.com/story/iran-global-propaganda-fireeye/?verso=true.

37. Ibid.

38. FireEye Intelligence report, available at: https://www.fireeye.com/blog/threat-research/2018/08/suspected-iranian-influence-operation.html

39. Social media giants discovered a vast propaganda network linked to IRIB, which is involved in a variety of manipulative activities, and dissemination of disinformation. *Reuters* claimed that it found at least 70 websites that pushed Iranian government propaganda in more than 15 countries; See Reuters, Special Report: How Iran spreads disinformation around the world, 30 November 2018, https://uk.reuters.com/article/uk-cyber-iran-specialreport/special-report-how-iran-spreads-disinformation-around-the-world-idUKKCN1NZ1FH.

Another important reason for the global expansion of IRIB's media apparatus is that Iran's direct methods of suppression of independent voices seem to be increasingly less effective inside Iran, and even less so with regard to suppressing dissenting opinions and ideas coming from outside.[40]

## 2.1 Victims

The Islamic Republic's media apparatus targets a vast range of groups and individuals, including: political activists; writers and journalists; women's rights defenders; environmental activists; children's rights activists; labour activists; members of ethnic and religious minorities; dual nationals; foreign academics and businessmen; and ordinary citizens with no political or activist affiliations. The type and range of targets change in accordance with the government's domestic and foreign policies, or its internal power conflicts. However, the socio-political narrative established by the Islamic Republic and the scenarios written in accordance with such narratives, with contextual keywords such as "infiltration" or "cultural invasion," may also determine the type and range of the targets for propaganda programmes.

It is crucial to stress that the broad and diverse spectrum of the victims implies that, in practice, anyone can be a target of these propaganda programmes. The broadcast confessions of teenage dancers,[41] social media influencers,[42] musical artists,[43] and dual nationals with no political affiliations demonstrate this. The main contextual framework for discrediting all types of victims is "their relationship with foreign powers" or "being at service of the foreign powers unintentionally." However, each group of victims, categorised into the four main groups detailed below, is tied to the foreign powers in a different way and with different accusations.

### 2.1.1 Activists & journalists

From human rights defenders and political activists, to labour activists, feminists, environmental activists, and journalists, this category of targets is usually framed by the Islamic Republic as those preparing the conditions for the return of Western culture and its colonialist influence. Activists, as the most effective body in civil society, are usually labelled as sell-outs, traitors, and infiltrators. Journalists are also targeted as agents of foreign intelligence services and labelled as the media arm of the imperialist powers. For example, on 4 March 2012, *Press TV* broadcast a programme titled 'Fox's Eye', in which the staff members of *BBC Persian* were directly targeted as the forced confessions of a number of individuals accused of working for *BBC Persian* inside Iran were broadcast,[44] and *BBC Persian* and its staff were accused of organising protests in Iran with the aim of overthrowing the Islamic Republic.

In many cases, certain groups of activists are targeted by the Islamic Republic's propaganda apparatus as a result of internal rivalries between political factions or certain agencies. The programmes about detained environmental activists are good examples of activists being targeted as result of power conflicts between security agencies. In 2018, more than 55 environmental activists across the country were arrested by the IRGC. Among them were seven prominent activists who were eventually charged with espionage.[45] Following the death in custody of one

---

40. The same point was made by media experts who argue that in the age of digital media "the more you block a content, the more it emboldens people to actually avoid the censorship and win this cat-and-mouse game. So the only way to control a message is actually to try to spin it and accuse anyone who has written something critical of being, for example, a CIA agent." See CNN, Iran's propaganda hits the 'Spinternet', 29 December 2009, http://edition.cnn.com/2009/OPINION/12/29/morozov.dicatorships.internet/index.html.

41. BBC, Iranian Pharrell fans arrested for Happy tribute video, 21 May 2014, https://www.bbc.co.uk/news/entertainment-arts-27499642.

42. New York Times, Iran's Shaming of Young Dancer Draws Backlash, 9 July 2018, https://www.nytimes.com/2018/07/09/world/middleeast/irans-instagram-dancer-teen.html.

43. Centre for Human Rights in Iran, IRGC Forces Arrest Music Distributors, Pressure Them to Confess on Television, 11 December 2013, https://www.iranhumanrights.org/2013/12/bargmusic/.

44. See the programme at: https://vimeo.com/37897121.

45. Human Rights Watch, Iran: Environmentalists Face Capital Charges, 26 October 2018, https://www.hrw.org/news/2018/10/26/iran-environmentalists-face-capital-charges.

of them, Kavous Seyed Emami,[46] IRIB broadcast a programme entitled 'Forbidden Zone', in which these detained activists were accused of gathering sensitive information about the IRGC's missile sites under the cover of their environmental activism.[47] In these cases, while the MOI expressly rejected the charges of espionage against the detainees, the Intelligence Organisation of the IRGC insisted on the charges and produced televised propaganda programmes against them.[48]

### 2.1.2 Minorities

Ethnic, religious, and racial minorities are usually labelled as separatists, extremists, or terrorists, while sexual minorities are labelled as hedonists, immoral, and promiscuous agents of foreign powers with a mission to corrupt the Islamic society. The followers of the Baha'i faith, who are systematically persecuted and targeted by propaganda programmes that portray them as Israeli spies, are the main target among the religious minorities of Iran. Even though ethnic minorities are generally labelled as separatists and threats to the territorial integrity of the country, they are also labelled differently based on their affiliations. For example, the Kurds are labelled as communist terrorists, Arabs as Islamic extremist terrorists, and Turks as fascist or Chauvinist terrorists. In other words, the Islamic Republic's propaganda apparatus ties the minorities' identities to a defamatory accusation that could effectively discredit them as public enemies.

### 2.1.3 Dual nationals or Iranians residing in foreign countries

Dual nationals[49] and Iranians residing in foreign countries are usually targeted to justify the official narrative of Iran being "an independent state under siege by malevolent superpowers."[50] In this context, dual nationals are mostly labelled as spies and agents of foreign intelligence services and infiltrators with secret missions, such as creating a network of saboteurs, gathering information about sensitive institutions, organising a cultural metamorphosis or a soft revolution, or other similar alleged missions. They are mostly detained as result of internal power conflicts or used as bargaining chips in foreign diplomacy.

### 2.1.4 Professional experts, academics & businessmen

As a result of having one of the highest rates of brain drain in the world,[51] Iran frequently hires professionals, researchers, and experts, especially in military or advanced technologies. In many cases, dual nationals and Iranian expatriates with expertise in different fields of research, business and technology have been approached by the Iranian government and enticed into cooperation. Those who rejected such offers were subsequently targeted by the propaganda programmes, detained, unfairly tried, and imprisoned. The cases of Omid Kokabee[52] and Ahamad Reza Jalali[53] illustrate this trend.

---

46. See Chapter 3.2.

47. See the programme at: https://bit.ly/2M6Lg1Y.

48. On 9 May 2018, MP Mahmoud Sadeghi wrote on his twitter account that in his meeting with the Members of Parliament, the Minister of Intelligence "expressly announced that there is no evidence" that amount to the involvement of detained environmental activists in espionage. See: https://persian.iranhumanrights.org/1397/02/arrest-of-environmental-activists/.

49. It is worth mentioning that, in accordance with Article 977 of the Civil Code, the Islamic Republic of Iran does not recognise dual nationality. Although it is possible for Iranians to hold citizenship of another country, the Iranian government consider them only as Iranian. See:https://www.jpost.com/Middle-East/Iran-on-British-prisoner-Iran-does-not-recognize-dual-nationality-593513

50. See the Chief Commander of IRGC speech at: https://bit.ly/2TLLoWp

51. Online Universities, "10 Countries Facing the Biggest Brain Drain", 10 July 2011, https://www.onlineuniversities.com/blog/2011/07/10-countries-facing-the-biggest-brain-drain/.

52. Omid Kokabee is an Iranian experimental laser physicist at the University of Texas at Austin who was arrested in Iran after returning from the United States to visit his family on 30 January 2011.

53. Ahmad Reza Jalali is a Swedish-Iranian academic and researcher who was sentenced to death for allegedly spying in Iran. He is a medical doctor and lecturer at the Karolinska Institute in Stockholm. He was also a visiting professor at Belgium's Free University of Brussels. See "The case of Ahamad Reza Jalali" in Chapter 3.3 - Defamation.

## 2.2 Perpetrators

### 2.2.1 IRIB organisation

As previously mentioned, the Islamic Republic's suppressive apparatus consists of a network of military, paramilitary, intelligence, cultural, and media organisations. However, this report is focused on the media arm of this apparatus, IRIB, and its crucial role in recording, producing, and broadcasting the state's propaganda programmes.

IRIB, which was called the National Iranian Radio and Television until the Iranian Revolution of 1979, is a state-owned media corporation in charge of all radio and TV services in Iran. The importance of IRIB's role in the Islamic Republic's propaganda apparatus lies in the monopoly held by this state-owned corporation over all types of TV and radio broadcasting in Iran. Such a monopoly, along with a ban on the use of satellite equipment for watching foreign TV channels since 1995,[54] have made IRIB the main, and, in some parts of Iran, the only source of information for Iranian citizens.

IRIB is among the largest media organisations in the Asia-Pacific region, with more than 46,000 employees[55] and numerous branches in more than 20 countries, with five international news channels, more than 21 national channels,[56] and 35 local channels.[57] IRIB currently has offices in 21 capitals, including London, Berlin, and Washington, DC. It also runs 30 satellite channels that broadcast around the clock, as well as 13 radio stations that air programs in numerous languages, including English, French, Arabic, Russian, Turkish, Kurdish, Urdu, Hausa, and Swahili. In 2019, IRIB received a budget of 19.88 trillion Rials (around one billion US$), which amounted to 86% of the total public budget for media and mass communication for that year.[58] This widespread infrastructure has helped the Islamic Republic build a media empire that successfully disseminates its messages while demonising its targets.

According to Article 44 of the Iranian Constitution, radio and TV broadcast are considered part of the state sector. Therefore, no private radio or TV stations are allowed. Article 175 of the Constitution grants the power to the Supreme Leader to appoint and remove the head of IRIB. In its opinion in October 2000, the Guardian Council, which is mandated to interpret the Constitution, asserted that "policy making, directing and strategising regarding radio and television in all dimensions are within the exclusive authority of the leader of Islamic Republic. Radio and Television in the Islamic Republic are state owned and establishing private radio and television networks of any kind is incompatible with the constitution."[59]

According to Article 175, the head of IRIB must report to a supervisory board, which consists of representatives from the executive, legislative, and judicial branches. However, in practice, IRIB is only accountable to the Supreme Leader.

The IRIB Programmes Act sheds light on the nature of this organisation as a media arm of the state's propaganda apparatus, stating:

> "*Today, the world is overshadowed by imperialist regimes which, in their efforts to expand their demonic dominance, bring other nations under cultural, intellectual, economic subjugation. Having access to innovative propaganda techniques, they are working to discredit genuine values, and alienate man from his true spiritual nature. Our society had been in thrall to superpowers and their agents for long, resulting in the spread of degenerate values in fields as varied as culture, politics, art, and economics. Purging people's hearts*

---

54. See the Prohibition of Using Satellite Receivers Act, available at: https://rc.majlis.ir/fa/law/show/92510.

55. Al Jazeera, The Role of Iran's Regional Media in its Soft War Policy, 16 February 2017,
   http://studies.aljazeera.net/en/reports/2017/02/role-irans-regional-media-soft-war-policy-170216114010915.html

56. Ibid.

57. See IRIB's list of channels at:  https://www.irib.ir/

58. ISNA Press, The Share of Mass Media and Communication in the Annual Budget 2019, 12 January 2019, available at:
   https://bit.ly/2WHWkcv

59. See Annex 2.

*and minds of all traces of sin and infidelity requires enormous effort and commitment. Identifying and disclosing the consequences of depraved values contribute to the removal of impediments to progress and freedom and provide for the promotion of authentic Islamic values."*[60]

The IRIB Programmes Act also outlines the main responsibilities of IRIB as follows:
- a) The majesty and supremacy of Islam over all of the programs, so that the programs which are against Islamic criterion would be avoided.
- b) The majesty of spirit of the Islamic Revolution, as well as that of the Constitution, over all of the programs.
- c) The fulfilment of the Supreme Leader's point-of-view as the Islamic Jurisprudent.
- d) Setting the situation toward the self-sufficiency and embodiment of the policy of *Neither East, Nor West* in all of the fields of politics, social affairs, culture, economics, and military within the framework of the Islamic Republic's Laws.
- e) IRIB is obligated to convey its message as indirectly as possible within attractive artistic frameworks, in terms of the different social classes, in order to touch the feelings and thoughts of the society.

Furthermore, the IRIB Programmes Act establishes red lines for IRIB regarding what should not be broadcast. Among them are:
- a) [Contents] considered as military, political, and economic secrets or whatever that could be abused by enemies.
- b) Accusations towards official establishments and institutions and groups, communities, and parties whose activities are authorised by law.
- c) Any item which might be considered as publicity for counter-revolutionaries and mischievous groups.

The key point about these red lines is their vagueness and ambiguity as to what constitutes content that "could be abused by enemies" or "be considered as publicity for counter-revolutionaries." Such ambiguity has allowed IRIB to censor any content critical of the state's policies and to deny the victims of defamatory programmes their right to respond.

However, the most important issue regarding the above-mentioned red lines is that, despite the clear wording of Iranian law on libel,[61] the scope of protection against libel in the IRIB Programmes Act only protects the official institutions or political groups and parties authorised to operate under Islamic Republic. It even goes further into assigning IRIB to take an aggressive propaganda approach towards individuals and groups which it has labelled as 'counter-revolutionary'. Article 55 of the IRIB Programmes Act, which determines IRIB's responsibilities towards political groups and organisations, asserts IRIB's duty:

> *"[To] expose the activities, conspiracies and nature of the operation of counter-revolutionary groups and the fifth column of the enemy and making people aware of the true nature of their ideas and activities."*

The IRIB Programmes Act extends this aggressive propaganda approach towards foreign governments as well. Article 56 mandates IRIB to "expose the hostile countries," "warn hypocrite states," and "attract indifferent countries." In another instance, the legislation determines the position of IRIB towards other nations:

> *"IRIB, in order to publicise the salvation call of Islam and preparation of the ground for liberation of all oppressed people of the world from the domination of world arrogance, must propagate Islam as the only genuine liberating and revolutionary faith, work towards cultural unity and export of the Islamic Revolution to other Muslim nations and world population [...]"*

---

60. See Annexes 1 & 3.

61. Article 697 of the Islamic Penal Code of Iran states that "Anyone who through any printed press or any other media falsely accuses someone of an offense or crime should be sentenced to imprisonment from one month to one year or flogging up to 74 lashes (unless the punishment is specified in Haads)."

These duties clearly illustrate the nature and role of IRIB as a media arm of the state's propaganda apparatus at both domestic and international levels. It also proves that the recording, producing, and broadcasting of the propaganda programmes against Iranian and foreign individuals and entities by IRIB are not the result of arbitrary and personal decisions, but rather amount to a specific task assigned to IRIB by Iranian law.

