# EXHIBIT 44

[left column, partially cut off:]

nally protected rights to
h, assembly and protest
ars after China's post-
evolution process of le-
It is an appropriate time
erican Bar Association
serious concern about the
China and their implica-
he development of the
there. Encouraging ad-
the rule of law through-
ld is an established and
al of the Association.
, until June of this year,
d made encouraging
wards greater respect for
law. The American Bar
, through such activities
*a Law Reporter* and the
epublic of China Law
both sponsored by the
International Law and
s endeavored to encour-
ogress. The Section of
ights and Responsibil-
tanding Committee on
r Under Law and the
International Law and
erefore, urge that the
ar Association adopt the
solution.

 submitted,

   STEVEN C. NELSON
   *Chairperson*
ection of International
  Law and Practice

IFFORD D. STROMBERG
   *Chairperson*
n of Individual Rights
 and Responsibilities

  ROBERT C. MUSSEHL
   *Chairperson*
tanding Committee on
orld Order Under Law

REPORT NO. 1 OF THE

SECTION OF

INTERNATIONAL LAW AND PRACTICE

PRESENTED JOINTLY WITH THE

STANDING COMMITTEE ON

WORLD ORDER UNDER LAW

AND THE

SECTION OF INDIVIDUAL RIGHTS

AND RESPONSIBILITIES

### RECOMMENDATION*

*BE IT RESOLVED*, That the American Bar Association deplores the persistent, gross violations of human rights committed by the Government of the Islamic Republic of Iran. In particular, the Association deplores the mass, summary execution of political and other prisoners, torture and other inhuman punishment of prisoners, continuing persecution of the Baha'i religious community, and gross denials of fair trial rights in political cases.

*BE IT FURTHER RESOLVED*, That the American Bar Association calls upon the new leadership of that Government to protect basic human rights, to ensure that fair procedures are followed in political cases, and to eliminate torture and other inhuman punishment of prisoners.

*BE IT FURTHER RESOLVED*, That the American Bar Association, in view of these persistent and gross violations, calls upon the Government of the United States of America to urge the Government of the Islamic Republic of Iran to (1) recognize and protect basic human rights; (2) adhere to United Nations procedures for the resolution of alleged human rights violations; (3) accept a U.N.-sponsored delegation to investigate conditions in Iranian prisons; and (4) accept an international delegation of lawyers and jurists to observe Iranian judicial proceedings and determine whether defendants' rights are being safeguarded.

---

*The recommendation was approved. See page 32.

*BE IT FURTHER RESOLVED*, That the American Bar Association urges that the United States of America, in consultation with its allies and other governments, consider a full range of multilateral economic and diplomatic sanctions against the Government of the Islamic Republic of Iran, in addition to existing sanctions, if the new leadership of that Government fails to take the necessary steps as soon as possible to end such gross violations.

## REPORT

The Government of the Islamic Republic of Iran has engaged in a new wave of terror against internal political opponents during the past year, according to the best information available. This wave of terror apparently includes (1) mass, summary executions for offenses that are not punishable by death under international law; (2) widespread torture and other severe mistreatment of political prisoners; (3) continued, extreme persecution of a minority religious community, the Baha'is; and (4) virtually complete denials of international norms of due process for political prisoners. With the death of the regime's leader, Ayatollah Khomeini, on June 3, 1989, this is a propitious time to encourage the new leadership of the Islamic Republic to focus on such gross violations of basic human rights, and end them.

There seems little doubt about the existence of the violations. Iran's Interior Minister recently acknowledged a spate of summary executions of political prisoners (see p. 2, below). The general reliability of the other reports was confirmed by the Special Representative of the United Nations Commission on Human Rights, following a thorough investigation, summarized below.[1]

Adding further credibility to the reports are the recent public calls by Iranian leaders for the execution, without trial or other legal process, of various persons inside and outside Iran. Examples are the repeated death threats against a fiction writer in Britain (Salman Rushdie) and unspecified employees of a British publishing house (Penguin Books) that published his fiction.[2] The remarkable recent statements by the Iranian Chief Justice (quoted below, pp. 8–9) about the need for more executions and fewer trials, lend even greater credibility and urgency to these reports. The Islamic Republic has been censured by at least four consecutive United Nations General Assembly sessions for persistent, gross violations of human rights.

