# EXHIBIT 47

United Nations

A/HRC/13/39



# General Assembly

Distr.: General
9 February 2010

Original: English

**Human Rights Council**
**Thirteenth session**
Agenda item 3
**Promotion and protection of all human rights, civil**
**political, economic, social and cultural rights,**
**including the right to development**

## Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Manfred Nowak*

| Summary |
| --- |
| In the present report, the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment gives an overview of the mandate and his activities, and the main observations he has made over five years of fact-finding and research. His global assessment is based on a detailed study of the phenomena of torture, cruel, inhuman or degrading treatment or punishment, including an assessment of conditions of detention, in the world today, contained in document A/HRC/13/39/Add.5. Based on the study, he observes that torture remains a global phenomenon and is practised widely in many countries, the major structural reason being the malfunctioning of the administration of justice and, consequently the lack of respect for safeguards. Moreover, he maintains that, in practice, most States parties to the Convention against Torture have failed to fulfil their obligations, such as criminalizing torture, investigating allegations, prosecuting perpetrators and providing redress for victims of torture. He further holds that, in many countries, conditions of detention in police custody, pretrial detention, other detention facilities and sometimes correctional institutions for convicted prisoners, amount to inhuman or degrading treatment: detainees, whether deprived of their liberty for justified or less justified reasons, belong to the most vulnerable and forgotten sectors of our societies. He also recalls that other forms of widespread cruel, inhuman or degrading treatment or punishment include corporal punishment and excessive police violence during arrest, in reacting to demonstrations and political gatherings, combating riots and similar law enforcement activities. States also do not live up to the standard of due diligence required by the obligation not to commit torture by acquiescence when combating torture and ill-treatment by private actors, including harmful traditional practices, such as female genital mutilation, domestic violence and trafficking in human beings, notably of women and children. |

* Late submission.

# Contents

|  |  |  | Paragraphs | Page |
|---|---|---|---|---|
| I. | Introduction | | 1–2 | 3 |
| II. | Activities of the Special Rapporteur | | 3–20 | 3 |
| | A. | Communications concerning human rights violations | 4 | 3 |
| | B. | Country visits | 5–6 | 3 |
| | C. | Highlights of key presentations and consultations | 7–16 | 4 |
| | D. | Press statements | 17–20 | 5 |
| III. | The mandate of the Special Rapporteur on the question of torture and State cooperation | | 21–41 | 5 |
| | A. | Country visits | 29–34 | 7 |
| | B. | Follow-up to country visits | 35–36 | 9 |
| | C. | Individual communications | 37–39 | 9 |
| | D. | Reports to the Human Rights Council and the General Assembly | 40–41 | 10 |
| IV. | Torture | | 42–58 | 10 |
| | A. | What is torture? | 43–44 | 10 |
| | B. | Context that allows torture to happen | 45–56 | 11 |
| | C. | Remedies and reparation | 57–58 | 14 |
| V. | Cruel, inhuman or degrading treatment or punishment | | 59–64 | 15 |
| | A. | Distinguishing cruel, inhuman or degrading treatment or punishment from torture | 60 | 15 |
| | B. | Excessive use of force by law enforcement bodies | 61 | 16 |
| | C. | Privately inflicted harm | 62 | 16 |
| | D. | Corporal punishment | 63 | 17 |
| | E. | Conditions of detention | 64 | 17 |
| VI. | Non-refoulement | | 65–67 | 17 |
| VII. | Conclusions and recommendations | | 68–77 | 18 |

## I.   Introduction

1.     This report, the fourth by the current mandate holder, is submitted in accordance with Human Rights Council resolution 8/8.

2.     The summary of communications sent by the Special Rapporteur from 15 December 2008 to 18 December 2009 and the replies received thereto from Governments by 31 December 2009 are contained in document A/HRC/13/39/Add.1. Document A/HRC/13/39/Add.6 contains a summary of the information provided by Governments and non-governmental sources on implementation of the recommendations of the Special Rapporteur and his predecessors following country visits. Documents A/HRC/13/39/Add.2, 3 and 4 are reports of country visits to Uruguay, Kazakhstan and Equatorial Guinea, respectively. Document A/HRC/13/39/Add.7 is a preliminary note on the visit to Jamaica, while document A/HRC/13/39/Add.5 contains a study of the phenomena of torture, cruel, inhuman or degrading treatment or punishment, including an assessment of conditions of detention, in the world today.

## II.   Activities of the Special Rapporteur

3.     The Special Rapporteur draws the attention of the Council to his fifth interim report to the General Assembly (A/64/215), in which he described his activities for the period January to July 2009.[1] He also informs the Council of the key activities undertaken since the submission of that report to the General Assembly on 3 August 2009.

### A.   Communications concerning human rights violations

4.     During the period from 15 December 2008 to 18 December 2009, the Special Rapporteur sent 70 letters of allegations of torture to 38 Governments and 175 urgent appeals to 59 Governments on behalf of persons who might be at risk of torture or other forms of ill-treatment.

### B.   Country visits

5.     In 2009, the Special Rapporteur undertook visits to Uruguay and Kazakhstan. In the period since the submission of his report to the General Assembly, the Special Rapporteur has received invitations from Papua New Guinea and Jamaica. He had been scheduled to conduct a visit to Zimbabwe from 28 October to 4 November 2009; however, the mission was postponed by the Government on 26 October 2009. Cuba had also issued an invitation to the Special Rapporteur for 2009, but the visit was postponed at a very late stage, meaning that the Special Rapporteur could not undertake any country visits during the second half of the year.

**Pending requests**

6.     In November 2009, the Special Rapporteur renewed requests for invitations from the following States: Algeria (request first made in 1997); Afghanistan (2005); Belarus (2005); Bolivia (Plurinational State of) (2005); Côte d'Ivoire (2005); Egypt (1996); Eritrea (2005);

---

[1]   Since the submission of his report to the seventh session of the Human Rights Council (see A/HRC/10/44 and addenda).

Ethiopia (2005); Fiji (2006); Gambia (2006); India (1993); Iran (Islamic Republic of) (2005); Israel (2002); Liberia (2006); Libyan Arab Jamahiriya (2005); Saudi Arabia (2005); Syrian Arab Republic (2005); Tunisia (1998); Turkmenistan (2003); Uzbekistan (2006); and Yemen (2005). He regrets that some of these requests are long-standing. Another outstanding request is with Iraq (2005).

## C.    Highlights of key presentations and consultations

7.      On 4 September 2009, the Special Rapporteur gave a lecture on the prevention and prohibition of torture and other cruel, inhuman or degrading treatment or punishment in Belgrade, organized by the Belgrade Centre for Human Rights, together with the Ombudsperson and the Organization for Security and Co-operation in Europe Mission to Serbia.

