# EXHIBIT 48

Case 1:19-cv-03599-GMH   Document 31-50   Filed 12/05/22   Page 2 of 26

United Nations

A/63/175


**General Assembly**

Distr.: General
28 July 2008

Original: English

---

**Sixty third session**
Item 67 (a) of the provisional agenda*
**Promotion and protection of human rights: implementation of
human rights instruments**

## Torture and other cruel, inhuman or degrading treatment or punishment

### Note by the Secretary-General

The Secretary-General has the honour to transmit to the members of the General Assembly the interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment, Manfred Nowak, submitted in accordance with Assembly resolution 62/148.

---

* A/63/150.

08-44075 (E)   220808


## Interim report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment

*Summary*

In the present report, submitted pursuant to General Assembly resolution 62/148, the Special Rapporteur addresses issues of special concern to him, in particular overall trends and developments with respect to questions falling within his mandate.

The Special Rapporteur draws the attention of the General Assembly to the situation of persons with disabilities, who are frequently subjected to neglect, severe forms of restraint and seclusion, as well as physical, mental and sexual violence. He is concerned that such practices, perpetrated in public institutions, as well as in the private sphere, remain invisible and are not recognized as torture or other cruel, inhuman or degrading treatment or punishment. The recent entry into force of the Convention on the Rights of Persons with Disabilities and its Optional Protocol provides a timely opportunity to review the anti-torture framework in relation to persons with disabilities. By reframing violence and abuse perpetrated against persons with disabilities as torture or a form of ill-treatment, victims and advocates can be afforded stronger legal protection and redress for violations of human rights.

In section IV, the Special Rapporteur examines the use of solitary confinement. The practice has a clearly documented negative impact on mental health, and therefore should be used only in exceptional circumstances or when absolutely necessary for criminal investigation purposes. In all cases, solitary confinement should be used for the shortest period of time. The Special Rapporteur draws attention to the Istanbul Statement on the Use and Effects of Solitary Confinement, annexed to the report, as a useful tool to promote the respect and protection of the rights of detainees.

# Contents

|  |  | *Paragraphs* | *Page* |
|---|---|---|---|
| I. | Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1–4 | 4 |
| II. | Activities related to the mandate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5–36 | 4 |
| III. | Protecting persons with disabilities from torture . . . . . . . . . . . . . . . . . . . . . . . . . | 37–76 | 8 |
|  | A. Legal framework for the protection of persons with disabilities from torture | 42–44 | 9 |
|  | B. Applying the torture and ill-treatment protection framework to persons with disabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 45–69 | 10 |
|  | C. Conclusions and recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 70–76 | 18 |
| IV. | Solitary confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 77–85 | 18 |
| Annex |  |  |  |
|  | Istanbul Statement on the Use and Effects of Solitary Confinement . . . . . . . . . . . . . . . . . . . . . . |  | 22 |

## I.  Introduction

1.    The present report is the tenth submitted to the General Assembly by the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment. It is submitted pursuant to General Assembly resolution 62/148 (para. 32). It is the fourth report submitted by the present mandate holder, Manfred Nowak. The report includes issues of special concern to the Special Rapporteur, in particular overall trends and developments with respect to issues falling within his mandate.

2.    The Special Rapporteur draws attention to document A/HRC/7/3, his main report to the Human Rights Council, in which he explored the influence of international norms relating to violence against women on the definition of torture and the extent to which the definition itself can embrace gender sensitivity and discussed the specific obligations upon States which follow from this approach. According to the Special Rapporteur, the global campaign to end violence against women when viewed through the prism of the anti-torture framework can be strengthened and afforded a broader scope of prevention, protection, justice and reparation for women than currently exists.

3.    Document A/HRC/7/3/Add.1 covered the period 16 December 2006 to 14 December 2007 and contained allegations of individual cases of torture or general references to the phenomenon of torture, urgent appeals on behalf of individuals who might be at risk of torture or other forms of ill-treatment, as well as responses by Governments. The Special Rapporteur continues to observe that the majority of communications are not responded to by Governments.

4.    Document A/HRC/7/3/Add.2 contains a summary of the information provided by Governments and non-governmental organizations (NGOs) on implementation of recommendations of the Special Rapporteur following country visits. The Government of Mongolia has not provided any follow-up information since the visit was carried out in June 2005. Documents A/HRC/7/3/Add.3 to 7 are reports of country visits to Paraguay, Nigeria, Togo, Sri Lanka and Indonesia, respectively.

## II.  Activities related to the mandate

5.    The Special Rapporteur draws the attention of the General Assembly to the activities he has carried out pursuant to his mandate since the submission of his report to the Human Rights Council (A/HRC/7/3 and Add.1-7).

### Communications concerning human rights violations

6.    During the period from 15 December 2007 to 25 July 2008, the Special Rapporteur sent 42 letters of allegations of torture to 34 Governments, and 107 urgent appeals on behalf of persons who might be at risk of torture or other forms of ill-treatment to 42 Governments. In the same period 39 responses were received.

## Country visits

7.    With respect to fact-finding missions, the Special Rapporteur was to undertake a visit to Equatorial Guinea from 30 January to 8 February 2008; however, the Government requested postponement of the visit. In a meeting at the Human Rights Council on 5 March 2008, the Vice-Prime Minister for Human Rights assured the Special Rapporteur that the visit would take place between 18 and 26 October 2008. Dates for the visit to Iraq are still under consideration. The Special Rapporteur continues to express the wish that dates for the visit to the Russian Federation, originally postponed in October 2006, will be forthcoming.

8.    The Special Rapporteur undertook a visit to Denmark, including Greenland, from 2 to 9 May 2008. He expressed his appreciation to the Government for the full cooperation extended to him and paid tribute to Denmark's long-standing leadership in anti-torture efforts worldwide. He noted that no allegations of torture and very few complaints of ill-treatment were received during the visit. However, he regretted that a specific crime of torture is still missing in Danish criminal law. The hallmark of the prison system in Denmark is the "principle of normalization", meaning that life inside reflects, to as great an extent as possible, life outside the prison. Taken together with an attentive approach to the concerns of detainees by prison staff, the result is generally a high standard of conditions of detention inside Danish prisons. The Special Rapporteur commended the Government's efforts in carrying out successful awareness-raising campaigns on domestic violence and trafficking of women. In Greenland, action against domestic violence has so far not received adequate attention despite the severity of the problem. Notwithstanding the Government's efforts to restrict the use of solitary confinement, the extensive recourse to this practice remains a major concern, particularly with respect to pre-trial detainees. The Special Rapporteur noted with concern allegations about United States Central Intelligence Agency rendition flights operating through Denmark and Greenland and plans to resort to diplomatic assurances to return suspected terrorists to countries known for their practice of torture.

9.    The Special Rapporteur on the question of torture, together with the Special Rapporteur on violence against women, its causes and consequences, visited Moldova, including the Transnistrian region, from 4 to 11 July 2008. The Special Rapporteurs expressed appreciation to the Government for its full cooperation and stressed that Moldova has made great progress in human rights protection since independence in 1991. They commended the adequate legal frameworks that have been put in place in regard to violence against women as well as to torture. In that context, they welcomed the recent law on preventing and combating family violence and the establishment of a national preventive mechanism under the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. However, they noted with concern the significant gaps between the normative framework and the reality on the ground. They stressed in particular that violence against women had not received enough attention and that the protective infrastructure for victims of violence was insufficient. They also observed that ill-treatment during the initial period of police custody was widespread and that complaints mechanisms were largely ineffective. Whereas conditions in the detention centres under the Ministry of Justice had somewhat improved, conditions in police custody facilities were still a source of major concern. The Special Rapporteurs called for the effective implementation of existing

laws and better protection mechanisms for labour migrants. They recommended that safeguards for detainees be strengthened and that rehabilitation and reintegration be put at the centre of Moldova's penal policies and laws.

