# EXHIBIT 50

United Nations



**General Assembly**

**A**/74/148

Distr.: General
12 July 2019

Original: English

Seventy-fourth session
Item 72 (a) of the preliminary list*
**Promotion and protection of human rights:**
**implementation of human rights instruments**

## Relevance of the prohibition of torture and other cruel, inhuman or degrading treatment or punishment to the context of domestic violence

### Note by the Secretary-General

The Secretary-General has the honour to transmit to the members of the General Assembly the interim report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Nils Melzer, submitted in accordance with General Assembly resolution 72/163.

———————————
\* A/74/50.

19-11892 (E)    050819





Please recycle 

# Interim report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment

*Summary*

In the present report, the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment examines the relevance of the prohibition of torture and other cruel, inhuman or degrading treatment or punishment to the context of domestic violence and, in the light of his conclusions, offers recommendations to States with a view to strengthening their capacity to prevent torture and other cruel, inhuman or degrading treatment or punishment in that context.

19-11892

## I.   Domestic violence as a human rights issue

1.     Domestic violence is perpetrated every day against millions of children, women and men worldwide. It is experienced by all generations, nationalities, cultures and religions and on all socioeconomic and educational levels of society. It constitutes a major obstacle to the universal fulfilment of human rights and to the achievement of the 2030 Agenda for Sustainable Development and it severely damages the physical, sexual, emotional, mental and social well-being of innumerable individuals and families, often leaving lasting trauma not only on its direct victims but also within entire communities. For countless people, it makes the home a place of danger, humiliation and untold harm, rather than a place of refuge, trust and protection.

2.     In essence, domestic violence refers to "all acts of physical, sexual, psychological or economic violence that occur within the family or domestic unit or between former or current spouses or partners, whether or not the perpetrator shares or has shared the same residence with the victim".[1] Moreover, while a person's home is most commonly understood to be the family or foster home, it may also be a communal care setting, whether community-based or institutional. On the basis of that generic understanding, domestic violence includes a wide range of abusive conduct, from culpable neglect and abusive or coercive or excessively controlling behaviour that aims to isolate, humiliate, intimidate or subordinate a person, to various forms of physical violence, sexual abuse and even murder. In terms of the intentionality, purposefulness and severity of the inflicted pain and suffering, domestic violence often falls nothing short of torture and other cruel, inhuman or degrading treatment or punishment (also referred to as "torture and ill-treatment"). It is particularly concerning, therefore, that it remains both extremely widespread and routinely trivialized.

3.     In quantitative terms, data provided by the United Nations Office on Drugs and Crime indicate that, in 2017 alone, approximately 78,000 individuals (64 per cent female and 36 per cent male) were killed by intimate partners or family members,[2] a gruesome "tip of the iceberg" pointing towards a far greater number of victims that are beaten, raped, threatened and humiliated in their own homes every day. Indeed, it has been estimated that, depending on the country, between 15 and 70 per cent of the female population – and a worldwide average of 30 per cent of women – have suffered intimate-partner violence at some point in their lives,[3] and that between 50 and 75 per cent of children worldwide (up to 1 billion) experience physical, sexual, or emotional violence at home.[4] Those staggering numbers are exacerbated by the fact that, in general, the exposure of victims to domestic violence continues for many years and often lasts an entire lifetime. Contrary to some perceptions, therefore, domestic violence is neither an exceptional occurrence nor a matter of lesser importance, but in fact represents one of the predominant sources of humiliation, violence and death

---

[1] See Article 3 of the Council of Europe Convention on Preventing and Combating Violence against Women and Domestic Violence (the Istanbul Convention).

[2] United Nations Office on Drugs and Crime, *Global Study on Homicide: Gender-related Killing of Women and Girls* (2018), pp. 10–11.

[3] World Health Organization (WHO), *Multi-country study on women's health and domestic violence against women* (Geneva, 2005).

[4] Office of the Special Representative of the Secretary General on Violence against Children, *Toward a world free from violence: Global survey on violence against children* (New York, 2013); United Nations Children's Fund (UNICEF), *Child Disciplinary Practices at Home: Evidence from a Range of Low- and Middle-Income Countries* (New York, 2010); and UNICEF, *Hidden in Plain Sight: A statistical analysis of violence against children* (New York, 2014), pp. 165–166.

worldwide; roughly comparable to all of the killing and abuse caused by armed conflict.[5]

4.    In the light of these observations, the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment is of the view that domestic violence cannot be regarded as a private matter, but constitutes a major human rights issue of inherently public concern that requires examination, inter alia, from the perspective of the prohibition of torture and ill-treatment. Building on the work of his predecessors and other mechanisms, the Special Rapporteur conducted extensive research and broad stakeholder consultations with experts, government representatives, international organizations and civil society organizations, including through a general call for submissions in response to a thematic questionnaire posted on the website of the Office of the United Nations High Commissioner for Human Rights. The present report reflects the resulting observations, conclusions and recommendations of the Special Rapporteur.

## II.   Relevance of the prohibition of torture and ill-treatment to the context of domestic violence

### A.   "Substantive" and "attributive" components of torture and ill-treatment

5.    The international legal concepts of "torture" and of "other cruel, inhuman or degrading treatment or punishment" have two distinct components, which could be described as "substantive" and "attributive". The "substantive" component defines the conduct that amounts to torture and, respectively, other cruel, inhuman or degrading treatment or punishment, whereas the "attributive" component defines the level of State agent involvement required in order for torture or ill-treatment to give rise to the State's international legal responsibility.

6.    From a substantive perspective, torture and ill-treatment as conceptualized under international law need not necessarily involve a State agent, but can also be committed by private actors without a State agent's participation, instigation, consent or acquiescence. For example, international humanitarian law prohibits any act of torture and other or cruel, humiliating and degrading treatment committed by organized armed groups in armed conflict.[6] Similarly, the Rome Statute of the International Criminal Court criminalizes war crimes and crimes against humanity that involve torture and ill-treatment by any perpetrator, irrespective of their status or of any State agent involvement.[7] In international human rights law, it is widely recognized that torture or ill-treatment at the hands of private perpetrators can trigger a wide range of positive State obligations, including in the context of domestic violence.[8] Thus, the question of State agent involvement is most significant in determining whether a particular act of torture or ill-treatment is legally attributable to a State or to delineating positive State obligations under human rights law.

7.    In the context of domestic violence, it is of particular importance to distinguish between the substantive analysis of whether domestic violence amounts to torture and ill-treatment within the generic meaning of those terms under international law and

---

[5] Small Arms Survey, *Global Violent Deaths 2017: Time to Decide* (Geneva, 2017), p. 10.

[6] See, e.g. art. 3 common to the Geneva Conventions and art. 4 (2) (a) of their Additional Protocol II. See also REDRESS, *Not only the State: Torture by non-State actors* (London, 2006).

[7] Articles 7 (2) (e) and 8 (2) (a) (ii)/(iii) and (c) (i)/(ii) of the Rome Statute of the International Criminal Court.

[8] See, for example, the factsheet on domestic violence produced by the European Court of Human Rights, available from www.echr.coe.int/Documents/FS_Domestic_violence_ENG.pdf.

the attributive analysis into the way the State may be held responsible for its involvement in, including its failure to take appropriate action against, domestic violence.

