# EXHIBIT 52



# HEALTH TAKEN HOSTAGE

## CRUEL DENIAL OF MEDICAL CARE IN IRAN'S PRISONS



Amnesty International is a global movement of more than 7 million people who campaign for a world where human rights are enjoyed by all.

Our vision is for every person to enjoy all the rights enshrined in the Universal Declaration of Human Rights and other international human rights standards.

We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and public donations.

© Amnesty International 2016
Except where otherwise noted, content in this document is licensed under a Creative Commons
(attribution, non-commercial, no derivatives, international 4.0) licence.
https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode
For more information please visit the permissions page on our website: www.amnesty.org
Where material is attributed to a copyright owner other than Amnesty International this
material is not subject to the Creative Commons licence.

First published in 2016
by Amnesty International Ltd
Peter Benenson House, 1 Easton Street
London WC1X 0DW, UK

Index: MDE 13/4196/2016
Original language: English

*Cover photo:* © Tavaana / Mana Neyestani



**amnesty.org**

# CONTENTS

| | |
|---|---|
| **EXECUTIVE SUMMARY** | **4** |
| **METHODOLOGY** | **8** |
| **1.  LEGAL BACKGROUND** | **10** |
| 1.1.  International human rights law and standards | 10 |
| 1.2.  Iranian law | 11 |
| **2.  DENIAL OF MEDICAL CARE IN IRAN'S PRISONS** | **13** |
| 2.1.  Denial of timely specialized medical care outside prison | 15 |
| 2.2.  Intentional interruption or discontinuation of treatments | 20 |
| 2.3.  Denial of release on medical grounds | 21 |
| 2.4.  Withholding medication | 23 |
| 2.5.  Gender-specific abuses | 25 |
| **3.  'CONFESSION' AS A PRECONDITION FOR MEDICAL CARE** | **26** |
| **4.  ABUSED AND BETRAYED BY MEDICAL PROFESSIONALS** | **29** |
| **5.  ILL AND ILL-TREATED** | **32** |
| 5.1.  Excessive and unnecessary use of restraints | 32 |
| 5.2.  Beatings and harassment | 34 |
| 5.3.  Intrusion on physical privacy | 35 |
| 5.4.  Denial of medical care for torture-related injuries | 36 |
| **6.  HUNGER STRIKES AND REPRISALS** | **38** |
| **7.  RECOMMENDATIONS** | **43** |

# EXECUTIVE SUMMARY

In April 2016, prisoner of conscience **Omid Kokabee**, a 33-year-old physicist sentenced to 10 years' imprisonment underwent surgery to remove his right kidney, which had become badly damaged by advanced cancer. The news of his ill-health triggered a global wave of sympathy and outrage, particularly as it was revealed that he had complained of kidney problems for nearly five years but the authorities had kept denying him adequate medical care including diagnostic tests. In the days that followed his surgery, a picture from an earlier period of hospitalization in November 2015 that showed the frail young scientist being chained to his hospital bed circulated online, sending further shock waves through social media. The picture encapsulated the cruelty of a criminal justice system in which prison and judicial authorities recklessly ignore the medical needs of prisoners.

Iran's criminal justice system is notorious for imprisoning people merely for peacefully exercising their human rights. However, the legal framework relating to the rights of prisoners guarantees, in theory, that they should at least benefit from adequate medical care. Iran's prison regulations require the prison administration to provide prisoners with regular medical check-ups, and ensure that their medical needs are addressed. They also provide that prisoners may be granted medical leave or transferred to treatment centres outside prison when the care they need is not available in prison. Iran's Code of Criminal Procedure further authorizes judges to postpone the implementation of a prison sentence when imprisonment would exacerbate the illness of the prisoner, or to issue an alternative sentence if the individual is deemed too ill to serve.

The reality in Iran's prisons is, however, very different. Amnesty International's research shows that, in general, the prison regulations are flouted in practice and, in particular, political prisoners, including prisoners of conscience, are denied adequate medical care – a key human right which under international law and standards must not be adversely affected by imprisonment.

The 18 individual cases highlighted in this report, which present only a snapshot of the shocking cruelty suffered by political prisoners who have health problems, demonstrate that the denial of adequate medical care is generally not due to lack of resources. Neither have the Iranian authorities made this claim. Rather, there is strong evidence, in all the cases, that the denial is a deliberate act by the judiciary, in particular the Office of the Prosecutor, and/or the prison administration.

In some of the cases, there is also evidence that the denial is being used as a means to extract "confessions" from political prisoners or to intimidate or punish them. For example, the authorities have repeatedly put **Zeynab Jalalian**, an Iranian Kurdish woman serving a life sentence in Khoy Prison, West Azerbaijan province, under pressure to "confess" as a condition to access an urgently needed eye surgery. She is at risk of losing her sight due to a lack of specialized treatment for a worsening eye problem that may have been caused by torture.

Common practices that threaten the health and lives of political prisoners include the following:

## DENIAL OF TIMELY SPECIALIZED MEDICAL CARE OUTSIDE PRISON

Amnesty International has documented a pattern of political prisoners being denied timely specialized medical care outside prison. This is well illustrated by the case of Iranian Kurdish political prisoner **Afshin Sohrabzadeh** who was long denied the specialized medical care that he urgently needed for an

intestinal cancer that resulted, among other things, in recurring gastrointestinal bleeding. Up until 25 June, when he was granted temporary medical leave, the authorities kept him in a remote prison in Minab, Hormozgan province, even though the province lacks the medical facilities that he needs, and denied his repeated requests for medical leave. They further hindered his access to government-subsidized health insurance, and seemed to have required that his family pay for his treatment, knowing that they cannot afford to do so. This is in breach of international law, which requires that states pay the medical expenses of all prisoners, completely and without discrimination.

## WITHHOLDING MEDICATION

The authorities have denied some political prisoners medication, apparently as a form of punishment. Political prisoner **Iraj Mohammadi** and prisoners of conscience **Narges Mohammadi**, **Hossein Ronaghi Maleki**, **Sayed Hossein Kazemeyni Boroujerdi** and **Alireza Rasouli** are among those whose cases Amnesty International has documented.

A related problem has been the failure of authorities to provide regular check-ups in order to ensure that the prisoner is receiving the right dose of medication. In the case of prisoner of conscience **Afif Naimi**, one of seven imprisoned leaders of Iran's Baha'i community who suffers from a severe blood clotting disorder, the failure to carefully monitor and adjust the dose of his medication has contributed to recurrent bleeding and loss of consciousness, resulting in his frequent hospitalization.

## DENIAL OF RELEASE ON MEDICAL GROUNDS

The Iranian authorities have a track record of refusing to release prisoners who are critically ill on medical grounds and forcing prisoners who have been granted medical leave to interrupt their treatment and return to prison against medical advice. Highly emblematic here are the cases of prisoners of conscience **Hossein Ronaghi Maleki**, **Saeed Hosseinzadeh** and **Afif Naimi**, who have been imprisoned even though doctors associated with the Legal Medicine Organization of Iran (a state forensic institute) have deemed them to be unfit to remain in prison due to the severity of their health problems, which include, respectively, a kidney disease, rheumatoid arthritis, and a severe blood clotting disorder.

## HUNGER STRIKES AND REPRISALS

Political prisoners suffering from deteriorating health sometimes feel that they have no choice but to go on hunger strike to compel the authorities to provide them with medical care. Sometimes, this compels the authorities to transfer the hunger striker to hospital or grant them short-term medical leave, but they often force the prisoner to interrupt their treatment after a brief period and return to prison against medical advice. In some cases though, even the drastic step of a hunger strike has not moved the authorities to grant access to urgent or specialized medical care. Indeed, some prisoners have faced threats or reprisals for staging such protests.

For example, prisoner of conscience **Alireza Rasouli**, who is serving a three-and-a-half year prison sentence in Mahabad Prison, West Azerbaijan province, was sentenced in September 2015 to three additional years in prison on charges of "spreading propaganda against the system" and "gathering and colluding to commit crimes against nationality security", including through staging hunger strikes "at the behest of foreign opposition groups." He suffers from osteonecrosis (a bone disease) of the leg. The disease has progressed considerably because it has been left untreated, leading to severe knee and hip pain, and restricted mobility. He has been on three hunger strikes in protest at the authorities' refusal to provide him with a surgery he needs to relieve the pain and prevent potentially permanent joint damage.

## INTENTIONAL INTERRUPTION OR DISCONTINUATION OF TREATMENTS

Amnesty International's research shows that prosecution authorities, as well as security and intelligence officials, also frequently return political prisoners they have transferred to hospital to prison even though doctors advise that their treatments remain incomplete and they have not sufficiently recovered. Such interruption or discontinuation of treatment has often caused the prisoners' health to worsen, and significantly increased, as the case of **Alireza Golipour** illustrates, the risk of post-operative complications such as bleeding, infections, breathing problems and blood clots in prisoners who have undergone surgery.

Alireza Golipur was transferred to hospital on 8 January 2016 to undergo a surgical operation to remove a malignant tumour in his lung and to implant a stent in his heart. He was returned to prison the next day, just 24 hours or so after his surgery, despite advice from the hospital doctors, who said his discharge from hospital was premature and likely to pose serious risks to his health. Back in prison, Alireza Golipour's health rapidly deteriorated. His respiratory problems apparently worsened and the frequency of his nosebleeds increased to two or three times per day. In the early hours of 1 February, he had to be returned to hospital on an emergency basis and undergo a second operation to remove the blood clots in his body with suction.

## ABUSE AND BETRAYAL BY MEDICAL PROFESSIONALS

Amnesty International is concerned that in some cases practitioners providing health care to political prisoners have been complicit in their abuse, subjecting them to ridicule and threats of violence, dismissing their health problems as "figments of their own imagination", and prescribing them ordinary painkillers and tranquillizers without addressing the underlying medical problem they complained of. One former prisoner told Amnesty International: "When I would tell the prison doctor that I had vomited blood, he would say, 'You are just being delusional'… [He] also used to laugh mockingly."

## ILL AND ILL-TREATED

International law and standards require that states treat all prisoners with the respect due to their inherent dignity and value as human beings. Information received by Amnesty International, however, suggests that Iranian officials frequently subject political prisoners with health problems to a whole range of abusive practices that can qualify as torture and other ill-treatment. These include the unnecessary or excessive use of restraints such as handcuffs and leg shackles on prisoners receiving medical care; beatings of sick prisoners before, during, or after their transfer to hospital; and intrusions on the privacy of prisoners undergoing intimate medical examinations. These abuses, which have been documented in the cases of **Narges Mohammadi**, **Omid Kokabee**, **Alireza Golipour**, **Farhad Atlasi**, **Jaber Sakhravi** and **Ramazan Ahmad Kamal**, seem to have been for purposes such as punishment, intimidation or humiliation or for reasons based on discrimination, including on grounds of political opinion, religion, ethnicity and legal status.

## GENDER-SPECIFIC ABUSES

Amnesty International is concerned that women political prisoners, at least in Tehran's Evin Prison where Amnesty International has been able to research the situation, face additional layers of gender-specific abuse when seeking access to medical care.

Information received by Amnesty International indicates that, as of June 2016, the prison clinic was entirely staffed by male doctors and nurses; there were apparently a few female administrators working in the clinic until mid-afternoon. Only one of the female administrators appeared to have received basic training in administrating injections and electrocardiogram (ECG) tests, but none of them had a professional medical background. On several occasions, the prison authorities have denied women prisoners, who have experienced health problems in the evening or at night, emergency tests, or failed to ensure that they are transferred out of their cells on stretchers by professional medical staff. The "justification" has been that it is "inappropriate" for the medical staff, who were all men, to engage in such actions.

