# EXHIBIT 53

**UNITED**
**NATIONS**

**E**



## Economic and Social Council

Distr.
GENERAL

E/CN.4/2004/3/Add.2
27 June 2003

ENGLISH
Original: FRENCH

COMMISSION ON HUMAN RIGHTS
Sixtieth session
Item 11 (b) of the provisional agenda

**CIVIL AND POLITICAL RIGHTS, INCLUDING THE QUESTION
OF TORTURE AND DETENTION**

**REPORT OF THE WORKING GROUP ON ARBITRARY DETENTION**

**Addendum\***

**VISIT TO THE ISLAMIC REPUBLIC OF IRAN**

**(15-27 February 2003)**

---

\*  The executive summary of this mission report is being circulated in all official languages.  The report itself is contained in the annex to the executive summary and is being circulated in the language of submission and English only.

E/CN.4/2004/3/Add.2
page 2

## Executive Summary

The Working Group on Arbitrary Detention visited the Islamic Republic of Iran from 15 to 27 February 2003 at the invitation of the Government.  This was the first visit under the machinery established by the Commission on Human Rights since February 1996.  The delegation visited a number of prisons, detention centres and police stations in Tehran, Shiraz and Esfahan and met government, legislative and judicial leaders, representatives of non-governmental organizations and families of prisoners.

The report analyses the prospects for reform of the administration of justice, in particular with regard to detention pending trial and visiting rights, and reform of the public prosecution service and criminal procedure.  During the visit the Working Group noted that situations of arbitrary detention were essentially related to infringements of freedom of opinion and expression and many malfunctions in the administration of justice, in particular concerning due process of law, abuse of "solitary confinement", the role of the revolutionary tribunals and clerical courts, the failure to take account of the principle of proportionality in passing sentence, and the consequences of the abolition of prosecutors between 1995 and 2002 on observance of the right to a fair trial.

In its recommendations the Working Group gives priority to the progressive transfer of authority from the revolutionary tribunals and clerical courts to the ordinary courts to reduce the proliferation of judicial decision-making bodies, review of the practice of solitary confinement, the progressive freeing of prisoners of conscience, guarantees of due process and reform of imprisonment for debt.  The Working Group concludes with the hope that the current obstacles to the reforms needed will be removed with a view to strengthening the rule of law.

E/CN.4/2004/3/Add.2
page 3

**Annex**

**CONTENTS**

|  |  | *Paragraphs* | *Page* |
|---|---|---|---|
| Introduction ................................................ | | 1 - 2 | 4 |
| I. | PROGRAMME FOR THE VISIT ............................. | 3 - 11 | 4 |
| II. | INSTITUTIONAL AND LEGAL FRAMEWORK FOR DETENTION ........................................ | 12 - 28 | 5 |
| | A. Institutional framework ........................ | 12 - 14 | 5 |
| | B. Legal framework ................................ | 15 - 28 | 5 |
| III. | EFFORTS NOTED AND DIFFICULTIES ENCOUNTERED IN COOPERATING WITH THE WORKING GROUP ............ | 29 - 33 | 8 |
| IV. | PROSPECTS FOR REFORM ...................... | 34 - 40 | 10 |
| V. | SITUATIONS OF ARBITRARY DETENTION NOTED AND THEIR CAUSES ................................ | 41 - 62 | 13 |
| | A. Arbitrary detention related to recurrent infringements of freedom of expression ..................... | 42 - 47 | 13 |
| | B. Arbitrary detention related to malfunctions in the administration of justice ................. | 48 - 62 | 14 |
| VI. | CONCLUSIONS ................................. | 63 - 64 | 17 |
| VII. | RECOMMENDATIONS ............................. | 65 - 69 | 19 |

E/CN.4/2004/3/Add.2
page 4

## Introduction

1.     On 24 July 2002 the Government of the Islamic Republic of Iran announced that it was issuing a standing invitation to all thematic mechanisms of the Commission on Human Rights. In a letter dated 23 October 2002 the Permanent Representative stated that his Government had decided to invite the Working Group to visit the Islamic Republic of Iran.

2.     The visit took place from 15 to 27 February 2003.  The delegation comprised Mr. Louis Joinet, Chairman of the delegation and Chairman-Rapporteur of the Working Group, and Ms. Leïla Zerroügui, Vice-Chairperson of the Working Group, as well as the Secretary of the Working Group, an official from the Office of the United Nations High Commissioner for Human Rights and two interpreters from the United Nations Office at Geneva.  It should be noted that the visit by the Working Group was the first by a thematic mechanism of the Commission since 1996, when the Special Rapporteur on freedom of religion or belief (formerly called the Special Rapporteur on religious intolerance) visited the country.  The visit by the Working Group was also the first mission to the country by a Commission mechanism since February 1996, the date of the last mission by the Special Representative of the Commission on Human Rights on the situation of human rights in the Islamic Republic of Iran, Mr. Maurice Danby Copithorne.

## I.  PROGRAMME FOR THE VISIT

3.     The delegation twice visited Evin prison in Tehran, Esfahan and Shiraz prisons, the Shiraz military prison, the main police station in Tehran and police stations in Shiraz and Esfahan.

4.     The Working Group met senior officials from the executive, legislative and judicial branches on a number of occasions, including the Deputy Head of the Judiciary for International Affairs, the Vice-President of the Supreme Court for International Affairs, the chief administrative officer of the judiciary in Tehran, the Deputy Minister of the Interior for Security, the Governor-General of the province of Esfahan, the Governor-General of the province of Fars, the Director-General for Legal and International Affairs of the Ministry of Foreign Affairs, the members of the Supreme Council for Judicial Reform, the President of the second division of the Special Clerical Court, the Vice-President of the Revolutionary Tribunal, the Director of the National Prisons Office, and the Commander of the Police Force of the Islamic Republic of Iran.

5.     The delegation also held working meetings with the Islamic Human Rights Commission, the Article 90 Parliamentary Commission and the Bar Associations of Tehran, Esfahan and Shiraz, non-governmental organizations and prisoners' families.

6.     Throughout the mission the Working Group enjoyed the full cooperation of the Government regarding access to prisons and holding cells in police stations.

