# EXHIBIT 55

You are viewing:

ARCHIVED CONTENT

Information released online from January 20, 2009 to January 20, 2017.

**NOTE:** Content in this archive site is **NOT UPDATED**, and links may not function. External links to other Internet sites should not be construed as an endorsement of the views contained therein.

Go to the current State.gov website for up-to-date information. (http://www.state.gov/)

# U.S. Department of State
Diplomacy in Action

## Iran

Bureau of Democracy, Human Rights, and Labor
2004
February 28, 2005

The Islamic Republic of Iran [note 1] is a constitutional, theocratic republic in which Shi'a Muslim clergy dominate the key power structures. Article Four of the Constitution states that "All laws and regulations…shall be based on Islamic principles." Government legitimacy is based on the twin pillars of popular sovereignty (Article Six) and the rule of the Supreme Jurisconsulate (Article Five). The unelected Supreme Leader of the Islamic Revolution, Ayatollah Ali Khamene'i, dominates a tricameral division of power among legislative, executive, and judicial branches. Khamene'i directly controls the armed forces and exercises indirect control over the internal security forces, the judiciary, and other key institutions. The executive branch was headed by President Mohammad Khatami, who won a second 4-year term in June 2001, with 77 percent of the popular vote in a multiparty election. The legislative branch featured a popularly elected 290-seat Islamic Consultative Assembly, Majlis, which develops and passes legislation, and an unelected 12-member Council of Guardians, which reviews all legislation passed by the Majlis for adherence to Islamic and constitutional principles and also has the duty of screening Majlis candidates for eligibility. Conservative candidates won a majority of seats in the February Seventh Majlis election that was widely perceived as neither free nor fair, due to the Council of Guardians' exclusion of thousands of qualified candidates. The 34-member Expediency Council is empowered to resolve legislative impasses between the Council of Guardians and the Majlis. The Constitution provides that "the judiciary is an independent power"; however, the judicial branch is widely perceived as both corrupt and heavily biased towards conservative elements within the society and against reformist forces.

Several agencies share responsibility for law enforcement and maintenance of order, including the Ministry of Intelligence and Security, the Law Enforcement Forces under the Ministry of Interior, and the Islamic Revolutionary Guards Corps, a military force established after the revolution. A paramilitary volunteer force known as the Basiji, and various gangs of men known as the Ansar-e Hezbollah (Helpers of the Party of God), or "plain clothes," aligned with extreme conservative members of the leadership, acted as vigilantes. Civilian authorities did not fully maintain effective control of the security forces, and there were instances in which elements of the security forces acted independently of government authority. The regular and the paramilitary security forces both committed numerous, serious human rights abuses.

The mixed economy depends on oil and gas for 80 percent of its export earnings. The population was more than 69 million. All large-scale industry is publicly owned and state-administered. Large parastatal charitable foundations ("bonyads"), with strong connections to the clerical regime, controlled as much as a third of the country's economy and exercised considerable influence. The Government heavily subsidized basic foodstuffs and energy costs. Government mismanagement and corruption negatively affected economic performance. The official unemployment rate was approximately 11 percent, although other estimates were higher. Estimated inflation was 15 percent with economic growth approximately 6.5 percent during the year.

The Government's poor human rights record worsened, and it continued to commit numerous, serious abuses. The right of citizens to change their government was restricted significantly. Continuing serious abuses included: summary executions; disappearances; torture and other degrading treatment, reportedly including severe punishments such as amputations and flogging; poor prison conditions; arbitrary arrest and detention; lack of habeas corpus or access to counsel; and prolonged and incommunicado detention. Citizens often did not receive due process or fair trials. The Government infringed on citizens' privacy rights and restricted freedom of speech, press, assembly, association, and religion.

An intense political struggle continued during the early part of the year between a broad popular movement favoring greater liberalization in government policies, particularly in the area of human rights, and certain hard-line elements within the Government and society that viewed such reforms as a threat to the survival of the Islamic Republic. In many cases, this struggle was played out within the Government, with reformists and hard-liners squaring off in divisive internal debates. As in the past, reformist members of Majlis were harassed, prosecuted, and threatened with jail for statements made under parliamentary immunity. In screening for the February Seventh Majlis elections, the Guardian Council ruled approximately 2,500 of the over 8,000 prospective candidates ineligible to run, including 85 sitting reformist deputies; this was one factor leading to conservatives winning a majority of seats.

The Government restricted the work of human rights groups. Violence and legal and societal discrimination against women were problems. The Government discriminated against minorities and severely restricted workers' rights, including freedom of association and the right to organize and bargain collectively. Child labor persisted. Vigilante groups, with strong ties to certain members of the Government, enforced their interpretation of appropriate social behavior through intimidation and violence. There were reports of trafficking in persons.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were reports of political killings. The Government was responsible for numerous killings during the year, including executions following trials that lacked due process.

The law criminalized dissent and applied the death penalty to offenses such as "attempts against the security of the State, outrage against high-ranking officials, and insults against the memory of Imam Khomeini and against the Supreme Leader of the Islamic Republic." Citizens continued to be tried and sentenced to death in the absence of sufficient procedural safeguards.

Exiles and human rights monitors alleged that many of those supposedly executed for criminal offenses in the past, such as narcotics trafficking, actually were political dissidents. Supporters of outlawed political groups, or in the case of the Mujahedin-e Khalq, a terrorist organization, were believed to constitute a number of those executed each year.

In January, security forces killed four persons and injured many others when they attacked striking copper factory workers in the Khatunabad village near Shahr-i Babak (see Section 6.b.).

In February, security forces killed seven persons in post-Majlis election violence in the towns of Andimeshk and Izeh in Khuzestan Province and the town of Firuzabad in the Fars Province.

In August, Iranian media reported that 16-year-old Ateqeh Rajabi was hanged in public for charges reportedly involving her "acts incompatible with chastity." Rajabi was not believed to be mentally competent; she had no access to a lawyer. Her sentence was reviewed and upheld by the Supreme Court. An unnamed man arrested with her was given 100 lashes and released.

In July 2003, an Iranian-Canadian photographer, Zahra Kazemi, died in custody after being arrested for taking photographs at Evin prison in Tehran. After initially claiming that she had died as a result of a stroke, the Government subsequently admitted that she died as a result of a blow to the head and charged individuals involved in her detention. The Government denied Canada's request, based on her son's statement, that Kazemi's remains be sent to Canada for further autopsy and burial. In July, a court acquitted an Intelligence Ministry official accused of her death, and the Government has taken no subsequent investigative or legal action to resolve ambiguities surrounding her death (see Section 4).

Two political activists associated with the outlawed Komala party, Sassan al-Kanaan and Mohammad Golabi, were executed in February and March 2003. Golabi reportedly was tortured while in detention. The opposition Democratic Party of Iranian Kurdistan (KDPI) alleged that the Government executed party member Jalil Zewal in December 2003, after 9 years in prison during which he reportedly was tortured. KDPI member Ramin Sharifi was also executed in December 2003 after his arrest in July 2003. KDPI reported that hard-line vigilante groups killed at least seven other Kurdish civilians during 2003.

The 1998 murders of prominent political activists Darioush and Parvaneh Forouhar, writers Mohammad Mokhtari and Mohammad Pouyandeh, and the disappearance of political activist Pirouz Davani continued to cause controversy about what is perceived to be the Government's cover-up of involvement by high-level officials. Prominent investigative journalist Akbar Ganji, who was arrested in 2000 and sentenced to 6 years in prison for his reporting on the case, remained in prison (see Sections 1.d. and 1.e.). In 2001, the Special Representative for Iran of the Commission on Human Rights (UNSR) also reported claims that there were more than 80 killings or disappearances over a 10-year period as part of a wider campaign to silence dissent. Members of religious minority groups, including the Baha'is, evangelical Christians, and Sunni clerics were killed in recent years, allegedly by government agents or directly at the hands of authorities.

b. Disappearance

Little reliable information was available regarding the number of disappearances during the year.

The Government announced that approximately 4,000 persons--both protesters and vigilantes--were arrested in connection with pro-reform protests in June 2003. As of December, approximately 130 still were detained.

No further information was known regarding the disappearances of Baha'i, Kurdish, and Jewish Iranian prisoners cited in previous Human Rights Reports dating from as early as the fall of the Shah in 1979.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution forbids the use of torture, as does the Law on Respect of Lawful Liberties and Protection of Citizenship Rights adopted in May; however, there were numerous credible reports that security forces and prison personnel continued to torture detainees and prisoners. Some prison facilities, including Tehran's Evin prison, were notorious for the cruel and prolonged acts of torture inflicted upon political opponents of the Government. Additionally, in recent years, government officials have inflicted severe prisoner abuse and torture in a series of "unofficial" secret prisons and detention centers outside the national prison system. Common methods included prolonged solitary confinement with sensory deprivation, beatings, long confinement in contorted positions, kicking detainees with military boots, hanging detainees by the arms and legs, threats of execution if individuals refused to confess, burning with cigarettes, sleep deprivation, and severe and repeated beatings with cables or other instruments on the back and on the soles of the feet. Prisoners also reported beatings about the ears, inducing partial or complete deafness, and punching in the eyes, leading to partial or complete blindness.

On February 28, Judiciary Head Ayatollah Shahroudi issued a directive protecting the rights of the accused and, among other points, instructing police, judicial officials, and security agents to refrain from physical abuse when interrogating suspects. On May 2, the Majlis passed a law based on this 15-point directive in the form of the Bill on Legitimate Liberties and Civil Rights, which the Council of Guardians approved shortly thereafter. However, there is much anecdotal evidence that this law was ignored routinely in practice.

In August, credible international and local NGOs reported the case of a prisoner in the province of Khuzistan who had to have his hands amputated because prison officials had left him hanging by the wrists and then forgot about him.

In August 2003, the Council of Guardians rejected a bill on accession to the U.N. Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. The Majlis amended the bill in late December 2003, reportedly addressing Council of Guardians concerns over the monetary costs of joining the convention, but the council still rejected the revised bill. The Council of Guardians also rejected in mid-2002 a bill passed by the Majlis to end torture and forced confessions.

In July 2002, in an effort to combat "un-Islamic behavior" and social corruption among the young, the Government formed a new "morality" force, referred to merely as "special units" (yegan ha-ye vizhe), to complement the existing morality police, "Enjoining the Good and Prohibiting the Forbidden" (Amr be Ma'ruf va Nahi az Monkar). The new force was to assist in enforcing the Islamic Republic's strict rules of moral behavior. Credible press reports indicated that members of this force chased and beat persons in the streets for offenses such as listening to music or, in the case of women, wearing makeup or clothing regarded as insufficiently modest (see Section 1.f.). While not uniformly enforced, in July, morality police made several raids in shopping centers and shops in northern Tehran, rounding up young women who they determined to be violating the Islamic dress code and confiscating articles of clothing considered immodest.

In February, Mohsen Mofidi reportedly received 80 lashes following a 4-month prison sentence having been convicted of consuming alcohol, owning a satellite dish, and aiding his sister's "corruption" in associating with male companions. He died in a hospital in Tehran shortly after his release.

