# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**MASIH ALINEJAD,**

       **Plaintiff,**

  **v.**

**THE ISLAMIC REPUBLIC OF IRAN,** *et al.*,

       **Defendants.**

**Case No. 19-cv-3599 (GMH)**

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Masih Alinejad ("Plaintiff") brought this action against the Islamic Republic of Iran ("Iran"), Iran's Supreme Leader Seyed Ali Hosseini Khamenei ("the Supreme Leader"), the Judiciary of Iran, and the Islamic Revolutionary Guard Corps ("IRGC") (collectively, "Defendants") under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.  Section 1605A permits United States nationals to sue foreign states designated as state sponsors of terrorism for personal injury or death "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  Plaintiff alleges that, in response to her high-profile political activism against the practices and policies of the Iranian government, Defendants detained her brother, Alireza Alinejad-Ghomi ("Plaintiff's brother" or "Alinejad-Ghomi"), in September 2019, held him hostage until August 2021, and tortured him during his detention.  She seeks compensatory and punitive damages from Defendants for the emotional injuries she has suffered knowing that her brother likely faced horrific treatment during his detention.

Plaintiff filed a motion for default judgment against Iran only after it failed to appear before the Court.  After a thorough review of the record,[1] the Court grants Plaintiff's motion and awards her $3.325 million in total damages.[2, 3]

# I.      BACKGROUND[4]

## A.      Masih Alinejad's Activism

Plaintiff Masih Alinejad is an Iranian-born United States citizen and a journalist, author, and political activist.  *See* ECF No. 1 at 3.  Due to her political activism, she fled Iran in 2009 around the time of the disputed Iranian Presidential election that year.  *See id.* at 6.  Plaintiff later

---

[1] The docket entries relevant to this Memorandum Opinion are (1) Plaintiff's Complaint (ECF No. 1); (2) Clerk's Entry of Default (ECF No. 15); and (3) Plaintiff's Motion for Default Judgment (ECF No. 31) and the attached exhibits.  Citations to page numbers reflect the pagination assigned by the Court's Electronic Case Filing system.

[2] After Plaintiff consented to the jurisdiction of a magistrate judge for all purposes, Judge Sullivan referred this matter to the Court pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  *See* ECF Nos. 20, 22; Minute Entry (Dec. 1, 2021) (referring case to the undersigned for all purposes).  Under the Federal Magistrate Act, magistrate judges may, with the consent of the parties, preside over "any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court."  28 U.S.C. § 636(c)(1).  A party may, through conduct, impliedly consent to a magistrate judge's jurisdiction.  *Roell v. Withrow*, 538 U.S. 580, 591 (2003).  On this basis, courts in this Circuit have found a party's default effected consent to a magistrate judge's jurisdiction to decide a motion for default judgment.  *See Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61, 2022 WL 18071921, at *1 n.2 (D.D.C. Dec. 28, 2022); *Koch Minerals Sàrl v. Bolivarian Republic of Venezuela*, 514 F. Supp. 3d 20, 38 (D.D.C. 2020); *Radmanesh v. Gov't of Islamic Republic of Iran*, No. 17-cv-1708, 2019 WL 1787615, at *1 (D.D.C. Apr. 24, 2019), *aff'd sub nom. Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338 (D.C. Cir. 2021); *Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90, 98 (D.D.C. 2011) ("[D]efaulting nullifies any right to argue the absence of the magistrate judge's jurisdiction . . . ."); *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 682–85 (2015) (applying *Roell*'s implied consent standard and holding that a bankruptcy judge may enter default judgment against an absent party where their defaulting conduct evinces consent to the bankruptcy judge's jurisdiction).

[3] Plaintiff also brings claims under the Torture Victim Protection Act of 1991 ("TVPA") against the Supreme Leader for torturing her and her brother.  *See* ECF No. 1 at 2.  However, because Plaintiff moved for default judgment against Iran only, the TVPA claim against the Supreme Leader is not addressed here.

[4] The following background relies on the allegations of the complaint, assertions in the motion for default judgment, and information from the exhibits supporting the motion without regard to questions of admissibility.  Admissibility issues are discussed in Section III, *infra*.

moved to the United States in July 2014.  *See id.* at 3.  She became a United States citizen on October 17, 2019.  *See id.*; ECF No. 31-8 at 2.

Plaintiff's political activism began in the 1990s, when she and her brother were both arrested after publishing material critical of the Iranian government.  *See* ECF No. 31-3, ¶ 4. Plaintiff later made a career in journalism, covering the Iranian parliament and associated corruption.  *Id.*  Then, in 2014, Plaintiff created a Facebook page entitled "My Stealthy Freedom" to protest compulsory hijab for Iranian women.  *See* ECF Nos. 31-14, 31-15.  A hijab is loose clothing that covers the head, neck, and hair, and became mandatory for women following the Iranian Revolution in 1979.  *See* ECF No. 31-16 at 2.  Women in Iran can be arrested by "morality police" or attacked if they do not wear a hijab.  *See id.*  The Facebook page welcomed Iranian women to post pictures of themselves not wearing hijab.  *See* ECF No. 31-14 at 1–2.  Within two days of its creation, 30,000 women had posted photos showing themselves without hijab.  *See id.*

Following Plaintiff's successful Facebook campaign in 2014, an Iranian television report claimed that three men had raped Plaintiff in London and that her seventeen-year-old son was a witness to the rape.  *See* ECF No. 31 at 4; ECF No. 31-20 at 2.  Plaintiff denied this event occurred and called the allegations "imagination."  ECF No. 31-20 at 2.  She believes the allegations were intended to ruin her reputation and deter others from following in her activist footsteps.  *See* ECF No. 31 at 4.

In 2017, Plaintiff initiated a "White Wednesdays" campaign to encourage women to post pictures or videos of themselves wearing white pieces of clothing in protest of compulsory hijab. *See* ECF No. 1 at 6; ECF No. 31 at 3.  Plaintiff's memoir, *The Wind in My Hair: My Fight for Freedom in Modern Iran*, was published in 2018.  ECF No. 31-3, ¶ 3.  In February 2019, she met with then-U.S. Secretary of State Mike Pompeo to discuss the human rights situation in Iran.  *See*

ECF No. 31-17 at 2. Plaintiff also says she initiated "a campaign for the Islamic Republic to be banned from international sports competition." ECF No. 31-3, ¶ 29. Then, in July 2019, just months before Plaintiff's brother was detained, an Iranian judiciary official announced that persons sharing photos or videos with Plaintiff—who Iran considered to be acting on behalf of the United States and thus an enemy of the state—could face up to 10 years in prison. *See* ECF No. 31-18 at 3 (quoting the head of Iran's Revolutionary Court as saying, "[a]ll those women who send the video footage of removing their hijab to her will be sentenced to between one to 10 years of jail").

### B.    The Arrest of Alinejad-Ghomi

In 2019, Plaintiff's brother, Alireza Alinejad-Ghomi, made a video that was to be released in the event he was detained; the video was uploaded in May 2020. *See* ECF No. 31-3, ¶ 15; ECF No. 31-22 at 2. In the video, he asserted that his parents had been interrogated by Iranian officials when they refused to denounce Plaintiff on television. ECF No. 31-3, ¶¶ 14–15; ECF No. 31-22 at 2. He also encouraged Plaintiff to continue her work even if he was arrested. *See* ECF No. 31-22 at 2. On or about September 24, 2019, Alinejad-Ghomi was detained, allegedly by the IRGC. *See* ECF No. 31-24 at 2; ECF No. 31-28 at 2; ECF No. 31-42 at 2; ECF No. 31-62, ¶ 5.[5] Alinejad-Ghomi was kept in Ward 2A of Evin Prison in Tehran, "a special section for political prisoners operated by the Revolutionary Guards." ECF No. 31 at 5; ECF No. 31-42 at 2. On July 11, 2020, Alinejad-Ghomi was sentenced to eight years in prison for "[i]nsulting the supreme leader," "[p]ropaganda against Islamic Republic of Iran," and "[a]ssociation and collusion to commit crimes against internal and external security" in relation to Plaintiff's campaign against

---

[5] There is some discrepancy as to when Alinejad-Ghomi was arrested. According to a Washington Post article, an Amnesty International news report, and the declaration of ▮▮▮▮, Alinejad-Ghomi was arrested on September 24, 2019. *See* ECF No. 31-42 at 2; ECF No. 31-28 at 2. However, according to an Iran International news article, he was arrested in August 2019. *See* ECF No. 31-24 at 2. It appears from these three sources that Alinejad-Ghomi was arrested sometime in the late summer or early fall of 2019.

compulsory hijab.  ECF No. 31-23 at 2–5.  Indeed, the crux of the charges against Alinejad-Ghomi

appears to have been that he aided his sister's activism:

> [I]nvestigations show that he was in charge of directing, guiding, and persuading
> Masih Alinejad in organizing anti-cultural actions and security activities, and he
> has been instrumental in regard to the qualitative and quantitative measures and
> effectiveness of Masih's anti-cultural and subversive actions aiming at improving
> the level of feedback and effectiveness of measures in the field of publishing
> criminal content.

ECF No. 31-23 at 3.  On February 13, 2021, the Iranian Supreme Court apparently denied Alinejad-

Ghomi's appeal.  *See* ECF No. 31 at 6; ECF No. 31-24 at 2.  However, on August 3, 2021, he was

reportedly "temporarily released" from prison on bail; according to Plaintiff the release was

conditioned on him not having any contact with her and can be revoked at any time.  ECF No. 31-

3, ¶ 44; *see also* ECF No. 31-62, ¶ 16.

## C.    The Campaign Against Plaintiff's Family

After Plaintiff's online campaign against compulsory hijab garnered international

attention, Alinejad-Ghomi reported (in the video released in May 2020) that the Iranian

government began to pressure her family in Iran by continuously calling on them "to appear on

television and make statements against [Plaintiff] using different techniques . . . threats, bribes."

ECF No. 31-22 at 2.  In 2018, Plaintiff's sister, Mina Alinejad, appeared on National Iranian

Television to publicly denounce Plaintiff.  *See* ECF No. 31 at 14 n.51; ECF No. 31-3, ¶ 14.  In

March 2019, Iranian authorities reportedly interrogated Plaintiff's mother, Zarrin Badpa, for two

hours about Plaintiff's activities.  *See* ECF No. 31-28 at 2.  Plaintiff's mother thereafter "severely

curtailed her contacts" with Plaintiff, apparently contacting her only once in 2021 to warn Plaintiff

not to travel outside of the United States.  ECF No. 31-3, ¶¶ 35, 37; *see also* ECF No. 31 at 15–16.

### D.    Aftermath

Because of the arrest of Alinejad-Ghomi, Plaintiff says she is racked by anxiety, guilt, depression, sadness, recurrent nightmares, and "constant fear for how her actions could have negative repercussions for him."  ECF No. 31 at 7; ECF No. 31-3, ¶¶ 18–20, 22, 27, 29–30.  Iran's treatment of her brother has "hurt [her] deeply" and she has "been devastated by Alireza's arrest and imprisonment—he was my brother and my best friend.  I'm able to function but there is a big hole in my life."  ECF No 31-3, ¶ 27.  She says continues to receive death threats and insults from Iranians and the government.  ECF No. 31 at 7; ECF No 31-3, ¶¶ 34, 45; ECF No. 31-41.

On July 13, 2021, federal prosecutors in New York announced that five Iranians had been charged with conspiracy to kidnap Plaintiff "in furtherance of the government of Iran's efforts to silence [Plaintiff's] criticisms of the regime."  ECF No. 31-43 at 2–3.  As part of the plot to kidnap Plaintiff, the defendants allegedly hired private investigators to monitor her and her family members in Brooklyn, New York.  *See id.* at 3.  The then-U.S. Attorney for the Southern District of New York remarked that if those efforts to forcibly take Plaintiff to Iran were successful, her "fate would have been uncertain at best."  *Id.* at 2.

### II.    TESTIMONY AND OTHER EVIDENCE

### A.    Testimony of Masih Alinejad

Plaintiff supplied testimony by a signed declaration dated December 5, 2022.[6]  ECF No. 31-3.  She was born in 1976 in a small village in northern Iran and was the youngest of five children.  *See id.*, ¶ 3; ECF No. 31-8.  She developed a close relationship with her brother, who

---

[6] Plaintiff submitted a redacted and an unredacted version of this declaration.  *See* ECF No. 31-3 (redacted version); ECF No. 32-1 (unredacted version).  This discussion recites information from the redacted version only.

was eighteen months older and her "guardian angel."  ECF No. 31-3, ¶ 3.  He taught her "little things like riding a bicycle but also introduced [her] to great works of literature and politics."  *Id.*

After moving to Tehran to become a journalist, Plaintiff went through a divorce in September 2000.  *Id.*, ¶ 5.  During that time, Alinejad-Ghomi provided emotional support and assisted her with moving and child custody issues.  *Id.*  Even when Plaintiff ran into problems as a parliamentary reporter after exposing corruption in the Iranian government, her brother encouraged her to write a book, and edited the manuscript. *Id.*, ¶ 6.  After Plaintiff fled Iran around the time of the country's 2009 Presidential election, she kept in touch with her brother on a regular basis.  *Id.*, ¶ 8.  Alinejad-Ghomi "became the bridge that connected [Plaintiff] and her family every day . . . ma[king] it easier for [her] to bear the distance with his messages and the videos he sent [her] almost daily."  *Id.*

When Plaintiff launched the My Stealthy Freedom campaign against compulsory hijab, she says the Iranian government issued threats in an effort to silence her.  *Id.*, ¶ 10.  In one case, an Iranian news channel reported that she was raped in London on account of her failure to wear hijab.  *Id.*, ¶ 11.  Plaintiff avers that no rape occurred and that "the aim was to shame [her] and scare off women."  *Id.*  She says she was "devastated" when her mother called to "complain of how [she] had brought shame to the family" after watching the news.  *Id.*  Not long after, Alinejad-Ghomi contacted her to show his support, and he calmed their mother down.  *Id.*

In 2018, when Plaintiff's sister Mina appeared on national television in Iran to denounce and disown Plaintiff, Plaintiff says she was "extremely pain[ed]."  *Id.*, ¶ 14.  She also claims that the Iranian government similarly pressured her parents to appear on national television, but they resisted.  *Id.*  Apparently, her mother was interrogated at length by Iranian officials.  *Id.*  In September 2020, a neighbor of Plaintiff's mother sent Plaintiff a copy of a taped conversation

between Plaintiff's mother and the neighbor.  According to Plaintiff, the tape indicates that her mother had, at some point, been "taken for interrogation one late night and the agents kept her for most of the night . . . [after which] they warned [her] not to contact [Plaintiff] again."  *Id.*, ¶ 36.  However, "[r]ecently" her mother called her with one sentence:  "Do not travel outside the U.S." *Id.*, ¶ 37.  Plaintiff says she "knew that it was dangerous for [her] to travel because [she] is a target of the government of Iran."  *Id.*

Plaintiff says that when she was told her brother had been arrested in September 2019, she passed out.  *Id.*, ¶ 18.  In the days after the arrest, Plaintiff scrambled, without success, to find out where her brother was located.  *Id.*, ¶ 19.  At the time, she did not know whether he was alive and says that lack of knowledge was "a form of torture."  *Id.*  When Plaintiff found out from her brother's friend, Navid Mihandoost, that her brother was being held in section 2A of Evin Prison— which she says is known for "tough and inhumane interrogations"—she began to experience recurring nightmares that left her screaming.  *Id.*, ¶ 20.  She also learned from Mr. Mihandoost that her family had been threatened with detention by the IRGC if they told Plaintiff anything about her brother.  *Id.*, ¶ 21.