In March 2012, the European Union (EU) designated Ezzatollah Zarghami, the then head of IRIB, in its sanction list for his key role in broadcasting forced confessions.[62] In June 2013, the US Treasury Department also sanctioned IRIB and Zarghami, under the Iran Threat Reduction and Syria Human Rights Act of 2012, for their role in human rights violations, through producing false reports against dissidents and the broadcasting of forced confessions.[63] In March 2013, the EU placed Mohammad Sarfaraz, the then head of IRIB, and Hamidreza Emadi, Editor-in-Chief of *Press TV* [see below, Chapter 2.2.2], on its sanctions list for their roles in producing and broadcasting forced confessions.[64] In February 2014, then-US President Barack Obama's administration temporarily waived sanctions that the US had placed on IRIB for Iran's practice of satellite broadcast jamming and IRIB's routine broadcasting of detainees' forced confessions. The waiver was "based on Iran's commitment to ensure that harmful satellite interference does not emanate from its territory."[65] However, the harmful satellite jamming and the broadcasting of forced confessions continued and in May 2018, the US Treasury Department added the current head of IRIB, Abdulali Ali-Asgari, to its sanctions list for his role in censorship and hindering the free flow of information.[66]

### 2.2.2 *Press TV*

*Press TV* is a 24-hour English and French-language news and documentary TV network that acts as the international propaganda arm of IRIB. The network's director is appointed by the head of IRIB. Based in Tehran, *Press TV* has an extensive network of bureaus in the world's most strategic cities, among them a London-based office operating under the name of Press TV Limited (registered under company number 10957861).

Apart from the systematic broadcasting of anti-Semitic and anti-West diatribes,[67] *Press TV* is the producer and broadcaster of the largest number of forced confessions and defamatory programmes against Iranian activists and civil society. In the past few years, JFI has recorded the broadcast of at least 70 Iranian detainees' forced confessions by *Press TV*. In almost every case, the confessions were broadcast before the detainees' trial, constituting a blatant violation of the right to a fair trial, including the right to be presumed innocent until proven guilty and the right against self-incrimination and forced confession.

In June 2010, British broadcaster *Channel 4* aired a programme featuring Maziar Bahari, a documentary filmmaker and *Newsweek* contributor, who was arrested while covering the Iranian presidential election in 2009 and held in custody for 118 days. He testified that the ten-second interview or ‹confession› that had been broadcast on *Press TV* on 1 July 2009 had been preceded by torture and given under the threat of execution. Bahari, now a British resident, filed a complaint with Ofcom, the British telecommunications regulatory authority, for alleged breach of Ofcom regulations of TV channels broadcasting from the UK.[68]

In May 2011, Ofcom ruled that *Press TV* was responsible for a serious breach of UK broadcasting rules by airing the interview with Maziar Bahari, accepting that it had been obtained under duress

---

62. Reuters, *EU names 17 Iranians sanctioned over human rights*, 24 March 2012, https://www.reuters.com/article/us-iran-eu-sanctions/eu-names-17-iranians-sanctioned-over-human-rights-idUSBRE82N0EH20120324 .

63. See US Treasury Department press release, https://www.treasury.gov/press-center/press-releases/Pages/tg1847.aspx.

64. See the EU Consolidated list of persons, groups and entities subject to EU financial sanctions, https://data.europa.eu/euodp/en/data/dataset/consolidated-list-of-persons-groups-and-entities-subject-to-eu-financial-sanctions.

65. Centre for Human Rights in Iran, *Iran State TV: A Major Human Rights Violator*, https://www.iranhumanrights.org/wp-content/uploads/IRIB_Briefing-FINAL.pdf.

66. See US Treasury Department press release, https://home.treasury.gov/news/press-releases/sm0397.

67. Guardian, *Who will rid us of hate channels such as Press TV*, 4 December 2011, https://www.theguardian.com/commentis-free/2011/dec/04/nick-cohen-press-tv-hatred.

68. The Ofcom verdict is available at: https://www.ofcom.org.uk/__data/assets/pdf_file/0032/52997/press-tv.pdf.

while he was held in a Tehran jail. *Press TV* rejected Ofcom's findings and accused Bahari of being "an MI6 contact person." A fine of £100,000 (US$130,580) was imposed in November 2011. On 20 January 2012, Press TV Limited's licence to broadcast in the UK was revoked by Ofcom. However, on 12 September 2017, Press TV Limited resumed operations in London,[69] using a legal loophole which allows them to broadcast via the internet.[70]

Other similar actions have been taken against *Press TV* in Europe. On 3 April 2012, Bavaria's media regulatory office (BLM) in Germany announced that it was banning *Press TV* broadcasts from SES Astra.[71] In March 2013, the European Commission imposed sanctions against two of *Press TV*'s officials because of their roles in producing and broadcasting show trials and forced confessions.[72] *Press TV* challenged the decision by taking the case to the European Court of Justice (ECJ). Upholding the EU sanctions and referring to JFI's report "Cut! Take Press TV off Air,"[73] published in December 2015, the ECJ ruled that under their leadership, IRIB and *Press TV* had both repeatedly and closely collaborated with the Iranian security apparatus and Revolutionary Court prosecutors to coerce confessions from prisoners of conscience and then broadcast them under the pretext of interviews conducted with the approval of the prisoners.[74]

### 2.2.3 *Ofogh TV*

*Ofogh TV* ("The Horizon Channel" in Persian), is an IRIB TV channel, which broadcasts worldwide. The channel is one of the more recent TV channels set up by IRIB. It started broadcasting nationally on 24 December 2014 and was officially established on 27 February 2015. The channel currently broadcasts 24 hours a day and includes cultural, artistic, and social content based on the discourse of the Islamic Revolution.

*Ofogh TV* was originally established as a subset of the IRGC-sponsored[75] Owj Arts and Media Organisation.[76] It is now under administrative management of IRIB. *Ofogh TV* is the main sponsor and broadcaster of the first season of the notorious programme, "Out of Sight,"[77] which targeted a number of Iranian activists and political dissidents by damaging their reputations with false accusations and violating their privacy through the use and misrepresentation of their personal videos, pictures, correspondence, and documents. The programme includes hours of footage of forced confessions obtained by the security forces.

*Ofogh TV* is allegedly the revived version of the IRGC Television Group, which was active in the 1980s and early 1990s[78]. *Ofogh TV* has a direct relationship with the IRGC through its directors. On 20 September 2017, Morteza Mirbagheri, the deputy director of IRIB, appointed five individuals as members of *Ofogh TV*'s Policy Making Council.[79] One of them, Nader Talebzadeh, is on the US Treasury Department's Office of Foreign Assets Control (OFAC) sanctions list.[80] On 13 February 2019, OFAC designated New Horizon Organisation, an Iran-based entity that organises international conferences that support the Islamic Revolutionary Guard Corps-Qods Force's (IRGC-QF's) efforts to recruit and collect intelligence from foreign attendees, including US persons, and four associated

---

69. See PressTV re-established company registration details at: https://beta.companieshouse.gov.uk/company/10957861.

70. Sun, Web of Lies: Corbyn allies help Iranian regime pump out propaganda in UK using loophole in TV laws, 22 October 2018, https://www.thesun.co.uk/news/7554741/corbyn-allies-help-iranian-regime-pump-out-propaganda-in-uk-using-loophole-in-tv-laws/.

71. JFI, Rights body slams Iran Press TV for airing "forced confessions", 23 April 2012, https://justice4iran.org/publication/call-for-action/rights-body-slams-iran-press-tv/ .

72. JFI, Justice for Iran welcomes EU announcing new Iran sanctions, 12 March 2013, https://bit.ly/2Qssvl7.

73. JFI, Rights body slams Iran Press TV for airing 'forced confessions,' 23 April 2012, https://justice4iran.org/6175/.

74. JFI, European Court upholds sanctions against Press TV for broadcasting forced confessions, https://justice4iran.org/j4i-ran-activities/european-court-upholds-sanctions-against-press-tv-for-broadcasting-forced-confessions/ .

75. See the statement of Ofogh TV director on IRGC sponsorship at https://www.yjc.ir/fa/print/6441014.

76. See the details on the Ofogh TV's new director, available at: https://bit.ly/2PfdKGf

77. Broadcasted on January 2017.

78. See Deutsche Welle Persian, available at: https://bit.ly/2IrFoze

79. See the press release on appointing the members of Ofogh TV Policy Making Council by the head of IRIB, available at: https://bit.ly/2vblPCE.

80. See the US Treasury Department press release, available at: https://home.treasury.gov/news/press-releases/sm611

individuals. OFAC also designated Nader Talebzadeh, the director of New Horizon Organisation, on the sanctions list.[81]

### 2.2.4 *Mardom Khabar Internet TV*

*Mardom Khabar* is an internet TV broadcast established and hosted by IRIB. Its target audience is young Iranians who spend a significant amount of time online and rarely watch state-owned TV channels. *Mardom Khabar* frequently targets Iranian dissidents and activists with defamatory programmes.

One example is the programme "Felesh," broadcast on 20 October 2018, which was exclusively about Masih Alinejad,[82] an Iranian journalist and women's rights activist in exile. The programme contained an interview with Armin Rad, who claimed to be a hacker who had attacked "anti-Iranian websites and enemies of Iran." During the interview, he specifically talked about Alinejad and claimed to have hacked her private e-mail accounts.[83]

Rad also referred to a fake news report broadcast by IRIB News on 31 May 2014, which claimed that Alinejad had been found "naked under the influence of heavy drugs on a street in London" and was then "raped by three men in front of her son," implicitly drawing a connection between not wearing a hijab and sexual assault.[84] Rad also showed pictures of a receipt that he claimed was for a payment to Alinejad by the Broadcasting Board of Governors (BBG) on behalf of the CIA. Rad claimed that the BBG paid US$431,000 to Alinejad over three years.[85]

---

81. Talebzadeh, who is the link between *Ofogh TV* (meaning Horizon TV in Persian), New Horizon Organisation, and the IRGC-QF, was also a key figure in the recruitment of Monica Witt, the former US counterintelligence officer who defected to Iran on 28 August 2013, through organising the Hollywoodism and New Horizon conferences where Witt met the IRGC-QF agents and was eventually recruited.

82. Born in 1976, Masih Alinejad, a refugee in the UK and a US permanent resident, is an Iranian journalist and women's rights activist in exile. She is well-known for the campaign "My Stealthy Freedom," which she launched in 2014 and through which she invited Iranian women to post their pictures without hijab. The campaign quickly received domestic and international attention and led to a new wave of protest against compulsory hijab in Iran.

83. See the full video at: http://www.mardomkhabar.ir/video-news/789

84. Ibid

85. See the full transcription of the interview in English in Annex 6.

# 3. Weaponisation of media: Types of content

Based on the findings obtained by reviewing propaganda programmes and analysing the interviews with those targeted by these programmes, this chapter focuses on three major types of content used in their production: stolen private data; forced and/or fake confessions; and defamation. The use of each type of content effectively violates certain fundamental human rights, which is discussed in detail in Chapter 6 and under the relevant sections on each of these contents.

## 3.1 Stolen private data

Illegally confiscating the private data of detainees and subsequently using that data against them is a routine procedure in Iran's prisons. According to the testimonies obtained by JFI, the detainees are forced to give access to their phone as soon as they are arrested. The detainees are then forced to write down the passwords to all of their e-mail and social media accounts before the formal interrogation begins. The detainees' consent is never obtained and the detainee, in practice, cannot challenge the legality of such a procedure.

The TV programme "Out of Sight 2" broadcast[86] by IRIB showed footage of Lebanese national and American resident Nizar Zakka's arrest, during which his phones were confiscated and inspected by an agent.[87] The programme also showed a close-up of Zakka's passport pages with his personal details. These acts are clearly a breach of the Iranian Criminal Procedure Code, which details specific procedures for obtaining and inspecting communications.[88]

One of the most extensive use of illegally obtained and misrepresented private data can be observed in another episode of "Out of Sight 2," about Iranian-British national Nazanin Zaghari.[89] The programme used numerous private and personal data and material belonging to Zaghari and her husband Richard Ratcliffe, among them:

- An admission letter from London Metropolitan University concerning Zaghari's Master's Degree in 2008, which included her full address in Iran, her course, her fees, the start and end dates of her degree, and her campus;
- An e-mail dated February 2016 from the Iran Heritage Foundation to Zaghari and a screenshot including her full email address;
- Zaghari's official marriage certificate in Farsi with the couple's picture included;
- The couple's family and personal photos;
- A *BBC* payslip, including salary and tax, from when Zaghari worked for BBC Media Action; and
- Videos of Zaghari's Training Station Project colleagues.

In this case, the private materials were not simply illegally obtained and broadcast but also intentionally edited and misrepresented in order to fit a pre-scripted scenario portraying Zaghari as a foreign agent.[90]

---

86. Broadcasted on 3 January 2019.

87. See the programme at:  https://www.youtube.com/watch?v=wVX1Ez5BKms

88. Article 104 of the old Criminal Procedure Code (1999), which was in force and applicable in the majority of cases examined in this report, stated: "In cases where there is a need to inspect and detect mailing, telecom, audio and visual correspondences related to the accused, in connection with investigation of a crime, the judge will inform the respective officers to confiscate [these materials] and send them to him or her. Once they are received, they will be presented to the accused, noted in the minutes, and attached to the file after being signed by the accused. Refusal of the accused to sign will be noted in the minutes and in case the items are not of relative importance, and if the confiscation is not necessary, they will be returned to the owner obtaining an acknowledgment of receipt." The content of that article is now reflected in Article 152 of the new Criminal Procedure Code (2014).

89. For more details, see the case study on Nazanin Zaghari-Ratcliffe in Chapter 3.3 - Defamation.

90. See for instance Richard Ratcliffe's statement in Chapter 5.

In cases in which individuals have been arrested at their place of residence or work, security forces typically enter the detainee's home or office, make an arrest and start search and seizure procedures without a warrant. For instance, Sepehr Ebrahimi, who was arrested in 2010 along with six other bloggers on charges of insulting Islam and the Prophet,[91] testified that the agents knocked on the door early in the morning and as soon as his father opened the door, they rushed into the apartment, arrested him, and started confiscating all of the electronic devices, CDs, and even the satellite receiver.

In many cases, the agents also confiscate the personal belongings of the detainees' relatives or anybody who lives with them or is present at the time of arrest, without any reasonable ground for suspicion. Most of the time, the agents take advantage of the state of shock of the residents and confiscate their personal belongings. In the cases when the victims challenge the confiscation afterwards, the agents present the lack of protest on the part of the detainee or other residents at the time of the seizure as a sign of consent.

In other cases, the agents show an arrest warrant and use it for search and seizure, despite clear provisions in the Iranian Criminal Procedure Code stating that search and seizure procedures must be authorized through a specific warrant issued by a court.[92]  Interviews conducted by JFI with former political prisoners and the analysis of the accounts of other victims and family members present at the time of their arrest indicate that these provisions are regularly and systematically violated by law enforcement agents, who conduct search and seizures without warrants issued by judicial authorities, amounting to a theft of private data.

In an interview with JFI, human rights lawyer Vahid Ahmad Fakhroldin,[93] who was arrested in March 2010, said that all of his personal and family photos were used by his interrogator and broadcast by IRIB as evidence of his alleged promiscuity and moral corruption: "Among my personal things [which they confiscated], there were my personal photos showing me at a family party where people were dancing, or for example, I was having a beer, things like that, and they took them and broadcast them precisely as their evidence."