Iran's Permanent Representative to the United Nations promised its Commission on Human Rights in March, 1988, to give detailed responses to allegations of human rights violations. Despite urgent telegrams and letters to the relevant Iranian officials in September, 1988, and earlier, no such respons-

---

[1] United Nations Economic and Social Council, *Report on the Human Rights Situation in the Islamic Republic of Iran*, by the Special Representative of the Commission on Human Rights, Mr. Reynaldo Galindo Pohl—Interim Report of October 13, 1988 ("IR"), ¶ 79; Final Report of January 26, 1989 ("FR"), ¶ 5.

[2] E.g., *Washington Post*, February 20, 1989, p. A-1, col. 6.

can Bar Associa-
sultation with its
ge of multilateral
overnment of the
ctions, if the new
ecessary steps as

er credibility to the
recent public calls
lers for the execu-
rial or other legal
ous persons inside
1. Examples are the
hreats against a fic-
Britain (Salman
specified employ-
publishing house
) that published his
emarkable recent
Iranian Chief Jus-
ow, pp. 8–9) about
re executions and
l even greater cred-
cy to these reports.
ublic has been cen-
t four consecutive
General Assembly
sistent, gross vio-
rights.
ent Representative
tions promised its
Human Rights in
give detailed re-
gations of human
s. Despite urgent
ters to the relevant
ls in September,
, no such respons-

tative of the Commis-
s, Mr. Reynaldo Galin-
eport of October 13,
inal Report of January

st, February 20, 1989,

es had been given before the U. N. Special Representative finished his January 1989, final report. The Government of Iran had refused to cooperate with the Special Representative's mandate in other ways. For example, it had not allowed him to visit Iran to investigate any of the allegations.[3]

## I. BACKGROUND

Since the overthrow of the Shah's government on February 11, 1979, Iran has been an "Islamic Republic." Pursuant to the Constitution approved in 1980 by popular referendum, the President and National Assembly are directly elected. These elections are competitive. However, the choices offered to the voters are extremely limited. The candidates must satisfy certain political and religious criteria. In practice, the country is governed by a political-religious elite.[4]

## II. HUMAN RIGHTS VIOLATIONS

### A. Mass, summary executions of political prisoners

Iran's Interior Minister confirmed in late February a recent wave of summary executions of political prisoners, according to *The Baltimore Sun*.[5] The executions were initiated following an assault by Iran's strongest opposition group, the Mojahedin Khalq, on the Iranian city of Bakhataran in late July, 1988. The Interior Minister is quoted as saying:

> [A]ll those who have been arrested and those who agitated politically during the Bakhataran campaign have been executed according to Islamic law.... All those who stated their support for the mujahedeen [Mojahedin] were executed.[6]

Those executions hardly could have been carried out "according to Islamic law." For example, there is the severe lack of due process in the Government's political trials. These trials are inconsistent with general international standards adopted by Islamic nations, among others. (See discussion below, pp. 6–9). Moreover, "there is no unresolvable complication stemming from" differences between international law and Islamic law, according to Iran's current Permanent Representative to the United Nations.[7] Furthermore, some Islamic legal scholars and practitioners contend that the death penalty for political crimes is contrary to Islamic law.[8] In any event, execution of political prisoners is contrary to international law, including the

---

[3]IR ¶¶ 9, 10, 52, 63; FR ¶ 10.
[4]United States Department of State, *Country Reports on Human Rights Practices for 1988*, at 1343 (Comm. Print 1988) (hereinafter "*1988 Country Reports*").
[5]*Baltimore Sun*, February 28, 1989, based on interview of Interior Minister Ali Akbar Mohtashemi, published in *Al Mostagbal*, an Arabic-language weekly news magazine published in Paris, France, on February 25, 1989.

[6]*Id.*
[7]The Permanent Representative recently stated:

> Matters raised by the [U. N.] Special Representative may still be considered in practical terms: there is no unresolvable complication stemming from the compatibility (*sic*) between Islamic law and international law. I shall stress that Iran does not pursue a selective approach to international law.