8.      On 14–16 September 2009, the Special Rapporteur conducted a workshop in Chisinau for the country's national preventive mechanism, organized by the United Nations Development Programme and the European Union. On 15 September 2009, he gave the keynote speech on "Domestic Violence, a serious breach of human rights", during a training session for judges and attorneys organized by the Ministry of Justice of the Republic of Moldova. On 16 September 2009, as part of a round table organized by the United Nations Development Programme, the European Union and the Government of Moldova entitled "Towards an adequate remedy framework for torture and other extreme abuses of human rights in Moldova", he made a presentation on his 2009 report on Moldova, which examined issues, follow-up and remedy for torture and torture-related violations of human rights.

9.      On 5 October 2009, the Special Rapporteur gave the keynote speech at the "The War on Words" Conference on terrorism, media and the law, organized by the International Press Institute and the Center for International Legal Studies in Vienna.

10.     From 29 to 30 September 2009, the Special Rapporteur, along with the other special procedures mandate holders involved in the joint global study on secret detention, participated in informal consultations in Geneva (A/HRC/13/42).

11.     On 8 October 2009, the Special Rapporteur met with a delegation from the Armenian national preventive mechanism in Vienna.

12.     On 20 October 2009, the Special Rapporteur participated in a panel discussion on "A united front against torture: Challenges and the way forward", organized by the Permanent Mission of Denmark and the Association for the Prevention of Torture in New York, and met with the Deputy Head of the Permanent Mission of Zimbabwe to the United Nations.

13.     On 6 November 2009, the Special Rapporteur acted as general rapporteur at the joint European Committee for the Prevention of Torture and Association for the Prevention of Torture conference on new partnerships for the prevention of torture in Europe, in Strasbourg, France.

14.     The Special Rapporteur gave a speech during the conference on the theme "Beyond torture: Establishing an acceptable framework for the fight against international terrorism", held on 12 and 13 November 2009 and organized by Reprieve and the Institute for Strategic Dialogue in London.

15.     On 30 November and 1 December, the Special Rapporteur participated in round-table discussions and workshops on the prevention of torture and ill-treatment in Port Moresby. He also met with Government officials in order to discuss the future visit to Papua New Guinea.

16.     From 14 to 17 December 2009, the Special Rapporteur travelled to Hong Kong, China, where he gave two lectures on the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and the principle of non-refoulement, as part of the training programme for lawyers on Convention against Torture claims and refugee law organized by the Academy of Law and the Law Society of Hong Kong. He also gave a lecture on "The odyssey of a Special Rapporteur: Impact of the International Covenant on Civil and Political Rights on domestic administration of justice in the Asia-Pacific region" at the Department of Justice and a presentation on the Convention against Torture and the Covenant, as part of a training workshop for decision makers that was organized by the Security Bureau of the Hong Kong Special Administrative Region.

## D.     Press statements

17.     On 13 August 2009, the Special Rapporteur, together with three other mandate holders, issued a statement expressing serious concern over reports of detainees being subjected to torture and harsh interrogations to obtain confessions, which were later used in a trial in the Islamic Republic of Iran.

18.     On 2 October 2009, jointly with other special procedures mandate holders, the Special Rapporteur issued a statement expressing serious concern about the human rights violations in Honduras resulting from the events that took place in the country since the return of deposed President José Manuel Zelaya.

19.     On 28 October 2009, the Special Rapporteur issued a statement in Johannesburg on the last-minute postponement of his visit to Zimbabwe. He welcomed the Southern African Development Community initiative and efforts to resolve the political crisis in the country and called upon the Government to allow the visit to go ahead, albeit in a modified form. On the explicit invitation of the Prime Minister, he travelled to Zimbabwe but was denied entry and held at Harare Airport overnight. Upon returning to Johannesburg, he issued another press statement, expressing his regret over his treatment by the Government. Despite recent, credible allegations of torture and ill-treatment, the visit unfortunately could not take place.

20.     On 10 December 2008, on the occasion of the anniversary of the adoption of the Universal Declaration of Human Rights and together with other special procedures mandate holders, the Special Rapporteur issued a joint statement calling for stronger global commitments and more determined action to defeat discrimination.

## III.    The mandate of the Special Rapporteur on the question of torture and State cooperation

21.     Within the United Nations, human rights have been promoted and protected through cooperation between four main types of actors: States, non-governmental organizations (NGOs), independent experts and the United Nations Secretariat.

22.     Formally speaking, States are the most important actors. Only States are members of the United Nations and its decision-making bodies. They also bear the primary responsibility for implementing international human rights standards and, at the same time, are the main perpetrators of human rights violations; no State is immune from violating human rights.

23.     Civil society is one of the main sources of information about the factual situation of human rights implementation in all countries. By allowing international NGOs to actively participate, speak and distribute written reports in the former Commission on Human

Rights and present Human Rights Council, the United Nations has significantly enhanced the objectivity of the international human rights discourse.

24.     Independent experts have played an increasingly active role within the human rights system of the United Nations since the late 1960s. They make up the human rights treaty bodies entrusted with the monitoring of States parties' compliance with their respective treaty obligations. In parallel, on the basis of Economic and Social Council Resolution 1235 (XLII) of 1967, the former Commission on Human Rights entrusted working groups and later individual experts to investigate the overall human rights situation in those States particularly criticized for gross and systematic violations of human rights (country-specific mandates). The Special Rapporteur on Torture was established in 1985 as the third thematic mandate.

25.     The tasks of the Special Rapporteur on the question of torture are manifold and, besides the key areas outlined below, include a variety of awareness-raising activities done, for example, via the media.

26.     Despite the considerable constraints in terms of time and resources, the Special Rapporteur feels that he is able to provide a fairly comprehensive study of the phenomena of torture, cruel, inhuman or degrading treatment or punishment, including an assessment of conditions of detention, in the world today (contained in A/HRC/13/40/Add. 5). Although in total he has visited less than 10 per cent of all Member States, many problems found in the countries visited are similar and follow a certain pattern, which allows the Special Rapporteur to draw general conclusions.

27.     The present report builds on the analysis contained in the study, which is primarily based on the experience gained during country visits. The Special Rapporteur would therefore like to thank all the Governments that had invited him to carry out fact-finding missions and facilitated them by providing information and support. Secondly, he is grateful to the Office of the High Commissioner for Human Rights in Geneva for supporting his mandate most effectively and providing him with highly motivated and professional staff. Thirdly, without the effective support and cooperation of a considerable number of international and domestic NGOs, as well as courageous human rights defenders in many countries, it would have been impossible either to regularly send allegation letters and urgent appeals to Governments or carry out highly difficult and complex fact-finding missions in all regions. Fourthly, he wishes to thank the Governments of Austria, Switzerland, Liechtenstein and other donors for their support of a remarkable team of highly professional and dedicated human rights experts at the Ludwig Boltzmann Institute of Human Rights at the University of Vienna. Lastly, he is impressed by the courage of so many victims and witnesses, both inside and outside detention, who provided him with information about prison conditions and detailed accounts of their own suffering at the hands of ruthless torturers and their superiors in too many countries. Many of these courageous individuals, despite the major concern that the protection that the Special Rapporteur — and the United Nations — could give is regrettably very limited, took the risk to provide him with the information necessary to carry out his mandate and inform the United Nations about the reality of torture and ill-treatment around the world.