10.    The Special Rapporteur recalls requests for invitations sent to the following States: Algeria (request first made in 1997); Afghanistan (2005); Belarus (2005); Bolivia (2005); Côte d'Ivoire (2005); Egypt (1996); Eritrea (2005); Ethiopia (2005); Fiji (2006); Gambia (2006); India (1993); Iran (Islamic Republic of) (2005); Israel (2002); Liberia (2006); Libyan Arab Jamahiriya (2005); Papua New Guinea (2006); Saudi Arabia (2005); Syrian Arab Republic (2005); Tunisia (1998); Turkmenistan (2003); Uzbekistan (2006); Yemen (2005); and Zimbabwe (2005). He regrets that some of these requests are long-standing.

## Key press statements

11.    On 4 January 2008, the Special Rapporteur jointly with other special procedures mandate holders issued a statement expressing deep concern at the loss of life and destruction of property following election-related violence in Kenya.

12.    On 10 April, jointly with other mandate holders, the Special Rapporteur issued a statement calling for restraint and transparency as mass arrests were reported in the Tibetan Autonomous Region of China and surrounding areas.

13.    On 29 April, the Special Rapporteur issued a joint statement with other mandate holders concerning acts of intimidation, violence and torture related to the parliamentary and presidential elections in Zimbabwe.

14.    On 26 June, on the occasion of the International Day in Support of Victims of Torture, the Special Rapporteur, together with the Special Rapporteur on violence against women, the Committee against Torture, the Subcommittee on Prevention of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Board of Trustees of the United Nations Voluntary Fund for Victims of Torture and the United Nations High Commissioner for Human Rights, issued a joint statement. It called attention to, among other things, the need to strengthen the protection of women and persons with disabilities from torture and ill-treatment.

15.    On 26 June, the Special Rapporteur issued a joint statement with other mandate holders concerning widespread reports of politically motivated violence in Zimbabwe in the country's presidential run-off election scheduled for 27 June.

## Highlights of key presentations/consultations/training courses

16.    On 23 February, the Special Rapporteur delivered the opening speech entitled "Instruments that Zimbabwean civil society can use in the fight against torture", in Harare, on the occasion of the tenth anniversary of the Human Rights NGO Forum.

17.    On 11 March, the Special Rapporteur participated in a panel discussion on "Strengthening the protection of women from torture: applying a gender-sensitive definition of torture", which was organized by the Office of the United Nations High Commissioner for Human Rights and the Government of Switzerland.

18.    On 12 March, the Special Rapporteur chaired a panel discussion at the Human Rights Council on "The role of doctors in the fight against torture".

19.   On 14 March, the Special Rapporteur held consultations with the Director and staff of the Division of International Protection Services of the Office of the United Nations High Commissioner for Refugees. Matters of mutual interest were discussed as well as ways and means to strengthen cooperation.

20.   On 27 March, the Special Rapporteur held a meeting with representatives of the Ministry of Justice of Austria in Vienna on the use of tasers.

21.   On 3 April, the Special Rapporteur participated in a meeting organized by the Geneva Academy of International Humanitarian Law and Human Rights on the "Agenda for Human Rights", an initiative of the Government of Switzerland to commemorate the sixtieth anniversary of the Universal Declaration of Human Rights.

22.   On 14 and 15 April, at the Dead Sea in Jordan, the Special Rapporteur delivered the keynote presentation and participated in the regional training programme on human rights for the Middle East and North Africa region, organized by the Raoul Wallenberg Institute and Adalah, a local NGO.

23.   On 17 April, at a meeting organized by Amnesty International in Mannheim, Germany, the Special Rapporteur delivered a presentation on "Torture and terrorism. Current challenges to the prohibition of torture in the fight against terrorism".

24.   On 18 April, in Strasbourg, France, the Special Rapporteur held discussions with the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) on matters of mutual interest as well as on ways and means to strengthen cooperation.

25.   On 23 and 24 April, as a follow-up to his predecessor's study on the situation of trade in and production of equipment which is specifically designed to inflict torture (see E/CN.4/2005/62), the Special Rapporteur participated in an international expert meeting to review and further develop national, regional and international controls on the transfer of security equipment used for torture. The meeting was organized by Amnesty International and the Omega Foundation in London.

26.   On 30 April, the Special Rapporteur conducted a seminar at the Vienna Diplomatic Academy, Vienna, entitled "The international struggle against torture".

27.   On 19 and 20 May, the Special Rapporteur participated in a workshop organized by the Council of Europe and the European Union in St. Petersburg, Russian Federation, on "Complaints against the police".

28.   On 2 and 3 June, the Special Rapporteur held meetings with representatives of the International Criminal Court, the International Criminal Tribunal for the Former Yugoslavia and the Special Court for Sierra Leone at The Hague.

29.   On 6 June, at the American University in Washington, D.C., he led a panel discussion on "The future of United Nations special procedures". On 9 June, he gave a speech on "How to Incorporate United Nations special procedures in a human rights strategy" also at the American University. On 10 June, at the Washington Convention Center, he participated in a panel discussion organized by the American Civil Liberties Union on "Linking the Universal Declaration of Human Rights to United States' civil liberties".

30.   On 10 June, he held consultations with representatives of the United States Congressional Human Rights Caucus about the Optional Protocol to the Convention against Torture and other questions related to the mandate.

31.   On 11 and 12 June, the Special Rapporteur participated, at the invitation of the Ministry of Foreign Affairs of Norway, in a meeting on the further development of the "Agenda for Human Rights". The meeting was organized by the Geneva Academy of International Humanitarian Law and Human Rights

32.   On 16 June, the Special Rapporteur participated in an expert meeting in Berlin organized by Amnesty International, the Walther Schucking Institute and the Heinrich Böll Foundation on the application of United Nations human rights treaties to troops participating in United Nations peace operations.

33.   On 23 June, the Special Rapporteur held a meeting in Geneva with members of the Subcommittee on Prevention to discuss matters of mutual concern.

34.   On 24 June 2008, the Special Rapporteur took part in a round table on international aviation law sponsored by REDRESS and the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism with the support of the Office of the High Commissioner for Human Rights.

35.   On 25 June 2008, on the occasion of the International Day in Support of Victims of Torture on 26 June, he attended an event organized in Brussels by the European Parliament Subcommittee on Human Rights to discuss the prohibition of torture.

36.   On 19 July 2008, at the Diplomatic Conference "Living the UDHR after 60 Years: challenges for the European Union" organized by the European Inter-University Centre for Human Rights and Democratisation in Venice, Italy, the Special Rapporteur gave a presentation on the question "Is there a need for a coordinated European policy relating to the principle of non-refoulement?".

## III.   Protecting persons with disabilities from torture

37.   In the exercise of his mandate, the Special Rapporteur has received information[1] about different forms of violence and abuse inflicted against persons with disabilities — men, women and children.[2] But for their disability, such individuals are targets for neglect and abuse.

38.   Persons with disabilities are often segregated from society in institutions, including prisons, social care centres, orphanages and mental health institutions. They are deprived of their liberty for long periods of time including what may amount to a lifelong experience, either against their will or without their free and

---

[1] See A/58/120, paras. 36-53. In addition, on 11 December 2007, the Special Rapporteur participated in an expert seminar on "Freedom from torture and ill-treatment and persons with disabilities", organized by the Office of the High Commissioner for Human Rights, where relevant situations and cases were discussed; the report can be found at: http://www2.ohchr.org/english/issues/disability/index.htm.

[2] The term "persons with disabilities" refers to women, men and children who have physical, mental, intellectual or sensory impairments, as reflected in article 1 of the Convention on the Rights of Persons with Disabilities.

informed consent. Inside these institutions, persons with disabilities are frequently subjected to unspeakable indignities, neglect, severe forms of restraint and seclusion, as well as physical, mental and sexual violence.[3] The lack of reasonable accommodation in detention facilities may increase the risk of exposure to neglect, violence, abuse, torture and ill-treatment.