## B.   Substantive analysis: domestic violence as torture or ill-treatment

8.    From a substantive perspective, torture and ill-treatment can take many forms but, in essence, always involve a violation of physical, mental or emotional integrity that is incompatible with human dignity. Under universally applicable human rights law, torture denotes the intentional infliction on a powerless person of severe pain or suffering, whether physical or mental, for purposes such as obtaining information or a confession, punishment, intimidation or coercion, or for any reason based on discrimination of any kind, whereas ill-treatment denotes any other cruel, inhuman or degrading treatment or punishment that, contrary to torture, does not necessarily require the intentionality and purposefulness of the act or omission, the severity of the resulting pain or suffering, or the powerlessness of the victim (A/72/178, para. 31, and E/CN.4/2006/6, paras. 38–41). As the Special Rapporteur has previously clarified, "powerlessness" means that someone is overpowered or otherwise under the control of the perpetrator and, at the time of the relevant act or omission, cannot effectively resist or escape the infliction of pain or suffering (A/72/178, para. 31). Conceptually, torture and ill-treatment can occur in both custodial and extracustodial contexts as well as in both the public and the private sphere, however these may be defined.

9.    As illustrated by the predominant patterns discussed in the present report, domestic violence degrades, humiliates, coerces, brutalizes and otherwise violates the physical, mental and emotional integrity of persons who are often subjected to controlling and disempowering situations or environments. In this context, pain or suffering is in general inflicted intentionally, or even systematically, for purposes such as punishment, intimidation or coercion of any kind, or to express or consolidate gender-based or other forms of discrimination. Depending on the circumstances, the pain, suffering or humiliation resulting from domestic violence can range from comparatively moderate and brief to extremely severe and long-lasting but, being abusive by definition, always amounts to a violation of physical, mental and emotional integrity that is incompatible with human dignity.

10.   From a substantive perspective under international law, and regardless of questions of State responsibility and of individual criminal culpability, both of which need to be separately assessed, domestic violence therefore always amounts to cruel, inhuman or degrading treatment or punishment and very often to physical or psychological torture.

## C.   Attributive analysis: international practice concerning State responsibility in the context of domestic violence

11.   The reports of previous mandate-holders and the practice and jurisprudence of universal and regional oversight mechanisms have confirmed that domestic violence gives rise to a wide range of human rights obligations, including the obligation of States to prevent acts of torture and ill-treatment within their jurisdiction, including at the hands of private actors (arts. 2 and 16 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment).

12.   Thus, the Special Rapporteur has previously observed that States are internationally responsible for torture or ill-treatment when they fail to exercise due diligence to protect against such violence or when they legitimize domestic violence

by, for instance, allowing husbands to "chastise" their wives or failing to criminalize marital rape (A/HRC/31/57, para. 55). With reference to article 7 of the International Covenant on Civil and Political Rights, the Human Rights Committee has repeatedly condemned the failure of States to prevent and redress domestic violence (e.g. CCPR/C/JAM/CO/4, para. 23; and CCPR/C/LKA/CO/5, para. 9), and the Committee Against Torture has done the same with reference to the Convention against Torture (e.g. CAT/C/GRC/CO/5-6, para. 23). Moreover, in paragraphs 18 and 19 of its general comment No. 2 (2007) on the implementation of article 2 by States parties, the Committee Against Torture confirmed States' due diligence obligations to prevent, investigate, prosecute and punish acts of torture or other cruel, inhuman or degrading treatment by non-State actors, including gender-based violence, such as rape, domestic violence, female genital mutilation and trafficking. Importantly, according to the Committee, if a person is to be transferred or sent to the custody or control of an individual or institution known to have engaged in torture or ill-treatment, or the State has not implemented adequate safeguards, the State is responsible, and its officials subject to punishment for ordering, permitting or participating in this transfer contrary to the State's obligation to take effective measures to prevent torture.

13.    At the regional level, the European Court of Human Rights has repeatedly found violations of the prohibition of torture and ill-treatment owing to States' failure to take general and specific measures to effectively protect persons from domestic violence,[9] or because the domestic court's approach suggested that "isolated and random" acts of violence could be tolerated within the family.[10] In doing so, the Court has elaborated States' positive obligations to protect persons facing domestic violence.[11] Thus, the Court has found, for example, that States should strive expressly and comprehensively to protect children's dignity against domestic violence, most notably through an adequate legal framework affording protection through effective deterrence against serious breaches of personal integrity, through reasonable steps to prevent abuse of which the authorities have, or ought to have, knowledge and through effective official investigations of credible allegations of ill-treatment.[12] Other cases in which the Court has found a violation of the Convention for the Protection of Human Rights and Fundamental Freedoms on the basis of States' response to domestic violence also concerned the right to life,[13] the right to private and family life[14] and the prohibition of discrimination.[15]

14.    The Inter-American Commission on Human Rights has found the failure to protect a victim of domestic violence and her children to be in breach of the American Declaration of the Rights and Duties of Man, notably the right to life, liberty and security of person and the right to equality before the law, in particular owing to the State's failure to enforce a restraining order against the victim's husband.[16] The Inter-

---

[9]  See, inter alia, Opuz v. Turkey, App. No. 33401/02, Judgment of 9 June 2009; N. v. Sweden, App. No. 23505/09, Judgment of 20 July 2010; E.M. v. Romania, App. No. 43994/05, Judgment of 30 October 2012; Valiulienė v. Lithuania, App. No. 33234/07, Judgment of 26 March 2013; B. v. Republic of Moldova, App. No. 61382/09, Judgment of 16 July 2013; T.M. and C.M. v. Moldova, App. No. 26608/11, Judgment of 28 January 2014.

[10]  D.M.D. v. Romania, App. No. 23022/13, Judgment of 3 October 2017, paras. 40–53.

[11]  See factsheet on domestic violence produced by the European Court of Human Rights.

[12]  D.M.D. v. Romania, para. 51.

[13]  See, for example, Kontrová v. Slovakia, App. No. 7510/04, Judgment of 31 May 2007; and Branko Tomašić and Others v. Croatia, App. No. 46598/06, Judgment of 15 January 2009.

[14]  See, for example, Bevacqua and S. v. Bulgaria, App. No. 71127/01, Judgment of 12 June 2008; and A. v. Croatia, App. No. 55164/08, Judgment of 14 October 2010.

[15]  See, for example, Eremia v. Republic of Moldova, App. No. 3564/11, Judgment of 28 May 2013.

[16]  Jessica Lenahan (Gonzales) et al v. United States of America, report No. 80/11, case 12.626, Inter-American Commission on Human Rights, 21 July 2011.

American Court of Human Rights has elaborated States' positive human rights obligations in relation to acts of private perpetrators through the "due diligence" standard, in the following terms: "An illegal act which violates human rights and which is initially not directly imputable to a State (for example, because it is the act of a private person or because the person responsible has not been identified) can lead to international responsibility of the State, not because of the act itself, but because of the lack of due diligence to prevent the violation or to respond to it as required by the Convention".[17] According to the Court, the actions required of the State are not isolated to establishing an appropriate legal framework. Instead, the State must "conduct itself so as to effectively ensure" the enjoyment of human rights.[18]

15.    Furthermore, under the Inter-American Convention on the Prevention, Punishment and Eradication of Violence against Women (the Convention of Belém do Pará), adopted in 1994, States are obliged to take a range of measures towards the eradication of violence against women. Although the term "domestic violence" is not used in that instrument, it is approached as a facet of violence against women more generally. In addition, the Council of Europe Convention on Preventing and Combating Violence against Women and Domestic Violence (the Istanbul Convention), adopted in 2011, elaborates States' obligations to take a variety of measures to counter violence against women and domestic violence. The measures contained in that Convention are "without prejudice to the positive obligations on states to protect the rights recognized by the [European Convention on Human Rights]."[19]