When women prisoners have complained about these practices, they have been told by the prison authorities that "Evin Prison is only for men". They have been further threatened that, if they continue complaining, they will be transferred to Gharchak Prison, in the city of Varamin, Tehran province, where women convicted of serious non-political crimes are held in extremely poor conditions. The male-dominated nature of the prison clinic has apparently made women prisoners vulnerable to sexual slurs and innuendos by the clinic staff. It has also placed them under immense pressure to observe mandatory "veiling" regulations.

## METHODOLOGY

The research for this report is based on interviews with well-informed sources, including former prisoners, lawyers and human rights defenders, and reviews of a range of reports produced by independent Iranian human rights monitors and media outlets. Where necessary, Amnesty International also sought expert

medical opinion. Unless otherwise indicated, Amnesty International has withheld the names of sources interviewed for this research in order to protect their security. Amnesty International wrote to the Iranian authorities to request comments on the cases and issues contained in this report, but had not received a response by the time the report was finalized.

## RECOMMENDATIONS

Amnesty International calls on the Iranian authorities to:

- Ensure that all individuals in custody receive adequate health care, including prevention, screening and treatment, free of charge and without discrimination on grounds such as legal situation, status or gender;

- Stop using the denial of timely and adequate medical care as a form of additional punishment against political prisoners, including prisoners of conscience, and ensure that officials belonging to security and intelligence agencies, prison staff (including medical staff), and the prosecution authorities suspected of deliberately denying medical care to detainees and prisoners or withholding medication for purposes such as coercion, punishment or to elicit "confessions" are investigated and, where sufficient, admissible evidence is obtained, are prosecuted in fair trials;

- Ensure that medical decisions concerning the need for ongoing care and observation outside prison and the necessity of release on medical grounds are only taken by the responsible health care professionals and are not overruled or ignored by non-medical authorities.

# METHODOLOGY

Amnesty International's research for this report is primarily based on interviews with reliably informed sources, including former prisoners, lawyers and human rights defenders. Where necessary. Amnesty International also sought expert medical opinion. Unless otherwise indicated, Amnesty International has withheld the names of sources interviewed for this research in order to protect their security.

Whenever possible, Amnesty International has sought documentary evidence, including medical records, in order to verify the health history of the prisoners. When such documents were not available or could not be secured through safe means of correspondence, Amnesty International has ensured that the information collected is cross-checked with various reliable sources. Where there have been doubts about the name of the specific condition from which a prisoner suffers and no diagnostic records were available, Amnesty International has limited itself to explaining the symptoms from which the prisoner was understood to suffer. In cases where the information available was inconsistent or feared to be speculative, Amnesty International has erred on the side of caution; it has either not included the information at all or highlighted which details remain unclear.

Amnesty International's research has also involved detailed reviews of the reports produced by various independent non-governmental human rights organizations and Persian-language media outlets relating to the human rights of prisoners, including their access to medical care. It was beyond the organization's capacity to independently research the situation of every prisoner with health issues mentioned in these reports as the number of such prisoners could surpass a hundred. The reports have, nevertheless, informed Amnesty International's analysis and corroborated its own independently researched findings.

The 17 cases highlighted in the report mostly concern individuals who are at risk of permanent disability or other irreparable damage to their health due to being denied adequate medical care. However, they present only a snapshot of the shocking cruelty suffered by political prisoners, including prisoners of conscience, who have health problems. The decision to select these cases was influenced by a variety of factors, including the severity and urgency of the prisoner's health condition and the extent to which Amnesty International was able to access detailed information and medical records. Amnesty International also decided to select cases that illustrate broader patterns of abuse and represent the diversity of the population of political prisoners, including prisoners of conscience, in Iran, who include journalists, bloggers, human rights defenders, lawyers, civil society activists, trade unionists, minority rights activists, and members of religious minorities targeted for practising their faith.

Conducting human rights research on Iran is fraught with challenges. The Iranian authorities generally do not allow human rights groups or international experts to visit the country to conduct research, and use various repressive measures to silence independent activists in a bid to stop evidence of human rights violations from reaching the outside world. Nevertheless, Amnesty International is confident that its research, which included collecting information from reliable sources in Iran, interviewing well-placed and reliable individuals, and reviewing numerous medical records, has allowed it to accurately summarize patterns of human rights violations in relation to the denial of medical care to political prisoners, including prisoners of conscience, in Iran. On this note, we would like to express our gratitude to all former prisoners and their families who placed their trust in us to share their experiences. We would also like to acknowledge the

generous support of individual human rights activists and groups, without whom this research would not have been possible.

Amnesty International sent a letter to the Head of the Judiciary on 29 June 2016, seeking information about the steps taken by the Iranian authorities to address long-standing concerns regarding the denial of medical care to political prisoners in Iran. In particular, it requested information on the measures taken by the authorities to ensure that the political prisoners whose cases are highlighted in the report, as well as others in custody, receive adequate health care, including prevention, screening and treatment, and are granted medical leave or transferred, free of charge, to specialized institutions or outside hospitals, whenever they require specialist or any other treatment not available within their prison. As of 11 July, the authorities had not responded to Amnesty International.

The letter to the Head of the Judiciary reiterated concerns raised by Amnesty International through its membership over recent months and years. Amnesty International members have repeatedly written to the Iranian authorities to raise concerns about the dire situation of most of the individuals whose cases are featured in this report and the broader pattern of political prisoners being denied timely specialized medical care outside prison. However, Amnesty International has never received responses from the authorities to the allegations of serious violations being committed.

The Iranian authorities have not granted Amnesty International access to Iran to conduct human rights research since shortly after the 1979 Revolution. Amnesty International has frequently written to the authorities to raise human rights concerns and to request access. To date, the organization has not received a positive reply. Amnesty International continues to seek opportunities to discuss its concerns and recommendations with the authorities and to be allowed to visit the country for research purposes.

# 1. LEGAL BACKGROUND

## 1.1. INTERNATIONAL HUMAN RIGHTS LAW AND STANDARDS

As a state party to the International Covenant on Economic, Social and Cultural Rights, Iran is legally obliged to respect, protect and fulfil "the right of everyone to the enjoyment of the highest attainable standard of physical and mental health."[1] Rule 24 of the UN Standard Minimum Rules for the Treatment of Prisoners (Nelson Mandela Rules) clarifies the "provision of health care for prisoners is a State responsibility" and that prisoners "should enjoy the same standards of health care that are available in the community" and without discrimination.[2]

The Mandela Rules also provide that prisoners who require specialist treatment must be transferred to specialized institutions or outside hospitals when such treatment is not available in prison (Rule 27).

Under the UN Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment as well as the Mandela Rules, health care provided to individuals in custody must be free of charge (Principle 24).[3]

The failure to provide adequate health care to prisoners may violate the absolute prohibition of torture and other cruel, inhuman or degrading treatment or punishment, including under Article 7 of the International Covenant on Civil and Political Rights, to which Iran is also a state party.[4]

The UN Committee against Torture, in its General Comment 2, has affirmed that "States bear international responsibility for the acts and omissions of their officials and others".[5] This means that conduct such as depriving someone of basic needs, including medical attention, can violate the prohibition on torture and

---

[1] International Covenant on Economic, Social and Cultural Rights (ICESCR), adopted by UN General Assembly Resolution 2200A (XXI) of 16 December 1966, entered into force on 3 January 1976, Article 12. Iran ratified the ICESCR in 1975. See also Committee on Economic, Social and Cultural Rights, General Comment 14, *The right to the highest attainable standard of health*, E/C.12/2000/4, para. 33, available at www.refworld.org/docid/4538838d0.html

[2] UN Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules), adopted by UN General Assembly Resolution 70/175 of 17 December 2015, E/CN.15/2015/L.6/Rev.1, Annex, Rule 24(1), available at www.penalreform.org/wp-content/uploads/2015/05/MANDELA-RULES.pdf (the Mandela Rules, Rule 24(1)).

[3] Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, adopted by UN General Assembly Resolution 43/173 of 9 December 1988, Principle 14, available at www.un.org/documents/ga/res/43/a43r173.htm (Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment); the Mandela Rules, Rule 24(1).

[4] International Covenant on Civil and Political Rights (ICCPR), adopted by General Assembly Resolution 2200A (XXI) of 16 December 1966, entered into force on 23 March 1976. Iran ratified the ICCPR in 1975.

[5] Committee against Torture, General Comment 2, *Implementation of article 2 by States parties*, CAT/C/GC/2, para. 15, available at www.refworld.org/docid/47ac78ce2.html

other ill-treatment. Whenever such deprivation is intentional, causes "severe pain or suffering" and meets the other requirements of the torture definition, it would constitute torture.[6]

# 1.2. IRANIAN LAW

Most of the provisions relating to the health of prisoners are contained in Iran's Executive Regulations for the Organization of State Prisons (the Prison Regulations), adopted in December 2005 and amended in May 2010.[7] Many of the provisions in the Regulations broadly conform with international law and standards, and if implemented properly, would protect the right of prisoners to receive timely access to medical care.

- **Medical check-ups and screenings**

The prison clinic must undertake a comprehensive medical examination of every prisoner on admission, perform diagnostic tests when necessary, and take steps as appropriate to treat the prisoner or refer them to the relevant medical centre. All medical steps taken must be recorded in the prisoner's file (Article 111). The clinic must provide all prisoners with a medical check-up at least once a month (Article 102).

- **Medical care**

All measures necessary must be taken to ensure that prisoners' medical needs are addressed, to the extent possible, inside prison to avoid the need for transfers to treatment centres outside prison. When such transfers are necessary, they must be approved by the prison clinic and authorized by the head of the prison and the Associate Prosecutor of the Prison (*Dadyar-e Zendan*) (Article 103). The Associate Prosecutor works under the direct supervision of the Prosecutor General.

- **Medication**

Any prescription or medication possessed by prisoners must be seized on admission and submitted to the prison clinic, which will then prescribe the prisoner any medicine they need. Whenever medication is of a "critical nature" it must be provided immediately after the prisoner is examined (Article 112).

- **Medical leave**

Prisoners may be granted medical leave for hospitalization if a prison doctor determines that they need treatment in a medical institution outside prison. Medical leave can be extended beyond a month if the hospital and the Legal Medicine Organization of Iran (a state forensic institute) confirm the need for continued hospitalization. In such cases, the date and location of hospitalization must be specified to enable prison guards to conduct visits and inspections as necessary (Article 216).

There are, however, a number of provisions that conflict with international law and standards:

- **Medical expenses**

The prison administration is responsible for check-ups and, when necessary, treatment of ill prisoners (Article 118). However, prisoners must bear the financial costs associated with the treatment of conditions and illnesses that do not require urgent or immediate care or are "their own fault" (Article 104). This is in breach of international law, which requires that states pay the medical expenses of all prisoners, completely and without discrimination.[8]

---

[6] See for instance N. S. Rodley and M. Pollard, "Criminalisation of torture: state obligations under the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment", *European Human Rights Law Review* (2006), p.120. The definition of torture that is widely used in human rights law, including by the Human Rights Committee, is provided in Article 1(1) of the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted by UN General Assembly Resolution 39/46 of 10 December 1984, entered in to force on 26 June 1987. Iran has not ratified the Convention.