7.     The Working Group wishes to thank the authorities for their full cooperation during the visit, as well as the United Nations Development Programme and the United Nations Information Centre in Tehran for its assistance and its substantive and logistical support.

8.      The Working Group adopted this report at the 7th meeting of its thirty-sixth session.  In accordance with paragraph 5 of its revised methods of work, the Iranian member of the Working Group did not take part in its deliberations.

9.      For 14 years, starting in 1984, the Commission designated a so-called "geographical" special representative to make a thorough study of the human rights situations in the Islamic Republic of Iran.  From 1997 on, i.e. for a little over six years, in a reaction to the creation of this procedure, the two successive Special Representatives, Mr. Reynaldo Galindo Pohl and Mr. Maurice Copithorne, were no longer permitted to visit the country.

10.      Taking into consideration this impasse, the Iranian authorities finally took the initiative in cooperating with the Commission by issuing a standing invitation in 2003 to all those responsible for thematic mechanisms.  It is in this context that the Working Group's visit took place.

11.      This report will consider:

The institutional and legal framework for detention (II);

Efforts noted and difficulties encountered in cooperating with the working group (III);

Prospects for reform (IV);

Situations of arbitrary detention noted and their causes (V).

## II.  INSTITUTIONAL AND LEGAL FRAMEWORK FOR DETENTION

### A.  Institutional framework

12.      The President of the Islamic Republic of Iran, head of the executive but not Head of State, is elected by universal suffrage for a four-year term, renewable once only.  He chairs the Council of Ministers.

13.      The Head of State is the Supreme Leader of the revolution.  He is elected for life by an 86-member college of religious experts who, in turn, are elected by direct universal suffrage.

14.      Legislative authority lies with a unicameral chamber of 290 representatives elected by universal suffrage.  Candidates must have previously been endorsed by the Council of Guardians, comprising 12 members responsible for monitoring compliance of legislation with the Constitution and Islam.  The Council has a veto.  In the event of conflict between Parliament and the Council of Guardians, the dispute is arbitrated by the Council on the Higher Interest of the Regime, comprising some 30 members appointed by the Supreme Leader.  Hence the absolute pre-eminence of the authority of the Supreme Leader over the head of the executive and the legislative and judicial branches.

### B.  Legal framework

15.      Since its Islamization the Iranian legal and judicial system has been heavily influenced by Shariah laws and norms.  Under the system the conception of justice is rooted in Islamic law,

E/CN.4/2004/3/Add.2
page 6

conceived of and practised at a time when the norms of due process, as defined in contemporary international law, were neither known nor applied. For example, the principle of separation of authority for prosecution and judgement, the authority of res judicata, the prohibition of discrimination on the basis of sex, religion or nationality, the prohibition of the use of certain sanctions which today are comparable to torture or cruel, inhuman or degrading treatment. That explains why, as observed by the Working Group, the legal framework for detention, as applied in the Islamic Republic of Iran, has significant shortcomings with regard to international principles and norms. Thus, the role of counsel - fundamental in a State subject to the rule of law - is secondary in the administration of justice.

## 1.  Code of Criminal Procedure

### (a)  Procedure applicable in prosecution, committal proceedings and sentencing

16.     Under article 32 of the Constitution, "no one may be arrested other than in accordance with the procedure laid down by law. In case of arrest, charges with the reasons for the accusation must, without delay, be communicated to the accused in writing, and a provisional dossier must be forwarded to the competent judicial authorities within a maximum of 24 hours so that the preliminaries to the trial can be completed as swiftly as possible".

17.     In practice, most of the individuals visited by the Working Group were prosecuted and sentenced during the seven-year period in which the prosecution service was suspended. Prosecution was subject to authorization by the National Security Council (Code of Criminal Procedure, art. 15). Prosecutors were ultimately reinstated at the end of 2002, a development welcomed by the Working Group.

### (b)  Due process of law

18.     During committal proceedings, counsel may be present, but may not speak until the end of the proceedings. In "sensitive" cases, the judge has the discretionary authority to exclude counsel from the hearing for sentencing (Code of Criminal Procedure, art. 128).

### (c)  Public trials

19.     The judge may refuse a public trial if it seems incompatible with "accepted principles of morality or public order" (Constitution, art. 165) and proceedings in camera are conducted when the charges relate to national security or if a public trial "would offend the religious sentiments of the people" (Code of Criminal Procedure, art. 188). Thus, following a series of political assassinations and kidnappings resulting in the disappearance of opposition figures in the second half of 1998, the military court trying the Ministry of the Interior agents involved met in camera, so that the victims were not able to attend the hearings. It will be noted that under article 168 of the Constitution political and press offences are to be tried openly in courts of law in the presence of a jury.

### (d)  Rules of evidence

20.     The rules of evidence are based on the constitutional principle of the presumption of innocence (art. 37). Their scope is however limited in practice by the importance attached to confession, to the "satisfaction of the judge" - comparable to "reasonable certainty", and to

evidence by witnesses.  The latter point is all the more disquieting since evidence by a man is equivalent to that of two women.  Moreover, in establishing the existence of certain offences (adultery, theft, homosexuality, lesbianism, corruption, etc.), testimony by women alone or given jointly with just one man cannot be accepted as evidence (arts. 119, 74, 75, 76, 199).  It should be noted that the use of torture "for the purpose of extracting confessions or acquiring information is expressly forbidden" by the Constitution (art. 38).

**(e)      Appeals**

21.      Under article 232 of the Code of Criminal Procedure judgements by ordinary courts and revolutionary tribunals are final, and are not subject to appeal on points of law.  However, in the event of a sentence to the death penalty or to stoning, a sentence under lex talionis, a flogging, confiscation of an asset worth more than 1 million rials, a term of imprisonment longer than three months or a fine of more than 500,000 rials, appeal is possible.  It should be noted that appeals against decisions of religious courts are still more restricted.

**(f)      Res judicata**

22.      If a judge considers that his decision is flawed or that he is not competent, he may refer the case to a higher court for appeal or annulment (Code of Criminal Procedure, art. 235).  As there is no time limit for proceedings, this right accorded the judge generates legal insecurity, which results in inconsistency or arbitrariness, as noted by the Working Group.