In March 2003, activist Siamak Pourzand was re-imprisoned after his provisional release in November 2002. After his arrest in 2001, Pourzand was tried in March 2002 behind closed doors and sentenced to 11 years in prison for "undermining state security through his links with monarchists and counter-revolutionaries." Press reports said that he had confessed to his crimes at his trial, but his family claimed that the confession was extracted under duress. Pourzand suffered severe health problems while held incommunicado, reportedly including a heart attack, and was allegedly denied proper medical treatment. As of December, Siamak Pourzand was on leave from prison for medical treatment, his condition a direct result of physical, emotional, and mental abuse during 2½ years of imprisonment (over 12 months of which was in solitary confinement). Despite critical health problems, the Government did not allow him to leave the country for treatment.

In April 2003, Former Deputy Prime Minister and longtime political dissident, Abbas Amir-Entezam was re-imprisoned, after his release in 2002 for medical reasons. Amir-Entezam was reportedly incarcerated for calling for a referendum on whether the country should remain under clerical rule during a speech at Tehran University. He was reportedly a frequent victim of torture in prison resulting in numerous medical problems. He reported having been taken on numerous occasions before a firing squad (see Section 1.e.). During the year, he was released on medical leave until late November, due to

the Government's inability to treat his medical conditions in prison. As of December, he was receiving medical treatment at his home while recovering from back surgery, and his medical leave was extended until early January 2005.

In July 2003, an Iranian-Canadian photographer, Zahra Kazemi, died in custody as a result of a blow to the head (see Section 1.a.).

In November 2003, four men were reportedly sentenced to death by stoning for involvement in kidnapping and rape. In December 2002, the Government officially suspended the practices of amputation and lapidation or stoning--a form of capital punishment for adultery and other crimes, although the law has not been rescinded. Amnesty International (AI) reported at least nine cases of amputation since 2002 and four cases of execution of children.

In mid-September, the Public Relations head of Hamedan Province's Department of Prisons announced that the fingers of a robber were cut off on the order of the public prosecutor's office. In mid-October, an Ahvaz judge upheld the sentence to amputate a young man's right hand, with the sentence subsequently implemented. On November 11, in Sanandaj, a 14-year-old Kurdish boy died after having received 85 lashes based on a judge's ruling finding him guilty of breaking his fast during the month of Ramadan.

Prison conditions in the country were poor. Many prisoners were held in solitary confinement or denied adequate food or medical care to force confessions. After its February 2003 visit, the U.N. Working Group on Arbitrary Detentions reported that "for the first time since its establishment, [the Working Group] has been confronted with a strategy of widespread use of solitary confinement for its own sake and not for traditional disciplinary purposes." The Working Group described Sector 209 of Evin Prison as a "prison within a prison," designed for the "systematic, large-scale use of absolute solitary confinement, frequently for long periods."

The 2001 report by the UNSR noted a significant increase in the prison population and reports of overcrowding and unrest. In July, the UK-based International Center for Prison Studies reported that 133,658 prisoners occupied facilities constructed to hold a maximum of 65,000 persons. In November, the Iran Prison Organization reported a prison population of 134,103.

The UNSR reported that much of the prisoner abuse occurred in unofficial detention centers run by unofficial intelligence services and the military. The UNSR further reported that the unofficial detention centers were to be brought under the control of the National Prison Organization (NPO)during 2001; however, November 2003 press reports indicated that a number of unofficial detention centers continued to operate outside NPO control. The U.N. Working Group on Arbitrary Detention raised this issue with the country's Article 90 Parliamentary Commission during its February 2003 visit, generating a commission inquiry that reportedly confirmed the existence of numerous unofficial prisons.

In a June study, Human Rights Watch (HRW) documented a number of unofficial prisons and detention centers such as "Prison 59" and "Amaken" an interrogation center where persons are held without charge, questioned intensively for prolonged periods, and physically abused and tortured during the process.

The Government generally has only granted prison access to the International Committee of the Red Cross (ICRC); however, it did permit visits to imprisoned dissidents by U.N. human rights officials during 2003 (see Section 4). U.N. Working Group on Arbitrary Detention officials visited Evin prison in Tehran--including sector 209, in which many political prisoners were believed held--as well as Esfahan and Shiraz prisons, the Shiraz military prison, and police stations in each city. The Working Group interviewed approximately 140 "ordinary" prisoners plus 14 out of a requested 45 inmates described as political prisoners and prisoners of conscience. The Working Group described the authorities' cooperation as "on the whole positive," although it noted problems with fulfillment of follow-up requests generated by the visit and disappointment over arrests carried out after the Group's departure. Following his November 2003 visit to the country, the UNSR for the Promotion and Protection of the Right to Freedom of Opinion and Expression noted that his delegation met with almost 40 dissidents, both in and out of prison.

d. Arbitrary Arrest or Detention

The Constitution prohibits arbitrary arrest and detention; however, these practices remained common. In practice, there is no legal time limit for incommunicado detention nor any judicial means to determine the legality of detention. In the period immediately following detention or arrest, many detainees were held incommunicado and denied access to lawyers and family members. Suspects may be held for questioning in jails or in local Revolutionary Guard offices. There also are numerous detention centers not under the control of the NPO, reportedly run by "plainclothes" officers of various security and intelligence agencies, elements of the judiciary, and state-sponsored vigilante groups.

The security forces often did not inform family members of a prisoner's welfare and location. Authorities often denied visits by family members and legal counsel. In addition, families of executed prisoners did not always receive notification of the prisoners' deaths. Those who received such information reportedly were forced on occasion to pay the Government to retrieve the body of their relative.

Security forces often targeted family members of political prisoners for harassment. In April, a court sentenced student activist Payman Piran, detained since February on charges of acting against national security, contacting foreigners, disturbing public opinion, and behaving insultingly, to 10 years in prison. In July, security forces forcibly evicted retired teacher Mostafa Piran, father of Peyman Piran, and his family from their apartment, confiscated their goods, and sealed the apartment. They beat Mostafa Piran and then detained him in Evin Prison. He was not informed of any charges against him nor allowed to see a lawyer. Subsequently, family members who saw him said that he had been mistreated during lengthy interrogation sessions and badly bruised. Also in July, Simin Mohammadi and her father Mohammad Mohammadi, sister and father respectively of jailed student activists Manuchehr and Akbar Mohammadi, were arrested, reportedly for "acts against state security." Simin was released after posting bail following 2 weeks' imprisonment in solitary confinement; her father also was released on bail after having had a heart attack in solitary confinement.

According to the media, in November, Mohammad Reza Aghapour, former editor-in-chief of the banned magazine, Asan, was arrested upon his return from London where he reportedly attended seminars on the circumstances of the country's Turkish population. At year's end, there was no information on whether Aghapour was imprisoned or if charges were brought against him.

According to the media, in September, authorities arrested and held for 11 days Soeed Matalebi, the father of Sinn Motalebi, a political opponent of the regime who helped to operate an Internet opposition website.

In January 2003, the Government released Ayatollah Hossein Ali Montazeri, amid reports of health problems after 5 years of house arrest. Montazeri was formerly the designated successor of the late Spiritual Leader, Ayatollah Khomeini, who subsequently became an outspoken critic of the Supreme Leader (see Section 2.a.). In recent years, the Government has used the practice of house arrest to restrict the movements and ability to communicate of senior Shi'a religious leaders whose views regarding political and governance issues were at variance with the ruling orthodoxy; however, there was no information on current practice.

In July 2003, the press credibly reported that Iranian-American academic Dariush Zahedi was detained during a private visit to the country and reportedly held in solitary confinement in Evin prison. Majlis officials noted that Zahedi was held on suspicion of espionage but, after a 40-day investigation, was cleared by the Ministry of Intelligence. However, Zahedi remained in detention after the case was transferred to the judiciary, reportedly at the intervention of Tehran's chief prosecutor. Zahedi was released on approximately $250,000 (200 million Tomans) bail in November 2003 and, although technically free to leave the country, is still subject to criminal prosecution. As of February, Zahedi had left the country; the charges against him were still pending.

In November 2003, security agents briefly arrested two sons of Ayatollah Hossein Ali Montazeri, the dissident cleric released from house arrest in January (see Section 1.d. above). The arrests reportedly were in response to the sons' attempts to refurbish a building purchased by the family for use as a teaching facility. The Qom mosque and Koranic school at which Montazeri formerly taught has remained closed since 1997, when comments by the cleric questioning the authority of the Supreme Leader sparked attacks on the school and his home by Ansar-e Hezbollah mobs.

In November 2003, student activist Ahmed Batebi met with the UNSR for the Promotion and Protection of the Right to Freedom of Opinion and Expression, while on medical leave from prison where he is serving a 15-year sentence for participating in the 1999 student demonstrations. He was re-arrested shortly afterward; however, he was temporarily released in late April, but he was re-incarcerated and, again, temporarily released on May 3. Subsequently, he was returned to prison, and his 10-year sentence remained in place.

AI reported that in October 2003, Arzhang Davoodi was arrested for assisting in making a television documentary criticizing the authorities. Reportedly, he was kept in solitary confinement for over 3 months and extensively beaten during the period. According to AI, he has not been charged and, although having paid bail in March, has not been released.

In July 2002, the Government permanently dissolved the Freedom Movement, the country's oldest opposition party, and sentenced over 30 of its members to jail terms ranging from 4 months to 10 years on charges of trying to overthrow the Islamic system. Other members were barred from political activity for up to 10 years and ordered to pay fines up to more than approximately $6,000 (currently 48 million tomans)(see Sections 2.b. and 3).

Numerous publishers, editors, and journalists (including those working on Internet sites) were either detained, jailed, and fined, or they were prohibited from publishing their writings during the year (see Section 2.a.).

Adherents of the Baha'i faith continued to face arbitrary arrest and detention. According to Baha'i sources, four Baha'is remained in prison for practicing their faith at year's end, one facing a life sentence, two facing sentences of 15 years, and the fourth a 4-year sentence. A small number of Baha'is were detained at any given time. Sources claimed that such arrests were carried out to "terrorize" the community and to disrupt the lives of its members. Others were arrested, charged, and then quickly released. However, the charges against them often were not dropped (see Section 2.c.).

During 2003, the Government continued to exchange with Iraq prisoners of war (POWs) and the remains of deceased fighters from the 1980-88 Iran-Iraq war. In March 2003, the Government said it released 888 Iraqi POWs in exchange for 351 Iranian prisoners that the Government claimed were not POWs, but religious pilgrims, university students, tour guides, farmers and villagers from the border regions, and border guards). In April and August, the Government claimed that it held no more Iraqi POWs.

e. Denial of Fair Public Trial

The Constitution provides that the judiciary is "an independent power"; however, in practice the court system was subject to government and religious influence. It served as the principal vehicle of the Government to restrict freedom and reform in the society. U.N. representatives, including the UNSR, the U.N. Working Group on Arbitrary Detention, and independent human rights organizations noted the absence of procedural safeguards in criminal trials. Trials are supposed to be open to the public; however, frequently they are held in closed sessions without access to a lawyer; the right to appeal often is not honored.