In March 2020, Plaintiff became "tremendously" upset when she received an Instagram message from another Iranian political prisoner who had been furloughed that Alinejad-Ghomi was depressed.  *See id.*, ¶ 24.  She says she became even more upset when she learned that her brother had developed an ear infection for which he was allegedly denied medical treatment.  *Id.*, ¶ 25.  She is unable to communicate regularly with her brother; if the Iranian authorities discovered that the two were communicating, she says, it could have unpleasant consequences for Alinejad-Ghomi.  *See id.*, ¶ 26.  However, in a "rare call in summer 2021," Alinejad-Ghomi asked her "to stop advocating for sanctions against head of Evin Prison, Hamid Mohammadi and to stop posting

about Mohammadi on social media" because Alinejad-Ghomi's "life [was] under [Mohammadi's] control." *Id.*, ¶ 43.

Overall, Plaintiff says she feels "guilty about being responsible for [Alinejad-Ghomi's] arrest and detention." *Id.*, ¶ 22. She has "been devastated by [her brother's] arrest and imprisonment" as she grieves the loss, even if only temporary, of her brother and best friend. *Id.*, ¶ 27. Although she can function, "there is a big hole in [her] life." *Id.* She says she "planted a cherry blossom tree [in her garden] and named it after [her brother]." *Id.* Apparently, she makes "daily video clips for [her brother] in which [she] talks to him about the events of [her] day . . . and how much [she] miss[es] him." *Id.*, ¶ 31. Since her brother's arrest, Plaintiff says she has difficulty sleeping and now requires medication to fall asleep. *See id.*, ¶ 30. Plaintiff claims that "[her] brother is being punished and all of [her] loved ones are in danger of Iran's retaliation just as [she] is" due to "[her] refusal to be intimidated by Iran and give into their threats." *Id.*, ¶ 46. In addition, she asserts that she herself is a target of Iranian schemes, including attempts to kidnap and otherwise harm her. *Id.*, ¶¶ 37–39, 41.

### B. Testimony of ▮▮▮▮▮▮▮▮▮[7]

▮▮▮▮▮▮▮▮ provided a signed declaration dated December 5, 2022. ECF No. 33-1. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮ *Id.*, ¶ 2. According to ▮▮▮▮▮▮ Alinejad-Ghomi was arrested on September 24, 2019, and held in solitary confinement in a tiny, dirty cell in Ward 2A of Evin Prison, where he was subjected to "daily, around-the-clock interrogation" until December 2019, refused medical

---

[7] ▮▮▮▮ has filed a declaration in redacted and unredacted form, seeking to shield his identity from public disclosure for fear of repercussions. *See* ECF Nos. 31-62 (redacted declaration), 33-1 (unredacted declaration). The information provided in this section includes material that has been redacted by Plaintiff, such as ▮▮▮▮▮▮ name.

treatment, and prohibited from communicating with his family.  *Id.*, ¶¶ 5, 6, 8.  To gain his cooperation, interrogators threatened to torture his family, convict him of crimes against Islam, ███████████████████████, and "publish wrong and publicly shameful information against his character."  *Id*, ¶ 7.  ██████████ asserts that the IRGC, knowing of the close relationship between Alinejad-Ghomi and his sister, was convinced that his "unknown status and the fact that he [was] not free due to [Plaintiff's] activities" would cause her to "cease her work in the hopes of her brother then being released."  *Id.*, ¶ 9.  Interrogators focused on getting Alinejad-Ghomi to assert that Plaintiff was ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*Id.* ¶ 9.  He was finally moved out of solitary confinement in May 2020 to be tried on charges of propaganda against the State, assembling and colluding to act against national security, and insulting the Leader and Founder of the Islamic Republic.  *Id.*, ¶ 10.  ████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████  *Id.*, ¶¶ 2, 11, 12.

Regarding Alinejad-Ghomi's release from prison in August 2021, ████████████████ that it came about because, after the July 2021 revelation that Iranian agents were trying to kidnap Plaintiff, "the government realized that their goal of arresting [her] was not going to materialize and detaining [Alinejad-Ghomi] was only increasing damage[] [to] the regime."  *Id.*, ¶ 17.

### C.    Testimony of Kambiz Foroohar

Kambiz Foroohar, Plaintiff's husband, provided a signed declaration dated August 16, 2021.  ECF No. 31-4.  He came to the United States in 1988 and became a naturalized citizen in

October 2013. *Id.*, ¶ 1. Since 1990, he has been a journalist for publications such the Wall Street Journal, Bloomberg, and Forbes, and is a documentary maker. *Id.*, ¶ 2.

Foroohar described Alinejad-Ghomi as a "well-read and rounded person" who provided "love and support" for Plaintiff through near-daily interactions. *See id.*, ¶ 4. According to Foroohar, Plaintiff's brother was her "most important family member." *Id.* Apparently, Alinejad-Ghomi called Foroohar at some point in 2017 to warn him and Plaintiff of an IRGC plot to lure the couple to Turkey "on the pretext of meeting her family" as a set-up for forcibly taking Plaintiff to Iran. *Id.*, ¶ 8.

After the arrest of Alinejad-Ghomi, Foroohar says Plaintiff "was devastated by guilt" and blamed herself for what happened—yet was unable to speak with her family in Iran "because that would only put them in greater harm." *Id.*, ¶ 11. Foroohar notes that Plaintiff lost more than 10 percent of her body weight following the arrest, falling to under 100 pounds. *Id.*, ¶ 12. He also reports having to rouse Plaintiff from nightmares on weekly basis. *Id.* According to her husband, Plaintiff talks to a "cherry blossom tree" in their front yard, which she named after her imprisoned brother, and "would talk to it without concern of being seen by passersby." *Id.*, ¶ 13. Since the arrest and even before the COVID-19 pandemic, Plaintiff quit eating out, reasoning that "her brother couldn't enjoy fine dining." *Id.*, ¶ 14. Foroohar says Plaintiff has depression, "which she self-medicates." *Id.*

### D.    Testimony of Roya Hakakian

Roya Hakakian provided a signed declaration dated August 14, 2021. *See* ECF No. 31-5. She is a writer and journalist who has known Plaintiff since approximately 2017. *See id.* ¶¶ 2–3. Hakakian says there were two occasions over the past several years in which Plaintiff called her in "despair and fear." *Id.*, ¶ 4. One was in July 2018, when Plaintiff's sister "appeared on the

Iranian National TV broadcast to denounce her." *Id.*, ¶ 4. Hakakian describes Plaintiff as being "heartbroken" and fearful that her parents would feel similar pressure to denounce her. *Id.* When Hakakian checked on Plaintiff the next day, she found that Plaintiff was back to normal because she had spoken with her brother. *Id.*, ¶ 5. Alinejad-Ghomi was someone who "alone could be [Plaintiff's] lifeline" and that "[w]ith a few brotherly words of love, especially in the intimate and familiar dialect of her community which no one else can speak, he could build her back up, and remind her that her work was too important to yield to momentary despair, or even a sister's betrayal." *Id.*, ¶ 6. The second time Plaintiff called Hakakian was after Alinejad-Ghomi's arrest. *Id.*, ¶ 7. *Id.* Although Plaintiff "still carries on," Hakakian notes that Plaintiff's "sleep is disturbed when she visits . . . [s]he goes to bed long after everyone else, and is awake before everyone else . . . [s]he eats less, and works more . . . ." *Id.* at ¶ 8.

### E. Testimony of Ramin Ahmadi

Dr. Ramin Ahmadi provided a signed declaration dated August 16, 2021. ECF No. 31-6. He is a medical doctor who has known Plaintiff since approximately 2011. *See id.*, ¶ 3. In the past 30 years, Ahmadi has completed numerous health and human rights projects and founded the Iran Human Rights Documentation Center, which "document[s] systematic and widespread violation of human rights in Iran." *See id.*, ¶ 2.

Ahmadi says that ever since the Iranian government arrested Plaintiff's brother, Alinejad-Ghomi "has been under pressure to denounce his sister but he has bravely resisted various physical and mental tortures of captivity." *Id.*, ¶ 4. It is unclear how Ahmadi knows this, as he did not provide a basis for his knowledge of Alinejad-Ghomi's condition. According to Ahmadi, Plaintiff's mental health deteriorated after her brother's arrest. *Id.*, ¶ 6. He writes that Plaintiff has a "depressed mood and classic symptoms of post-traumatic distress syndromes" and that

Plaintiff "is now frequently anxious and has difficulty . . . concentrat[ing]." *Id.* This stands in stark contrast to Plaintiff's overall affect before the arrest of her brother, when she was "always optimistic, efficient with her time, and full of energy[;] [s]he was tireless, a real workaholic." *Id.* Now, Plaintiff has "overwhelming feelings of guilt especially about her brother's children." *Id.* at ¶ 7. Ahmadi also says that Plaintiff has PTSD, an assessment he makes "[b]ased on [his] experience of interviewing so many human rights victims during [his] life." *Id.* at ¶ 8. It is not clear, however, whether Ahmadi has ever examined Plaintiff in a clinical setting. More, Ahmadi writes that "[Plaintiff] is well aware that her brother's detention and torture has been the direct result of her human rights activity and open criticism of Islamic Republic of Iran." *Id.* Plaintiff does not seek to qualify Ahmadi as an expert.

### F. Testimony of Mehrangiz Kar

Mehrangiz Kar provided a signed declaration dated April 12, 2021. ECF No. 31-7. Kar is a human rights attorney who has known Plaintiff since Plaintiff came to the United States. *Id.*, ¶¶ 1, 15. Kar writes that "[t]he Islamic Republic routinely relies upon threats, harassment and intimidation to silence those who oppose the regime." *Id.*, ¶ 3. She recounts how she was arrested in 2000 for her political activism and in 2001 was given a four-year prison term. *Id.*, ¶ 4. Kar then tells the story of her husband, Iranian journalist and film critic Siamak Pourzand, who was arrested by the Iranian authorities in November 2001 and held until his death in 2011. *Id.*, ¶¶ 7, 12. While in detention, Kar describes how Pourzand was treated, including a forced confession, a sham trial, substantial weight loss, and "terrible torture." *Id.*, ¶¶ 8–11. She reports that, during her husband's

detention, she "suffered from constant anxiety, worry, and fear" and was "gripped by paranoia." *Id.*, ¶¶ 13–14.

According to Kar, Plaintiff "has suffered the imprisonment and sentencing of her beloved brother . . . as an attempt to silence her voice." *Id.*, ¶ 16. Having gone through "the same abusive practices at the hands of the Islamic Republic," Kar describes how "every day is filled with feelings of guilt for the harm being visited upon that person due to [her] actions, and fear for how every word or action [she] make[s] could cause them further suffering." *Id.*

### G.     Expert Report of Professor Ali Arab

Professor Ali Arab provided an expert report dated December 4, 2022, addressing "conditions of human rights in Iran as [they] pertain[] to [Plaintiff's] case versus the Islamic Republic of Iran."[8] ECF No. 31-58 at 3. Professor Arab reports that arbitrary detentions and hostage takings "have been part of the history of the [Islamic Republic of Iran] since the early days of the 1979 Revolution" and have been used "as a systematic tool for the regime to oppress dissent." *Id.* at 16–17. Indeed, he avers that the regime practices hostage taking, including the arbitrary and unlawful detention of the "loved ones" of activists, "as part of its hostage diplomacy strategy." *Id.* at 18. Professor Arab opines that the detention of Alinejad-Ghomi is part of "an effort to pressure and compel his sister to abstain from speaking out against the regime." *Id.* at 21.

---

[8] Professor Arab is an Associate Professor of Statistics at Georgetown University. ECF No. 31-58 at 3. His areas of expertise include topics related to science and human rights. *Id.* He is currently the Deputy Treasurer for the Board of Directors of Amnesty International USA and is both a founding member and a Director of Hostage Aid Worldwide, an organization that "assist[s] hostage victims and their families by providing insights on their cases, coordination with governments and the UN bodies, and a strategy to disrupt the hostage business model and the emerging threat of hostage diplomacy through combining global advocacy with empirical data driven methods and extensive research." *Id.* at 4. As has at least one other court in this Circuit, the Court finds that Professor Arab is sufficiently qualified to testify as an expert pursuant to Rule 702 of the Federal Rules of Evidence. *See Kar v. Islamic Republic of Iran*, Nos. 19-cv-2070, 19-cv-2602, 2022 WL 4598671, at *5 n.7 (D.D.C. Sept. 30, 2022) (finding Professor Arab "sufficiently qualified by knowledge, skill, experience, training, and education to meet the requirements of Federal Rule of Evidence 702" in a case against Iran alleging hostage taking and torture).

In addition, Iran's prisons employ the "systematic use of torture" and prominent detainees like Alinejad-Ghomi often "are tortured and coerced into forced confessions which are then used by the intelligence apparatus . . . to leverage the government's goals vis-á-vis the hostage." *Id.* at 22–23. Professor Arab concludes that Alinejad-Ghomi's situation "follows these patterns" of Iranian hostage taking and that, while detained at Evin Prison, "he was victim to physical torture, namely denial of adequate medical care, and immense psychological torture." *Id.* at 32–33.

### H.    Other Evidence

In addition to the declarations and expert report, Plaintiff has presented documentary evidence in support of her motion for default judgment, including news articles and press releases about Plaintiff, *see, e.g.*, ECF Nos. 31-12, 31-13, 31-14, 31-17, 31-18, 31-20, 31-21, 31-27, 31-28, 31-30, 31-34, 31-35, 31-38, 31-40, 31-43, and 31-61; news articles and press releases about the Islamic Republic of Iran (some of which overlap with the prior category), *see, e.g.*, ECF Nos. 31-16, 31-18, 31-20, 31-21, 31-27, 31-28, 31-30, 31-34, 31-35, 31-39, 31-43, and 31-53; and government and non-governmental organization ("NGO") reports concerning human rights, including Iran's treatment of political prisoners and other detainees, *see, e.g.*, 31-19, 31-26, 31-29, 31-32, 31-33, 31-37, 31-44, 31-45, 31-47, 31-48, 31-49, 31-50, 31-51, 31-52, 31-54, 31-55, 31-56, 31-57, and 31-60. *See generally* ECF No. 31-2.[9] Other courts' findings concerning Iran's treatment of prisoners are the subject of judicial notice by the Court.

### III.    LEGAL STANDARD

The Federal Rules of Civil Procedure establish a two-step process for entry of default judgment. Fed. R. Civ. P. 55(a)–(b); *see also United States v. Twenty-Four Cryptocurrency*

---

[9] As discussed more fully below, *see infra* note 22, the majority of those documents appear to be inadmissible, irrelevant, or both.

*Accounts*, 473 F. Supp. 3d 1, 4 (D.D.C. 2020). First, a plaintiff must request "that the Clerk of Court enter default against a party who has failed to plead or otherwise defend." *Cryptocurrency*, 473 F. Supp. 3d at 4 (citing Fed. R. Civ. P. 55(a)). Second, the plaintiff must then apply for a default judgment against the absent defendant. *Id.* (citing Fed. R. Civ. P. 55(b)).

A default judgment is available only when "the adversary process has been halted because of an essentially unresponsive party." *Doe v. Syrian Arab Republic*, No. 18-cv-66, 2020 WL 5422844, at *5 (D.D.C. Sept. 10, 2020) (internal citations omitted). "[D]efault judgment is warranted if a defendant is a 'totally unresponsive' party and its default is plainly willful, as reflected by its failure to respond, 'either to the summons and complaint, the entry of default, or the motion for default judgment.'" *Id.* (internal citations omitted). However, a notation of default by the Clerk of the Court against an unresponsive defendant does not automatically entitle a plaintiff to a default judgment. Rather, it is appropriate only if the complaint's well-pleaded allegations, accepted as true, state an adequate claim for relief. *See Marmaras v. Marafatsos*, No. 18-1236, 2019 WL 3414363, at *2 (D.D.C. July 29, 2019); *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26–27 (D.D.C. 2008). In other words, entry of default "'establishes the defaulting party's liability for the well-pleaded allegations of the complaint,' but not for allegations that are not sufficiently pleaded." *United States v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte Ltd.*, 368 F. Supp. 3d 10, 17 (D.D.C. 2019) (quoting *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011)). In that way, "'[c]onceptually, . . . a motion for default judgment is like a reverse motion to dismiss for failure to state a claim.'" *Doe*, 2020 WL 5422844, at *5 (alteration in original) (quoting *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015)).