The theft of private data has become such a common procedure that IRIB's internet TV channel *Mardom Khabar* broadcast an interview with a pro-government hacker who claimed that he had hacked the e-mails of women's rights activist Masih Alinejad and showed some documents he claimed to have obtained through hacking. The TV interviewer praised the hacker as a revolutionary hero.[94]

The case of Rouzhin Mohammadi, a human rights activist who was arrested on 14 November 2011 at Imam Khomeini International Airport as she was travelling back to Iran to visit her family in the western city of Kermanshah, indicates a more sophisticated method of stealing private information. While abroad, she had been in contact with Hossein Ronaghi, an activist who was arrested in 2009. While Ronaghi was in prison, his interrogators tried to communicate with his friends using Ronaghi's social media accounts. In an interview with JFI, Rouzhin Mohammadi stated:

*'I was actually chatting with Hossein's interrogator posing as Hossein. I asked him if you really are Hossein, then tell me who I am. He answered you are Rouzhin. I mean I kept*

---

91. See Reporters Without Borders, Plight of Seven Detained Netizens,
https://rsf.org/en/news/plight-seven-detained-netizens-still-worrying-one-year-after-their-arrest

92. Article 24 of the old Criminal Procedure Code (1999) stated: "The judicial officers shall inform the appropriate judicial authority about the results of the inquiry taken, and if the mentioned authority finds the inquiry taken to be insufficient, they may request supplementary action. In this case, the officers are obliged to follow the orders of the judicial authority to investigate and take legal measures to identify the crime, but they cannot keep the accused in detention. And, if in evident crimes, detention of the accused is necessary in order to complete the investigation, the accused should be notified of the subject of accusation along with the reasons in writing. The accused can be kept under surveillance for a maximum of 24 hours, and the issue should be reported to a judicial authority to render a legal decision. The judicial authority will then decide on the continuation of detention or determine whether the accused should be released. Inspection of houses, premises, items, and arrest with regard to non-evident crimes should be performed with the special permission of a judicial authority, even if the general detection is assigned to the officer by the judicial authority." The content of that article is now reflected in Article 46 of the new Criminal Procedure Code (2014).

93. See Annex 4 for details on Fakhroldin.

94. See Annex 6.

*asking him for a while and he eventually said it […]. When I was arrested, I realised that they really know their way around the internet. Because they did not need any of my passwords, they already had all of them, even the password to the e-mail address I used only once. They only asked me for the passwords to test if I'm lying […]. They had all my emails in print, even those that I had deleted.'*

The case of Mohammadi shows that private data is not only obtained by compelling the prisoners to give access to their data, but in fact, also by employing illegal methods, such as hacking, without a court order and against individuals who are not under investigation.

Another legal issue with the search and seizure of personal devices and confiscation of private data is the matter of relevance. In almost all cases reviewed for this report, the agents confiscated all the devices, documents, data, family albums, movie and music discs, books, and more, not only belonging to the suspect but also to all other individuals residing in the same place or present at the time of arrest. The Iranian Criminal Procedure Code states that "Among the papers, documents, belongings, and other personal effects of the accused, only those related to the crime shall be secured and presented to the examining witness(es) if need be. The judge is bound to cautiously treat other documents and belongings, and he should not allow contents irrelevant to the crime to be revealed."[95]

Moreover, the same law stipulates that law enforcement agents are not authorised to directly inspect the content of mailed and multimedia correspondence but to pass the materials to the judge. However, the law is never followed, and the agents personally decide on what is to be confiscated and how it is to be inspected and used. In fact, they confiscate all electronic belongings of the detainee and those of their family or anyone else present at the time of arrest, along with all photos, family albums, music discs, movies, books, posters and ornaments in bulk.

The purpose of the law is to guarantee that the relevance of the private material is assessed by a judicial authority competent to maintain a balance between the individual's right to privacy and the public's interest. The importance of such a balance is expressly mentioned in the Criminal Procedure Code, which states that "[i]f the inspection and search does interfere with people's rights, it is allowed only if it is more important than the rights of the people."[96]

The refusal to follow the above-mentioned provisions in search and seizure procedures results in blatant violations of the detainees' rights to privacy and presumption of innocence.

The illegal confiscation of private data also plays an important role in the justification of an illegal arrest. In many cases, the detainees are arrested without a warrant. Then, the material illegally confiscated during the arrest is subsequently used to find grounds and justification for the arrest.[97] In most cases, the detainees are not informed of the grounds for their arrest and for the search and seizure before it happens. Instead, they are charged afterwards, based on a made-up scenario backed by private materials obtained illegally after or at the time of their arrest.

The Criminal Procedure Code stipulates that the "reason for arrest" must be mentioned in the arrest warrant, and the detainee must be informed of such reason at the time of arrest.[98] Article 9(2) of the ICCPR also states that "anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arrest and shall be promptly informed of any charges against him."

In the first week of February 2010, dozens of Iranian journalists, human rights defenders, and political activists were arrested, including Mahfarid Mansourian, an environmental activist. Ms.

---

95. See the full text of the legislation, available at: https://www.refworld.org/docid/517fb0994.html. Article 103 of the old Criminal Procedure Code (1999), the content of which is now reflected in Article 146 of the new Criminal Procedure Code (2014).

96. Article 97 of the old Criminal Procedure Code (1999), the content of which is now reflected in Article 139 of the new Criminal Procedure Code (2104).

97. Sepehr Ebrahimi and Hanieh Farshi stated in their interview with JFI that no search warrant was shown during their arrest. However, a search and seizure was conducted in both cases.

98. Articles 113 and 119 of the old Criminal Procedure Code (1999), the content of which is now reflected in Article 181 of the new Criminal Procedure Code (2104).

Mansourian's husband says his wife's arrest was made in the middle of the night, and the agents showed an arrest warrant with no name on it. They subsequently entered the premises and started performing a search and seizure.[99]

The private data obtained illegally have been routinely used as a means of exerting pressure on the detainees to force them to comply with the scenario. In some cases, private photos and video footage completely irrelevant to the charges have been used as a tool to threaten the detainees that if they did not cooperate their private activities would be revealed to the public.

Farzaneh Jalali, a women's rights activist and a victim of recorded forced confession, told JFI that personal photos of her with her boyfriend were frequently used by her interrogators to exert pressures on her. In another case, Sepideh Gholian, a labour activist, described in a video that the personal data found on her electronic devices was used as a means to pressure her, and interrogators threatened they would reveal the information to her family: *"They kept repeating false sexual accusations [...]. An agent, who called himself Sadeghi, threatened me and said, 'if you don't say what we ask you to, I'll bring your brother here, and I know that you have a traditional family. Your brother will cut your head off."*[100]

Finally, while there are provisions in Iranian law that prohibit extra-judicial confiscation and abuse of private data,[101] the detainees have no chance of bringing a legal action against such illegal conduct. For example, immediately after publishing the above-mentioned video detailing illegal actions, Sepideh Gholian was arrested and transferred to an unknown detention centre.[102]

## 3.2 Forced and/or false confessions

Early on the afternoon of 11 December 2018, on his way back home from a demonstration with his co-workers from Ahwaz National Steel Company, labour rights activist Meysam AleMahdi found himself surrounded by eight plain-clothes men, coming out of five private cars. They handcuffed him, covered his head, and pushed him into a car without showing him any warrant or identification. He was not informed of which organisation was holding him and for what reason. However, based on what he heard, he believes that those responsible for his arrest were members of the Imam Ali Security Headquarters of the IRGC, located near Chaharshir square in Ahwaz.[103] In an interview with JFI he stated: "They said we know your wife is ill. We know her illness is fatal. We can block her access to medicine. We can exclude her from the list of medicine allocation."[104]

The purpose of such a threat was to force AleMahdi to confess that he was a member of Harakat al-Nizal, a separatist group in Khuzestan.[105] According to AleMahdi, from the very beginning of his interrogation, he was under heavy mental and physical pressure to confess to a list of accusations prepared by his interrogators, which included connections with opposition parties abroad and contacts with separatist Arab organisations. The types of ill-treatment to which AleMahdi was subjected during his interrogation and the techniques used to force him to confess in front of a camera were similar to those mentioned by other victims interviewed by JFI. Such similarities reveal patterns indicating that these forms of ill-treatment are not exceptional but rather a systematic and common procedure of interrogation in prisons of Iran.

---

99. See Deutsche Welle Persian's report, available at: http://tiny.cc/twlgbz

100. See Sepideh Gholian's video message, available at: https://www.youtube.com/watch?v=4ytmysYOYmE

101. See Articles 13 and 14 of the 2004 Law of Legitimate Liberties and Civil Rights, available at: https://bit.ly/2IEzF6O

102. Human Rights Watch, Iran: Prominent Labor Activist Rearrested, 24 January 2019, https://www.hrw.org/news/2019/01/24/iran-prominent-labor-activist-rearrested.

103. Imam Ali Security Headquarters and its military arm, Imam Ali Battalions, were established after the 2009 election protests as a combination of intelligence and military forces specialised in dealing with civil protests and demonstrations. See: https://www.radiofarda.com/a/f2_iran_imam_ali_forces_revolutionary_guards_protests_baseejis_police/24357494.html

104. This threat likely refers to the Red Crescent list of drugs for special diseases or that of the Centre for Special Diseases. AleMahdi's wife suffers from advanced multiple sclerosis.

105. The Islamic Republic considers Harakat al-Nizal to be a terrorist group and affiliation with this group can lead to serious criminal charges punishable by death.

Torture and ill-treatment are used as the main methods to coerce or force detainees to confess in front of the camera. However, the element of coercion has been imposed in various forms to pressure prisoners and compel them to confess. The following examples illustrate the most common methods used to extract confessions based on the common patterns identified through interviews with victims.

*Physical torture*

AleMahdi alleges he was constantly threatened, beaten, slapped, punched in the stomach, and hit in the neck or shoulder with heavy objects during his interrogation. AleMahdi also mentioned that his interrogator showed him a device and told him that it was an electroshock weapon. According to AleMahdi, his interrogator told him "I can electrocute you with this and mess you up. Think of your wife and children."

Loqman Moradi was arrested along with his cousin, Zanyar Moradi, in August 2009 and charged with killing three individuals, including the son of the Friday Prayer Imam for the city of Mariwan. Although there was substantial evidence to prove the two men were not near the scene when the crimes happened, they were forced to falsely confess before cameras to being members of the communist group Komala and carrying out the assassination on its command. The two then were forced to meet with the Imam in person and ask for his forgiveness in front of the cameras.

Based on the testimony of an eyewitness (a close associate of the two prisoners) and Loqman's exclusive interview with JFI,[106] the agents of the Sanandaj Office of Intelligence, severely tortured the Moradi cousins. Loqman told JFI: "In order to [accept to] go to the Friday Prayer Imam, for two to three days they performed Hadd[107] on me [...]. They threatened the family saying: 'We'll get your sisters, we'll get your families, we'll ruin you all, we'll rape you'."[108]

In a letter to the UN Special Rapporteur on human rights in Iran, Zanyar and Loqman Moradi described instances of severe physical and mental torture they experienced: "They brought a bottle and said you must agree [to confess], and if you don't, you must sit on this bottle. And they also threatened to rape me and said: 'You choose! You either accept or this is your last choice.' I had to accept because I couldn't bear this type of torture, and I had severe bleeding and burns on my genitals and could no longer stand these brutal tortures."[109]

*Press TV* broadcast the Moradi cousins' confessions and their meeting with the Imam on 12 November 2012, as an "exclusive" episode of the "Iran Today" programme. Loqman and Zanyar Moradi were eventually executed on 8 September 2018.

On 14 March 2012, *Press TV* broadcasted a programme titled "Al-Ahvazi Terrorist Groups in Khuzestan," featuring an interview with Ahmad Debat, an individual arrested during the Arba'in unrest in the city of Shush. In the broadcast, Mr. Debat confessed to blowing up oil pipelines and shooting at people's houses and law enforcement officials. The same episode broadcasted another interview with Sajjad Beyt Abdollah (Ka'abi) who confessed to armed assault. JFI examined and compared the footage of Ahmad Debat and Sajjad Beyt's confessions to the photos of both men before their arrest, provided by their relative Sa'id Debat. The videos of their confessions clearly showed that both prisoners' teeth were broken.

Saeed Malekpour, a Canadian resident and IT expert, who was arrested in 2008 and sentenced to death, was forced to confess to a series of baseless crimes. His confessions, along with those of several other detainees, were broadcast by IRIB on 20 March 2009. In an open letter smuggled out of prison, Malekpour described the severe manners in which he was tortured, both while in

---

106. The interview was conducted by JFI while Loghman and Zanyar were in Rajaei Shar Prison and through a phone which was smuggled into the prison.

107. Hadd in this case means lashing.

108. Listen to excerpts of Moradi's testimony at:
   https://twitter.com/Justice4Iran/status/1053307411161890818

109. See BBC Persian's report including Moradi's testimony on the torture he experienced, available at:
   http://www.bbc.com/persian/iran-45490264

Ward 2A of Tehran's Evin prison and at another location known as the "Technical Office," in order to extract a confession from him: "Most of the time, the tortures were performed by a group. While I remained blindfolded and handcuffed, several individuals armed with cables, batons, and their fists struck and punched me. At times, they would flog my head and neck and other body parts. Such mistreatment was aimed at forcing me to write what the interrogators were dictating, and to compel me to play a role in front of the camera, based on their scenarios. Sometimes, they used extremely painful electrical shocks that would paralyse me temporarily."[110]

While physical torture is a common technique used by interrogators to extract confessions, their form and the severity depend on the detainees' social status and the probability of the public and international community's sensitivity about the detainees' condition. High profile detainees, such as internationally known activists, artists, or well-connected politicians, are rarely tortured using severe methods (i.e. flogging, electrocution, or hanging-up by handcuffs) that could leave physical marks on their bodies. However, these methods are commonly used on low-profile detainees, or detainees whose suffering is unlikely to raise public outcry (i.e. members of ethnic and religious minorities, or prisoners accused of terrorism or separatism).

*Drugging and sleep deprivation*

Several individuals interviewed by JFI reported specific events that led them to believe they had been drugged prior to their interrogation in order to influence the interrogation. Minutes before the interrogation began, AleMahdi asked for a glass of water, and after drinking the water he felt severe fatigue and irresistible drowsiness. He believes that his weariness was abnormal and suspects that he was drugged. He was then interrogated for hours and forced to answer questions in written form while he could barely keep his eyes open.[111]

Another example of suspected drugging to extract forced confession was reported as part of the show trials of reformists after the 2009 election. On 1 August 2009, 110 defendants, including reformist politicians, journalists, and activists, were put on trial.[112] The trials were broadcast by IRIB, along with a press conference of some of the defendants, including the former chief of staff of Khatami's administration, Mohammad Ali Abtahi. During this press conference, the defendants withdrew their claims about fraudulent elections and confessed that the reformists had planned to overthrow the Islamic Republic, using the allegations of election fraud as an excuse. On 4 August 2009, Fahimeh Mousavinejad, Abtahi's wife, told the *Associated Press* that she had seen her husband in prison two days before the trial began and that she was "in no doubt" that he had been drugged, because he appeared disoriented.[113] In another case, blogger and activist Hanieh Farshi was arrested on the early morning of 18 July 2010 and transported to the Intelligence Ministry's headquarters in Tabriz, a city in northern Iran. She was kept in the interrogation room, blindfolded, and seated on a chair towards the wall while she was told to wait and not to fall asleep. She had to wait for hours before her preliminary interrogation began.[114]

In an interview with JFI, Farzaneh Jalali, a former political prisoner, described her interrogation sessions as "extremely wearing and unbearably long," usually lasting about ten hours each. She mentioned that, during one of those sessions she was kept in a room seated and blindfolded, waiting for her interrogators from 1 PM until 9 PM without permission to take a rest. When she tried to lie down due to an extremely painful backache, the interrogators went into the room and ordered her to return to her seat.[115]

Based on the interviewees' accounts, it is apparent that forcibly causing drowsiness and wearing

---

110. See the full text of Malekpour's letter at: https://peoplewithoutnation.wordpress.com/saeed-malekpour-open-letter-to-the-iri-judiciary/

111. Interview with JFI, 2019

112. See Amnesty International, *Over 100 Iranians face grossly unfair trials,* 4 August 2009, https://www.amnesty.org/en/latest/news/2009/08/over-100-iranians-face-grossly-unfair-trials-20090804/.

113. Independent, *As Ahmadinejad is anointed, his victims pay the price of dissent,* 4 August 2009, https://www.independent.co.uk/news/world/middle-east/as-ahmadinejad-is-anointed-his-victims-pay-the-price-of-dissent-1766953.html.