(IR ¶ 56)
[8]FR ¶ 36; *see also* FR ¶¶ 27–35.

right to life provisions (Article 14) of the International Covenant on Civil and Political Rights ("Covenant"), to which the Islamic Republic of Iran is a party.[9]

The *Sun* article also reported that: (1) Thousands more political prisoners could be executed at any time, according to an official of Amnesty International; (2) The Mojahedin say that 12,000 of their members have been taken prisoner and executed since August, 1988; (3) These included students, doctors, army officers and religious leaders. The article indicated that 1,634 names of victims were given to the United Nations Secretary-General on February 27, 1989.

All this information is fully consistent with that developed by the U. N. Special Representative.[10] Summary executions in places not affected by any military operations were reported to the U. N. Special Representative. For example, about 860 bodies of "executed political prisoners" reportedly were transferred from Evin Prison in Teheran to a cemetery on August 14 to 16, 1988.[11]

**B. Torture of prisoners**

The Special Representative noted:

> The Iranian constitution does contain a provision forbidding torture, but it appears to be ignored by certain officials in charge of investigations and by prison officials.[12]

In fact, all sources providing information to the Special Representative reported "that ill-treatment and torture, both physical and psychological, continued to be common in Iranian prisons...."[13] The 16 persons who appeared before the Special Representative in June, 1988 (all members of the Baha'i faith or the Mojahedin group) reported having been subjected to physical and psychological torture and other ill-treatment. Some showed scars and marks on various parts of their bodies that they said resulted from prison torture.

> The most common form of torture was flogging, especially on the soles of the feet, and beating by several guards simultaneously. Various persons were subjected to mock-executions and other forms of psychological torture, including threats of sexual abuse and threats of torturing the detainee's parents, children or spouses. Prison conditions were invariably described as extremely poor. Cells were narrow, damp, dark and extremely overcrowded. Food was insufficient and of poor quality. Sanitary conditions were very bad, resulting in the spread of skin and other diseases among the detainees and there was insufficient access to doctors and to medicine. Very often political prisoners were kept together with common criminals, including drug addicts.[14]

There were reports of torture of children as young as six, forced labor involving children aged 8 to 11, rapes by revolutionary guards

---

[9]IR ¶ 69; FR ¶¶ 17, 27.
[10]*E.g.*, IR ¶¶ 28–33, 48, 69; FR ¶ 16.
[11]IR ¶ 31; FR ¶ 68.
[12]IR ¶ 75. Also, the Geneva Convention on Protection of Civilian Persons in Time of War, to which the Islamic Republic of Iran is a party, prohibits corporal punishment. (FR ¶ 26)

[13]IR ¶ 70.
[14]IR ¶ 15; *See* FR ¶ 73.

irces providing in-
Special Represen-
"that ill-treatment
physical and psy-
tinued to be com-
prisons...."[13] The
appeared before the
entative in June,
ers of the Baha'i
jahedin group) re-
been subjected to
chological torture
treatment. Some
d marks on various
dies that they said
ison torture.

mon form of tor-
ing, especially on
e feet, and beating
ds simultaneously.
ns were subjected
utions and other
hological torture,
ts of sexual abuse
torturing the de-
nts, children or
n conditions were
cribed as extreme-
ls were narrow,
d extremely over-
l was insufficient
ality. Sanitary con-
ery bad, resulting
of skin and other
the detainees and
ifficient access to
medicine. Very
l prisoners were
ith common crim-
drug addicts.[14]

orts of torture of
ng as six, forced
hildren aged 8 to
olutionary guards
'3.

within sight of other prisoners, and torture of women just after giving birth. New devices were being used to disguise torture (*e.g.*, new sorts of flogging cables, needles and isolation of torture victims during recovery). Political prisoners were being tortured and raped by brutal common criminals who were sent among them and incited by prison personnel.[15] Also,

> Former prisoners have complained of incommunicado or solitary confinement, not...to punish misdemeanors related to the prison regime, but as part of a method of obtaining confessions or information. According to witnesses with personal experience, the morale and mental health of the prisoners suffer on account of this treatment.[16]

### C. Persecution of Baha'is

About 140 Baha'is reportedly still were in prison, and two reportedly were executed, during the latter half of 1988.[17] The fact that there have been no reported new arrests of Baha'is since February, 1988,[18] suggests that the Iranian government realizes the invalidity of these confinements and executions.