28.     The reality is alarming. Despite the fact that torture constitutes one of the most brutal attacks on human dignity and one of the most serious human rights crimes — and notwithstanding the absolute prohibition of torture and ill-treatment even in the most exceptional circumstances, such as war, internal disturbances and terrorism — torture and ill-treatment are widespread practices in the majority of the countries. No society is immune from torture, but, in many societies, torture is practised on a daily basis, both as a means to fight ordinary crime and in combating terrorism, extremism or similar politically motivated offences. In addition, conditions of detention are appalling in the vast majority of countries and must often be qualified as cruel, inhuman or degrading. Whether convicted

criminals, suspects in police custody or accused in pretrial detention, illegal migrants and asylum-seekers in detention pending deportation, patients in psychiatric hospitals or children in closed institutions, detainees are among the most vulnerable and forgotten human beings in our societies. As soon as people are locked up, whether for justified or less justified reasons, society loses interest in their fate. One of the oldest stereotypes of modern societies is that those who are in detention must have done something wrong: an attitude which totally overlooks the fact that the criminal justice systems in most countries do not function properly, and detainees often have no effective access to any independent judicial review of their detention (habeas corpus) and similar complaints and control mechanisms. Prison walls and fences lock people up and society out. Because of punitive justice systems, detainees have very little contact with the outside world, and society has no interest in the fate of detainees. Prison conditions seem to be one of the last taboos, even in so-called "open societies". Another challenge that accompanied the Special Rapporteur throughout his tenure was the manifold attempts by a number of States to undermine or weaken the absolute prohibition of torture with reference to the need to counter terrorism.

## A.   Country visits

29.    During the last five years, the Special Rapporteur has undertaken 15 fact-finding missions to Georgia (including Abkhazia and South Ossetia), Mongolia, Nepal, China (including the autonomous regions of Tibet and Qinjang), Jordan, Paraguay, Nigeria, Togo, Sri Lanka, Indonesia, Denmark (including Greenland), Moldova (including Transnistria), Equatorial Guinea, Uruguay and Kazakhstan. Together with other special procedures mandate holders, the Special Rapporteur has prepared studies of the situation of detainees in the United States detention centre at Guantánamo Bay, Cuba, on the human rights situation in Darfur, Sudan, and on the global phenomenon of secret detention in the fight against terrorism. He also visited a considerable number of countries to hold meetings with and advise Governments, NGOs, victims and witnesses, and give lectures and training seminars. He also met with international and regional human rights bodies of the African Union, the Organization of American States, the Organization for Security and Co-operation in Europe, the Council of Europe and the European Union.

30.    The Special Rapporteur is grateful to States with standing invitations to special procedures and all Governments that responded positively to his requests for invitations to visit their countries. At the same time, he regrets that certain Governments have not responded to his requests or denied him access to their territories (see above, paragraph 6). Some Governments issued an invitation but refused to comply with the Special Rapporteur's terms of reference, which meant that the mission had to be cancelled or postponed at the last minute. These include the United States of America (in respect of Guantánamo Bay) and the Russian Federation. Others, including Sri Lanka, Equatorial Guinea and Cuba, invited the Special Rapporteur and then postponed the mission. Zimbabwe postponed the mission on the day that the Special Rapporteur travelled to Johannesburg and denied him access to its territory despite the explicit wish of the Prime Minister to meet him. Postponements of visits at the last minute are a considerable waste of scarce resources. Much time and effort had been invested by the Special Rapporteur and his staff in preparing missions to the Russian Federation, Sri Lanka, Equatorial Guinea, Cuba and Zimbabwe to the best of their abilities. In the case of Zimbabwe, considerable travel expenses were even paid. Nevertheless, the visits to Sri Lanka and Equatorial Guinea actually took place in late 2007 and 2008, respectively, whereas no new dates have ever been proposed by the Russian Federation. In the case of Cuba and Zimbabwe, these visits might be undertaken in 2010, but only at the expense of other missions which the Special Rapporteur intended to conduct during his last year as mandate holder, and only if he receives convincing assurances that his terms of references will be respected.

31.     The purpose of country missions is very simple. The Special Rapporteur tries to assist Governments in their efforts to eradicate torture and to improve prison conditions. Such assistance is only possible on the basis of thorough and objective fact-finding and assessment of the respective needs for reform. In order to evaluate the legal and factual situation of torture and ill-treatment in the countries concerned, the Special Rapporteur must enjoy all diplomatic privileges and immunities of experts on mission as specified in the Convention on the Privileges and Immunities of the United Nations, as well as freedom of inquiry in the territory of the respective countries, the right to speak with all stakeholders, including high-level Government officials, members of parliament, judges, prosecutors, police and prison officials, representatives of national human rights institutions, academia and NGOs and other civil society actors. Most important, of course, are unrestricted and confidential interviews with victims and witnesses and full access to relevant documents. Since torture usually takes places behind closed doors, his terms of reference also include unannounced visits to all place of detention and confidential interviews with detainees and prison staff.

32.     Furthermore, he is accompanied on visits by highly professional teams of human rights experts, doctors (in particular forensic experts), interpreters, security officers and other United Nations staff who must enjoy the same rights, diplomatic privileges and immunities. In order to document cases of torture and ill-treatment in accordance with the respective provisions of the Manual on Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and professional rules of experts in the field of human rights and forensic science, the team also uses electronic devices, photo, audio and video equipment inside detention facilities. These terms of reference are commonsense requirements for any effective and objective fact-finding efforts.

33.     Nevertheless, the Special Rapporteur was often confronted with substantial efforts by Governments to obstruct his fact-finding activities by subjecting him to extensive surveillance and bureaucratic hurdles, demanding that he inform them in advance which facilities he wished to inspect and granting unannounced visits only after long and difficult negotiations; denying him access to certain detention facilities; preventing him from speaking in private with detainees, victims and witnesses; extensively preparing detention facilities and instructing detainees about the way they should interact (or not) with him, etc. His task is to independently assess, to the best of his abilities, conditions of detention and instances of torture as they are in reality. All efforts of the authorities aimed at falsifying the situation make his task of objective fact-finding much more difficult and may even be counterproductive, as they naturally raise suspicions that the Government has something to hide. There is no country where there is no risk of torture and ill-treatment or prison conditions that could not be improved.