39.   In the private sphere, persons with disabilities are especially vulnerable to violence and abuse, including sexual abuse, inside the home, at the hands of family members, caregivers, health professionals and members of the community.[4]

40.   Persons with disabilities are exposed to medical experimentation and intrusive and irreversible medical treatments without their consent (e.g. sterilization, abortion and interventions aiming to correct or alleviate a disability, such as electroshock treatment and mind-altering drugs including neuroleptics).

41.   The Special Rapporteur is concerned that in many cases such practices, when perpetrated against persons with disabilities, remain invisible or are being justified, and are not recognized as torture or other cruel, inhuman or degrading treatment or punishment. The recent entry into force of the Convention on the Rights of Persons with Disabilities and its Optional Protocol provides a timely opportunity to review the anti-torture framework in relation to persons with disabilities.

## A.   Legal framework for the protection of persons with disabilities against torture

42.   The absolute prohibition of torture contained in the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, article 7 of the International Covenant on Civil and Political Rights, and article 37 of the Convention on the Rights of the Child, is reaffirmed in the Convention on the Rights of Persons with Disabilities. According to article 15 of the that Convention, persons with disabilities have the right not to be subjected to torture or to cruel, inhuman, or degrading treatment or punishment and, in particular, to scientific or medical experimentation. Article 15, paragraph 2, contains the obligation for States parties to

---

[3] See e.g. Mental Disability Rights International (MDRI) reports on Argentina (2007), Serbia (2007), Turkey (2005), Peru (2004), Uruguay (2004), Kosovo (2002), Mexico (2000), the Russian Federation (1999) and Hungary (1997), available at www.mdri.org; International Disability Rights Monitor regional report of Asia (2005), available at: www.ideanet.org; Mental Disability Advocacy Centre report on cage beds in Hungary, the Czech Republic, Slovakia and Slovenia (2003) available at www.mdac.info; Amnesty International reports on Bulgaria (2002) and Romania (2005), available at: www.amnesty.org; and Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness* (2003) available at: www.hrw.org. See also, Committee on the Rights of the Child, concluding observations on the initial report of the Democratic Republic of the Congo (CRC/C/15/Add.153, para. 50), on the initial report of Serbia (CRC/C/SRB/CO/1, paras. 35 and 36) and on the third periodic report of Colombia, (CRC/C/COL/CO/3, para. 50); Human Rights Committee, concluding observations on the initial report of Bosnia and Herzegovina (CCPR/C/BIH/CO/1, para. 19); Committee against Torture, concluding observations on the fourth periodic report of the Russian Federation (CAT/C/RUS/CO/4, para. 18) and on the third periodic report of Bulgaria (CAT/C/CR/32/6, paras. 5 (e) and 6 (e)).

[4] See *State of Disabled People's Rights in Kenya*, Disability Rights Promotion International 2007, B. Waxman Fiduccia and L. R. Wolfe, *Women and Girls with Disabilities: Defining the Issues*, Centre for Women Policy Studies, 1999.

take all effective legislative, administrative, judicial or other measures to protect persons with disabilities from torture or ill-treatment on an equal basis with others.

43. Article 16 prohibits violence, abuse and exploitation of persons with disabilities, and article 17 recognizes the right of every person with disabilities to respect for his or her physical and mental integrity.

44. The Special Rapporteur notes that in relation to persons with disabilities, the Convention on the Rights of Persons with Disabilities complements other human rights instruments on the prohibition of torture and ill-treatment by providing further authoritative guidance. For instance, article 3 of the Convention proclaims the principle of respect for the individual autonomy of persons with disabilities and the freedom to make their own choices. Further, article 12 recognizes their equal right to enjoy legal capacity in all areas of life, such as deciding where to live and whether to accept medical treatment. In addition, article 25 recognizes that medical care of persons with disabilities must be based on their free and informed consent. Thus, in the case of earlier non-binding standards, such as the 1991 Principles for the Protection of Persons with Mental Illness and for the Improvement of Mental Health Care (resolution 46/119, annex), known as the MI Principles,[5] the Special Rapporteur notes that the acceptance of involuntary treatment and involuntary confinement runs counter to the provisions of the Convention on the Rights of Persons with Disabilities.

## B. Applying the torture and ill-treatment protection framework to persons with disabilities

45. Under international law, and the Convention against Torture in particular, States have the obligation to criminalize acts of torture, prosecute perpetrators, impose penalties appropriate to the gravity of the offence and provide reparation to victims. By recognizing and reframing violence and abuse perpetrated against persons with disabilities as torture or other cruel, inhuman or degrading treatment or punishment, victims and advocates can be afforded stronger legal protection and redress for violations of human rights.

### 1. The elements of the torture definition

46. The application of article 15 of CRPD concerning the prohibition of torture and ill-treatment can be informed by the definition of torture contained in article 1 of the Convention against Torture. For an act against or an omission with respect to persons with disabilities to constitute torture, the four elements of the Convention definition — severe pain or suffering, intent, purpose and State involvement — need to be present. Acts falling short of this definition may constitute cruel, inhuman or degrading treatment or punishment under article 16 of the Convention against Torture.

47. Assessing the level of suffering or pain, relative in its nature, requires considering the circumstances of the case, including the existence of a disability,[6] as

---

[5] See the International Disability Alliance position paper on CRPD and other instruments of April 2008, available at: www.psychrights.org/Countries/UN/IDACRPDpaperfinal080425.pdf.

[6] See the report of the European Commission of Human Rights of 10 March 1994 in the case of *M. N. v. France*, application No. 19465/92, paras. 30, 47 and 48.

well as looking at the acquisition or deterioration of impairment as result of the treatment or conditions of detention in the victim.[7] Whereas a fully justified medical treatment may lead to severe pain or suffering, medical treatments of an intrusive and irreversible nature, when they lack a therapeutic purpose, or aim at correcting or alleviating a disability, may constitute torture and ill-treatment if enforced or administered without the free and informed consent of the person concerned.

48.   The definition of torture in the Convention against Torture expressly proscribes acts of physical and mental suffering committed against persons for reasons of discrimination of any kind. In the case of persons with disabilities, the Special Rapporteur recalls article 2 of CRPD which provides that discrimination on the basis of disability means "any distinction, exclusion or restriction on the basis of disability which has the purpose or effect of impairing or nullifying the recognition, enjoyment or exercise on an equal basis with others, of all human rights and fundamental freedoms in the political, economic, social, cultural, civil or any other field. It includes all forms of discrimination, including lack of reasonable accommodation".

49.   Furthermore, the requirement of intent in article 1 of the Convention against Torture can be effectively implied where a person has been discriminated against on the basis of disability. This is particularly relevant in the context of medical treatment of persons with disabilities, where serious violations and discrimination against persons with disabilities may be masked as "good intentions" on the part of health professionals. Purely negligent conduct lacks the intent required under article 1, and may constitute ill-treatment if it leads to severe pain and suffering.

50.   Torture, as the most serious violation of the human right to personal integrity and dignity, presupposes a situation of powerlessness, whereby the victim is under the total control of another person. Persons with disabilities often find themselves in such situations, for instance when they are deprived of their liberty in prisons or other places, or when they are under the control of their caregivers or legal guardians. In a given context, the particular disability of an individual may render him or her more likely to be in a dependant situation and make him or her an easier target of abuse. However, it is often circumstances external to the individual that render them "powerless", such as when one's exercise of decision-making and legal capacity is taken away by discriminatory laws or practices and given to others.

## 2.   Who is accountable?

51.   In relation to the State involvement requirement, the Special Rapporteur notes that the prohibition against torture relates not only to public officials, such as law enforcement agents in the strictest sense, but may apply to doctors, health professionals and social workers, including those working in private hospitals, other institutions and detention centres.[8] As underlined by the Committee against Torture in its general comment No. 2 (2008), the prohibition of torture must be enforced in

---

[7] See Human Rights Committee, views on communication No. 606/1994, *Clement Francis v. Jamaica*, adopted on 25 July 1995 (CCPR/C/54/D/606/1994), para. 9.2 and communication No. 900/1999, *C v. Australia*, adopted on 28 October 2002 (CCPR/C/76/D/900/1999), para. 8.4. See also *Bueno Alves v. Argentina*, Inter-American Court of Human Rights, judgement of 11 May 2007, paras. 71 and 84-86.