16.    With respect to the African Union, the Protocol to the African Charter on Human and Peoples' Rights on the Rights of Women in Africa (the Maputo Protocol), adopted in 2003, places a range of obligations on States parties in relation to violence against women, including domestic violence. Furthermore, the African Charter on the Rights and Welfare of the Child enshrines specific human rights protections for children, including protection from violence (art. 16). The African Court on Human and Peoples' Rights has, for example, found one particular national family code that permitted underage marriage and marriage without consent and that discriminated against women in matters of inheritance to be discriminatory and to perpetuate practices harmful towards women and children, in violation of applicable human rights law.[20]

17.    Specialized mechanisms also have long recognized domestic violence to give rise to human rights obligations. The Committee on the Elimination of Discrimination against Women recognizes that the Convention on the Elimination of All Forms of Discrimination against Women prohibits violence against women in both the public and the private sphere.[21] The Committee has regularly made recommendations to States on how to address domestic violence and related discriminatory attitudes and practices and has developed a formidable body of guidance in that respect.[22] The Committee has affirmed that gender-based violence, including domestic violence, is

---

[17] See Velasquez Rodriguez v. Honduras, Judgment of 29 July 1988, Inter-American Court of Human Rights (ser. C) No. 4 (1988), para. 172.

[18] Ibid., para. 167.

[19] See Council of Europe, Explanatory Report to the Council of Europe Convention on preventing and combating violence against women and domestic violence (2011), para. 29. Available from https://rm.coe.int/16800d383a.

[20] APDF and IHRDA v. Mali, App. No. 046/2016, African Court on Human and Peoples' Rights, 11 May 2018.

[21] Committee on the Elimination of Discrimination against Women, general recommendation No. 19 (1992) on article 3 of the Convention, para. 9, and general recommendation No. 35 (2017) on gender-based violence against women, updating general recommendation No. 19.

[22] R. McQuigg, International Human Rights Law and Domestic Violence (Routledge 2011).

a pernicious form of discrimination.[23] Furthermore, in 1994, the Special Rapporteur on violence against women, its causes and consequences, was appointed by the Commission on Human Rights and, soon after, produced a framework for model legislation on domestic violence (E/CN.4/1996/53/Add.2), followed by a key report on the related due diligence obligations of States (E/CN.4/2006/61) and, more recently, on shelters and protection orders (A/HRC/35/30).

18.    Moreover, article 19 of the Convention on the Rights of the Child provides that States shall take "all appropriate legislative, administrative, social and educational measures to protect the child from all forms of physical or mental violence, injury or abuse, neglect or negligent treatment, maltreatment or exploitation, including sexual abuse, while in the care of parent(s), legal guardian(s) or any other person who has the care of the child." This provision complements and reinforces the generic prohibition of torture and ill-treatment, enshrined in article 37 of the Convention, which applies across custodial and extra-custodial contexts, and in both the public and private sphere.

19.    In its general comment No. 13 (2011) on the right of the child to freedom from all forms of violence, the Committee on the Rights of the Child found that States are required to take a range of measures to protect children from all forms of physical or mental violence, injury or abuse, neglect or negligent treatment, maltreatment or exploitation, including sexual abuse. The Committee emphasized the enormously deleterious implications of violence against children, which often occurs at the hands of members of their own household and which includes threats to their survival and their physical, mental, spiritual, moral and social development.

20.    The practice of international human rights mechanisms therefore supports the conclusion that, in principle, domestic violence triggers a range of relevant legal obligations of States under international human rights law, including their duties under the universal, absolute and non-derogable prohibition of torture and ill-treatment.

## D.   Attributive analysis: due diligence and "perpetration", "instigation", "consent" and "acquiescence" in the context of domestic violence

21.    **Negative duty to "respect" the prohibition of torture and ill-treatment**. By definition, domestic violence occurs in the context of the family or the home and, therefore, is rarely seen as an official act of the State. Nevertheless, in certain circumstances, State officials can be direct perpetrators of domestic violence, namely when the State is involved in providing a home, such as in an orphanage or certain forms of social care. Moreover, certain policies and practices adopted by the State may amount to the instigation of torture or ill-treatment by private actors within the meaning of articles 1 and 16 of the Convention against Torture. In the context of domestic violence, this can include calls by political or State-endorsed religious leaders to "discipline" household members through violence; official endorsement of "honour"-based violence or other harmful practices, or of the social norms dictating such practices, including coercive control over family members; or discriminatory political narratives openly encouraging violence and abuse against persons or groups that are being marginalized for reasons such as gender, age, origin, race, religion, disabilities or sexual orientation. The prohibition of torture and ill-treatment

---

[23] Committee on the Elimination of Discrimination against Women, general recommendation No. 35 (2017) on gender-based violence against women, updating general recommendation No. 19, para. 21.

unequivocally outlaws any direct perpetration, instigation or other encouragement of domestic violence by State officials.

22.   **Positive duty to ensure the right to be free from torture and ill-treatment**. In the context of domestic violence, State responsibility for torture and ill-treatment most frequently arises in connection with the violation of its positive duty to ensure human rights by preventing, protecting against, responding to and offering redress for abuse perpetrated by private actors (art. 2 in conjunction with art. 7 of the International Covenant on Civil and Political Rights), and in connection with policies and practices that may be regarded as "acquiescence" or "consent" within the meaning of articles 1 and 16 of the Convention against Torture. In particular, States must take effective legislative, administrative, judicial or other measures to prevent acts of torture or ill-treatment in any territory under their jurisdiction (arts. 2 and 16 of the Convention against Torture). Failure to exercise due diligence to prevent, investigate, prosecute and redress torture and ill-treatment by private perpetrators, including in the context of domestic violence, amounts to consent or acquiescence in torture or ill-treatment (Committee against Torture, general comment No. 2, para. 18).

23.   Positive obligations require States to take "effective measures", both general and individualized, to prevent, protect against, respond to and provide redress for torture and ill-treatment. Those duties do not necessarily entail strict State responsibility for every act of torture or ill-treatment committed by private actors within the State's jurisdiction, and States are neither expected nor entitled to impose constant surveillance on every family home. Rather, States incur international legal responsibility when they fail to take those measures of prevention, protection and redress that are reasonably available to them and likely to have the desired effect. The State's positive obligations must be interpreted and complied with in good faith, in line with the spirit and purpose of the prohibition (A/HRC/37/50, para. 14), and without discrimination of any kind.[24] They can be categorized as follows:

    (a)   **General duties**. States are required to establish legal provisions, mechanisms and processes that effectively protect people from torture and ill-treatment, including in the context of domestic violence.[25] Beyond the direct prevention, investigation and redress of acts of torture and ill-treatment, States must also take appropriate measures to transform societal structures and values that perpetuate and entrench domestic violence (E/CN.4/2006/61, paras. 15–16) and to remedy legal, structural and socioeconomic conditions that may increase exposure to domestic violence by private actors (A/73/207, para. 77 (i)), as well as to establish and facilitate access to services and support for (potential) victims, such as telephone hotlines and online platforms, health care, counselling centres, legal assistance, shelters and financial aid. States must provide particular protection to persons in vulnerable situations and establish structures to address the increased risk of torture and ill-treatment that they are exposed to, in line with human rights norms developed to eliminate various forms of discrimination, such as discrimination against women, children and persons with disabilities (A/73/207, para. 64).[26]

    (b)   **Operational duties**. States must also take effective measures to protect individuals from particular risks of torture or ill-treatment of which they know or ought to know. This requires them to establish avenues and mechanisms for receiving,

---

[24]   Art. 26 and 31 (1) of the Vienna Convention on the Law of Treaties, and art. 26 of the International Covenant on Civil and Political Rights.