[7] The website of the Prisons Organization uses the title "State Prisons and Security and Corrective Measures Organization". See: prisons.ir (accessed on 27 June 2016). For the text of the Prison Regulations, see the Executive Regulations for the Organization of State Prisons and Security and Corrective Measures, available at bit.ly/1QFVIHV (accessed on 27 June 2016).

[8] Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Principle 24, available at www.un.org/documents/ga/res/43/a43r173.htm

- **Compassionate release on medical grounds**

The Prison Regulations oblige the Associate Prosecutor of the Prison to examine the situation of prisoners with an incurable disease and take appropriate action based on the Code of Criminal Procedure (Note to Article 103).

Iran's 2014 Code of Criminal Procedure, which entered into force in June 2015, provides that "whenever the convicted individual suffers from physical or mental illnesses and the implementation of the sentence would exacerbate the illness or delay the recovery, the Judge Overseeing Implementation of Sentences shall, after obtaining the opinion of the Legal Medicine Organization of Iran, postpone the implementation until the time of the recovery" (Article 502). The Code further provides that, if there is no prospect of recovery and the Judge Overseeing Implementation of Sentences is satisfied that the convicted person is unfit to serve the sentence, the judge will refer the case to the court that originally issued the sentence to issue an alternative, appropriate sentence.

The process for deciding prisoners' requests for medical leave under Iranian law is not in full compliance with international law and standards, including Rule 27(2) of the Mandela Rules which states: "Clinical decisions may only be taken by the responsible health-care professionals and may not be overruled or ignored by non-medical prison staff."[9]

---

[9] The Mandela Rules, Rule 27(2), available at www.penalreform.org/wp-content/uploads/2015/05/MANDELA-RULES.pdf

# 2. DENIAL OF MEDICAL CARE IN IRAN'S PRISONS

If he had been transferred out of the prison to receive a routine sonography in November 2011, when he first experienced bleeding and pain caused by kidney stones, [the tumour] would have been noticed… Omid had repeatedly gone to the prison infirmary, complaining of kidney and stomach pain… He had been waiting for a long time to be transferred to a hospital… but the officials wouldn't agree to it. Prison doctors never even examined him, and kept prescribing painkillers for him. A week ago, Omid was diagnosed with cancer."

Family member of Omid Kokabee, April 2016

In April 2016, the lawyer of prisoner of conscience Omid Kokabee announced that the 33-year-old physicist, who is serving a 10-year prison sentence for his refusal to work on military projects in Iran, had been diagnosed with advanced kidney cancer and his damaged kidney had to be removed immediately. The news triggered a global wave of sympathy and outrage, particularly as it was revealed that Omid Kokabee had complained of kidney problems for nearly five years but the prison authorities had kept denying him specialized medical care outside prison and refused all his requests for medical leave. In the days that followed his surgery, a picture from an earlier period of hospitalization in November 2015 that showed the frail young scientist being chained to his hospital bed circulated online, sending further shock waves through social media. The picture encapsulated the cruelty of a criminal justice system in which prisoners' health is

regularly taken hostage by prison and judicial authorities who recklessly ignore the medical needs of prisoners.



*The news that Omid Kokabee had been diagnosed with kidney cancer triggered a global wave of sympathy and outrage, especially on social media.*
*© Radio Farda / Assad Binakhahi*

Iran's criminal justice system is notorious for imprisoning people merely for peacefully exercising their rights, such as criticizing the authorities. However, the legal framework relating to the rights of prisoners guarantees, in theory, that they should at least benefit from adequate medical care while detained. Iran has reasonable prison regulations on the whole when it comes to medical treatment and the authorities have never indicated that they lack resources to provide such care.

In reality however, Amnesty International's research shows that, in general, these regulations are being flouted in practice and, in particular, political prisoners, including prisoners of conscience, in Iran are being denied adequate medical care – a key human right which under international law and standards must not be adversely affected by imprisonment.

The 18 individual cases highlighted in this report, which present only a snapshot of the shocking cruelty suffered by political prisoners who have health problems, demonstrate that the denial of adequate medical care is generally not due to a lack of capacity or resources. Neither have the Iranian authorities ever made this claim. Rather, there is strong evidence, in all cases, that the denial is a deliberate act by the judiciary, in particular the prosecution authorities, and/or prison administrations – in some cases with the collusion of prison doctors. In some of the cases, there is also evidence that the denial is being used as a means to extract "confessions" from political prisoners or to intimidate or punish them.

Common practices that threaten the health and lives of prisoners include:

• Deliberately delaying or refusing urgent or specialized medical care, including screening and treatment;

• Downplaying or outright dismissing the seriousness of prisoners' medical problems, and prescribing them ordinary painkillers and tranquillizers without addressing the underlying medical problem they complain of;

• Withholding essential medication;

• Refusing to release prisoners who are critically ill on compassionate grounds or making their access to medical leave conditional on extortionate bail amounts;

- Forcing prisoners who have been transferred to hospital or granted medical leave to interrupt their treatment and return to prison against medical advice.

Harsh prison conditions, such as lack of heating in cold weather, overcrowding, inadequate food and poor sanitation, often exacerbate prisoners' pre-existing medical problems or contribute to new health problems.

Cumulatively, these practices and conditions mean that political prisoners in Iran are put at risk of needless death, permanent disability or other irreparable damage to their health.

# 2.1. DENIAL OF TIMELY SPECIALIZED MEDICAL CARE OUTSIDE PRISON

Political prisoners and their distressed families often endure excruciating waiting games while officials ignore their cries for medical help, offer false assurances, demand hefty bail payments, and renege on their promises.

Medical services offered in Iran's prison clinics are generally limited to basic forms of care such as measuring body weight and blood pressure, administrating injections, providing intravenous fluids and prescribing medication. Therefore, prisoners whose medical needs go beyond such basic services have to be transferred to medical facilities outside prison to receive treatment. However, in order for such transfers to take place, the prison's general physician must refer the prisoner to a specialist doctor who must then certify the prisoner as ill and in need of medical examination or care outside prison.



© Amnesty International / Daniel Clarke

In Evin Prison, there are apparently three rotating general physicians and five specialists, specializing in, respectively, dentistry, ophthalmology, obstetrics and gynaecology, internal medicine, and infectious diseases. In many prisons, the specialist doctors appear to visit every two to six weeks. As a result, sick prisoners are usually forced to wait several weeks before they can be seen by the specialist doctor, even when their health problems are severe and painful.

Testimonies received from former prisoners interviewed by Amnesty International suggest that, in many cases, the prison doctors, including the specialists, do not engage with political prisoners in a professional or caring manner.

Several former prisoners told Amnesty International that the doctor specializing in internal medicine in Evin Prison frequently dismissed their health problems as trivial, even when they suffered from pre-existing health problems and, even though their own doctors had said, prior to their arrest, that they needed specialized medical tests and treatment. They also said that he refused to order diagnostic tests. Instead, he would prescribe ordinary painkillers and tranquillizers and tell prisoners to come back the next time they visited if the problem persisted.

Amnesty International understands that political prisoners suffering from worsening health problems frequently have to go through multiple rounds of these visits, which they describe as futile and frustrating, before the specialist might finally confirm that they require medical care outside prison.

> **"For the majority of hospital transfers, which relate to heart, kidney and digestive problems, the approval of the internal medicine specialist is required. However, the internal medicine doctor [in Evin Prison] who works under the pseudonym of Shahriari never assists. He always uses phrases such as 'there is nothing wrong with you', 'you are just exaggerating' or 'you are being neurotic' in order to try to tell us that that our illnesses do not need treatment in a medical facility [outside prison], or he just prescribes tranquillizers."**
>
> Former prisoner held in Tehran's Evin Prison, April 2016

Even when specialists confirm the need for medical treatment outside prison, prisoners often have to battle with the Office of the Prosecutor, which is responsible for authorizing prisoners' transfer to hospital and approving or extending their medical leave.

Indeed, the prosecution authorities are often directly or indirectly involved with violating the rights to health and freedom from torture and other ill-treatment of prisoners who need specialized medical care outside prison. They deny their requests for medical leave or admission to hospital arbitrarily and without providing a reason.

Sometimes, prison officials tell prisoners that the prosecution authorities or intelligence officials have blocked their medical leave or hospitalization because of the political nature of their cases, which is in blatant contravention of international human rights law and standards prohibiting discrimination on the basis of legal status.

## AFSHIN SOHRABZADEH



Afshin Sohrabzadeh with his mother before his arrest © Private

> **"If you cannot provide a property bond for your medical leave, it is not a problem. You will die in prison and we will send your body to a mortuary and your mother and father can go and pick it up."**
>
> The alleged words of a prosecutor in Minab, Hormozgan province, to Afshin Sohrabzadeh, a gravely ill Iranian Kurdish prisoner, May 2016

Afshin Sohrabzadeh, an Iranian Kurdish prisoner serving a 25-year sentence in "internal exile" at a remote prison in Minab, in the southern Hormozgan province, was long denied the specialized medical care that he urgently needs for an intestinal cancer that has resulted, among other things, in recurring gastrointestinal bleeding and severe drops in his blood pressure. In addition, he is believed to suffer from respiratory, renal and urinary tract problems, potentially caused by the torture and other ill-treatment to which he says he was subjected in detention, and which have worsened due to poor prison conditions and a lack of adequate medical care. He was sentenced to serve 25 years in "internal exile" in September 2010 following an unfair trial before a Revolutionary Court in Sanandaj, Kurdistan province, which convicted him of "enmity against God" (*moharebeh*) for membership in an armed Kurdish opposition group and unlawful possession of firearms.

Up until 25 June 2016, when he was granted temporary medical leave, Afshin Sohrabzadeh had been admitted numerous times as an emergency patient to hospitals in Minab and Bandar Abbas, Hormozgan province. However, each time he had been returned to prison without receiving appropriate diagnostic tests and treatment, apparently due to a lack of adequate medical facilities in Hormozgan province. As a result, his health had seriously deteriorated, prompting prison officials to request from the prosecution authorities that he be allowed to serve his sentence in a province equipped with better medical facilities. However, the requests had been rejected.



*Afshin Sohrabzadeh in hospital © Private*

Between August and November 2015, the authorities transferred Afshin Sohrabzadeh twice to Tehran's Evin Prison, purportedly to give him access to specialized medical care. On both occasions, his family covered the cost of his transfer to Tehran, which they have said was around 10.2 million rials (around US$300). However, the promised medical care was denied. The first time was for an unknown reason. The second time was apparently because the prison authorities required that the family of Afshin Sohrabzadeh pay for his treatment in Tehran's Imam Khomeini hospital; the treatment was to cost around 700 million rials (around US$20,000) and the family was unable to afford the fee.

Afshin Sohrabzadeh was released on temporary medical leave on 25 June 2016 after the Office of the Prosecutor finally approved a 20-day leave from prison on medical grounds.

Prior to his being granted leave, Afshin Sohrabzadeh's requests for medical leave had been repeatedly denied. His family had been initially promised that medical leave would be granted if they secured a property bail worth 1 billion rials (US$30,000). The prosecution authorities, however, increased the bail, without justification, to the extortionate amount of 2 billion rials (US$60,000) in March 2016 after his family went through much hardship and managed to secure the initial amount.