## 2.  Islamic Penal Code (Islamic Punishments Act)

23.      Iranian criminal law comprises three categories of offence:  crimes for which punishments and sentences are determined and specified in Shariah, crimes infringing on the rights of society and public order, and crimes violating the rights of natural persons and/or legal entities (Code of Criminal Procedure, art. 2).

24.      Crimes and offences under the Islamic Penal Code fall into three categories, on the basis of the applicable punishments.  There are five punishments for crimes:  *hudud*, *quisas*, *diyah*, *ta'zir* and preventive punishments.

**(a)      *Hudud***

25.      This body of criminal law is based on a comparison of crimes and offences with sin as an offence against divine law.  Proceedings against perpetrators of these offences are initiated by the president of the court even if no complaint is made (Code of Criminal Procedure, arts. 3 and 4).  Applicable punishments are:  the death penalty; crucifixion; stoning; amputation of the right hand and, for repeat offences, the left foot; flogging; imprisonment and exile.  By way of example, the death penalty is applicable in the following instances:  fornication involving a non-Muslim man and a Muslim woman (art. 82) and fornication by a single person involving a fourth act (art. 90), the three previous offences being punishable by 100 lashes of the whip (art. 110); homosexuality (art. 179); and consumption of alcohol as a third offence, the punishment for the earlier offences being 80 lashes of the whip.  *Hudud* is also applicable to "apostates and corrupters" (art. 190) and perpetrators of theft (art. 201) committed under the circumstances provided for in article 198.  Sixteen conditions must be met for the following

sentences to be carried out:  amputation of the right hand, and for repeat offences, the left foot, for the third instance of theft, life imprisonment, and the death penalty for multiple repeat offenders; for the corrupter, four punishments are applied:  death; crucifixion; amputation of the right hand, and for repeat offences, the left foot; or exile.

**(b)**      *Qisas* **and** *diyah*

26.      This body of criminal law is based on the ancient lex talionis.  Proceedings against the life or physical integrity of the person are subject to the decision of the victim, who may ask for the guilty party to suffer the same treatment as he or she suffered or accept financial compensation (*diyah*) in cases of murder (blood money) or physical injury.  In the absence of agreement between victim and perpetrator, *diyah* is calculated on the basis of a predetermined scale, with *diyah* for a woman being assessed at half that for a man.  This same highly discriminatory principle is also applied to the three religious minorities recognized under the Iranian Constitution.

**(c)**      *Ta'zir*

27.      *Ta'zir* is defined in article 16 as "a punishment the nature or limits of which are not defined in Shariah law but which are left to the discretion of the religious judge and which may be imprisonment, fine or the lash (…)".

**(d)**      **System of preventive punishments**

28.      In this category article 17 of the Islamic Penal Code provides for:  imprisonment in the form of detention pending trial, fines, loss of civil rights, house arrest, banishment order, closure of commercial premises, and withdrawal of authorization to carry out a profession or activity.  Under the article these measures have an interlocutory character pending trial.  As such they are at the discretion of the competent judges and courts, without there apparently being any specific guarantees.

### III.      EFFORTS NOTED AND DIFFICULTIES ENCOUNTERED IN COOPERATING WITH THE WORKING GROUP

29.      The Working Group, aware that its visit was taking place after a long interval in cooperation with international mechanisms, expected some misgivings.  In fact, some weeks before the arrival of the Working Group and despite the invitation issued by the Government, a senior representative of the judiciary expressed hostility towards the Government's initiative, denying the news that a group of special rapporteurs was to travel to the Islamic Republic of Iran to visit prisons (Islamic Republic News Agency, 20 February 2003).

30.      It is not unusual, in visits by the Working Group, for its working methods to be accepted only reluctantly at first, inasmuch as they imply, in particular for junior and mid-level officials, a sea change in outlook when they realize, as was the case on our arrival, that:

We ourselves have chosen the prisons to visit;

We ourselves have selected the prisoners to be interviewed, including some on the basis of evidently "sensitive" lists, mostly on a random basis and in situ;

We select the place of interview at the last moment, out of the field of view of surveillance cameras, with frequent changes of venue;

Lastly, and this is the most difficult aspect to have accepted, the interviews take place using our own interpreters and without any witnesses, staff being invited to leave the quarters visited.

31.     Apart from two incidents, one on a visit to sector 209 of Evin prison (see below), the other during a visit to a women's prison where a guard, quickly detected by the Working Group, attempted to pass herself off as a prisoner, which led to a formal protest by the Chairman-Rapporteur, for the most part the Working Group is pleased to note that these rules were respected.  The Group was even able to conduct an unannounced visit to Shiraz military prison, which, with very few exceptions, is refused in most countries.  So as to pre-empt any risk of manipulation that might tarnish the willing cooperation displayed by the authorities, the Working Group, whenever possible, drew up a plan of each prison to be visited on the basis of accounts by former inmates in exile and obtained photographs of most of the political prisoners it intended to interview.  This wise precaution made it possible for the Working Group to refute rumours of hidden places of detention in the prisons visited and of prisoners being substituted.  In terms of access to prisons and prisoners, the Working Group thus considers that cooperation by the authorities was on the whole positive.

32.     The difficulties encountered concern:

        (1)     **Relations with families of prisoners**.  While the Working Group was able to arrange meetings at its hotel without difficulty with two delegations of families of Iranian prisoners of war imprisoned in Iraq during hostilities, that was not so for family members of political prisoners held in the Islamic Republic of Iran.  Some examples:  one of the few people met at the hotel was later questioned by the police and his identity card was confiscated; while the Working Group was visiting the provinces, on several occasions groups of families meeting near the hotel in Tehran were dispersed and some 20 participants arrested on the ground - according to the authorities - that they had held unauthorized demonstrations.  The Working Group regrets these incidents all the more since, in its view, these are instances of arbitrary detention in that the information received indicates that these people were simply exercising the "right of peaceful assembly" guaranteed under article 21 of the International Covenant on Civil and Political Rights, to which the Islamic Republic of Iran is party.