There are several different court systems. The two most active are the traditional courts, which adjudicate civil and criminal offenses, and the Islamic Revolutionary Courts. The latter try offenses viewed as potentially threatening to the Islamic Republic, including threats to internal or external security, narcotics and economic crimes, and official corruption. A special clerical court examines alleged transgressions within the clerical establishment, and a military court investigates crimes committed in connection with military or security duties by members of the army, police, and the Revolutionary Guards. A press court hears complaints against publishers, editors, and writers in the media. The Supreme Court has limited review authority.

After the revolution, the judicial system was revised to conform to an Islamic canon based on the Koran, Sunna, and other Islamic sources. Article 157 provides that the Head of the Judiciary, currently Ayatollah Mahmoud Hashemi Shahrudi, shall be a cleric chosen by the Supreme Leader. The head of the Supreme Court and Prosecutor General also must be clerics. Women are barred from serving as judges.

Many aspects of the pre-revolutionary judicial system survived in the civil and criminal courts. For example, defendants have the right to a public trial, may choose their own lawyer, and have the right of appeal. Panels of judges adjudicate trials. There is no jury system in the civil and criminal courts. If post-revolutionary statutes did not address a situation, the Government advised judges to give precedence to their own knowledge and interpretation of Islamic law.

In its 2003 report, the U.N. Working Group on Arbitrary Detention noted failures of due process in the court system caused by the absence of a "culture of counsel" and the previous concentration of authority in the hands of a judge who prosecuted, investigated, and decides cases. The Working Group called for active involvement of counsel in cases, from the custody and investigation phase through the trial and appeals phases. The Working Group welcomed the December 2002 reinstatement of prosecution services, after a 7-year suspension, but noted that this reform had thus far had been applied unevenly, with the judge still having major investigative responsibilities in many jurisdictions.

Trials in the Revolutionary Courts, in which crimes against national security and other principal offenses are heard, were notorious for their disregard of international standards of fairness. Revolutionary Court judges were chosen in part based on their ideological commitment to the system. Pretrial detention often was prolonged, and defendants lacked access to attorneys. Indictments often lacked clarity and included undefined offenses such as "anti-revolutionary behavior," "moral corruption," and "siding with global arrogance." Defendants did not have the right to confront their accusers. Secret or summary trials of 5 minutes' duration occurred. Others were show trials that were intended merely to highlight a coerced public confession.

The legitimacy of the Special Clerical Court system continued to be a subject of debate. The clerical courts, which investigate offenses and crimes committed by clerics and which are overseen directly by the Supreme Leader, are not provided for in the Constitution and operated outside the domain of the judiciary. In particular, critics alleged that the clerical courts were used to prosecute clerics for expressing controversial ideas and for participating in activities outside the sphere of religion, such as journalism. The recommendations of the U.N. Working Group on Arbitrary Detention included a call to abolish both the Special Clerical Courts and the Revolutionary Courts, which were described as "responsible for many of the cases of arbitrary detention for crimes of opinion."

The President stated on April 28 that, "absolutely, we do have political prisoners and people who are in prison for their beliefs." No accurate estimates were available regarding the number of citizens imprisoned for their political beliefs. In November 2003, the UNSR for the Promotion and Protection of the Right to Freedom of Expression and Opinion estimated the number to be in the hundreds. The Government has arrested, convicted, and sentenced persons on questionable criminal charges, including drug trafficking, when their actual "offenses" were political. The Government has charged members of religious minorities with crimes such as "confronting the regime" and apostasy, and conducted trials in these cases in the same manner as threats to national security.

In December, a Tehran justice department official alleged that the Government tried and sentenced fugitive al-Qaeda members detained in the country. The Government did not identify those convicted, the verdicts, or their sentences.

In March 2002, after a trial behind closed doors but with his lawyer present, Nasser Zarafshan, the attorney representing the families of the victims of the 1998 extrajudicial killings of dissidents by intelligence ministry officials, was sentenced to 5 years in prison (2 years for disseminating state secrets and 3 years for the possession of firearms) and 70 lashes for the possession of alcohol. He was charged with leaking confidential information pertaining to the trial. HRW reported that he was also charged with "having weapons and alcohol at his law firm." Zarafshan was originally arrested in 2000 but released after a month pending trial. An appeals court upheld his conviction in July 2002; he was arrested and taken to Evin Prison in August 2002. In November 2003, the Supreme Court reportedly dismissed his appeal. According to the NGO PenCanada, in September, a group of prisoners in collusion with prison authorities reportedly attempted to kill Zarafshan. Opposition websites reported that Zarafshan participated in a July hunger strike to protest mistreatment of prisoners' families by government officials. Reportedly, since September 2003, prison authorities have given Zarafshan only one leave of 48 hours.

Several other human rights lawyers also reportedly were abused, among them Mohammad Dadkhah, who participated in the defense of members of the Iran Freedom Movement and is a founding member of the Iranian Center for Protection of Human Rights, and Abdol Fattah Soltani, who was reportedly charged for raising accusations of torture during the 2002 defense of a number of political prisoners. In 2002, Dadkhah was sentenced to 5 months in jail and banned from practicing law for 10 years; however, in November, he remained free and was practicing law. However, in October, the Government refused to issue him a passport. In 2002, Soltani was sentenced to 4 months in prison and barred from practicing law for 5 years. At year's end, he was not in jail but still precluded from practicing law. The U.N. Working Group on Arbitrary Detention included among its recommendations the need for guaranteeing the immunity of counsel in pleading cases as an essential element of the right to due process.

In November 2002, academic Hashem Aghajari was sentenced to death at a closed trial for blaspheming against Islam during a speech in Hamedan. In addition to the death sentence, he was sentenced to 74 lashes, exile to a remote desert location, 8 years in jail, and a ban on teaching for 10 years. In February 2003, the Supreme Court revoked his death sentence, but the case was sent back to the lower court for retrial. In June, the Government announced that the Supreme Court overturned his death sentence. As a result of a retrial in July, the sentence was reduced to 3 years in prison and 2 years suspended sentence in prison, in addition to 5 years "deprivation of social rights." Aghajari was released on bail on July 31 and has announced that he will challenge the court's decision to bar him from publishing articles and speaking in public.

Former Deputy Prime Minister, Abbas Amir-Entezam, was re-imprisoned in April 2003, after his release in 2002 for medical reasons. A longtime political dissident, Amir-Entezam has spent much of the past 24 years in prison. He reportedly was incarcerated for calling for a referendum on whether the country should remain under clerical rule (see Section 1.c.). During the year, he was freed on medical leave due to the Government's inability to treat his medical conditions in prison. As of December, he was receiving medical treatment at his home recovering from back surgery, and his medical leave was extended until early January 2005.

The trials in 2000 and 2001 of 13 Jewish citizens on charges related to espionage for Israel were marked by a lack of due process. Ten of the original 13 were sentenced to jail terms ranging from 4 to 13 years. The last five in prison were released in April 2003 (see Section 2.c.).

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The Constitution states that "reputation, life, property, (and) dwelling(s)" are protected from trespass except as "provided by law"; however, the Government infringed on these rights. Security forces monitored the social activities of citizens, entered homes and offices, monitored telephone conversations, and opened mail without court authorization.

Vigilante violence included attacking young persons considered too "un-Islamic" in their dress or activities, invading private homes, abusing unmarried couples, and disrupting concerts or other forms of popular entertainment. Attackers targeted women whose clothing did not cover their hair and all parts of their body except the hands and face or those who wore makeup or nail polish. In October, in Rasht, Unit 110 of the Law Enforcement Forces, another police unit charged with maintaining Islamic propriety, arrested 8 girls and 12 boys dancing at a party. In Shiraz, in late October, over a 2-day period at least 150 people were arrested. Eyewitnesses said that dozens of individuals, mostly youths, were arrested on the streets for their "un-Islamic attire." A large number of persons reportedly were arrested for "acting as a nuisance." A young man was arrested for "eating in public" in the Islamic holy month of Ramadan according to friends accompanying him.

Authorities entered homes to remove television satellite dishes, or to disrupt private gatherings in which unmarried men and women socialized or where alcohol, mixed dancing, or other forbidden activities were offered or took place. There were also widespread reports that the homes and offices of reformist journalists were entered, searched, or ransacked by government agents in an attempt to intimidate. The government campaign against satellite dishes continued, although enforcement appeared to be arbitrary and sporadic, varying widely with the political climate and the individuals involved. Press reports from late 2003 noted that security authorities restarted periodic efforts to remove satellite dishes from Tehran homes, and in 1 day confiscated 450 dishes in a single neighborhood. Early in the year, western media reported that Islamist militia confiscated approximately 40,000 satellite dishes from 4 factories secretly manufacturing satellite equipment in eastern Tehran; however, the vast majority of satellite dishes in individual homes continued to operate.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of the press, except when published ideas are "contrary to Islamic principles, or are detrimental to public rights"; it makes no mention of freedom of speech. In practice, the Government severely restricted freedom of speech and of the press. Since the election of President Khatami, the independent press, especially newspapers and magazines, played an increasingly important role in providing a forum for an intense debate regarding reform in the society. However, basic legal safeguards for freedom of expression did not exist, and since approximately 2000, the independent press has been subjected to arbitrary enforcement measures by elements of the Government, notably the judiciary, which treated such debates as a threat.

In October, security forces prevented dissident intellectual Emaddedin Baghi from leaving the country to accept an award for civil courage, informing him he was on a list of those forbidden to leave the country (see Section 2.d.). Later that month, a court revoked a December 2003 ruling that had suspended a 1-year prison sentence for "propagating against the regime," giving him 20 days to appeal the ruling. At year's end, Baghi was still free; however, he was not permitted to leave the country.

In November, local press reported that after an early October trial, a Tehran Revolutionary Court sentenced Ebrahim Yazdi, leader of the Iranian liberal nationalist Freedom Movement opposition party, to an unspecified but long-term imprisonment, based on charges of actions against national security, possessing unauthorized weapons, insulting the supreme leader and government officials, and propagating against the system through actions benefiting opposition groups.

The Government continued to harass senior Shi'a religious and political leaders and their followers who dissent from the ruling conservative establishment. In May, the Special Court for the Clergy in Qom arrested Hojatoleslam Mujtaba Lotfi, an aide to Ayatollah Hussein Ali Montazeri-Najafabadi, for publishing a book that detailed the ayatollah's 5 years under house arrest. The book also covered the attacks on Montazeri's home and theological school and described the various charges and accusations against Ayatollah Montazeri. The court confiscated all copies of the book. More generally, there were reports that the Government maintained a broad network of student informants in Qom's major seminaries, who reported teachings that are counter to official government positions.

According to HRW, following a meeting in November 2003 with the UN Special Rapporteur on Freedom of Opinion and Expression, a student (Ahmed Batebi), who was out of prison on medical leave, was returned to prison by government officials (see Section 1.d.).

In October 2003, media reported that reformist parliamentarian and outspoken critic Mohsen Armin was sentenced to 6 months in prison for insulting a conservative Majlis member. The judge reportedly also stripped Armin of his "social rights" for 1 year for not appearing in court. Armin ascribed his absence from court to his assumption that he held parliamentary immunity. In August, Armin appeared in court in response to a complaint relating to speeches he made in 1999-2002 and an accusation of spreading lies. At year's end, Armin had not been imprisoned.