Before a default judgment can be entered against a foreign sovereign, the FSIA requires a plaintiff to establish his or her "claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e)).  That evidence must also be admissible.  *Owens v. Republic of Sudan*, 864 F.3d 751, 786–87 (D.C. Cir. 2017), *vacated and remanded sub nom on other grounds.*, *Opati v. Republic of Sudan*, __ U.S. __, 140 S. Ct. 1601 (2020).  A court must "scrutinize the plaintiff's allegations and 'may not unquestioningly accept a complaint's unsupported allegations as true.'"  *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 152 (D.D.C. 2019) (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012)).  However, "[c]ourts take uncontroverted factual allegations that are supported by admissible evidence as true."  *Blank v. Islamic Republic of Iran*, No. 19-cv-3645, 2021 WL 3021450, at *6 (D.D.C. July 17, 2021) (internal citations omitted).  An evidentiary hearing is not required; rather, a "plaintiff may establish proof by affidavit."  *Compagnie Sahelienne d'Entreprise v. Republic of Guinea*, No. 20-cv-1536, 2021 WL 2417105, at *2 (D.D.C. June 14, 2021); *see also Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) ("In the absence of an evidentiary hearing, although the plaintiffs retain 'the burden of proving personal jurisdiction, [they] can satisfy that burden with a prima facie showing.' . . . [T]hey may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." (first alteration in original) (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991))).

Additionally, "the procedural posture of a default does not relieve a federal court of its 'affirmative obligation' to determine whether it has subject-matter jurisdiction over the action."  *Egypt Dep't of Def. v. Alboghdady*, No. 21-cv-1144, 2021 WL 3737682, at *3 (D.D.C. Aug. 24, 2021) (quoting *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996)).  The party seeking the default judgment is required to demonstrate that "the court has both subject-

matter jurisdiction over the action and personal jurisdiction over the absent defendant." *Radmanesh v. Gov't of Islamic Republic of Iran*, No. 17-cv-1708, 2019 WL 1787615 (D.D.C. Apr. 24, 2019), *aff'd sub nom. Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338 (D.C. Cir. 2021). And "'[e]ven if there are sufficient contacts for a court to assert personal jurisdiction over a defendant, it lacks power to do so unless the procedural requirements of effective service of process are satisfied.'" *Doe*, 2020 WL 5422844, at *6 (quoting *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 514 (D.C. Cir. 2002)).

If a court deems default judgment appropriate, it must independently determine the appropriate remedies. *See Pescatore v. Palmera Pineda*, 345 F. Supp. 3d 68, 70 (D.D.C. 2018) ("'[U]nless the amount of damages is certain, the court is required to make an independent determination of the sum to be awarded.'" (quoting *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001))). Specifically, "unlike a plaintiff's well-pleaded allegations as to liability, a court does not take factual allegations related to damages as true." *Doe*, 2020 WL 5422844, at *6. Rather, "a court makes its damages determination 'in light of the facts and the circumstances of the case at hand.'" *Id.* (quoting *SEC v. Whittemore*, 691 F. Supp. 2d 198, 209 (D.D.C. 2010)). "While the court may conduct a hearing to fix the amount of damages, it is not required to do so, 'as long as it ensure[s] that there [is] a basis for the damages specified in the default judgement.'" *Id.* (quoting *SEC v. China Holdings, Inc.*, No. 09-cv-2045, 2010 WL 11603046, at *2 (D.D.C. Sept. 24, 2010) (alterations in original)).

## IV.    DISCUSSION

Plaintiff filed her complaint on December 2, 2019. ECF No. 1. On March 9, 2020, Plaintiff requested the Clerk of the Court's assistance to effect service on Defendants pursuant to 28 U.S.C. § 1608(a)(3). ECF No. 4. When Defendants failed to respond within thirty days, Plaintiff, on June

25, 2020, requested the Clerk's assistance in effecting service pursuant to 28 U.S.C. § 1608(a)(4). ECF No. 7. Service was executed on Iran on October 27, 2020. ECF No. 12. Defendants had until December 26, 2020, to file an answer. *Id.* When Defendants failed to respond or file an answer by the deadline, Plaintiff filed an affidavit for entry of default against Iran on January 13, 2021.[10] ECF No. 13. The Clerk of the Court entered default on January 13, 2021. ECF No. 15 at 1. On December 5, 2022, Plaintiff filed the present motion for default judgment as to liability and for an award of non-economic and punitive damages.[11] ECF No. 31. A default judgment may be entered against a foreign sovereign defendant when (1) personal jurisdiction is properly exercised over the defendant; (2) subject matter jurisdiction over the claims is established; (3) the plaintiff has satisfactorily presented evidence establishing the defendant's liability to the plaintiff; and (4) the plaintiff has satisfactorily proven she is entitled to the monetary damages she seeks. *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017).

## A. Personal Jurisdiction

The Court first examines if effective service has been made pursuant to 28 U.S.C. § 1330(b), which governs personal jurisdiction over foreign sovereigns. That section provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the

---

[10] Plaintiff did not seek entry of default against IRGC. *See* ECF No. 13 at 1 (requesting "that the Clerk of Court enter a default by Defendant the Islamic Republic of Iran"); ECF No. 13-1 (referring in the affidavit in support of the request for entry of default only to a single "Defendant[,] the Islamic Republic of Iran"). Further, her motion for default judgment "request[s] that this Court enter default judgment against Iran," with no mention of the IRGC. ECF No. 31 at 1. However, cases have held that IRGC is "not a 'separate legal person,' but is a governmental entity," *Ben-Rafael v. Islamic Republic of Iran*, 718 F. Supp. 2d 25, 33 (D.D.C. 2010), and thus is "the foreign state itself," *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 59 (D.D.C. 2019). As such, there was no need for a separate entry of default against the IRGC, because it is not an entity distinct from the Islamic Republic of Iran. *See Holladay*, 406 F. Supp. 3d at 59 (stating that the IRGC "must in all cases be considered as the 'foreign state' itself" (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994))). Hereinafter, any references to Iran as a defendant should be read to include IRGC.

[11] Plaintiff filed an initial motion for default judgment in August 2021, ECF No. 19, but withdrew that motion after the Court found that it was deficient. *See* ECF Nos. 26, 30.

district courts have jurisdiction . . . where service has been made under section 1608 of this title."

28 U.S.C. § 1330(b). Service is made on a foreign state under section 1608 in one of four ways:

1. by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

2. if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

3. if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

4. if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). The methods of service provided in section 1608(a) "are listed in order of preference; plaintiffs must attempt the first method before proceeding to the next." *Doe*, 2020 WL 5422844, at *12. "'[S]trict adherence to the terms of 1608(a) is required' and 'neither substantial compliance, nor actual notice, suffice[s] under section 1608(a)(3) because Congress had mandated "service of the Ministry of Foreign Affairs, the department most likely to understand American procedure."'" *Id.* (quoting *Barot v. Embassy of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015)). As many litigants do in FSIA cases against Iran, Plaintiff successfully served Iran pursuant to Section 1608(a)(4).

Iran does not have a special arrangement for service with Plaintiff, nor has it "entered into any international convention governing service" of judicial documents, so sections 1608(a)(1) and 1608(a)(2) do not provide avenues for service. *See Blank*, 2021 WL 3021450, at *8 (finding that the methods of service set forth in Section 1608(a)(1) and (2) were unavailable to plaintiffs in FSIA action against Iran). So, on March 9, 2020, Plaintiff attempted service under section 1608(a)(3) and requested that the Clerk of the Court mail a copy of the summons and complaint to the Ministry of Foreign Affairs of Iran. *See* ECF No. 4-1. In support of her request for service under 1608(a)(3), Plaintiff noted that Iran has no diplomatic relations with the United States and that Congress has directed the Clerk of the Court to "send a copy of the summons, complaint, and a notice of suit, together with a translation of each (in this case, a Farsi translation)" pursuant to 28 U.S.C. § 1608(a)(3). See ECF No. 4-1 at 1. On March 10, 2020, the Clerk of Court mailed "[o]ne copy of the summons, complaint and notice of suit, together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested, to the head of the ministry of foreign affairs, pursuant to of 28 U.S.C. 1608(a)(3)." ECF No. 6 at 1. On June 17, 2020, Plaintiff sent a letter to the Clerk stating that no response was received from Defendants. ECF No. 7-1 at 1. Thus, service under 1608(a)(3) was unsuccessful and nothing more was required under that section. *See Doe*, 2020 WL 5422844, at *12 (concluding "[n]othing more was required for [the plaintiffs] to satisfy their obligations to attempt service under section 1608(a)(3)" after the Clerk of the Court mailed the documents and the Syrian Foreign Ministry refused delivery); *Ben-Rafael*, 540 F. Supp. 2d at 52 (holding that service under 1608(a)(3) was not possible and plaintiff's obligations were satisfied when delivery was attempted and recipient refused delivery).

Plaintiff then moved to the method of service prescribed by section 1608(a)(4) and requested that the Clerk mail two copies of the summons and complaint to the U.S. Department of

State.  *See* 28 U.S.C. § 1608(a)(4) (allowing resort to this method "if service cannot be made within 30 days under paragraph (3)"); ECF Nos. 7 & 7-1.  On June 29, 2020, the Clerk of Court mailed "[t]wo copies of the summons, complaint and notice of suit, together with a translation of each into the official language of the foreign state, by certified mail, return receipt requested, to the U.S. Department of State . . . pursuant to the provisions of 28 U.S.C. § 1608(a)(4)."  ECF No. 9.  On December 2, 2020, the State Department sent a letter to the Clerk stating that service was executed on Iran on October 27, 2020, through a diplomatic note delivered by the Foreign Interests Section of the Embassy of Switzerland in Tehran.  *See* ECF No. 12 at 1.  Accordingly, service on Iran was completed under section 1608(a)(4), and the Court therefore has personal jurisdiction over Iran. *See, e.g.*, *Blank*, 2021 WL 3021450, at *9 (finding that court had personal jurisdiction over Iran where "the United States Department of State stated in a letter that it had met the requirements for diplomatic service under § 1608(a)(4) by causing delivery of the summons, complaint, and notice of suit to Iran through Swiss channels").

### B.  Subject Matter Jurisdiction

The Court has personal jurisdiction over Iran, so the analysis now shifts to subject matter jurisdiction.  28 U.S.C. § 1330(a) grants district courts original subject matter jurisdiction in cases arising under the FSIA "without regard to amount in controversy" over (1) nonjury civil actions (2) as to any claim for relief *in personam* (3) against a foreign state (4) provided that the foreign state is not entitled to immunity under sections 1605 to 1607 of the FSIA.  *See* 28 U.S.C. § 1330(a); *see also Braun*, 228 F. Supp. 3d at 75.  A plaintiff's "burden of production to establish the court's jurisdiction" is "rather modest."  *Owens*, 864 F.3d at 784.

The first three elements are easily met here.  First, Plaintiff has not sought a jury trial.  *See* ECF No. 1, ¶ 1.  Second, Plaintiff is seeking *in personam* relief, rather than *in rem* relief (i.e., the

Court is being asked to exercise personal jurisdiction over Defendant as a legal person and not to exercise such jurisdiction over any property). *See id.*, ¶ 3; *see also Reed*, 845 F. Supp. 2d at 210 (finding "the court has personal jurisdiction over [Iran] as legal persons"). Third, Iran is a foreign sovereign. *See Braun*, 228 F. Supp. 3d at 87 n.3. The fourth requirement—that Defendant is not entitled to sovereign immunity under the FSIA—merits further analysis. Plaintiff argues that the FSIA's "terrorism exception" to sovereign immunity applies here because Iran took Alinejad-Ghomi hostage and tortured him. That exception provides, in pertinent part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking . . . if such act . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). A party seeking relief under this exception must establish the following: (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred," *id.* § 1605A(a)(2)(A)(i)(I); (2) "the claimant or the victim was, at the time the act . . . occurred a national of the United States," *id.* § 1605A(a)(2)(A)(ii)(I); (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration," *id.* § 1605A(a)(2)(A)(iii); and (4) an official, employee, or agent of the foreign state, while acting within the scope of his or her office, employment, or agency, engaged in an act of hostage taking or torture that caused personal injury or death, *id.* § 1605A(a)(1). The four requirements are addressed in turn.

### 1. Iran's Designation as a State Sponsor of Terrorism

The United States designated Iran a state sponsor of terror in January 1984 and it has remained so designated since that time. *See* Determination Pursuant to Section 6(i) of the Export

Administration Act of 1979—Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz); *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 59 (D.D.C. 2021) (noting that "the U.S. State Department designated Iran as a State Sponsor of Terrorism in 1984").

        2.        Plaintiff's Status as a U.S. National

Plaintiff was a U.S. national during the time in which she claims her brother was taken hostage and tortured. As used in section 1605A, a "national of the United States" is either a "citizen of the United States" or a "person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22). The only persons who are not U.S. citizens who "owe[ ] permanent allegiance to the United States" are "persons born in, or possessing a specified personal or parental connection with, an 'outlying possession of the United States,' presently defined as American Samoa and Swains Island." *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015) (quoting 8 U.S.C. § 1408(1)-(4)). Because Plaintiff has not shown any "specified personal or parental connection with" American Samoa or Swains Island, the only way she can qualify as a U.S. national is by being a U.S. citizen. Here, although Plaintiff came to the U.S. as an asylee in 2014, she did not become a citizen—and, thereby, a U.S. national—until October 17, 2019. See ECF No. 31-8 at 2 (showing a Certificate of Naturalization indicating that plaintiff became a naturalized United States citizen on October 17, 2019). She alleges that her brother has been detained by Iran since September 24, 2019.[12]

---

[12] The fact that Plaintiff was not a U.S. national for the entirety of her brother's detention does not divest the Court of subject matter jurisdiction. *See, e.g.*, *Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong*, 414 F. Supp. 3d 109, 125 n.9 (D.D.C. 2019) (finding that plaintiffs who "became naturalized citizens while [their family members] were held hostage" were U.S. nationals and had standing to sue under the FSIA).

Thus, in order for the Court to have subject matter jurisdiction over Plaintiff's claims, it must find that Iran tortured or took Alinejad-Ghomi hostage[13] on or after October 17, 2019.

### 3.     Reasonable Opportunity to Arbitrate

In order to sue under FSIA's terrorism exception, a plaintiff must also have provided the foreign state a "reasonable opportunity" to arbitrate the claim.  28 U.S.C. § 1605A(a)(2)(A)(iii); *see also Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 45 (D.D.C. 2018) ("[T]he FSIA 'does not require any particular form of offer to arbitrate, simply the extension of a reasonable opportunity.'" (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003)) ("*Simpson I*")).  Plaintiff has done so in this case.  On September 25, 2020—three months before Iran's answer was due—she mailed an offer to arbitrate to Iran's ambassador to the United Nations and to the Interests Section of the Islamic Republican of Iran in Washington, D.C.  ECF No. 31-11.  Evidently, Iran did not respond to the offer to arbitrate.  Section 1605A does not require more than that.  *See Asemani v. Islamic Republic of Iran,* 266 F. Supp. 2d 24, 25 (D.D.C. 2003) (finding that plaintiff "offered the foreign state a reasonable opportunity to arbitrate his claim" when he sent an arbitration offer "by certified mail to the Interests Section of the Islamic Republic of Iran"), *abrogated on other grounds by Lin v. United States*, 561 F.3d 503 (D.C. Cir. 2009).