114. In an interview with JFI, 2019; see Annex 4.

115. Ibid.

prisoners down both mentally and physically through the use of drugs or extremely prolonged waiting hours, is a common interrogation technique adopted to alter prisoners' consciousness and break their resistance.

*Threatening detainees' families*

The interrogators constantly threatened AleMahdi's family.[116] "We can cause serious troubles for your brother," AleMahdi recalls interrogators telling him. He reported that such threats had more impact on him to agree with the false confessions than the physical ill-treatment he experienced: "They said: 'Just like we can bring you here, we can also bring your wife over and have her stand naked in front of us all.' At this moment, you have to say whatever they ask you to."

Loqman Moradi described similar threats: "They carried out flogging on me and yet I refused [to confess]. Then they called my family in front of me and told them that they couldn't leave the house. They said to me that if I refused to tell the Friday Imam what they want, they will bring my entire family there. I was forced to accept." His confession, along with Zanyar Moradi's confession, was broadcast on 12 November 2010 in the propaganda weekly show "Iran Today," under the title of "Komala Terrorist Organisation."[117]

In her interview with JFI, human rights activist Rouzhin Mohammadi stated that her brother was brought to the cell next to hers and tortured while she could hear him screaming: "It is unbearable that my brother who wasn't political at all was brought exactly to a cell next to mine and was tortured while the door was open so I could hear him. They hung him from his shoulders. His shoulders became loose. He cannot put on his clothes by himself and he cannot sleep."[118]

Rouzhin Mohammadi also described how the intelligence agents threatened her father: "My father told me later that they asked him whether he wants her daughter back dead or alive. They asked him: 'do you want your daughter unharmed or you want us to […] do something to her.'[…] My dad didn't say the word they used."[119]

Ahmadreza Jalali, an Iranian-Swedish academic in detention in Iran on espionage charges, wrote in a letter from prison that his interrogators threatened that they would arrest and hurt his two small children if he refused to confess in front of the camera.[120]

Saeed Malekpour wrote in a letter about the similar threats made by his interrogators: "I endured long solitary confinement time (totalling more than one year) without phone calls or the possibility of visiting my loved ones, constant threats to arrest and torture my wife and family if I did not cooperate, threats to kill me. They also provided me with false news of arresting my wife. My mental health was severely threatened."

---

116. Ibid.

117. See JFI, *Cut! Take Press TV Off the Air*, p 6, available at: https://justice4iran.org/wp-content/uploads/2013/03/CutTake-PressTVofftheAir-English.pdf.

118. Interview with JFI, 2019

119. In an interview with JFI, 2012. For more information see Annex 4.

120. See Centre for Human Rights in Iran, *Iran's State TV Aired Forced Confession of Ahmadreza Djalali Because He Refused to Spy for Iran*, 20 December 2017, https://www.iranhumanrights.org/2017/12/irans-state-tv-aired-forced-confession-of-ahmadreza-djalali-because-he-refused-to-spy-for-iran/; Also see Chapter 3.3 below for detailed information on Ahmadreza Jalali's case.

The most recent examples of threats being made against a prisoner's family are the cases of women's rights activists campaigning against the Islamic Republic's mandatory hijab policy.[121] In its 2019 report, Amnesty International identified at least six women's rights defenders still detained in Iranian prisons, who were placed under heavy pressure and various forms of ill-treatment to force them to confess in front of cameras.[122]

Since her arrest on 1 June 2019, women's rights defender Saba Kordafshari has been subjected to different forms of ill-treatment, which at some points amounted to torture. The interrogators conditioned her release on providing a forced confession and threatened to arrest her mother if she did not "cooperate." As a result of Saba's refusal, on 10 July 2019, the authorities arrested Saba's mother, Raheleh Ahmadi.[123] In another case, 24-year-old women's rights defender Yasaman Aryani was arrested by security forces on 10 April 2019 at her home in Tehran. Her mother, Monireh Arabshahi, was arrested the next day after inquiring about her daughter's whereabouts at the Vozara detention centre in Tehran.[124] According to Amnesty International, Aryani has been under constant pressure and threatened with the arrest of the rest of her family, including her younger siblings and her father.[125]

These instances and the above-mentioned testimonies indicate that threatening the family members of the detainee is in fact a common means of coercion used by the Islamic Republic's security agencies. They also suggest that this method is among the most effective ones for compelling the detainee to confess. The interrogators take advantage of the prisoners' vulnerabilities and force them to imagine the same level of suffering being inflicted on their loved ones. The interrogators also repeatedly stress that if these threats are to be realised, it is the detainees' fault for not cooperating. In this manner, they impose an agonising psychological burden on the detainees to feel responsible for any suffering that might be inflicted on their loved ones.

It is worth noting that, in many cases, the relatives of the prisoners are also coerced to provide interviews, mostly to IRIB, and to recite certain statements dictated by the security forces. One of the most characteristic instances of such methods is that of Saru Ghahremani. Saru Ghahremani was an Iranian Kurdish citizen who disappeared after taking part in a protest against the Iranian government in Sanandaj. According to his family, on 12 January 2018, his death was reported to them, 11 days after his arrest by the Sanandaj Intelligence Office.[126] On 13 January 2018, after Saru's body was returned to his family, MOI agents took Saru's father with them, and, a few hours later, a video of him was broadcast by IRIB news channel,[127] in which he stated that Saru was a member of Komala, that he had been armed and trained by Komala for terrorist operations inside Iran, and that he had been killed during a shootout with Iranian security forces.[128] The case of Saru's family is by no means an exception. Similar statements were extracted from the families of Kavous Seyed Emami,[129] and, most recently, from the siblings and parents of women's rights defender Masih Alinejad.[130]

---

121. For list of legislations on mandatory hijab see: JFI, *Thirty Five Years of Force Hijab*, March 2014, p 19, https://justice4iran.org/wp-content/uploads/2014/03/Hejab-Report-JFI-English.pdf

122. See Amnesty International, Iran: Cruel campaign to extract propaganda 'confessions' from protesters against compulsory veiling, 15 July 2019, https://www.amnesty.org/en/latest/news/2019/07/iran-cruel-campaign-to-extract-propaganda-confessions-from-pro-testers-against-compulsory-veiling/?fbclid=IwAR28zx6QpqzhXJ6RF-8vi6fMBd55rp5hE-EJzh_Su03qf3ev0ynVH8uYjCA_

123. Ibid.

124. Ibid.

125. Ibid.

126. Iran Observer, *Iran Kills More Protesters Under Torture Across the Country*, January 2018, http://www.iranobserver.org/iran-kills-more-protesters-under-torture-across-the-country/_

127. See the video of Ghahremani's father's confessions at: https://bit.ly/2XNilHq

128. See Centre for Human Rights, *Intelligence Ministry Forces Father of Slain Protester to Repeat Authorities' Version of Events on State TV*, 16 January 2018, iranhumanrights.org/2018/01/intelligence-ministry-forces-father-of-slain-protester-to-repeat-authorities-version-of-events-on-state-tv/

129. See the case of Kavous Seyed Emami under the Chapter 4.3 on defamation.

130. New York Times (editorial), *My Sister Disowned Me on State TV*, 31 July 2018, https://www.nytimes.com/2018/07/31/opinion/iran-hijab-feminist.html_

According to Amnesty International, in March 2019, the MOI summoned for interrogation Zarrin Badpa, the elderly mother of Masih Alinejad, a US-based Iranian women's rights defender and founder of the White Wednesday campaign. She was questioned for two hours about her daughter's activities while being filmed. IRIB had already broadcast an interview with Alinejad's sister, in which she denounced her and her campaign.[131]

*Sexual accusations*

For a theocratic regime that claims moral sanctity, one of the most common ways of demonising its critics is through accusations of sexual promiscuity. By forcing detainees to confess to promiscuity and sexual relationships with their comrades, the Islamic Republic seeks to label its dissidents as immoral, filthy, and debauched. It is worth mentioning that marital sex and same-sex conduct are social and cultural taboos that are criminalised under the Islamic Republic's laws and are punishable by lashing, stoning, or hanging.

AleMahdi's interrogators expressly accused him of having an affair with his female comrades, Asal and Sepideh: "The interrogator said; 'You have sexual relationships with Asal[132] and Sepideh.'[133] I told them they were my comrades. 'Do you look at all your friends like that? No, these are whores,' he replied and kept insulting them."[134]

Blogger Sepehr Ebrahimi also described a part of his interrogation in which he was questioned about his alleged sexual relationship with other group members he was in contact with: "They [the authorities] humiliated you. They tried to make confess to having sex with the others, so they can go and torture them using my confessions."[135]

---

131. For more details, see Chapter 5 - Impact.

132. Asal Mohammadi is a labour activist and a contributor to the leftist student journal *Gaam*. She was arrested at her home in Ahvaz by security forces on 4 December 2018, and transferred to Branch One of the Prosecutor's Office in Tehran's Evin prison.

133. Sepideh Gholian is an Iranian labour activist, journalist, and prisoner of conscience from the city of Ahvaz. She worked with several journals as a citizen journalist and reported on the labour protests organised by the Workers Union of Haft Tappeh. She was arrested on 18 November 2018. After her release on bail she released a video message in which she revealed the ill-treatment and torture she experienced during her arrest. As a result of this message, she was re-arrested. On 26 December 2019, Sepideh Gholian, who was released on bail, announced that she has filed a lawsuit against IRIB for broadcasting her forced confessions extracted under torture. She also filed a lawsuit against one of IRIB reporters who allegedly prepared the script of her confessions. Gholian's twitter account was deactivated hours after her announcement. See RadioFarda, *Labor Activist's Twitter Deactivated After Suing State TV Reporter*, 26 December 2019, https://en.radiofarda.com/a/labor-activist-s-twitter-deactivated-after-suing-state-tv-reporter-for-forced-confessions/30345730.html

134. Interview with JFI, 2019.

135. Interview with JFI, 2019.

## Case study: Iran Chain Murders

Although this report covers cases since 2009, the case of the Iran Chain Murders and the leaked video that showed the process of obtaining confessions from the alleged perpetrators provide details and evidence of the systematic pattern of abusive interrogation methods in Iran. The video confirms, and lends legitimacy to, the accounts of witnesses interviewed by JFI regarding the methods used by state agents to obtain forced confessions.

The Iran Chain Murders were a series of assassinations of Iranian dissidents and intellectuals undertaken between 1988 and 1998. The murders came to light in late 1998 when Dariush Forouhar, his wife Parvaneh Eskandari Forouhar, and three dissident writers were murdered over a span of two months. In mid-1999, public outcry and a series of media investigations forced Iranian prosecutors to announce that they had found the perpetrator. They alleged that Saeed Emami, a senior director of the MOI, had led "rogue elements" within the MOI to conduct the assassinations. Emami had reportedly committed suicide in prison to avoid prosecution.

In January 2000, authorities showed to Iranian members of parliament a video of six suspects in the case, in which they confessed to having collaborated with the FBI, the Mossad and the CIA. During the session, Mohammad Niazi, the then-head of Iran's Judiciary Organisation of the Armed Forces, asserted "there were no pressure on the detainees to confess whatsoever. These confessions are sincere and real and based on the facts and can be relied on as substantial evidence in the court."[136]

However, 18 months later, in June 2001, a leaked video showed how the confessions had been obtained from the suspects. Seemingly shot in the detention centre of the MOI, the video shows the interrogation of former intelligence agents Mostafa Kazemi, PourMohammadi, Morteza PourFallah, Akbarian, and Taheri, as well as the interrogation of Fahime Dorri, the wife of Saeed Emami.

The sequence and methods of interrogation bear striking similarities to those reported by people interviewed by JFI and other NGOs, such as the use of accusations of sexual nature (e.g. adultery), blasphemy, and treason. In the video, the first three suspects are told by various interrogators that they had "illicit" relationships with each other's spouses. One interrogator also accuses one of the prisoners of moral corruption, a charge the prisoner denies. The shouts heard later in the video are the sounds of beating and pleas for help. In the next round of interrogations, a man named Morteza [PourFallah] is beaten while his interrogators speak.

At some point, Fahime Dorri is returned to interrogation. She ends up admitting that she took a "security" report to Canada to hand it over to the CIA. The interrogators then tell her that she has to explain her visits to Israel. She says she has never gone to Israel and repeats this a number of times. The interrogator asks her: "What if we do something that forces you to admit that you have gone there?"

At this time, the course of interrogation shifts towards accusations of sexual nature and forced confessions related to alleged acts of moral corruption. Such a shift indicates that the sexual accusations are a form of psychological torture in order to convince her that confessing to treason and espionage might be less serious than admitting to moral corruption.

...

---

136. See Hamshahri Newspaper report, available at:
https://images.hamshahrionline.ir/hamnews/1378/781105/siasi.htm#siasi3

Later in the video, interrogators question Ms. Dorri about intimate details of her relationship with her husband. They repeat their accusations that she had "illicit relations" with other men, and that she was pregnant as a result of a relationship with one of these ex-agents. The interrogators repeatedly tell her that they will really "hurt her where it matters," that she is a "nymphomaniac" and a "dirty whore." They also repeatedly tell her to confess that her husband brought men home for her pleasure. When she finally confesses to this series of accusations, including to having had extra-marital sex with other men, they accuse her of having had lesbian relations.

This video represents the most credible evidence of torture and ill-treatment of detainees in Iran, including the use of these techniques against the MOI's own agents. It is also the only visual documentation of the interrogation process that is fully consistent with the accounts of other detainees regarding the torture and coercion they underwent. The video clearly illustrates what happens behind IRIB's cameras before the detainees are interviewed for a TV programme, wearing clean clothes and sitting in a nice and clean room.

It is also crucial evidence that, while these confessions were extracted through such brutal methods, Mohammed Niazi expressly lied to members of parliament regarding how these confessions were obtained and asserted that they must be considered as reliable substantial evidence in the court. It also demonstrates the influence of security forces on the judicial system: in one part of the video, the interrogator tells the detainee; "We are the judge, the jury and the trial in this case."

  

*Threat of execution*

One of the most common means of pressuring detainees to obtain confessions is threatening them with execution. This method imposes an agonising pressure on the detainees and makes them believe that the same fate could be awaiting them.

In many cases, the detainees are first charged without any evidence with crimes such as treason, insulting the Prophet, or "corruption on earth." These offences are punishable by death under the Islamic Penal Code. The interrogators frequently try to convince the detainees that they are in immediate danger of being executed and sometimes go as far as describing to the detainees the way in which they will be hanged, in order to add psychological pressure on them.

In her testimony to JFI, blogger and activist Hanieh Farshi described her interrogator's words about her potential execution:[137] "He told me, Hanieh! I will personally pick a nice noose for you. You are tall and it will be so much fun watching you hang from a rope, as if we hang a large camel."

Sepehr Ebrahimi,[138] who was on a hunger strike during his interrogation, reported, "[M]y interrogator said: 'Eat something, so when we hang you, it will be quick.'"

Both these interviewees were primarily charged with insulting the Prophet, an offence that is punishable by death under the Islamic Penal Code. Ebrahimi says he refused to confess in front of the cameras until the last moment: "Then, my interrogator told me if you refuse, we send you to the court with charge of blasphemy by insulting the Prophet (sabb-al-nabi) and you'll be executed." It was only then that he agreed to confess in front of the cameras. The charges were then dropped during the trial. Most interviewees asserted that when they were threatened with the death penalty by their interrogators, they believed that authorities were fully capable of carrying out those threats.