The official Iranian stand has been that Baha'is never had been punished on account of their faith, but only for "subversive activities." However, the Baha'i International Community, which consults with the United Nations Economic and Social Council, has pointed out the express prohibition in Baha'i teach-

---

[15]IR ¶ 16.
[16]FR ¶ 46.
[17]IR ¶ 76; FR ¶ 19.
[18]FR ¶ 20.

ing of engaging in partisan politics or subversive activities.[19]

Baha'is who appeared before the Special Representative described various forms of persecution and harassment including denial of means of subsistence, brutal arrests and beatings during interrogation. One person told the Special Representative of a religious judge named Mesbah, who specialized in Baha'i cases and was personally involved in severe beatings of Baha'is. He reported that Mesbah had sentenced him to death "for having become a Baha'i and having married a Baha'i woman." Mesbah ordered him to pay back all his earnings as a government employee. In another case, this "judge" confiscated a Baha'i widow's only source of income, a house she rented. He then rented it to his own relatives.[20]

### D. Denial of fair trial

Individuals accused of political offenses enjoy virtually no fair trial rights, according to the best available information. Even the inadequate safeguards prescribed by the Iranian Constitution and Revolutionary Court administrative regulations are not honored in practice. Political cases are generally heard by the Islamic Revolutionary Courts established in 1979, not by the regular criminal courts.[21]

Many citizens reportedly are arrested merely on grounds of sympathy with opposition groups or criticism of the current political situation. Political prisoners often are

---

[19]IR ¶ 77.
[20]IR ¶¶ 18–20.
[21]Amnesty International, *Iran Briefing* 7–8 (1988). The regular courts provide somewhat greater due process, at least with respect to common criminal offenses. *1988 Country Reports* at 1346.

not informed of the charges against them for weeks or months.[22] This violates Article 9 of the Covenant (which, as noted above, has been ratified by Iran). Article 9 requires that a detainee be informed immediately of the reasons for his arrest and the charges. Also, Article 32 of the Iranian Constitution requires that written notice of the accusation be given to a prisoner immediately upon arrest. The common practice of incommunicado detention of political prisoners for indefinite periods also infringes upon fair trial rights.[23]

Defendants in political cases are never allowed access to defense counsel, either before or during trial.[24] Nor are they given an opportunity to prepare a defense.[25] These are violations of Article 14 of the Covenant, as well as the Iranian Constitution.[26]

Political trials are "extremely summary proceedings" lasting sometimes no more than three minutes.[27] Thus, the trial is often little more than the formal reading of the charge and the passing of sentence.[28] The sole judge presiding over these trials, often a mullah,[29] may endeavor to persuade the defendant to confess. In many cases, the defendant is not informed of the verdict and the sentence until days or weeks after the trial.[30]

Needless to say, the defendant's rights to "examine, or have examined, the witnesses against him,"[31] is not recognized in political cases.[32] Moreover, witnesses for the defense are not permitted in such cases.[33] Confessions obtained as a result of torture are often the sole basis for conviction.[34] The presumption of innocence also is not recognized by Revolutionary Court judges—in violation of both the Iranian Constitution (Article 37), and the Covenant (Article 14(2)).

In practice, political trials are almost always held *in camera*.[35] Not even the family of the defendant or defense counsel are allowed to attend.[36] By contrast, Iranian law, in conformity with the Covenant, requires that trials be open to the public except where the court decides that a public trial would be incompatible with public morals or public order.[37]

There is no right to seek pardon or commutation of a death sen-

---

[22]*Iran Briefing* at 8; IR ¶ 72; FR ¶ 43.
[23]Amnesty International, *Persistent Violations of Human Rights* (1988), p. 2.
[24]*Iran Briefing* at 8.
[25]FR ¶ 48.
[26]Article 14 provides that everyone charged with a criminal offense has the right (1) to adequate time and facilities for the preparation of his defense; (2) to communicate with counsel of his own choosing; and (3) to have legal assistance, in any case where the interests of justice so require, without payment in case of need. Art. 14(3)(b), (d). The Iranian Constitution also provides for the right to retain counsel, and to be represented by court-appointed counsel if one cannot afford to retain counsel. 1980 Constitution, Art. 35.
[27]IR ¶ 48; *Iran Briefing* at 8.
[28]*Persistent Violations* at 7. The administrative regulations governing the Revolutionary Courts state that the defendant shall be given up to 15 hours to present the defense case, but the regulations are not followed. *Id.* at 8.
[29]*Id.*
[30]*Id.*
[31]Covenant, Article 14 (3) (e).
[32]FR ¶ 50.
[33]*Id.*
[34]*Iran Briefing* at 8. The Iranian Constitution (Article 38) and the Covenant (Article 7) proscribe the use of torture. As noted above, one religious judge who specializes in Baha'i cases reportedly has acted as torturer himself.
[35]FR ¶ 49.
[36]*Id.*
[37]1980 Constitution, Article 165; Covenant, Article 14(1).