34.     If Governments wish to use the Special Rapporteur's findings and reports as a solid basis for a comprehensive needs assessment aimed at improving the situation, it is in their own interest to allow him to carry out his work as smoothly and effectively as possible. In practice, only relatively few countries, notably Denmark and Uruguay, enabled him to conduct his fact-finding without any particular interference or obstruction. The lessons seem clear: as an independent expert, the Special Rapporteur has no interest other than to objectively assess the situation of torture and ill-treatment in countries that invite him, with the aim of assisting the respective Governments in their efforts to improve the situation. This aim can only be achieved if Governments are genuinely interested in soliciting an objective assessment from an external expert by engaging in an open and frank dialogue based on mutual trust and respect. Governments have no obligation to invite the Special Rapporteur. Nevertheless, it seems that several Governments invited him for other reasons, such as earlier pledges to the Human Rights Council in order to be elected and a general political desire to show to the international community that they actively cooperate with

special procedures. Sometimes, certain parts of a Government are genuinely interested in the Special Rapporteur's assessment, while others are not. Such half-hearted invitations create a difficult situation for all actors involved, since they put pressure on the authorities to hide the real situation and to make fact-finding as difficult as possible. Sometimes, it needed considerable efforts from the Special Rapporteur to break through a "wall of silence" or a "wall of lies" which had been erected by the authorities when instructing detainees about how to interact with him.

## B.   Follow-up to country visits

35.     The Special Rapporteur has a particular interest in the development of the situation of torture and ill-treatment in countries that he or his predecessors have visited. In order to be kept informed about more recent developments, he annually compiles follow-up reports, which contain information from Governments about how they endeavour to implement recommendations. If he has the impression that Governments have a genuine interest in improving the situation by implementing at least some of his key recommendations, but lack the necessary financial means, he usually appeals to the United Nations Development Programme and other donors for assistance.

36.     The Special Rapporteur fully recognizes that the follow-up to his country missions would benefit from improvement. However, follow-up to country visits is not primarily the Special Rapporteur's task but that of the bodies to which he reports, i.e., the Human Rights Council and the General Assembly. Special procedure mandate holders are independent experts appointed by the Human Rights Council and mandated to objectively investigate the legal and factual situation and report their findings. Strictly speaking, their task is fulfilled when they deliver reports and present them during the interactive dialogue in the respective political decision-making bodies of the United Nations. These bodies have the mandate to urge the respective Governments to implement recommendations and the political leverage for effective follow-up. Unfortunately, apart from discussing reports during interactive dialogue and using some of the recommendations in the universal periodic review, not much attention has been paid to mandate holders' mission reports by the political bodies of the United Nations.

## C.   Individual communications

37.     The Special Rapporteur receives and sends communications concerning individual allegations of torture and ill-treatment to a considerable number of countries on an almost daily basis. Communications are based on allegations received from alleged victims and their families or lawyers, or via domestic and international NGOs and other channels. Whereas the Special Rapporteur is unable to assess from afar whether the allegations are true or not, he carefully checks the reliability of the sources and the consistency of the information provided. In his letters, the Special Rapporteur emphasizes that he does not prejudge the accuracy of the allegations. Consequently, communications forwarded by the Special Rapporteur to any Government must not be interpreted as an accusation from him. Nevertheless, since he only forwards allegations or risks of torture and ill-treatment which at first sight seem credible to him, he also stresses the obligations arising under international human rights law for the respective Government to carry out, notably, a thorough and independent investigation, and asks the Governments concerned to inform him of the type of investigations conducted and their results.

38.     Over five years, the Special Rapporteur has sent a total of 431 allegation letters to 107 Governments and a total of 891 urgent appeals to a total of 104 Governments. While many Governments send responses, serious investigations into the allegations of torture and

ill-treatment which actually lead to sanctions against the officials responsible appear to be conducted in exceptional cases only. Often, Governments simply explain the reasons for the arrest and detention of the alleged victims, i.e., they refer to the crimes which these individuals have committed or are suspected of having committed and fail to respond to the allegations of torture and ill-treatment to which these individuals may have been subjected. Thirty-six Governments failed to react to any of his allegation letters or urgent appeals.[2]

39.     Whereas it is difficult to assess the impact of the individual communication procedure, the effect of such communications should not be underestimated. During country visits, the Special Rapporteur often met former victims, whether still detained or at liberty, who assured him that individual communications sent on their behalf by him, his predecessors or other special procedures had had a positive effect and had saved them from further torture or similar human rights violations.

### D.    Reports to the Human Rights Council and the General Assembly

40.     In the thematic parts of his annual reports to the Human Rights Council and the General Assembly, the Special Rapporteur has reported on a wide range of topics. Interactive dialogue with Governments, NGOs and other stakeholders is usually interesting and sometimes leads to highly controversial discussions. He had been particularly challenged in relation to his reports concerning corporal and capital punishment. Other controversial discussions were stimulated by reports on torture-related issues in the context of the fight against terrorism, such as extraordinary renditions, diplomatic assurances to circumvent the principle of non-refoulement or the use of evidence extracted by torture.

41.     Some of the Special Rapporteur's recommendations have been included or confirmed in general resolutions on the issue of torture and ill-treatment, but his country-specific conclusions and recommendations have never led to any resolutions or recommendations by the Human Rights Council or the General Assembly; although some of these recommendations have been taken up again as part of the universal periodic review. Nevertheless, better use could be made of the extensive research and investigation by the Special Rapporteur and his distinguished predecessors in order to eradicate torture and ill-treatment, improve conditions of detention and guarantee the human right of dignity and personal integrity to detainees and other vulnerable groups.

## IV.    Torture

42.     All the Special Rapporteur's work on the mandate, but in particular his visits to countries in all regions of the world, have enabled him to make the observations set out below, on which his general conclusions and recommendations are based (see the full assessment in the document A/HRC/13/39/Add.5).

### A.    What is torture?

43.     The term "torture" should not be used in an inflammatory manner. It is reserved for one of the worst possible human rights violations and abuses human beings can inflict upon each other, and therefore carries a special stigma. It therefore holds a special position in international law: it is absolutely prohibited and this prohibition is non-derogable. Where

---

[2]   See summaries of these communications and government replies in the Special Rapporteur's annual communication reports.

torture has been inflicted, it is a very serious crime against a human being, who most likely will suffer from its consequences for the rest of his or her life, either physically or mentally. According to the definition contained in the Convention against Torture, four elements are needed in order for an act to be qualified as torture: firstly, an act inflicting severe pain or suffering, whether physical or mental; secondly, the element of intent; thirdly, the specific purpose; and lastly, the involvement of a State official, at least by acquiescence.

44.     Only acts which cause severe pain or suffering qualify as torture. Severity does not have to be equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily functions or even death.[3] Another element which distinguishes torture from cruel, inhuman or degrading treatment or punishment is the powerlessness of the victim. Torture is predominantly inflicted on persons deprived of their liberty in any context and therefore rendered particularly vulnerable to abuse.