[8] See general comment No. 2 (2008) of the Committee against Torture on the implementation of article 2 of the Convention (CAT/C/GC/2), para. 17. See also A/HRC/7/3, para. 31.

all sorts of institutions[9] and States have to exercise due diligence to prevent, investigate, prosecute and punish such non-State officials or private actors.[10]

**3.   Accountable for what?**

**(a)   Poor conditions of detention**

52.   On numerous occasions the Committee against Torture has expressed concerns about poor living conditions in psychiatric institutions and homes for persons with disabilities in the context of ill-treatment under article 16 of the Convention against Torture.[11] Poor conditions in institutions are often the result of the failure of the State to live up to its obligations to provide persons in their custody with adequate food, water, medical care and clothing, and may constitute torture and ill-treatment.[12]

53.   States have the further obligation to ensure that treatment or conditions in detention do not directly or indirectly discriminate against persons with disabilities. If such discriminatory treatment inflicts severe pain or suffering, it may constitute torture or other form of ill-treatment. In *Hamilton v. Jamaica* the Human Rights Committee examined whether the alleged failure of prison authorities to take the disability of the complainant into account and make proper arrangements to allow him leave the cell and have his slop bucket removed breached articles 7 and 10 of the International Covenant on Civil and Political Rights.[13] The Committee found that the complainant, who was paralysed in both legs, had not been treated with humanity and with respect for the inherent dignity of the human person in violation of article 10, paragraph 1, of the Covenant. In *Price v. The United Kingdom*, the European Court of Human Rights found that detention conditions of a woman with physical disabilities, including inaccessible toilets and bed, amounted to degrading treatment under article 3 of the European Convention on Human Rights.[14]

54.   The Special Rapporteur notes that under article 14, paragraph 2, of CRPD, States have the obligation to ensure that persons deprived of their liberty are entitled to "provision of reasonable accommodation". This implies an obligation to make appropriate modifications in the procedures and physical facilities of detention centres, including care institutions and hospitals, to ensure that persons with disabilities enjoy the same rights and fundamental freedoms as others, when such adjustments do not impose a disproportionate or undue burden. The denial or lack of reasonable accommodations for persons with disabilities may create detention and living conditions that amount to ill-treatment and torture.

---

[9]   (CAT/C/GC/2), para. 15.

[10]   Ibid., para. 18.

[11]   See Committee against Torture, concluding observations on the fourth periodic report of the Russian Federation (CAT/C/RUS/CO/4), para. 18, the fourth periodic report of Estonia (CAT/C/EST/CO/4), para 24, and the third periodic report of Bulgaria (CAT/C/CR/32/6), paras. 5 (e) and 6 (e).

[12]   See Inter-American Court of Human Rights, *Ximenes Lopes v. Brasil*, judgement of 4 July 2006, paras. 132 and 150.

[13]   Human Rights Committee, views on communication 616/1995, adopted on 28 July 1999 (CCPR/C/66/D/616/1995), paras. 3.1 and 8.2.

[14]   See *Price v. the United Kingdom*, European Court of Human Rights, judgement of 10 July 2001, application No. 3394/96, para. 30.

**(b)   Use of restraints, and seclusion**

55.   Poor conditions in institutions are often coupled with severe forms of restraint and seclusion. Children and adults with disabilities may be tied to their beds, cribs or chairs for prolonged periods, including with chains and handcuffs; they may be locked in "cage" or "net beds" and may be overmedicated as a form of chemical restraint.[15] It is important to note that "prolonged use of restraint can lead to muscle atrophy, life-threatening deformities and even organ failure", and exacerbates psychological damage.[16] The Special Rapporteur notes that there can be no therapeutic justification for the prolonged use of restraints, which may amount to torture or ill-treatment.[17]

56.   Within institutions, persons with disabilities are often held in seclusion or solitary confinement as a form of control or medical treatment, although this cannot be justified for therapeutic reasons, or as a form of punishment.[18] In December 2003, the Inter-American Commission on Human Rights approved precautionary measures to protect 460 individuals detained in the State-run Neuro-psychiatric Hospital in Paraguay, including two teenage boys who had been detained in solitary confinement for over four years in isolation cells, naked and in unhygienic conditions.[19] In *Victor Rosario Congo v. Ecuador*, the Inter-American Commission on Human Rights considered that the solitary confinement to which Mr. Congo (who had a mental disability) was subjected in a social rehabilitation centre constituted inhuman and degrading treatment in terms of article 5, paragraph 2, of the American Convention on Human Rights.[20] The Special Rapporteur notes that prolonged solitary confinement and seclusion of persons may constitute torture or ill-treatment.[21]

**(c)   Medical context**

57.   It is in the medical context that persons with disabilities often experience serious abuse and violations of their right to physical and mental integrity, notably in relation to experimentation or treatments directed to correct and alleviate particular impairments.

---

[15] See the standards set by the Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) of the Council of Europe contained in *The CPT Standards: "Substantive" sections of the CPT's General Reports* (CPT/Inf/E (2002) 1-Rev.2006), p. 64.

[16] MDRI "Torment not treatment: Serbia's segregation and abuse of children and adults with disabilities", 2004. pp. 19, 47 and 49.

[17] See Inter-American Court of Human Rights, *Ximenes Lopes v. Brasil*, op. cit., paras. 133-136; see also *The CPT Standards*, op. cit., 62-68.

[18] See Human Rights Committee, concluding observations on the second periodic report of Slovakia (CCPR/CO/78/SVK), para. 13 and on the second periodic report of the Czech Republic (CCPR/C/CZE/CO/2), para. 13, where the Committee expressed concern about the persistent use of cage-net beds as a means to restrain psychiatric patients, recalling that this practice is considered inhuman and degrading treatment and amounts to a violation of articles 7, 9 and 10 of the International Covenant on Civil and Political Rights.

[19] See *Annual Report of the Inter-American Commission on Human Rights 2003* (OEA/Ser.L/V/II.118, Doc. 5 rev. 2), chap. III.C.1, para. 60.

[20] See Inter-American Commission of Human Rights, *Rosario Congo v. Ecuador*, report 63/99, case 11.427 of 13 April 1999, para. 59. See also *Keenan v. the United Kingdom*, European Court of Human Rights, judgement of 3 April 2001, application No. 27229/95, para. 113.

[21] See section IV, below.

(i)   *Medical or scientific experimentation*

58.   Under article 15 of CRPD medical or scientific experimentation on persons with disabilities, including testing of medicines, is permissible only when the person concerned gives his or her free consent and when the very nature of the experiment cannot be deemed torture or cruel, inhuman or degrading treatment.[22]

(ii)   *Medical interventions*

59.   The practice of lobotomy and psychosurgery can serve as examples. The more intrusive and irreversible the treatment, the greater the obligation on States to ensure that health professionals provide care to persons with disabilities only on the basis of their free and informed consent. In the case of children, States must ensure that health professionals carry out such interventions only if they serve a therapeutic purpose, are in the best interests of the child, and are based on the free and informed consent of the parents (though parental consent must be disregarded if the treatment is not in the best interest of the child).[23] Otherwise, the Special Rapporteur notes that such treatments may constitute torture, or cruel, inhuman or degrading treatment.

a.   *Abortion and sterilization*

60.   Innumerable adults and children with disabilities have been forcibly sterilized as a result of policies and legislation enacted for that purpose.[24] Persons with disabilities, and particularly women and girls, continue to be subjected to forced abortion and sterilization without their free and informed consent inside and outside institutions,[25] a practice in relation to which concern has been expressed.[26] The Special Rapporteur notes that under article 23 (c) of CRPD States parties have an obligation to ensure that "persons with disabilities, including children, retain their

---

[22] See HRI/GEN/7/Rev.8, sect. II, Human Rights Committee, general comment No. 20 (1992) on the prohibition of torture and cruel treatment or punishment, para 6.