[25]   For a recent overview of the current state of the national and international normative and institutional framework, see World Bank "Compendium of International and National Legal Frameworks on Domestic Violence" (January 2019), available from **Error! Hyperlink reference not valid.**.

[26]   Committee against Torture, general comment No. 2 (2008) on implementation of article 2 by States parties, para. 21.

recording and responding effectively to complaints of torture or ill-treatment, including domestic violence and to establish services and institutions capable of initiating and implementing protective measures in a prompt and effective manner.[27]

(c)   **Investigative and procedural duties**. Investigative and procedural duties require an investigation into all credible allegations or suspicions of torture or ill-treatment, which must be independent and impartial, effective, prompt, expeditious, sufficiently open to public scrutiny, capable of identifying those responsible and holding them to account; and which involves the victims or their next-of-kin to the extent necessary to safeguard their legitimate interests in the proceedings. The duty to investigate credible allegations of domestic violence can be intrinsically linked to the operational duty in respect of an ongoing situation, and an investigation may trigger duties to take specific measures for the protection of (potential) victims who are at risk from private perpetrators.[28]

(d)   **Redress, reparation and non-recurrence**. States must secure avenues towards redress and reparation for all victims of torture or other ill-treatment, including victims of domestic violence, and take concrete measures to ensure non-recurrence (A/HRC/14/22, paras. 62–64).

## III.   Applying the substantive definition of torture and ill-treatment to predominant patterns of domestic violence

24.   The present section applies the substantive aspect of the definitions of torture and ill-treatment to concrete manifestations of domestic violence, without prejudice to the question of State responsibility and of individual criminal culpability, both of which need to be separately assessed. Given the virtually unlimited forms that domestic violence can take, and given that some of the described practices can also manifest in contexts other than domestic violence, the following examples are not comprehensive or exclusive, but instead focus on patterns of domestic violence that are highly prevalent throughout the world.

### A.   Killings

25.   Approximately one in five homicides globally is perpetrated by an intimate partner or family member (64 per cent female and 36 per cent male victims), and at least one in seven exclusively by an intimate partner (82 per cent female and 18 per cent male victims).[29] The staggering numbers of women killed by an intimate partner recently led to a call by numerous international human rights mechanisms for measures to end what can only be described as a "global epidemic of femicide".[30] In practice, those killings are commonly the culmination of a history of domestic violence. Likewise, children face the highest risk of homicide by parents and someone they know.[31]

---

[27] See, for example, Opuz v. Turkey. See also REDRESS and Amnesty International, Gender and Torture (2011), pp. 15–17.

[28] See D. v. Commissioner of Police of the Metropolis (Liberty and others intervening); V. v. Commissioner of Police of the Metropolis (Liberty and others intervening), Supreme Court of the United Kingdom of Great Britain and Northern Ireland (2018), UKSC 11.

[29] United Nations Office on Drugs and Crime, *Global Study on Homicide: Gender-related Killing of Women and Girls* (2018), p. 11; Heidi Stöckl et al, "The global prevalence of intimate partner homicide: a systematic review", *The Lancet*, vol. 382 (September (2013) pp. 859–865.

[30] www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=23921&LangID=E.

[31] Heidi Stöckl et al, "Child homicide perpetrators worldwide: a systematic review", in *British Medical Journal Paediatrics Open*, vol. 1, iss. 1 (2017).

26.   In the view of the Special Rapporteur, killings that result from or are preceded by domestic violence, including culpable neglect or physical, psychological or emotional abuse resulting in self-harm, engage not only the right to life, but also the prohibition of torture and ill-treatment and the related positive obligations and aggravate the crime or violation in question.

## B.   Physical violence

27.   Physical violence within the home or between family members, including former spouses or partners, is widespread throughout the world. In the context of domestic violence, the use of physical force is always abusive, save for very exceptional circumstances, in which its use is absolutely necessary and proportionate for self-defence or to otherwise protect a person against imminent death or serious injury. Physical violence may include a wide range of transgressions including, inter alia, hitting, slapping, pushing, kicking, misuse of medication and inappropriate restraint. Physical violence includes all forms of corporal punishment, which is defined as any punishment in which physical force is used and intended to cause some degree of pain or discomfort. In its general comment No. 13, the Committee on the Rights of the Child affirmed that no form of violence against children, however light, could be tolerated, including in the familial sphere, and reiterated the States' obligation to prevent violence and protect child victims. The Committee further reiterated that corporal or physical punishment is invariably degrading and must be prohibited (A/61/299, paras. 56, 60 and 62). As the Committee underlined in paragraph 61 of the above-mentioned general comment, the "best interests of the child" criterion cannot be used to justify practices, including corporal punishment and other forms of cruel or degrading punishment, that conflict with the child's human dignity and right to physical integrity.

28.   In the view of the Special Rapporteur, any form of physical abuse occurring within the home or between family members amounts to cruel, inhuman or degrading treatment or punishment and, in case of intentional and purposeful or discriminatory infliction of severe pain and suffering on a powerless person, to torture.

## C.   Sexual violence

29.   Sexual violence includes rape and any other non-consensual act of a sexual nature between adults, including current and former spouses,[32] as well as any act of a sexual nature by adults with children. Between adults, consent must be given voluntarily as the result of the person's free will assessed in the context of the surrounding circumstances. Consent can be conditional on a multitude of personalized factors, such as the use of contraceptives or protection against the transmission of disease, and can be unilaterally withdrawn at any time. Sexual violence can also include sexual harassment, namely any form of unwanted verbal, non-verbal or physical conduct of a sexual nature with the purpose or effect of violating the dignity of a person, in particular when creating an intimidating, hostile, degrading, humiliating or offensive environment.[33]

30.   Sexual violence is always an attack on human dignity and inflicts lasting and multifaceted harm on victims, capable of destroying childhoods and entire lives. Both female and male victims can be subjected to sexual violence at any age, including during childhood and old age, at the hands of parents, siblings or other relatives, caregivers, intimate partners or acquaintances, as well as strangers. According to a

---

[32] See also Istanbul Convention, art. 36.
[33] Ibid., art. 40.

study by the World Health Organization (WHO), in practice, the risk of sexual violence at the hands of intimate partners, members of the victim's household or persons known to them is significantly higher than at the hands of strangers.[34] As far as children are concerned, approximately 18 to 19 per cent of women and 8 per cent of men report to have been sexually abused during childhood.[35] Moreover, studies on marital rape indicate a prevalence of 10 to 14 per cent among all married women and 40 to 50 per cent of battered women.[36] Transposed globally, those figures suggest that hundreds of millions of children, women and men are likely to have been or to currently be exposed to sexual abuse. That disturbing extrapolation becomes even more devastating considering that, given various barriers to reporting and recording such incidents, the figures are likely in fact to be a considerable underrepresentation of the true scale of the problem. The Special Rapporteur has repeatedly affirmed that sexual violence amounts to cruel, inhuman or degrading treatment and, in some circumstances, even to torture (A/HRC/13/39/Add.5, para. 53; A/72/178, para. 34).[37]

31.    In the view of the Special Rapporteur, any form of sexual violence constitutes cruel, inhuman or degrading treatment or punishment, and amounts to torture when it intentionally inflicts severe pain or suffering on a powerless person for purposes such as obtaining information, coercion, punishment or intimidation, or for any reason based on discrimination of any kind, including mere sexual or sadistic gratification or unequal gender power relations.