According to reports by human rights monitors, a prosecutor in Minab told Afshin Sohrabzadeh in May 2016: "If you cannot provide a property bond for your medical leave, that is not a problem. You will die in prison and we will send your body to a mortuary and your mother and father can go and pick it up." In the weeks that followed, Afshin Sohrabzadeh's respiratory health problems apparently worsened severely, leading to him coughing up blood and nearly suffocating due to a deficient supply of oxygen to his body caused by abnormal breathing. The prosecution authorities, however, continued to refuse him medical leave until 25 June 2016 when his family managed, with the assistance of friends, to raise the additional amount requested. However, Amnesty International understands that he remains unable to fund his treatment because the intelligence authorities have confiscated his national identification documents, preventing him from applying for government-subsidized health care.

## ABDOLFATAH SOLTANI



*Abdolfattah Soltani © Private*

"Over the years, my mother has made so many requests for my father's medical leave that she could probably publish a multi-volume book with these written requests.

She puts in a request for my father's medical leave almost every week. However, the Associate Prosecutor of the Prison does not pay any attention to her requests.

He only takes the letters and says that they will be processed. Shouldn't a prisoner's health receive attention? The life of a human being is at stake."

Maedeh Soltani, daughter of prisoner of conscience Abdolfattah Soltani, May 2016

Prisoner of conscience Abdolfattah Soltani, a prominent human rights lawyer sentenced to 13 years in prison for his human rights work and held in Tehran's Evin Prison, may be at elevated risk of a heart attack due to being denied adequate medical care while he has been in prison. In recent years, he has been transferred to the prison clinic several times because of chest pains and severe heart palpitations. However, he has been returned to his prison cell each time after either having received no treatment or having simply been given drugs such as aspirin and propranolol to regulate his heart rhythm. The prosecution authorities have repeatedly refused to grant him medical leave or authorize his transfer to hospital, even though his doctors have advised that he needs ongoing care and observation outside prison and said that the harsh prison conditions are aggravating his high blood pressure and rapid heart rate.

Abdolfattah Soltani suffers from several other health problems, including digestive problems, which resulted in his admission as an emergency patient to hospital in 2013. After spending 41 days in hospital and seeing his requests for medical leave rejected, he asked to be returned to prison as he did not wish his family to continue paying for his hospitalization in a private hospital. The authorities had refused to grant him medical leave, despite advice from his doctors that he needed ongoing care, including a balanced diet not available in prison. The Associate Prosecutor of Evin Prison has generally refused Abdolfattah Soltani's requests for medical leave without providing any reasons. However, on one occasion, Abdolfattah Soltani's family was told that the Prosecutor General, to whom the Associate Prosecutor of Evin Prison reports, is opposed to granting him medical leave because Abdolfattah Soltani remains "steadfast" in his beliefs.

Abdolfattah Soltani also has a herniated disc in his back. Although his wife has booked several sessions of physiotherapy for him, the authorities have not ensured that he is taken to his scheduled appointments on time. As a result, he has missed some of his appointments, forcing him to wait several weeks until his wife can book another one.

**KAMAL FOROUGHI**



> "We are very worried about his health and are concerned he may die in prison... we have received no information on the brief medical checks that have been made."
>
> Kamran Foroughi, son of elderly British-Iranian prisoner Kamal Foroughi, November 2015

*Kamal Foroughi with his son Kamran © Private*

Kamal Foroughi, a 76-year-old British-Iranian businessman, is serving an eight-year sentence in Tehran's Evin Prison, where he has been held since May 2011. In 2013, he was convicted of charges, including espionage, after an unfair trial before a Revolutionary Court in Tehran. Kamal Foroughi suffers from various medical conditions and Amnesty International understands that, prior to his arrest, his doctors had said that he needed specialized medical tests, including screening for cancer, and frequent check-ups. However, he was only transferred to a hospital for a standard medical check-up since being imprisoned in November 2015 after his case was publicized in the media and activists from around the world sent letters to the Iranian authorities. Neither Kamal Foroughi nor his family were ever given any information about the nature of the tests taken or their outcomes.

In May 2016, Kamal Foroughi received his second standard medical check-up. This time, the authorities provided Kamal Foroughi and his family with some limited information about the nature and outcome of some of the medical tests taken, which apparently yielded normal results. However, the tests taken did not include any specific cancer-screening tests. Over the years, the authorities have refused Kamal Foroughi's repeated requests to be released or granted leave on medical grounds.

## 2.2. INTENTIONAL INTERRUPTION OR DISCONTINUATION OF TREATMENTS

Amnesty International's research shows that prosecution authorities, as well as security and intelligence officials, frequently return political prisoners they have transferred to hospital to prison even though doctors advise that their treatment is incomplete and they have not sufficiently recovered. Such interruption or discontinuation of treatment has often caused the prisoners' health to worsen, and significantly increased, in cases where they have undergone surgery, the risk of post-operative complications such as bleeding, infections, breathing problems and blood clots.

**ALIREZA GOLIPOUR**



*Alireza Golipour © HRANA*

Alireza Golipour, a university student and a former employee of the Ministry of Information and Communications Technology held in Tehran's Evin Prison, suffers from lung cancer and heart problems, and requires ongoing specialized treatment outside prison. Following four years of pre-trial detention where his legal status remained uncertain, including eight months in solitary confinement, he was sentenced, in May 2016, to 39 years and five months in prison and 174 lashes after being convicted of several charges including "espionage", "gathering and colluding against national security", "spreading propaganda against the state", "insulting the Supreme Leader" and "disrupting public minds".

Alireza Golipur was transferred to hospital on 8 January 2016 to undergo a surgical operation to remove a malignant tumour in his lung and to implant a stent in his heart. He was returned to prison the next day, just about 24 hours after his surgery, despite advice from the hospital doctors, who said his discharge from hospital was premature and likely to pose serious risks to his health.

A number of human rights groups have reported that Ministry of Intelligence officials accompanying Alireza Golipour on his transfer to prison inflicted sharp blows on his chest, while he was semi-conscious, causing severe swelling and inflammation in his chest.

Back in prison, Alireza Golipour's health rapidly deteriorated. His respiratory problems apparently worsened and the frequency of his nosebleeds increased to two or three times per day. In the early hours of 1 February, he was transferred to hospital on an emergency basis and underwent a second operation to remove the blood clots in his body with suction. Amnesty International understands that immediately following the operation, which is said to have lasted about six hours, Ministry of Intelligence officials once again returned Alireza Golipour to prison.

Alireza Golipour has been since provided with chemotherapy and medication. His health, however, remains very poor as he is held in extremely harsh conditions in sections Seven and Eight of Tehran's Evin Prison, which are severely overcrowded, poorly ventilated, infested with insects and do not have enough beds and toilets. The authorities have repeatedly refused to release him on medical grounds even though doctors associated with the Legal Medicine Organization of Iran have confirmed that he is unfit to remain in prison.

# 2.3. DENIAL OF RELEASE ON MEDICAL GROUNDS

The Iranian authorities have a track record of keeping critically ill political prisoners in prison even though state-appointed doctors have confirmed that they are unfit to remain in prison and that their continued imprisonment would severely endanger their life or health. This is in contravention of Iran's own domestic law, including Article 502 of the Code of Criminal Procedure, which provides that "if there is no prospect of recovery and the Judge Overseeing Implementation of Sentences is satisfied that the convicted person is unfit to serve the sentence, the judge shall refer the case to the court that originally issued the sentence to issue an alternative, appropriate sentence."

## AFIF NAIMI



*Afif Naimi © Private*

Prisoner of conscience Afif Naimi, one of seven imprisoned leaders of Iran's Baha'i community, who is serving a 10-year prison sentence for peacefully practising his religious beliefs, suffers from a severe blood clotting disorder which requires constant monitoring and regular, specialized medical care not available in prison. If left untreated or treated inappropriately, the blood clots can travel to the arteries or veins in the brain and heart, which can in turn cause a heart attack, a stroke, damage to the body's organs or even death.

The lack of appropriate care in prison appears to have caused Afif Naimi bleeding and loss of consciousness, leading to frequent hospitalizations. Since June 2011, he has spent over 700 days in hospital. The Legal Medicine Organization of Iran has, therefore, stated multiple times that Afif Naimi is not fit for imprisonment. Despite this, the Office of the Prosecutor has refused to grant him medical leave or refer his case to court to issue an alternative sentence (under Article 502 of the Code of Criminal Procedure).

## HOSSEIN RONAGHI MALEKI

Prisoner of conscience Hossein Ronaghi Maleki, a blogger and pioneering activist against on-line censorship who has been sentenced to 13 years in prison for establishing the first ever popular, widely used proxy server in Iran and for his writings on his blog, has several serious medical conditions. These include a kidney disease, and gastro-intestinal, bladder, heart, chest, and spinal problems.



*Hossein Ronaghi Maleki © Private*

He has only one functioning kidney and needs constant monitoring and regular specialized medical care that is only available outside prison. The Legal Medicine Organization of Iran assessed his medical condition in April 2016 and issued a written statement, saying that he was not in a fit state to be imprisoned. Despite this, the Office of the Prosecutor has refused to refer his case for the application of Article 502 and said that he must return to prison in July 2016 when his medical leave ends.

Hossein Ronaghi Maleki started a prolonged hunger strike on 26 March in protest at the prison authorities' refusal to allow him access to his medication, as well as his continued imprisonment. He ended his hunger strike on 4 May after the Office of the Prosecutor finally approved a 30-day period of leave from prison on medical grounds. Prior to his being granted leave, he had gone on hunger strike on 26 March in protest at the prison authorities' refusal to allow him access to his medication, as well as his continued imprisonment. He had been taken to a Tehran hospital on 5 and 9 March for tests, including an examination by an orthopaedic doctor for his back pain, but was returned to prison without receiving

adequate treatment on either occasion. He was also not allowed to attend a hospital appointment for a magnetic resonance imaging (MRI) scan for his spine. Hossein Ronaghi Maleki has been granted medical leave from prison several times. Each time however, he has been summoned to return to prison to resume serving his 13-year sentence though he is critically ill and doctors have advised against stopping his specialized medical care.

# 2.4.   WITHHOLDING MEDICATION

Political prisoners also complain of being denied essential medication. In some cases, this seems to be because inadequate budgets leave prison administrators unable to offer some medicines, particularly when they are expensive, or the management of the prison clinic is incompetent or poorly organized. For example, the prison authorities mix up prisoners' prescriptions or lose the medication provided by their families. These practices have contributed to new health problems or exacerbated prisoners' pre-existing problems.

In other cases, however, the withholding of medication is apparently a form of punishment as the medication is inexpensive or has been provided by the prisoner's family.



© Amnesty International / Daniel Clarke

"Prisons in Iran are highly advanced in terms of respecting prisoners' rights… they are not only unique in the Middle East but are also fairly unsurpassed in the world… medical care is provided to all prisoners.

Head of Iran's State Prison Organization Asqar Jahangir, March 2016.

"Even though I have heart and several other medical problems, the prison doctor who worked under the pseudonym of Shahriari claimed that I am completely healthy and refused to prescribe me medication."

Former prisoner held in Tehran's Evin Prison, May 2016.

Amnesty International is concerned that practitioners providing health care to prisoners have been sometimes complicit in this abusive practice, refusing to authorize the prison clinic to provide prisoners with the medication they need. One prisoner of conscience told Amnesty International about a doctor in Tehran's Evin Prison who infamously dismisses prisoners' health problems as "figments of their own imagination" and refuses to prescribe them their medication. In this case, the prisoner, who suffers from severe health problems, said that he found a contact in the prison clinic who would "smuggle" the medication into his cell.