        On its return to Tehran the Working Group intervened to obtain their release and an assurance that the people in question would not be harassed once the Working Group had left.  The authorities subsequently confirmed that all the individuals had been released and would not be prosecuted.

        (2)     **The question of lists of prisoners**.  The Working Group wishes to recall that it has always interpreted its mandate as applying as much to prisoners under ordinary law as to political prisoners and prisoners of conscience.  While many interviews were held without difficulty with prisoners in the first group, around 140 selected at random, the Iranian authorities insisted that a list should be provided in advance for prisoners in the second category.  On principle, to avoid pressure on the prisoners to be interviewed, the Working Group provided the list only on its arrival at the prison.  The Group ultimately agreed to this derogation on condition

that it did not constitute a precedent.  Owing to a lack of time, of 45 people on this list, 14 were interviewed.  Accordingly, in a letter dated 6 March 2003, the Working Group requested the Iranian authorities, in the spirit of the good cooperation enjoyed, to provide details of the place of detention and legal status of the 31 other people on the list.  To its great regret, two months later, the Working Group had still not received any reply at the time of adoption of this report.

      (3)    **Visit to sector 209 at Evin**.  Access to this sector is in principle "prohibited". The delegation was finally able to enter the sector, but the visit and interviews of prisoners were cut short under the pressure of two unidentified individuals, apparently belonging to the intelligence service, who, without identifying themselves, firmly requested the delegation to leave, even though the authorization for the visit and interviews with a number of prisoners had just been finally agreed by high-level ministerial representatives, who were with the delegation and thus present in the prison.  The incident was all the more regrettable since it gave the impression, on the one hand, that there was something to hide, and, on the other hand, that a secret service agent had obstructed the will of senior government authorities, which is disquieting for the future of the reforms being prepared.  One positive result, however, was that the Working Group was able to visually verify the existence of this "prison within a prison" through which most of the prisoners, in particular political prisoners, interviewed by the Group had passed.

33.    The Working Group was informed by former prisoners in exile of a prison known as No. 59, located in Tehran on the Vali Assr-e des Pasdaran base.  The Group was unable to visit it owing to a lack of time.  These reports indicate that a number of opposition figures have allegedly been held in that prison in prolonged solitary confinement.

## IV.  PROSPECTS FOR REFORM

34.    The judicial authorities recognize the need for reform and assert that reform is a central concern for them.  The Working Group held a meeting with the Supreme Council for Judicial Reform, responsible for reform of the system of justice.  The Council comprises judges and academics working on an ongoing basis to strengthen, according to our interlocutors, respect for human rights in the administration of justice and to bring the Iranian judicial system and legislation into line with international standards.  Also according to our interlocutors, the legal and judicial systems of over 40 countries have been studied in preparing the proposed reforms. It is this council that formulates and has formulated draft legislation on reinstatement of the prosecution service, the system of juvenile justice and the application of alternative sentences instead of imprisonment.  The Council is currently preparing a reform of criminal procedure. The Working Group has asked to be kept informed of this work and proposals for reform, but, to its great regret, has not always received the information promised.  Information collected in situ nevertheless suggests that initiatives on some issues have begun, but, as one member of the Council emphasized, "it is not enough to reform laws, mentalities must change".  Three examples will confirm this:

      (1)    **Detention pending trial and visiting rights**.  In 2000 the Special Representative, Mr. Copithorne, expressed particular regret that a circular by the head of the judiciary concerning the right to family visits was rarely applied.  The point came up with most of the

prisoners met.  It seems that while the situation has somewhat improved in some institutions - at least for ordinary law prisoners - significant difficulties remain in the case of political prisoners, particularly those held in solitary confinement wings such as sector 209 in Evin prison.

(2)    **Reform of the prosecution service**.  In receiving the Working Group, the head of the Tehran judiciary stated that the abolition of prosecutors seven years earlier had been a disaster for the administration of justice.  An amendment to the Code of Criminal Procedure, voted by Parliament and approved by the Council of Guardians on 11 November 2002, has recently reinstituted the prosecution service.  The amendment also provided for a merger of the prosecution function in ordinary courts and in revolutionary tribunals with the aim of ending various inconsistencies.  As it is, the reform has begun to be applied in only three jurisdictions, including Tehran.

(3)    **Reform of the Code of Criminal Procedure**.  The Working Group regrets that the draft text being prepared was not submitted to it.  Information from members of the Supreme Council suggests that the draft would require the presence of a lawyer immediately after arrest, the right for the accused to remain silent, assertion of the exceptional nature of detention pending trial, proportionality between bail and the seriousness of the offence, increased use of alternatives to imprisonment, introduction of the concept of compensatory justice, access to legal aid for accused and victims and codification of the rules for the protection of victims.

35.    As to whether the draft code has any chance of being promulgated as it stands, there is room for doubt in view of the obstacles that must be overcome to bring about reform.

36.    This issue is of great importance for the future of bilateral and multilateral international cooperation, which has meaning only if reform is successful.  The Working Group has noted that, while the initiatives by Parliament relate to political debate itself, its deliberations - and thus reform - are subject under articles 93 and 96 of the Constitution to endorsement by the Council of Guardians.  The Council exercises control over Parliament in two ways:  at a preliminary stage candidacies of deputies must be approved by the Council, whereas at a later stage in proceedings it has the authority to censure Parliament's deliberations, so that no reform can be adopted without its approval.  Thus, several laws embodying international human rights standards have been blocked by the Council of Guardians after having been approved by Parliament (the Majlis).  These include legislation ratifying the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, proposed by 100 deputies and unanimously approved; a law defining various acts of torture, rejected by the Council of Guardians because "certain parts of the law defied judicial authority".  The Majlis noted instances of torture in prison, and stated that confessions obtained by torture were not valid as submissions before a court.  In 2000 the Supreme Leader effectively vetoed draft legislation on guaranteeing the independence of radio and the press, and in 2001 the Council of Guardians prevented the Majlis from reviewing the use of resources and expenditure by institutions under the authority of the Supreme Leader.  The Working Group also regrets that in April 2003 the Council of Guardians rejected a law voted by Parliament providing for equality in *diyah* (blood money to be paid by the perpetrator to the victim or to his or her assigns), to correct the discrimination in favour of Muslims to the detriment of those belonging to the three religious minorities recognized by the Constitution, and which, moreover, seems to completely exclude non-recognized religious minorities and non-nationals.  In other words, while Parliament seems to be independent vis-à-vis the Government, its oversight authority does not extend to the