In spring 2001, security forces arrested then Majlis member Fatima Haqiqatju for inciting public opinion and insulting the judiciary for criticizing the arrest of a female journalist and claiming that the Government tortured prisoners. She was the first sitting Majlis member to face prosecution for statements made under cover of immunity. Haqiqatju was sentenced to 17 months in prison, although at year's end, she had not been imprisoned for this offense. Separately, in June, the public prosecutor summoned her to court and charged her with "propaganda against the system," "spreading lies with the intent of disturbing public opinion," and "insulting the Council of Guardians, the judiciary, and the Islamic Revolutionary Guard Corps." She was released on bail, but she was forbidden to leave the country. On November 29, Haqiqatju was summoned to a Tehran Penal Court due to a complaint by the Public Prosecutor based on her February 23, 2003, resignation speech from the Majlis. She was charged with spreading lies to disturb public opinion, insulting officials, and propaganda against the Government.

Newspapers and magazines represented a wide variety of political and social perspectives, many allied with members of the Government. Many subjects were tolerated, including criticism of certain government policies. However, the Press Law prohibits the publishing of a broad and ill-defined category of subjects, including material "insulting Islam and its sanctities" or "promoting subjects that might damage the foundation of the Islamic Republic." Prohibited topics include fault-finding comments regarding the personality and achievements of the late Leader of the Revolution, Ayatollah Khomeini; direct criticism of the Supreme Leader; assailing the principle of velayat-e faqih, or rule by a supreme religious leader; questioning the tenets of certain Islamic legal principles; publishing sensitive or classified material affecting national security; promotion of the views of certain dissident clerics, including Ayatollah Montazeri; and advocating rights or autonomy for ethnic minorities. Organs of the Government, such as the judiciary or the National Security Council, often issued written orders to newspapers instructing them to avoid covering controversial topics, or directing them as to how to cover these topics.

The Press Law established the Press Supervisory Board, which is responsible for issuing press licenses and for examining complaints filed against publications or individual journalists, editors, or publishers. In certain cases, the Press Supervisory Board may refer complaints to the Press Court for further action, including closure. Its hearings were conducted in public with a jury composed of clerics, government officials, and editors of government-controlled newspapers. The jury was empowered to recommend to the presiding judge the guilt or innocence of defendants and the severity of any penalty to be imposed, although these recommendations were not legally binding.

Since 2000, approximately 100 newspapers and magazines have been closed for varying lengths of time. In the last few years, some human rights groups asserted that the increasingly conservative Press Court assumed responsibility for cases before Press Supervisory Board consideration, often resulting in harsher judgments. Efforts to amend the press laws have not met with success, although in October 2003, Parliament passed a law limiting the duration of temporary press closures to a maximum of 10 days for newspapers, 4 weeks for weeklies or bi-weeklies, 2 months for monthlies, and 3 months for other publications. The importance of the legislation was to stop the practice of extending "temporary" bans indefinitely.

The Press Law allows government entities to act as complainants against newspapers, and often members of the Islamic Revolutionary Guards Corps, the Intelligence Ministry, the Law Enforcement Forces, the Islamic Republic of Iran Broadcasting, or other public officials lodged criminal complaints against reformist newspapers that led to their closures. Offending writers were subjected to lawsuits and fines. Suspension from journalistic activities and imprisonment were common punishments for guilty verdicts for offenses ranging from "fabrication" to "propaganda against the State" to "insulting the leadership of the Islamic Republic."

Freedom of the press continued to deteriorate during the year. Many reformist newspapers and magazines were closed, and many of their managers were sentenced to jail and, sometimes, lashings.

In January, legal authorities threatened eight reformist dailies for their coverage of the sit-in by reformist deputies in front of the Parliament. The weekly Hadith-e Kerman, in Kerman Province, was closed in February for coverage in 2003 of serial killings committed by armed militia. In February, prior to the Parliament elections, the newspapers Sharq and Yas-e Nau were shut for publishing extracts from a letter by reformist parliamentarians to the Supreme Leader of the Islamic Republic, Ali Khamenei. The letter blamed Khamenei for the electoral "coup d'état" and the current political crisis. In July, Jumhuriyat, a morning newspaper started by reformist and human rights activist Emadeddin Baqi, was closed after publishing only one issue. Also in July, the court for offenses committed by government employees and the media issued a temporary ban against the Vaqa-yi Itifaqi-yi daily newspaper. Complaints against the newspaper included propaganda against the state, "insulting officials," and "publishing lies." At year's end, the paper remained closed. A handful of pro-reform newspapers continued to publish, most with heavy self-censorship. In contrast to the past when new reformist newspapers often opened to replace those that had been closed, this was no longer the case.

Dozens of individual editors and journalists have been charged and tried by the Press Court in recent years, and several prominent journalists were jailed for long periods without trial. Others have been sentenced to prison terms or exorbitant fines. As of October, at least 14 journalists, editors, and publishers remained in prison, according to Reporters Without Borders (RSF), the most prominent being Akbar Ganji, sentenced to 6 years in prison in 2000 for his reporting on the "serial murder" of prominent reformists by elements within the Intelligence Ministry. Ganji has been allowed short furloughs from prison for treatment of a serious medical condition. Ali Reza Jabari was jailed in March 2003 after being sentenced to 4 years of imprisonment, 253 lashes, and an approximately $750 (600,000 Tomans) fine for "relations with enemies of the Islamic Republic of Iran and propaganda against the Government." Appeals subsequently reduced his term to 2 years, and he was released in October, 4 months before the end of his 2-year sentence. Other journalists imprisoned during the year included: Iraj Jamshidi, imprisoned without trial and held in isolation for long periods; Taghi Rahmani, held in solitary confinement for long periods and reportedly sentenced in a separate case to 13 years in jail; and Reza Alijani and Hoda Saber, both held since June 2003 and reportedly sentenced in separate cases to 6 and 10 years, respectively. In November, the head of Tehran's Islamic Revolution's Court Branch 26 ordered Alijani, Saber, and Rahmani released on bail of approximately $63,000 (50 million Tomans) each. In October 2003, journalist Mohsen Sazgara was released from jail amid rumors of ill health, after 4 months in prison on charges of inciting protest.

In January, freelance journalist Ensafali Hedayat was arrested after returning to the country after attending a conference in Germany organized by a group advocating a democratic and secular state. He reportedly faced charges relating to national security in connection with his participation in this conference and with a visit to Turkey in 2003, as well as defamation charges relating to an article he wrote which appeared on a website. Reportedly he was held in solitary confinement. In May, the Tabriz Appeals Court confirmed an 18-month prison sentence against him; reportedly he planned to appeal. However, in early December, according to his lawyer, Hedayat was returned to prison and his application to extend his leave from prison denied, due to "political activities" while on leave.

In January, a criminal court found Abdul Rasul Vesal, managing director of the daily newspaper Iran, guilty of press offenses and barred him from working in public service (journalism) for 3 years.

In May, an Iranian cleric serving as a member of the Press Supervisory Council, physically attacked and bit reformist journalist Issa Saharkhiz during a council meeting. At year's end, no charges had been brought against the cleric.

In August, a court summoned former Majlis Deputy Mohsen Mirdamadi in response to a complaint from an Islamic Revolution Guards Corps member concerning published remarks by Mirdamadi that military personnel's interference in political affairs weakens the armed forces. At year's end, there was no further information on legal action; however, he had not been incarcerated.

In August, dissident intellectual reformist and journalist Emadeddin Baqi and attorney Saleh Nikbakht appeared in court because of a complaint filed by the Intelligence and Security Ministry, relating to Baqi's banned book "Tragedy of Democracy in Iran." Later in August, a public court fined Baqi approximately $115 (100 thousand Tomans) for insulting the Council of Guardians and other officials.

In September, government officials arrested Hanif Mazroui, the son of a former member of Parliament, Rajabali Mazroui. Mazroui was a computer technician who worked for the daily newspaper Vaghayeh Etefaghieh, which was shut by the Government. He was freed on November 11 after paying approximately $19,000 (15 million Tomans) bail.

On December 27, the press reported that the Revolutionary Court sentenced prominent political activist Heshmat Tabarzadi, jailed since June 2003, to 16 years in prison.

On December 25, a Tehran judge ruled, based on a complaint by the State-run "Voice and Vision" media, that former Tehran Majlis Representative Abol Fazl Shakuri Rad must pay approximately $500 (400,000 Tomans) for comments made while he was a Majlis representative, despite constitutional protection according representatives the right to "express their views on all internal and external affairs of the country."

The Government censored and banned access to Internet sites, many of them with political content, such as the Amir Kabir University news website. During the year, the Government launched a crackdown on sites based in the country, to include "weblogs." Reportedly during the year, the Government blocked hundreds of Internet sites. According to HRW, since September, more than 20 Internet journalists and civil society activists have been arrested and held in a secret detention center in Tehran. By year's end, most were released on bail. On December 10, in a public letter to President Mohammed Khatami, the father of one of those detained, Ali Mazrui, who is also president of the Association of Iranian Journalists and a former Majlis member, implicated the judiciary in the torture and secret detention of these individuals. On December 11, the chief prosecutor of Tehran, Judge Saeed Mortazavi, filed charges against Mazrui for libel. On December 14, four of these "weblog" detainees were presented at a televised "press conference" arranged by Judge Mortazavi and denied that they had been subjected to solitary confinement, torture, or ill-treatment during their earlier detention. However, widespread and credible reports indicated that threats and coercions were used to induce their statements and, while in secret detention, threats, torture, and physical abuse were employed to obtain false confessions and letters of repentance from many of those detained.

On November 1, according to media information, Mahboubeh Abbas-Gholizadeh, editor of the magazine Farzaneh, was arrested after returning from London where she attended the European Social Forum. She was released on bail of approximately $38,000 (30 million Tomans) in late November.

On October 28, Fereshteh Ghazi, a journalist addressing women's issues for the daily newspaper Etemad, was arrested after being summoned to court to answer questions. She was released in mid-December after 40 days of detention and paying bail of approximately $62,000 (50 million Tomans). She was detained on a variety of charges including "acting against state security, spreading lies, membership in internal opposition groups, and defense of murders in order to stir up public opinion against the judiciary." For 23 of the 40 days of detention, Gazhi was on a hunger strike. According to press accounts, at least part of the time she was held in an undisclosed location and was repeatedly beaten by her interrogators for refusing to cooperate with her interrogators, including refusal to sign a "confession." Her interrogators reportedly inflicted multiple, severe injuries, and, upon release in mid-December, she was immediately hospitalized.

On October 18, Javad Gholam Tamayomi, a journalist with the daily Mardomsalari was arrested after responding to a summons from the Tehran prosecutor's office. On October 10, authorities arrested journalist and Internet writer Omid Memarian and detained him on charges of espionage. In early December, four of the seven detained "weblog journalists" were released on bail, with Omid Memarian and Shahram Rafizadeh released on bail of approximately $62,000 dollars (50 million Tomans). On September 27, Rozbeh Mir Ebrahimi, former political editor of the daily Etemad was arrested at his home for contributing to reformist Internet websites. On November 26, he was released on a bail of approximately $4,000 (3 million Tomans).