### 4.     Terrorist Acts

The fourth and final requirement for establishing jurisdiction under the FSIA's terrorism exception is "the foreign state's commission of at least one" of the following "terrorist act[s]": "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support

---

[13] "Hostage-taking" is something of a term of art under the FSIA and can encompass not only initial seizure of an individual, but also the continuing detention of an individual.  *See* Section III.B.4.a, *infra*; *see also* 28 U.S.C. § 1605A(h)(2).

25

or resources for such an act." *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 135 (D.D.C. 2021); 28 U.S.C. § 1605A(a)(1). Here, Plaintiff has alleged that Iran's detention of her brother constitutes a hostage taking, and that he has been tortured during his detention. ECF No. 31 at 1 (seeking "to recover for severe personal injuries and other irreparable harm suffered as a result of Defendants' hostage taking and torture of her brother"). The Court need find that only one of those things—either hostage taking or torture—is true in order to have subject matter jurisdiction over Plaintiff's claims. *See Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 101 (D.D.C. 2019) ("To support a finding of subject-matter jurisdiction, the Court need only find that one of [the acts set forth in 28 U.S.C. § 1605A(a)(1)] were present as to each of the victims."). Here, Plaintiff has proffered sufficient evidence to show that Alinejad-Ghomi was tortured and the Court therefore dispenses with an analysis of whether he was taken as a hostage.

The FSIA incorporates the definition of "torture" from the Torture Victim Protection Act. 28 U.S.C. § 1605A(h)(7). Under that statute,

> (1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
>
> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—
>
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly   the   senses   or personality.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), *codified at* 28 U.S.C. § 1350 (note).  In cases such as this one, where the hostage has apparently been forbidden to contact the plaintiff, "there is often little direct evidence about precisely how he was treated by his abductors."  *Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 173 (D.D.C. 2020) [hereinafter *Levinson I*].  And that is by design:  of course, the persons or entities torturing hostages or other detainees often attempt to conceal their conduct to avoid accountability.  As the D.C. Circuit explained in 2017:

> [F]irsthand evidence of terrorist activities is difficult, if not impossible, to obtain. Victims of terrorist attacks, if not dead, are often incapacitated and unable to testify about their experiences. Perpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection. Eyewitnesses in a state that sponsors terrorism are similarly difficult to locate and may be unwilling to testify for fear of retaliation. The sovereigns themselves often fail to appear and to participate in discovery, as Sudan did here.

*Owens*, 864 F.3d at 787.

Yet, it would frustrate the compensatory and deterrent aims of the FSIA to allow foreign governments to evade liability simply because they have effectively hidden their misdeeds from public view.  *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) ("*Han Kim II*") (finding that requiring FSIA plaintiffs to "prove exactly what happened to" an absent hostage "would defeat the Act's very purpose . . . 'to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future.'" (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002))).  So, "this Circuit has held that in such cases—and when the hostage-takers have not appeared to answer for

their conduct—the Court may infer that a victim was tortured from 'compelling, admissible evidence' that the regime at issue routinely tortures its prisoners." *Levinson I*, 443 F. Supp. 3d at 173 (quoting *Han Kim II*, 774 F.3d at 1049). Such evidence includes "secondary materials and the opinions of experts." *Owens*, 864 F.3d at 787 ("With a dearth of firsthand evidence, reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception."); *see also id.* at 789 (explaining that *Han Kim II* "did not announce a categorical requirement of direct evidence in FSIA cases"). Indeed, "cases in this Circuit and in others have repeatedly sustained jurisdiction or liability or both under the terrorism exception to the FSIA and in other terrorism cases based solely upon" such secondary evidence. *Id.* at 788. In *Han Kim II*, the D.C. Circuit found that torture occurred where the only supporting evidence was expert testimony that the North Korean government routinely tortured prisoners in the type of labor camps to which the hostage was confined. 774 F.3d at 1049. Likewise, in *Owens*, "expert testimony" alone was enough to "meet the plaintiffs' burden of production on jurisdiction" and "connect the defendant sovereign to the extrajudicial killings." 864 F.3d at 789. So, too, in *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, where the D.C. Circuit upheld a finding of jurisdiction under the FSIA based solely upon the declaration of an expert witness. *See* 376 F.3d 1123, 1131–32 (D.C. Cir. 2004). Importantly, although the courts in *Owens*, *Han Kim II*, and *Kilburn* all relied on expert testimony in determining that the plaintiffs had satisfied their burden of production to establish the courts' subject-matter jurisdiction, the Court does not read those cases as categorically requiring expert testimony. As *Owens* explained, "[n]either § 1608(e) nor any other provision of the FSIA requires a court to base its decision upon a particular type of admissible evidence. As long as the evidence itself is admissible . . . and the court finds it satisfactory, its form or type is irrelevant." *Owens*,

864 F.3d at 788.  So, courts can properly "place[ ] great weight upon . . . admissible non-expert

evidence," as well.  *Id.* at 789 (citing *Han Kim II*, 774 F.3d at 1049).

More, because "the FSIA does not require this Court to relitigate issues that have already

been settled," courts can and do take judicial notice "'of related proceedings and records in cases

before the same court'" and of the "findings of other judges in this jurisdiction" when determining

FSIA jurisdictional issues.  *See Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C.

2009) (quoting *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 263 (D.D.C.

2006) ("*Heiser I*")).  Thus, *Brewer* concluded that Iran provided material support for extrajudicial

killings conducted by Lebanese militant group Hezbollah based in part on the conclusions reached

by other courts concerning Iran's connections to Hezbollah.  *Id.*; *see also Roth v. Islamic Republic

of Iran*, 78 F. Supp. 3d 379, 387 (D.D.C. 2015) (taking judicial notice of findings in other,

unrelated cases before different judges concerning Iran's "liability for state sponsorship of

terrorism"); *Bakhtiar v. Islamic Republic of Iran*, 571 F. Supp. 2d 27, 29 (D.D.C. 2008) (taking

"judicial notice of the findings of fact and conclusions of law in" a separate but related case before

a different judge), *aff'd*, 668 F.3d 773 (D.C. Cir. 2012).  Of course, courts cannot merely adopt the

findings reached in a prior, related case.  "Instead, courts in this district rely on the evidence

presented" in the other cases "and make their own independent findings of fact based on that

evidence."  *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 73 (D.D.C. 2014).  Taking judicial

notice in this manner is consistent with the "unusual degree of discretion" district courts have "over

evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism."  *Owens*, 864

F.3d at 785; *see also Han Kim II*, 774 F.3d at 1048 (noting that "the Supreme Court has

'recognize[d] very realistically' that courts have the authority—indeed, we think, the obligation—

to 'adjust [evidentiary requirements] to . . . differing situations'" (quoting *Bundy v. Jackson*, 641

F.2d 934, 951 (D.C. Cir. 1981) (citing *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973))). Further, courts may take judicial notice *sua sponte*. *See T. V. T. Corp. v. Basiliko*, 257 F.2d 185, 187 (D.C. Cir. 1958) (noting that courts "may, in proper circumstances, take judicial notice of court records not specifically presented . . . by the parties"); *see also Price v. Coll. Park Honda*, No. 05-cv-0624, 2006 WL 1102818, at *6–7 (D.D.C. Mar. 31, 2006) (taking judicial notice *sua sponte* of facts that concerned court's subject matter jurisdiction).

Here, the Court must ultimately "find[] it more likely than not that the Iranian government tortured" Alinejad-Ghomi at some point during his detention and after Plaintiff became a U.S. national in October 2019. *Levinson I*, 443 F. Supp. 3d at 173; *see also Bathiard v. Islamic Republic of Iran*, No. 16-cv-1549, 2019 WL 3412983, at *4 (D.D.C. July 29, 2019) (noting that the "FSIA does not demand unimpeachable evidence, but merely satisfactory evidence" that the foreign sovereign has engaged in terrorist activities). At the outset, the Court finds that Alinejad-Ghomi was arrested by the Iranian regime in or about September 2019 and detained in Evin Prison until August 2021. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████                              ECF No. 33-1, ¶¶ 2, 5. ███████

██████████ Alinejad-Ghomi was released on August 3, 2021.[14]  *Id.*, ¶ 16.  Plaintiff indicates that she has had little contact with her brother since September 2019, which, given their regular pattern

---

[14] It is not clear how ██████████ came by that information.  If he was informed by a verbal report from Alinejad-Ghomi or another individual, his statement would appear to be hearsay and therefore not admissible for the truth of the matter asserted.  *See* Fed. R. Evid. 801(c).  It seems unlikely that ██████████ has personal knowledge of the release, ██████████████████████  Nor is his information likely to be from some official document, ██████████ ECF No. 33-1, ¶ 16, and, in any case, no such document is part of the record here.  The only other report of Alinejad-Ghomi's release in the record comes from Plaintiff, who asserts that her brother's lawyer told her of the conditional release.  *See* ECF No. 31-3, ¶ 44.  Nevertheless, it is Plaintiff's burden to establish that Alinejad-Ghomi was detained and tortured and, as she appears to admit that Alinejad-Ghomi is no longer detained, the Court will credit that concession.

of communications prior to that time, suggests that Plaintiff's brother's freedom has been restricted. *See* ECF No. 31-3, ¶ 17 (describing how Plaintiff called her brother in September 2019 but received no answer); ¶ 26 (suggesting that Plaintiff has not heard from her brother via phone). Further, in July 2020, the Iranian authorities sentenced Alinejad-Ghomi to a total of eight years in prison. *See* ECF No. 31-23 at 5.[15]  This evidence is sufficient for the Court to determine that Plaintiff's brother was detained by the Iranian government in Evin Prison from approximately September 2019 to August 2021.[16]  The Court next turns to Plaintiff's claim that her brother was tortured by the Iranian government during that detention.  The Court concludes that the evidence presented establishes it is more likely than not that Alinejad-Ghomi was tortured while in detention, including during the period between October 2019 (when Plaintiff because a U.S.

---

[15] The Court may take judicial notice of an Iranian court's judgment under Fed. R. Evid. 201.  *See Han Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29, 35–36 (D.D.C. 2013) ("*Han Kim I*") (taking judicial notice of a South Korean court's judgment to establish that individual was abducted by foreign sovereign), *rev'd and remanded on other grounds*, *Han Kim II*,774 F.3d 1044 (D.C. Cir. 2014).  As in *Han Kim I*, "[a] declaration certifying under penalty of perjury that the translation of the decision is true and correct accompanies the decision," *see* ECF No. 31-23 at 6, which "suffices to establish its accuracy."  *Han Kim*, 950 F. Supp. 2d at 36.

[16] Plaintiff has set forth other evidence supporting the conclusion that her brother was arrested, but the Court finds that it is hearsay.  For instance, Plaintiff apparently spoke to her brother's daughter hours after he had been taken in September 2019; the daughter reported that Alinejad-Ghomi "had been taken away in blindfolds and handcuffs."  ECF No. 31-3, ¶ 17.  Plaintiff later received word from a friend in Iran that her brother was being held in section 2A of Evin Prison, "which is where the [IRGC] keep their political prisoners."  *Id.*, ¶ 20.  These statements appear to be hearsay—they are out-of-court statements offered to prove the truth of the matter asserted—and Plaintiff has not argued otherwise.  Similarly, a January 2020 report of the United Nation's Special Rapporteur on the situation of human rights in the Islamic Republic of Iran states that "[t]he arrest of one family member of prominent women's rights defender Masih Alinejad is emblematic of" Iran's "increasing pressure on families of human rights defenders."  ECF No. 31-26 at 11.  As supporting evidence, the report references a news article that reports Alinejad-Ghomi's arrest.  *Id.*  The news article, if considered alone, would also appear to be hearsay.  As is explained more fully below, the U.N. report itself and its conclusions are admissible under the public records exception to the hearsay rule.  Fed. R. Evid. 803(8).  However, "'[p]lacing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible.'"  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) (alteration in original) (quoting *Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 407 F. Supp. 2d 1304, 1315 n. 2 (S.D. Fla. 2005), *aff'd in part, vacated in part on other grounds*, 531 F.3d 1339 (11th Cir.2008)).  Yet only "[i]f inadmissible evidence alone substantiates an essential element of jurisdiction" does a court "abuse[ ] its discretion in concluding the claimant has established his case 'by evidence satisfactory to the court.'"  *Owens*, 864 F.3d at 786 (citing 28 U.S.C. § 1608(e)).  Here, because Plaintiff has presented other, admissible evidence that her brother has been abducted, the Court need not dwell on the inadmissible evidence she sets forth.

citizen) and his release in August 2021. *See Kar*, 2022 WL 4598671, at *16–17 (finding that the court had subject-matter jurisdiction to award damages to two plaintiffs only for the period after they became U.S. citizens).

Nevertheless, in making this determination, the Court must reject much of the argument and evidence Plaintiff offers to support her claim. For example, she asserts that Alinejad-Ghomi suffered pain and suffering sufficiently severe to constitute torture

> result[ing] from the denial of medical care for illnesses acquired in detention, such as a severe ear infection. His around-the-clock interrogations were never paused to tend to his illnesses, and he was never provided adequate specialist care. When he was eventually allowed to access the medical clinic in Evin Prison, he was only entitled to delayed and limited treatment. These repeated denials of adequate medical care resulted in the serious deterioration of his health.

ECF No. 31 at 21. To the extent that she relies on her declaration and that of ██████████

████, *see id.* at 21 n.82, that is insufficient because their descriptions of her brother's treatment while detained are inadmissible. To be sure, those declarants make factual assertions that Alinejad-Ghomi endured prolonged interrogations and was denied medical care. *See* ECF No. 31-3, ¶ 25 (Plaintiff asserting that her brother suffered an ear infection while at Evin Prison and was not allowed "access to the prison hospital or any medical staff"); ECF No. 33-1, ¶ 8 (████████████

████ asserting that "interrogations lasted between 8-12 hours, without interruption" and that Alinejad-Ghomi "became ill on many occasions," including with an ear infection, but "[t]he authorities refused him medical treatment and never provided him with specialists, causing his health to seriously deteriorate"). However, Plaintiff does not make clear how she learned that information. Elsewhere in her declaration, she asserts that while her brother was detained, what little she learned about his treatment came from her brother's friend Mihandoost, ████████

████, or family members; she learned "the rest" after his conditional release, but she does not identify from whom. ECF No. 31-3, ¶ 22. ████████████████ indicates that he learned of

the mistreatment from Alinejad-Ghomi himself.  ECF No. 33-1, ¶ 6.  But any statements that

Mihandoost, ███████, or family members made to Plaintiff concerning her brother's condition

are out of court statements offered for the truth of what they assert—in this particular instance,

that Alinejad-Ghomi was denied medical care—and are therefore hearsay; similar statements made

to ██████ by Alinejad-Ghomi are also hearsay.  *See Smith ex rel. Smith v. Islamic Emirate of*

*Afghanistan*, 262 F. Supp. 2d 217, 224 (S.D.N.Y. 2003) (explaining that "hearsay is an out-of-

court unsworn statement offered for the truth of the matter asserted"), *amended sub nom. Smith ex*

*rel. Est. of Smith v. Islamic Emirate of Afghanistan*, No. 01 Civ.10132, 2003 WL 23324214

(S.D.N.Y. May 19, 2003); *see also Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138,

175 (D.D.C. 2016) (explaining that the "latitude" afforded district courts in making evidentiary

rulings in FSIA default judgment actions "should not be read to permit a court to rely

on inadmissible evidence").  They are thus inadmissible unless they fall under one of the

exceptions to the hearsay rule found in Rules 803, 804, and 807 of the Federal Rules of Evidence,

and Plaintiff has not argued that any exceptions apply here.  The same evidentiary deficiencies

mar Plaintiff's reliance on assertions in those same two declarations that Alinejad-Ghomi was held

in solitary confinement for 225 days and that he suffered psychological torture from threats

interrogators made against him and his family.  *See* ECF No. 31 at 22–23 & nn. 85–86, 91–93.