Hanieh Farshi told JFI that her confession was recorded in the same room where Majid Jamali-Fashi's confessions were recorded. Jamali-Fashi was charged with the assassination of an Iranian nuclear scientist and was executed in May 2012. Farshi stated: "They brought me to the same room where they recorded [Jamali-]Fashi's confessions, and I watched it on TV a day before that. They told me that he got the death sentence, and he will be executed."[139]

*Using harsh prison conditions as a pressure tool*

Aside from direct forms of pressuring the detainee, such as physical and psychological torture and ill-treatment, the use of harsh prison conditions is also a very effective method to force the detainees to confess in front of a camera. This includes, for instance, transferring the detainees to sections of the prison where dangerous prisoners are held, putting the prisoner in overcrowded cells or in solitary confinement, and depriving prisoners of access to medical care. These are common methods of punishment against those who refuse to take part in televised confessions.

Hanieh Farshi was transferred to the general ward of Tehran's Evin prison where, she stated, "the prisoners beat up anyone who looks a bit different."[140] Sepehr Ebrahimi was also transferred to the notorious Ghezel Hesar prison in Karaj, where the most dangerous prisoners are kept. He described the situation: "650 prisoners were kept in a space less than 500 square meters. At night, we had to lie down next to each other, right from behind the toilet doors to the gate of the ward. In the morning, there was not enough space to sit and stretch your legs out."[141]

Aside from the unbearable physical conditions, the fear of being attacked or raped by other prisoners or the fear of fatal contagious diseases impose huge psychological pressures on the detainees.

---

137. See Annex 4.
138. Ibid.
139. Interview with JFI, 2019
140. JFI interview, see Annex 4.
141. JFI interview, see Annex 4.

Ebrahimi states: "The sanitary conditions were terrifying. There was no light, no ventilation [...], the drug addicted prisoners were kept there [ ...], there were gang wars going on, and each night, they were trying to kill each other. There was always a possibility of getting killed or stabbed."

Most reports on the use of long-term solitary confinement to compel the prisoners to confess on camera suggest that this technique is systematically used for extracting forced confessions. According to Amnesty International, women's rights defenders Saba Kordafshari and Yasaman Aryani, along with four other women's rights defenders, have been subjected to prolonged solitary confinement, simply to pressure them to confess on camera.[142] Deliberately exposing the detainees to prolonged periods in solitary confinement or to a condition where the detainee constantly fears death, rape, or being infected with HIV or Hepatitis, is tantamount to torture and inhuman or degrading treatment. Such a horrifying situation can easily break the detainee both physically and psychologically, to the point where they agree to do whatever it takes to get out of that situation.

*Psychological pressure and degrading treatment*

In effect, all the above-mentioned methods to extract confession from prisoners may amount to torture. The threats of execution, subjecting prisoners to unbearable prison conditions, or interrogating prisoners about their intimate and sexual relationships could all arouse in the victims the feeling of constant fear, anguish, and insecurity. However, there are methods specifically used by Iranian security forces, not only to compel prisoners to confess, but simply to push them to the verge of nervous breakdown, in order to strip them of their identity and will, and to break them into total submission. In other words, there are three stages of turning a human being into a submissive object.[143] The first stage is that of breaking prisoners who are isolated, tortured and subjected to the most severe types of treatment. The second stage is that of transformation, as prisoners are systematically subjected to degrading treatment, forcing them to doubt their identity, beliefs, ideals and principles, which are constantly being questioned, mocked, and rejected. Prisoners are bombarded with identities, beliefs and ideas, and are told that they will be rewarded for accepting them.

In her interview with JFI, Dorsa Sobhani, a human rights activist and Iranian Baha'i citizen,[144] reported that she was constantly humiliated and debased for being an adherent of the Bahai faith: "They kept telling me: 'We already have successful Muslim students, academics and experts. We don't need you in our universities. You must rot and die here in these prisons."

The third stage is that of reconstruction, in which prisoners will be rewarded for accepting their new identities or ideas or for their cooperation. At this stage, prisoners are once again allowed to imagine and hope for better conditions or a future. However, with the slightest sign of resistance, all hopes and rewards will be taken away.

Dorsa Sobhani described how happy she was when her solitary confinement ended, and two prisoners were brought to her cell.  However, the day after, her cellmates were transferred to another cell, and she was left alone again. Dorsa said: "I went to the interrogation session, and there, my interrogator told me that those prisoners were Muslims, and they requested to be transferred because, 'you are a Baha'i, a dirty and untouchable (najes) person for Muslims'."

This type of humiliating and degrading treatment in the harsh and already stressful conditions of Iranian prisons can have severe impact on the prisoners' mental health, causing long-lasting or even permanent trauma.

---

142. Amnesty International, Iran: Cruel campaign to extract propaganda 'confessions' from protesters against compulsory veiling, 15 July 2019.

143. For more on this subject see: Luci, Monica, Torture, Psychoanalysis and Human Rights, London: Routledge, 2017.

144. Baha'ism is viewed by the Iranian government as a deviant and illegal religion. The practitioners of the Baha'i faith in Iran are deprived of their basic human rights, including the right to education.

*Deception*

Another method used to convince the detainee to take part in a televised confession is through deception. In almost all the cases JFI analysed for this report, the detainee was told that the recorded confession would not be broadcast.

The interrogators told labour activist AleMahdi that the confessions were being recorded so they could "convince the high-ranking officials that unionists are not political."

Farzaneh Jalali, former political prisoner, was told that recording her confessions was "just a formality and a normal procedure, only for internal use." She was also told that "recording the confession is a precondition for [her] release on bail."

Sepehr Ebrahimi, who was charged with insulting the Prophet and disseminating anti-Islamic content, was told by his interrogators that confessions would not be broadcast, and would only be for the MOI archive and to show to the high-ranking clergy in Qom.

Rouzhin Mohammadi described a different type of deception for convincing her to confess in front of cameras: "The interrogations were over, and I was told that I will be released on bail [...]. The day after, they came and gave me my own clothes. I was really afraid, because I thought that if they were to release me, they would have told me already. The first thing that crossed my mind was televised confession [...]. They had told me that there won't be any interrogation for today. But then, four of them ambushed me and started yelling and shouting. They said: 'You've been lying all this time'[...]. They started acting. Vahid [the main interrogator] said: 'I will resign, this girl played me all this time, and I believed her.' [...] I was shocked, really shocked to the extent that I couldn't say no, I don't want to do it."[145]

In another similar and more recent case, on 18 April 2019, Yasaman Aryani and Monireh Arabshahi, both arrested for participating in the campaign against mandatory hijab, were transferred from a detention centre to an unidentified location in Tehran, without being given any explanation. According to Amnesty International, as soon as they were taken out of the van, they were confronted with camera crews from IRIB, who filmed them without their consent. They were then taken to a room to be "interviewed" by the IRIB. When they objected, they were told that they had no choice but to answer the questions.[146]

It is worth noting that, not only the prisoners' rights to privacy are systematically violated by forcing them to confess on camera and by broadcasting defamatory programmes about them, but also their right to seek judicial remedy and to take legal actions against such violations are totally denied. Attempts to seek redress are met with more severe punishments.

### 3.2.1 Scripted interviews

The majority of testimonies reviewed for this report described the process of recording the forced confessions as completely scripted and controlled by the interrogators or by IRIB staff. The testimonies assert that the setting and every audio-visual element of these productions are carefully selected, in order to fit the scenario that is written by interrogators or IRIB staff. The following sections cover the basic element of these staged and scripted interviews.

*Questions and answers*

An important feature of recording forced confessions is that both the questions and answers are determined by the interviewers. Hanieh Farshi, Farzaneh Jalali, and Meysam AleMahdi described, in a similar manner, the way their confessions were recorded. They all mentioned a whiteboard in front of them, behind the camera, on which all of the answers were already written by their interrogators.

---

145. Interview with JFI, 2012

146. Amnesty International, Iran: Cruel campaign to extract propaganda 'confessions' from protesters against compulsory veiling, 15 July 2019.

Most of the interviewees mentioned that they had to memorise each answer and practice until they could recite it naturally and in their own words. The recording was stopped several times, and the process was repeated until the interrogators or IRIB reporters were satisfied that the detainee had answered the questions in a "natural" manner.

*Made-up stories*

All the interviewees confirmed that they were asked by their interrogators to confess to crimes they never committed, and that the impossibility of their committing those crimes was clear to their interrogators. Hanieh Farshi said: "My interrogator asked me to confess on the record that I visited Israel and trained there to topple the Islamic Republic. It was clear that this is not true, as I never left the country in my life and they knew that […]. Another time, they asked me to say that I had an intimate relationship with Bahram Mushiri, a TV presenter based in the US; and I asked them how that was possible, as he was based in the US, and I was in Iran."

The testimonies indicate that the televised confessions are completely based on made-up scenarios and have little to do with the evidence or real activities of the detainees.

### Case study: Assassinations of nuclear scientists

One of the most recent and outrageously shocking cases of obtaining false confessions to fit a fabricated scenario is that of the 18 individuals charged with the assassination of four Iranian nuclear scientists between 2010 and 2012. The unique importance of this case lies in the fact the Iranian authorities eventually had to officially admit that the whole case was indeed a fabricated scenario simply to ease the political pressure on the Iranian intelligence services.

In March 2013, Iran's prosecutor said 18 assassins who had killed the nuclear scientists were to be tried on the charges of cooperation with US and Israeli agents.[147] Among them was 24-year-old Majid Jamali Fashi, who was eventually convicted and sentenced to death, and hanged on 15 May 2012.[148]

On 5 August 2012, IRIB's Channel 1 broadcast a programme titled "Terror Club," in which 13 prisoners, eight men and five women, confessed to their involvement in the assassination of the nuclear scientists. The prisoners also confessed that they had been recruited by the CIA and the Mossad, and some of them admitted that they had received "special training" by Israeli agents for carrying out the assassinations.

...

On 3 August 2019, *BBC Persian* published a shocking report on the details of the case and how the prisoners were severely tortured and forced to confess.[149] One of the victims, Maziar Ebrahimi told the *BBC* that Iranian MOI Agents had tortured him and 11 others to confess on TV that they had assassinated one of the nuclear scientists in collaboration with Israeli secret agents.

---

147. See Iran's prosecutor's statement at: https://www.radiofarda.com/a/f10-tehran-prosecutor-says-18-people-arrest-ed-over-nuclear-scientists-assassination/24931173.html

148. Independent, Iran Hangs 'Mossad Spy' Majid Jamali Fashi for Killing Scientist, 16 May 2012, https://www.independent.co.uk/news/world/middle-east/iran-hangs-mossad-spy-majid-jamali-fashi-for-killing-scientist-7754332.html .

149. BBC Persian, Release of Nuclear Scientists Assassination Suspects: Miracle or Innocence, 5 August 2019, http://www.bbc.com/persian/iran-49221220.

Ebrahimi described severe torture methods used by the intelligence agents to obtain these confessions. These confessions were taken after 30-40 days of torture. "*After only ten strokes of the cable on my feet, my foot broke. I endured around 600 strokes on my broken foot. I spent seven months in solitary confinement, handcuffed. My backbones have been bent and damaged. I was willing to plead guilty to anything.*"[150]

Ebrahimi, who now lives in Germany, reported that he and other inmates were released from jail after two years when another intelligence body, the IRGC Intelligence Organisation, discovered during an investigation that the case against them had been fabricated by the MOI.

Even after confessing to the assassination of the Iranian nuclear scientists, Ebrahimi was still tortured and pressurised to take responsibility for another unsolved case of the explosion in the missile factory in Mallard. He was also under pressure to confess that he had visited Israel along with the sons of two high-ranked government officials, Heshemi Rafsanjani and Emami Kashani.

During an investigation by the IRGC Intelligence Organisation regarding the explosion in Mallard, the IRGC interrogator found out about the serious contradictions in Ebrahimi's statements and the facts of the case. Ebrahimi recounted: "*I was asked by the IRGC agent about the Mallard explosion and I admitted, as I was told, that I detonated the bomb through a remote control. He asked me about my location when I detonated the bomb. I replied that I was behind the fence. He asked what happened after the explosion. Were you hurt? I said no. He jumped and started yelling. He said 25 km away from the explosion not a single window remained intact and you were behind the fence and not even hurt your ears? What's going on here? At this moment, I gather all my courage and said that I was tortured.*"[151]

After that, Ebrahimi's torture stopped. He was transferred to the general ward and certain high-ranking officials came to visit him in prison. Even after his innocence was established for the officials, he spent another 26 months in prison. When Ebrahimi asked why he hadn't been released, the official answered: "*For preserving the reputation of the system, we cannot release you, not yet.*"

When he was eventually released in 2016, Ebrahimi filed a lawsuit against the MOI, IRIB, and the *Keyhan* and *Jam-e-Jam* newspapers. He quoted the response of, Mohmmad Shahriyari, the judicial official in charge of the case: "*When I complained he said: What are you talking about? Go thank God that you are still alive. They keep pressuring me to hang some of you just to please the victims' family.*" In his interview with BBC, Ebrahimi mentioned that his mother had two strokes after his confessions were broadcast.

In reaction to the *BBC Persian* report, on 19 August 2019 the spokesperson of the Islamic Republic's government, Ali Rabiei, confirmed that the claims made by Ebrahimi regarding being framed, tortured, and forced to confess to the assassination of the nuclear scientists were true. Although the Intelligence Minister promised to clarify the case, no explanation has yet been released.

---

150. Ibid. Also see the video of Ebrahimi's interview at: https://www.youtube.com/watch?v=2Oa_u6pIlcE&feature=youtu.be
151. Ibid.

*Setting and appearances*

Another fact that supports the finding that these forced confessions are completely based on a pre-planned scenario, is that the interrogators or IRIB staff try to control every audio-visual aspect of the recorded confession, including the setting and the detainees' appearance.

Sepehr Ebrahimi reported he was asked to cut his hair and shave his beard before the confession was recorded. In Islamic cultures, wearing a beard is a sign of faith. Therefore, it was important that Ebrahimi, who was to confess to anti-Islam activities, did not resemble a faithful Muslim.[152]

About officials controlling her appearance before the cameras, blogger Hanieh Farshi said: "When they brought me to record the confessions, I was wearing a veil. My interrogator asked me to remove the veil and wear a scarf, instead. He also asked me to reveal some of my hair."[153] Once again, the interrogators' intention was to control the appearance of Farshi and to make sure there was no resemblance between her and the stereotypical faithful Islamic woman.

In many cases, the detainees were repeatedly asked to smile during the confession and show a happy and calm face. If the detainees frowned or showed a weary face, the recording was repeated, and the detainees were pressured to show an energetic or calm face.

All the above examples indicate that the interrogators or IRIB staff attempt to control every element of the recorded confession and to ensure that everything is done exactly in accordance with the prepared scenario. In these scenarios, the confessing detainee is solely an actor directed by them. Such emphasis on controlling every element of the recorded confession indicates that, in contrast with the interrogators' claims, the confessions are primarily recorded to be broadcast to the public, and every detail is prepared to support the narrative the interrogators and IRIB staff are trying to establish.

## 3.3 Defamation

The ultimate goal of the Islamic Republic's media apparatus is defaming and damaging the reputation of its targets. In fact, the other types of content (private data and forced confessions) are often at the service of this ultimate goal.

The analysis of more than 148 defamatory programmes broadcast by IRIB during 2009-2019 reveals several patterns that are common to all of these programmes. These defamatory programmes are connected to each other and function as puzzle pieces in order to create a grand narrative of a good versus evil; a benevolent and independent state in constant war with malevolent superpowers and their countless corrupt, evil, and sell-out minions.

This official narrative is supposed to spread a social paranoia illustrating the whole world as plotting against the security, territorial integrity, and values of Iranian society. The concept of a foreign enemy seeking to regain influence over Iran and enslave Iranians has roots in both the 1979 Revolution and other historical events of the 20th century.