rials, often a mullah,[29] or to persuade the de- onfess. In many cases, it is not informed of the the sentence until days er the trial.[30]

to say, the defendant's amine, or have exam- nesses against him,"[31] gnized in political over, witnesses for the not permitted in such fessions obtained as a ture are often the sole nviction.[34] The pre- innocence also is not y Revolutionary Court violation of both the stitution (Article 37), nant (Article 14(2)).

, political trials are al- held *in camera*.[35] Not ily of the defendant or sel are allowed to at- ntrast, Iranian law, in ith the Covenant, re- rials be open to the t where the court de- public trial would be with public morals or [37]

right to seek pardon tion of a death sen-

at the defendant shall be ours to present the defense ulations are not followed.

cle 14 (3) (e).

t 8. The Iranian Constitu- and the Covenant (Article use of torture. As noted ous judge who specializes eportedly has acted as tor-

on, Article 165; Covenant,

tence, as required by Article 6(4) of the Covenant. The Covenant also states, "Everyone convicted of a crime shall have the right to his conviction and sentence being re- viewed by a higher tribunal ac- cording to law." Article 14(5). However, in 1985 the Iranian Gov- ernment decreed that the Supreme Court could review only those Rev- olutionary Court decisions which are recommended for review by the Supreme Judicial Council, which consists of the Chief Justice, the Prosecutor General, and three mul- lahs.[38] Recently, the Supreme Ju- dicial Council was authorized to review death sentences; it can re- mand cases to the lower courts for further investigation or reconsider- ation.[39] Nevertheless, the defendant is still not entitled to present state- ments to the Council regarding his conviction and sentence.[40] Thus, that review is inadequate.

Many cases of prisoners being held far beyond the terms to which they were sentenced were reported to the U.N. Special Representa- tive.[41] To date, there is no known case of punishment of a govern- ment official for abuse of power.[42] The official attitude toward due process can most aptly be illustrat- ed by the following comments made by the Chief Justice, Adol- Karim Moussavi-Ardabili, at Fri- day prayers in Teheran on August 5, 1988:

> The public is exerting great pres- sure on the judiciary, asking why we bother to try them. Trials are unnecessary. The crime is clear,

the verdict is clear, and the pun- ishment is clear. There is no need for trials.... We are under pres- sure to explain why they have not all been executed, why some are still in jail.... I regret to re- port that instead of trying them in groups of ten or twenty, review- ing their files and taking them away, we have only gotten rid of one-fifth of them....It was lucky that many of those who fought with the National Liberation Army were killed, this saved having to prepare files to have them executed.[43]

### III. Conclusion

The Government of the Islamic Republic of Iran has manifested a profound contempt for human rights and the rule of law. This is the time to encourage the new lead- ership of that Government to re- store respect for human rights and international law. Promoting the rule of law throughout the world is an established goal of the Ameri- can Bar Association. The Section of International Law and Practice, therefore, urges that the American Bar Association adopt the proposed resolution.

Respectfully submitted,

STEVEN C. NELSON
*Chairman*
Section of International
Law and Practice

August, 1989

---

[38]*1988 Country Reports* at 1346.
[39]*Persistent Violations* at 7.
[40]*Id.*
[41]*E.g.*, IR ¶ 17; FR ¶ 40.
[42]FR ¶ 55.

[43]*Ettela'at* (newspaper), August 6, 1988. It is interesting to note that the Supreme Ju- dicial Council authorized the imprisonment or exile for up to two years of anyone with a criminal record, even without evidence of further criminal acts. FR at 17.