## B.   Context that allows torture to happen

### 1.   Impunity

45.     The magnitude of impunity has been one of — if not the most — disappointing findings of his tenure as Special Rapporteur. Impunity is almost total in most countries he has visited, despite undeniable, sometimes routine, widespread or even systematic practices of torture and in contravention of the clear obligation under the Convention against Torture to hold perpetrators of torture accountable under criminal law. As soon as there is a suspicion of torture or an explicit allegation, a thorough investigation should be initiated immediately or without any delay.[4] It therefore has to be ensured that all public officials, in particular prison doctors, prison officials and magistrates who have reasons to suspect an act of torture or ill-treatment do report ex officio to the relevant authorities for proper investigation in accordance with article 12 of the Convention against Torture.[5] Moreover, whereas the decision on whether to conduct an investigation should not be discretionary, but rather an obligation irrespective of the filing of a complaint,[6] this is too often not the case. In addition, the lack of criminalization of torture and the mostly inadequate sanctions are the main factors contributing to impunity.

46.     Very frequently, national criminal codes contain provisions outlawing several offences which are similar to torture, such as the infliction of bodily injuries, battery, duress, or wilful violence, etc. While all these offences may be part of a form of torture, none covers all elements contained in the definition of article 1 and all therefore fall short of providing comprehensive protection of physical and psychological integrity. This highlights the prevalence of fundamental misconceptions about the elements and the nature of torture and a lack of sensitivity to the overall issue. Often the definition of torture relates

---

[3]   See E/CN.4/2006/6. See also M. Nowak and E. McArthur, *The UN Convention against Torture – A commentary* (Oxford University Press, 2008).

[4]   This corresponds also to the meaning of "promptly" in arts. 9 and 14 of the International Covenant on Civil and Political Rights: cf. M. Nowak, *UN Covenant on Civil and Political Rights. CCPR-Commentary* (Kehl, Engel, 1993), pp. 210–240, pp. 302–357. See also *Nedyibi v. Austria*, communication No. 8/1991, para. 15; *M'Barek v. Tunisia*, communication No. 60/1996, paras. 11.5–11.7; in *Blanco Abad v. Spain* (Committee against Torture, communication No. 59/1996), a delay of two weeks is already decided to be a violation of art. 12.

[5]   See, e.g., the report on the mission to Sri Lanka (A/HRC/7/3/Add.6, para. 94 (f)).

[6]   See, e.g., CAT/C/SR.145, para. 10 and SR.168, para. 40. See also the Committee against Torture, concluding observations on the third periodic report of France, CAT/C/FRA/CO/3, para. 20 and communication No. 59/1996, para. 8.2.

to the infliction of injuries.[7] However, the definition does not require any bodily injuries, let alone any lasting impairment. Injuries can be an aggravating factor, but torture should never be reduced to its consequences. With good reason, the drafters of the Convention against Torture included "whether physical or mental" into the definition of torture. Psychological ill-treatment is by no means less severe than physical abuse. Definitions of torture that leave out its psychological dimension encourage the use of mental ill-treatment and provide a loophole resulting in impunity. Furthermore, the insistence on injuries is particularly worrying, since more and more torture methods are designed not to leave any traces.

47.     It is disappointing to see that the few perpetrators who are held accountable are punished with sentences far below what is required by international law. While the Committee against Torture, in its State reporting procedure, has interpreted the obligation for an adequate punishment as a long-term prison sentence with a penalty of up to 20 years,[8] the Special Rapporteur's fact-finding missions have shown that perpetrators, if held accountable at all, were predominantly punished with disciplinary sanctions and light or suspended prison sentences. The forms of discipline do not normally go beyond demotion, delayed promotion or pay freeze. These sanctions are an affront to the victims, lack any meaningful acknowledgment of their suffering, are devoid of any deterrent effect and, therefore, put further persons at risk.

## 2.     Lack of effective complaints mechanisms

48.     The Special Rapporteur is unable to think of any other mechanism where the gap between the protection required by international instruments and the actual situation is as glaring. One of the most vivid, indicative and telling situations he encountered during one of his missions was where he found more than 70 detainees crammed into a small, badly lit and filthy cell, who had been there up to more than two years, and who had not once left the cell since their arrival. They were held incommunicado, some secretly, and many reported how they were most seriously tortured by the police during arrest and interrogation. None of them had received any medical treatment. This was just a few metres behind a human rights desk, which had been set up to receive complaints by detainees. Several officers were on duty at the desk, their workplace was adorned with a complaints box and posters on the rights of detainees. They had never received a single complaint from a detainee.[9] These human rights desks are only one example of numerous utterly ineffective complaints mechanisms. Whenever the Special Rapporteur receives information from officials that torture is not an issue in their country because no complaint has ever been filed, that has, in practice, been a clear signal that the opposite is the case – that torture is routine and that detainees are too afraid or simply unable to complain.

49.     The Special Rapporteur has ample grounds to believe that the vast majority of violations are never reported by detainees, including because they are often not aware of their right to complain. In a context of detention frequently characterized by violence and other abuse, it seems beyond imagination for many detainees that someone could listen to their allegations. If detainees know about their right to complain and the actual existence of a complaints mechanism, the fear of reprisals and lack of confidence in the overall functioning of the system may silence them. Normally, there is no complaints body sufficiently independent from the authority which is in charge of holding the detainees.

---

[7]   See also Human Rights Committee, general comment No. 20, para. 5.
[8]   See also Chris Ingelse, *The UN Committee against Torture: An assessment* (The Hague/Boston/London, Kluwer Law International, 2001), p. 342.
[9]   A/HRC/7/3/Add.4.

### 3. Lack of prevention

50.     All too often, the safeguards required by international human rights law are either not foreseen or not effective.

##### (a) Notification and detention records

51.     The rationale behind the notification and proper recording of arrest and custody is that open knowledge about the arrest and the place of detention provides some protection against abuse. By way of notification, it is established that the person is under the authority of the State, which assumes the duty of care. Unrecorded places of detention are not permissible. Proper record-keeping is a crucial contribution to establishing accountability in case of allegations of abuse.

##### (b) Length of police custody

52.     Detainees are at a high risk of being ill-treated during the first hours of deprivation of liberty. Suspects mostly find themselves in the hands of the officers in charge of investigating the crime of which they are accused. The officers therefore have an interest in obtaining a confession or other relevant information. In order to keep this critical phase as short as possible, international human rights law requires the minimization of the period before a person is brought before a judge or another officer authorized by law to exercise judicial powers. However, suspects are frequently held in police custody for much longer than international human rights law allows, sometimes for weeks or months, and find themselves in a situation which is generally dominated by a feeling of vulnerability and fear. In many of the police stations the Special Rapporteur has visited, there was a palpable level of fear which manifested itself inter alia in the strong reluctance of detainees to speak with him.

##### (c) Inadmissibility of evidence obtained under torture

53.     The inadmissibility of evidence obtained under torture is one of the most crucial safeguards in the criminal justice system. Its purpose is twofold: firstly, given that the vast majority of torture is inflicted in the course of criminal investigations with the purpose to extract a confession, the safeguard intends to remove a prime incentive for torture; secondly, evidence obtained under torture is highly unreliable. Declaring such evidence inadmissible will help to ensure that no innocent person is convicted. Whereas, legally, most States visited seem to comply with this provision by and large, confessions and other evidence obtained under torture are more frequently admitted in legal proceedings. In most of the countries visited, the Special Rapporteur received a very high number of related allegations, which were convincingly corroborated by representatives of civil society, lawyers, local human rights experts and others. Apart from the procedural weaknesses mentioned in this section, one of the main reasons for this phenomenon appears to be the almost insurmountable credibility deficit with which suspects are confronted. In sharp contrast to the presumption of innocence, they are a priori believed to be guilty and raising torture allegations only in order to evade justice.