[23] For a discussion of related issues, see the Disability Rights Washington Investigative Report Regarding the "Ashley Treatment", May 2007, available at: www.disabilityrightswa.org/news-1/ashley-treatment-investigation.

[24] For example, concerning Nazi-era policy on forced sterilization, see M. Grodin and G. Annas, "Physicians and torture: lessons from the Nazi doctors, *International Review of the Red Cross*, vol. 89, No. 867, 2007, pp. 638 and 639. See M. L. Perlin, et al., *International Human Rights and Comparative Mental Disability Law: Cases and Materials* (Durham, N.C., Carolina Academic Press, 2006), p. 980.

[25] See United Nations Population Fund, *Sexual and Reproductive Health of Persons with Disabilities*, 2007. See also the report of the Special Rapporteur on the right to the highest attainable standard of physical and mental health (E/CN.4/2005/51), para 12.

[26] The Human Rights Committee has referred to the sterilization of women without their consent as well as to forced abortion as a breach of article 7 of the International Covenant on Civil and Political Rights. See HRI/GEN/1/Rev.8, sect. II, Human Rights Committee, general comment No. 28 (2000) on equality of rights between men and women, para. 11. See also Committee against Torture, concluding observations on the third periodic report of the Czech Republic (CAT/C/CR/32/2, paras. 5 (k) and 6 (n)) and on the fourth periodic report of Peru (CAT/C/PER/CO/4, para. 23); Human Rights Committee, concluding observations on the fourth periodic report of Peru (CCPR/CO/70/PER, para. 21); on the second periodic report of the Czech Republic (CCPR/C/CZE/CO/2, para. 10); on the second periodic report of Slovakia (CCPR/CO/78/SVK, paras. 12 and 21), and on the fourth periodic report of Japan (CCPR/C/79/Add.102, para. 31).

fertility on an equal basis with others" and to ensure their right to decide freely and responsibly on the number and spacing of their children (art. 23 (b)).

### b. Electroconvulsive therapy

61.    The use of electroshocks on prisoners has been found to constitute torture or ill-treatment.[27] The use of electroshocks or electroconvulsive therapy (ECT) to induce seizures as a form of treatment for persons with mental and intellectual disabilities began in the 1930s.[28] CPT has documented instances in psychiatric institutions where unmodified ECT (i.e. without anaesthesia, muscle relaxant or oxygenation) is administered to persons to treat their disabilities, and used even as a form of punishment.[29] The Special Rapporteur notes that unmodified ECT may inflict severe pain and suffering and often leads to medical consequences, including bone, ligament and spinal fractures, cognitive deficits and possible loss of memory.[30] It cannot be considered as an acceptable medical practice,[31] and may constitute torture or ill-treatment. In its modified form, it is of vital importance that ECT be administered only with the free and informed consent of the person concerned, including on the basis of information on the secondary effects and related risks such as heart complications, confusion, loss of memory and even death.

### c. Forced psychiatric interventions

62.    The use of psychiatry as a means of torture or ill-treatment for the purpose of political repression,[32] in the context of the fight against terrorism[33] and, to a lesser extent, in treatment inflicted in order to attempt to suppress, control and modify the sexual orientation of individuals has been well documented.[34] However, the Special Rapporteur notes that abuse of psychiatry and forcing it upon persons with

---

[27] See E/CN.4/1986/15, para. 119 and Amnesty International, *Arming the Torturers, Electro-Shock Torture and the Spread of Stun Technology,* 1997, AI Index ACT 40/001/1997. See also CAT/C/75, para. 143 and Human Rights Committee, views on communication No. 11/1977, *Grille Motta v. Uruguay*, adopted on 29 July 1980 (CCPR/C/10/D/11/1977) and communication No. 366/1989, *Kanana v. Zaire*, adopted on 2 November 1993 (CCPR/C/49/D/366/1989).

[28] M. V. Rudorfer, M. E. Henry, H. A. Sackeim, Electroconvulsive Therapy, in Tasman, Kay and Lieberman (eds.), *Psychiatry, Second Edition*, vol. 1, sect. VI, chap. 92 (Chichester: John Wiley & Sons Ltd., 2003.

[29] Reports from CPT have documented the administration of "Electro Convulsion Therapy" in its unmodified form in psychiatric establishments in Turkey. Out of the total of 15,877 ECT sessions administered at Bakirkoy, only 512 (3.2 per cent) were modified. See documents CPT/Inf (2006) 30, paras. 58-68 and CPT/Inf (99) 2, paras. 178-182.

[30] See MDRI, *Behind Closed Doors: Human Rights Abuses in the Psychiatric Facilities, Orphanages and Rehabilitation Centers of Turkey*, 2005, pp. 3 and 4.

[31] See the CPT Standards, op. cit., paras. 39-41. The World Health Organization and the Pan American Health Organization have also called for this practice to be stopped.

[32] See Human Rights Watch, *Dangerous Minds: Political Psychiatry in China Today and its Origins in the Mao Era*, 2002; Perlin et al., op. cit., and *The Breaking of Bodies and Minds: Torture, Psychiatric Abuse, and the Health Professionals*, E. Stover and E. Nightingale (eds.), (W. H. Freeman, 1985), pp. 130-158.

[33] See the list of interrogations techniques used at Guantánamo Bay, including the use of the detainees' individual phobias to induce stress, that "have adversely affected the mental health of detainees" (E/CN.4/2006/120, para. 78).

[34] See Amnesty International, "Crimes of hate, conspiracy of silence", torture and ill-treatment based on sexual identity, 2000, AI index ACT 40/016/2007.

disabilities, and primarily upon persons with mental or intellectual disabilities, warrants greater attention.

63.   Inside institutions, as well as in the context of forced outpatient treatment, psychiatric medication, including neuroleptics and other mind-altering drugs, may be administered to persons with mental disabilities without their free and informed consent or against their will, under coercion, or as a form of punishment. The administration in detention and psychiatric institutions of drugs, including neuroleptics that cause trembling, shivering and contractions and make the subject apathetic and dull his or her intelligence, has been recognized as a form of torture.[35] In *Viana Acosta v. Uruguay*, the Human Rights Committee concluded that the treatment of the complainant, which included psychiatric experiments and forced injection of tranquillizers against his will, constituted inhuman treatment.[36] The Special Rapporteur notes that forced and non-consensual administration of psychiatric drugs, and in particular of neuroleptics, for the treatment of a mental condition needs to be closely scrutinized. Depending on the circumstances of the case, the suffering inflicted and the effects upon the individual's health may constitute a form of torture or ill-treatment.

   *d.   Involuntary commitment to psychiatric institutions*

64.   Many States, with or without a legal basis, allow for the detention of persons with mental disabilities in institutions without their free and informed consent, on the basis of the existence of a diagnosed mental disability often together with additional criteria such as being a "danger to oneself and others" or in "need of treatment".[37] The Special Rapporteur recalls that article 14 of CRPD prohibits unlawful or arbitrary deprivation of liberty and the existence of a disability as a justification for deprivation of liberty.[38]

65.   In certain cases, arbitrary or unlawful deprivation of liberty based on the existence of a disability might also inflict severe pain or suffering on the individual, thus falling under the scope of the Convention against Torture. When assessing the pain inflicted by deprivation of liberty, the length of institutionalization, the conditions of detention and the treatment inflicted must be taken into account.

---

[35] E/CN.4/1986/15, para. 119.

[36] Human Rights Committee, views on communication No. 110/1981, *Viana Acosta v. Uruguay*, adopted on 29 March 1984 (CCPR/C/21/D/110/1981), paras. 2.7, 14 and 15.