## D.    Psychological and emotional violence, including coercive control

32.    Domestic violence can include various forms of severe and/or systematic psychological or emotional violence. Psychological or emotional violence can include verbal assault, serious neglect, enforced isolation from the outside world, persistent ridicule, the use of intimate information to threaten or degrade and "gaslighting" – a form of psychological manipulation seeking to make a person question their own memory, perception or even sanity – through persistent misdirection, lies or other attempts to destabilize and create self-doubt. Emotional and psychological violence targets the emotional and psychological resilience, stability and well-being of the victim and is often a precursor to, or inflicted in combination with, physical violence.

33.    States are also increasingly recognizing and addressing the phenomenon of "coercive control", which can be understood as an act or a pattern of acts of assault, threats, humiliation and intimidation or other abuse that is used to harm, punish or frighten their victim, with a view to coercing or controlling them. Thus, for example, "coercive" behaviour has been described as encompassing psychological, physical, sexual, financial and emotional abuse, and "controlling" behaviour as making a person subordinate and/or dependent by isolating them from sources of support, exploiting their resources and capacities for personal gain, depriving them of the means needed for independence, resistance and escape and regulating their everyday behaviour.[38]

34.    In the view of the Special Rapporteur, psychological and emotional violence, including coercive control, amounts to cruel, inhuman or degrading treatment or

---

[34] WHO, *Multi-country Study on Women's Health and Domestic Violence against Women* (Geneva, 2005).

[35] M. Stoltenborgh et al, "A global perspective on child sexual abuse: meta-analysis of prevalence around the world", in *Child Maltreatment* (2011), pp. 79–101.

[36] E.K. Martin et al, "A review of marital rape" in *Aggression and Violent Behaviour* (2007).

[37] Office of the United Nations High Commissioner for Human Rights, fact sheet No. 4 (Rev.1), Combating Torture (2002), pp. 31–32.

[38] United Kingdom domestic abuse bill (2019).

punishment and, where it involves the intentional and purposeful or discriminatory infliction of severe suffering on a powerless person, amounts to torture.

## E.   Economic violence

35.   In the context of domestic violence, economic or financial violence rarely happens in isolation from other patterns of abuse. It involves the use or misuse of money or other resources so as to limit, control or coerce a person's actions. It can include, for example, interference with a person's ability to acquire, use and maintain material resources, such as money and means of transportation. It tends to centre on creating and abusing economic dependency on the perpetrator. It can leave victims with no funds for basic essentials, such as food and clothing, and with no access to any independent income and can isolate them and proliferate their abuse, thus causing severe suffering and lasting harm.[39]

36.   In the view of the Special Rapporteur, economic violence can cause significant suffering and can amount to cruel, inhuman or degrading treatment or punishment and, when such abuse is intentional, purposeful or discriminatory and inflicts severe suffering on a powerless person, amounts to torture.

## F.   Serious neglect

37.   Serious neglect involves the refusal or failure of a caregiver to meet the basic needs of a person in their care. Serious neglect can include the failure to protect a person from harm or to provide them with food or clothing, chronic inattention, exposure to violence between others or drug or alcohol abuse, withholding of essential medical care, or abandonment.[40] It may or may not involve an intention to inflict physical or emotional suffering. In some States, serious neglect is the most common form of child abuse and is a highly prevalent form of elder abuse.[41] Frequently, serious neglect will occur in combination with other forms of abuse. Besides children and elderly dependents, persons with disabilities can be in a particularly vulnerable position in respect of such abuse.

38.   In the view of the Special Rapporteur, serious neglect can amount to cruel, inhuman or degrading treatment or punishment and, where it involves the intentional and purposeful or discriminatory infliction of severe suffering on a powerless person, to torture.

## G.   Female genital mutilation

39.   Female genital mutilation describes "all procedures involving partial or total removal of the external female genitalia or other injury to the female genital organs for non-medical reasons".[42] It is estimated that more than 200 million girls and women alive today have undergone female genital mutilation in the countries where the practice is concentrated. Furthermore, there are an estimated 3 million girls at risk

---

[39] R.J. Voth Schrag, S.R. Robinson and K. Ravi, "Understanding Pathways within Intimate Partner Violence: Economic Abuse, Economic Hardship and Mental Health", in *Journal of Aggression, Maltreatment and Trauma*, November 2018.

[40] See, e.g., European Court of Human Rights, Z. and others v. United Kingdom, App. No. 29392/95, 10 May 2001.

[41] WHO, *World report on violence and health* (Geneva, 2002), chap. 5.

[42] World Health Organization, *Eliminating female genital mutilation: an interagency statement – OHCHR, UNAIDS, UNDP, UNECA, UNESCO, UNFPA, UNHCR, UNICEF, UNIFEM, WHO* (Geneva, 2008), p. 4.

A/74/148

of undergoing female genital mutilation every year. In some countries, the prevalence rates are at over 80 per cent.[43]

40.   Female genital mutilation causes severe and prolonged suffering and its purposes are generally of discriminatory character, given that it is inflicted with a view to enforcing patriarchal standards of female chastity through the elimination of sexual pleasure and, indeed, the perpetuation of suffering.[44] It is generally inflicted on girls who are, in the circumstances, powerless to resist or escape such abuse. Female genital mutilation has been consistently regarded as torture or ill-treatment by the Special Rapporteur (A/HRC/7/3, paras. 50–53; A/HRC/31/57, para. 61–62) and, for the purposes of refugee law, as persecution.[45]

41.   In the view of the Special Rapporteur, given that female genital mutilation involves the intentional and purposeful or discriminatory infliction of severe pain or suffering on powerless persons, the practice amounts to torture or, in the absence of one or more of those constitutive elements, to other cruel, inhuman or degrading treatment or punishment.

## H.   "Honour" crimes

42.   "Honour" crimes are crimes perpetrated by family members predominantly on women or girls deemed to have defiled the honour of the family, in a purported attempt to redeem such familial honour. Every year, such crimes expose countless women to severe suffering and serious injury and result in thousands of "honour" killings across the world.[46] As the Special Rapporteur on violence against women has stated in that context: "Honour is defined in terms of women's assigned sexual and familial roles as dictated by traditional family ideology. Thus adultery, premarital relationships (which may or may not include sexual relations), rape and falling in love with an 'inappropriate' person may constitute violations of family honour" (E/CN.4/1999/68, para. 18). Furthermore, LGBTI persons can also become victims of such violence, including "honour" killings, carried out against them because they are seen to have brought shame on their family, often for transgressing gender norms or societal expectations in respect of sexuality and behaviour (A/HRC/19/41, para. 25). The purported intent of "honour" crimes is to redeem personal or family honour by taking action against the alleged culprit, which invariably involves elements of punishment, coercion or intimidation and, in general, aims to enforce a deeply discriminatory social order.

43.   In the view of the Special Rapporteur, the intentional and purposeful or discriminatory infliction of severe pain or suffering on a powerless person with the purported aim of redeeming personal or familial honour amounts to torture or, in the absence of one or more of those constitutive elements, to other cruel, inhuman or degrading treatment or punishment.

## I.   Trafficking of family members

44.   Human trafficking involves the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion,

---

[43] UNICEF, "Female genital mutilation/cutting: a global concern" (New York, 2016); and UNICEF, *Female Genital Mutilation/Cutting: A statistical overview and exploration of the dynamics of change* (New York, 2013).

[44] Eliminating Female Genital Mutilation, pp. 5–7.

[45] Office of the United Nations High Commissioner for Refugees, Guidance Note on Refugee Claims relating to Female Genital Mutilation (May 2009).