Whether by intent or neglect, depriving prisoners of medication for no legitimate medical purpose can violate the rights to health and freedom from cruel, inhuman and degrading treatment. As noted, whenever such deprivation is intentional, and inflicts "severe pain or suffering" for such purposes as punishment, coercion

or intimidation, obtaining a "confession", or for any reason based on discrimination of any kind, this constitutes torture.[10]

### IRAJ MOHAMMADI



*Iraj Mohammadi © Private*

"The severe injuries inflicted on my right testicle could have been treated [without removing it] had I been transferred to a hospital within one to three days.

However, unfortunately, because of lack of attention and negligence, I was referred to hospital after 12 days."

Iraj Mohammadi, in an open letter addressed to the UN High Commissioner for Human Rights, dated 27 May 2016.

Iraj Mohammadi suffers from epilepsy. He believes it may have been caused by repeated blows to his head that he says he suffered while held for eight months in solitary confinement by the intelligence services of the Revolutionary Guards in Oroumieh, West Azerbaijan province.

A member of Iran's Azerbaijani Turkish minority, Iraj Mohammadi is serving a 10-year prison sentence on a charge of "espionage". He has always denied the allegation, maintaining that he has been targeted for his contributions to Turkish-language publications in the country of Azerbaijan. Amnesty International understands that he was denied medical care, including access to his medication, after he was transferred in March 2016 from Zahedan Prison in southern Iran to the Central Prison in Tabriz, East Azerbaijan province. Doctors at the Legal Medicine Organization of Iran who have examined him have apparently stated that Iraj Mohammadi requires regular medication and treatment to prevent epileptic seizures that could harm his health.

More recently, a human rights group reported that Iraj Mohammadi had undergone surgery on 18 May 2016 to remove his right testicle, after he was beaten by the wardens of Section 11 in Tabriz's Central Prison and sustained serious testicular injuries. Iraj Mohammadi was subsequently granted a 10-day period of medical leave on 22 May. He was, however, forced to return to prison on 7 June, after the authorities refused to extend the leave.

In an open letter addressed to the UN High Commissioner for Human Rights, dated 27 May 2016, Iraj Mohammadi wrote that he and his family had had to bear the costs of his surgery, leaving them "destitute". As noted, responsibility for prisoners' health lies with the state and the costs of treatment should be borne by it.

A related concern in this relation has been the failure of authorities to provide regular check-ups in order to ensure that the prisoner is receiving the right dose of medication. This can result in serious consequences, as illustrated by the case of prisoner conscience **Afif Naimi** who has suffered recurrent bleeding and loss of

---

[10] The UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Article 1(1). See also N. S. Rodley and M. Pollard, "Criminalisation of torture: state obligations under the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment", *European Human Rights Law Review* (2006) p.120.

consciousness, resulting in his frequent hospitalization because the authorities have failed to ensure that the dose of his medication is carefully monitored and adjusted (see section 2.3. above).

**HOSSEIN RAFIEE**



*Hossein Rafiee @ Private*

Another prisoner of conscience facing such neglect is Hossein Rafiee, a 71-year old retired university professor who is serving a six-year prison term in Section 8 of Tehran's Evin Prison, which is severely overcrowded, poorly ventilated, infested with insects and does not have enough beds and toilets.

His family have said that he is not receiving regular medical check-ups for his various health problems, raising concerns that he is not receiving the right dose of medication for his high blood pressure and heart condition.

# 2.5. GENDER-SPECIFIC ABUSES

Information received by Amnesty International suggests that women political prisoners, at least in Tehran's Evin Prison where Amnesty International has been able to research the situation, face additional layers of gender-specific abuse when seeking access to medical care. Amnesty International understands that, as of April 2016, the prison clinic there was entirely staffed by male doctors and nurses; there were apparently a few female administrators working in the clinic until mid-afternoon and one of them appeared to have received basic training in administrating injections and electrocardiogram (ECG) tests, but none of them had a professional medical background. On several occasions, women prisoners, who have experienced heart problems in the evening or at night, have been denied emergency ECG tests because the prison authorities have insisted that these tests must be carried out by female staff as patients are required to remove garments covering their chests.

Prison authorities have also failed to ensure that women prisoners with urgent health problems are transferred out of their cells on stretchers by professional medical staff. The justification given by the prison authorities is that it is inappropriate for the medical staff, who are all men, to enter the women's ward due to Shari'a (Islamic law) considerations barring contact between men and women.

When women prisoners have complained to the prison authorities regarding these practices, they have been told that "Evin Prison is only for men". They have been further threatened that, if they continue complaining, they will be transferred to Gharchak Prison, in the city of Varamin, Tehran province, where women convicted of serious non-political crimes are held in extremely poor conditions.

The male-dominated nature of the prison clinic has apparently made women prisoners vulnerable to sexual slurs and innuendos by the clinic staff. It has also placed them under immense pressure to observe mandatory "veiling" regulations; women prisoners are believed to be frequently harassed for showing strands of hair under their headscarves, including by being yelled at and threatened with disciplinary penalties.

# 3. 'CONFESSION' AS A PRECONDITION FOR MEDICAL CARE

> **"In early February 2016, the intelligence officials again came and asked Zeynab to give videotaped confessions. They said that, if she did so, they would not only reduce her sentence but also take her to a doctor. Zeynab replied, 'If you want to trade with me in this way, I neither want to see a doctor nor have visits with my family'…"**

Deniz Jalalian, Zeynab Jalalian's sister, February 2016

Iranian authorities have a track record of airing forced "confessions" and statements of "repentance" by political prisoners on state-run television and media outlets.[11] Amnesty International's research shows that security and intelligence officials, including from the Ministry of Intelligence and the Revolutionary Guards, have in some cases prevented access to medical care for detainees and prisoners, barred their transfer to hospital or blocked permission for medical leave, for the purposes of punishment or to elicit "confessions". In such cases, the officials have typically made health care conditional on prisoners giving videotaped "confessions" or writing statements of "repentance" (*tobeh*).

Attempting to obtain a "confession" as a condition for medical treatment violates the absolute prohibition of torture and other cruel, inhuman or degrading treatment or punishment. Obtaining a confession is explicitly mentioned in the definition of torture within the UN Convention against Torture and Other Cruel, Inhuman or

---

[11] See, for example, Amnesty International, Urgent Action, *Iran: Juvenile offender Saman Naseem threatened* (Index: 13/3645/2016), 15 March 2016, available at www.amnesty.org/en/documents/mde13/3645/2016/en/; Amnesty International, Urgent Action, *Iran TV "confessions" breach suspects' rights* (Index: MDE 13/062/2012), 10 September 2012, available at www.amnesty.org/en/documents/mde13/062/2012/en/; Amnesty International, "Reports of latest Ashtiani TV 'confession' in Iran condemned", 10 December 2010, available at www.amnesty.org/en/latest/news/2010/12/amnistia-condena-nueva-confesion-televisada-ashtiani/; Amnesty International, *From protest to prison: Iran one year after the election* (Index: MDE 13/062/2010), 9 June 2010, available at www.amnesty.org/en/documents/MDE13/062/2010/en/

Degrading Treatment or Punishment as a purpose for which the intentional infliction by officials of severe pain or suffering, whether physical or mental, constitutes torture.[12]

## ZEYNAB JALALIAN



*Zeynab Jalalian © Private*

> "The authorities said that they would take her to a doctor if one of her family members was detained [in her place].
>
> Zeynab's father said that he would submit himself for detention [so that] they could send Zeynab to a doctor with a guard.
>
> But they said that her father was too old and someone younger should be offered."
>
> Deniz Jalalian, Zeynab Jalalian's sister, February 2016

Zeynab Jalalian, an Iranian Kurdish woman serving a life sentence on the charge of "enmity against God" (*moharebeh*) in connection with her alleged membership of and support for the Kurdish opposition group, the Party for Free Life of Kurdistan (PJAK), in Khoy Prison, West Azerbaijan province, is at risk of losing her sight due to a lack of specialized treatment for a worsening eye problem that her family believes may have been caused by torture. Zeynab Jalalian, who has been in jail since March 2008, has said that her interrogators repeatedly hit her head against the wall, which apparently fractured her head, causing a brain haemorrhage and vision impairment.

Beside her eye problem, Zeynab Jalalian is also believed to suffer from a yeast infection in her mouth, intestinal and kidney infections, and abnormal uterine bleeding.

The authorities have repeatedly refused to give her access to a specialist outside prison and authorize her transfer to a hospital for urgently needed eye surgery. They have also refused her repeated requests for medical leave. According to her lawyer, some of her requests have been rejected outright while others have been accepted on condition that she makes a videotaped "confession".

She was believed to have refused the requests until May 2016 when she was briefly featured in a state television programme entitled "The Shadow of Terrorism", which denounced the PJAK as a "deadly terrorist group" bent on "brainwashing" gullible youths and children into recruitment and "killing women and children." The programme referred to the reports about Zeynab Jalalian's denial of access to medical care as "a typical propaganda tactic by the terrorist PJAK to take advantage of a victim" who "is being directed toward revival… with the forgiveness and compassion of the state of the Islamic Republic of Iran."

Zeynab Jalian was shown in the programme saying, "The reports about me that I have lost sight, my life is at risk or that I am sick are not true. I have had some medical problems but they have been minor." This account was reinforced with lengthier interviews with the head of Khoy Prison, a prison social worker, and a woman whose face was blurred and introduced as Zeynab Jalalian's cellmate. They claimed that Zeynab Jalalian has had full access to medical care and her eye pain has been resolved with the use of eye drops. The section of the documentary concerning Zeynab Jalalian ended with a short interview with her brother, who said, "I visited Zeynab… and was happy to find that she was healthy."

Zeynab Jalaian's sister has since told Amnesty International that Zeynab Jalalian has retracted the broadcast "admissions" on the basis that they were false. However, due to heavy surveillance, her sister said, Zeynab

---

[12] The UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Article 1(1).

Jalalian has not yet been able to describe to her family the conditions under which she was coerced into giving the video-recorded statement. According to her sister, their brother has also said that the documentary distorted the context of his statement, which he had been asked to make while he was held in detention in early 2016.

Following the broadcast, Zeynab Jalalian's lawyer stated, in an interview with a human rights group, that both her eye condition and her mouth infection were worsening and the basic treatment provided in the prison clinic was insufficient, as she required surgery in a hospital outside prison. Her lawyer added that her requests for medical leave continue to be rejected without reason.

### SAYED HOSSEIN KAZEMEYNI BOROUJERDI



Sayed Hossein Kazemeyni Boroujerdi © Private

Prisoner of conscience Sayed Hossein Kazemeyni Boroujerdi, a dissident cleric serving an 11-year sentence in Tehran's Evin Prison for peacefully expressing his religious beliefs, has serious medical conditions, including heart, kidney and respiratory problems, osteoporosis (a disease in which the bones become porous and liable to fracture), and loss of vision. He has also been complaining of symptoms associated with Parkinson's disease, including muscle cramp, pain and limping, but he has not received any diagnostic tests.

Over the course of his decade-long imprisonment, the Special Prosecution Office for the Clergy has repeatedly blocked his request to access specialized medical care outside prison, apparently setting "repentance" as a precondition for allowing him potentially life-saving treatment. As a result, his health has progressively deteriorated.

Amnesty International understands that the prison authorities have also, on many occasions, refused to give him the heart medication, painkillers and vitamins that his family had brought in for him.