E/CN.4/2004/3/Add.2
page 12

executive in the broad sense, that is including the Supreme Leader as Head of State. In the Iranian system, the legislative, executive and judicial functions are under the "absolute" authority of the Supreme Leader (Constitution, art. 57). The Council of Guardians, which systematically monitors all parliamentary initiatives, has prohibited Parliament from exercising any control whatsoever over the management of bodies under the direct authority of the Supreme Leader, thereby greatly limiting its oversight authority. This handicap considerably reduces Parliament's influence over political life. This limitation probably explains the name given to it in title II of the Constitution, "Majlis-e-Shura-e-Islami", the official English translation of which is "The Islamic Consultative Assembly". Hence the importance of the emergence of so-called countervailing centres of power. Two were visited by the Working Group:

(a)      **The Islamic Human Rights Commission.**  Originally established by the judiciary, of which it formed part and whose head was an ex officio member, the Commission partially distanced itself after the election of President Khatami. The Commission has offices, inadequate but separate, and has its own budget. In this context, the head of the judiciary, seeing the chairmanship of the Commission elude him, refused to continue to sit, which ultimately strengthened the Commission's autonomy. The most recent summary report of the Commission (available in English), covering the period April 2001-January 2002, reported - and regretted - a number of factors which undermined its credibility:

> "Some citizens have no confidence in the Islamic Human Rights Commission. This is due to the fact that in Iran there are no independent organs for the protection of human rights; they thus doubt that the Commission is independent and think that it is a government body." (report, p. 8);

In the context of its monitoring function the Commission indicated that, of 444 complaints received, 161 (i.e. more than a third) concerned problems attributable to the judiciary, which shows the urgent need for reform, indeed a thorough overhaul, of the administration of justice.

If it is to meet the expectations of Iranians, the Commission must be given greater latitude to increase its autonomy and move towards independence;

(b)      **The Article 90 Parliamentary Commission**.  The Working Group held an important working meeting with the Commission, entrusted under article 90 of the Constitution with investigating and handling individual complaints. Subsequent to complaints, the Commission investigated prisons at which arbitrary treatment occurred.

The aim of the investigation was twofold:  to identify unofficial (secret) prisons and visit them, then induce the ministries concerned to place them officially under the sole authority of the National Prisons Office.

The resultant list shows that prisons are run by several authorities, such as the Ministry of Information, the Army and Military Police Counter-Intelligence Service, the Law Enforcement and General Inspectorate Protection Service, the Pasdaran Counter-Intelligence Service and Military Police, the Bassidj, the Ministry of Defence Counter-Intelligence Service.

Even if, through the efforts of the Article 90 Commission, most of these prisons are gradually being placed in principle under the sole authority of the National Prisons Office, the intelligence services retain an obviously predominant influence, as the Working Group was regrettably able to verify during its visit to sector 209 of Evin prison.

37.     The Working Group requested the Chairman of the Article 90 Commission to send his report, but to date it would appear that he has not been able to accede to this request.

38.     At the end of the meeting, the Article 90 Commission drew the Working Group's attention to the inadequate training of many judges, even though they enjoy considerable authority, and to the inadequate knowledge of their rights of those arrested or detained - as noted by the Group - and lastly to the need to strengthen and make more effective parliamentary immunity.

39.     This last criticism coincides with that made by the Islamic Human Rights Commission in its report.  After being informed of accusations against a certain number of deputies and the verdicts pronounced against them, the Article 90 Commission - in its role as countervailing authority - informed the judiciary of its serious concern at such violations of parliamentary immunity (report, p. 27).

40.     Members of the Article 90 Commission drew the Working Group's attention to "inconsistencies as a result of the proliferation of judicial decision-making bodies" (see below).

## V.  SITUATIONS OF ARBITRARY DETENTION NOTED AND THEIR CAUSES

41.     The Working Group, pursuant to its mandate, focused its activities on the causes and consequences of situations of arbitrary detention in all their forms.  Such situations are essentially linked on the one hand to infringements of freedom of opinion and expression, and on the other to the many problems noted in the administration of justice by the judiciary.

### A.  Arbitrary detention related to recurrent infringements of freedom of expression

42.     In formal terms this fundamental freedom is guaranteed by a series of articles of the Constitution, such as article 23 (freedom of belief), article 24 (freedom of the press), article 26 (freedom of association), article 27 (freedom of assembly and demonstration).  Almost all the 45 prisoners on the list given to the authorities were prosecuted or tried for having peacefully exercised these constitutional rights which, moreover, are guaranteed in articles 19, 21 and 22 of the International Covenant on Civil and Political Rights, which makes their detention arbitrary under category II of the Group's working methods.

43.     In this regard the Working Group regrets that certain judicial authorities deliberately sought to undermine the credibility of the invitation issued by the Government to the Working Group by proceeding, during its visit, to arrest four journalists from the cinema press, followed by the arrest of two of their colleagues, and finally very recently (23 April 2003) a seventh cinema journalist.

44.    According to information received by the Working Group, since the fifty-eighth session of the Commission on Human Rights (March 2002) 18 newspapers have been temporarily closed and/or banned by judicial decisions, including at least 10 reformist newspapers, while with regard to journalists, 12 have been called before the courts or police.  In addition, some 30 reporters are currently in prison or have been sentenced to imprisonment.  To the knowledge of the Group, only two have been set free recently (Mohsen Sazegara after a hunger strike, and Ali Reza Eshraghi, who, for reasons that were not made clear, the Working Group was unable to meet during its visit, although his name was on the list).