Other weblog journalists detained as part of this repression included Shahram Rafizadeh, Babak Ghafouri-Azar, and Mehdi Derayati. The judiciary announced that they would be tried for "acting against national security, disturbing the public mind, and insulting sanctities." On November 11, Mehdi Derayati, Masoud Ghoreishi, and Asghar Vatanikhah were released on bail. According to Derayati's father, these detainees spent up to 3 months in detention, much of it in solitary confinement at an undisclosed location. A number of Internet news sites continued to operate from outside the country. There is little information on the extent of readership inside the country; however, media suggested that there were upwards of 4.8 million Internet users and as many as 100,000 weblogs.

In January 2003, the judiciary halted efforts by deputy speaker of the Majlis, Mohammad-Reza Khatami, to re-open the banned newspaper Norouz under the new name Rouz-e No, by extending the 6-month ban on the original publication. Khatami was slated to replace former Norouz editor and parliament member Mohsen Mirdamadi, who, despite parliamentary immunity, was sentenced in May 2002 to 6 months in jail and banned from practicing journalism for 4 years for "insulting the state, publishing lies, and insulting Islamic institutions." At year's end, there were no reports that Mirdamadi had been imprisoned; however, the newspaper has never re-opened.

In January 2003, the newspaper Hayat-e No was banned and editor Alireza Eshraghi arrested after the paper reprinted a 1937 U.S. cartoon about President Franklin Roosevelt's battle with the Supreme Court. The authorities deemed that the judge portrayed too closely resembled the late Ayatollah Ruhollah Khomeini. Eshraghi was released on bail for $31,400 (25 million Tomans) in March 2003, after spending all his jail time in solitary confinement in Evin Prison. The daily Hamshahri was also temporarily suspended in January 2003 after refusing to print an article from the chief of a state-run trade union. Hamshahri was apparently shut for 5 days; however, Hayat-e No remained closed at year's end.

In January 2003, the Press Court also closed the reformist daily Bahar after the newspaper ran an article about a company whose shareholders include former president Hashemi Rafsanjani, former judiciary head Ayatollah Yazdi, and Ahmad Jannati, head of the Legislative Branch's Guardians Council. Bahar was first closed in 2000 and had only re-opened in December 2002. The newspaper remained closed throughout the year.

In February 2003, according to AI, Abbas Abdi and Hussein Qazian were sentenced to 8 and 9 years, respectively, in the National Institute for Research Studies and Opinion Polls case. In April 2003, an appeals court reduced the sentences to 4 years and 6 months for each. The third defendant in the case, Behrouz Geranpayeh, was reportedly released on bail in January 2003, pending a final ruling. The case originated in October 2002, when the judicial authorities closed the Institute, which had found in a poll commissioned by the Majlis that a majority of citizens supported dialogue with the United States. The defendants were charged with spying for the United States, illegal contacts with foreign embassies, working with anti-regime groups, and carrying out research on the order of a foreign polling organization. Government intelligence officials publicly stated that the accused were not spies. According to press reports, President Khatami also rejected the charges, stating that the Intelligence and Foreign Ministries had cleared the pollsters' work. Reformist parliamentarians were reportedly barred from the court, and the defendants were not allowed to see their families or their attorneys. At year's end, the defendants remained in jail.

In May 2003, a government spokesman acknowledged state attempts to block access to "immoral" websites. The judiciary also announced the creation of a special unit to handle Internet-related issues. According to press reporting, the judiciary highlighted over 20 subject areas to be blocked, including: insulting Islam; opposing the Constitution; insulting the Supreme Leader or making false accusations about officials; undermining national unity and solidarity; creating pessimism among the population regarding the Islamic system; and propagating prostitution and drugs.

In October 2003, RSF reported that the Government closed the newspaper Avay-e Kordestan, marking the first time a Kurdish language newspaper was banned in the country.

The Government directly controlled and maintained a monopoly over all television and radio broadcasting facilities; programming reflected the Government's political and socio-religious ideology. Because newspapers and other print media had a limited circulation outside large cities, radio and television served as the principal news source for many citizens. Satellite dishes that received foreign television broadcasts were forbidden; however, many citizens, particularly the wealthy, owned them. In December 2002, the Majlis passed a bill legalizing private ownership of satellite receiving equipment. However, the Council of Guardians rejected the legislation in January 2003 on constitutional and religious grounds. The Government reportedly acted to block foreign satellite transmissions during the year using powerful jamming signals (see Section 1.f.).

The Ministry of Islamic Culture and Guidance was in charge of screening books prior to publication to ensure that they did not contain offensive material. However, some books and pamphlets critical of the Government were published without reprisal. The Ministry inspected foreign printed materials prior to their release on the market. In August 2003, author of "Iran's Women Musicians," Toka Maleki, its publisher Jaafar Homai, and cultural critic Banafsheh Samgis received prison terms for publishing and publicly commenting on the book, which was deemed to contain "lies" about Islamic history. The translator of the book, "Women behind Veil and Well-Dressed Men," Maliheh Moghazei and Ministry of Culture and the Islamic Guidance Director General Majid Sayyad also received prison terms in connection with the book's publication.

The Government effectively censored domestic films, since it remained the main source of production funding. Producers must submit scripts and film proposals to government officials in advance of funding approval. In April, "Lizard," a film indirectly satirizing the clerical class, was released. It was withdrawn from circulation in May, and the screenwriter, director, producer, and star were banned briefly from travel abroad. Since the release and subsequent banning of this film, government restrictions over film have intensified.

The Government restricted academic freedom. Government informers were common on university campuses. Admission to universities was politicized; all applicants had to pass "character tests" in which officials screened out applicants critical of the Government's ideology. To obtain tenure, professors had to refrain from criticism of the authorities.

b. Freedom of Peaceful Assembly and Association

The Constitution permits assemblies and marches "provided they do not violate the principles of Islam"; however, in practice the Government restricted freedom of assembly and closely monitored gatherings to prevent anti-government protest. Such gatherings included public entertainment and lectures, student gatherings, labor protests, funeral processions, and Friday prayer gatherings.

During a wave of student protests in June 2003, government-supported vigilantes beat many protestors, and police arrested approximately 4,000 persons according to government figures shortly after the protests. Although the police arrested both protestors and vigilantes, the overwhelming majority of those arrested were protestors. Approximately 130 of those arrested during these protests were still in detention as of December. The Government banned demonstrations planned for July 9 to commemorate the killing of several students by security forces in the 1999 demonstrations in both 2003 and 2004 (see Sections 1.b. and 1.f.). An unknown number of the students were still imprisoned, in addition to Ahmed Batebi, Manuchehr Mohammadi, Abbas Fakhravar, Akbar Mohammadi, and Mehrdad Lahrasbi. AI reported in March that Abbas Fakhravar had been given 19 days leave from prison and that prior to temporary release, he had been confined in "Band 325" military detention center run by the Islamic Revolutionary Guard Corps and subjected to sensory deprivation. As of November, International PEN reported that Fakhravar Fakhravar had been returned to Evin Prison.

In December, according to local media, imprisoned student activist Manuchehr Mohamadi was found guilty of disturbing order in prison and acting against officials, and fined approximately $375 (300,000 Tomans), which converted to additional imprisonment.

Paramilitary organizations such as the Ansar-e Hezbollah, a group of vigilantes who seek to enforce their vision of appropriate revolutionary comportment upon the society, harassed, beat, and intimidated those who demonstrated publicly for reform. Ansar-e Hezbollah gangs were used to harass journalists, intimidate dissident clerics, and disrupt peaceful gatherings. Ansar-e Hezbollah cells were organized throughout the country, and some were reportedly linked to individual members of the country's leadership. In the period prior to the February Majlis elections, Ansar-e Hezbollah and other government-supported vigilantes repeatedly attacked political gatherings of reformist candidates and vandalized their offices.

In January, approximately 200 members of the Ansar-e Hezbullah vigilante group attacked a political meeting of disqualified prospective parliamentary candidates and their supporters in Hamedan. The vigilantes entered the meeting hall, heckled the speakers, and rushed the speakers' platform. No legal action was taken against the vigilantes.

In May, government security officers reportedly attacked workers and their families during a Labor Day march in Saqez; 40 workers, including labor leader Mahmoud Salehi, reportedly were arrested (see Section 6.b.).

In June, security forces reportedly arrested more than 100 ethnic Azeris for "spreading secessionist propaganda" during a holiday gathering of thousands of Azeri-Iranians in East Azerbaijan Province.

In September, approximately 100 vigilantes disrupted a speech by prominent Islamic scholar Abdolkarim Soroush at a private home; security forces present at the scene failed to stop them. There was no subsequent legal action against the vigilantes.

In June 2003, during a wave of pro-reform protests, members of vigilante groups, such as Ansar-e Hezbollah, attacked protestors, according to press reports. Ansar-e Hezbollah members reportedly stormed a university dormitory in Tehran, destroyed student property, and injured more than 50 students. Some vigilantes were reportedly included among those arrested by authorities during the clashes. Vigilantes who attacked a demonstration in Shiraz reportedly killed a protestor. Before being transferred to government custody, vigilantes reportedly seized and beat journalist Ensafali Hedayat. Vigilante groups were also reported to have attacked protesters during pro-reform demonstrations near Tehran University in December 2003.

In December 2003, vigilantes beat reformist parliamentarian, Mohsen Mirdamadi, as he began a speech in Yazd. President Khatami ordered a crackdown on vigilantes after the attack; five individuals subsequently were arrested. At year's end, there was no further information on the status of their detention.

In November 2002, the Aghajari verdict sparked large and ongoing protests at universities throughout the country (see Section 1.e.). Students boycotted classes for almost 2 weeks and staged the largest pro-reform demonstrations in 3 years, with crowds of up to 5,000 at any given location. In late December 2002, two students were given jail terms for their protests against the Aghajari sentence. Hojatollah Rahimi was sentenced to 2 years in prison and 70 lashes for "insulting religious sanctities and issuing an insulting declaration." Co-defendant Parviz Torkashvand was sentenced to 4 months in jail and 40 lashes. At year's end, there was no further information on their status.

Government restrictions using Basiji and other forces restored quiet for 2 weeks, until a large demonstration occurred at the University of Tehran in December 2002, attended by over 2,000 within the walls of the campus, and with a larger crowd outside. Law enforcement officials and "plainclothes" forces wielding batons, whips, and belts suppressed the protest. Basiji violently dispersed subsequent demonstrations.

The Constitution provides for the establishment of political parties, professional associations, Islamic religious groups, and organizations for recognized religious minorities, provided that such groups do not violate the principles of "freedom, sovereignty, and national unity," or question Islam as the basis of the Islamic Republic; however, the Government limited freedom of association, in practice.

In July 2002, the Government permanently dissolved the Freedom Movement, the country's oldest opposition party, jailing some members and baring others from political activity for up to 10 years (see Sections 1.d. and 3).

In 2001, the Government provisionally closed the 50-year-old Iran Freedom Movement political party for "attempting to overthrow the Islamic regime," and the Government permanently banned it in 2002. In response to the permanent dissolution of the movement, President Khatami warned against the banning of political groups, saying that suppression did not eliminate ideas; they were simply forced underground and continue to grow (see Sections 1.d. and 1.e.).

c. Freedom of Religion

The Constitution declares that the "official religion of Iran is Islam and the doctrine followed is that of Ja'fari (Twelver) Shi'ism." The Constitution also states that "other Islamic denominations are to be accorded full respect" and recognizes Zoroastrians, Christians, and Jews, the country's pre-Islamic religions, as "protected" religious minorities; however, in practice, the Government restricted freedom of religion.