The Court will therefore not consider these statements in resolving whether Plaintiff has garnered

sufficient evidence that her brother was tortured while detained.[17]

However, the foregoing allegations are not the sum total of Plaintiff's evidence.  Rather,

among the dozens of documents Plaintiff has submitted in connection with her motion, she singles

---

[17] The Court does not address whether Plaintiff's specific allegations of denial of medical attention, prison conditions, or psychological mistreatment would meet the definition of torture if properly supported by evidence.

out for discussion three that support her claims as to torture:  (1) the U.S. State Department's 2019 Country Report on Human Rights Practices in Iran (the "2019 State Department Report"), ECF No. 31-19; (2) a January 2020 report of the United Nation's Special Rapporteur on the situation of human rights in the Islamic Republic of Iran (the "2020 U.N. Report"), ECF No. 31-26; and (3) Amnesty International's 2019 Annual Report on Iran (the "2019 Amnesty International Report"), ECF No. 31-25.  *See* ECF No. 31 at 26–27.  In addition, Plaintiff cites in a footnote a U.S. State Department report published in 2018 by the Department's Iran Action Group titled "Outlaw Regime: A Chronicle of Iran's Destructive Activities" (the "2018 State Department Report"), ECF No. 31-33.  *See* ECF No. 31 at 27 n.104.  The Court first addresses the admissibility of these documents, and for those that are admissible, then turns to the evidence of torture contained therein.[18]

Plaintiff asserts that the 2019 State Department Report and the 2018 State Department Report are admissible under both Rule 803(8) as public records and under Rule 803(20) "to support assertions of historical record."  ECF No. 31-2 at 4, 6.  To be admissible under that hearsay exception for public records, the record must be from a "public office," contain "factual findings . . . from a legally authorized investigation," and must not "indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).  "Pursuant to the 'broad approach to admissibility' under Rule 803(8), a court may also admit 'conclusion[s] or opinion[s]' contained within a public record."  *Owens*, 864 F.3d at 792 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988) (alterations in original)).  The State Department is clearly a public office.  *See, e.g.*, 30B Charles Alan Wright, *et al.*, Federal Practice and Procedure § 6882 (2023 ed.) (noting that Rule 803(8) applies to federal offices and agencies).  The 2019 State Department Report contains factual findings concerning human rights

---

[18] Other documents cited only in footnotes as support for Plaintiff's claims of torture are addressed *infra* note 22.

issues in Iran and was created and submitted to Congress pursuant to Sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961. 22 U.S.C. § 2151n(d); 22 U.S.C. § 2304(b). Because the Report "bears no indicia of unreliability," the Court will admit it into evidence under Rule 803(8). *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 92 n.2 (D.D.C. 2019); *see Owens*, 864 F.3d at 792 (admitting a State Department Country Report on Terrorism under Fed. R. Evid. 803(8) because it "fit squarely within the public records exception" to the hearsay rule); *Sotloff*, 525 F. Supp. 3d at 131 n.10 (admitting a State Department Country Report on Terrorism under Fed. R. Evid. 803(8) because it "contain[s] factual findings and conclusions regarding terrorism in various countries compiled pursuant to [a federal statute], which requires annual reports on terrorism"). The 2018 State Department Report also includes factual findings concerning human rights issues in Iran but, rather than being created pursuant to a statutory mandate, appears to have been the product of an initiative within the State Department called the "Iran Action Group," which was created in August 2018 to carry out the Department's "new Iran strategy." Briefing on the Creation of the Iran Action Group, U.S. Department of State (Aug. 16, 2018), https://perma.cc/VE3F-6N65. However,

> courts do not interpret the "legal duty" provision [of Rule 803(8)] to require that a statute or other legal rule explicitly impose a duty on the declarant or agency to report a particular observation. "Rather, it suffices if the nature of the responsibilities assigned to the public agency are such that the record is appropriate to the function of the agency."

30B Charles Alan Wright, *et al.*, Federal Practice and Procedure § 6884 (2023 ed.) (footnote omitted) (quoting *United States v. Lopez*, 762 F.3d 852, 862 (9th Cir. 2014)). Under that standard, the 2018 State Department Report is included in the hearsay exception.[19]

---

[19] Plaintiff also cites Rule 803(20) to support the admissibility of both these reports. That exception applies to "Reputation Concerning Boundaries or General History" and provides that "[a] reputation in a community—arising before the controversy—concerning the boundaries of land in the community or customs that affect the land, or concerning general historical events important to that community, state, or nation" are admissible for the truth of the

The 2020 U.N. Report is also admissible under Rule 803(8).  The D.C. Circuit has recognized that the U.N. "satisfies the threshold requirement of Rule 803(10) that it be a 'public office.'"[20]  *United States v. M'Biye*, 655 F.2d 1240, 1242 (D.C. Cir. 1981).  Because Rule 803(8) is similarly limited to "[a] record or statement of a public office," the Court finds that the U.N. is also a "public office" as used in Rule 803(8).  *See id.* ("The U.N. is an organization composed of nation members. It would defy reason to suppose that such an organization, constituted of public entities of the highest political order, would not itself be a public agency.").  The 2020 U.N. Report was also created and submitted pursuant to U.N. authorization—specifically, U.N. General Assembly resolution 74/167.  *See* ECF No. 31-26 at 3 (stating that "[t]he present report[ ] [is] submitted pursuant to General Assembly resolution 74/167").  Although the Special Rapporteur who compiled the 2020 U.N. Report did not personally witness conditions inside Iran, this is because Iran has denied entry to U.N. human rights officials since 2005.  *See* ECF No. 31-19 at 40 (noting Iran's "continued failure to allow the [U.N. Special Rapporteur] into the country to investigate human rights abuses despite repeated requests").  More, the Special Rapporteur "met with victims of alleged violations" in both Europe and the United States.  ECF No. 31-26 at 3.  The Report therefore does not lack trustworthiness, and the Court will admit it into evidence.[21]

---

matter asserted.  Fed. R. Evid. 803(20).  The exception applies to "reputation" evidence, which has been defined as "sum[ming] up a multitude of trivial details" and "compact[ing] into the brief phrase of a verdict the teaching of many incidents and the conduct of years.  It is the average intelligence drawing its conclusion."  30B Charles Alan Wright, *et al.*, Federal Practice and Procedure § 6942 (2023 ed.) (quoting *Michelson v. United States*, 335 U.S. 469, 477 (1948).  The advisory committee explains that the exception of Rule 803(20) "is designed to facilitate proof of events when judicial notice is not available."  Fed. R. Evid. 803, advisory committee notes to proposed rules.  Because these records are admissible under Rule 803(8), the Court does not address this alternate basis for admissibility.

[20] In relevant part, Rule 803(10) provides an exception to the hearsay rule for statements that "a diligent search failed to disclose a public record or statement" if it is admitted to prove that "a matter did not occur or exist, if a *public office* regularly kept a record or statement for a matter of that kind."  Fed. R. Evid. 803(1)(A)(ii) (emphasis added).

[21] Other courts have similarly admitted U.N. documents.  *See, e.g.*, *Chavez v. Carranza*, 559 F.3d 486, 496 (6th Cir. 2009) (affirming the admission of a U.N. report under Fed. R. Evid. 803(8)); *Funk v. Belneftekhim*, No. 14-cv-376, 2018 WL 3536766, at *1 & n.1 (E.D.N.Y. May 16, 2018) (stating that a report of a U.N. Special Rapporteur was admissible under Fed. R. Evid. 803(8)); *Chavez v. Carranza*, 413 F. Supp. 2d 891, 905 (W.D. Tenn. 2005) (admitting

The Court, however, will not rely on the 2019 Amnesty International Report.  Plaintiff cites no provision of the hearsay rule and provides no intelligible basis for admitting this material; her sole argument is the opaque statement that it "is offered to demonstrate historical records of the Islamic Republic of Iran's conduct."  ECF No. 31-2 at 5.  It is too farfetched to believe that Plaintiff's use of the phrase "historical records" is meant to fit the 2019 Amnesty International Report into the exception for "ancient documents," which by its terms applies only to "documents prepared before January 1, 1998."  Fed. R. Civ. P. 803(16).  Plaintiff does not claim, as she has for certain other evidence, *see* note 19, *supra*, that the hearsay exception for "Reputation Concerning Boundaries or General History," Fed. R. Evid. 803(20), applies.  Nor can the report be admitted as a public record.  Amnesty International is a non-governmental organization.  *See Zubeda v. Ashcroft*, 333 F.3d 463, 466 (3d Cir. 2003) (characterizing Amnesty International as a "private organization[]"), *abrogated on other grounds by Auguste v. Ridge*, 395 F.3d 123 (3d Cir. 2005).  The report is therefore not admissible as "[a] record or statement of a public office."  Fed. R. Evid. 803(8); *see also Coalition for a Sustainable Delta v. FEMA*, 812 F. Supp. 2d 1089, 1097 (E.D. Cal. 2011) (finding that a report prepared by a non-governmental organization was not admissible under Fed. R. Evid. 803(8) "because it was not prepared by a government agency pursuant to a legal duty"); *United States v. Davidson*, 308 F. Supp. 2d 461, 475 (S.D.N.Y. 2004) (similar).  Unsurprisingly, then, other courts have also found Amnesty International reports to be hearsay and not admissible under various exceptions, including Rule 803(6) (business records) and 803(18) (learned treatises).  *See, e.g.*, *Glowczenski*, 928 F. Supp. 2d at 576; *Bachtel*, 2013 WL

---

U.N. report under Fed. R. Evid. 803(8)); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 505 F. Supp. 1125, 1187 (E.D. Penn. 1980) (admitting U.N. reports under Fed. R. Evid. 803(8) because "we see treatment of the U.N. and OECD as public offices or agencies as consistent with the theory and *raison d'etre* of 803(8)"), *rev'd in part on other grounds sub nom. In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238 (3rd Cir. 1983), *rev'd in part on other grounds sub nom. Mutsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

317538, at *5 (concluding that Amnesty International report was inadmissible hearsay). So, while the Court will consider the evidence that Iran routinely tortures its political prisoners set forth in the 2018 and 2019 State Department Reports and the 2020 U.N. Report, it will not consider similar evidence in the document published by Amnesty International. [22]

The 2018 State Department Report asserts that "[d]etainees in Iran face appalling conditions," including the "regular[]" use of physical and mental torture, "particularly in Iran's notorious Evin Prison, which hosts many of Iran's political prisoners." ECF No. 31-33 at 38. The 2019 State Department Report concludes that there were "[s]ignificant human rights issues" in Iran, including "numerous reports of . . . torture by government agents" and "harsh and life-threatening prison conditions." ECF No. 31-19 at 4. That Report further states that "[t]here were credible reports that security forces and prison personnel tortured and abused detainees and prisoners throughout" 2019 and that "[c]ommonly reported methods of torture and abuse in prisons

---

[22] In footnotes (and occasionally in text), Plaintiff mentions a number of other documents that purportedly support her allegations of torture; however, they are either inadmissible, of limited relevance, or both. For example, an Amnesty International news article about the arrest of her brother, ECF No. 31-28; *see also* ECF No. 31 at 27 n.103, is an out-of-court statement containing other out-of-court statements and therefore "cannot serve as evidence of the truth of the matter asserted." *Spotts v. United States*, 562 F. Supp. 2d 46, 54 (D.D.C. 2008); *see also, e.g. Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 123 (D.D.C. 2002) (concluding that news articles are hearsay and that "[t]t would be wholly inappropriate to permit" a FSIA plaintiff "to satisfy the requirement of 28 U.S.C. § 1608(e) by submitting an unsubstantiated newspaper article"); Fed. R. Evid. 805 (stating that hearsay within hearsay is admissible only "if each part of the combined statements conforms with an exception to the rule [against hearsay]"). Plaintiff attempts to salvage such evidence by stating that she "is not offer[ing] [it] for the truth of the matter asserted but as contextual insight into Plaintiff's career and political activities, and into the historical context of the Islamic Republic's conduct." *E.g.*, ECF No. 31-2 at 3. But that does not work, because in order to provide "context," historical or otherwise, the facts therein would have to be taken as true. Plaintiff also seeks admission of reports prepared by various NGOs—such as Amnesty International, the International Federation for Human Rights (FIDH), Human Rights Watch, and Freedom from Torture—to "demonstrate historical records of the Islamic Republic of Iran's conduct." ECF No. 31-2 at 5, 7, 9–11; *See also* ECF No. 31 at 18 nn.66–67, 27 n.103; ECF Nos. 31-29, 31-37, 31-47, 31-56. Not only is the meaning of that phrase unclear, but as discussed in the text above, such reports are also hearsay and do not appear to be admissible under any exception. Other documents may be admissible but are of limited relevance. The American Bar Association's 1989 report, ECF No. 31-46; *see also* ECF No. 31 at 18 n.65; and Amnesty International's 1987 report, ECF No. 31-48, *see also* ECF No. 31 at 18 n.68, both of which concern human rights violations by Iran, would, if properly authenticated, appear to be admissible under the hearsay exception of Rule 803(16) for "statements in ancient documents." However, they are unhelpful because they relate to a time period far removed from the allegations at issue here.

included threats of execution or rape, forced tests of virginity and 'sodomy,' sleep deprivation, electroshock, including the shocking of genitals, burnings, the use of pressure positions, and severe and repeated beatings." *Id.* at 8–9. It also notes that Evin Prison, where Alinejad-Ghomi was detained, was cited for its "use of cruel and prolonged torture of political opponents, particularly Wards 209 and Two of Evin Prison, reportedly controlled by the IRGC." *Id.* at 9. The 2019 State Department Report also credits accounts that "guards beat both political and nonpolitical prisoners during raids on wards, performed nude body searches in front of other prisoners," and "singled out political prisoners for harsher treatment." *Id.* at 11. Generally speaking, "[p]rison conditions" in Iran "were harsh and life threatening due to food shortages, gross overcrowding, physical abuse, and inadequate sanitary conditions and medical care." *Id.* Specifically, there were reports of "frequent water shortages, insufficient food, intolerable heat, unsanitary living spaces, poor ventilation, infestations with cockroaches and mice, chronic overcrowding, and prisoners being forced to sleep on the floor with little bedding in prisons throughout the country." *Id.* at 12. As to medical care, "[p]rison authorities often refused to provide medical treatment for pre-existing conditions, injuries that prisoners suffered at the hands of prison authorities, or illnesses due to the poor sanitary conditions in prison." *Id.* at 11.