One of the key demands of the 1979 Revolution was "independence." Although Iran has never been colonised, one of the strongest discourses at the heart of the 1979 Revolution was that of anti-imperialism picturing the Shah of Iran as a mere puppet of the US and Western superpowers. Events such as the 1941 Anglo-Soviet invasion of Iran during World War II and the 1953 US-led coup against Prime Minister Mosaddegh strengthened demands for an independent and sovereign Iran. Relying on this historical context, the Islamic Republic has actively established a discourse that presents itself as an independent country continually resisting the adversary of foreign enemies and their agents, and any international criticism or domestic activism is immediately labelled as attempts to weaken the independence and territorial integrity of Iran.

---

152. Interview with JFI, 2019
153. Interview with JFI, 2019

Within the main discourse of an "independent state and its adversaries," other concepts are created, such as "infiltration," "sedition," "cultural invasion," "soft war," and "proxy war." The term "cultural invasion," coined in the late 1980s by the then-Supreme Leader of the Islamic Republic, Ali Khamenei, immediately became a code for legitimising the brutal repression of writers, artists, and intellectuals, as well as for exercising strict control over the appearance and cultural preferences of the younger generations.

The term was subsequently replaced by a new one, "infiltration," after 2009, which again paved the way for a new wave of strict controls, repression, and persecution. In order to establish and perpetuate such a discourse, the Islamic Republic has created a dichotomy between an "independent state fully supported by people" and "dependent and venal mercenaries funded and guided by foreigners." This dichotomy lies at the heart of all defamatory programmes broadcast by IRIB against Iranian dissidents. The scenarios based on which the forced confession are extracted are in accordance with this dichotomy. The concept of a state in a perpetual war with foreign forces and their infiltrators helps maintain a state of emergency, where the majority of human rights and legal protections are suspended or ignored.

Using this strategy, the Islamic Republic is able to manipulate the context within which the message of dissidence is received by the public. The state believes it is easier and more effective to discredit dissenting voices by defaming the dissidents rather than preventing them from communicating with the public.

Having been forced to leave Iran following the protests after the 2009 election and once again after the brutal crackdown of the recent protests in late 2017 and early 2018, a significant number of prominent Iranian journalists and activists now live outside Iran and continue to fight through gathering international support for the Iranians' struggle for freedom and prosperity. The Islamic Republic's government cannot directly supress these voices outside Iran, although their long list of successful and unsuccessful assassination plots indicates that they put significant effort into attempting to do so.[154] However, smear campaigns have proved to be a much more common tool for indirectly discrediting and isolating dissidents, both inside and outside Iran. Through smear campaigns, the state seeks to control and neutralise the dissenting discourse by classifying and labelling them. Those labels are frequently echoed in defamatory TV programmes to such an extent that they result in the audience automatically associating dissidents with these labels. Such a defamatory labelling also compels the dissidents to react and explain or defend themselves against such accusations. This requires a substantial amount of time and energy, which could otherwise be used to conduct advocacy.

Picturing the Kurds or Turks as separatists, Arabs as Islamic extremists, political activists as sell-outs, human rights defenders as foreign agents, and dual nationals as spies, the state tries to divide the activists and civil society making it very politically costly for them to work together or support each other. The state also seeks to create a hostile environment within which the defaming labels precede or even supersede the dissenting message.

In order to establish such divisive labelling, the state uses religious, cultural, ethnic, racial, and mainly nationalistic sensitivities in order to manipulate the public's emotions and prejudices against its targets.

The common link between most of these defaming labels is a reliance on a nationalistic phobia of a plan to disintegrate of the country - a plan purportedly led and executed by the foreigners and their domestic infiltrators and mercenaries. This main concept then takes various forms, as it is attached to the state's targets, e.g. separatist terrorists funded by western countries; Sunni terrorists funded by Arab countries; spies recruited by foreign intelligence services; and cultural, religious or political infiltrators.

---

154. The most recent attempts to assassinate Iranian activists by the Iranian authorities occurred in Germany, the Netherlands, and Denmark, which led to the designation of the Foreign Department of the MOI on the EU sanction list. For a detailed report on Islamic Republic's record of state terrorism see:  https://www.aasoo.org/fa/articles/1807.

On 1 January 2019, Iranian state-run TV broadcast a programme about women's rights activists and so-called "infiltration" through the women's rights movement.[155] The program accused Shadi Sadr, an Iranian-British human rights lawyer and JFI co-founder and Executive Director, of espionage, organising illegal demonstrations, spreading anti-Islamic and anti-government ideas among women, and working for foreign intelligence agencies through collaboration with their front companies and organisations. The programme claimed that Sadr received €180,000 (US$200,000) from a Dutch organisation called Hivos to "campaign for freedom of homosexuality."[156]

The programme also accused Sadr of "having no problem with separatism, dividing the nation, terrorism [...] and [inviting] women to join the terrorist group." The programme used footage of Sadr speaking during a private meeting without her permission. It is likely that the footage was confiscated from the belongings of the activists who had attended the meeting and were later arrested.

It is worth mentioning that *Press TV* has a history of targeting Sadr with serious allegations of a defamatory nature. On 27 February 2014, *Press TV* published an article titled "Shadi Sadr, A Traitor in Activist's Clothing" on its website, which accused her of demanding "the separation of the resource rich southern province of Khuzestan from the rest of the country," misquoting a short status posted on her Facebook page that referred to the hardship and unhappiness of people of Khuzestan and their exploitation by the central government.[157] The article, which quoted an anonymous expert, labelled Sadr and her activities as part of a recent campaign to create ethnic tensions in Iran. It also accused Sadr of being "the British Intelligence Service's hit woman on Iran" without providing any supporting evidence.[158]

The article was followed by more accusations and offensive labelling on air by one of *Press TV*'s directors, Hamid Reza Emadi, who referred to Sadr as "a traitor," "a rat," and "a representative of the British spy agency on media sanctions against Iran." As a result of this smear campaign, many threats, insults, and other defamatory articles against Sadr appeared on the internet and social media.

Aside from the above-mentioned strategy, the defamatory programmes have other functions as well. They play an important role in preparing the public for new waves of suppression and are used as a tool to justify unlawful judicial or extrajudicial actions.[159] One of the most characteristic instances of such use of a defamatory campaign to justify the illegal actions of the state is that of environmental activist Kavous Seyed Emami. Kavous Seyed Emami was an Iranian-Canadian academic and prominent environmentalist and founder of the Persian Wildlife Heritage Foundation (PWHF). Emami was arrested on 24 January 2018 on suspicion of espionage. On 8 February 2018, Tehran prosecutor Abbas Jafari-Doaltabadi announced his death in prison, telling the press: "He was one of the defendants in a spying case and unfortunately he committed suicide in prison since he knew that many had made confessions against him and because of his own confessions."[160]

A few days later, on 13 February 2018, IRIB's 8:30 PM news program[161] broadcast a special reportage during which it claimed Emami was a spy in direct contact with the CIA and which concluded that he committed suicide in order to protect sensitive information about the spy network in Iran. The program featured Emami and his family's private photos, video footage from

---

155. See the programme at : http://www.doctv.ir/programs/10402-%D8%AE%D8%A7%D8%B1%D8%AC-%D8%A7%D8%B2-%D8%AF%DB%8C%D8%AF-4

156. Ibid

157. See Annex 5.

158. Ibid

159. The recent assassination of Ahmad Neisy in the Netherlands and the Interpol arrest warrant for arresting another Arab-Ahwazi activist in Poland are clear examples of the Islamic Republic's extrajudicial actions. Both of these activists were mentioned in several programmes broadcast by IRIB's *Press TV* and were accused of organising terrorist cells inside Iran. For more information see: https://www.theguardian.com/world/2019/jan/08/iran-behind-two-assassinations-in-netherlands-minister

160. Reuters, *Iran says Canadian-Iranian committed suicide in jail*; more arrests expected, 14 February 2018, https://af.reuters.com/article/worldNews/idAFKBN1FV0Q1

161. 8:30 PM news is the major political news bulletin on IRIB domestic networks. It has been the most active news bulletin in broadcasting forced confessions and defamatory programmes since 2009.

family gatherings, and documents and correspondence extracted from Emami's online accounts without their consent. An e-mail between Emami and a friend known as David was shown during the programme to "prove" Emami's connection with foreign intelligence services. The program also featured a video statement by Emami's brother during which he admitted that he had seen his brother's body and believed that he had committed suicide. Emami's family has since filed a defamation lawsuit against IRIB and have claimed that the authorities pressured Emami's brother into recording the video when they raided his house a few days earlier. As of the date of publication of this report, the lawsuit had not yet been processed by the court and no public report of any investigation into Emami's death in prison or the allegations made by IRIB had been released. Emami's case exemplifies the use of defamatory programmes as means of justification or covering up the state's wrongdoing. It is also one of the clearest examples of violation of the right to the presumption of innocence.

It is worth noting that the defamatory programmes and the intelligence operations attached to them are multifunctional by nature. Smear campaigns against journalists, activists, and civil society representatives have almost always both a political and propaganda value. On one hand, these programmes are part of the state's propaganda campaign as it was described above and, on the other hand, they are sometimes a means of domestic rivalry between factions within the power structure of the Islamic Republic.

The best and earliest example for the multi-functionality of defamatory programmes is the "Iran after Election" Conference, a three-day event on reform in Iran organised by the Heinrich Böll Foundation in Berlin, Germany, in April 2000, following the decisive victory of reformists in the parliamentary election. The participants and speakers were prominent reformist intellectuals and supporters of the reformist government. The conference faced a massive protest by Iranian activists in exile who entered the venue and protested the participants and the Islamic Republic. During the event, a man undressed in protest and showed the marks of torture on his body and some of the protesters started dancing in the venue.

Ten days later, IRIB broadcast a programme about the conference, showing edited footage of the event including women dancing and a man stripping along with parts of the speeches and slogans against the Islamic Republic.[162] The day after, the Supreme Leader of the Islamic Republic called the conference a conspiracy orchestrated by Germans against Iran. Soon after, large demonstrations were organised in the religious city of Qom and other cities across the country, turning the conference into a political crisis for the reformist government of President Mohammad Khatami. Following the protests, all of the participants of the conference were charged with conspiracy against national security. However, among the participants, only the most prominent reformist politicians with direct links to the reformist government were sentenced to long-term imprisonment. This project not only silenced a wide range of intellectuals and dissidents, but also had a devastating impact on the reformist government.

*Dual nationals*

In the last two decades, as Iran has become a focus of attention for the international community, defamatory programmes have gained a new target: dual nationals, who have been labelled as spies. Targeting dual nationals not only has the functions described above, but also play an important role in the Islamic Republic's foreign relations. It also helps the regime to establish a narrative for an international audience, in which the Islamic Republic is presented as a victim of a global conspiracy and as a target of international spy networks.

---

162. See the full account of event by one of the participants, Mohsen Kadivar, available at:
     http://kadivar.maktuob.net/archives/2007/04/26/829.php

The cases of *Reuters* journalist Jason Rezaian,[163] American academic Xiyue Wang,[164] Slovak businessman Matej Valúch,[165] and many other foreigners or dual nationals detained in Iran can be viewed in this context. By January 2019, at least 30 dual nationals, including British-Iranian Nazanin Zaghari-Ratcliffe, were estimated to remain behind bars in Iran,[166] mostly on national security charges, including espionage.[167]

Many of these prisoners are in fact victims of hostage diplomacy, which has been utilised by Iran since the occupation of the US embassy in 1979. Many others are simply victims of political rivalry inside the Islamic Republic. However, all of them eventually become victims of the Islamic Republic's propaganda apparatus.

In September 2018, an extraordinary propaganda film released by the IRGC revealed a deep conflict between the country's intelligence agencies. The documentary strengthened the theory that some of the imprisoned dual nationals could be victims of internal power struggles. The film, which was produced in documentary-style by the intelligence arm of the IRGC, shown to Iranian members of parliament, and released online, focused on the case of Canadian-Iranian Abdolrasoul Dorri-Esfahani, a member of the Iranian government's nuclear negotiating team who was jailed for espionage.[168]

The film was released by a member of parliament in September 2018 despite an open statement by the Intelligence Minister in October 2017 insisting that Dorri-Esfahani was not a spy. While the conflict between the two intelligence organisations had been reported before, this was the first time that the two agencies publicly disputed each other's claims. In fact, President Rouhani's top media advisor, Hesamoddin Ashena, warned against a "very dangerous" move because it brought to the public's attention an "institutional rivalry" between the parallel intelligence services.[169]

The film is unique in terms of combination of all types of content analysed for this report - private data, forced confession, and defamation. The film contains Dorri-Esfahani's private photos, financial receipts, and his confessions to having links to the US intelligence agencies and getting paid for his services. It also indicates that the defamatory propaganda against dual nationals may be motivated by political rivalry within the power structure of the Islamic Republic.[170] This was also asserted by Richard Ratcliffe, husband of Nazanin Zaghari, whose case is one of the most internationally covered among the cases of dual nationals.[171]

163. Guardian, *Reporter Jason Rezaian on 544 days in Iranian jail: 'They never touched me – but I was tortured'*, 18 February 2019, https://www.theguardian.com/media/2019/feb/18/reporter-jason-rezaian-on-544-days-in-iranian-jail-they-never-touched-me-but-i-was-tortured

164. See Scholar at Risk's profile on Xiyue Wang, available at: https://www.scholarsatrisk.org/actions/xiyue-wang-iran/#Case%20Information

165. See The Slovak Spectator's report on Matej Valúch, at: https://spectator.sme.sk/c/20045811/slovak-detained-in-iran-accused-of-spying-for-cia.html

166. For the profiles of 17 imprisoned dual and foreign nationals held in Iran see: https://iranhumanrights.org/2018/05/who-are-the-dual-nationals-imprisoned-in-iran/

167. By December 2019 as this report's draft being finalised, Xiyue Wang was exchanged with an Iranian prisoner Massoud Soleimani.

168. For more information see: Iranian Diplomacy, *Nuclear Negotiator Arrested over Espionage: Fact or Fiction*, 27 August 2016, http://www.irdiplomacy.ir/en/news/1962621/nuclear-negotiator-arrested-over-espionage-fact-or-fiction-

169. See Ashena's comment at: Guardian, *Jailed dual nationals may be victims of Iranian agents' rivalry, row suggests*, 9 September 2018, https://www.theguardian.com/world/2018/sep/09/jailed-dual-nationals-may-be-victims-of-iranian-agents-rivalry-row-suggests.

170. Ibid.

171. In an interview with JFI in 2019, Richard Ratcliffe stated: "I think half of what the Revolutionary Guard are doing is to justify their existence and their actions. For the dual national cases, there are some taken by the Revolutionary Guard and there are some taken by the Ministry of Intelligence. And it seems like there is a competition for budgets by competitive arrests – each claiming that they are doing something important, that there are all these 'infiltrators' out there, and inventing stories about people to justify their big budgets and resources. It is kind of marketing of their operations. But it is also a way of scaring people watching, and of justifying political control."

## Case study: Nazanin Zaghari-Ratcliffe

Iranian-British citizen Nazanin Zaghari-Ratcliffe, born in 1978 in Tehran, was a project manager with the Thomson Reuters Foundation.[172] Before joining the Thomson Reuters Foundation, she worked for *BBC* Media Action for around 18 months.

On 17 March 2016, Zaghari travelled to Iran with her 22-month-old daughter, Gabriella, to visit her family for the Persian New Year. On 3 April 2016, she was arrested by members of the IRGC at Imam Khomeini International Airport while she and her daughter were about to board a flight back to the UK.