##### (d) Access to a lawyer and legal assistance

54.     Given that most cases of abuse take place during the very early stages of detention, immediate access to an independent lawyer is crucial. In many countries, however, detainees are arrested, interrogated and indicted without having been able to access counsel. Even access to a lawyer at a later stage remains a hypothetical option for most detainees since they lack the financial resources to pay for it. Since persons from poorer social strata make up the majority of detainees, the inability to effectively access legal aid affects the majority of persons deprived of their liberty. The lack of legal counsel is in sharp contrast

to the basic principles of equality before the law and fairness. Detainees are often not aware of their rights, even when it comes to which treatment is actually permissible during interrogations. However, even in States with legal aid schemes, many detainees voiced doubts regarding the independence of their State-appointed lawyers or reported that they requested additional payment, since State-provided remuneration did not meet the lawyers' fees.

*(e)    Lack of forensic examinations*

55.    One of the major challenges when it comes to proving cases of torture and ill-treatment is the gathering of evidence. Since abuses are mainly inflicted behind closed doors, victims most often have an uphill struggle to make their cases heard and get their complaints properly considered. This is particularly the case for persons who are accused of having committed a crime and carry the stigma of not being credible and trying to avoid justice by complaining about their treatment.[10] Forensic medical science is a crucial tool in addressing this problem, since it can establish the degree of correlation of the medical findings with the allegations brought forward and therefore provide evidence on which prosecutions can be based.[11] Modern medical examinations can help to detect injuries which are otherwise not visible, such as soft tissue or nerve trauma – essential in light of the ever increasing sophistication of torture methods.

56.    As the Special Rapporteur has previously stated, the most effective way of preventing torture therefore is to expose all places of detention to public scrutiny.[12] However, in too many countries, no public monitoring exists or external monitors rarely have access to all places of deprivation of liberty, and the preconditions for effective monitoring, such as unannounced visits and confidential interviews with detainees, are often not granted. Moreover, a recurring problem faced by public monitoring is a lack of human and financial resources.

## C.    Remedies and reparation

57.    As torture often leaves indelible traces on the body — or in the minds — of the victims, reparation can almost never be complete. However, article 14 of the Convention against Torture requires each State party to ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full a rehabilitation as possible. This is a specific manifestation of the general right of victims of human rights violations to a remedy and adequate reparation, as laid down in various international and regional human rights treaties and should also apply to victims of other forms of cruel, inhuman or degrading treatment or punishment. Consequently, reparation has to encompass several aspects. What victims perceive as fair and adequate reparation for the ordeals they had to endure may differ from case to case. In the Special Rapporteur's experience, victims of torture are not primarily interested in monetary compensation, but in having their dignity restored. Public acknowledgment of the harm and humiliation caused and the establishment of the truth together with a public apology may often provide greater satisfaction than monetary compensation. For many torture survivors, justice is only perceived as such when criminal prosecution has lead to an appropriate punishment of the perpetrators. Most victims of torture are in urgent need of long-term medical and psychological rehabilitation in

---

[10]    See also A/62/221, para. 50.
[11]    Ibid.; see also Human Rights Council resolution 10/24, para. 11.
[12]    A/61/259, para. 74.

specialized treatment centres where they feel secure. The amount of monetary compensation must therefore include any economically assessable damage, such as the costs of long-term rehabilitation measures and compensation for lost opportunities, including employment, education and social benefits. In addition to reparation tailored to the needs of the individual victim, States are also obliged to adopt more general guarantees of non-repetition, such as taking resolute steps to fight impunity through, for example, the revision of amnesty laws, the establishment of independent investigation units or promotion of the observance of codes of conducts for law enforcement officials.

58.     In practice, the right to a remedy and adequate reparation for victims of torture is either non-existent or severely limited, and adequate reparation is almost never provided. In addition, a common problem is that victims and relatives of victims often do not enjoy legal standing in relation to allegations of torture and are therefore prevented from claiming reparation. If at all, medical, psychological and social rehabilitation is usually not provided by Governments responsible for the torture inflicted but by private organizations, usually in the countries that granted asylum to the victims.

# V.   Cruel, inhuman or degrading treatment or punishment

59.     The Special Rapporteur's mandate is not only about torture, but also includes cruel, inhuman or degrading treatment or punishment. During the tenure of his mandate, much of his attention — and many of his thematic reports — has been devoted to issues relating to cruel, inhuman or degrading treatment, including privately inflicted violence, corporal punishment and conditions of detention. The following are some brief remarks in relation to the most salient questions arising in this regard.

## A.   Distinguishing cruel, inhuman or degrading treatment or punishment from torture

60.     Article 7 of the International Covenant on Civil and Political Rights and relevant provisions of regional human rights treaties prohibit not only torture, but also cruel, inhuman or degrading treatment or punishment, which is separately proscribed in article 16 of the Convention against Torture. As is the case of the prohibition of torture, the prohibition of cruel, inhuman or degrading treatment or punishment is non-derogable. While the Convention against Torture expressly defines torture, there is no such definition of cruel, inhuman or degrading treatment or punishment in international treaties. Consequently, cruel, inhuman or degrading treatment or punishment is commonly distinguished from torture with reference to article 1 of the Convention against Torture. However, as the Special Rapporteur has argued before,[13] the distinguishing factor is not the intensity of the suffering inflicted, but rather the purpose of the conduct, the intention of the perpetrator and the powerlessness of the victim. Torture constitutes such a horrible assault on the dignity of a human being because the torturer deliberately inflicts severe pain or suffering on a powerless victim for a specific purpose, such as extracting a confession or information from the victim. Cruel, inhuman or degrading treatment or punishment, on the other hand, means the infliction of pain or suffering without purpose or intention and outside a situation where a person is under the de facto control of another. It follows that one may distinguish between justifiable and non-justifiable treatment causing severe suffering. Examples where causing severe suffering may be justifiable are the lawful use of force by the police in the exercise of law enforcement policies (e.g. arrest of a criminal

---

[13]    See E/CN.4/2006/6.

suspect, dissolution of a violent demonstration) and of the military in an armed conflict. In such situations, the principle of proportionality has to be strictly observed. If the use of force is not necessary and, in the particular circumstances of the case, disproportional to the purpose achieved, it amounts to cruel or inhuman treatment. In a situation where one person is under the de facto control of another and thus powerless, the test of proportionality is no longer applicable. Other situations which may amount to cruel, inhuman or degrading treatment or punishment are particularly severe conditions of detention, domestic violence, female genital mutilation and trafficking in human beings.[14] This means that, in principle, all forms of cruel or inhuman treatment or punishment, including torture, require the infliction of severe pain or suffering. This is different for the qualification of degrading treatment or punishment only in the sense of article 16 of the Convention against Torture, which arises from humiliation of the victim even if the pain or suffering is not severe.