[37] See HRI/GEN/1/Rev.8, sect. II, Human Rights Committee, general comment No. 8 (1982) on the right to liberty and security of the person, para. 1, where the Committee clarifies that article 9 applies "whether in criminal cases or in other cases such as, for example, mental illness …". See also the report of the Working Group on Arbitrary Detention (E/CN.4/2005/6), para. 58. See further the discussion by the European Court of Human Rights in *Shtukaturov v. Russia*, application No. 44009/05, judgement of 27 March 2008.

[38] During the convention-making process, some States (Canada, Uganda, Australia, China, New Zealand, South Africa and the European Union) supported deprivation of liberty based on disability being permitted when coupled with other grounds. Finally, at the seventh session of the Ad Hoc Committee on a Comprehensive and Integral International Convention on Protection and Promotion of the Rights and Dignity of Persons with Disabilities, Japan, with the support of China, sought to amend the text of article 14 to read "in no case shall the existence of a disability 'solely or exclusively' justify a deprivation of liberty". However, the proposal was rejected. See daily summary of discussion at the seventh session, on 18 and 19 January 2006, available at www.un.org/esa/socdev/enable/rights/ahc7summary.htm.

**(d)    Violence against persons with disabilities, including sexual violence**

66.    Inside institutions, persons with disabilities may be exposed to violence by other patients or inmates, as well as by the staff of the institution.[39] In *Ximenes Lopes v. Brasil*, the Inter-American Court of Human Rights held that the context of violence against the patients admitted to the psychiatric hospital, combined with regular beatings and restraints imposed on the victim and the poor conditions of detention (i.e. poor health care, sanitation conditions and food storage), violated the right to physical and mental integrity and the prohibition of torture and ill-treatment under article 5, paragraphs 1 and 2, of the American Convention on Human Rights.[40]

67.    The Special Rapporteur reiterates that custodial rape constitutes torture if carried out by or at the instigation of or with the consent or acquiescence of public officials, including officials working in hospitals, care institutions and the like.[41]

68.    In the private sphere, persons with disabilities, men and women alike, are up to three times more likely to be victims of physical and sexual abuse and rape,[42] both at the hands of family members and by their caregivers. Women and girls experience high rates of violence, including intimate partner violence, as a result of double discrimination on the basis of gender and disability.[43] In *Z. and Others v. the United Kingdom* and in *A. v. the United Kingdom*, the European Court of Human Rights recognized the obligation of States to take measures to protect individuals and, in particular, children and other vulnerable persons from ill-treatment, as well as to take reasonable steps to prevent ill-treatment of which the authorities had or ought to have had knowledge.[44]

69.    As stated in article 16 of CRPD, States have an obligation to take all appropriate measures to prevent and protect persons with disabilities from all forms of violence, abuse and exploitation, within and outside the home, including their gender-based aspects, and to investigate and prosecute those responsible. The Special Rapporteur notes that State acquiescence with regard to violence against persons with disabilities may take many forms, including discriminatory legislative frameworks and practices such as laws depriving them of their legal capacity or failing to ensure equal access to justice of persons with disabilities, resulting in impunity for such acts of violence.

---

[39] See MDRI and Center for Legal and Social Studies (CELS), *Ruined Lives*, *Segregation from Society in Argentina's Psychiatric Asylums,* 2007, pp. 23-25; MDRI, *Not on the Agenda: Human Rights of People with Mental Disabilities in Kosovo*, 2002, pp. 10 and 11; MDRI, *Behind Closed Doors: Human Rights Abuses in the Psychiatric Facilities, Orphanages and Rehabilitation Centers of Turkey*, 2005, pp. 12, 23, 24. See also Human Rights Watch, *Ill-equipped*, op. cit., pp. 56-59 and 92. K. L. Raye, *Women's Rights Advocacy Initiative: Violence, Women and Mental Disability*, MDRI, 1999.

[40] See *Lopes v. Brasil*, op. cit., paras. 120-122 and 150.

[41] See CAT/C/GC/2, paras. 17 and 18.

[42] World Bank/Yale University, *HIV/AIDS & Disability: Capturing Hidden Voices*. Report of the Global Survey on HIV/AIDS and Disability (Washington, D.C.: World Bank, 2004), p. 11.

[43] See Human Rights Watch, Women and Girls with Disabilities, available at http://www.hrw.org/ women/disabled.html and P. E. Erwin, *Intimate and Caregiver Violence Against Women with Disabilities*, Battered Women's Justice Project-Criminal Justice Office, 2000.

[44] See *Z. and Others v. the United Kingdom*, application No. 29392/95, judgement of 10 May 2001, paras. 73 and 74 and *A. v. the United Kingdom*, application No. 25599/94, judgement of 23 September 1998, para. 22.

## C.  Conclusions and recommendations

70.   The Special Rapporteur hails the entry into force of the Convention on the Rights of Persons with Disabilities, which reaffirms the absolute prohibition of torture and cruel, inhuman or degrading treatment or punishment, and which offers authoritative guidance in the interpretation of the rights and fundamental freedoms of persons with disabilities. Against continued reports of indignities, neglect, violence and abuse perpetrated against persons with disabilities, the recognition of these practices for what they are, i.e. torture and ill-treatment, and the utilization of the international anti-torture framework, will afford avenues for legal protection and redress.

71.   **The Special Rapporteur calls upon States to ratify the Convention on the Rights of Persons with Disabilities and ensure its full implementation, with particular attention to the non-discrimination provision, article 2.**

72.   **States parties to the Convention should ensure that it is published and widely disseminated and should develop awareness-raising for the public at large and training for all relevant professional groups (e.g. judges, lawyers, law enforcement officials, civil servants, local Government officials, personnel working in institutions and health personnel). Public officials and private actors alike have a role to play in protecting and preventing torture and ill-treatment of persons with disabilities.**

73.   **In keeping with the Convention, States must adopt legislation that recognizes the legal capacity of persons with disabilities and must ensure that, where required, they are provided with the support needed to make informed decisions.**

74.   **States should issue clear and unambiguous guidelines in line with the Convention on what is meant by "free and informed consent", and make available accessible complaints procedures.**

75.   **Independent human rights monitors (e.g. national human rights institutions, national anti-torture preventive mechanisms, civil society) should regularly monitor institutions where persons with disabilities may reside, such as prisons, social care centres, orphanages and mental health institutions.**

76.   **The Special Rapporteur calls on relevant United Nations and regional human rights mechanisms, including those addressing individual complaints and conducting monitoring of places of detention, to take full account of the new standards contained in the Convention and integrate them in their work.**

## IV.  Solitary confinement

77.   In the exercise of his mandate, particularly in the course of visits to places of detention as well as by responding to allegations brought to his attention, the Special Rapporteur has expressed concern at the use of solitary confinement (i.e. physical isolation in a cell for 22 to 24 hours per day, and in some jurisdictions being allowed outside for up to one hour). In the opinion of the Special Rapporteur the prolonged isolation of detainees may amount to cruel, inhuman or degrading treatment or punishment and, in certain instances, may amount to torture.