[46] http://hbv-awareness.com/statistics-data/.

abduction, fraud, deception, abuse of power or of a position of vulnerability, or the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation.[47] The trafficking of family members is a widespread phenomenon in many parts of the world and concerns predominantly children. In fact, the extent of family involvement in the trafficking of children (41 per cent) is more than four times higher than in cases of adult trafficking (9 per cent).[48] In practice, the trafficking of family members invariably involves the intentional infliction of severe physical or mental pain and suffering, often on the basis of discriminatory criteria, for the purpose of coercive exploitation including, most notably, forced prostitution and other sexual abuse, forced marriage, forced labour, forced recruitment into armed groups and criminal gangs, or even organ removal (A/HRC/7/3, paras. 56–58; CAT/C/RUS/CO/4, para. 11).[49]

45.   In the view of the Special Rapporteur, the trafficking of family members amounts to cruel, inhuman or degrading treatment or punishment and, where it involves the intentional and purposeful or discriminatory infliction of severe pain or suffering on a powerless person, to torture.

## J.   Child, early and forced marriage

46.   Child, early and forced marriage is a human rights violation and a harmful practice that disproportionately affects women and girls globally, preventing them from living their lives free from all forms of violence.[50] The practice is detrimental to the victims' capacity to realize the full range of their human rights (A/HRC/26/22) and contradicts the Sustainable Development Goals, in particular Goal 5.3, on eliminating all harmful practices. Child marriage, or early marriage, is any marriage where at least one party is a child and, as the Committee of the Rights of the Child states in paragraph 29 of its general comment No. 13, it is considered to be a form of violence against children. While the practice of child marriage is declining, UNICEF estimates that a staggering 650 million girls and women alive today were married before their eighteenth birthday.[51] Forced marriage is marriage that lacks the full and free consent of one or both parties, or where a person desiring to end or leave their marriage is prevented from doing so, and is recognized as a form of domestic violence.[52] Child marriage is considered to be a form of forced marriage, given that one or both parties have not expressed full, free and informed consent. Data on other forms of forced marriage is scarcer, but the practice is strongly linked to contexts marked by patriarchal structures imposing discriminatory status and treatment on women. Both child marriage and forced marriage can inflict lasting harm, including severe psychological, emotional and physical suffering, marital rape and other forms of sexual abuse, servitude and life-threatening early pregnancies or unwanted pregnancies. These consequences being predictable given the children's young age, the resulting infliction of suffering must be regarded as intentional and is generally rooted in profoundly discriminatory views of women and girls.

---

[47] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, art. 3.

[48] www.iom.int/sites/default/files/our_work/DMM/MAD/Counter-trafficking%20Data%20Brief%20081217.pdf.

[49] United Nations Office on Drugs and Crime, Global Report on Trafficking in Persons 2018 (Vienna, 2018).

[50] https://www.ohchr.org/EN/Issues/Women/WRGS/Pages/ChildMarriage.aspx.

[51] https://data.unicef.org/wp-content/uploads/2018/07/Child-Marriage-Data-Brief.pdf.

[52] European Union Agency for Fundamental Rights, *Addressing forced marriage in the EU: legal provisions and promising practices* (Vienna, 2014).

A/74/148

47.   Building on the views expressed by his predecessors and the Committee Against Torture, the Special Rapporteur is of the view that both the marriage of children (A/HRC/31/57, paras. 63–64; and CAT/C/YEM/CO/2, para. 31) and forced marriage (e.g. CAT/C/SEN/CO/3, para. 14; and A/HRC/31/57, paras. 58 and 63–64) amount to cruel, inhuman or degrading treatment and, where it involves the intentional and purposeful or discriminatory infliction of severe pain or suffering on a powerless person, to torture.

## K.   Forced "conversion therapy"

48.   So-called "conversion therapy", sometimes referred to as "reparative therapy", describes a range of highly discredited practices that could involve electric shock, medication, psychotherapy or spiritual interventions or faith "healings", that aim to change a person's sexual orientation or gender identity or expression. Children are especially vulnerable to being subjected to such practices, in particular at the instigation of their parents or guardians, including through pressure or coercion.[53] The practice of "conversion therapy" has been rejected by every mainstream medical and mental health organization for decades, but due to continuing discrimination and societal bias against LGBTI people, remains widespread. Undergoing such so-called "therapy" can cause severe physical and mental suffering and lead to depression, anxiety, drug use, homelessness and suicide.

49.   While the extent of the use of "conversion therapy" is not known, even conservative estimates suggest that many thousands of children and adults are being subjected to it in many parts of the world.[54] By the end of 2018, only three States Members of the United Nations had banned "conversion therapy", although some efforts towards a national ban have been made at the subnational level in other States.[55] The practice of "conversion therapy" has been condemned by the Special Rapporteur (A/HRC/31/57, para. 48; and A/56/156, para. 24), as well as by the Committee against Torture (CAT/C/ECU/CO/7, paras. 49–50; and CAT/C/CHN/CO/5, paras. 55–56), the Subcommittee on Prevention of Torture (CAT/C/57/4, paras. 68–69) and the Office of the United Nations High Commissioner for Human Rights (A/HRC/29/23, paras. 14, 38).

50.   In the view of the Special Rapporteur, given that "conversion therapy" can inflict severe pain or suffering, given also the absence both of a medical justification and of free and informed consent, and that it is rooted in discrimination based on sexual orientation or gender identity or expression, such practices can amount to torture or, in the absence of one or more of those constitutive elements, to other cruel, inhuman or degrading treatment or punishment.

## L.   Reproductive coercion

51.   Reproductive coercion is frequently perpetrated by intimate partners or the wider family and involves behaviour that interferes with contraceptive, pregnancy and other reproductive choices, including about continuing or terminating a pregnancy. Examples of reproductive coercion are intentional destruction or removal

---

[53] C. Ryan et al, "Parent-Initiated Sexual Orientation Change Efforts with LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment", in *Journal of Homosexuality*, November 2018.

[54] See, for example, C. Mallory, T. Brown and K. Conron, "Conversion Therapy and LGBT Youth" (Williams Institute, 2018).

[55] International Lesbian, Gay, Bisexual, Trans and Intersex Association, "State-Sponsored Homophobia 2019" (Geneva, 2019).

of a chosen method of contraception (contraceptive sabotage), as well as efforts to coerce pregnancy, pregnancy outcomes, or abortion. All of those phenomena are associated with serious reproductive consequences including unintended pregnancy, abortion, sexually transmitted infections, poor pregnancy outcomes and psychological trauma.[56] Women experiencing partner violence tend to be at higher risk of experiencing reproductive coercion.[57]

52.   There is a continuum between certain forms of reproductive coercion and laws that restrict reproductive freedom. In particular, as repeatedly pointed out by the Committee Against Torture, denying victims of rape access to medically safe abortion can violate the prohibition of torture and ill-treatment (CAT/C/BOL/CO/2, para. 23; CAT/C/POL/CO/5-6, para. 23; CAT/C/PER/CO/5-6, para. 15).

53.   In the view of the Special Rapporteur, given that reproductive coercion intentionally interferes with the personal dignity, integrity and autonomy of the victim for coercive or discriminatory purposes and can inflict severe pain or suffering, it can amount to torture or, in the absence of one or more of those constitutive elements, to other cruel, inhuman or degrading treatment or punishment.