On 19 January 2016, Sayed Hossein Kazemeyni Boroujerdi was taken to the prison clinic as he was suffering from recurring stomach pain, nausea, vomiting and dizziness. It appears, however, that prison officials returned him to his cell the same day without providing him with adequate medical care. The next day he fell down a flight of stairs, hurting his abdomen and legs. It is feared that no treatment was provided for his injuries.

# 4. ABUSED AND BETRAYED BY MEDICAL PROFESSIONALS

Information received by Amnesty International suggests that medical professionals working in prisons are also sometimes complicit in the abuse of political prisoners.

The most common grievance voiced by prisoners is that doctors are overwhelmingly inclined to downplay or outright dismiss the seriousness of their medical problems.

> **"When I went to the doctor to discuss my kidney problems, he did not conduct any physical examinations. He simply said that there was nothing wrong with me and I was just having sciatic pain. It was only after my release from prison that I realized that my pain was because of a severe kidney infection."**
>
> Former prisoner held in Tehran's Evin Prison, April 2016

The doctors apparently refuse or delay referring prisoners suffering from worsening health problems to hospital, and instead of ordering diagnostic tests and addressing the causes of the prisoners' medical symptoms, they just prescribe painkillers and tranquilizers. On some occasions, this practice has resulted in grave consequences where early symptoms of serious disease have been missed or prisoners' body parts or organs have been damaged beyond repair.

Another concern voiced by political prisoners interviewed by Amnesty International was that some doctors speak to prisoners in an aggressive or abusive manner and subject them to mocking laughter, ridicule, stares, taunting and threats of violence. These attitudes and behaviours are believed to have caused some prisoners so much distress that they have actually postponed or avoided seeing the prison doctors for as long as they could.

> **"When I would tell the doctor that I had vomited blood, he would say, 'You are just being delusional'… [He] also used to laugh mockingly."**
>
> Former prisoner held in Tehran's Evin Prison, April 2016

## FARHAD ATLASI



*Farhad Atlasi before his imprisonment © Private*

Farhad Atlasi, a former employee of Iran's Ministry of Foreign Affairs, who is serving a 10-year prison sentence in Tehran's Evin Prison on the charge of "collaborating with a hostile state", was transferred to hospital on an emergency basis on 2 June after he suffered a heart attack. The diagnostic tests that he received following his hospitalization revealed that he apparently had 50 to 60% blockage in one artery, 70% to 80% blockage in another artery, and 90% to 100% blockage in yet another artery.

Amnesty International understands that, since his imprisonment in 2008, Farhad Atlasi had complained of chest pains to the prison doctors on multiple occasions but he was never given a complete heart assessment. Each time, the prison medical staff carried out a simple electrocardiogram (ECG) test and said that his heart was "healthy".

He has said that he was never referred to any heart specialist outside prison to further investigate and follow up on his persistent chest pains and that when he kept going to the prison clinic due to his persistent chest pains, he was accused of "lying" and "faking illness" (*tamaroz*).

According to a medical expert interviewed by Amnesty International, had a patient in Farhad Atlasi's situation undergone appropriate investigations and treatment at an earlier time, it is possible that the progression of his coronary artery disease could have been prevented.

The principles of medical ethics outlined in the Istanbul Protocol state: "Doctors have a duty to monitor and speak out when services in which they are involved are unethical, abusive, inadequate or pose a potential threat to patients' health. In such cases, they have an ethical duty to take prompt action as failure to take an immediate stand makes protest at a later stage more difficult. They should report the matter to appropriate authorities or international agencies who can investigate".[13]

In many cases, doctors working in Iran's prisons seem to neglect these duties. For example, Amnesty International has received reports that doctors working in Evin Prison clinic sometimes use medical supplies that have long passed their expiry date or ignore standard disinfection and sterilization procedures for medical instruments and equipment.

Another area where doctors have generally failed to speak out concerns the failure of the prison authorities to provide stretchers for transferring injured or critically ill prisoners from their cells to the prison yard where they are received by ambulances. Amnesty International understands that, in many situations, fellow prisoners are forced to physically carry sick prisoners in their arms out of their cells and into the prison yard. Even when a stretcher is provided, it seems that it is often prisoners, rather than experienced medical professionals, who are left with the responsibility of lifting critically ill prisoners onto stretchers and moving them around. This has led to falls and other accidents resulting in injuries.

---

[13] Office of the High Commissioner for Human Rights (OHCHR), *Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Istanbul Protocol)*, HR/P/PT/8/Rev.1, para. 67, available at www.ohchr.org/Documents/Publications/training8Rev1en.pdf

It bears noting that the Iranian authorities have never invoked budgetary constraints to justify these glaring examples of failure to respect and protect the right to health of prisoners. On the contrary, they have frequently claimed that prisons in Iran are "highly advanced" in terms of respecting prisoners' rights. The Head of Iran's State Prison Organization, Asqar Jahangir, for example, stated in a March 2016 media interview that "Iran's prisons are not only unique in the Middle East but are also fairly unsurpassed in the world. With a view to promoting prison standards… medical care is provided to all prisoners."

Beyond failing to speak out, Amnesty International is concerned that medical professionals working in prisons are sometime even complicit in coercing prisoners into silence. One ailing prisoner gave Amnesty International the following account about his distressing encounter with a prison doctor who had long refused to prescribe him medication and approve his case for specialized medical care outside prison:

> **"I was told that the prison doctor would see me only for a few minutes in order to report on my condition. When I entered his office, he was going through my file. He asked a few brief questions about my condition and then began making threats. He said that by writing letters complaining about the condition of the prison clinic, I had in reality slandered the personnel and doctors working in the clinic. He warned that there would be consequences for writing letters criticizing Evin's clinic."**

# 5. ILL AND ILL-TREATED

## 5.1.  EXCESSIVE AND UNNECESSARY USE OF RESTRAINTS

> "For what reason and with what logic… was I handcuffed to the ambulance stretcher and the hospital bed for several hours, which itself led to another seizure? Isn't the use of handcuffs on a patient who cannot even stand on her feet because of recurrent seizures a blatant form of inhuman treatment and torture?"
>
> Narges Mohammadi in an open letter to the Prosecutor General of Tehran, November 2015

Information received by Amnesty International suggests that on many occasions, guards unnecessarily or excessively use restraints such as handcuffs and leg shackles on political prisoners while they are receiving medical care in hospital. These abuses seem to have been for purposes such as punishment, intimidation or humiliation.

International standards prohibit the use of chains, irons or any other instruments of restraint that are "painful or inherently degrading" and restrict the use of other restraints such as handcuffs.[14] Instruments of restraint can only be used as a precaution against escape or when lesser forms of control would not effectively remove a risk that a prisoner would injure him/herself or others or damage property. As soon as the risk posed by unrestricted movement is no longer present, restraints must be removed.[15]

### FARHAD ATLASI

Farhad Atlasi, a former employee of Iran's Ministry of Foreign Affairs who is serving a 10-year prison sentence in Tehran's Evin Prison on the charge of "collaborating with a hostile state", launched a hunger strike on 3 June 2016, in protest at having his hands and legs shackled to his hospital bed following a closed heart surgery. He had been admitted to hospital the day before, after he had suffered a heart attack and lost consciousness, and when he had regained his consciousness, he had found himself bound with chains and shackles. His family told Amnesty International that he found the experience both uncomfortable and degrading. The restraints apparently left bruises on his hands and feet and forced him to lie down on his bed all the time. His family said that he was even taken to the bathroom in chains.

Amnesty International understands that the guards continued to shackle Farhad Atlasi until 5 June, when they finally removed the restraints following widespread media coverage of his case in Persian-language media outlets based outside Iran. He was returned to prison the next day, even though his doctor had advised that patients in his situation should receive post-surgical care for 10 to 15 days after their surgery. His family believes that the reason for his return is because the prison administration, which covered the

---

[14] The Mandela Rules, Rules 47 and 48, available at www.penalreform.org/wp-content/uploads/2015/05/MANDELA-RULES.pdf

[15] The Mandela Rules, Rules 47 and 48.

cost of Farhad Atlasi's hospitalization in this instance, generally seeks to keep the costs associated with the medical care of prisoners to the absolute minimum.

Farhad Atlasi was told by his doctor that he had three blocked arteries and must return to hospital on 5 July to undergo further examinations in preparation for open-heart surgery. He asked the authorities to grant him medical leave so that he could check himself into a better quality hospital and avoid the experience of being shackled once again. As of 4 July, the prosecution authorities had denied his request for medical leave but made informal promises that they would not restrain him and would allow him to wear his own clothes.

> **"I cannot go back to hospital under the conditions [imposed on me last time] which forced me to go on a hunger strike… I am going to write to [the authorities] that I will not go to hospital with handcuffs and leg cuffs, in prison clothes, and without access to a telephone and that the responsibility for whatever will happen to me will rest on them… [The restraints] cause excruciating pain and bruise the hands and feet."**
>
> Farhad Atlasi, June 2016

## OMID KOKABEE



Prisoner of conscience Omid Kokabee, a physicist who is serving a 10-year prison sentence for his refusal to work on military projects in Iran, underwent surgery to remove his kidney on 20 April 2016, after he was diagnosed with advanced kidney cancer.

In the two and a half weeks prior to his surgery, between 4 April and 20 April, Omid Kokabee was shackled by his hands and arms to his hospital bed despite repeated objections by himself, his family and his doctors, who said the restraints caused him physical discomfort and emotional distress, hindered his access to bathroom, and interfered with his medical treatment.[16] The authorities did not, however, agree to remove the restraints until after his surgery, when a picture of Omid Kokabee being chained to his hospital bed went viral, triggering a global wave of outrage and sympathy.

*Omid Kokabee with his lawyer © Private*

Amnesty International has since learned that the picture which was circulated on-line was taken in November 2015 when Omid Kokabee had been hospitalized in Taleghani Hospital in Tehran. Then, the authorities had also shackled his hands and legs to his hospital bed during the initial days of his hospitalization but they had agreed to remove them after 10 days following repeated pleas from his family and lawyer.[17]

Omid Kokabee's diagnosis with cancer came following years of medical neglect in prison, where he had repeatedly complained of kidney and stomach pain but the authorities had refused to grant him medical

---

[16] Omid Kokabee was first hospitalized in Shohaday'e Tajrish Hospital, where he stayed from 4 to 17 April 2016, and then moved to Sina Hospital, where he underwent surgery and stayed until 25 May, when he was released on temporary medical leave.

[17] In that year, Omid Kokabee was hospitalized for a total of three months and 24 days.

leave or transfer him to a hospital with a urology department for specialized testing. During this period, Omid Kokabee had passed kidney stones and found blood in his urine on multiple occasions. Consequently, he had repeatedly gone to the prison clinic but the prison doctors had never adequately examined him and kept prescribing him painkillers instead. He was ultimately allowed to have a sonogram exam on 26 November 2015 in Taleghani Hospital in Tehran, which revealed a large tumour in his right kidney. A subsequent magnetic resonance imaging (MRI) scan on 8 April 2016 established that Omid Kokabee had renal cell carcinoma (kidney cancer).

## 5.2. BEATINGS AND HARASSMENT

International law and standards require that states treat all prisoners with the respect due to their inherent dignity and value as human beings.[18]

Amnesty International has, however, received troubling reports indicating that guards in Iran have beaten, verbally assaulted or sexually harassed political prisoners, including when transferring them to and from hospitals. These abuses seem to have been for purposes such as punishment or intimidation or for reasons based on discrimination, including on grounds of political opinion, religion, ethnicity and legal status.