45.    Under articles 12 and 13 of the Constitution, Islam is the official religion of the Islamic Republic of Iran, and the religions of the Zoroastrian, Jewish and Christian minorities are the only others recognized.  Article 14 also specifies that the human rights of non-Muslims must be respected.  One grave concern is that followers of the Baha'i faith are continually persecuted.  The Working Group noted in particular during its visit that four of them had been sentenced to very long sentences for "association with Baha'i institutions" (Binham Mithaqi and Kayvan Khalajabadi, held in Evin since 29 April 1989), or for "apostasy" (Dhabihu'llah Mahrami, held at Yazd since 6 September 1995).  The Working Group also visited at Esfahan one of the best known of them, Musa Talibi, 70 years old and imprisoned for the past nine years.  His 10-year prison sentence, commuted to 18 months, was challenged at the time by the prosecutor in the Supreme Court, which referred the case to a revolutionary tribunal.  The tribunal sentenced him to death for apostasy, subsequently commuted to life imprisonment.

46.    During its stay the Working Group was informed of the announcement on radio and television of the release of prisoners aged 65.  This was confirmed by the director of Esfahan prison and by the representative of the judiciary; accordingly the Working Group called for release of Musa Talibi before the fifty-ninth session of the Commission on Human Rights, indicating that this would serve as a test of the willingness of the judiciary to engage in effective cooperation.  Mr. Talibi was ultimately released at the beginning of June 2003, a development welcomed by the Working Group.

47.    Specific corroborative information gathered by the Working Group indicates that the Baha'i community is kept under pressure by the use of revolving arrests for short periods:  the Group has drawn up a list of 23 people who over the past six months have been arrested for belonging to the Baha'i community, then interrogated regarding practice of their faith, and ultimately released.

## B.    Arbitrary detention related to malfunctions in the administration of justice

48.    Ayatollah Hashemi Shahroudi, head of the judiciary, recently stated before senior members of the judiciary that on assuming his duties he had inherited the ruins of the judiciary, and he undertook to make restructuring his priority.  Among the causes of situations of arbitrary detention, the working group has noted the problems indicated below.

### 1.  First cause:  failings in due process

49.    The Working Group was struck by the absence of a culture of counsel, which seriously undermines due process.  This situation is explained in part by the fact that criminal proceedings

in their entirety are, as we have emphasized, concentrated in the hands of a single person since the judge prosecutes, investigates and decides the case.  The Group noted that many ordinary law prisoners have no understanding of the role of counsel and do not request the assistance of State appointed counsel.  The latter are in any event few in number, and largely unmotivated owing to the low pay.  As for choice of counsel by political prisoners, this is increasingly difficult owing to the serious risk of harassment.  The Group has noted that lawyers have been prosecuted or sentenced simply for having, as a legitimate part of their role as defence counsel, drawn the attention of the court to the ill-treatment suffered by their clients or malfunctions in the system of justice.

50.     As an aggravating circumstance, these lawyers have for the most part been tried by revolutionary tribunals, and even, in one case, by a military tribunal, rather than initially being submitted to the authority of the lawyers' disciplinary panel provided for by law.  Hence the recent protest by the Tehran Bar which, apparently unsuccessfully, sought to visit two of its members (Mr. Dadkhah and Mr. Soltani).  In several cases of which the Working Group is aware, lawyers defending colleagues have themselves been arrested.

51.     Another alarming observation:  through an extremely restrictive interpretation of article 128 of the Code of Criminal Procedure and of note No. 3 to the law on the selection of counsel, the revolutionary tribunals - in addition to the fact that they have no constitutional legitimacy - abuse the already questionable authority given them under these instruments to exclude counsel at their discretion from hearings in cases covered by this article, that is, those involving the internal and external security of the State, cases in which their presence is all the more necessary.  This derogation is so serious that it makes these tribunals "special courts".

52.     The Bar Associations fear a further deterioration in due process following recent statements by the highly influential Tehran chief justice that lawyers could no longer enjoy immunity if their behaviour was critical of the system of justice.  This position is firmly contested by the Bar, which emphasizes that it indicates an unacceptable non-separation of power, in that such a decision can stem only from the legislature and not from the judiciary.

53.     The Working Group is particularly concerned by the seriousness of these remarks owing to their likely impact on many judges whose understanding of due process is already inadequate.

## 2. Second cause:  abuse of "solitary confinement"

54.     Solitary confinement covers the generalized use of "incommunicado" imprisonment.  The Working Group, for the first time since its establishment, has been confronted with a strategy of widespread use of solitary confinement for its own sake and not for traditional disciplinary purposes, as the Group noted during its truncated visit to sector 209 of Evin prison.  This is not a matter of a few punishment cells, as exist in all prisons, but what is a "prison within a prison", fitted out for the systematic, large-scale use of absolute solitary confinement, frequently for very long periods.

55.     The Working Group considers that owing to the absence of guarantees such "imprisonment within imprisonment" is arbitrary in nature and must be ended.  All the more so since the Group's observations indicate that:

E/CN.4/2004/3/Add.2
page 16

It appears to be an established fact that the specific use of this kind of detention has allowed the extraction of "confessions" followed by "public repentance" (on television); besides their degrading nature, such statements are manifestly inadmissible as evidence;

Furthermore, such absolute solitary confinement, when it is of long duration, can be likened to inhuman treatment within the meaning of the Convention against Torture. The Working Group has brought this matter to the attention of the competent Special Rapporteur, in that he is also a recipient of the standing invitation issued by the Iranian authorities.

### 3.  Third cause:  role of clerical courts

56.     The Special Clerical Court - not provided for in the Constitution - was established under a directive issued by Imam Khomeini on 15 June 1987 in the context of the revolution.  De facto these special courts seem to be under the ultimate authority of the Supreme Leader.  They have their own prison comprising a special wing at Evin, where the Working Group met, among the 50 or so clerics held, Mr. Hassan Youssefi-Eshkevari, clearly imprisoned for his views.

57.     The Court and its provincial branches are competent *rationae personae* for clerics, regardless of the offence.  According to information provided to the Working Group by judge Salimi, head of the second division of the Special Clerical Court, 92 per cent of cases involve ordinary law offences.  It would appear, without further clarification, that the remaining 8 per cent concern offences relating to interpretation of Shariah, falling, in the view of the Group within the category of crimes of opinion.  These courts, which also lack any constitutional legitimacy, are incompatible with article 20 of the Constitution, which provides for equality of citizens before the law.