Religions not specifically protected under the Constitution did not enjoy freedom of religion. This situation most directly affected the approximately 300,000 followers of the Baha'i faith, who were not recognized by the Government as a community and were considered to belong to an outlawed political organization.

The central feature of the country's Islamic republican system is rule by a "religious jurisconsult." Its senior leadership, including the Supreme Leader of the Revolution, the President, the Head of the Judiciary, and the Speaker of the Islamic Consultative Assembly (Parliament) was composed principally of Shi'a clergymen.

The Ministry of Intelligence and Security (MOIS) closely monitored religious activity. Adherents of recognized religious minorities were not required to register individually with the Government. However, their community, religious, and cultural organizations, as well as schools and public events, were monitored closely. The population was approximately 99 percent Muslim, of which 89 percent were Shi'a and 10 percent Sunni. Minorities (mostly Turkomen, Arabs, Baluchs, and Kurds) lived in the southwest, southeast, and northwest sections of the country. Baha'i, Christian, Zoroastrian, and Jewish communities constituted less than 1 percent of the population.

Sunni Muslims are the largest religious minority in the country. The Constitution provides Sunni Muslims a large degree of religious freedom, although, for example, it forbids a Sunni Muslim from becoming President. In practice, Sunni Muslims claimed that the Government discriminated against Sunnis, although it was hard to distinguish whether the cause for discrimination was religious or ethnic, since most Sunnis are also ethnic minorities. Sunnis cited the lack of a Sunni mosque in the nation's capital, Tehran, despite the presence of over a million Sunnis living there, as a prominent example of this discrimination. Sunnis also have cited as proof of discrimination the lack of Sunni representation in appointed offices in provinces where Sunnis form a majority, such as Kordestan Province, and also the reported inability of Sunnis to obtain senior governmental positions. Sunnis also have charged that the state broadcasting company, Voice and Vision, aired programs insulting to Sunnis.

In April, Sunni Majlis representatives sent a letter to Supreme Leader Khameneni, decrying the lack of Sunni presence in the executive and judiciary branch of government, especially in higher-ranking positions in embassies, universities, and other institutions. They called on Khamenei to halt anti-Sunni propaganda in the mass media, books, publications, and the state-run media; they also requested adherence to the constitutional articles ensuring equal treatment of all ethnic groups.

Members of the country's religious minorities, particularly Bahai's, reported imprisonment, harassment, and intimidation based on their religious beliefs. All religious minorities suffered varying degrees of officially sanctioned discrimination, particularly in the areas of employment, education, and housing. The Government generally allowed recognized religious minorities to conduct religious education of their adherents, although it restricted this right considerably in some cases. Religious minorities, by law and practice, are barred from election to a representative body, except to the five Majlis seats reserved for minorities, and from holding senior government or military positions. Members of religious minorities were allowed to vote, but they could not run for President. Although the Constitution mandates an Islamic Army, members of religious minority communities sometimes served in the military.

The Government allowed recognized religious minorities to establish community centers and certain privately financed cultural, social, sports, or charitable associations. However, since 1983, the Government has denied the Baha'i community the right to assemble officially or to maintain administrative institutions.

The legal system discriminated against religious minorities, awarding lower monetary compensation in injury and death lawsuits for non-Muslims than for Muslims and imposing heavier punishments on non-Muslims than on Muslims. However, in January, the Expediency Council approved appending a Note to Article 297 of the 1991 Islamic Punishments Act, authorizing collection of equal blood money for the death of Muslims and non-Muslims.

Proselytizing of Muslims by non-Muslims is illegal and the Government was harsh in its response, in particular against Baha'is and evangelical Christians. The Government did not ensure the right of citizens to change or recant their religion. Apostasy, specifically conversion from Islam, is punishable by death.

Baha'is were considered apostates because of their claim to a religious revelation subsequent to that of the Prophet Mohammed. The Government defined the Baha'i faith as a political "sect" linked to the Pahlavi monarchy and, therefore, as counterrevolutionary. Historically at risk, Baha'is often have suffered increased levels of mistreatment during times of political unrest. There have been reports in the past that historic Baha'i shrines were destroyed. Baha'is may not teach or practice their faith or maintain links with co-religionists abroad. The Government continued to imprison and detain Baha'is based on their religious beliefs. A 2001 Ministry of Justice report indicated that government policy aimed at the eventual elimination of the Baha'is as a community.

In February, two members of the Baha'i faith, Bihnam Mithaqi and Kayvan Khalajabadi, were released from prison after serving almost 15 years on charges related to their religious beliefs. According to a Baha'i organization, the only Baha'i still known to be imprisoned in the country because of his adherence to the Baha'i faith is Zabihullah Mahrami, who was arrested in September 1995 and is serving a life sentence.

In July, for the first time, Baha'i applicants were permitted to take part in the nationwide exam for entrance into state-run colleges. However, the word "Islam" was pre-printed in a slot listing a prospective student's religious affiliation. This action precluded Baha'i matriculation, since as a matter of faith, Baha'is do not deny their faith.

According to Baha'i sources outside the country, since 2002, 23 Baha'is from 18 different localities were arbitrarily arrested and detained for a short time because of their Baha'i faith. None of these persons was in prison at the end of the period covered by this report.

In 2001, the UNSR estimated the Christian community at approximately 300,000. Of these, the majority were ethnic Armenians and Assyro-Chaldeans. Protestant denominations and evangelical churches also were active, but they reported restrictions on their activities. The authorities became particularly vigilant in recent years in curbing proselytizing activities by evangelical Christians. In May and June, several Christians in the northern part of the country reportedly were arrested, and in September, officials raided the Protestant Assemblies of God Church, imprisoning its minister, Hamid Pourmand. Since his arrest, Pourmand has been imprisoned at an undisclosed location, and, under local law, he can be executed for "apostasy against Islam."

In May, there were reports of the arrest of evangelical Christians in the northern part of the country, including a Christian pastor and his family in Mazandaran Province. The pastor's family and two other church leaders who had been arrested earlier were reportedly released on May 30. Although the pastor reportedly was a convert from the Baha'i Faith, a number of those arrested in raids on house churches were converts from Islam. The pastor and another Christian leader reportedly were released from custody in early July.

Estimates of the size of the Jewish community varied from 20,000 to 30,000, a substantial reduction from the estimated 75,000 to 80,000 Jews in the country prior to the 1979 revolution. While Jews were a recognized religious minority, allegations of official discrimination were frequent. The Government's anti-Israel stance, and the perception among many citizens that Jewish citizens supported Zionism and the State of Israel, created a threatening atmosphere for the small community. Jews limited their contact with and did not openly express support for Israel out of fear of reprisal. Jewish leaders reportedly were reluctant to draw attention to official mistreatment of their community due to fear of government reprisal.

The Government carefully monitored the statements and views of the country's senior Muslim religious leaders. It has restricted the movement of several who have been under house arrest for years. All ranking clerics were under pressure to ensure that their teachings confirm or at least do not contradict government policy and positions.

For a more detailed discussion, see the 2004 International Religious Freedom Report (//2009-2017.state.gov/j/drl/rls/irf/2004/).

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The Government placed some restrictions on these rights. Citizens may travel within the country and change their place of residence without obtaining official permission. The Government required exit permits (a validation stamp in the passport) for foreign travel for draft-age men and citizens who were politically suspect. Some citizens, particularly those whose skills were in short supply and who were educated at government expense, must post bonds to obtain exit permits. The Government restricted the movement of certain religious minorities and several religious leaders (see Sections 1.d. and 2.c.).

In October, AI reported that the Government confiscated the passport of a senior member of the Society for the Defense of the Rights of Prisoners, preventing him from attending human rights conferences (see Section 4).

In May, the Government temporarily prohibited the screenwriter, director, producer, and star of the satirical film, "Lizard," from leaving the country (see Section 2.a.).

Citizens returning from abroad sometimes were subjected to searches and extensive questioning by government authorities for evidence of anti-government activities abroad. Recorded and printed material, personal correspondence, and photographs were subject to confiscation.

The Government permitted Jews to travel abroad, but it often denied them multiple-exit permits issued to other citizens. Baha'is often experienced difficulty in obtaining passports.

Women must obtain the permission of their husband, father, or another male relative to obtain a passport. Married women must receive written permission from their husbands before being allowed to leave the country.

The Government did not use forced exile, and no information was available regarding whether the law prohibits forced exile; however, the Government used internal exile as a punishment. Many dissidents and ethnic and religious minorities left and continue to leave the country due to a perception of threat from the Government.

The law provides for granting asylum or refugee status in accordance with the 1951 U.N. Convention Relating to the Status of Refugees or its 1967 Protocol. The Government has established a system for providing protection to refugees. There were no reports of the forced return of persons to a country where they feared persecution; however, there were reports that the Government deported refugees deemed "illegal" entrants into the country. In times of economic uncertainty, the Government increased pressure on refugees to return to their home countries. The Government generally cooperated with the office of the U.N. High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting refugees and refugee seekers.

There was no information on the policy of the Government regarding temporary protection to individuals who may not qualify as refugees under the 1951 Convention or its 1967 Protocol.

The country hosted a large refugee population, mostly Afghans, as well as a significant number of Iraqis. After the September 2001 terrorist attacks, the Government sealed its border in anticipation of a war in Afghanistan and a resulting wave of refugees. The Government set up several refugee camps just inside Afghanistan to deal with the crisis. In September, UNHCR estimated that approximately 1 million refugees from Afghanistan remained in the country, with up to 1 million having returned to Afghanistan since the fall of the Taliban in December 2001. The Government denied UNHCR concerns that it was pressing Afghan refugees to leave. Most refugees subsisted on itinerant labor. The Government accused many Afghans of involvement in drug trafficking.

The UNHCR estimated that in 2001 there were approximately 200,000 Iraqi refugees in the country, the majority of whom were Iraqi Kurds, but also including Shi'a Arabs. Iraq expelled many of these Iraqi refugees at the beginning of the Iran-Iraq war because of their suspected Iranian origin. In numerous instances, both the Iraqi and Iranian Governments disputed their citizenship, rendering many of them stateless. Other Iraqi refugees arrived following Iraq's invasion of Kuwait in 1990.

During 2003, the Government took substantial steps to prepare for the possibility of new Iraqi refugees, but significant outflows never appeared. In November 2003, the UNHCR initiated a pilot repatriation of refugees from the country and had repatriated a few hundred to Iraq by early December 2003. According to press reports, refugee officials speculated that up to 120,000 of the 200,000 refugees in the country may have crossed back into Iraq without formal assistance since April 2003. As of September, according to the UNHCR, approximately 9,000 Iraqi refugees in the country had been repatriated into Iraq, as part of a UNHCR program.