The 2020 U.N. Report is similarly stark. The Special Rapporteur wrote that "detainees are being tortured or are suffering other forms of ill-treatment, sometimes to extract forced confessions." ECF No. 31-26 at 3. Interrogations, according to the Report, "include[e] beating, kicking, punching, slapping and suspension by the arms and legs." *Id.* at 15. The U.N. Report also describes denial of "access to medical care for detainees and prisoners," as well as "medical attention or transfers to hospital" that were "conditional upon confession." *Id.* Apparently, "prison infirmaries [in Iran] have poor, outdated and insufficient stocks of medicine and the relevant prison

staff are usually untrained or are unhelpful to prisoners, particularly political prisoners." *Id.* at 19. In addition, the U.N. Report contains several items relevant to the treatment of prisoners held in Evin Prison. One detainee, a gay rights activist, reported being kept in solitary confinement in a cell measuring two meters by three meters for nineteen days. *Id.* at 17. Another prisoner reported similar confinement for 83 days. *Id.* Another detainee at Evin Prison said he was not allowed to change clothes for three months. *Id.* at 18. Yet another prisoner reported that, "in order to have an appropriate level of nutrition, prisoners were forced to buy their own food, which was sold at a much higher price than in the markets outside the prison." *Id.*

The reports that Iran regularly engages in shockingly violent and abusive conduct toward its prisoners, including those in Evin Prison, are consistent with the findings of other courts in this District that have considered similar issues. Indeed, "[t]he courts of this District are— unfortunately—all too familiar with Iran's use of torture." *Levinson I*, 443 F. Supp. 3d at 174 n.21 (citing *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 175–78 (D.D.C. 2019); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 150–55, 159–61 (D.D.C. 2017); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 60–63, 66–69 (D.D.C. 2015)). In *Levinson I*, an expert opined that "Iran routinely tortures its prisoners," a finding the court credited. *Id.* at 174; *see also id.* at 173 ("The evidence in this case includes both direct evidence of Levinson's condition suggesting he was tortured and 'compelling evidence' that Iran routinely tortures its hostages."). Further, in *Azadeh v. Government of the Islamic Republic of Iran*, this Court received expert testimony that, at least as of 2017, "interrogators [at Evin Prison] routinely inflict various forms of torture, physical abuse and ill-treatment on the detainee. Such beatings and physical assault are carried out by the interrogators themselves. Interrogators sometimes use whips, clubs and other instruments during beatings." Expert Report of Hadi Ghaemi, ¶ 28, *Azadeh v. Islamic Republic of*

*Iran*, No. 16-cv-1467, 2018 WL 4232913 (D.D.C. Sept. 5, 2018), ECF No. 13-5. The same expert also concluded that it was "common practice for interrogators to carry out 'mock executions.' In such instances, the detainee is often taken to an outside space, such as the prison yard, where the interrogator threatens the detainee with a gun.[]" *Id.*, ¶ 30. Another expert in *Azadeh*—a former U.N. Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment—similarly testified that "the reports [his] office received detailing the conditions of imprisonment in Iran include some of the most egregious violations of human rights," including "solitary confinement, beatings, deprivation of adequate medical treatment, threats of imminent execution, and informing the inmates' family members that he/she would be executed." Expert Report of Juan E. Méndez, ¶ 26, *Azadeh*, 2018 WL 4232913, ECF No. 13-12. This Court credited those findings. *Azadeh*, 2018 WL 4232913, at *13. This Court and others have also recognized that Evin Prison is well-known for its inhumane conditions. *See id.* at *4 ("Evin is a notoriously brutal prison located in northwestern Tehran."); *see also Saberi v. Gov't of Islamic Republic of Iran*, 541 F. Supp. 3d 67, 79 (D.D.C. 2021) (citing expert's description of Evin Prison "as a 'notoriously frightening and evil' place"); *Hekmati*, 278 F. Supp. 3d at 150 ("Evin Prison in Tehran [is] notorious for cruel and prolonged torture of political opponents of the government." (citing U.S. Dep't of State, Iran 2012 Human Rights Report)); *Estate of Bayani v. Islamic Republic of Iran*, 530 F. Supp. 2d 40, 42 (D.D.C. 2007) ("Some parts of the Evin prison complex provide pleasant housing for public display, and other parts are used to hold political prisoners in solitary confinement where they are tortured."); *Dodge v. Islamic Republic of Iran*, No. 03-cv-252, 2004 WL 5353873, at *2 (D.D.C. Aug. 25, 2004) (describing Evin Prison as the "Bastille of Tehran"). Again, because "the FSIA does not require this Court to relitigate issues that have already been settled," *Brewer*, 664 F. Supp. 2d at 54, the Court will take judicial notice of the fact that other

courts in this District have concluded that Iran regularly tortures its prisoners and that Evin Prison is often the situs of such ill-treatment.

That evidence is bolstered by Professor Arab's expert report, which describes numerous incidents of the torture of prisoners in Iranian prisons, including Evin Prison, concluding that torture is a "common[] practice[]" in Iranian prisons and that Alinejad-Ghomi likely suffered torture while detained.  ECF No. 31-58 at 23–26, 33.  In *Kar*, Judge Bates found similar expert testimony from Professor Arab to be "compelling, admissible evidence that Iran routinely tortures the people it abducts" and therefore "sufficient for the Court to conclude that the pain and suffering [the detainee] endured while being held in Iranian detention centers was severe enough to constitute torture."  *Kar*, 2022 WL 4598671, at *10 (citing *Han Kim*, 774 F.3d at 1049); *see also Owens*, 864 F.3d at 789 (finding that "expert testimony" alone "suffice[d] to meet the plaintiffs' burden of production on jurisdiction").  The Court reaches the same conclusion here.

So, to recap, although Plaintiff has presented no direct, admissible evidence that her brother was tortured by the Iranian government, she has submitted admissible reports from the State Department and the United Nations that paint a bleak picture for detainees in Iranian prisons, including Evin.  As explained, the 2018 State Department Report concludes that "the regime regularly uses torture, particularly in Evin Prison, where Alinejad-Ghomi was held.  ECF No. 31-33 at 38.  The 2019 State Department Report finds that "[t]here were credible reports that security forces and prison personnel tortured and abused detainees and prisoners throughout" 2019, ECF No. 31-19 at 8, and that such treatment "included threats of execution or rape, forced tests of virginity and 'sodomy,' sleep deprivation, electroshock, including the shocking of genitals, burnings, the use of pressure positions, and severe and repeated beatings."  *Id.* at 9.  The 2020 U.N. Report also details widespread physical abuse, denial of medical treatment, and ill-treatment of

those housed in Evin Prison, including extended solitary confinement and limited access to food. *See* ECF No. 31-26.  This treatment is generally consistent with the type of conduct courts in this District have found rises to the level of torture.  *See, e.g.*, *Price*, 294 F.3d at 92–93 (explaining that torture includes "sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain"); *Kilburn*, 699 F. Supp. 2d at 152 (concluding that hostage taken by an Iranian-supported terrorist group experienced torture in the form of "beatings, unsanitary conditions, inadequate food and medical care, and mock executions"); *Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 66 (D.D.C. 2008) (former members of a crew of a United States Naval vessel captured by the North Korean government in 1968 were victims of torture where they were "provided inadequate rations of food and forced to live in unsanitary conditions" and subjected to "individual threats of death, threats to kill others, [and] severe beatings" in order to coerce them into signing confessions); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 97 (D.D.C. 2003) (finding that victim was tortured when his captors regularly beat him, threatened him with death, and confined him in "deplorable and inhumane conditions"), *abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004).  In addition, there are the numerous findings by this Court and others in this District that Iran regularly tortures political prisoners and other detainees.   One court has expressly credited expert testimony that "Iran routinely tortures its prisoners."  *Levinson I*, 443 F. Supp. 3d at 174.  Similarly, this Court has accepted and credited expert testimony that guards and interrogators at Evin Prison "routinely inflict" beatings, other physical assaults, and "mock executions" on detainees.  Expert Report of Hadi Ghaemi, ¶¶ 28, 30, *Azadeh*, 2018 WL 4232913, ECF No. 13-5.  This Court also has before it an expert report that it is Iran's common practice to torture detainees, *see* ECF No. 31-58 at 32,

43

and another judge in this District recently credited a similar report from Professor Arab and found that it supported a finding that a detainee in Iran was likely tortured, *see Kar*, 2022 WL 4598671, at *11.

The Court therefore finds, on the basis of the admissible evidence considered here, that it is more likely than not that Alinejad-Ghomi was tortured by the Iranian government during his period of detention and, therefore, that it has jurisdiction over Plaintiff's FSIA claim. *See Levinson I*, 443 F. Supp. 3d at 173 (finding that the court had subject matter jurisdiction over plaintiffs' FSIA claims where it was "more likely than not that the Iranian government tortured Levinson at some point since it took him hostage").

### C.     Iran's Liability Under the FSIA

Having addressed personal and subject-matter jurisdiction, the Court now must determine whether Plaintiff has established Iran's liability under a viable cause of action. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010). While section 1605A(c) offers a general private right of action, it "does not itself provide the 'substantive basis' for claims brought under the FSIA." *Force*, 464 F. Supp. 3d at 361. Rather, FSIA plaintiffs are also required "to prove a [specific] theory of liability." *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 175-76 (D.D.C. 2010) ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). To determine if plaintiffs have properly asserted a substantive basis for liability for their claims, the D.C. Circuit "rel[ies] on well-established principles of law, such as those found in Restatement (Second) of Torts." *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009); *see also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (using the Restatement of Torts "as a proxy for state common law" in determining

liability under the FSIA).  Here, Plaintiff asserts that Iran is liable for her emotional trauma as a family member of a torture victim under an intentional infliction of emotional distress ("IIED")/solatium theory.  The Court agrees.

"Under the FSIA, a solatium claim is indistinguishable from an IIED claim."  *Valore*, 700 F. Supp. 2d at 85; *see also, e.g.*, *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017).  Iran is liable for IIED if "by extreme and outrageous conduct [it] intentionally or recklessly causes severe emotional distress," both to the primary victim and/or "to a member of such person's immediate family who is present at the time."  *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) ("*Heiser II*")  (quoting Restatement (Second) of Torts § 46).  The "immediate family" includes one's "spouse, parents, siblings, and children."  *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 n.8 (D.D.C. 2001).  Although traditionally IIED requires the family member to be present at the event that resulted in the emotional distress, "the Restatement's caveat 'suggests that . . . "[i]f the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability," simply because the person was not present.  *Valore*, 700 F. Supp. 2d at 80 (quoting *Heiser II*, 659 F. Supp. 2d at 27).  So, Plaintiff may state a claim for IIED even though she was not present while Alinejad-Ghomi was tortured.  *See, e.g.*, *Rezaian*, 422 F. Supp. 3d at 179 (noting that "torture ha[s] been deemed sufficiently outrageous to inflict severe emotional harm on family members who were not present." (citing *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 49–50 (D.D.C. 2001))).

Iran's alleged conduct satisfies the requirements for IIED/solatium.  To start, "acts of terrorism—such as hostage taking, torture, and extrajudicial killing—are 'by their very definition' extreme and outrageous."  *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 140 (D.D.C.

45

2019) (quoting *Valore*, 700 F. Supp. 2d at 77); *see also Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) ("All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.").  Next, uncontroverted admissible evidence establishes that Plaintiff has suffered severe emotional distress during the period of Alinejad-Ghomi's detention, during which it is more likely than not that he was tortured. Plaintiff says that, since her brother's arrest, her sleep has been disrupted and she now has recurring nightmares, ECF No. 31-3, ¶ 20; she is racked with guilt knowing that she is, at least in part, responsible for her brother's detention, *id.*, ¶ 22; and that the loss, if even only temporary, of her brother has deprived her of her best friend, which has left her "devastated" and without her "bearings," *id.*, ¶ 27.  Plaintiff's declaration leaves no doubt that her brother's treatment in Iran has "hurt [her] deeply." *Id.*  The other declarations Plaintiff submitted, which include statements from her husband, colleagues, and friends, all report that Plaintiff's life has been totally upended by her brother's detention and treatment in Iran.  *See, e.g.*, ECF No. 31-4, ¶¶ 11–12 (noting that Plaintiff "was devastated by guilt" after her brother's arrest and explaining that she lost ten percent of her pre-arrest body weight); 31-5, ¶¶ 7–8 (reporting that Plaintiff was "despondent" following the arrest of her brother and her sleep remains "disturbed"); 31-6, ¶ 7 (explaining that Plaintiff "has difficulty focusing and is easily distracted from some of her projects.  On occasions she has had panic attacks and having tightness in her chest and difficulty breathing.  Her energy level and enthusiasm have diminished. She has complained of having trouble sleeping and has upsetting nightmares about her brother. Above all else, she has overwhelming feelings of guilt especially about her brother's children.").  Accordingly, the Court is satisfied that Iran is liable for intentional infliction of emotional distress to Plaintiff as the family member of a person tortured by Iran.  Other courts in this District have reached similar conclusions in like cases.  *See, e.g.*, *Abedini v. Islamic*

*Republic of Iran*, 422 F. Supp. 3d 118, 135 (D.D.C. 2019) (finding that the sister of a detainee who was tortured established an IIED claim against Iran where she "allege[d] that she underwent immense emotional pain as a result of her brother's abduction" and "had vivid nightmares of abductions and attacks"); *see also Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 62 (D.D.C. 2018) ("As the record shows, the abductions, torture, and murders of Fritz, Chism, Falter, and Al-Taie inflicted extraordinary suffering on all of their family members, whether those family members were brothers and sisters, mothers and fathers, or . . . half-siblings, step-siblings, or step-parents.").

### D.     Plaintiff's Damages

Now to the "undeniably difficult" matter of quantifying Plaintiff's damages. *Heiser I*, 466 F. Supp. 2d at 269. As explained, she has shown that Iran is liable to her for intentional infliction of emotional distress stemming from the torture of her brother while in Iranian custody. That emotional distress, Plaintiff contends, merits compensatory damages in the amount of $6.25 million and punitive damages in the amount of $150 million. *See* ECF No. 31 at 35, 40.

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Roth*, 78 F. Supp. 3d at 402 (alteration in original) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005)). In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injuries in similar cases. *See Reed*, 845 F. Supp. 2d at 214. As explained, "[c]ommon law claims of IIED provide for the same relief as the solatium claims pleaded by the Plaintiffs under § 1605A(c)." *W.A. v. Islamic Republic of Iran*, No. 18-CV-

1883, 2020 WL 7869218, at *13 (D.D.C. Mar. 23, 2020) (citing *Valore*, 700 F. Supp. 2d at 85), *report and recommendation adopted*, 2020 WL 7869211 (D.D.C. Apr. 11, 2020). Here, Plaintiff has made a successful claim for IIED on the basis of her relation to a person who has suffered torture at the hands of the Iranian government. So, "the specific damages awarded to [Plaintiff] may be decided using the same framework as solatium claims awarded in previous FSIA cases, and the court may consider precedent pertaining to both IIED and solatium claims." *Id.*.

        1.     Compensatory Damages

Turning first to compensatory damages, Plaintiff requests $6.25 million for her IIED/solatium claim. That amount comprises a "baseline" award of $1.25 million derived from the *Heiser* line of cases, plus a $5 million "enhancement" to account for her particularly close relationship with her brother and because she herself is a direct target of Iran's machinations. ECF No. 31 at 33–35.

Before determining the quantum of damages, however, the Court must first determine that "the consequences of the foreign state's conduct"—here, Plaintiff's severe emotional distress— were more likely than not to result from that conduct—here, the torture of Alinejad-Ghomi. *Roth*, 78 F. Supp. 3d at 402. The Court easily concludes, as many others have, that torture of an individual while in detention is reasonably certain to cause that individual's family members acute emotional distress. *See, e.g.*, *Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-0252, 2021 WL 723257, at *7 (D.D.C. Feb. 24, 2021) ("Each family member plaintiff has established . . . that their emotional distress was reasonably certain to occur as a consequence of the North Koreans' actions," including torture of their family members.); *Panahi v. Islamic Republic of Iran*, No. 19-cv-0006, 2020 WL 6591425, at *9 (D.D.C. Nov. 10, 2020) ("The Court concludes that

the torture of [plaintiff] was reasonably certain to cause emotional distress . . . to his former spouse and their children while he was detained in an Iranian prison."); *Warmbier*, 356 F. Supp. 3d at 55 ("[T]he plaintiffs have satisfactorily shown that North Korea's torture, hostage taking and extrajudicial killing of Otto was likely, and reasonably certain, to . . . devastate his family."); *Moradi*, 77 F. Supp. 3d at 72 ("The Court is also satisfied that [plaintiff's sister's] emotional distress 'was reasonably certain to occur' as a result of [plaintiff's] detention and torture."). The Court now addresses the amount of compensatory damages Plaintiff should receive.