On 25 November 2017, Iranian state TV broadcast a programme about Nazanin Zaghari. The programme accused Zaghari of trying to "infiltrate" the Islamic Republic with the purpose of overthrowing the government through training spies under the cover of educational programmes for journalists sponsored by the *BBC Persian* and Media Training Station. More specifically, the programmes made the following untrue claims about Zaghari:

- She and her husband, Richard Ratcliffe, were British spies.
- She was affiliated to the School of Oriental and African Studies (SOAS) at the University of London and its Centre of Iranian Studies.
- She was the focal point of the BBC's Iran project, a secret intelligence project that pursued various goals.
- The BBC Media Action project she worked on was to train and recruit BBC Farsi staff, or to start cyber teams inside Iran: 'Zigzag[173] would employ those trained in that course and some of them would be used to launch espionage agencies like the UK's 'Small Media'; others would be used to launch cyber teams of individuals from inside Iran. Using these individuals, Zaghari would monitor bloggers and anti-government reporters. They would, then, contact these individuals and invite them abroad for [face to face] training.
- She was an opposition activist in the protests following Iran's 2009 presidential election in London.

While no solid evidence was provided for any of the above-referenced allegations, it seems that the claims were made simply to fit a pre-scripted scenario aimed at portraying Zaghari as a spy and an enemy of the state. According to her husband,[174] some of these accusations have an impact on other families who are watching and are in a similar situation.

> "*There is a level of outrageous nonsense [regarding what] they say about Nazanin which has increased over time, usually to make signals to the UK government that Nazanin will suffer unless her case is addressed. But it does have an effect on all the other families of the other dual nationals held, who are watching their TVs looking at us and say 'oh I don't fancy that,' and see it as a kind of punishment for speaking out. Inevitably there are other families who are wary for a long time of getting too close to us because it's horrible and they worry about contagion. With time, that wariness fades, but there is a kind of tactical battle that happens to create a kind of conspicuous suffering for those who are prominent.*"[175]

On 16 November 2017, *Reuters* reported that the detention of Zaghari might be linked to a £400 million (US$523 million) UK debt to Iran stemming from a 1970s arms deal between

---

172. Thomson Reuters Foundation is the charitable arm of the Canadian news agency *Thomson Reuters*. The charity is involved in promoting the socio-economic progress and the rule of law through organising training programmes and has no operations in Iran.

173. "ZigZag" was one of the projects initiated by BBC World Service Trust which enabled young Iranians to develop journalism skills, according to a report by the UK's Foreign Office published in 2009. It allowed aspiring journalists to generate content for platforms including the BBC Persian service.

174. In an interview with JFI, 2019.

175. Quote from Richard Ratcliffe's interview with JFI, 2019.

the two countries.[176] On 26 May 2019, *The Times* also confirmed that the Iranian government had demanded that "the Treasury approve the payment from a government-owned defence company to the Central Bank of Iran."[177] On 25 April 2019, the Iranian Foreign Minister announced that he had been given authorisation to negotiate a prisoner exchange,[178] but the UK Foreign Office responded by calling Iran's actions "hostage diplomacy."[179]

According to Richard Ratcliffe, the family was encouraged by the Iranian authorities to pressure the British government to make a deal, and to publically campaign for this. However, as the negotiations fell apart and did not have the intended results for the Iranian government, Zaghari suffered from repercussions, seemingly as a consequence of the family's perceived failure to have effectively influenced the British government.

The use of defamatory programmes as a means of justification can be seen in the case of another dual national, Ahamad Reze Jalali, a Swedish-Iranian scholar of disaster medicine. Jalali, who taught at universities in Sweden, Italy, and Belgium, was arrested in April 2016 during a visit to Iran and charged with "collaboration with hostile governments" and "espionage." The charges were related to the allegations that Jalali had provided intelligence to Israeli authorities. In October 2017, Jalali was convicted and sentenced to death for "corruption on earth through espionage."[180]

In December 2017, edited footage of Jalali's forced confession was broadcast by the IRIB news channel. In this footage, Jalali explained his background and academic credentials along with the state projects he was involved in before moving abroad. Jalali also talked about his collaboration with a company providing security systems for the EU. The programme, however, dubbed this company as a front for the Mossad (Israeli intelligence). In his confession, Jalali never mentioned Mossad or any intelligence services or admitted to collaborating with, or revealing of sensitive information to, such organisations. However, the programme frequently dubbed his activities as a form of collaboration with the Mossad through which he allegedly revealed information about Iran's nuclear scientists. The programme used edited footage of Jalali in academic conferences or work meetings to create an impression that he was under surveillance by Iranian intelligence agents. The programme also showed Jalali's alleged handwritten answers to the questions, the latter not being revealed. One of these answers was a list of names on which the only readable names were those of the Iranian nuclear scientists assassinated in 2010.[181] The question for which these names were given as an answer was not shown, and the narrator concluded that Jalali had given the detailed information of these scientists to the Mossad. The programme also used several private and personal photos of Jalali and his family, friends, and colleagues.

According to Jalali's wife Vida Mehran-Nia, the programme was broadcast after Jalali sent a letter from prison, which was revealed to the public, and in which he stated that he was being punished for refusing to spy for the Islamic Republic.[182] Following the broadcast of the programme, in an audio message secretly sent from prison, Jalali rejected all allegations and stated that "the interview was edited and misrepresented in a way that only my answers regarding the nature of the questions, demands and propositions of the foreign employers were broadcast and my answers and refusal

176. Reuters, *Britain denies £400 million debt to Iran linked to bid to free jailed aid worker*, 16 November 2017, https://uk.reuters.com/article/uk-british-iran-may-transfer/britain-denies-400-million-debt-to-iran-linked-to-bid-to-free-jailed-aid-worker-idUKKBN1DG1ER

177. Times, *Nazanin case 'linked to £400m payment to Iran'*, 26 May 2019, https://www.thetimes.co.uk/edition/news/nazanin-zaghari-ratcliffes-freedom-depends-on-400m-payment-to-tehran-05rj6flx7.

178. Radio Farda, *Zarif Says Iran Ready To Swap Prisoners With U.S.*, 25 April 2019, https://en.radiofarda.com/a/zarif-says-iran-ready-to-swap-prisoners-with-u-s-/29901661.html .

179. Ham & High, *Aras Amiri and Nazanin Zaghari-Ratcliffe: MPs slam 'hostage diplomacy' after second north London woman given 10 years in Iran jail*, 14 May 2019, https://www.hamhigh.co.uk/news/crime-court/aras-amiri-and-nazanin-zaghari-ratcliffe-mps-slam-hostage-diplomacy-after-second-north-london-woman-jailed-in-iran-1-6048814.

180. See Amnesty International profile on Djalali, at: https://www.amnesty.org/en/documents/mde13/0359/2019/en/.

181. For more information, see Chapter 4.2.2.

182. Center for Human Rights in Iran, Swedish Resident Facing Death Penalty, 25 October 2017, https://www.iranhumanrights.org/2017/10/swedish-resident-facing-death-penalty-i-was-imprisoned-for-refusing-to-spy-for-irans-intelligence-ministry/.

of any cooperation was omitted in order to falsify the narrative."[183] Moreover, in two open letters from prison,[184] Jalali claimed that the confession was obtained under extreme duress while he was being held in solitary confinement, including being threatened that his two children would be arrested and harmed if he refused to cooperate with the authorities.[185]

183. Listen to the full audio message at: http://www.bbc.com/persian/iran-42420204

184. See the full letter at: https://bit.ly/2WPMLs3

185. Read the full letter at: https://www.tribunezamaneh.com/archives/148854

# 4. Broadcasting: Tactics, patterns, & conceptual context

The process of broadcasting forced confessions, just like the process of extracting them, follows certain patterns in terms of form and structure. The confessions are always broadcast either as part of documentary-style feature programmes or as part of an exclusive report broadcast during a news bulletin. In either case, the confessions are always broadcast accompanied by a narrative that establishes a context in which the confessions are used as evidence to support the allegations. In other words, the confessions are always preceded by a commentary that essentially instructs the audience on how to interpret the confessions and how to react to them.

The documentary programmes are sometimes broadcast as a series accompanied by a title that illustrates the context and usually refers to one of the key concepts used frequently by the Islamic Republic's high-ranking officials, especially by the Supreme Leader. For example, a bi-weekly programme broadcast in the late 1990s, which included a number of confessions by Iranian intellectuals, academics, artists, and writers, was broadcast under the title "Hoviyat" [Identity]. The programme opened with a narration that established the contextual concept of the programme, "western cultural invasion," a concept coined by Supreme Leader Ali Khamenei.[186] Throughout various episodes of this programme, victims were forced to confess their involvement in an alleged foreign plot for westernisation and subversion of the national and religious identity of Iranians.[187] The format and structure of the programme were quite similar to the earlier instances, such as the show trials of the Sarberdaran and Forgan groups [see above, Chapter 1.1].

A similar format, albeit more sophisticated in terms of scripting, editing, and other technical aspects, was followed in the more recent daily series "Out of sight," which was broadcast in two seasons of ten episodes each between 2018 and 2019. The first season of "Out of Sight" was focused on the 2009 election and the concept of "sedition," coined by Ali Khamenei in reference to the protests over the alleged 2009 election fraud.[188] The second season was focused on "infiltration," a term used by the Supreme Leader with a reference to post-Nuclear Deal risks.[189]

The patterns in these programmes indicate that IRIB, in collaboration with intelligence and paramilitary organisations, is assigned to produce and broadcast programmes that substantiate the ideas of the Supreme Leader regarding potential domestic and international threats. In order to achieve this goal, IRIB and intelligence organisations are seemingly empowered to do whatever it takes to falsify evidence of the existence of such threats.

The most important audio-visual aspect of these programmes is a notable effort to present these confessions as voluntary and friendly conversations between the prisoners and their interrogators or interviewers. The clear aim of these programmes, in terms of audio-visual and technical direction, is to convince the audience that those who confess have been converted and willingly denounce their past. The programmes are produced in a similar fashion to that of a documentary in order to convey a sense of credibility and investigation. In most of these programmes, the confessions are broadcast in parallel with the interviews with the officials, who usually have the first and the last words.

The programmes are always broadcast during prime time (8:00 PM to 10:00 PM) and by the three most-watched domestic TV channels – *Channel 1*, *Channel 2*, and *Channel 3* – and by its most prominent international TV channel, *Press TV*. In addition, since 2014, IRIB has established specific TV channels for broadcasting these programmes more frequently and extensively: *Documentary Channel* and *Ofogh TV* are now assigned to specifically produce and broadcast these types of programmes.

---

186. See the excerpts of Khamenei's speeches on Cultural Invasion at: http://english.khamenei.ir/news/5798/Cultural-invasion-on-Islam-a-reality-or-a-conspiracy-theory

187. See the programme at: youtube.com/watch?v=xOoqK89EbJQ

188. See Khamenei's "Ayatollah Khamenei's narration of claims of 2009 election fraud", at: http://english.khamenei.ir/news/6229/Ayatollah-Khamenei-s-narration-of-claims-of-2009-election-fraud

189. Reuters, *Iran's Khamenei calls for fight against enemy 'infiltration'*, 28 October 2018, https://uk.reuters.com/article/uk-iran-khamenei/irans-khamenei-calls-for-fight-against-enemy-infiltration-idUKKCN1N20CL

# 5. Goals and impacts

The Islamic Republic's media apparatus, including IRIB and numerous cultural entities affiliated with them, operates in close collaboration with judicial, military, paramilitary, and intelligence organisations. This network of organisations is involved in establishing, disseminating, and promoting certain ideas on one hand, and censoring, discrediting, silencing, and suppressing undesirable ideas on the other. Its operations target audiences both domestically and internationally, and each organisation has its own agenda.

At the domestic level, the Iranian media apparatus aims at establishing and strengthening its own ideas and points of view, and, at the same time, creating a hostile and suppressive environment for opposition ideas using a vast and powerful smear campaign, which includes publishing falsified, fake, and fabricated content against its targets or forcing them to confess against themselves. These activities constitute two pillars of this apparatus: one using forced confessions as its main tool, and the other using defamatory content.

At the international level, the Iranian authorities strive to spread an anti-Western ideology stemming from the Islamic Revolution and to strengthen its influence beyond Iran's borders. The Islamic Republic's government implements a specific political agenda, which consists of using cultural, media, and intelligence material as tools "to win the hearts and minds of youth in the Middle East and beyond."[190]

Considering this multifunctional nature of the media apparatus, we can point out specific goals and impacts for these propaganda programmes, emphasising that not every single one these programmes necessarily pursues all of these goals or has all of these impacts.

## 5.1 Demoralising civil society

One of main goals of the Islamic Republic's suppressive media apparatus is to demoralise civil society by showing its prominent figures broken under interrogation and willing to make confessions or being discredited as a result of smear campaigns. This tactic creates a terrifying image of the security services and sends a strong message that anyone, no matter how strong or resolute, will be eventually broken into submission or stripped of his or her reputation.

These frightening messages directly target the morale and spirit of hope and have had a significant chilling effect on civil society. The fear of being publicly defamed on national TV channels through the use of fabricated evidence or misrepresented private data, or watching loved ones denounce victims in public, has a tremendous suppressive impact on society. In a conversation with her husband, Nazanin Zaghari stressed how watching the TV report about her "brought her to tears or shock, and anger at all these lies." She described "how violated she had been, and uncomfortable it felt to see the pictures from our family album – of holidays in Torquay and Bakewell, and Switzerland – now given a very different meaning."[191]

## 5.2 Spinning the discourse

Another crucial goal and impact of using media as means of suppression is its capacity to spin the discourse by discrediting the targets and defaming them with labels that provoke the public's sensitivities. Creating endless conflict between the groups and factions of society drains energy, which could be directed towards the Islamic Republic. It also uses the parts of the audience to

---

190. Washington Institute, *The Overlap of Media, Culture, and Intelligence in Iran*, 6 November 2018, https://www.washingtoninstitute.org/fikraforum/view/the-overlap-of-media-culture-and-intelligence-in-iran

191. Free Nazanin Campaign press release, 12 November 2017.

silence and suppress independent voices by creating negative presumptions about them and their message. A good example of this impact is the case of labelling JFI Executive Director Shadi Sadr as a separatist, which led to multiple threats and harassment.[192]

The impact of these smear campaigns on the reputation of the victim was emphasised by all the victims interviewed for this report, who all rejected the possibility that the public would not believe the accusations made in these programmes.

Mr. Ratcliffe, the husband of Nazanin Zaghari, believes that the impact of these programmes on the public must be taken more seriously.

> "*My sense is that mud sticks. Of course, these are lies, but for the neighbours in Iran, for Farsi speakers over here [in the UK], they had an impact. Some of the propaganda was also reproduced by a UK audience.*"[193] — Richard Ratcliffe.

Mrs. Alinejad highlighted the damaging impact of smear campaigns, false accusations and fake news on the victims' reputation and on the public's view.

> "*It doesn't matter who you are and how aware you are. When you are watching the national TV and the presenter says three men raped this woman, what is your first reaction? It is that maybe it's true, because it is on the news. [ ...] I always get mad when people say no one believes these accusations, because I experienced it. I saw that many would believe them. It wasn't just my parents. My close friend said: I thought to myself that perhaps there was something and they are only exaggerating.*"[194] — Masih Alinejad.

Rouzhin Mohammadi pointed out the public's view of the very act of confessing on camera as an act of treason, which indicates how victims of forced confession could be chastised by both the interrogators and the public that would see them as traitors to their cause.

> "*Agreeing to televised confession is really disapproved of by the community. When I got out of Iran, my friend advised me not to talk about it at all. As if giving televised confession is equal to snitching.*" — Rouzhin Mohammadi.

> "*They want these [kinds of confessions] to say look! This person who claims I am a human rights activist, is actually a promiscuous and morally corrupt person. You know in Iran lots of people accept such a view. This is, in fact, a method to humiliate the prisoner's family and to make people question everything about him.*"[195] - Rouzhin Mohammadi.