## B.   Excessive use of force by law enforcement bodies

61.     The Special Rapporteur has received many allegations of excessive violence, during apprehension of a suspect and during demonstrations or public turmoil, including in pre-election and election periods. In many of those cases, people have been peacefully exercising their right to assembly when police or security officers violently dispersed the demonstration by beatings, the use of pepper and tear gas, sound bombs, water cannons, rubber bullets or firearms indiscriminately used on the masses. This all too often has led to persons being injured or killed. Of particular concern are reports of police brutality against vulnerable, disadvantaged groups and minorities. The Special Rapporteur has therefore repeatedly stated that the use of force must be exercised with restraint and only once non-violent means have been exhausted. Law enforcement bodies shall refrain from the use of firearms, except in self-defence or defence of others from an imminent threat of death or serious injury. In this regard, strict rules on the use of force for police and security forces should be applied. Furthermore ways to improve the recording and monitoring of arrests and the control of demonstrations should be explored.

## C.   Privately inflicted harm

62.     Domestic violence, in particular against women and children, is a widespread practice in most countries, and not enough action is taken by States to protect women and children against ill-treatment by their husbands, partners or parents. Although female genital mutilation inflicts most severe pain and long-term suffering on girls, it continues to be practised in too many African and other countries without adequate laws prohibiting it and without law enforcement bodies implementing existing laws. Trafficking in human beings, notably women and girls, is one of the most widespread and lucrative activities of organized crime. Most Governments seem to be more interested in returning victims of trafficking to their countries of origin than providing protection and reparation for them. By not acting with due diligence to protect victims of domestic violence, trafficking, female genital mutilation and similar practices, States may commit torture or cruel, inhuman or degrading treatment or punishment by acquiescence.[15]

---

[14]   If the additional definition criteria for torture are fulfilled, these practices may also amount to torture. See also the Committee against Torture, communication No. 207/2002, para. 5.3; A/48/44/Add.1, para. 52; and A/56/44.

[15]   See A/HRC/7/3, para. 68.

### D.  Corporal punishment

63.     In its pervasiveness, impact on the victim and justifications put forward by its proponents, corporal punishment of children in the home and in educational settings differs from corporal punishment that is administered as part of a judicial sentence in a number of States. A separate problem is the corporal chastisement of detainees as a disciplinary sanction that the Special Rapporteur has witnessed in many countries. What is common to all these forms of corporal punishment, however, is that physical force is used intentionally against a person in order to cause severe pain. Furthermore, without exception, corporal punishment has a degrading and humiliating component. Corporal punishment must therefore without exception be considered to amount to cruel, inhuman or degrading punishment or torture in violation of international treaty and customary law.

### E.  Conditions of detention

64.     Deprivation of personal liberty, which is one of the most precious human rights, is an indispensible tool of criminal justice. However, what is often forgotten, is that detainees should continue to enjoy all other liberties and human rights, unless further restrictions are absolutely necessary for upholding prison discipline or for similar justified reasons. As the Special Rapporteur described in his most recent report to the General Assembly,[16] the reality in most countries is totally different. Since it is an essential element of fact-finding during country missions to visit prisons, police lock-ups, closed psychiatric institutions and other places of detention, the Special Rapporteur had a fairly comprehensive insight into the conditions of detention around the world. In many countries, he was shocked by the way human beings are treated in detention. In this regard, he is most concerned about the structural deprivation of most human rights, notably the rights to food, water, clothing, health care and a minimum of space, hygiene, privacy and security necessary for a humane and dignified existence. It is the combined deprivation and non-fulfilment of these existential rights which amounts to a systematic practice of inhuman or degrading treatment or punishment and, around the world, there is an urgent need to ensure more respect for detainees and improve conditions of detention: the respect shown for the detainees is a mirror of a country's general human rights culture.

## VI.  Non-refoulement

65.     The principle of non-refoulement is an important principle codified in several international instruments, considered part of international customary law and reflected in international jurisprudence prohibiting the return or extradition of a person to another State where there are substantial grounds for believing that he or she would face the risk of being tortured.[17] States are thus not only prohibited from subjecting persons to torture but also from sending them to States where they face that risk, or through indirect or "chain"

---

[16]  A/64/215.
[17]  Convention against Torture, art. 3. See also Human Rights Committee, *Kindler v. Canada*, communication No. 470/1991, 1993, para. 13.2.; general comment No. 20 on art. 7, para. 9; European Court of Human Rights, *Jabari v. Turkey*, 11 July 2000, para. 38; M. Nowak, *UN Covenant on Civil and Political Rights. CCPR Commentary*, second edition (Kehl, Engel, 2005), art. 7, para. 45; Declaration on Territorial Asylum, 1967; General Assembly resolutions 37/195 and 48/116; San Remo Declaration on the Principle of Non-Refoulement; and Executive Committee of the Office of the High Commissioner for Refugees, Conclusions on International Protection Nos. 25 (1982), 55 (1989) and 79 (1996).

refoulement. The sending State is therefore responsible for undertaking a proper risk assessment of the situation in the receiving State.

66.    Although there are similarities between the two, the refoulement procedure is not to be equated with the asylum procedure. While there are limitations to asylum in terms of the Refugee Convention, article 3 of the Convention against Torture and article 7 of the International Covenant on Civil and Political Rights apply to every person and are not subject to any limitation or exclusion clauses. Consequently, the non-refoulement principle is absolute. While doubts about the credibility of the facts provided by the applicant can result in the refusal of asylum, the State has to ensure that the security of the applicant is not endangered, as continuously upheld by the Committee against Torture.[18]

67.    The principle of non-refoulement has come under fire during the Special Rapporteur's tenure both from the ever increasing tightening of immigration laws and domestic procedures that often only provide for superficial examinations by the authorities and the several attempts at undermining the principle in the context of the fight against terrorism (including through the so-called "test of reasonableness", which balances the risk of torture against the threat to national security and the increased use of diplomatic assurances), where there were fears that States may use torture on persons suspected of terrorist acts. As the Special Rapporteur has stated repeatedly, diplomatic assurances related to torture are nothing but an attempt to circumvent the absolute nature of the principle of non-refoulement.[19]

# VII.   Conclusions and recommendations

68.    **Torture is a global phenomenon. Only a very small number of countries have managed to eradicate torture in practice. In the vast majority of States, torture not only occurs in isolated cases, but is practised in a more regular, widespread or even systematic manner.**

69.    **Most victims of torture are not political prisoners or suspected of having committed political crimes, but ordinary persons suspected of having committed criminal offences. They usually belong to disadvantaged, discriminated and vulnerable groups, in particular those suffering from poverty.**

70.    **The most frequent purpose of torture is to extract a confession. Since confessions in many contexts are still regarded as the crown of evidence, considerable pressure is exerted by politicians, the media, prosecutors and judges on law enforcement bodies to "solve criminal cases" by means of extracting confessions that are later used in courts to convict the suspects.**

71.    **The major structural reason for the widespread practice of torture in many countries is the malfunctioning of the administration of justice and, consequently the lack of respect for safeguards. States are not investing sufficient resources in the administration of justice. Judges, prosecutors, police and prison officials are often undereducated, overworked, underpaid and, therefore, corrupt.**

72.    **Another often-used reason for the widespread use of torture, particularly during the last decade, is the extraction of intelligence information in the context of**

---

[18]    See Committee against Torture, *Aemei v. Switzerland*, communication No. 34/1995, para. 9.6, and *A.S. v. Sweden*, communication No. 149/1999, para. 8.6. See also communications Nos. 13/1993, para. 9.2; 15/1994, para. 12.3; 34/1995, para. 9.6; 138/1999, para. 7.3.