78.   For example:

(a)   In Abkhazia, Georgia, the Special Rapporteur expressed concern about a death row prisoner held in solitary confinement in a 3 x 4 m cell for what appeared to be a very long time (E/CN.4/2006/6/Add.3, para. 53);

(b)   In Mongolia, the Special Rapporteur expressed concern about the special isolation regime (E/CN.4/2006/6/Add.4, paras. 47-49). At Prison No. 405 he met nine prisoners serving 30-year sentences, held in isolation in 3 x 3 m cells for up to 24 hours per day. The prisoners were visibly depressed, expressed despair, had suicidal thoughts, and said they would have preferred the death penalty to solitary confinement. The total isolation of the detainees did not seem to be motivated by reasons of security; the purpose appeared to be to impose additional punishment, leading to severe pain or suffering. The Special Rapporteur concluded that the entire regime amounted to cruel and inhuman treatment, if not torture. In relation to death row prisoners in Detention Centre No. 461 (Gants Hudag) and Zunmod Detention Centre, the fact that they were detained in complete isolation, were continuously kept handcuffed and shackled, and denied adequate food constitutes additional punishments which could only be qualified as torture (ibid., paras. 50-54);

(c)   In China, the Special Rapporteur received allegations of prolonged solitary confinement at Beijing Municipal Women's Re-education through Labour Facility (E/CN.4/2006/6/Add.6, appendix 2, para. 10). Although prison staff indicated that prisoners were held for only up to seven days in the small solitary cells of the Intensive Training Section, detainees alleged that they were held for up to 60 days, where they received "training" to induce them to renounce their beliefs;

(d)   In relation to detainees at the United States of America Naval Base at Guantánamo Bay, the Special Rapporteur reported that although 30 days of isolation was the maximum period permissible, detainees were put back in isolation after very short breaks, so that they were in quasi-isolation for up to 18 months (E/CN.4/2006/120, para. 53). It was concluded that the uncertainty about the length of detention and prolonged solitary confinement of the prisoners amounted to inhuman treatment (ibid., para. 87);

(e)   In Jordan, at the Al-Jafr Correction and Rehabilitation Centre, which is now closed, the Special Rapporteur received allegations of newly arrived prisoners being beaten in solitary confinement cells (A/HRC/4/33/Add.3, appendix, para. 9). He further received allegations of detention in solitary cells for long periods (e.g. ibid., para. 21);

(f)   In Paraguay, the Special Rapporteur received allegations of detention in solitary cells for more than one month (A/HRC/7/3/Add.3, appendix I, para. 46). Allegations of solitary confinement for up to two weeks for disciplinary punishment were received in the women's prison (ibid., para. 4);

(g)   In Nigeria, the Special Rapporteur heard numerous allegations that prisoners were held in solitary confinement for up to two weeks on disciplinary grounds. At Kaduna Medium Security Prison, he found a teenage boy suffering from severe mental illness, locked up in a punishment cell with his feet shackled (A/HRC/7/3/Add.4, appendix I, para. 115);

(h)   In Indonesia, the Special Rapporteur received allegations of detention in solitary cells for more than one month (A/HRC/7/3/Add.7, appendix I, para. 34).

Allegations were received of newly arrived prisoners being held in dark isolation cells for up to a week (ibid., para. 82);

(i)   In Denmark, the Special Rapporteur expressed concern at the extensive recourse to solitary confinement, particularly with respect to pre-trial detainees (United Nations press release, 9 May 2008).

79.   Solitary confinement is typically used as a form of punishment for disciplinary infractions by inmates, to isolate suspects during criminal investigations and as a judicial sentence. Sometimes, as indicated above, it is used as a form of treatment or punishment of persons with disabilities in institutions or to manage certain groups of prisoners, such as those considered in need of psychiatric care.

80.   In general comment No. 20 (1992), the Human Rights Committee stated that the use of prolonged solitary confinement may amount to a breach of article 7 of the International Covenant on Civil and Political Rights (para. 6). The Committee against Torture has recognized the harmful physical and mental effects of prolonged solitary confinement and has expressed concern about its use, including as a preventive measure during pre-trial detention, as well as a disciplinary measure.[45] Except in exceptional circumstances, such as when the safety of persons or property is involved, the Committee has recommended that the use of solitary confinement be abolished, particularly during pre-trial detention, or at least that it should be strictly and specifically regulated by law (maximum duration, etc.) and exercised under judicial supervision. The Committee on the Rights of the Child has recommended that solitary confinement should not be used against children.[46] Principle 7 of the Basic Principles for the Treatment of Prisoners states, "Efforts addressed to the abolition of solitary confinement as a punishment, or to the restriction of its use, should be undertaken and encouraged."

81.   The history of the use and effects of solitary confinement on detainees has been well documented.[47] In modern prison systems of the world one can trace the origins of the philosophy of rehabilitation through isolation to the Pennsylvania prison model, developed in the 1820s at the Cherry Hill Prison in Philadelphia, Pennsylvania, United States of America. The aim of the model was to rehabilitate criminals through solitary confinement; prisoners spent all their time in their cells, including for work, in order to reflect on their transgressions and return to society "morally cleansed". The Pennsylvania model was subsequently imported and used in many European and South American countries from the 1830s.

82.   The weight of accumulated evidence to date points to the serious and adverse health effects of the use of solitary confinement: from insomnia and confusion to

---

[45] For example, see the concluding observations of the Committee on the third periodic report of Denmark, *Official Records of the General Assembly, Fifty-second Session, Supplement No. 44* (A/52/44), chap. IV, sect. I, paras. 181 and 186; on the third periodic report of Sweden (ibid., chap. IV, sect. K, paras. 220 and 225; on the third periodic report of Norway (ibid., *Fifty-third Session, Supplement No. 44* (A/53/44), chap. IV, sect. H, paras. 154 and 156; on the third periodic report of France (CAT/C/FRA/CO/3), para. 19; on the second periodic report of the United States of America (CAT/C/USA/CO/2), para. 36; and on the third periodic report of New Zealand (CAT/C/CR/32/4, paras. 5 (d) and 6 (d)).

[46] For example, with respect to Denmark (CRC/C/DNK/CO/3), para. 59 (a).

[47] For example, P. Scharff Smith, "The effects of solitary confinement on prison inmates: a brief history and review of the literature", in *Crime and Justice*, vol. 34 (2006), University of Chicago Press, pp. 441-528.

hallucinations and mental illness. The key adverse factor of solitary confinement is that socially and psychologically meaningful contact is reduced to the absolute minimum, to a point that is insufficient for most detainees to remain mentally well functioning. Moreover, the effects of solitary confinement on pre-trial detainees may be worse than for other detainees in isolation, given the perceived uncertainty of the length of detention and the potential for its use to extract information or confessions. Pre-trial detainees in solitary confinement have an increased rate of suicide and self-mutilation within the first two weeks of solitary confinement.

83.   In the opinion of the Special Rapporteur, the use of solitary confinement should be kept to a minimum, used in very exceptional cases, for as short a time as possible, and only as a last resort. Regardless of the specific circumstances of its use, effort is required to raise the level of social contacts for prisoners: prisoner-prison staff contact, allowing access to social activities with other prisoners, allowing more visits and providing access to mental health services.

84.   On 7 and 8 December 2007, the Special Rapporteur participated in the Fifth International Psychological Trauma Symposium in Istanbul, Turkey, where he delivered a presentation entitled "Solitary confinement and isolation practices as a human rights problem". He participated in a task group together with several prominent international experts in the field of solitary confinement, prisons and torture, and an outcome document was produced, the Istanbul Statement on the Use and Effects of Solitary Confinement.[48] The document aims to promote the use of existing human rights standards in the use of solitary confinement and creates new standards based on the latest research.

85.   **The Special Rapporteur draws the attention of the General Assembly to the Istanbul Statement (see annex) and strongly encourages States to reflect upon the Statement as a useful tool in efforts to promote the respect and protection of the rights of detainees.**

---

[48] See P. Scharff Smith, "Solitary confinement: an introduction to the Istanbul Statement on the Use and Effects of Solitary Confinement, *Journal on Rehabilitation of Torture Victims and Prevention of Torture*, vol. 18, No. 1, pp. 56-62.

## Annex

### The Istanbul Statement on the Use and Effects of Solitary Confinement

**Adopted on 9 December 2007 at the International Psychological Trauma Symposium, Istanbul**

### The purpose of the statement

Recent years have seen an increase in the use of strict and often prolonged solitary confinement practices in prison systems in various jurisdictions across the world. This may take the form of a disproportionate disciplinary measure, or increasingly, the creation of whole prisons based upon a model of strict isolation of prisoners.[a] While acknowledging that in exceptional cases the use of solitary confinement may be necessary, we consider this a very problematic and worrying development. We therefore consider it timely to address this issue with an expert statement on the use and effects of solitary confinement.