## IV.  Prioritizing the rights and needs of victims, including the best interests of the child

54.   By definition, domestic violence takes place within the sphere of the family or the home and, more often than not, is perpetrated in a context where perpetrators exercise economic, social, legal and/or emotional power over the victims. In that context, ensuring effective and adequate enforcement of the law and protection of victims is a particularly delicate and complex matter. In particular, as the Special Rapporteur has indicated before, prosecution and the imposition of sanctions, including imprisonment, must result from a nuanced determination that prioritizes the rights and needs of victims, including the best interests of the child (A/HRC/31/57, para. 62).

55.   In practice, victims of domestic violence are often deprived of access to justice. Some victims may be separated from their families or institutionalized as a result of their experiences coming to the authorities' attention. When domestic violence is litigated or prosecuted, victims are frequently re-traumatized by the manner in which subsequent civil and criminal legal proceedings are conducted. Perpetrators of serious violence may be unjustly acquitted or punished with a mere fine and set free without any, or without adequate, preventative or protective measures for the victim. Even where perpetrators are convicted and imprisoned, victims often experience severe additional suffering through social pressure, loyalty conflicts, feelings of guilt and shame and, crucially, through economic hardship when the perpetrator is also the breadwinner of the family.

56.   When addressing the complex challenges arising in the context of domestic violence, States should therefore take a comprehensive approach and all measures of prevention, intervention and redress should be informed and guided primarily by the rights and needs of the victims, including the best interests of the child. Most notably, in order to avoid undue social pressure and manipulation, States confronted with circumstances and cases indicative of domestic violence should systematically conduct full *ex officio* investigations with a view to establishing the facts and ensuring

---

[56] J. Park et al, "Reproductive coercion: uncloaking an imbalance of social power", in *American Journal of Obstetrics and Gynecology*, August 2015.

[57] E. Miller et al, "Reproductive Coercion: Connecting the Dots Between Partner Violence and Unintended Pregnancy" in *Contraception*, June 2010, vol. 81, iss. 6, pp. 457–459.

accountability. In doing so, the authorities should avoid making their investigation or decisions exclusively dependent on the testimony of the victim.

57.    At the same time, the consequent protective measures, legal processes and criminal sanctions should prioritize the rights and needs of the victims, including the best interests of the child. This means that the design and functioning of relevant protective and redress-orientated mechanisms must be victim-centred, responsive and accessible, including supported decision-making in circumstances where a victim's capacity is compromised (CRPD/C/ESP/CO/1; and A/HRC/22/53, para. 27). Where appropriate and supported by free, genuine and informed consent, criminal, civil and administrative investigations and proceedings relating to allegations of domestic violence can be complemented, but not replaced, by measures of mediation, reconciliation and restorative justice.[58]

58.    In all cases, however, the primary objective of any decision, measure or sanction taken in response to domestic violence must be:

(a)    To prevent further abuse on the part of the same or other likely perpetrators;

(b)    To prevent re-traumatization or abuse of victims of domestic violence through subsequent procedures, measures and sanctions;

(c)    To provide victims with rehabilitation and redress, including just compensation and the means, support and protection required to establish and sustain a dignified and protected life without domestic violence or other abuse in the long term.

## V.    Conclusions

59.    **On the basis of the preceding observations and considerations, and informed by broad stakeholder consultations, the Special Rapporteur, to the best of his personal judgment and conviction, has drawn the conclusions set out below.**

60.    **Every day, millions of people across the world are exposed to domestic violence in intimate relationships, within the home and in communal or State-run settings replacing the family home. Children in particular are vulnerable to experiencing or witnessing domestic violence. Among adults, including older people, domestic violence disproportionately affects women. In terms of both scale and severity, domestic violence is one of the predominant sources of humiliation, violence and death worldwide, and claims a similar number of lives as armed conflict.**

61.    **Like war, domestic violence is a veritable scourge of humanity, traumatizing countless individuals, in particular women and children, on a daily basis and brutalizing human society for generations to come. Unlike war, however, domestic violence is still widely considered to be a "private matter", a social taboo to be dealt with at the discretion of the perpetrator or the family in the perceived legal "black hole" of the home. As long as a substantial part of the world's population is oppressed, abused and even murdered by their own family members or within their homes, the promises of the Universal Declaration of Human Rights and the 2030 Agenda for Sustainable Development will remain a far cry from reality. Consequently, domestic violence must be regarded as a human rights issue of inherently public concern.**

---

[58] IARS et al, "Restorative Justice and Domestic Violence: A Guide for Practitioners" (January 2016).

62.   From a substantive perspective, domestic violence amounts to cruel, inhuman or degrading treatment or punishment and, where it involves the intentional and purposeful or discriminatory infliction of severe pain or suffering on a powerless person, to torture. From the attributive perspective of State responsibility, States have not only the negative obligation to refrain from engaging in, instigating or otherwise encouraging domestic violence, but also the positive obligation to effectively prevent, protect against, respond to, investigate, prosecute and provide redress for such abuse at the hands of private actors.

63.   While it is not possible for States to eliminate the risk of domestic violence completely, a range of measures can and must be taken to mitigate such risk substantially, to empower those exposed to such risk and to support and offer redress to survivors. States must take all measures reasonably available to them to fulfil their legal obligations in line with the principles of non-discrimination, due diligence and good faith.

64.   The particular context in which domestic violence occurs and the wider environment in which patterns and enabling factors of domestic violence are embedded give rise to particular challenges in terms of prevention, investigation, accountability and redress, which must be considered. In particular, the domestic context of the family and the home is largely withdrawn from the purview of the State and protected, to a certain extent, by the right to privacy, resulting in considerable difficulties with regard to the effective detection, identification and protection of victims, perpetrators and situations of risk.

65.   Domestic violence frequently occurs, or is exacerbated or perpetuated, at the intersection of different types of discrimination. Societal indifference to, or even support for, the subordinate status of certain persons, in particular of women and children, together with the existence of discriminatory and disempowering laws, combined with the sometimes systematic or systemic failure of States to prevent and redress abuse, create conditions under which victims are subjected to severe forms of domestic violence with impunity and for prolonged periods of time.

66.   In most cases of domestic violence, the relationship between perpetrators and victims is marked by factors such as legal and/or economic dependence or otherwise unequal power relations, social expectations, or strong emotional ties, which add further complexity to the identification and implementation of adequate preventive, protective and punitive measures in line with the rights and needs of the victims, including the best interests of the child.

67.   The trivialization of domestic violence is often a consequence of a systemic and/or systematic failure of States to regard as a matter of public concern abuse that predominantly affects women, children, sexual and gender minorities, older persons, disabled persons and other marginalized groups. That trivialization often goes hand-in-hand with the stigmatization of the victims of domestic violence, in particular those perceived to have transgressed dominant social norms, for example by breaching a so-called "honour" code, or by reporting a close relative to the authorities.

68.   In many contexts, perpetrators of domestic violence are still excused or even encouraged by dominant social or legal norms, including systemic tolerance of certain abuses and suspicion towards, or even legally enshrined or societally administered punishment of, complainants. The effect of such dynamics is often further compounded by legal, structural and socioeconomic conditions that may increase certain persons' exposure to violence and abuse. Those conditions are in general the result of public governance failures and must be alleviated by States through systematic reform of relevant policies and practices.

69.   In the light of the scale and nature of this phenomenon and of the societal factors that sustain it, States should adopt multifaceted strategies and measures to prevent and combat it effectively. In determining appropriate policies, measures and practices, the victims' rights and needs, including the best interests of the child, should be prioritized and safeguarded at all times.

# VI.   Recommendations

70.   In the light of the above observations, the Special Rapporteur offers the following recommendations to States with a view to strengthening their capacity to ensure the effective prevention of torture and other cruel, inhuman or degrading treatment or punishment in the context of domestic violence.