### RAMAZAN AHMAD KAMAL



*Ramazan Ahmad Kamal © Private*

"I faced brutal and inhuman beatings at the hands of guards in Raja'i Shahr Prison as I was being transferred to hospital on 30 December 2015.

As a result of the blows inflicted on my head with batons and leg kicks, I slipped into coma for six days…

The prison authorities have since denied this incident and claimed that my coma was caused by medication poisoning even though the marks of the beating are still visible [on my body]."

Ramazan Ahmad Kamal in a letter to the UN Special Rapporteur on the situation of human rights in the Islamic Republic of Iran, January 2016

Ramazan Ahmad Kamal, a Syrian Kurd serving a 10-year sentence for "membership of the Kurdistan Workers' Party (PKK)", in Raja'i Shahr Prison in Karaj near Tehran, is in need of surgery for an infection that has partially paralysed his arm. The infection appears to be the outcome of two substandard surgical operations that he received inside prison and the inadequate post-surgical care that followed.

Ramazan Ahmad Kamal was transferred to a hospital on 30 December. He was, however, returned after two weeks without receiving the full treatment he needed. The transfer back to prison took place even though prison doctors and the Legal Medical Organization of Iran had apparently advised continued hospital treatment.

Ramazan Ahmad Kamal has said that while being transferred to hospital, prison officials assaulted him including by kicking him on the head and beating him with a baton, resulting in him falling into a coma. He has said that he endured severe bleeding from his nose and ears and sustained bruises.

---

[18] The Mandela Rules, Rule 1(1), available at www.penalreform.org/wp-content/uploads/2015/05/MANDELA-RULES.pdf

Amnesty International understands that he was also cuffed to his bed during his entire stay in hospital.

Ramazan Ahmad Kamal was arrested on 7 July 2008 by Iran's border control guards after he, along with three other member of the PKK, crossed the border from Iraq, allegedly by mistake. He was shot several times during arrest and sustained multiple gunshot wounds in his shoulder, abdomen, and thigh.

# 5.3.  INTRUSION ON PHYSICAL PRIVACY

Amnesty International is also concerned by reports that prison guards accompanying political prisoners to hospital may intrude, with impunity, on the privacy of prisoners undergoing intimate medical examinations. Established standards of medical practice provide that medical examinations must be conducted in private under the control of the medical expert and outside the presence of security agents and other government officials.[19]

With respect to women prisoners, Rule 11 of the UN Rules for the Treatment of Women Prisoners and Non-custodial Measures for Women Offenders (Bangkok Rules) provide that "[o]nly medical staff shall be present during medical examinations" of women prisoners, unless the medical staff or the woman herself request otherwise. In these cases, such staff should be women and examinations must be carried out "in a manner that safeguards privacy, dignity and confidentiality."

### NARGES MOHAMMADI



Narges Mohammadi © Private

"I cannot fathom why security and police officials [referring to female officials in this case] have to be present when a patient is taking a shower or undergoing examinations for which she needs to take her clothes off.

I consider this to be inhuman… and a form of emotional and psychological harassment against a patient when she absolutely rejects it and is even willing to forgo her treatment because of it."

Narges Mohammadi in an open letter to the Prosecutor General of Tehran, November 2015

Prisoner of conscience Narges Mohammadi is a prominent human rights defender who is serving a six-year sentence imposed for her human rights activism in Tehran's Evin Prison. She was recently informed in May 2016 that she had been sentenced to 16 additional years in prison in a separate case also related to her human rights work.

Narges Mohammadi suffers from several medical conditions including a pulmonary embolism (a blockage in the blood vessel that carries blood from the heart to the lungs) and a neurological disorder that can

---

[19] Office of the High Commissioner for Human Rights (OHCHR), *Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Istanbul Protocol)*, HR/P/PT/8/Rev.1, Annex I, para. 6, available at www.ohchr.org/Documents/Publications/training8Rev1en.pdf

result in seizures and temporary partial paralysis. In October 2015, she suffered several seizures which eventually prompted the authorities to allow her to be hospitalized. Her treatment was, however, disrupted as she was returned to prison against her doctor's advice after 17 days.

She subsequently filed a complaint with regards to the degrading and inhumane treatment she received by the prison guards when she was transferred to hospital for examinations, including their refusal to allow her a confidential consultation with her doctors. In response to the complaint, the authorities brought against her a new charge of "insulting officers while being transferred to a hospital".

In her letter of complaint to the Public Prosecutor of Tehran in October 2015, Narges Mohammadi wrote:

"Since I was transferred from Evin to the hospital, I was handcuffed, even when the doctor had to measure the blood pressure. As we entered the room, they immediately bound me to the bed, as a result, I was not able to lie down nor seat comfortably. Because of the nervous tension, my health got worse and worse. No one cared about my protests and appeals. From 11 until 18 October, I was denied any conversation, even with my parents. I was forbidden from going out of my room... The door of the room was closed, so were the curtains."

Narges Mohammadi had begun serving a six-year jail sentence in April 2012, for "gathering and colluding to commit crimes against national security" and "spreading propaganda against the system" through her human rights activism. She was released three months later, after being granted leave from prison to obtain medical treatment for a health condition that caused partial paralysis, which was exacerbated by her imprisonment.

On several occasions throughout her years of imprisonment, prison officials have also withheld Narges Mohammadi's medication from her, putting her health at grave risk.

# 5.4. DENIAL OF MEDICAL CARE FOR TORTURE-RELATED INJURIES

Many of the political prisoners denied medical treatment are suffering from injuries sustained during torture by security and intelligence officials. In many cases, torture-related injuries are left untreated resulting in health problems that are then exacerbated by poor prison conditions and continued denial of adequate care.

Common methods of physical torture in Iran include beatings with cables and other instruments on the back and on the soles of the feet, kicking, punching, slapping and suspension by the arms and legs.

Under international law and standards, whenever a detainee or prisoner makes allegations of torture or other ill-treatment, or there is reason to believe that the individual has been tortured or otherwise ill-treated, the case should be investigated promptly and impartially, including by independent medical experts.

## JABER SAKHRAVI



*Jaber Sakhravi © Private*

Jaber Sakhravi, a member of Iran's Ahwazi Arab minority serving a 12- and-five-month prison sentence on a charge of "enmity against God" (*moharebeh*) in Ahvaz's Sheiban Prison, Khuzestan province, needs medical care for injuries believed to have been caused and/or exacerbated by torture and other ill-treatment. These include kidney pain, bladder pain, and testicular swelling. He also seems to require continuous screening and treatment for a brain tumour that his family says he was diagnosed as having prior to his arrest and is feared to be malignant.

Jaber Sakhravi was arrested in March 2014 and held for about three months in a Ministry of Intelligence detention centre in Ahvaz. A relative of his living outside Iran told Amnesty International that Jaber Sakhravi informed his interrogators from the outset that he suffered from a brain tumour but they paid no attention to his fragile medical condition. Instead, the relative said, the interrogators subjected him to mental and physical torture, which included beatings by electric batons that have apparently left scars still visible on his back and legs.

Toward the end of his detention, Jaber Sakhravi apparently suffered a stroke which has left the right side of his body paralysed. Amnesty International understands that the authorities subsequently transferred him to a hospital but did not allow his family to pay him any visits. Nor did they give the family any information about the name of the hospital where Jaber Sakhravi was held or the treatment that he was undergoing. Jaber Sakhravi was transferred from hospital to Ahvaz's Karoun Prison on 17 June. It was after this time that his family learned about the paralysis on the right side of his body.

A number of human rights groups have reported that Jaber Sakhravi was vomiting and urinating blood for two months after he was transferred to Karoun Prison but was not provided with adequate medical care. Jaber Sakhravi is also believed to suffer, possibly as a result of torture, from progressive vision loss, which may lead to blindness if not properly treated. He has also apparently lost hearing in one ear.

Amnesty International understands that the prison clinic has prescribed Jaber Sakhravi some medicine. He has not, however, been visited by any specialist from outside prison who could further investigate and address his various medical conditions.

The authorities have repeatedly refused his requests for medical leave.

# 6. HUNGER STRIKES AND REPRISALS

Political prisoners suffering from deteriorating health have often felt that they had no choice but to go on hunger strike to compel the authorities to provide them with medical care. The authorities have usually responded with initial indifference followed by half-hearted promises. Sometimes they have transferred the hunger striker to hospital or granted them short-term medical leave, but have then forced them to interrupt their treatment after a brief period and return to prison against medical advice.

> **"Those who go on hunger strikes use this issue as a tool and they are often people who are looking to be placed in the media and want to carve out for themselves a space for [self-]advertising."**
>
> Head of Iran's State Prison Organization, Asqar Jahangir, March 2016

## SAEED HOSSEINZADEH


*Saeed Hosseinzadeh in hospital © Private*

Prisoner of conscience Saeed Hosseinzadeh, a children's rights activist sentenced to five years in prison for his peaceful activism, was forced to interrupt his treatment and return to prison on 11 July after the Office of the Prosecutor refused to extend his medical leave despite doctors' advice.

He had been granted a three-day period of medical leave from Tehran's Evin Prison on 14 March 2016 after he had gone on a 19-day hunger strike to protest against the authorities' refusal to allow him access to medical care.

However, the Office of the Prosecutor subsequently refused to extend his leave and repeatedly threatened to confiscate the property used as a guarantee to secure his release on bail. For several months, Saeed Hosseinzadeh resisted the pressure to return to prison as he needed to be hospitalized intermittently and receive specialized treatment. On 28 June the authorities raided his house, when he was out, and put the

house under round-the-clock surveillance in a bid to rearrest him. Warned of the development, he went into hiding for 10 days in order to ensure that he could collect from his doctor's office a special back brace that he had ordered and his medical certificates, which advise that he must receive a specific type of injection treatment once a week. On 11 July, feeling he had no choice, he presented himself to the Office of the Associate Prosecutor in Tehran, who immediately arrested him and transferred him to Evin Prison. He has since launched a new hunger strike in protest. Amnesty International understands that the Associate Prosecutor of Evin Prison and the prison clinic did not approve his request to take his back brace with him to prison but he managed to do so by making an emotional plea to the prison's inspection officers and wardens.

Saeed Hosseinzadeh suffers from serious medical conditions, including severe scoliosis (curvature of the spine), rheumatoid arthritis (a chronic, progressive disease causing pain, swelling and stiffness in the joints), heart disease and chronic sinusitis (inflammation of the lining of the sinuses).

In December 2015, prison doctors confirmed that the specialized care Saeed Hosseinzadeh needs for rheumatoid arthritis was not available in prison. Two months later, rheumatologists associated with the Legal Medicine Organization of Iran stated that he was unfit to remain in prison. However, the Associate Prosecutor of Evin Prison told Saeed Hosseinzadeh that the Sarrollah Unit of the Revolutionary Guards had blocked his release and the extension of his medical leave, putting him at risk of permanent disability.

## MARYAM NAGHASHZARGARAN



*Maryam Naghashzargaran © Private*

"It does not matter whether or not you end your hunger strike. We have other tasks to attend to."

Maryam Naghashzargaran, describing, in a letter she wrote while on medical leave, how the authorities' initial attitude to her hunger strike had been one of indifference.

Maryam Naghashzargaran, a Christian convert serving a four-year prison sentence at Evin Prison for peacefully practising her religious beliefs, was granted temporary medical leave on 6 June 2016, following a hunger strike that she launched on 26 May 2016 in protest at the authorities' lack of attention to her medical needs and their refusal to grant her conditional release or medical leave.