### 4.  Fourth cause:  failure to observe the principle of proportionality

58.     In its interviews both with political prisoners and ordinary law prisoners, the Working Group has noted that, in many cases, the length of the sentences handed down is disproportionate to the seriousness of the offence.  There are also manifest disparities from one court to another. Similarly, contrary to the demands of the law, bails set in connection with release are too often out of proportion to low family incomes.  The Working Group encountered, for example, a low-income family whose bail had been set at over 1 billion rials.  The same is often true of *diyah* where the perpetrator of the offence is insolvent.  A further example:  the Working Group noted that despite having completed their terms of imprisonment some people were kept in prison, in some cases for several years, since they were unable to pay the fine and/or damages and interest (*diyah*) demanded by the civil party.  The law provides that imprisonment for debt can last for up to five years.  Women prisoners are penalized by the system, since they are generally from the most disadvantaged sectors, but also because female criminality is often domestic in nature.  The vulnerability of women in prison is all the greater since they are frequently imprisoned for violating legal norms or social rules that regulate their sexuality or relationships with men on a discriminatory basis.

59.     These problems concerning proportionality are largely responsible for overcrowding in prisons.

### 5.   Fifth cause:  Non-respect for procedural formalities
as a guarantee against arbitrary treatment

60.    The Working Group has noted on several occasions that certain decisions, including decisions on release, have been taken orally, without written notification.  Cases include that of four Jews arrested in June 1999 whose legal status the Group was unable to fully clarify owing to this failure to observe formalities.  Their situation was successively represented as:

Temporary release during the visit of the Working Group in the form of prison leave;

Unconditional release (according to one of them), but notified only orally;

According to the Islamic Republic News Agency (15 April 2003) a spokesman for the judiciary, Ghalam Hossein, officially denied that they had been released;

In a letter dated 23 April 2003 the Group accordingly asked for written notification of the decision to be provided and for a copy to be sent to it;

In a note verbale of 6 May 2003 the Permanent Mission of the Islamic Republic of Iran denied the denial by the judiciary and confirmed that they had been released, with the clarification, however, that they had been released on bail.  Despite several requests, no written notification of their release has been sent to the Working Group.

61.    This experience makes it easier to understand why some members of the Article 90 Commission have highlighted the inconsistencies resulting from the proliferation of judicial decision-making bodies.

### 6.   Sixth cause:  Abolition of prosecutors between 1995 and end 2002,
and the consequences for observance of the right to due process

62.    While a recent reform provides for reinstatement of prosecutors, it is nonetheless true that over the period preceding implementation of this reform cases were tried in a manner that is incompatible with the norms guaranteeing the right to due process, including the essential norm on the impartiality of the judge since - as we have emphasized - in each case the same judge acts in succession as prosecutor, then investigating magistrate and lastly sentencing judge.  The Working Group thus considers that this multiplicity of functions is such as to vitiate the right to due process and that account should be taken of this in the context of amnesty laws and pardons.

## VI.  CONCLUSIONS

63.    **The recent increase in cooperation in the form of standing invitations from which the Working Group benefited to conduct its visit to the Islamic Republic of Iran is to be encouraged, on condition, however, that such visits are considered a means not an end, a beginning and not the culmination of a process.  In other words the fact that the Working Group was able to visit prisons transparently and without major hindrances, while very positive, must be evaluated from two aspects.**

64.     **These aspects are:**

        **Cooperation during the visits:  from this perspective the Iranian authorities made every effort to allow the Working Group to conduct its visits in transparency and without major hindrances, which should be highlighted;**

        **Cooperation in terms of the immediate follow-up to the visit:  the situation is more nuanced, as indicated by various recent events subsequent to the Group's visit which it wishes to bring to the attention of the Commission on Human Rights:**

        **(1)     In a letter dated 23 April 2003 the Group requested the Islamic Human Rights Commission to investigate the circumstances in which a riot at Esfahan prison resulted in at least 2 dead and some 10 wounded.  In a letter dated 7 May, the Islamic Human Rights Commission informed the Working Group that, owing to difficulties encountered with the National Prisons Office, it was not able to comply with that request;**

        **(2)     In a letter dated 6 March 2003 the Group asked to be informed of the fate and legal status of the 31 prisoners not visited whose names appeared on the list initially requested by the Government.  To date the Group has not received any reply;**

        **(3)     On 23 May 1996 the Working Group adopted its decision No. 14/1996 and on 29 November 1996 its opinion No. 39/2000 declaring as arbitrary the detention of opposition figure Abbas Amir-Entezam, 70 years old, who had then been released on health grounds a little over a year previously.  The Working Group during its visit met him at some length at his home, and has just been informed that he has again been arrested, in violation of Commission on Human Rights resolution 2003/9 urging Governments to refrain from all acts of reprisal against those who have cooperated with the United Nations;**

        **(4)     Another disappointment for the Working Group:  far from ceasing or even diminishing, persecution of the press has increased.  Since its return the Group has been informed of the arrest or detention of the following journalists:  Abbas Abdi and Hossein Ali Ghazian, visited by the Group in Evin, were sentenced on appeal to four years' imprisonment; Ahmad Zeydabadi was imprisoned in Evin (23 months' imprisonment and 25 years' loss of civil rights); Ali-Reza Jabbari was released on bail on 3 February 2003 and sentenced to four years' imprisonment, a fine, and 253 lashes; and Sina Mottalebi, a cinema journalist, was arrested on 28 April 2003;**

        **(5)     A further regrettable example:  the recent appointment, questionable and questioned, of judge Said Mortazari, a judge at the Administrative Court for the Press, as Attorney-General of Tehran, with the task of reforming the prosecution service.  The appointment was seen as a provocation by the press.  In that connection the Commission on Human Rights will recall, on reading the most recent report by the Special Representative, Mr. Copithorne (E/CN.4/2002/42, paras. 11, 22 and 40), that this judge was responsible for the mass closure in 2000 of newspapers (12 were banned) and for the wave of arrests of journalists and editors, several of whom were visited by the Working Group in Evin.  He is also responsible for the sentencing of academics and intellectuals who on 7 and 8 April 2000 participated in a conference in Berlin on the subject of "Iran after the**

elections", including Akbes Ganji and Ali Afshari, visited by the Group in Evin, and of attorneys Mohammad-Ali Dadkhah and Abdul Soltani, visited by the Group after their sentencing for events relating to the legitimate exercise of their functions as defence counsel;

(6)     Indictment of parliamentarian Akbas Moussari Khoini for having allegedly made false statements to the Working Group against the national interest - which he denied. The Group also formally denied having met Mr. Khoini. The Group simply learned of an interview by him concerning the problems of official and unofficial prisons and their ongoing regularization, further to the investigation by the Article 90 Commission.