Although the Government has claimed to host more than 30,000 refugees of other nationalities, including Tajiks, Bosnians, Azeris, Eritreans, Somalis, Bangladeshis, and Pakistanis, it did not provide information about them or allow the UNHCR or other organizations access to them. There was no further information during the year.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The right of citizens to change their government is restricted significantly. The Supreme Leader, the recognized Head of State, is elected by the Assembly of Experts and can only be removed by a vote of this same Assembly. The Assembly is restricted to clerics, who serve an 8-year term and are chosen by popular vote from a list approved by the Government. There is no separation of state and religion, and clerical influence pervades the Government, especially in appointed, rather than elected, positions. The Government effectively controlled the selection of candidates for elections. The Council of Guardians, which reviews all laws for consistency with Islamic law and the Constitution, also screens candidates for election for ideological, political, and religious suitability. It accepts only candidates who support a theocratic state; clerics who disagree with government policies or with a conservative view of the Islamic state also have been disqualified.

Regularly scheduled elections are held for the Presidency, the Majlis, and the Assembly of Experts.

Elections that were widely perceived as neither free nor fair were held for the 290-seat Majlis in February. The Council of Guardians, taking an expansive interpretation of its responsibility to screen candidates, barred over a third of the over 8,000 prospective candidates, mostly reformists, to include over 85 sitting Majlis members seeking re-election. Reasons cited included not showing "demonstrated obedience" to the current system of government. Reformers were reduced to a small minority of the Majlis.

Subsequently, there has been tension between the new Majlis and President Khatami's Government. On October 4, the Vice President for Majlis and Legal Affairs resigned, stating that he was unable to facilitate good relations between the Government and the Majlis.

Mohammad Khatami, a former Minister of Culture and Islamic Guidance who was impeached in 1992 by the Majlis for "liberalism" and "negligence," was elected President in 1997 and reelected in 2001 with 77 percent of the vote. The UNSR reported that the Council of Guardians significantly limited the number of candidates permitted to run in elections and noted that the Interior Minister denounced the "unprincipled disqualification" of candidates.

Elections were last held in the fall of 1998 for the 86-member Assembly of Experts. The Council of Guardians disqualified numerous candidates, which led to criticism from many observers that the Government improperly predetermined the election results.

In March, Supreme Leader Ayatollah Ali Khamenei told reporters that, "any action that weakens the sacred Islamic republican state is not permissible."

In 1999, elections for nationwide local councils were held for the first time since the 1979 revolution. A second round of nationwide local council elections was held in February 2003; substantial numbers of the pro-Khatami reformist forces elected to these councils in 1999 were defeated, and candidates aligned with conservative factions were elected.

In July 2002, the Government permanently dissolved the Freedom Movement, the country's oldest opposition party, jailing some members, fining others and barring them from political activity for up to 10 years (see Sections 1.d. and 2.b.).

There was widespread public perception of extensive corruption in all three branches of government, to include the judiciary (where many lawyers have said, "a judge's verdict is sold by the kilo"). This perception augmented by anecdotal information includes extensive corruption in the "bonyards" (foundations). In October, the NGO Transparency International released its annual Corruption Perception Index, noted that the country had an extremely low score (2.9 on a 10 point scale) and commented that, "corruption robs countries of their potential." In September 2003, the CEO and other top executives of the Norwegian oil company "Statoil" were dismissed after revelations of bribes paid an Iranian consulting company with direct links to the son of former President and current Expediency Council Chairman Ayatollah Ali-Akbar Hashemi-Rafsanjani.

The country apparently has no laws providing for public access to government information.

Women held 12 out of 290 Majlis seats. There were no female cabinet members, although several held high-level positions, such as Vice-President. A woman served as Presidential Advisor for Women's Affairs, and another was head of the Environmental Protection Agency.

Majlis seats were reserved for elected Christian (three), Jewish (one) and Zoroastrian (one) deputies. Religious minorities were barred from being elected to any other seats on a representative body and from holding senior government or military positions.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The Government continued to restrict the work of local human rights groups. The Government denies the universality of human rights and has stated that human rights issues should be viewed in the context of a country's "culture and beliefs."

In July, the Government granted permission to operate to an independent nonpolitical NGO, the Society for the Defense of the Rights of Prisoners. It worked to protect detainees and promote prison reform, established a small fund to provide free legal advice to prisoners, and supported the families of detainees.

Various professional groups representing writers, journalists, photographers, and others attempted to monitor government restrictions in their fields, as well as harassment and intimidation against individual members of their professions. However, the Government severely curtailed their ability to meet, organize, and effect change. There were domestic NGOs working in areas such as health and population, women and development, youth, environmental protection, human rights, and sustainable development. Some reports estimated a few thousand local NGOs currently in operation.

International human rights NGOs such as HRW and AI were not permitted to establish offices in or conduct regular investigative visits to the country. In June, AI officials, visited the country as part of the European Union's (EU's) Human Rights Dialogue, joining academics and NGOs to discuss the country's implementation of international human rights standards. However, authorities barred HRW and AI representatives from attending the EU's late 2002 human rights talks in Tehran, despite the EU's invitation. An October 2003 EU-Iran human rights dialogue was held in Brussels to facilitate the participation of NGO representatives. The Government also opened a human rights dialogue with Australia in 2002 and with Switzerland in October 2003, however, without tangible progress.

The ICRC and the UNHCR both operated in the country. However, the Government did not allow the UNSR to visit the country from 1997 to 2001, the last year his mandate to monitor human rights in the country was in effect. The Government allowed two visits by U.N. human rights representatives during 2003, one by the UNSR for the Promotion and Protection of the Right to Freedom of Opinion and Expression and one by a U.N. Working Group on Arbitrary Detention; there were no comparable visits during the year. In December, the Plenary of the U.N. 59th General Assembly adopted a resolution condemning the country for human rights abuses, including public executions, floggings, arbitrary sentences, torture, and discrimination against women and minorities.

The Islamic Human Rights Commission (IHRC) was established in 1995 under the authority of the head of the judiciary, who sits on its board as an observer. In 1996, the Government established a human rights committee in the Majlis, the Article 90 Commission, which receives and considers complaints regarding violations of constitutional rights; however, when the Seventh Majlis formed its new Article 90 Commission, the commission announced that it was dropping all cases pending from the Sixth Majlis. During the year, the commission took no effective action.

In October, AI reported that the Government confiscated the passport of Emaddedin Baqi, a senior member of the Society for the Defense of the Rights of Prisoners, preventing him from attending a ceremony outside the country where he was to receive an award for civil courage (see Section 2.d.). Baqi reportedly also was required to appear in court in August relating to complaints associated with his writings on human rights issues. At year's end, Baqi was still forbidden to leave the country.

In October 2003, the Article 90 Commission issued a report on the death in custody of Iranian-Canadian photojournalist Zahra Kazemi. The report identified Tehran's Chief Prosecutor and other members of the judiciary as being directly involved in subjecting Kazemi to violent interrogations in Evin Prison, and later attempting to cover up the cause of her death. The Article 90 Commission findings reportedly dismissed allegations of MOIS involvement in Kazemi's death, although an MOIS officer was charged with but later acquitted of her murder (see Section 1.a.).

In October 2003, lawyer and human rights activist Shirin Ebadi was awarded the Nobel Peace Prize for her work in advancing human rights both in the country and internationally. Ebadi, who served as one of the first female judges in the country before being forced to resign after the revolution, has campaigned on behalf of women, children, and victims of government repression. She represented the family of Darius and Parvaneh Forouhar, killed in 1998, and of a student killed during the 1999 student protests, which exposed links between vigilante groups and government officials and led to her arrest in 2000. Ebadi is a founder of the Center for the Defense of Human Rights, which represents defendants in political cases. She also agreed to represent the family of Zahra Kazemi during the investigation of her death and subsequent trial, and continued to press for justice in the case.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

In general, the Government did not discriminate on the basis of race, disability, language, or social status; however, it discriminated on the basis of religion, sex, and ethnicity. The poorest areas of the country are those inhabited by ethnic minorities, such as by the Baluchis in Sistan and Baluchestan Province, and by Arabs in the southwest. Much of the damage suffered by Khuzistan Province during the 8-year Iran-Iraq war has not been repaired; consequently, the quality of life of the largely Arab local population was degraded. Kurds, Azeris, and Ahvazi Arabs were not allowed to study their languages.

In October 2003, lawyer and human rights activist Shirin Ebadi was awarded the Nobel Peace Prize for her work in advancing human rights both in the country and internationally.

Women

Although spousal abuse and violence against women occurred, statistics were not available. Abuse in the family was considered a private matter and seldom was discussed publicly. Rape is illegal, and subject to strict penalties, but remained a widespread problem. The UNSR published statistics provided by the IHRC indicating that, at the end of 2001, an estimated 1,000 of approximately 3,000 active files were related to women's issues.

In July, the Supreme Court voided the death sentence against Afsaneh Noroozi and ordered the case re-investigated by the original court. Noroozi has been jailed since 1997, having been accused of killing a police chief on Kish Island in the southern part of the country. Noroozi's lawyers claimed the act was legally permitted ("mashru"), as the official had tried to rape her, and the country's Islamic penal code allows citizens to take proportionate action to defend "life, honor, chastity, property, or freedom." In November 2003, after lobbying by female Majlis representatives and international attention, judiciary head Ayatollah Mahmoud Hashemi-Shahrudi lifted her death sentence and returned the case to the Supreme Court. On December 21, the Kish Island court began a new trial of Nooroozi.

Prostitution was illegal. Accurate information regarding the extent of the problem was not widely available, although the issue received greater attention as a result of the public's growing interest in social problems. Press reports described prostitution as a widespread problem, and government statistics showed the average age of prostitutes to be dropping.

In December, human rights groups reported that "Leyla M," an 18-year-old with a mental age of 8 years, faced imminent execution for "morality-related" offences arising from her being forced into prostitution by her parents as a child. In late November, she was sentenced to death by a court in Arak, and the sentence was subsequently passed to the Supreme Court for confirmation. According to November press reports, social workers tested her mental capacities repeatedly, and each time they have found her to have a mental age of 8 years. However, she has apparently never been examined by the court-appointed doctors and was sentenced to death solely on the basis of her explicit confessions, without consideration of her background or mental health.

Provisions in the Islamic Civil and Penal Codes, in particular those sections dealing with family and property law, discriminate against women. Shortly after the 1979 revolution, the Government repealed the Family Protection Law, a hallmark bill adopted in 1967 that had given women increased rights in the home and workplace, and replaced it with a legal system based largely on Shari'a practices. In 1998, the Majlis passed legislation that mandated segregation of the sexes in the provision of medical care. In August 2003, the Council of Guardians rejected a bill that would require the country to adopt U.N. conventions on eliminating torture and ending discrimination against women.

Although the law permits it, marriage at the minimum age of 9 was rare. In mid-2002, authorities approved a law that requires court approval for the marriage of girls below the age of 13 and boys younger than 15. Although a male can marry at age 15 and above without parental consent, the 1991 Civil Law states that a virgin female, even over 18 years of age, needs the consent of her father or grandfather to wed, unless she is willing to go to court to get a ruling allowing her to marry without this consent. The country's Islamic law permits a man to have up to four wives. The law also allowed for the practice of temporary marriages based on a Shi'a custom in which a woman or a girl may become the wife of a married or single Muslim male after a simple and brief religious ceremony. The temporary marriage may last any length of time. According to Shi'a Islamic law, men may have as many temporary wives as they wish. Such wives are not granted rights associated with traditional marriage.