To determine Plaintiff's IIED/solatium damages, the Court will follow the "majority of courts in this district [which] have adopted" the framework set forth in *Heiser* to determine how to quantify the emotional harm caused to family members by terrorist acts.[23] *Doe A-1*, 2021 WL 723257, at *8. "Under that framework, 'a spouse, child, or sibling may receive $4 million, $2.5 million and $1.25 million, respectively, for valid claims in which the family member survived the terrorist act.'" *Id.* (quoting *Reed*, 845 F. Supp. 2d at 214); *see also Kar*, 2022 WL 4598671, at *18 (noting that under the *Heiser* and *Peterson II* frameworks, "the standard damages awards for the immediate family members of a deceased victim are $5 million for parents, $2.5 million for siblings, $8 million for spouses, and $5 million for children. Those awards are typically halved for family members of an injured victim" (internal citation omitted) (quoting *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 270 (D.D.C. 2020))). "Although the *Heiser* framework was developed in the context of large-scale terrorist attacks, courts have also applied the framework in cases of hostage-taking or torture." *Moradi*, 77 F. Supp. 3d at 72 (applying *Heiser* framework in

---

[23] The *Heiser* framework is also known as the *Peterson II* framework, after *Peterson v. Islamic Republic of Iran* (*Peterson II*), which applied the *Heiser* amounts to family members of victims who died and halved those amounts for family members of surviving victims. 515 F. Supp. 2d 25, 51–52 (D.D.C. 2007), *abrogated on other grounds as recognized in Mohammadi*, 947 F. Supp. 2d at 65.

case where an individual had been unlawfully detained by the Iranian authorities and tortured during nearly six months of detention in an Iranian prison). Indeed, "[t]he framework has gained strong precedential support as other members of this court have repeatedly continued to follow it in FSIA cases." *Reed*, 845 F. Supp. 2d at 214; *see also Kar*, 2022 WL 4598671, at *18 (applying the *Heiser/Peterson II* framework to determine the measure of solatium damages); *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065, 2022 WL 2817730, at *45 (D.D.C. July 19, 2022) ("[R]ecent decisions hew close[ly] to the *Peterson II* framework."); *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361 (D.C. Cir. 2018) ("We recognize that many FSIA decisions issued by the District Court follow *Heiser*'s solatium damages model."); *Braun*, 228 F. Supp. 3d at 85 (describing the *Heiser* framework as "a commonly accepted standardized framework . . . for solatium damages"); *Valore*, 700 F. Supp. 2d at 85–86 (noting "strong precedential support" for the *Heiser* framework). All that said, nothing requires this Court to apply *Heiser*'s damages matrix, *see Fraenkel*, 892 F.3d at 361 ("We decline to impose *Heiser*'s framework as a mandatory scheme under the FSIA."), and even when *Heiser* is used, the "numbers serve only as an anchor from which the Court should deviate to compensate for specific circumstances." *Christie v. Islamic Republic of Iran*, No. 19-cv-1289, 2020 WL 3606273, at *26 (D.D.C. July 2, 2020); *see also Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, 'different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards.'" (quoting *Fraenkel v. Islamic Republic of Iran*, 258 F. Supp. 3d 77, 82 (D.D.C. 2017), *rev'd on other grounds*, 892 F.3d 348 (D.C. Cir. 2018)). Although there are myriad reasons why courts may elect to deviate from the *Heiser* framework, situations in which courts have awarded higher IIED/solatium damages include where "family members had an extraordinarily close relationship

to the victim; (2) [where] the family member's emotional trauma was particularly severe; and (3) [where] the circumstances of the attack made the suffering particularly agonizing for the family." *Abedini*, 422 F. Supp. 3d at 140 (internal citations and quotation marks omitted). In the interests of promoting consistency and ensuring that similar harm merits similar damage awards, this Court will apply the *Heiser* framework and deviate from it if appropriate. *See Warmbier*, 356 F. Supp. 3d at 58 (adopting the *Heiser* framework "in the interest of consistency"); *see also Kar*, 2022 WL 4598671, at *18 (noting that judges in this Circuit have applied the *Heiser*/*Peterson II* framework "[t]o bring some uniformity" to the damages awards in cases under the FSIA's terrorism exception); *Peterson II*, 515 F. Supp. 2d at 54 ("[T]he Court must take pains to ensure that individuals with similar injuries receive similar awards."). The Court does so with the understanding that *Heiser* is not binding.

The *Heiser* framework indicates that Plaintiff, as the sibling of a person who has survived an act of terrorism, is entitled to damages of $1.25 million on her IIED/solatium claim. *See, e.g.*, *Rezaian*, 422 F. Supp. 3d at 181 (concluding, in accordance with the "standard damages award for the pain and suffering experienced by family members of the victims of such crimes," that for sibling of individual who was detained and tortured by Iran, the baseline damages were $1.25 million); *Frost v. Islamic Republic of Iran*, No. 17-cv-603, 2019 WL 5110604, at *31 (D.D.C. Aug. 26, 2019) (recommending that siblings of still-living victim of torture be awarded $1.25 million), *report and recommendation adopted in part, rejected in part on other grounds*, 419 F. Supp. 3d 112 (D.D.C. 2020); *see also Moradi*, 77 F. Supp. 3d at 72–73 (adhering to *Heiser* formula in calculating IIED/solatium damages for wife of individual tortured in Iran). So $1.25 million is the baseline at which the Court will start in assessing whether there are special factors warranting an enhancement.

Plaintiff contends that her damages award should exceed the normal range. First, she says, her relationship with her brother is uniquely close because he was the only member of her family who regularly kept in touch with her as pressure mounted on her family to distance themselves from and denounce her. ECF No. 31 at 34. Second, she argues that she is differently situated than the typical sibling victim because "Iran's direct targeting of her 'appreciably worsen[s]' her pain and suffering." *Id.* at 31 (quoting *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006)). Third, as her declaration makes clear, Plaintiff suffers from the belief that she was the cause of her brother's detention and torture. *See* ECF No. 31-3, ¶¶ 22–23. The Court agrees that an upward departure from the *Heiser* baseline is appropriate here.

Plaintiff's relationship with her brother appears to transcend the normal bond between siblings. The fact that Alinejad-Ghomi became, at some point, the only family member in Iran who was willing to speak with Plaintiff—and did so on a near-daily basis—and the fact that he often acted as an intermediary between Plaintiff and the remainder of her family is suggestive of the "especially close relationship" that courts in this District have found merit an increase in IIED/solatium damages.[24] *See, e.g.*, *Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1, 11 (D.D.C. 2020) (awarding 20% enhancement to *Heiser* baseline figure to sibling of bombing survivor who

---

[24] The Court is aware that the law on awarding such enhancements to the family members of surviving terrorism victims is mixed. Some courts have held that an unusually close relationship between siblings is negated in the damages analysis by the fact of the victim's survival of captivity and return to their family. *See, e.g.*, *Abedini*, 422 F. Supp. 3d at 140 (declining to award an upward departure to sister of torture victim and noting that "[a]lthough the siblings appear to have a close relationship, this does not, standing alone, justify an upward departure beyond that intended to compensate the severe emotional injuries all siblings inevitably share in similar circumstances"); *Jenco*, 154 F. Supp. 2d at 38 (declining to increase IIED/solatium damages for siblings where the victim was "returned alive to be with his family" following his captivity). The Court is also mindful of the fact that a close relationship between the victim of terrorism and their family member is itself an element of a solatium claim. *Bova v. Islamic Republic of Iran*, No. 15-cv-1074, 2020 WL 2838582, at *8 (D.D.C. May 31, 2020) (noting that "solatium damages are not automatically conferred but are predicated on a finding of a 'close relationship'"). However, the Court is not convinced that the logic of *Abedini* and *Jenco* apply in this case because, in both of those cases, the torture victims were returned alive to enjoy the society of their families. Here, although Alinejad-Ghomi is alive and has been released from prison (at least temporarily), he is still largely lost to Plaintiff, who is unable to contact him.

spoke with the survivor for "at least two hours every day for three months" to assist in his recovery, with "severe negative consequences" for his own life, including loss of employment and relationships). As to the Iranian regime's targeting of Plaintiff herself, the decision in *Rezaian* is instructive. There, the court increased the solatium damages award to Ali Rezaian, the brother of the victim Jason Rezaian, from the baseline $1.25 million because, while holding Jason hostage in Evin Prison, "Iran surveilled Ali," thus "understandably[] increas[ing] [his] . . . emotional distress and paranoia." *Rezaian*, 422 F. Supp. 3d at 181. That is, his brother's damages award was enhanced based on offensive conduct directly targeting not the hostage and torture victim, but his family member. Finally, the Court agrees that an upward departure from the *Heiser* baseline is appropriate based on the unique circumstances of Alinejad-Ghomi's abduction and subsequent treatment—namely, that Plaintiff's political activism is a key reason why her brother was detained and, more likely than not, tortured. This is markedly different from the circumstances of detainment and torture other courts in this District have encountered. In those cases, the family members seeking damages for IIED/solatium rarely have anything to do with the individual's detention and treatment. For instance, when a U.S. soldier is taken hostage overseas—as is the case in a number of suits brought under the FSIA—it is highly unlikely that anything the soldier's family did led the foreign sovereign to abduct and mistreat the soldier. Not so in this case. Here, in addition to the already substantial emotional distress stemming from the knowledge of a loved one's detention and maltreatment, Plaintiff bears the added burden of knowing that it was likely her own conduct that led the Iranian authorities to detain and torture her brother. Indeed, other than his relation to and support for Plaintiff's activism, there appears to be no reason for Alinejad-Ghomi's detention or conviction. *See* ECF No. 31-23 (indicating that Alinejad-Ghomi's principal crime was supporting his sister's political activism). Plaintiff has indicated that the resulting

guilt—knowing that her own acts have condemned a sibling to years of detention and likely torture—is crushing. ECF No. 31-3, ¶ 22. The Court is of the view that these circumstances make Plaintiff's "suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 27 (D.D.C. 2011) ("*Oveissi II*").

The question is the proper measure of such an enhancement. Plaintiff seeks an additional $5 million—that is, she seeks an upward departure equal to four times her baseline damages award—for a total compensatory damages award of $6.25 million. That is far greater than the "relatively small" departures that have generally been approved in this Circuit for family members of victims of torture. *Kar*, 2022 WL 4598671, at *19 (quoting *Valore*, 700 F. Supp. 2d at 86); *see, e.g.*, *Valore*, 700 F. Supp. 2d at 86 (applying an upward departure of twenty-five percent to a sister's damages where her "emotional suffering stands out as particularly devastating" and included "several nervous breakdowns, at least one of which required hospitalization, from which she . . . never fully recovered). As support, Plaintiff points to three cases—*Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000); *Panahi*, 2020 WL 6591425; and *Levinson v. Islamic Republic of Iran*, No. 17-cv-00511, 2020 WL 7130164, at *15 (D.D.C. July 16, 2020) ("*Levinson II*"), *report and recommendation adopted*, 2020 WL 5834839 (D.D.C. Oct. 1, 2020)— but each is distinguishable. In *Anderson*, the court awarded $6.75 million to the child of an individual who was taken as a hostage and held for 2,454 days, during which he was tortured. 90 F. Supp 2d at 113. However, that award was to a child, not a sibling, of the victim. The *Heiser* framework places a higher value on the emotional distress of such family members as compared to siblings "to account for the natural differences between the two relationships." *Cf. Oveissi II*, 768 F. Supp. 2d at 28 ("[I]t is natural that a parent is likely to have a stronger bond and closer day-to-day relationship than, for example, a sibling of a victim . . . . Indeed, this is precisely the reason

why the starting point for parents of victims is higher than that of siblings on the *Heiser* scale—to account for the natural differences between the two relationships."). More, the victim was held for a significantly longer time than was Alinejad-Ghobi. Most critically, however, *Anderson* pre-dates the *Heiser* regime and its standardizing influence, and therefore is of limited assistance. *See, e.g.*, *Kar*, 2022 WL 4598671, at *19 (refusing to follow *Anderson* because it pre-dates the *Heiser* framework).

In *Panahi*, the court awarded $5 million to the minor children of a victim who was detained for over three years and tortured in an Iranian prison. 2020 WL 6591425, at *10. There, Saeed Abedini, the victim, provided the plaintiffs with updates during his detention detailing the physical and psychological torture he was suffering, eventually becoming paranoid and abusive; he also sustained lasting psychological damage, such that, after he was released, he threatened to take the children away from his then-wife and eventually divorced her, thus "increase[ing] the stress and suffering" that the children experienced. *Id.* at *8–9 (quoting the record). Again, that award was to the children (rather than the sibling) of a victim who was held for a longer period of time than Alinejad-Ghomi; it also sought to recompense aggravating factors not present here. More, the court did not purport to apply the *Heiser* framework; indeed, it cited the award in *Anderson* as a comparator. *Id.* at *10; *see Kar*, 2022 WL 4598671, at *19 (distinguishing a case in which the court awarded damages greater than the *Heiser* framework because it "determined the appropriate amount of damages in part by referring to . . . *Anderson*"). A more suitable comparison might be to *Abedini*, the case brought by the victim Saeed and his sister, in which the court did apply the *Heiser* framework and refused to increase the baseline $1.25 million by the $650,000 the sister requested because it found that no unusual circumstances were "acutely present" in the case. 422 F. Supp. 3d at 140.

The Court in *Levinson II* approved damage awards for the torture victim's wife and children that far exceeded the *Heiser* framework—$14 million for the victim's wife and $6.5 to the victim's children—due in part to the fact that they enjoyed "an especially close relationship" with their husband and father. 2020 WL 7130164, at *13. But those substantial departures from the *Heiser* framework were driven by factors not present here. Again, the plaintiffs in *Levinson II* were not the torture victim's siblings, but his spouse and children. Additionally, the victim in *Levinson II* had, at the time damages were being considered, been missing for 13 years—"the longest-held American hostage in history," over which time the family had "been subjected to . . . shifting and misleading explanations by U.S. and Iranian officials." *Id.* at *1, *15. Further, the family members in *Levinson* "had to watch a video and photographs of [their father], chained and in prison garb, begging for help." *Id.* at *15. As in *Panahi*, those aggravating factors are simply not present here. Instead, the Court will look to recent cases that have applied more moderate enhancements. In *Ben-Yishai v. Syrian Arab Republic*, the parents and younger siblings (as well as the estate) of a 16-year-old who was killed by a terrorist in Jerusalem sued Syria and Iran for materially supporting the organization that claimed responsibility for the shooting. __ F. Supp. 3d __, __, 2022 WL 17250344, at *1 (D.D.C. 2022). Granting the plaintiffs' motion for a default judgment, the court increased by 25 percent the baseline *Heiser* award for three of the victim's siblings to account for their documented and diagnosed psychological disorders brought on by the extrajudicial killing. *See id.* at *14. And in *Rezaian*, the baseline award of $1.25 million to the victim's brother was increased by 25 percent, noting that Iran had put the brother under surveillance, conduct that "goes well beyond a typical case of hostage taking." 422 F. Supp. 3d at 181. Some courts have approved increases greater than 25 percent. In *Neiberger v. Islamic Republic of Iran*, for example, the victim was a soldier who had been seriously injured in a terrorist

attack, suffering the loss of an arm and a brain injury that led to a brain infection.  No. 16-cv-2193, 2022 WL 17370239, at *16 (D.D.C. Sept. 8, 2022), *report and recommendation adopted*, 2022 WL 17370160 (D.D.C. Sep. 30, 2022).  The court awarded his sister an additional $750,000 (a 60 percent upward departure) in light of the severity of the injuries to her brother, which necessitated near-constant caretaking, and the fact that she had suffered a panic attack that required hospitalization.  *Id.*

This case seems most similar to *Rezaian* in that Plaintiff, like Jason Rezaian's brother, has been targeted by the Iranian regime.  The conduct here, however, includes a documented attempt to kidnap Plaintiff, which is even more alarming.  *See* ECF No. 31-3, ¶ 37.  More, as noted, Plaintiff has shown an especially close relationship with her brother and suffers from the guilt that she was responsible for his detention and torture, circumstances not, apparently, present in *Rezaian*.  So, the Court will depart upward from the standard *Heiser* figure by 33%, for a total of $1,662,500.