In fact, the impact on the victims' reputation is more damaging than physical torture and is unlikely to go away anytime soon. Concerns about the victim's reputation also intensify the psychological and traumatic impact of those programmes and impede the healing process. These defamatory programmes create a feeling of being stripped of all civil protections and violated in public. The fact that the accusations are falsified causes even more pain and stress.

## 5.3 Justification for suppressive measures

The justification for suppression is also among the main goals pursued by these programmes. As the Islamic Republic is under constant criticism for violating international and domestic human rights as a result of massive suppression of the press and civil society, its media apparatus comes to help in justifying the extrajudicial measures used to deprive the targets of their fundamental human rights such as the freedom of press, freedom of speech, and freedom of assembly and association, or right to fair trial and right to private and family life.

---

192.  See Chapter 4.3 and Annex 6.
193.  Quote from Ratcliffe's interview with JFI, 2019.
194.  Quote from Alinejad's interview with JFI, 2019.
195.  Quoted from Mohammadi's interview with JFI, 2012.

## 5.4 Evidential basis for conviction

Propaganda programmes are also frequently used as evidential basis for prosecution and conviction of the targets of these programmes. In many cases, such as the case of the Berlin Conference [see above, Chapter 4.3], the prosecution started immediately after the broadcast of defamatory programmes and relied on the content and allegations made in such programmes as criminal evidence, which led to the conviction of the accused.

## 5.5 Emotional pressure

Among many potential impacts of these programmes on the victims, their families, and society, individuals interviewed by JFI stressed in particular the mental and psychological suffering that these programmes inflict on the victims. In other words, the propaganda programmes, especially the use of footage of forced confessions or that of individuals being arrested, seem to have been used as a means of punishment.

In fact, not only parts of these programmes are made using torture, but they are also used as means of torture themselves. The footage of Nazanin Zaghari looking terrified during her arrest or that of Nizar Zakka blindfolded in a detention centre inflicted tremendous mental suffering on their families and friends. Similar, footage of US-based women's rights activist Masih Alinejad's family denouncing her on national TV was aimed at inflicting psychological pain on Alinejad herself.

According to Richard Ratcliffe, Nazanin Zaghari only watched one of the IRIB programmes about herself as she could not bear to watch the rest: "Even though the rest of the ward were watching, she lay on her bed rocking back and forth with her ears covered. She was really traumatised, really felt bewildered." Ratcliffe added that the most hurtful part of the programmes was "the way they violated her private photos, the way they used her family photos. They didn't even show her with a headscarf to picture her sort of dirty and immoral." According to Ratcliffe, Nazanin was also deeply worried about her family watching the programmes and the emotional and mental trauma that it could cause them, and she repeatedly asked how much of the IRIB programme her family had seen. Ratcliffe himself reported that he never watched any of the programmes, calling it one of his "coping mechanisms" in order to avoid the mental and emotional suffering that these programmes inflict on the victims' families.[196]

On 31 May 2014, IRIB news channel broadcast a reportage claiming that women's rights activist Masih Alinejad had been found "naked under the influence of heavy drugs on a street in London" and was then "raped by three men in front of her son," implicitly drawing a connection between the lack of hijab and sexual assault. Although the report was fake, it quickly spread and went viral on social media.

> "My brother called me and asked if I am alright. I said yes and then he lost his temper and started cursing the intelligence agents. I kept asking him what happened. And it was then that I found out about it. I rushed back home and watched the news with my son […]. The first thing that came to my mind was my mother and that she watches this, and she believes that I was raped."[197] — Masih Alinejad.

This wasn't the first time that Alinejad was targeted by smear campaigns. During the 2009 protest, Alinejad conducted a series of interviews with the families of those who had been killed during the demonstrations. It was then that IRIB broadcast a programme and accused Alinejad of collaboration with MEK, an unpopular Iranian political group known for their terrorist attacks in the 1970s and their cooperation with the Iraqi army during the Iran-Iraq war. The programme claimed that Alinejad was "faking victims and fabricating death toll for the post-election events."[198]

---

196. Quote from Richard Ratcliffe's interview with JFI, 2019
197. Quoted from Alinejad's interview with JFI, 2019
198. Interview with JFI, 2019

*"What my father told me [forbidding me from continuing the interviews] that day really shattered me. Because my father always loved me and always used to admire me. But then it was him giving me an ultimatum, saying that if you continue these interviews you are no longer my daughter and I will disown you. As he eventually did. After that, my father didn't speak to me anymore."* [199] - Masih Alinejad.

Alinejad's testimony indicates that these programmes are used as a means of mental and psychological pressure on both victims and their families with the aim of suppressing activists who may live hundreds of miles away by isolating them from her loved ones and permanently damaging their reputation in the eyes of their families.

In addition, by broadcasting these programmes, especially in case of dual nationals, the Islamic Republic creates pressure on their families and compatriots to push their own governments to comply with the Islamic Republic's demands. In many cases, particularly with regard to dual nationals, the victims of Iran's propaganda apparatus are not dissidents, activists or even particularly political. They are simply targeted because of their dual nationality, which is used to present an image of Iran as a state under attack by foreign powers and their infiltrators. In these cases, programmes are used to strengthen the government's position in its international diplomacy.

---

199. *Ibid.*

# 6. Forced confessions as human rights violations: A legal analysis

The whole process of obtaining private data, extracting forced confessions, and producing and broadcasting defamatory programmes involves several violations of domestic and international human rights law. Moreover, the evidence presented in the report confirms that propaganda has been used by IRIB as a means of torture. This chapter focuses on the violations of international human rights law, as the violations of Iranian law has been analysed in this report's previous chapters.

## 6.1 Right to a fair trial

The right to a fair trial is guaranteed by Articles 14 and 16 of the ICCPR, a binding human rights instrument to which the Islamic Republic of Iran is a state party. One of the core elements of the right to a fair trial is the presumption of innocence, a principle that is violated in most of the propaganda programmes broadcasted by IRIB.

Paragraph 2 of Article 14 states ``everyone charged with a criminal offence shall have the right to be presumed innocent until proven guilty according to law." In most cases, the defamatory programmes are broadcast before the target of these programmes has been tried by a court. As mentioned in Chapter 4, propaganda programmes are mainly used as a contextual basis that precedes judicial harassment, or as a means of justification for previous judicial and extrajudicial harassment.

Furthermore, among the minimum guarantees provided by Article 14 for those facing criminal charges is the guarantee not to be compelled to testify against themselves or to confess guilt. The nature of forced confessions is in clear violation of this guarantee and thus of Article 14 of the ICCPR.

## 6.2 Freedom from torture, inhuman or degrading treatment

The absolute prohibition of torture under international human rights instruments, including Article 7 of the ICCPR, to which Islamic Republic of Iran is a state party, stresses the gravity of this violation.

The use of torture, inhuman or degrading treatment in obtaining forced confessions in Iranian prisons is an undeniable fact. However, the existence of this element, in effect, in broadcasting the propaganda programmes has been mostly overlooked by international human rights mechanisms. The definition of the term torture as suggested by the European Court of Human Rights is "that a special stigma should attach to deliberate inhuman treatment causing very serious and cruel suffering."[200] The victims interviewed for this report described the impact of broadcasting defamatory programmes on its targets as "deeply traumatising," and "extremely humiliating," while noting long-term mental and psychological damages. Some of the interviewees described the experience of watching these programmes as the most painful experience to which they were subjected while in detention. Therefore, the extreme nature of the impact on the victims can be considered as one of the main elements of torture.

The fact that the Iranian authorities choose to publically broadcast content that discusses victims' private lives, including allegations of rape (such as the fake news of Masih Alinejad being raped in front of her child), on national news programmes, indicates a degree of deliberateness in inflicting

---

200. See Council of Europe, *A guide to the implementation of Article 3 of the European Convention on Human Rights*, p11, https://rm.coe.int/CoERMPublicCommonSearchServices/DisplayDCTMContent?documentId=090000168007ff4c

emotion and psychological pain on the victims, who are not in a position to give consent regarding the broadcast of these programmes. The use of defamatory programmes as a means of inflicting severe mental suffering is an intrinsic element of targeting the individuals abroad and beyond the reach of the Islamic Republic's censorship machinery.

## 6.3 Right to privacy

The use of the victim's private and family photos, video footage, or illegally-obtained correspondence against them is a normal procedure in producing the defamatory programmes. In addition to the theft of private data, the data is also distorted, edited, and misrepresented in order to discredit, humiliate, or incriminate the target. This is a blatant violation of Article 17 of the ICCPR, which states: "No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honour and reputation"; and: "Everyone has the right to the protection of the law against such interference or attacks."

Moreover, as discussed in detail in Chapter 3.1 of this report, these violations of the right to privacy are also violations of provisions of the Iranian Criminal Procedure Code, which prescribes procedures for obtaining and using private data. These violations are further amplified by the total impunity enjoyed by individuals involved in the production of these propaganda programmes, who abuse victims' private data without their consent.

# 7. Recommendations

The following recommendations reflect the necessary measures that need to be taken in order to effectively tackle the serious and systemic violations of human rights in the Islamic Republic of Iran, which include violations committed through obtaining, producing, and broadcasting forced confession and defamatory programmes.

**To the Islamic Republic of Iran:**

- Comply with the country's legal obligations under the ICCPR and guarantee the right to liberty and security of person, the right to private and family life, the right to a fair trial, and the right to freedom from torture and ill-treatment for all individuals within its jurisdiction.
- Provide unobstructed access to independent legal counsel during the whole process of pre-trial investigations, trials, and appeals. Inform detainees of their right to access to legal counsel and the right not to self-incriminate and provide defendants and their lawyers access to case files and evidence and guarantee their right to cross-examine the evidence.
- Ensure media outlets respect detainees' rights to privacy and the presumption of innocence, in accordance with Articles 14 and 17 of the ICCPR, respectively. Ensure remedies are in place for unlawful interference with these rights.
- Comply with obligations under the 1963 Vienna Convention on Consular Relations and allow unrestricted consular visits for both dual and foreign nationals in accordance with Article 36 of the Convention. Comply fully with obligations under the 1979 International Convention Against the Taking of Hostages, and quickly release all dual nationals and foreigners kept as a means of diplomatic leverage and prosecute those responsible for these hostage cases.
- Sign and ratify the United Nation Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) and its Optional Protocol (OPCAT), which provides jurisdiction to the UN Committee Against Torture to conduct regular visits to detention centres.
- Ratify the First Optional Protocol to the ICCPR, which establishes an individual complaint mechanism.

**To the international community:**

- Continue to pressure the Islamic Republic of Iran to comply with its obligations under international law, specifically the ICCPR, and particularly with regard to the right to liberty and security, the right to private and family life, the right to a fair trial, and the right to freedom from torture, inhuman, or degrading treatment.
- Use all diplomatic and punitive measures at its disposal to ensure that the Islamic Republic's government stops its systematic use of the media as a means of suppression and persecution of Iranians, dual nationals, and foreigners; and ensure that remedies are in place for such violations.
- Recognise the broadcast of forced confession and defamatory programmes using illegally obtained private data as a violation of the right to freedom from torture, inhuman, or degrading treatment.
- Adopt legislation that allows the prosecution under universal jurisdiction of these violations regardless of where they are committed.
- Support initiatives for the victims of IRIB propaganda campaigns to be able to take legal actions against the perpetrators and seek remedies.
- Take preventive measures to protect the individuals and entities within their jurisdiction from unlawful use of their private data for producing such defamatory programmes.

**To private actors and the business sector:**

- Reconsider their business relationships with the Islamic Republic of Iran with regard to services, technologies, and equipment that could potentially be used for recording, producing, and broadcasting forced confessions and defamatory programmes. Specific measures recommended on this matter include conducting proper risk assessments and enhanced due diligence, and act transparently during negotiations over business contracts with the Islamic Republic of Iran, or companies with ties to the authorities, to avoid any complicity in possible violations of human rights.

# Annexes

**Annex 1**

Act on the General Policies and Principles Governing the IRIB Programmes: https://justice4iran.org/wp-content/uploads/2020/03/Annex-One.pdf

**Annex 2**

The Guardian Council's Interpretation: https://justice4iran.org/wp-content/uploads/2020/03/Annex-Two.pdf

**Annex 3**

IRIB Administration Act: https://justice4iran.org/wp-content/uploads/2020/03/Annex-Three.pdf

**Annex 4**

List of Victims and Witnesses Interviewed by Justice for Iran: https://justice4iran.org/wp-content/uploads/2020/03/Annex-Four.pdf

**Annex 5**

Press TV's Article: https://justice4iran.org/wp-content/uploads/2020/03/Annex-Five.pdf

**Annex 6**

Felesh Programme, Mardom Khabar TV: https://justice4iran.org/wp-content/uploads/2020/03/Annex-Six.pdf

# Keep your eyes open



**Establishing the facts** - Investigative and trial observation missions
**Supporting civil society** - Training and exchange
**Mobilizing the international community** - Advocacy before intergovernmental bodies
**Informing and reporting** - Mobilizing public opinion

**For FIDH, transforming societies relies on the work of local actors.**
The Worldwide Movement for Human Rights acts at national, regional and international levels in support of its member and partner organisations to address human rights abuses and consolidate democratic processes. Its work is directed at States and those in power, such as armed opposition groups and multinational corporations.

Its primary beneficiaries are national human rights organisations who are members of the Movement, and through them, the victims of human rights violations. FIDH also cooperates with other local partner organisations and actors of change.

17, passage de la Main d'Or - 75011 Paris
Tel: (33-1) 43 55 25 18
www.fidh.org / Twitter: @fidh_en / fidh_fr / fidh_es
Facebook: https://www.facebook.com/FIDH.HumanRights

**Director of publication:**
Alice Mogwe
**Editor in chief:**
Éléonore Morel
**Researcher:**
Omid Shams
**Research Assistants:**
Elham Chaichy, Shima Mehrani
**Editors :**
Carla Ferstman, Mohammad Nayyeri, Juliette Rousselot, Shadi Sadr
**Design:**
FIDH/CB



Established in July 2010, Justice for Iran (JFI) is a London-based human rights NGO which seeks freedom from impunity.

Justice for Iran aims to hold the Iranian perpetrators of serious human rights violations, accountable; whether they are individuals or entities, state or non-state actors.

Justice for Iran focuses on the right to truth for individual victims and the whole society, and pursues right to justice for those who belong to the most marginalised groups such as women, ethnic and religious minorities, LGBTIs and political dissidents.

Justice for Iran conducts fact-findings, initiates judicial and semi-judicial actions and carries out campaign and advocacy at national, regional and international levels.

Justice for Iran is a member of the International Federation of Human Rights (FIDH) and the Regional Network for Historical Dialogue and Dealing with the Past (RNHDP).

Website: justiceforiran.org / Twitter: @Justice4Iran / @Justice4IranEn
Address: 25-27 Bickerton Road, N19 5JT London, United Kingdom
Tel: +44 (0)2072819940
Email: info@justiceforiran.org

Dépôt légal juin 2019 - FIDH (Éd. anglaise) ISSN 2225-1804 - Fichier informatique conforme à la loi du 6 janvier 1978 (Déclaration N°330 675)



FIDH
is an
**international human rights NGO**
federating 192 organisations
from 117 countries

# fidh

# ABOUT FIDH

FIDH takes action for the protection of victims of human rights violations, for the prevention of violations and to bring perpetrators to justice.

### A broad mandate
FIDH works for the respect of all the rights set out in the Universal Declaration of Human Rights: civil and political rights, as well as economic, social and cultural rights.

### A universal movement
FIDH was established in 1922, and today unites 192 member organizations in 117 countries around the world. FIDH coordinates and supports their activities and provides them with a voice at the international level.

### An independent organisation
Like its member organizations, FIDH is not linked to any party or religion and is independent of all governments.