[19]    See E/CN.4/2006/6 and A/60/316.

the global fight against terrorism and the deliberate undermining of the absolute prohibition of torture and ill-treatment.

73.    Although 146 States are party to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, most Governments have failed to effectively implement its provisions. Despite the obligation to criminalize torture and prosecute perpetrators of torture under different types of jurisdiction, only very few torturers have been brought to justice worldwide. Impunity continues to be one of the main factors in widespread torture. Despite the obligation to provide victims of torture with an effective remedy and adequate reparation for the harm suffered, only a very small number of victims of torture are able to enjoy this right in the country responsible for inflicting the torture. If victims manage to access medical, psychological and other forms of rehabilitation, this important form of reparation is usually provided by private organizations in countries in which torture victims are granted asylum. Despite the obligation to effectively investigate every allegation or suspicion of torture and ill-treatment, almost no country has established bodies with effective powers of criminal investigation which are also fully independent from the law enforcement officers subject to their investigations. Despite the obligation to take all legislative, administrative, political and other measures necessary to prevent torture, including prompt access of detainees to lawyers, judges, doctors and families, audio- or videotaping of interrogations, the prohibition of using confessions extracted by torture before courts and regular inspections of all places of detention and interrogation by independent bodies, most of the some 10 million detainees around the world can only dream of enjoying such measures.

74.    In most countries, conditions of detention in police custody, pretrial detention, other detention facilities and sometimes in correctional institutions for convicted prisoners, amount to inhuman or degrading treatment. Detainees, whether deprived of their liberty for justified or less justified reasons, belong to the most vulnerable and forgotten sectors of our societies. In practice, they are deprived of most of their liberties and human rights, including the right to an adequate standard of living, food, water, health, education and privacy.

75.    Among detainees, certain groups are subject to double discrimination and vulnerability, including aliens and members of minorities, women, children, the elderly, the sick, persons with disabilities, drug addicts and gay, lesbian and transgender persons.

76.    Other forms of widespread cruel, inhuman or degrading treatment or punishment include corporal punishment and excessive police violence during arrest and in reacting to demonstrations and political gatherings, combating riots and similar law enforcement activities. States also do not live up to the standard of due diligence required by the obligation not to commit torture by acquiescence when combating torture and ill-treatment by private actors, including harmful traditional practices, such as female genital mutilation and honour crimes, domestic violence and trafficking in human beings, above all of women and children.

77.    In building upon the general recommendations elaborated by his distinguished predecessor, Theo van Boven, in 2003,[20] the Special Rapporteur wishes to particularly stress the following recommendations:

(a)    All States should ratify the United Nations Convention against Torture and fully implement its provisions. In particular, they must criminalize torture, as

---

[20]  E/CN.4/2003/68, para. 26.

defined in article 1, with appropriate sanctions taking into account the gravity of the crime of torture; investigate all allegations and suspicions of torture by independent and effective "police-police" bodies; bring perpetrators of torture to justice under the various forms of criminal jurisdiction mentioned in article 5 of the Convention; provide victims of torture with an effective remedy and adequate reparation for the harm suffered – in particular medical, psychological and other forms of rehabilitation; and take all measures necessary to prevent torture, including prompt access of all detainees to lawyers, judges, doctors and their families;

(b)    All States should ratify the Optional Protocol to the Convention against Torture and establish effective national preventive mechanisms to carry out preventive visits to all places of detention. Those mechanisms should be fully independent bodies with a pluralistic composition and equipped with the financial and human resources necessary to conduct regular and ad hoc visits to all places of detention (police lock-ups, prisons, pretrial detention facilities, psychiatric hospitals and special detention facilities for women, children, migrants, drug addicts, etc.);

(c)    All States and the international community are requested to provide the resources necessary to develop national systems for the administration of justice that provide all human beings with equal access to justice and the right to a fair trial at all stages of criminal proceedings. In particular, judges, prosecutors, lawyers, police and prison officials shall be selected, educated and paid properly and in sufficient number. Effective measures for combating corruption in the administration of justice shall be taken. Judges shall be fully independent from the executive and legislative branches of Government and shall exercise judicial functions with impartiality and professionalism. Pretrial detention of criminal suspects shall be the exception, not the rule, and shall last for as little time as possible. Pretrial detainees shall be separated from convicted prisoners, children from adults, women from men. The main aim of correctional institutions shall be the rehabilitation of offenders and their reintegration into society. Punitive policies of criminal justice shall be brought in line with this important aim, provided for in article 10 of the International Covenant on Civil and Political Rights, by means of structural reforms of the administration of justice;

(d)    The international community should establish a global fund for national human rights protection systems which will assist States in their efforts to improve and reform national criminal justice systems, including the judiciary, prosecutors, police and prisons. That fund shall be financed by States, non-governmental organizations and the corporate sector and shall contribute to the legal empowerment of the poor;

(e)    The Human Rights Council should consider drafting a United Nations convention on the rights of detainees to codify all human rights of persons deprived of liberty, as laid down in the Standard Minimum Rules for the Treatment of Prisoners and similar soft law instruments, in a legally binding human rights treaty with effective monitoring and implementation mechanisms;

(f)    In the fight against terrorism and other forms of organized crime, States should keep in mind the absolute and non-derogable nature of the prohibition of torture. In particular, detention in secret places of detention, the expulsion or "rendition" of terrorist suspects to countries known for their practice of torture, the use of diplomatic assurances from these Governments not to torture as a means of circumventing the principle of non-refoulement, "enhanced interrogation techniques" aimed at inflicting severe physical or mental pain or suffering on detainees for the purpose of extracting intelligence information and similar practices in the global fight against terrorism are absolutely prohibited under international law and shall immediately be terminated. After all, torture, as the ultimate form of power exercised

by one individual over another individual in a powerless situation, constitutes a direct attack on the personal integrity, dignity and humanity of human beings and is, therefore, for sound philosophical and historical reasons, absolutely prohibited under international law even in the most extreme and exceptional circumstances, such as war or terrorism.

———————————