### Definition

Solitary confinement is the physical isolation of individuals who are confined to their cells for twenty-two to twenty-four hours a day. In many jurisdictions prisoners are allowed out of their cells for one hour of solitary exercise. Meaningful contact with other people is typically reduced to a minimum. The reduction in stimuli is not only quantitative but also qualitative. The available stimuli and the occasional social contacts are seldom freely chosen, are generally monotonous, and are often not empathetic.

### Common practices of solitary confinement

Solitary confinement is applied in broadly four circumstances in various criminal justice systems around the world: as either a disciplinary punishment for sentenced prisoners; for the isolation of individuals during an ongoing criminal investigation; increasingly as an administrative tool for managing specific groups of prisoners; and as a judicial sentence. In many jurisdictions solitary confinement is also used as a substitute for proper medical or psychiatric care for mentally disordered individuals. Additionally, solitary confinement is increasingly used as a part of coercive interrogation, and is often an integral part of enforced disappearance[b] or incommunicado detention.

---

[a] For the purpose of the present document, the term "prisoner" is used as a broad category covering persons under any form of detention and imprisonment.

[b] The International Convention for the Protection of All Persons from Enforced Disappearance of December 2006 defines enforced disappearance as "... the arrest, detention, abduction or any other form of deprivation of liberty by agents of the State or by persons or groups acting with the authorization, support or acquiescence of the State, followed by a refusal to acknowledge the deprivation of liberty or by concealment of the fate or whereabouts of the disappeared person, which place such a person outside the protection of the law."

### The effects of solitary confinement

It has been convincingly documented on numerous occasions that solitary confinement may cause serious psychological and sometimes physiological ill effects.[c] Research suggests that between one third and as many as 90 per cent of prisoners experience adverse symptoms in solitary confinement. A long list of symptoms ranging from insomnia and confusion to hallucinations and psychosis have been documented. Negative health effects can occur after only a few days in solitary confinement, and the health risks rise with each additional day spent in such conditions.

Individuals may react to solitary confinement differently. Still, a significant number of individuals will experience serious health problems regardless of the specific conditions, regardless of time and place, and regardless of pre-existing personal factors. The central harmful feature of solitary confinement is that it reduces meaningful social contact to a level of social and psychological stimulus that many will experience as insufficient to sustain health and well-being.

The use of solitary confinement in remand prisons carries with it another harmful dimension since the detrimental effects will often create a de facto situation of psychological pressure which can influence the pre-trial detainees to plead guilty.

When the element of psychological pressure is used on purpose as part of isolation regimes such practices become coercive and can amount to torture.

Finally, solitary confinement places individuals very far out of sight of justice. This can cause problems even in societies traditionally based on the rule of law. The history of solitary confinement is rich in examples of abusive practices evolving in such settings. Safeguarding prisoner rights therefore becomes especially challenging and extraordinarily important where solitary confinement regimes exist.

### Human rights and solitary confinement

The use of torture, cruel, inhuman or degrading treatment or punishment is absolutely prohibited under international law (article 7 of the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, for example). The United Nations Human Rights Committee has stipulated that use of prolonged solitary confinement may amount to a breach of article 7 of the International Covenant on Civil and Political Rights (general comment No. 20 (1992)). The United Nations Committee against Torture has made similar statements, with particular reference to the use of solitary confinement during pre-trial detention. The United Nations Committee on the Rights of the Child has furthermore recommended that solitary confinement should not be used against children.[d] Principle 7 of the Basic Principles for the

---

[c] For studies on the health effects of solitary confinement, see Peter Scharff Smith, "The Effects of Solitary Confinement on Prison Inmates. A Brief History and Review of the Literature", in *Crime and Justice*, vol. 34, 2006; Craig Haney, "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement" in *Crime and Delinquency* 49(1), 2003; Stuart Grassian, "Psychopathological Effects of Solitary Confinement" in *American Journal of Psychiatry*, vol. 140, 1983.

[d] Concluding observations on the third periodic report of Denmark (CRC/C/DNK/CO/3), para. 59 (a).

Treatment of Prisoners states that "[e]fforts addressed to the abolition of solitary confinement as a punishment, or to the restriction of its use, should be undertaken and encouraged". Jurisprudence of the United Nations Human Rights Committee has previously found a specific isolation regime to violate both article 7 and article 10 of the International Covenant on Civil and Political Rights (*Campos v. Peru*, judgement of 9 January 1998).

On a regional level, the European Court and former Commission on Human Rights, as well as the European Committee for the Prevention of Torture (CPT), have made it clear that the use of solitary confinement can amount to a violation of article 3 of the European Convention on Human Rights (i.e. constitute torture, or inhuman or degrading treatment), depending on the specific circumstances of the case, and the conditions and duration of detention. It has been recognized that "… complete sensory isolation coupled with total isolation, can destroy the personality and constitutes a form of inhuman treatment which cannot be justified by the requirements of security or any other reason".[e] CPT has also stated that solitary confinement "can amount to inhuman and degrading treatment" and has on several occasions criticized such practices and recommended reform, i.e. either abandoning specific regimes, limiting the use of solitary confinement to exceptional circumstances, and/or securing inmates a higher level of social contact.[f] The importance of developing communal activities for prisoners subjected to various forms of isolation regimes has for example been stressed (CPT, report on the visit to Turkey from 7 to 14 December 2005, para. 43). Furthermore, the revised European Prison Rules of 2006 have clearly stated that solitary confinement should be an exceptional measure and, when used, should be for as short a time as possible.[g] The Inter-American Court of Human Rights has also stated that prolonged solitary confinement constitutes a form of cruel, inhuman or degrading treatment prohibited under article 5 of the American Convention on Human Rights (*Castillo Petruzzi et al.*, judgement of 30 May 1999).

## Policy implications

Solitary confinement harms prisoners who were not previously mentally ill and tends to worsen the mental health of those who are. The use of solitary confinement in prisons should therefore be kept to a minimum. In all prison systems there is some use of solitary confinement — in special units or prisons for those seen as threats to security and prison order. But regardless of the specific circumstances, and whether solitary confinement is used in connection with disciplinary or administrative segregation or to prevent collusion in remand prisons, effort is required to raise the level of meaningful social contacts for prisoners. This can be done in a number of ways, such as raising the level of prison staff-prisoner contact, allowing access to social activities with other prisoners, allowing more visits, and allowing and arranging in-depth talks with psychologists, psychiatrists, religious

[e] *Ramirez Sanchez v. France*, Grand Chamber, judgement of 4 July 2006, para. 123.

[f] Rod Morgan and Malcolm Evans *Combating Torture in Europe*, 2001, p. 118. See also recommendation Rec(2003)23 of the Committee of Ministers of the Council of Europe, paras. 7, 20 and 22.

[g] See recommendation Rec(2006)2 of the Committee of Ministers of the Council of Europe (*Adopted by the Committee of Ministers on 11 January 2006* at the 952nd meeting of the Ministers' Deputies), para. 60.5. See also CPT, 2nd General Report (1991), para. 56.

prison personnel and volunteers from the local community. Especially important are the possibilities for both maintaining and developing relations with the outside world, including spouses, partners, children, other family and friends. It is also very important to provide prisoners in solitary confinement with meaningful in-cell and out-of-cell activities. Research indicates that small group isolation in some circumstances may have similar effects to solitary confinement and such regimes should not be considered an appropriate alternative.

The use of solitary confinement should be absolutely prohibited in the following circumstances:

• For death row and life-sentenced prisoners by virtue of their sentence

• For mentally ill prisoners

• For children under the age of 18

Furthermore, when isolation regimes are intentionally used to apply psychological pressure on prisoners, such practices become coercive and should be absolutely prohibited.

As a general principle solitary confinement should only be used in very exceptional cases, for as short a time as possible and only as a last resort.

———————