## A.   Ratification or adoption of international instruments

71.   States should adopt and/or ratify, without reservations, all international legal instruments aiming to give effect to the prohibition of torture and ill-treatment, including the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and the Optional Protocol thereto, the Convention on the Rights of the Child, the Convention on the Elimination of All Forms of Discrimination against Women and the Optional Protocol thereto, and the Convention on the Rights of Persons with Disabilities. States should also adopt the measures set out in the Council of Europe Convention on Preventing and Combating Violence against Women and Domestic Violence (the Istanbul Convention) and in other relevant universal and regional instruments relating to gender-based violence and the protection of the child.

## B.   National laws, policies and practices

72.   States should refrain from promoting violent, discriminatory or dehumanizing narratives, policies and practices that contribute to societal norms and structures that uphold and perpetuate domestic violence.

73.   States should repeal or reform any laws, policies and practices that instigate, permit, enable or tolerate domestic violence, for instance, by allowing husbands to "chastise" their wives or children; by excluding marital rape from criminal prosecution; by restricting access to divorce, property, inheritance or child custody rights and related legal proceedings; or by limiting the capacity of victims to prevent, escape from or otherwise protect themselves against domestic violence.

74.   States should take legislative and other measures to criminalize and prevent domestic violence and to empower victims or potential victims to resist or escape from such abuse. They should reform judicial systems and procedures so as to enable victims or potential victims to obtain protective measures against any form of domestic violence.

75.   In particular, States should never perpetrate, instigate or otherwise encourage domestic violence, but instead should explicitly prohibit, prevent, investigate and ensure appropriate accountability and redress for such abuse, including between current and former spouses. That includes, inter alia, any form of the following predominant patterns of domestic violence, all of which are relevant under the prohibition of torture and ill-treatment: killings; physical violence; sexual violence; psychological and emotional violence, including

coercive control; economic violence; serious neglect; female genital mutilation; "honour" crimes; trafficking of family members; child, early and forced marriage; forced "conversion therapy"; and reproductive coercion.

76.   States should ensure, as a matter of domestic law, that factors such as culture, custom, religion, tradition or so-called "honour" shall not be considered as justification or mitigating circumstance for domestic violence.

## C.   Protective measures

77.   States should dedicate sufficient resources towards establishing accessible help lines, data-collection processes and intervention services capable of taking prompt and effective measures with a view to protecting victims and potential victims and their dependents from a real and immediate risk of domestic violence.

78.   In order to have an objective basis for designing relevant policies and measures, States should collect relevant statistical data at regular intervals on all forms of domestic violence; support research on all forms of domestic violence, in particular with a view to examining its incidence and root causes and effects, as well as the effectiveness of measures to combat it; and ensure that data collected and research conducted on domestic violence are made available to the public.

79.   In order to ensure safe accommodation for victims and their dependents, States should establish a sufficient number of accessible shelters across the entire territory within their jurisdiction. Any accommodation of victims in detention centres for their own protection from domestic violence must be exceptional, temporary and subject to the victims' free and informed consent for the entire duration of such placement.

80.   Where there is reason to suspect domestic violence but the perpetrator cannot be arrested, States should issue and enforce strict compliance with emergency "barring orders", as well as court-mandated restraining or protection orders, to prevent the perpetrator from approaching or otherwise contacting the victim, subject to dissuasive sanctions.

81.   States should regularly monitor all institutional and community-based long-term care settings where people may be accommodated and cared for and, where necessary and appropriate, should provide independent decision-making support services, in particular for people with disabilities and older people.

82.   States should develop and implement at all levels and in an adequate geographical distribution comprehensive, coordinated policies and programmes to combat domestic violence, including gender-sensitive training of public officials as well as public education and awareness campaigns.

83.   States should place the rights and needs of the victim, including the best interests of the child, at the centre of all legislative, judicial and administrative measures and implement those through effective cooperation among all relevant agencies, institutions and organizations.

84.   Under no circumstances should States expel persons to places where there are substantial grounds for believing that they would be in danger of domestic violence amounting to torture or cruel, inhuman or degrading treatment or punishment.

### D. Judicial measures

85.   Wherever there is reasonable ground to believe that domestic violence has occurred or is likely to occur, States are obliged, *ex officio*, to conduct a prompt and impartial investigation and, where appropriate, take protective measures, ensure administrative, civil and criminal accountability of perpetrators and ensure that victims receive adequate redress and rehabilitation.

86.   States should provide for the right to free legal assistance for victims of domestic violence. Victims who experience particular vulnerability, such as children, older persons in need of care or persons with disabilities, should be effectively empowered and their rights and needs should be respected, including the best interests of the child.

87.   States should ensure that, in the determination of custody and visitation rights in relation to children, domestic violence incidents are duly considered and their severity properly weighted. In particular, States should take every reasonable step to ensure that the exercise of any visitation or custody rights does not threaten the physical or mental integrity of victims of domestic violence or their children.

### E. Full compensation and rehabilitation

88.   States should ensure in their legal systems that victims of domestic violence obtain redress and have an enforceable right to fair and adequate compensation, including the means for the fullest possible rehabilitation. In doing so, States should follow the comprehensive and gender-sensitive guidance provided by the Special Rapporteur on violence against women, its causes and consequences on the topic of reparations (A/HRC/14/22) as well as Committee against Torture general comment No. 3 (2012) on implementation of article 14 by States parties.

89.   States should take the legislative or other measures necessary to provide victims with adequate civil remedies, including compensation, against the perpetrator, as well as adequate civil remedies, including compensation, against State authorities that have failed in their duty to take the preventive or protective measures necessary within the scope of their powers.

90.   States should ensure that specialized centres and other mechanisms for the support and rehabilitation of victims are available and accessible, in an adequate geographical distribution across their jurisdiction. Those services should include legal advice, psychological counselling, financial support, adequate housing, education or training and assistance in finding employment. Access to those centres and services should not be dependent on attempted or successful pursuit of legal proceedings.

91.   Where appropriate and supported by free, genuine and informed consent, criminal, civil and administrative investigations and proceedings relating to allegations of domestic violence should be complemented by measures of mediation, reconciliation and restorative justice. Such processes must only be conducted in parallel to, and not in lieu of, criminal, civil and administrative investigations and proceedings relating to allegations of domestic violence. Facilitators of restorative justice and other complementary dispute resolution processes should be trained to recognize the contextual complexity of domestic violence and its different patterns, especially the incidence of structural and pervasive control and asymmetry of power and the risk of revictimization. Facilitators should engage in a continuous process of risk assessment to ensure

that the safety, rights and needs of victims, including the best interests of the child, are safeguarded at all times.

## F.  Structural measures

92.   States should take all reasonable steps to eliminate legal, structural and socioeconomic conditions that may increase exposure to, or perpetuate patterns of, domestic violence. Given that most forms of domestic violence are intrinsically linked to discriminatory patterns, structural subordination and systemic marginalization, measures of redress must go beyond individual reparation and include action aiming at structural and systemic transformation (A/HRC/31/57, para. 66; A/HRC/14/22, para. 24).

## G.  Non-discrimination

93.   In addressing the challenges arising in relation to domestic violence, all legislative, protective, judicial, reparative, structural and other measures should be taken in good faith and without any discrimination based on grounds such as gender, race, language, religion, political or other opinion, national or social origin, property, birth, sexual orientation, age, state of health, disability, marital status, migrant or refugee status, or other any other, similar grounds.

---