However, the Office of the Prosecutor refused to extend her medical leave and forced her to return to prison on 27 June, even though her treatment remained incomplete. On 5 July, Maryam Naghashzargaran launched an indefinite hunger strike in protest, which was ongoing as of 15 July. She said that she would continue her hunger strike until the authorities released her. She also said that she would not accept any treatment in the prison clinic because the prison doctor had harassed her and sworn at her the last time she was on hunger strike and accused her of "lying" that she was on a hunger strike.

While on medical leave, Maryam Naghashzargaran wrote a letter describing how the authorities' initial attitude to her hunger strike was one of indifference. In the letter, she wrote that on the fourth day of her

hunger strike, when she had lost consciousness and been transferred to the prison clinic, she received a telephone call from a prison official who told her, "It does not matter whether or not you end your hunger strike. We have other tasks to attend to."

She explained in the letter that the staff in the prison clinic attempted to force-feed her intravenously and, when she refused, "they said with indifference that, from both a religious and legal perspective, this matter is no longer our responsibility." It seems that she then heard them saying, "From now on, whatever happens [to her] is her own business." Maryam Naghashzargaran wrote in her letter that, after this exchange, she lost consciousness again, prompting the authorities to transfer her to hospital on an emergency basis. However, she was returned to prison after several hours, while still in a state of unconsciousness.

Maryam Naghashzargaran seems to suffer from several serious medical conditions. She has a heart problem known as atrial septal defect (ASD) for which she underwent surgery several years prior to her arrest. The problem has since required ongoing monitoring and follow-up with a cardiologist but it appears that, since her imprisonment in 2013, she has not had regular access to such care.


*Maryam Naghashzargaran © Private*

Over the past year, she has also experienced severe numbness in her hands and feet, and chronic pain in her joints. Amnesty International understands that it took several months and multiple rounds of visits to the prison clinic before she was finally examined by a specialist. The specialist provided an initial diagnosis of a herniated disc and arthritis, and advised that she must start receiving physiotherapy immediately. The Office of the Prosecutor, however, refused to comply with the opinion of the specialist doctor and to transfer her to a medical facility outside prison.

Human rights groups have reported that Maryam Naghashzargaran also suffers from several additional health problems, including acute earache, severe anaemia, persistent dizziness, diabetes and dyslipidaemia (abnormal amount of lipids in the blood), all of which seem to have worsened during her imprisonment.

In some cases, even the drastic step of a hunger strike has not moved the authorities to grant access to urgent or specialized medical care. Indeed, some prisoners have faced threats or reprisals for staging such protests. Families of prisoners who have spoken out against the ill-treatment of their loved ones have also sometimes attracted the wrath of the authorities.

## ALIREZA RASOULI



*Alireza Rasouli © Private*

**"When my requests for medical treatment were repeatedly refused by the authorities, I had no recourse but to go on a hunger strike…**

**"In doing so, I did not have the slightest intention of causing unrest…**

**"My fellow prisoners joined the hunger strike in solidarity, only after they saw the authorities' lack of response to my request for medical treatment and the [consequent] worsening of my physical condition and without me ever asking them."**

Alireza Rasouli, in a letter to the head of the Court of Appeal in West Azerbaijan province, September 2015

Prisoner of conscience Alireza Rasouli is a member of Iran's Kurdish minority who has been sentenced to a three-and-a-half year prison sentence for "gathering and colluding to commit crimes against national security". He was arrested in February 2013, two months after he participated in a peaceful protest against the Ministry of Education over the dire situation of a dozen young children who sustained severe burns after a fire involving a kerosene heater broke out in their primary school in the village of Shinabad, in the Central District of Miandoab County, West Azerbaijan province. Held in Mahabad Prison, West Azerbaijan province, he suffers from osteonecrosis (a bone disease) of the leg. The disease has progressed considerably because it was untreated, leading to severe knee and hip pain, and restricted mobility. He needs surgery outside prison to relieve the pain and prevent potentially permanent joint damage.

Alireza Rasouli has staged three hunger strikes in protest at the authorities' refusal to provide him with medical care. During the first two, in 2014, the authorities transferred him to a hospital and apparently promised that he would be operated on once he ended his hunger strike and regained strength. The surgery did not happen. When he started his third hunger strike on 30 May 2015, the authorities transferred Alireza Rasouli to solitary confinement and kept him there until 29 June when he ended his hunger strike. During this period, the authorities withheld the medication and orthopaedic footwear provided by his family.

While on hunger strike, the authorities also interrogated Alireza Rasouli on fresh charges of "spreading propaganda against the system" and "gathering and colluding to commit crimes against nationality security", including through staging hunger strikes "at the behest of foreign opposition groups." Alireza Rasouli was convicted of these charges in September 2015 and sentenced to three additional years in prison.

**"Given my lack of access to medical treatment, which has led my health to deteriorate severely, I have repeatedly asked for medical care from the competent prison authorities, and I have made this request as a human being, based on the right… granted to all prisoners… and without any ill-intention or recourse to violence. However, regrettably, they [the prison authorities] have been always merciless to me and refused all my requests for medical treatment. The question now is, when all lawful avenues for demanding the religious and legal rights granted by law to this humble prisoner have been closed, how and what other better, lawful way should I have tried in order to receive a response to my legitimate requests?**

"When my requests for medical treatment were repeatedly refused by the authorities, I had no recourse but to go on a hunger strike… In doing so, I did not have the slightest intention of causing unrest… my fellow prisoners joined the hunger strike in solidarity, only after they saw the authorities' lack of response to my request for medical treatment and the [consequent] worsening of my physical condition and without me ever asking them.

"I consider it unlawful… and unjust… to be accused of the serious charge of colluding against the internal and external national security of the country when I have spent nearly four years in prison [despite] my severe health condition and my deteriorating illness and have had no access to the [world] outside prison. "

Alireza Rasouli, in a letter to the head of the Court of Appeal in West Azerbaijan province, September 2015

## HOSSEIN RONAGHI MALEKI'S PARENTS



"They have repeatedly put us under pressure and said that we should not do media interviews. But how can we accept that?

When they first took our son to prison, he was well and healthy. They made him sick. He lost one of his kidneys.

They trampled on his rights and now they say be silent, don't do interviews, don't speak out. How can we possibly remain silent?"

Hossein Ronaghi Maleki's mother, Zoleikha Mousavi, July 2015

Hossein Ronaghi Maleki and his parents, Ahmad Ronaghi Maleki and Zoleikha Mousavi © Private

Hossein Ronaghi Maleki's parents have been targeted for harassment and intimidation by the Iranian authorities because of their activism on his behalf and told to stop their public campaigning for him. In July 2015, Branch 116 of the Criminal Court in Tabriz convicted Hossein Ronaghi Maleki's father, Ahmad Ronaghi Maleki, of "spreading lies in order to disturb public opinion" and sentenced him to four months' imprisonment. The trial took place without Ahmad Ronaghi Maleki's knowledge and in the absence of both him and any lawyer acting on his behalf. In February 2016, Branch 6 of the Court of Appeal in West Azerbaijan province ruled that, due to his age and poor health, his four-month sentence would be suspended for five years. The court also ruled that, for the period that his sentence is suspended, Ahmad Ronaghi Maleki must attend Friday prayers and provide evidence of his attendance to the Office for the Implementation of Sentences.

# 7. RECOMMENDATIONS

Amnesty International is urging the Iranian authorities to take the following steps:

- Ensure that all individuals in custody receive adequate health care, including prevention, screening and treatment, free of charge and without discrimination on grounds such as legal situation, status or gender;

- Ensure that prisoners who require specialist or any other treatment not available within their prison are transferred, free of charge, to specialized institutions or outside hospitals, whenever such treatment is not available in prison;

- Stop using the denial of timely and adequate medical care as a form of additional punishment against political prisoners, including prisoners of conscience;

- Take all necessary legal, administrative and other measures to prevent, prohibit and punish attempts to obtain "confessions" as a condition for providing medical treatment, which violates the absolute prohibition of torture and other ill-treatment;

- Ensure that officials belonging to security and intelligence agencies, prison staff (including medical staff), the police and the prosecution authorities suspected of deliberately denying medical care to detainees and prisoners or withholding medication for purposes such as coercion, punishment or to elicit "confessions" are investigated and, where sufficient, admissible evidence is obtained, are prosecuted in fair trials;

- Put an end to the unlawful practice of requiring prisoners to pay for their medical treatment, which violates both international law and Iran's own domestic law;

- Ensure that medical decisions concerning the need for ongoing care and observation outside prison and the necessity of release on medical grounds are only taken by the responsible health care professionals and are not overruled or ignored by non-medical authorities;

- Stop the use of bail as a punitive measure to block the release of prisoners who are critically ill and have been deemed by health care professionals to be unfit for imprisonment;

- Ensure that prison medical staff engage with prisoners in professional relationships solely focused on protecting and improving their health, and are held responsible for conducts that contravene international standards or medical ethics;

- Adopt legally binding regulations to restrict the use of restraints such as handcuffs in accordance with international standards, including by ensuring that they are never used in a degrading or painful way, and are used only when necessary and proportionate and are never applied for longer than strictly necessary or as a form of punishment;

- Respect and fulfil the duty to conduct prompt, independent, impartial and effective investigations into all complaints or reports of torture or other ill-treatment, and bring those suspected of criminal responsibility to justice;

- Allocate the financial and other resources necessary to ensure that health services in places of detention include adequate medical, psychiatric and dental care, and are organized in close co-ordination with health services in the country generally;

- Allocate the necessary financial and other resources to ensure humane conditions of detention, in accordance with international standards, including quality nutrition and adequate sanitation and sleeping facilities.

# AMNESTY INTERNATIONAL IS A GLOBAL MOVEMENT FOR HUMAN RIGHTS. WHEN INJUSTICE HAPPENS TO ONE PERSON, IT MATTERS TO US ALL.

CONTACT US

 info@amnesty.org

 +44 (0)20 7413 5500

JOIN THE CONVERSATION

 www.facebook.com/AmnestyGlobal

 @AmnestyOnline

# HEALTH TAKEN HOSTAGE

## CRUEL DENIAL OF MEDICAL CARE IN IRAN'S PRISONS

Iran's prison regulations broadly conform with international law and standards, and if implemented properly, would protect the right of prisoners to receive timely access to medical care. In reality, however, these regulations are flouted in practice and political prisoners, including prisoners of conscience, are denied adequate medical care – a key human right which under international law and standards must not be adversely affected by imprisonment.

The 18 individual cases highlighted in this report, which present only a snapshot of the shocking cruelty suffered by political prisoners who have health problems, demonstrate that the denial of adequate medical care is generally not due to a lack of capacity or incompetence in the Iranian medical system. Rather, there is strong evidence, in all cases, that the denial is a deliberate act by the judiciary, in particular the Office of the Prosecutor and/or prison administrations, and involves in some cases the collusion of prison doctors. In some of the cases, there is also evidence that the denial is being used as a means to extract "confessions" from political prisoners or to intimidate or punish them.

These practices, together with harsh prison conditions such as lack of heating in cold weather, overcrowding, inadequate food and poor sanitation have put many political prisoners at risk of needless death, permanent disability or other irreparable damage to their health.

**Index:** MDE 13/4196/2016
**July 2016**
Language: English

**amnesty.org**