## VII. RECOMMENDATIONS

65.     In the light of the foregoing and the observations made, the Working Group makes the following recommendations:

1.     <u>On the reduction of the proliferation of judicial decision-making bodies</u>. It should be recalled that the Article 90 Parliamentary Commission highlighted, in receiving the Working Group, "the injustices and inconsistencies resulting from the proliferation of judicial decision-making bodies". The revolutionary tribunals, one such group of bodies, as well as the religious courts, should be abolished for the following reasons and in the following manner.

Historically the revolutionary tribunals were established essentially to judge "collaborators" with the former regime. There seems to be no rationale for their continued existence. Moreover, since these tribunals have no constitutional basis, their absorption by the ordinary courts would not require reform of the Constitution. A further reason: owing to their jurisprudence, which is extremely restrictive of freedom of opinion and expression on the one hand and of due process and the right to a fair trial on the other, they are responsible for many of the cases of arbitrary detention for crimes of opinion, as noted by the Working Group.

This reform would have the merit of reflecting recent developments: a first stage has just been completed with the reform reinstating the prosecution service by merging prosecutors in the revolutionary tribunals with those in the ordinary courts. From this standpoint this would constitute a second stage in the current modernization of the system of justice sought by the head of the judiciary, Ayatollah Hachemi Chahroudi, who, speaking before senior members of the judiciary in early March 2003, stated that restructuring of the system of justice would be his priority.

A further stage concerning religious courts could be completed in due course to further reduce the proliferation of judicial decision-making bodies. The competence of these courts - which also have no constitutional basis - would be transferred to the ordinary courts. There are two reasons: according to the second division of the Tehran Special Clerical Court, these courts were originally established to prosecute usurpers who, taking advantage of the early confusion in the revolution, styled themselves "clerics". As this

problem is in the past, this special competence no longer seems justified.  These progressive abolitions would also have the merit of restoring respect for article 20 of the Constitution, which embodies the principle of the equality of all citizens before the law and thus before the system of justice.

2.      On the practice of "solitary confinement".  As this practice generates arbitrary situations, plans should be drawn up for the closure of these prisons, retaining only a few punishment cells in each institution for short disciplinary periods of solitary confinement.  In addition, the report of the Article 90 Parliamentary Commission on prisons should be made public or at least debated in Parliament.  The Commission would then be responsible for publishing a list of prisons each year.

3.      On the situation of prisoners of conscience.  These prisoners are punished twice over.  Many of them have, on the one hand, simply peacefully exercised their fundamental right to freedom of opinion and expression and, on the other, have been unable to benefit in most cases from the guarantees which are essential to the right to fair trial, as we have emphasized with regard in particular to the abolition of the prosecution service.  Solutions must be sought to bring about their release in the near term.

With this aim the Article 90 Parliamentary Commission which, as we have seen, has investigated situations of arbitrary detention, could usefully be employed to propose a reformed legal framework.  These releases could be announced on the holding of the next national or religious holiday.

4.      On the right to due process.  Three points should be borne in mind, in the following order of immediacy:

The immunity of counsel in pleading cases must be reaffirmed and expressly guaranteed in a legislative instrument formulated in cooperation with representatives of the Bar;

The active involvement of counsel must be provided for, whatever the nature of the case, starting with the custody or, the very least, the investigation phase, throughout the trial and in the appeals stage;

Access to legal aid must be made more effective.

5.      On imprisonment for debt.  The Working Group has noted that destitute individuals, in particular women without resources, are kept in prison for a period which can extend, according to information gathered in situ, for up to five years for non-payment of a fine or *diyah*.  The Working Group recommends that the Government should accelerate the ongoing reform of alternatives to imprisonment to avoid destitute individuals being subjected to lengthy imprisonment in connection with their insolvency.

66.     These are the principal recommendations made by the Working Group.  The Group wishes them to be taken into consideration by other Special Rapporteurs who may visit the Islamic Republic of Iran and that they be taken into account in the context of various cooperation programmes and the interactive dialogue under way.

67.    **The Working Group appreciates the Government's current efforts to promote substantive reforms.  It hopes that such reforms will be consolidated.  It also hopes that further reforms will be approved so that the legal system will become progressively imbued with the spirit of the Universal Declaration of Human Rights and the provisions of the International Covenant on Civil and Political Rights, to which the Islamic Republic of Iran is party.***

68.    **The Working Group wishes to thank the Government of the Islamic Republic of Iran which has now joined those States which accept the risk of being criticized because they have taken the initiative of cooperating, rather than those which are open to severe criticism because they refuse to cooperate.**

69.    **The Working Group wishes further in particular to thank the senior officials who made every effort to facilitate its visit.  These thanks go also to all the representatives of the authorities who worked unstintingly, including, in some cases, to convince their reticent colleagues.  We wish to commend all of them.**

-----

---

\*  Following the adoption of this report, the Working Group was informed of the following developments which it wishes to bring to the attention of the Commission on Human Rights.

The Council of Guardians has just vetoed two significant pieces of draft legislation aimed at modernizing institutions:  one abolishing the need for the prior endorsement of the Council of Guardians currently required for candidates to elections; the other making effective article 113 of the Constitution, which confers responsibility on the President for guaranteeing the Constitution. More than 100 parliamentarians and religious reformers have challenged these vetoes by making public a petition which analyses the obstacles to the reforms sought by Parliament and calls for a referendum as provided for in article 59 of the Constitution.

The Working Group trusts that these two reforms aimed at strengthening the rule of law will prove successful.