The Penal Code includes provisions for the stoning of women and men convicted of adultery, although judges were instructed at the end of 2002 to cease imposing such sentences (see Section 1.c.). Women may receive disproportionate punishment for crimes, including death sentences (see Section 1.a.).Women have the right to divorce if their husband has signed a contract granting that right or if the husband cannot provide for his family, is a drug addict, insane, or impotent. However, a husband is not required to cite a reason for divorcing his wife. In December 2002, a new law made the adjudication of cases in which women demand divorces less arbitrary and less costly.

A widely used model marriage contract limits privileges accorded to men by custom, and traditional interpretations of Islamic law recognize a divorced woman's right to a share in the property that couples acquire during their marriage and to increased alimony. Women who remarry are forced to give the child's father custody of children from earlier marriages. However, the law granted custody of minor children to the mother in certain divorce cases in which the father is proven unfit to care for the child. In November 2003, the Government amended the existing child custody law, which in the case of divorce gave a mother custody of a son up to 2 years of age and a daughter up to age 7 years, with custody reverting to the father thereafter. The new law gives a mother preference in custody for children up to 7 years of age; thereafter, the father has custody. After the age of 7 years, in disputed cases, custody of the child is to be determined by the court, taking into consideration the well being of the child.

The testimony of a woman is worth half that of a man in court. The blood money paid to the family of a female crime victim is half the sum paid for a man. A married woman must obtain the written consent of her husband before traveling outside the country (see Section 2.d.).

Women had access to primary and advanced education. Reportedly 60 percent of university students were women; however, social and legal constraints limited their professional opportunities. Women were represented in many fields of the work force, and the Government has not prevented women from entering many traditionally male-dominated fields; however, their unemployment rate reportedly was significantly higher than for men. Women can own property in their own name, own businesses, and obtain credit at a bank. Women are barred from seeking the presidency and from appointment to the judiciary. The law provides maternity, child care, and pension benefits.

The Government enforced gender segregation in most public spaces and prohibited women from mixing openly with unmarried men or men not related to them. Women must ride in a reserved section on public buses and enter public buildings, universities, and airports through separate entrances. Women were prohibited from attending male sporting events, although this restriction did not appear to be enforced universally. While the enforcement of conservative Islamic dress codes varied, what women wore in public was not entirely a matter of personal choice. The authorities sometimes harassed women if their dress or behavior was considered inappropriate, and women may be sentenced to flogging or imprisonment for such violations (see Section 1.c.). The law prohibits the publication of pictures of uncovered women in the print media, including pictures of foreign women. There are penalties for failure to observe Islamic dress codes at work.

Children

There is little current information available to assess Government efforts to promote the welfare of children. Except in isolated areas of the country, children had access to free education through the 12th grade (compulsory to age 11) and to some form of health care. Health care generally is regarded as affordable and comprehensive with competent physicians.

In December 2003, the Government enacted the Law on Protection of Children and Youth. This law prohibited abuse or harassment of children or youth in any manner and outlawed buying, selling, exploiting, or employing children to engage in illegal acts such as smuggling.

There was not enough information available to reflect how the Government dealt with child abuse (see Sections 6.c. and 6.d.).

Trafficking in Persons

In August, the Government enacted the Law on Combating Human Trafficking, defining and setting punishments for trafficking in persons. However, there were widespread reports that persons were trafficked to, through, and from the country during the year. It was difficult to measure the extent of the Government's efforts to curb human trafficking, but national and international press reporting indicated that the Government has taken action against bandits involved in abducting women and children and pursued agreements with neighboring states to curb human trafficking. The Government also reportedly has arrested, convicted, and executed numerous human trafficking offenders. During the year, police reportedly arrested numerous members of prostitution rings and closed brothels.

In April 2003, a court in Mashhad reportedly sentenced 53 individuals to 281 years in prison and 222 lashes on charges of abduction and slavery for trafficking scores of young girls to Pakistan.

Persons with Disabilities

In May, the Majlis passed a Comprehensive Law on the Rights of the Disabled; however, subsequent media reports indicate that there has been no implementing regulation. There was no current information available regarding whether the Government has legislated or otherwise mandated accessibility for persons with disabilities, or whether discrimination against persons with disabilities is prohibited; nor is there any information available on which government agencies are responsible for protecting the rights of persons with disabilities.

National/Racial/Ethnic Minorities

The Kurds continued to suffer from government discrimination. Suspicions of Kurdish separatist or foreign sympathies have led to sporadic outbreaks of fighting between government forces and Kurdish groups. In recent years, greater Kurdish cultural expression has been allowed and Kurdish publications and broadcasting have expanded. However, there was still no public school education in the Kurdish language.

The KDPI claimed that the Government executed at least three Kurdish party members and activists during the year and four during 2003. According to KDPI, plainclothes vigilantes in five separate attacks killed seven more Kurds in 2003 (see Section 1.a.). Other activists reportedly were imprisoned.

Azeris comprise approximately one-quarter of the country's population and are well integrated into the Government and society. However, Azeris complained of ethnic and linguistic discrimination, including banning the Azeri language in schools, harassing Azeri activists or organizers, and changing Azeri geographic names. The Government traditionally viewed Azeri nationalism as threatening, particularly since the dissolution of the Soviet Union and the creation of an independent Azerbaijan. Azeri groups also claimed that there were a number of Azeri political prisoners jailed for advocating cultural and language rights for Iranian Azerbaijanis. The Government has charged several of them with "revolting against the Islamic state."

Foreign representatives of the Ahwazi Arabs of Khuzistan, whose numbers could range as high as 4 million or more, claimed that their community in the southwest of the country suffered from discrimination, including the right to study and speak Arabic. In July 2003, authorities reportedly closed two bilingual Arabic/Farsi newspapers and imprisoned scores of political activists. They asserted that the Government ignored their appeals to de-mine the vast stretches of Khuzistan, mined during the Iran-Iraq War. They further stated that many Arabs, both Shi'a and Sunni, have been imprisoned and tortured for criticizing government policies. According to Ahwazi sources, a political activist with the Islamic Wafagh Party, Kazem Mojaddam, was sentenced to 2 years' imprisonment in November 2003 after his initial arrest in June 2003 on charges of secession and endangering internal security.

Other Societal Abuses and Discrimination

The law prohibits and punishes homosexuality. The punishment of a non-Muslim homosexual is harsher if the homosexual's partner is Muslim.

According to late 2003 estimates by a prominent local physician, there are approximately 25,000 to 30,000 HIV positive citizens; a 2001 estimate suggested an adult prevalence rate of less than 0.1 percent. There is a free anonymous testing clinic in Tehran. The Government supported the creation of an HIV awareness film to show in schools and has not interfered with private HIV-related NGOs. Nevertheless, persons infected with HIV were discriminated against in schools and workplaces.

Section 6 Worker Rights

a. The Right of Association

The Labor Code provides workers the right to establish unions; however, the Government did not allow independent unions to exist. A national organization known as the Workers' House was the sole authorized national labor organization. It served primarily as a conduit for the Government to exert control over workers. The leadership of the Workers' House coordinated activities with Islamic labor councils, which were made up of representatives of the workers and a representative of management in industrial, agricultural, and service organizations of more than 35 employees. These councils also functioned as instruments of government control, although they frequently were able to block layoffs and dismissals.

The Labor Code allows employers and employees to establish guilds. The guilds issued vocational licenses and helped members find jobs. Instances of late or partial pay for government workers reportedly were common.

b. The Right to Organize and Bargain Collectively

Workers did not have the right to organize independently and negotiate collective bargaining agreements. The International Confederation of Free Trade Unions (ICFTU) noted that the Labor Code was amended in 2003 to permit workers to form and join "trade unions" without prior permission if registration regulations are observed. The Ministry of Labor must register the organization within 30 days.

In January 2003, the Supreme Council of Labour, composed of representatives of Islamic labor councils, employers, and the government, exempted workshops of 10 employees or less from labor legislation. According to the ICFTU, this decision affected over 400,000 workshops of the total of 450,000 in the country.

The law prohibits public sector strikes, and the Government did not tolerate any strike deemed to be at odds with its economic and labor policies; however, strikes occurred. There are no mechanisms to protect workers rights in the public sector, such as mediation or arbitration. In addition to strikes, there were also work stoppages and protests by oil, textile, electrical manufacturing, and metal workers, as well as protests by the unemployed. There were strikes, such as that by copper factory workers (see Section 1.a.), and other labor stoppages in protest of issues such as nonpayment of salaries.

In December, textile workers in the city of Sanandaj struck to seek the re-hiring of laid off workers, a healthier work environment, cancellation of the practice of hiring temporary workers, and revising the regulations concerning factories' discipline committees.

In May, the ICFTU reportedly placed a formal complaint with the U.N. International Labor Office regarding the arrest of 40 workers during a Labor Day march in Saqez (see Section 2.b.).

In May 2003, textile workers in Behshar staged a hunger strike to protest nonpayment of overdue wages. Teachers staged demonstrations and sit-ins in several cities during the year for improved working conditions and wage benefits.

It is not known whether labor legislation and practice in the export processing zones (EPZs) differ from the law and practice in the rest of the country. According to the ICFTU, labor legislation did not apply in the EPZs.

c. Prohibition of Forced or Compulsory Labor

The Penal Code provides that the Government may require any person who does not have work to take suitable employment; however, this did not appear to be enforced regularly. The law prohibits forced and bonded labor by children; however, this was not enforced adequately, and such labor by children was a serious problem (see Section 5).

d. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits forced and bonded labor by children; however, there appears to be a serious problem with child labor (see Section 5). The Labor Law prohibits employment of minors less than 15 years of age and places restrictions on the employment of minors under age 18; however, laws pertaining to child labor were not enforced adequately. The law permits children to work in agriculture, domestic service, and some small businesses. The law prohibits the employment of women and minors in hard labor or night work. Information regarding the extent to which these regulations were enforced was not available.

e. Acceptable Conditions of Work

The Labor Code empowers the Supreme Labor Council to establish annual minimum wage levels for each industrial sector and region; however, no information was available regarding mechanisms used to set wages. It was not known if the minimum wages were adjusted annually or enforced. The Labor Code stipulates that the minimum wage should be sufficient to meet the living expenses of a family and should take inflation into account. However, under poor economic conditions, many middle-class citizens must work at two or three jobs to support their families.

The Labor Code establishes a maximum 6-day, 48-hour workweek, with a weekly rest day, normally Fridays, and at least 12 days of paid annual leave and several paid public holidays.

According to the Labor Code, a Supreme Safety Council, chaired by the Labor Minister or his representative, is responsible for promoting workplace safety and health. Labor organizations outside the country have alleged that hazardous work environments were common in the country and have resulted in thousands of worker deaths per year. It was not known how well the Ministry's inspectors enforced regulations. It was not known whether workers could remove themselves from hazardous situations without risking the loss of employment.

----------

1. The United States does not have an embassy in Iran. This report draws heavily on non-U.S. Government sources.

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.
External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.
Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).