### 2.    Prejudgment Interest

Plaintiff also seeks prejudgment interest on the compensatory damages award.  ECF No. 31 at 35–36.  The decision to award such interest "is subject to the discretion of the court and equitable considerations." *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (internal quotation marks omitted) (quoting *Motion Picture Ass'n of Am. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992)); *see also Forman v. Korean Air Lines, Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996).  "When an award without prejudgment interest fully compensates a plaintiff, an award of prejudgment interest no longer has the intended compensatory purpose and should be denied." *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012) (quoting *Price*, 384 F. Supp. 2d at 135).

Courts in this Circuit are split on the award of prejudgment interest in FSIA cases. Some have made such an award where there was a significant delay between the attack and relief given. *See, e.g.*, *Reed*, 845 F. Supp. 2d at 214 (citing *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263-65 (D.D.C. 2008)). Other courts have rejected that justification, reasoning that the *Heiser* framework reflects the appropriate level of total, just compensation. *See, e.g.*, *Wyatt*, 908 F. Supp. 2d at 232 ("[P]ain and suffering and solatium damages are both designed to be fully compensatory."). In line with that latter view, "the majority of Judges on this Court to consider the issue of prejudgment interest for FSIA damages awards have held 'the "values set by" the *Heiser* framework "represent the appropriate level of compensation, regardless of the timing of the attack,"'" and therefore deny requests for prejudgment interest on solatium damages. *Blank*, 2021 WL 3021450, at *14 (quoting *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020) (collecting cases)); *see also Selig*, 573 F. Supp. 3d at 77 ("[T]he overarching tide of persuasive precedent . . . plainly weighs against awarding prejudgment interest." (alterations in original) (quoting *Akins v. Islamic Republic of Iran*, 549 F.Supp.3d 104, 121 (D.D.C. 2021))). More, as shown by a report and recommendation adopted by then-District Judge Ketanji Brown Jackson, the undersigned adheres to the view that prejudgment interest should not be awarded on solatium damages awarded under the *Heiser* framework. *See Doe v. Syrian Arab Republic*, No. 18-cv-0066, 2020 WL 5422844, at *18 (D.D.C. Sept. 10, 2020). The Court therefore denies Plaintiff's request for prejudgment interest.

### 3.    Punitive Damages

Plaintiff seeks $150 million in punitive damages from Iran. ECF No. 31 at 40. "Punitive damages are not meant to compensate the victim, but instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future."

*Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56 (D.D.C. 2012). "Four factors are relevant in deciding the level of punitive damages appropriate in a given case: '(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.'" *Selig*, 573 F. Supp. 3d at 75 (quoting *Estate of Steinberg v. Islamic Republic of Iran*, No. 17-cv-1910, 2019 WL 6117722, at *9 (D.D.C. Nov. 18, 2019)).

Here, each of those factors counsel in favor of awarding punitive damages. Torture itself is appalling; torture of a prisoner whose only crime appears to have been his relation to a political activist—his sister—and his support for her is unquestionably beyond the pale. And although Iran has not done direct physical harm to Plaintiff, they have wreaked havoc on her emotional health and wellbeing, almost certainly intentionally. Further, "[t]here is a need for deterrence because, time and again, courts in this district have been confronted with families shattered by" Iran's wanton cruelty to its prisoners. *Selig*, 573 F. Supp. 3d at 75. Finally, the defendant, "as [a] state actor[], can be presumed to possess significant wealth." *Christie*, 2020 WL 3606273, at *21; *see also Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016) ("Iran is a sovereign and has substantial wealth.").

There are several different potential methods to calculate punitive damages in FSIA cases. "The first is to 'multiply the foreign state's annual expenditures on terrorism by a factor between three and five.'" *Selig*, 573 F. Supp. 3d at 75 (quoting *Braun*, 228 F. Supp. 3d at 87). "A second approach is to award each family of a decedent $150 million in punitive damages." *Id.* "Third, some courts in this district have calculated the total compensatory damages awarded for a victim and then multiplied that award 'by a factor between one and five.'" *Id.* (quoting *Fritz*, 324 F. Supp. 3d at 65). Fourth, some courts have awarded punitive damages equal to the amount of

compensatory damages. *See, e.g.*, *Blank*, 2021 WL 3021450, at *13 (awarding punitive damages equal to compensatory damages); *Panahi*, 2020 WL 6591425, at *12 (same); *Christie*, 2020 WL 3606273, *28 (same).

      The Court can easily rule out two of the four methods. The first, whereby punitive damages are calculated by using a multiple of the foreign sovereign's annual funding for terrorist activities, will not work in this case because Plaintiff has provided no evidence on the value of Iran's expenditures on terrorism. *See Selig*, 573 F. Supp. 3d at 76 (declining to apply the first method where plaintiffs failed to "provide an estimate of Iran's wealth or its annual expenditures on terrorism"). Likewise, the Court will not apply the third method—using a multiplier of compensatory damages to calculate punitive damages—because only "[a] minority of judges in this jurisdiction follow this approach" and, more, Plaintiff does "not ask the Court to award punitive damages this way." *Id.*; *see also Abedini*, 422 F. Supp. 3d at 142 ("[T]he method of applying a court-determined multiplier of compensatory damages was only utilized in a special circumstance during actions against Iran by hundreds of plaintiffs who were family members or victims themselves of the Beirut bombing.").

      Rather, Plaintiff adheres to the second method and requests a flat punitive damages award of $150 million. ECF No. 31 at 39–40. As this Court and others have explained, however, the $150 million figure is most appropriate in cases where the victim of terrorism has died. *See W.A.*, 2020 WL 7869218, at *20 ("The weight of the case law indicates that in cases where at least one of the plaintiffs dies the [$150 million] lump sum approach is used."); *see also Saberi*, 541 F. Supp. 3d at 87 (rejecting the $150 million lump sum approach in case involving surviving victim of torture because "that method 'is more typically employed when similar conduct has never been litigated or in cases of terrorist attacks more deadly than what happened here'" (quoting *Frost*, 419

F. Supp. 3d at 117)); *Doe A-1*, 2021 WL 723257, at \*10 (similar); *Doe*, 2020 WL 5422844, at \*17 (rejecting the $150 million lump sum approach because it "is typically used in cases where, unlike here, at least one of the plaintiffs dies").  Alinejad-Ghomi is fortunately not dead, and the circumstances here, though undeniably tragic, do not approximate the mass terrorism events that regularly garner nine-figure punitive damages.

To be sure, *Rezaian* bucked this trend and awarded the Plaintiffs—the direct victim of hostage taking and torture and his brother and mother—a total of $150 million in punitive damages. 422 F. Supp. 3d at 184.  However, as at least one other court has noted, *Rezaian* is not on all fours with situations where, as here, the family members of the victim of the terrorist act—not the direct victim themselves—are seeking damages under the FSIA.  *Panahi*, 2020 WL 6591425, at \*12.  As noted, in *Panahi*, the plaintiffs were the divorced wife of a survivor of hostage taking and torture in Iran, and her two children.  They sought three separate awards of $150 million each in punitive damages.  *Id.*  The court rejected that approach and the application of *Rezaian*.  In that case, the court reasoned, "Jason Rezaian himself was one of the claimants," whereas the plaintiffs in *Panahi* were the ex-spouse and children of the direct victim.[25]  *Id.*  So it is here, where a family member of the primary victim—not the primary victim himself—is before the court.  *Panahi* accounted for this by awarding punitive damages in an amount equal to the plaintiffs' compensatory damages.[26] *Id.*

---

[25] In *Panahi*, the court noted that the primary victim of the terrorist acts had "already obtained a punitive damage award against Iran to punish it for its action" in *Abedini*, which obviously has not happened here.  2020 WL 6591425, at \*12.  But the fact that Alinejad-Ghomi himself has not brought a claim against Iran and may never do so does not license this Court to expand Plaintiff's punitive damages award beyond reasonable limits.

[26] *Levinson II* went even further than *Rezaian*, awarding all nine plaintiffs—family members of the ostensibly still-living direct victim—$150 million each in punitive damages.  *Levinson II*, 2020 WL 5834839, at \*3.  *Levinson II* is an outlier in that regard, and although similar to this case in many respects, the Court declines to follow its lead on punitive damages.

Additionally, the $150 million flat-award approach has recently been criticized "for its inflexibility." *Selig*, 573 F. Supp. 3d at 76 (citing *Christie*, 2020 WL 3606273 at *22 ("[The flat-award method] trades discretion for predictability[.]"), and *Abedini*, 422 F. Supp. 3d at 142 ("[The flat-award method] limits a judge's discretion to tailor a punitive award appropriate to the magnitude of the underlying injury[.]").  More importantly, it is just not clear that massive punitive damage awards like the one requested by Plaintiff are having any real deterrent effect on the Iranian regime.  *See Christie*, 2020 WL 3606273, at *29 (noting "'the lack of any evidence that high awards have successfully deterred' Iran" (quoting *Bluth*, 203 F. Supp. 3d at 26)).  By now, Iran's total liability stemming from FSIA judgments totals well over $10 billion, and "[a]dding hundreds of millions of dollars to that amount in this case is not likely to have a meaningful deterrent effect."[27]  *Id.* (noting that, in 2009, one court calculated that "Iran had '10 billion . . . outstanding court judgments' in FSIA cases" and that this "amount has surely ballooned over the last decade" (quoting *Iran Terrorism Litig.*, 659 F. Supp. 2d at 37)).  For all these reasons, the Court declines to award Plaintiff $150 million in punitive damages.

The final method for calculating punitive damages would simply have punitive damages mirror compensatory damages.  Numerous courts with facts similar to those here have followed this method, even where the amount of compensatory damages was, as in this case, relatively low. *See, e.g.*, *Panahi*, 2020 WL 6591425, at *12 (awarding victim's ex-wife and children equal amounts of compensatory and punitive damages in case where victim survived torture in Iranian prisons); *Abedini*, 422 F. Supp. 3d at 142 (awarding victim's sister equal amounts of compensatory and punitive damages ($1.27 million) in case where victim survived torture in Iranian prisons); *Moradi*, 77 F. Supp. 3d at 73 (awarding victim's wife equal amounts of compensatory and punitive

---

[27] Indeed, in *Levinson II* alone, the Court awarded plaintiffs over $1.3 billion in punitive damages against Iran. *Levinson II*, 2020 WL 5834839, at *3.

damages ($4 million) in case where victim survived torture in Iranian prisons).  In *Abedini*, for instance, the Court awarded one plaintiff—the sister of a surviving torture victim—$1,273,858 in compensatory damages on her IIED/solatium claim and an identical amount in punitive damages. 422 F. Supp. 3d at 142.  Much as in this case, the victim in *Abedini* was detained while in Iran, kept in Evin Prison, and subject to both physical and psychological torture.  *Id.* at 127.  After more than three years in captivity, he was released, and he and his sister sued Iran under the FSIA.  *Id.* His sister established Iran's liability for IIED/solatium; similar to Plaintiff here, she suffered "immense emotional pain as a result of her brother's abduction" and "had vivid nightmares of abductions and attacks, and she uprooted her life in England and moved to the U.S. out of fear that Iran was tracking her whereabouts."  *Id.* at 135.  Given the similarities of this case and *Abedini* and the strong interest in promoting consistency by awarding similar awards in similar cases, the Court calculates Plaintiff's punitive damages by reference to her compensatory damages.  *See, e.g.*, *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 97 (D.D.C. 2014) (awarding "punitive damages in an amount equal to the total compensatory damages" where "[d]oing so will result in a punitive damage award consistent with the punitive damage awards in analogous cases").  Not only does this approach have "the merit of following Supreme Court precedent on punitive damages,"[28] *Selig*, 573 F. Supp. 3d at 77, the "method of doubling the compensatory damages also provides 'a bad man' with a modicum of predictability," *Abedini*, 422 F. Supp. 3d at 142. And, importantly, equalizing compensatory and punitive damages still acts as a "forceful deterrent against Iran's further support" and commission of terrorist acts.  *Sheikh*, 485 F. Supp. 3d at 273.

---

[28] In *State Farm Mutual Automobile Insurance Co. v. Campbell*, the Supreme Court held that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  538 U.S. 408, 425 (2003).  Although Iran, as a foreign sovereign, has no rights under the Fifth Amendment's Due Process Clause, courts adjudicating FSIA matters have looked to the constitutional limits on punitive damages inasmuch as those guardrails "embody general concerns for fairness and consistency."  *Flanagan*, 87 F. Supp. 3d at 126 n.37.  Like those courts, this Court, too, finds those limits instructive.

Thus, the Court will grant Plaintiff $1,662,500 million in punitive damages, for a total award of $3.325 million.[29]

## CONCLUSION

Despite Iran's failure to participate in these proceedings, Plaintiff has established its liability under the FSIA. Plaintiff has proffered enough admissible evidence to conclude that Alinejad-Ghomi was taken as a hostage and likely subjected to torture. That gives the Court subject-matter jurisdiction over her claims. Plaintiff also demonstrated that Iran is liable to her for IIED—there is no doubt that she has suffered substantial emotional harm as a result of her brother's detention and treatment in Iran. However, the compensatory damages Plaintiff requested for her emotional harm significantly exceed the standard limitations for such harm. Nonetheless, she is entitled to an upward departure from that standard *Heiser* framework due to her uniquely close relationship with her brother, her feelings of responsibility for his detention and torture, and the Iranian regime's conduct against her that exacerbated her suffering. An equal amount of punitive damages is likewise appropriate. Accordingly, it is hereby

**ORDERED** that Plaintiff's motion for default judgment against the Islamic Republic of Iran is **GRANTED** and Plaintiff shall be awarded a total of $3.325 million in overall damages. A separate Order embodying this damages award will be entered pursuant to Rule 58(a) of the

---

[29] The Court notes that this is nearly $800,000 more in total damages than the victim's sister in *Abedini* received for relatively similar emotional harm resulting from relatively similar conduct. All that materially separates this case from that one is the unique relationship shared by Plaintiff and Alinejad-Ghomi and the fact that Iran has targeted Plaintiff herself.

Federal Rules of Civil Procedure contemporaneously with this Memorandum Opinion and Order.[30]
It is further

      **ORDERED** that Plaintiff's motions to file the unredacted version of her declaration under seal, ECF No. 32, and her motion to file the unredacted version of the declaration of Alinejad-Ghomi's attorney, ECF No. 33, are **GRANTED**.  It is further

      **ORDERED** that, because this Memorandum Opinion and Order includes information that Plaintiff has filed under seal related to the identity of ███████████, it, too will be filed under seal.  It is further

      **ORDERED** that, on or before July 20, 2023, Plaintiff shall file, under seal, a version of this Memorandum Opinion and Order for filing on the public docket that includes proposed and targeted redactions—subject, of course, to the Court's approval of those redactions.

      **SO ORDERED.**

Digitally signed by G.
Michael Harvey
Date: 2023.07.06
13:28:04 -04'00'

Date:  July 6, 2023

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

---

[30] Although Plaintiff also sued additional Defendants—specifically the Judiciary of Iran and the Supreme Leader—the Court finds that she has abandoned any claims against those Defendants by failing to prosecute them; they are therefore dismissed without prejudice.